## IN THE UNITED STATES DISRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION<br><br>*Plaintiff*,<br><br> v.<br><br>ENBRIDGE INC.,<br>ENBRIDGE ENERGY PARTNERS, LP<br>ENBRIDGE ENERGY COMPANY, INC., and<br>ENBRIDGE ENERGY, LP<br><br>*Defendants*. | Case No. 3:19-cv-00602<br><br>Judge William M. Conley<br>Magistrate Judge Stephen Crocker |

## <u>JOINT RULE 26(f) PRETRIAL REPORT AND PROPOSED DISCOVERY PLAN</u>

Pursuant to Federal Rule of Civil Procedure 26(f) and this Court's Standing Order Governing Preliminary Pretrial Conferences, Plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of The Bad River Reservation ("Plaintiff," the "Bad River Band," or the "Band") and Defendants Enbridge Inc., Enbridge Energy Partners, LP, Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership (collectively "Defendants" or "Enbridge") submit the parties' Joint Rule 26(f) Preliminary Pretrial Conference Report and Proposed Discovery Plan.[1]

Counsel for the parties held telephone conferences on October 3, 16, and 21, 2019 and discussed in good faith those matters set forth in Rule 26 and the Court's Standing Order. The parties have reviewed and consented to the filing of this Joint Rule 26(f) Pretrial Report and Proposed Discovery Plan.

---

[1] The parties have filed a stipulated motion to dismiss without prejudice Plaintiffs' claims against Defendants Enbridge Inc. and Enbridge Energy Partners, LP. *See* D.E. 35.

## I.    STATEMENT OF THE NATURE OF THE CASE

### A.    Bad River Band Statement of the Case

The Band contends that Defendants:

a)   Are maintaining a public nuisance by operating a crude oil pipeline within the Band's Reservation under conditions known to pose a serious risk of pipeline failure;

b)   Are in trespass, by operating the pipeline over numerous parcels of land with respect to which they have no easement or other valid right of occupancy as the pipeline easements pertaining to those parcels expired in 2013; and

c)   Are subject to the inherent sovereign authority of the Band to investigate, license, and regulate the presence and operation of the pipeline within the Band's Reservation.

The Band seeks declaratory relief affirming the foregoing allegations, ejectment of Defendants, their pipeline, and the oil that flows through it from the Reservation, and injunctive relief requiring Defendants to cease operation of the pipeline on the Reservation and to remove it therefrom.  The Band's claims and requests for relief are stated more fully in its First Amended Complaint.

### B.    Enbridge Statement of the Case

Enbridge's position is stated in its Answer, Affirmative Defenses, and Counterclaims that was filed with the Court on September 24, 2019, in which it denies Plaintiff's claims.[2]  Enbridge is of the view that the Band cannot maintain any nuisance claim as a matter of law, and regardless, there is no nuisance that has been or is currently caused by Line 5's operation and maintenance on the Reservation.  The Band's nuisance claims ignore the current condition of Line 5 and its fitness for service, including at the Slope 18 and meander locations identified by the Band.  The Band's allegations that Line 5 presents a safety risk flies in the face of the fact that Enbridge operates the pipeline in full compliance with the federal safety regulations administered and enforced by its exclusive safety regulator, the U.S. Department of Transportation, Pipeline and Hazardous

---

[2] In light of Plaintiff's filing of its First Amended Complaint on October 15, 2019, Enbridge will file an updated Answer, Affirmative Defenses, and Counterclaim on or before October 29, 2019.

Materials Safety Administration ("PHMSA").  At all times, Enbridge operates and maintains Line 5 in accordance with the regulations found at 49 C.F.R. Parts 194 and 195, which PHMSA promulgated pursuant to its authority under the Pipeline Safety Act, 49 U.S.C. §§ 60101, et seq. PHMSA requirements allow for the continued operation of Line 5 even in light of the alleged safety risks that the Band claims may occur at some point in the future at the meander and at Slope 18; put differently, no facts asserted by the Band constitute a safety condition that triggers any excavation or repair requirements established by PHMSA pursuant to its exclusive regulatory authority.

The Band's safety-related allegations also ignore a number of highly-effective safety measures such as: the sophisticated technology used to inspect liquids pipelines (both internally and externally); the use of cathodic protection to prevent corrosion to the pipe exterior; the circumstances and frequency under which integrity "digs" are conducted to inspect, repair, and replace integrity threats; the continual operation and maintenance of a Supervisory Control and Data Acquisition ("SCADA") and a Material Balance System ("MBS"), and associated alarms, which notify an operator of a potential release; and the implementation of emergency response measures, consistent with federal requirements specified under the Oil Pollution Act of 1990, to timely and effectively respond to a release.

Enbridge operates and maintains Line 5 in a manner to ensure its safe operation.  Enbridge seeks at present to timely complete all maintenance activities, which encompass and fully respond to the conditions within the Reservation boundaries that the Band wrongly asserts constitute a nuisance.  Once all such activities are completed by Enbridge, the maintenance issues underlying the Band's nuisance allegations will be fully addressed and those allegations thereby mooted by Enbridge's maintenance of the pipeline.  To the extent that the Band denies, delays, or

unreasonably conditions Enbridge's access to the Reservation to complete these maintenance activities, the Band is preventing the prompt abatement of the alleged nuisance it asserts exists by Line 5's presence on the Reservation.

Defendant Enbridge Energy, LP ("EELP") has also asserted defenses to Plaintiff's trespass and ejectments claims, as well as counterclaims which assert that EELP has a legally valid right to operate and maintain Line 5 on the Reservation in its present location.  Those defenses and counterclaims contend that the Band River Band (1) breached its contractual obligations under the 1992 Agreement in which the Band committed to "do whatever [it]  can reasonably do to ensure that all of the objectives of the [Band] and [Enbridge], as those objectives are expressed in the [1992 agreement], are achieved, even if it means that one or both of the parties must do something which is not expressly described herein," and (2) is unlawfully delaying, denying, and/or unreasonably conditioning Enbridge access to the disputed parcels and the Reservation as a whole that has impeded Enbridge's ability to inspect, maintain, and operate Line 5.

Additionally, it is important for the Court to understand that Enbridge is actively engaged in monitoring Line 5, inspecting the surrounding land, and, where appropriate from time to time, performing remedial actions, such as erosion control, at various areas, including at the meander and at Slope 18 (areas at issue in the Complaint).  The Band is aware of these measures and has, in fact, issued permits for some of this work that has already taken place within the Reservation. More substantial work is planned in the immediate future, including *over the next several months*. As explained below, these remedial measures should be taken into account when the Court considers scheduling, particularly with respect to the nuisance claims.

## II.   IDENTIFICATION OF RELATED CASES

The parties are not aware of any related cases at this time.

## III.  AMENDMENTS TO THE PLEADINGS AND NEW PARTIES

### A.  Description of Any Pleading Amendments that Any Party Intends to Make

The parties agree that pleadings may be amended without leave of Court up to and including 90 days after the Court issues a scheduling order pursuant to FRCP 16(b).  The parties have negotiated and the Band has filed with the Court a stipulation for the voluntary dismissal, without prejudice, of Enbridge Inc. and Enbridge Energy Partners, LP as defendants in this lawsuit. *See* D.E. 35.

During the 90-day period, or with subsequent leave of the Court, the Band reserves its right to amend its pleadings in light of any material factual developments, the discovery of new material information, or as the result of any additional counterclaims filed by Enbridge.

EELP is considering additional counterclaims that may include: (1) injunctive relief for access to areas of the Reservation as may be necessary to properly inspect, maintain, and operate Line 5 within the Reservation, and (2) declaratory relief concerning the scope and nature of the Plaintiff's regulatory authority, if any, over the operation and maintenance of Line 5 on the Reservation.  Both types of claims may be pleaded in an Answer, Affirmative Defenses, and Counterclaims to Plaintiff's First Amended Complaint and may require naming additional parties as described *infra*.

### B.  Identity of New Parties to be Added, and an Explanation as to Why These Parties Must (or Should) Be Added

The Band is not aware of the need to add any additional parties at this time.

If EELP asserts the potential counterclaims mentioned above within the 90 days after this Court issues a scheduling order, it may also name additional defendants.  A claim demanding access to the Reservation may require naming one or more Bad River Band officials as defendants pursuant to the *Ex Parte Young* doctrine.  *See Michigan v. Bay Mills*, 572 U.S. 782, 796 (2014);

*Felix v. Wis. Dep't of Transp.*, 104 F. Supp. 3d 945, 957 (E.D. Wis. 2015), *aff'd*, 828 F.3d 560 (7th Cir. 2016) ("[T]he doctrine of *Ex parte Young,* which generally holds that state actors can be sued in their official capacity notwithstanding sovereign immunity when the claimant seeks prospective relief to end a continuing violation of federal law"); *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1092 (9th Cir. 2007) (the *Ex Parte Young* "doctrine has been extended to tribal officials sued in their official capacity such that 'tribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law'") (internal citation omitted).  A claim for declaratory relief concerning the Plaintiff's authority, if any, to regulate Line 5 and/or to regulate access to Line 5 may also require additional parties for the same reason.

Defendants intend to file any new or additional counterclaims no later than 90 days after the Court issues a scheduling order, as agreed upon by the parties.

## IV.  MATERIAL FACTUAL AND LEGAL ISSUES TO BE RESOLVED AT TRIAL

Recognizing that information revealed during discovery may unearth additional claims or defenses, the parties believe that the material factual and legal issues to be resolved currently include:

a)  Whether Enbridge's operation of Line 5 under conditions as they exist within the Bad River Reservation constitutes a public nuisance under federal and state law, and whether the Band has the right to assert such claims;

b)  Whether Defendants' continued operation of the pipeline for the transportation of petroleum products across parcels for which easements expired in 2013 constitutes a trespass, or whether Enbridge possesses contractual or other rights to continue to utilize the pipeline on the disputed parcels until 2043;

c)  Whether the Band has breached the 1992 Agreement (or related obligations of good faith and fair dealing) to Defendants by insisting that the flow of products through Line 5 cease on the Reservation and that the pipeline be removed prior to 2043;

d)  Whether the Band is entitled to have Enbridge, its pipeline, and the oil that flows through it ejected from the Reservation as a matter of law;

e) Whether Enbridge is entitled to an equitable easement to access and use all parcels of land on the Reservation right-of-way to operate and maintain Line 5;

f) Whether the Band possesses the inherent sovereign authority to enforce permitting, land use, and regulatory requirements relating to Defendants' operation and maintenance of the pipeline within the Bad River Reservation; and

g) The proper remedy for any claims on which Enbridge or the Plaintiff may prevail.

## V.  ESTIMATED TRIAL LENGTH

The Band submits that a total of ten trial days would be appropriate.

Enbridge submits that trial on liability, as it is currently postured, would take approximately 4 weeks.  Enbridge notes, however, that if EELP raises the counterclaims identified above, it may require an additional 5 to 10 days to try the liability portion of the case.  As proposed below, Enbridge proposes a separate trial on remedies, as may be necessary, of a duration that would be determined after the Court and jury's rulings on liability are handed down.

## VI.  JURY TRIAL

Enbridge has demanded a trial by jury of all claims and defenses upon which it is entitled to a jury.  The Band understands based on the parties' discussions that this demand extends to all actions at law that Enbridge believes are presented in this case, including ejectment and breach of contract.  It is the Band's position that any such claims may be susceptible to resolution prior to trial, but the Band does not oppose a jury trial on actions at law if the case reaches that stage.

## VII.  MEDIATION AND SETTLEMENT

The Parties engaged in an extensive (and unsuccessful) mediation process prior to the Band's filing of this lawsuit.  While the Parties do not believe that Alternative Dispute Resolution would be warranted at this stage, they will continue to evaluate ADR and other options relating to settlement as the case progresses.

## VIII.  DISCOVERY MATTERS

### A.    Subjects on Which Discovery May be Needed

#### i.    Subject on which the Bad River Band Believes Discovery May be Needed

The Band will seek discovery into topics materially bearing on the claims and issues in this case, including those topics relevant to any arguments, claims or defenses pressed by Defendants as the case moves forward, and specifically including:

- Negotiations, correspondence and agreements concerning right-of-way agreements and easements (whether proposed or consummated) for the operation of the pipeline on the Band's Reservation;

- Information bearing on the risks posed by the continued operation of the pipeline on the Band's Reservation, including at the Bad River meander and in the vicinity of the Denomie Creek tributary;

- Defendants' proposed measures to alleviate the risks posed by the continued operation of the pipeline on the Reservation; and

- To the extent that Defendants argue that the economic or other significance of the pipeline has any bearing on this case, discovery into the extent and nature of that significance.

#### ii.    Subject on Which Enbridge Believes Discovery May be Needed

Enbridge will seek documentation and discovery into all issues and theories raised in Plaintiff's First Amended Complaint and in Defendants' Answer, Affirmative Defenses and Counterclaims, including, but not limited to, standard paper discovery, interrogatories, requests for admission, requests for production, depositions of Band members and property owners in the Reservation, as well as a number of other individuals with information relevant to the issues raised in this case.

Under the allegations pleaded by Plaintiff, relevant documents may date back to 1953-54 (when Line 5 was designed and constructed) and will continue forward to some future date,

because Plaintiff has confirmed that it will seek discovery regarding Enbridge's ongoing efforts to ameliorate any alleged nuisances at Slope 18 and at the meander.

Under the allegations pleaded by Plaintiff, relevant documents will also include the need for documents from Enbridge's operations and maintenance of Line 5 as a whole, which covers hundreds of miles of pipeline, multiple states, and, consequently, likely hundreds of document custodians.

Under the allegations pleaded by Plaintiff, relevant documents will also include the need for discovery from federal land records offices maintained by the Bureau of Indian Affairs (which maintains documents relating to the validity of easements originally executed by the Band) or possibly repositories maintained by National Archives.  For example, Plaintiff and Enbridge agree that neither party possesses a full set of documents concerning the at-issue agreements and rights-of-way, and that both parties will require third-party discovery from the Bureau of Indian Affairs for a full set of those documents.  Depending on the documents or information sought and their location, this discovery may be time consuming.

Under the allegations pleaded by Plaintiff, relevant documents will also need to be collected, searched, and produced from not only the Band, related individuals, and from Enbridge, but also from those other pipeline companies that owned other pipelines named in the Complaint. Certain records, such as "integrity" data collected by in-line inspection (ILI) tools consists of literally billions of bits of data for each of the lines alleged to be relevant to the claims made by the Band, and that production of such data for analysis by experts may be time-consuming.

Given the scope and complexity of the allegations made in the Complaint, Enbridge currently anticipates the need for extensive expert testimony and extensive expert discovery, including at least on the following subject matters:

- The overall integrity/safety of Line 5 as a whole.  Specific topics could include existing methods of detecting (and preventing) the growth of axial cracks, circumferential cracks, corrosion, and other features that might pose a risk of release; the interpretation of data collected using these methods; the historical database of information collected over a decade or more used to assess changes to the line or to its integrity; the use of cathodic protection and other methods to protect the line from corrosion; the specific type of pipe used to construct Line 5; the reason that the 29 historical releases alleged by the Complaint may have occurred, and whether those causes are likely to be irrelevant to Line 5 where it crosses the Reservation; the reasons that other releases alleged in the First Amended Complaint from other Enbridge lines or from lines owned by other pipeline companies may have occurred, and whether those releases are likely to be irrelevant to Line 5 where it crosses the Reservation; recent improvements in the detection and remediation of threats to a pipeline, including research conducted by Enbridge and industry groups to minimize the risk of future spills; measures implemented by Enbridge to enhance the integrity of its lines since the 2010 spill in Marshall, Michigan; the risk of geological factors to the line, including erosion in the areas of the meander and Slope 18; the potential impact of VIV, as alleged in the First Amended Complaint; and the use of engineering methods for calculating the probability of a release and fitness for purpose (FfP) of a given line, including the reliability of such methods.

- The efficacy, and the environmentally-sound nature of, methods that Enbridge will employ and has employed to protect the Line from erosion at the meander and at Slope 18, including but not limited to "green" erosion protection and remediation measures that use vegetation and other natural or low-impact means to prevent and/or minimize erosion, and horizontal directional drilling ("HDD"), which safely and effectively would move the Line entirely from its current location, place it beneath the Bad River, and therefore permit the Bad River to continue to "migrate" northward, without any concern that the River will cause erosion to soils surrounding Line 5.

- The availability and use of leak detection systems on the Line that would allow rapid closure in the event of a release, as well as other methods to limit the volume released if a release (however unlikely) were to occur.

- The availability, use, and effectiveness of automatic valves to limit the volume of any release.

- The potential environmental impact of any release (however unlikely), including technical methods for predicting the direction of flow based on existing geographic models.

- Identification of the circumstances under which a release (however unlikely) is likely to impact particularly sensitive areas or streams and what the biological and

ecological impacts are likely to be, and what methods exist to remediate affected areas and minimize impacts to the environment.

- Whether (as Enbridge believes to be the case) the closure of the portion of Line 5 that crosses the Reservation would result in the closure of Line 5 as a whole due to both engineering and economic inability to operate only a portion of the Line.

- The estimated time to obtain permits necessary to construct an alternative, replacement line outside the borders of the Reservation.

- The economic impact on the general population in Wisconsin, Michigan, and adjacent areas if Line 5 were to cease operation, including the impact on the supply of propane used to heat homes in the areas affected, the impact on employment at refineries that rely on Line 5 as a source of supply, and downstream effects on consumers.

- Whether alternative methods of transporting products (such as transport by truck or by train) would be adequate to meet demand for petroleum products and, if so, the expected additional cost to the public of use of alternative methods.

- The likely impact of the cost of petroleum products caused by increased use of alternative pipelines (to the extent that alternative pipelines have capacity available), including an analysis of likely tariff impacts.

- The effectiveness of both existing federal regulations and Enbridge's existing integrity management program to protect against a release.

In addition to expert testimony on these and other issues, this case also raises complex factual issues related to the operation and maintenance of Enbridge's Line 5. The Band asserts that Enbridge's maintenance and operation of the pipeline is somehow deficient, thereby causing Line 5 to constitute a public nuisance. Yet, while Enbridge has repeatedly attempted to promptly address the very issues that the Band asserts to constitute a nuisance, and the Band has at times refused, impaired, or delayed access by Enbridge to access the facts and undertake any required maintenance.

Alongside the nuisance related issues, the Band has asserted trespass and ejectment claims that arise from a long history between the Band and Enbridge, ever since easements were first issued to authorize Enbridge's crossing in 1953. Other agreements and easements have since been

issued, including the 1992 Agreement with the Band in which it committed to facilitate Line 5's operation and maintenance on the Reservation, at least over the term of the 50-year easement (i.e., until 2043). There are also complex factual issues related to negotiations and communications between the parties prior to and subsequent to 2013, leading up to the Parties' mediation.

These factual issues, which include but are not limited to the following, will require extensive discovery and testimony from multiple experts to resolve numerous issues, which include the following:

- o **Pipeline Safety-Related Issues**: In support of its nuisance allegations, the Band asserts that older pipelines like Line 5 are "well known to rupture" under the circumstances that the Band alleges are presented by Line 5's operation and maintenance on the Reservation, including due to issues associated with Line 5's coating. The Band also asserts that the location of Line 5 on the Reservation, including where Line 5 transitions between wet and dry soils, may exacerbate latent pipeline defects. Enbridge will seek discovery and expert opinion concerning the basis for the Band's allegations, as well as discovery related to the basis for the Band's assertions relative to the prevalence of "fatigue cracks" and "pinhole features" on liquids pipelines. Enbridge will also seek discovery, as appropriate, from third-parties that the Band identifies in support of allegations asserted in its First Amended Complaint. For example, in support of its oscillation allegations, the Band refers to a July 1, 2011 ExxonMobil pipeline that failed near Laurel, Montana that released 63,000 gallons of crude oil into the Yellowstone River, as well as other pipeline failures by third-party pipeline operators, such as NuStar, Enterprise Products, and Bridger Pipeline Company, Colonial Pipeline Co., Amoco, Williams Pipeline, and Conoco. The Band also asserts a number of allegations concerning explosions and fires resulting from gas pipeline incidents. Enbridge will seek discovery, including expert opinion, regarding the irrelevance of such gas pipeline incidents to the operation and maintenance of Line 5 on the Reservation.

- o **Meander-Related Issues**: The Band contends that Line 5 presents a "looming disaster" at the point where the pipeline currently crosses the Bad River, which the Band refers to as the "meander," which is allegedly forming due to "channel migration." The Band asserts that the meander may become exposed due to fallen trees, logs, ice flows, and other materials moved by the Bad River. The Band also asserts that the flow of the river at the meander may cause "scouring" that will expose the buried Line 5 pipeline within the next two to five years, as based on figures, images, and other unsubstantiated allegations. The Band also asserts that the exposure will result in the "oscillation" of the pipe at that location that may cause integrity issues, such as "fatigue cracking." Enbridge will seek discovery, including expert opinion, regarding the basis for the Band's assertions relative to

the potential for the meander to expose the buried Line 5 pipeline and the timing of that potential exposure, including the Band's allegations concerning the movement of the river bank in periods following its installation that resulted in extensive flooding, including in 1963 and 2015. Enbridge will also seek discovery regarding the historical, current, and foreseeable water velocities and pressures of the Bad River, which the Band alleges will result in an "enormous force" on Line 5. Discovery is also needed to fully assess and understand these allegations, including expert opinion, as they relate to the historical, current, and future flow of the Bad River and the surrounding watershed. Such discovery may include the need for Enbridge or its experts to conduct site visits within the boundaries of the Reservation. Obtaining permission for such visits in recent years has required extensive negotiations with tribal regulatory authorities. If this pattern continues, it is likely that the estimate of the time needed for discovery will need to be increased.

o   <u>Slope 18-Related Issues:</u>   The Band also contends that at a location of the Reservation called "Slope 18" erosion has carved a gully that has rendered approximately forty-nine feet of pipeline visible, and in the same vicinity has also removed soil from beneath the line in certain locations. Upon being made aware of this information, Enbridge responded immediately, assured the BRNRD in several communications that the pipeline was operating safely, was structurally sound, and that the areas of exposed or unsupported pipeline did not constitute an emergency or any type of threat. Enbridge also braced the pipeline with sandbags to ensure that even if other erosion occurred the pipeline would be adequately supported while Enbridge designed a permanent solution to prevent future erosion. Nevertheless, the Band made a series of public statements warning the public of a purported "threatened release" and an "imminent and substantial danger." The Band also denied, delayed, and then unreasonably conditioned Enbridge's attempts to access the pipeline, even though Slope 18 is located on private land. The Band also took regulatory action against Enbridge without any legal or factual basis to do so, imposing numerous conditions on Enbridge purportedly under the Clean Water Act, even though Enbridge's work consisted of placing sandbags onto dry land, which is work that does not implicate the Clean Water Act. Enbridge therefore will seek significant discovery on all of these issues, including expert discovery, regarding the lack of a basis for the Band's assertions of a "threatened release" and an "imminent and substantial danger." Enbridge will also take significant discovery on the safe operation of Line 5, that no release or danger was ever present at Slope 18, and that Enbridge's efforts to remediate erosion and to prevent it from occurring again – which the Band characterizes as "infeasible" – are in fact feasible and technically sound. Additionally, there will be significant briefing raised by the lack of authority to support the Band's attempts to regulate the "siting and operation of the pipeline across Reservation lands," to regulate Enbridge's activities on private land with other non-Indians, and to attempt to use the Clean Water Act to regulate activities that have no impact on any wetland or any other watercourse.

o <u>Natural Resource Impacts Allegedly Resulting from Line 5 and from the Band</u>: The Band asserts that the presence of Line 5 has and/or will alter the Reservation and/or the natural resources located within the Reservation or surrounding watershed. The Band also asserts that it retains treaty-protected rights relative to certain resources within the Reservation. The Band asserts that such resources could be adversely harmed for generations to come. Discovery will be needed with respect to the Band's use of such resources, the extent of such resources in proximity to Line 5, and the extent to which, if any, such resources have been impacted or will be impacted by Line 5. This will include discovery that will allow Enbridge to assess the likelihood and extent to which such resources may be adversely impacted by other causes, such as the Band's administration of its Reservation and resources, as well as population growth of the Band that may diminish generational use of such resources. Discovery will also be needed to allow Enbridge to assess and understand the Band's allegations relative to its Natural Resource Department's ("NRD") management of the Band's resources, including to fishery populations, wild rice beds, and hunting areas, including the NRD's alleged cooperation with EPA, the U.S. Geological Survey, and the University of Wisconsin to research and preserve such resources. Discovery also will be needed with respect to the Band's releases of pollutants into its watershed.

o <u>Bad River Watershed</u>: The Band asserts extensive allegations concerning the watershed that surrounds and encompasses its Reservation. The hydrologic nature of that watershed will need to be fully understood through factual discovery and expert opinion in order to assess the Band's allegations that a release from Line 5 could adversely harm the entire watershed and/or waters within the Reservation.

o <u>Remedial Measures to Abate Alleged Nuisance</u>: The Band has asserted that ejectment of Line 5 at all locations within the Reservation is warranted based on the presence of a public nuisance condition. Enbridge will seek discovery needed to assess whether remediation of the alleged nuisance is necessary or to propose remedial options that would be sufficient to protect the line from the threats contained in the First Amended Complaint, such as at the meander and at Slope 18. For example, geological testing may be necessary to determine if the Line can be altered using HDD in the area of the meander. The Band's allegations raise the question, on which discovery will be needed, of why the Band does not believe and/or will not allow the alleged meander condition to be addressed and fully abated by Enbridge. Enbridge will accordingly seek discovery relating to the Band's hesitance to allow such activities to occur, including the related issue of discovery from property owners within the Reservation concerning Enbridge's efforts to successfully address other Line 5 maintenance issues with minimal burden to the Reservation, including surrounding environment and habitats.

o <u>Spill-Related Issues</u>: The Band asserts that Line 5 presents a nuisance due to the potential for a release on the Reservation, which will harm surrounding resources and be difficult to clean-up. For example, the Band asserts that the conditions in the Reservation, including the limited number of roads, presents problems associated with responding to any potential release. The Band also asserts that a

14

release could result in long-term impacts to the Reservation and the watershed. Enbridge will seek discovery, including expert opinion, with respect to the Band's allegations and the ability of emergency responders to timely and effectively respond to a release from Line 5 on the Reservation. Enbridge will also seek discovery relative to the Band's views of the likely trajectory of any release from Line 5, migration of that product, and plans for the clean-up and remediation of any potential release.

o   Slough-Related Issues: The Band makes assertions relative to the Kakagon and Bad River "Sloughs," which it asserts have a "huge cultural importance to the Bad River Tribe" and are one of the "world's last and best remaining examples of an intact freshwater estuarine ecosystem." The Band also asserts that Tribal Chairman Mike Wiggins, Jr. made statements in 2012 regarding the Sloughs and their importance to the Band. The Band also asserts that the Sloughs and Reservation include "numerous threatened and endangered plants and animals and the only remaining extensive coastal wild rice beds." Enbridge will seek discovery related to the basis for these allegations, as well as discovery related to the third-party sites identified by the Band in connection with its assertion that the waters within the Reservation that may be harmed by Line 5's operation or maintenance are critical, valuable, or important.

o   Easement-Related Issues: The Band agreed to allow Enbridge's predecessor-in-interest to locate Line 5 on the Reservation in 1953. Enbridge has safely operated the pipeline within the Reservation over that period of time. Enbridge will seek discovery from tribal members, including owners of property, council members, or others with historical knowledge, regarding their views of Enbridge's practices to safely operate and maintain Line 5 within the Reservation since 1953, the basis on which approval to locate and operate the Line 5 on the Reservation was granted in 1953, and the basis on which the Band now takes the position that it does regarding removal of the pipeline from the Reservation. In addition:

  o   The Band contends that the easements across the Allottee parcels expired in 2013. Yet, ever since 1953 Enbridge has held easements to operate Line 5 at locations in the Reservation. Such easements were re-issued by the BIA in the 1970s and again in 1993. Enbridge will specifically seek discovery relating to the easements that were issued in 1953, 1973, and 1993, including Band members with personal knowledge and/or materials related to such renewals.

  o   The Band asserts that the Bureau of Indian Affairs (BIA) has jurisdiction to grant and renew easements across tribal and allotted lands, and that the BIA undertook activities in 1953, 1973, and 1993 consistent with this authority across the Bad River Reservation. Enbridge will seek discovery from the BIA concerning its records relating to the grant and renewal of those easements, as well as the Band's records relating to such grants and renewals, including the Band's communications or correspondence (1) between its own tribal government officials; (2) with BIA; and (3) with

Band member allottees, other Band members, and non-Indian property owners concerning the grants and renewals.

o   The Band relies on a Resolution its Tribal Council allegedly passed in January 2017.  Enbridge will seek discovery related to that Resolution, including all Council members and Tribal members involved with the contents of that Resolution, including its stated purpose and underlying goals.

o   Prior to and since 1992, the Band has obtained ownership interests in the Allottee parcels that are the subject of the expired easements.  The reasons underlying why and how the Band acquired ownership interests in the parcels is relevant to Enbridge's Counterclaims in which it asserts a breach of the 1992 Agreement and breach of the covenant of good faith and fair dealing.  Related to this issue, Enbridge will seek discovery related to:

■   The Band's participation in the U.S. Department of Interior's Land Buy Back Programs.

■   The Band's decisions concerning the acquisition of ownership interests in parcels on the Reservation outside of the Line 5 routing post-1992, such as whether the acquisitions took place primarily around the time of the expiration of the alleged Allottee easements in 2013.

■   Facts surrounding the Band's acquisition of ownership interests in the Allottee parcels that are the subject of the expired easements.

■   Discovery from tribal members, Council members, or others with ownership interests in lands within the Reservation concerning the Band's mission to obtain ownership interests in lands within the Reservation, both outside and within the Line 5 right-of-way.

■   Discovery regarding the any communications between Council Members and Allottee owners and other third-parties regarding Line 5.

o   Discovery Related to Enbridge's Counterclaims and Defenses:

o   Enbridge asserts in its Counterclaims that the Band has a contractual obligation under the 1992 Agreement to provide consent to renew the expired easements.  Enbridge will seek discovery relating to the Band's execution and understanding of the 1992 Agreement, including relevant knowledge, communications, or materials in the possession of any tribal members or other third-parties relating to the 1992 Agreement.

o   Because the Band has acquired an ownership interest in the Allottee parcels at issue in this case, Enbridge will seek discovery from any person with

knowledge of Band deliberations relating to the Band's decision to grant consent permitting re-issuance of the expired easements applicable to the Allottee parcels, including any discussions between Band members that occurred post-1992.

o   Enbridge continues to hold a 50-year grant of right-of-way from the BIA that was renewed in 1993.  Given that the Band has authorized Line 5 to continue to operate until 2043 under the terms of that grant, Enbridge will seek discovery relating to the Band's decision to grant consent relating to the 50-year right-of-way.

o   The Band asserts that tribal consent will not be provided to allow for the renewal of the expired easements, and that Line 5 must be ejected in its entirety from the Reservation, even with respect to those segments of Line 5 that cross parcels for which a valid and effective easement is in place. Enbridge will seek discovery relating to the burden or harms caused by Line 5's operation and maintenance on the Reservation that the Band believes warrant ejectment from the entirety of the Reservation.

o   The Band asserts that Enbridge expressly promised to remove its pipeline (and associated facilities) from the Reservation upon expiration of the easements.   Enbridge will seek discovery concerning the Band's understanding of the alleged Enbridge promise regarding removal of Line 5 from the Reservation.

o   Even if the Band were to succeed on the merits of their claims, extensive discovery would be needed to allow this court to assess an appropriate remedy.  This will include a consideration of equitable factors, including the need for and benefits resulting from Line 5's continued operation to the public in general, to the refineries and other customers served by the pipeline and to the public at large; and adverse impacts relating to any cessation of operation on Line 5.  In addition, the Band requests the removal of Line 5 from the Reservation.  The Band's request raises a number of factual issues that will need to be the subject of discovery.

**B.   Initial Disclosures**

The Band proposes that the parties exchange Rule 26(a)(1) initial pretrial disclosures on or before November 12, 2019.  Enbridge proposes that the parties exchange said disclosures on or before January 17, 2020.  The parties do not waive either the Rule 26(a)(1) or the (a)(2)(B) disclosures, and propose no additional changes to the form or requirements for Rule 26(a)(1) disclosures.  Counsel for parties will supplement their initial disclosures pursuant to Rule 26(e).

### C.     Preservation of Discoverable Information

The Band has put into place a litigation hold preserving all tribal records and documents relating to this litigation, and will maintain and preserve all such information for the duration of the litigation.  Enbridge has also put into place a litigation hold and will preserve all relevant corporate documents in its possession, custody or control for the duration of the litigation.

### D.     Limitations on Discovery

The Parties propose that Interrogatories be limited to 50 each for Plaintiffs and Defendants. The Parties further propose that there be no limit on the number of Depositions of witnesses who any Party intends to elicit expert testimony from at trial.  The Band proposes a limit of 15 Depositions of fact witnesses each for Plaintiffs and Defendants.  Enbridge proposes a limit of 50 Depositions of fact witnesses each for Plaintiff and Defendants.

The Parties do not propose any additional limitations on discovery, and reserve the right to request leave to conduct discovery beyond these or other applicable limits.

### E.     Electronic Stored Information (ESI)

The Parties are amenable to entering into an agreement regarding electronically stored information and anticipate submitting such an agreement to the Court as a stipulated order.

### F.     Protective Order

The parties agree that a stipulated protective order controlling access to confidential and proprietary material and information pursuant to Rule 26(c) will be necessary, which will also govern the inadvertent production of protected materials.  The parties have agreed to discuss and seek agreement on the parameters of this stipulation, and intend to request that the Court enter the stipulation as an order.

## IX. PROPOSED SCHEDULE

### A. Plaintiff's Position:

<u>The Band</u> proposes a trial date of March 8, 2021, with deadlines for serving and responding to discovery, the phasing and timing of motions, and disclosure of expert witness testimony and rebuttal expert testimony under Fed. R. Civ. P. 26(a)(2) as set forth in the "Bad River Proposed Trial Schedule" below. The Band believes that Enbridge's proposed schedule significantly overstates the time necessary for appropriate discovery in this matter and would unjustifiably delay the resolution of this case.

Apart from expert related discovery as set forth in the Proposed Case Schedule, the Band does not believe that discovery should be phased, and further believes that Enbridge's phasing proposal rests on unworkable distinctions and would cause unnecessary delay of discovery into time-sensitive matters. The Band does not believe that bifurcation of trial is appropriate for this matter.

| Bad River Proposed Trial Schedule | |
|---|---|
| Trial Date | 3-08-21 |
| Initial Pre-Trial Conference | 10-29-19 |
| Initial Disclosures | 11-12-19 |
| Amendments to the Pleadings to Add Additional Parties or Claims Without Leave of the Court | 90 days from the Court's entry of scheduling order |
| Expert Report Disclosures | 06-15-20 |
| Rebuttal Expert Report Disclosures | 08-14-20 |
| Close of Fact Discovery | 10-07-20 |
| Dispositive Motions Deadline | 10-22-20 |
| Daubert Motions Deadline | 11-30-20 |
| Pretrial Statement | 2-15-21 |

| Bad River Proposed Trial Schedule | |
|---|---|
| Trial Date | 3-08-21 |
| Exhibit Lists, Deposition Designations and Proposed Findings of Fact | 2-19-21 |
| Pre-Trial Conference | 2-22-21 |
| Trial | 03-08-21 |

### B.   Defendants' Position:

Enbridge's proposed discovery plan and scheduling order is intended to efficiently address the complex and unique circumstances from which this case arises:

### a)   Phased Discovery and Bifurcated Trial

Enbridge proposes that the schedule divide the discovery in this case into three phases and bifurcate adjudication into a merits trial and remedies/damages trial. Phase I of discovery would consist of discovery of the parties' disputed property rights and interests and authority to regulate Enbridge and/or to deny, delay, or unreasonably condition its access to operate and maintain the pipeline, even, for example, on privately-held land on which Enbridge indisputably possesses perpetual rights-of-way (Counts III-V and EELP's counterclaims). Phase II would focus on discovery of the Band's nuisance claims (Counts I-II). A merits trial on the claims in this case would be scheduled after Phases I and II. Phase III would consist of discovery and determination of the potential remedies for any claim or counter-claim on which Plaintiff or Enbridge prevails in Phases I or II.[3] *See Krocka v. City of Chicago,* 203 F.3d 507, 516 (7th Cir. 2000) (courts have

---

[3]      For example, if Plaintiff succeeds in Phase I, there will be an issue whether ejectment is necessary or whether money damages is an appropriate compensation for trespass (especially if nuisance is not proven in Phase II). Separately, if a nuisance is found, the parties will require significant and complex expert assistance to demonstrate to the Court the potential ways to abate the nuisance, or, alternatively, if Plaintiff were also successful in Phase I, what would constitute an economically and environmentally feasible way to "remove" over twelve miles of underground pipeline without unduly harming regional energy markets and/or Enbridge's customers.

20

broad discretion in deciding whether to bifurcate issues presented in a case or to try them separately).

In Phase I of discovery, Plaintiff's trespass and ejectment claims overlap with Enbridge's counterclaims that the Band has materially breached, and/or frustrated the purpose of, the 1992 Agreement and the 1993 ROW.  Discovery on these property-related claims/counter-claims will require an examination of the extensive historical record (dating back 70 years) concerning the at-issue parcels, and how, when and why those interests were acquired by the Band.  Discovery on these claims should be addressed first, particularly before the nuisance claims, for several critical reasons.  First, this phased approach would allow Enbridge to complete any remedial measures on the land near Line 5, such as at the meander and at Slope 18—which Enbridge believes should resolve the nuisance claims—before the parties and the Court commit substantial resources to addressing whether Line 5 does, in fact, constitute a nuisance. It would make little sense to begin discovery on the nuisance claim—by committing exorbitant costs to litigation-related document collection, document production, investigation, measurements, testing, and expert consultants— before Enbridge completes remedial measures that it believes will ameliorate any purported cause for concern.  Second, the Bureau of Indian Affairs (BIA) is in possession of many of these critical property and easement-related documents, the parties agree that they will each need to seek such documents from the BIA, and the BIA tends to move slowly in producing records.

Discovery on the nuisance claims (Phase II) should be treated separately for the above reasons and also because discovery on the nuisance claim does not overlap with the property claims and involves by itself complicated, technical issues as alleged in the Complaint (including but not limited to pipeline integrity, the sensitivity/granularity of integrity scans, expected rates of erosion, vortex-induced vibration ("VIV"), and other issues).   The Complaint takes aim at the construction,

maintenance, and operation of the entirety of Line 5, and also refers to multiple, years-old pipeline incidents outside of the Band's Reservation related to other Enbridge pipelines (no incidents on Line 5 are alleged to have occurred), or on pipelines owned by other companies, all with alleged relevance to Line 5, which also must be subject to fact and (especially) expert discovery. Enbridge currently believes that the allegations that comprise Plaintiff's nuisance claims will require discovery of numerous Enbridge ESI custodians as well as outside consultants who historically have assisted Enbridge with various pipeline-related maintenance and operations and involve voluminous amounts of ESI and documentation regarding historical pipeline tests and measurements. Additionally, Enbridge expects to call 5-7 experts witnesses to defend against the nuisance claims alone.

Finally, if any of the parties are successful on their claims, there must be additional (and extensive) expert discovery focusing on the environmental, physical, and economic feasibility of changes to, or removal of, Line 5, and under what circumstances. Enbridge contends that even if Plaintiff were successful on its trespass claims, Plaintiff should not be entitled to immediate removal of the pipeline (and such a result would undermine its own purported goal of environmental safety).

If, however, this Court is not inclined to bifurcate trial, the parties should at least be able to conduct discovery through this staggered approach to ensure that critical, third-party documents in the possession of the BIA are produced in a timely manner and Enbridge completes its remedial efforts before discovery on the Band's nuisance claims begin.

b)  It is Premature to Set a Trial Date

Finally, scheduling a trial date at this time is premature at this moment, but should be set in several months when the facts become more settled.  The parties are in the midst of a prolonged, sophisticated settlement discussion and until resolution or the end of such talks, significant extensions to the scheduling order may be requested.  In addition, EELP's potential, additional counterclaims (described above in Section II) and potential inclusion of additional parties may reshape and enlarge the landscape of this case.   Enbridge believes that the Court will be better informed to set a trial date after Enbridge elects whether or not to raise new claims and add parties, which the parties have agreed should occur no later than ninety (90) days from the filing of this Report.

However, if this Court is inclined to schedule a trial date, Enbridge proposes setting the date for a merits trial on Phases I & II 20 months from the issuance of its scheduling order and a damages trial approximately two years from the order.

Defendants' Proposed Schedule

| Event | Defendants' Proposed Deadline |
|---|---|
| Initial disclosures served | January 17, 2020 |
| Amendments to the pleadings to add claims or additional parties without leave | 90 days from the scheduling of this Order |
| Phase I fact discovery to be completed by | June 1, 2020 |
| Proponent's Phase I expert disclosure(s) and report(s) served | July 1, 2020 |
| Opponent's Phase I expert disclosure(s) and report(s) served | August 3, 2020 |
| Phase I discovery cutoff | October 1, 2020 |
| Phase II discovery opens | August 3, 2020 |

| | |
|---|---|
| Proponent's Phase II expert disclosure(s) and report(s) served | December 11, 2020 |
| Opponent's Phase II expert disclosure(s) and report(s) served | January 18, 2021 |
| Phase II discovery cutoff | February 26, 2021 |
| Dispositive motions (merits only) due | March 26, 2021 |
| Parties' pretrial filings (Rule 26(a)(3) disclosures, motions *in limine,* voir dire questions, proposed jury instructions, and proposed verdict forms) | 31 days before trial |
| Responses to pretrial filings | 15 days before trial |
| Final pretrial conference | 7 days before trial |
| Liability/Merits Trial | **TBD** (approximately July 2021) |
| Phase III Fact Discovery opens | **TBD** (approximately August 2021) |
| Proponent's Phase III expert disclosure(s) and report(s) served | **TBD** |
| Opponent's Phase III expert disclosure(s) and report(s) served | **TBD** |
| Phase III discovery cutoff | **TBD** |
| Phase III dispositive motions due | **TBD** |
| Court to rule on Phase III dispositive motions by | **TBD** |
| Parties' pretrial filings (Rule 26(a)(3) disclosures, motions *in limine,* voir dire questions, proposed jury instructions, and proposed verdict forms) for Phase III | 31 days before trial |
| Responses to pretrial filings for Phase III | 15 days before trial |
| Final pretrial conference for Phase III | 7 days before trial |
| Damages/Remedies Trial on Phase III | **TBD** (approximately December 2021) |

Dated:  October 24, 2019

/s/ Michael C. Davis
Michael C.  Davis
David L.  Feinberg
VENABLE LLP
600 Mass.  Ave., NW
Washington, DC 20004
(202) 344-8278
MCDavis@Venable.com
DLFeinberg@venable.com


/s/ Eric M. McLeod
Eric M. McLeod
Joseph S. Diedrich
HUSCH BLACKWELL
33 East Main Street, Suite 300
Madison, WI 53701-1379
(608) 234-6056
eric.mcleod@huschblackwell.com

/s/ David H. Coburn
David H. Coburn
Shannen W. Coffin
Jody Cummings
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-8063
dcoburn@steptoe.com
scoffin@steptoe.com

*Counsel for Defendants*

/s/ Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, Michigan  48104
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com


Cory J. Albright
Jane G. Steadman
Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
401 2nd Avenue South, Suite 700
Seattle, Washington 98104
(206) 344-8100
calbright@kanjikatzen.com
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com

/s/ Bruce Wallace
Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE &
WALLACE 126 S. Main Street
Ann Arbor, Michigan  48104
(734) 662-4426
bwallace@hooperhathaway.com

/s/ Oday Salim
Oday Salim
NATIONAL WILDLIFE FEDERATION
231 West Liberty Street, Suite 200
Ann Arbor, Michigan 48104
Telephone: (586) 255-8857
salimo@nwf.org


*Counsel for Plaintiff*