UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE
LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION,  Case No. 3:19-cv-602

    Plaintiff /                                                 Judge William M. Conley
    Counterclaim                             Magistrate Judge Stephen Crocker
    Defendant,

v.

ENBRIDGE ENERGY COMPANY, INC.; and
ENBRIDGE ENERGY, L.P.,

    Defendants /
    Counter-Claimants,

v.

NAOMI TILLISON, Director of Mashkiiziibii
Natural Resources Department of the Bad River
Band of the Lake Superior Tribe of Chippewa
Indians of the Bad River Reservation, in her
Official Capacity,

    Counterclaim Defendant.

**DECLARATION OF NAOMI TILLISON IN SUPPORT OF THE BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PHASED DISCOVERY AND TO BIFURCATE TRIAL**

    I, Naomi Tillison, declare the following on the basis of my personal knowledge:

    1.     I have served as the Director of the Mashkiiziibii Natural Resources Department of the Bad River Band of the Lake Superior Tribe of Chippewa Indians (the "Natural Resources Department" or "NRD") since December 2016. I was first hired by the Natural Resources Department in October 2007 as a Water Quality Standards Specialist and Non-Point Pollution

1

Source Coordinator, and then became the NRD's Water Resources Specialist in January 2008, a position I remained in until becoming Director. I hold a Master of Science degree in Environmental Engineering (2005) and a Bachelor of Science degree in Environmental Engineering (2002), both of which I received from Michigan Technical University.

    2.    The Natural Resources Department is charged with the regulation and management of the Bad River Band's natural resources through the implementation and enforcement of the environmental codes and ordinances enacted by the Band's Tribal Council. The protection and enhancement of the Bad River Reservation's natural resources, including its unique and treasured water resources, and of treaty-protected uses of them, are critical priorities for the Band.

    3.    With minor fluctuations, the Natural Resources Department has twenty-seven full time employees and nine limited-term or seasonal employees, including specialists in the following areas: air quality, brownfields, climate change, environmental, GIS, fisheries, forestry, invasive species, private on-site wastewater treatment systems, realty, and wildlife. The Department also employs conservation wardens and the Band's Historic Preservation Officer. Water resources are an area of especial concern and the Department typically has between four and six water resources and wetlands specialists and technicians on staff, with other specialists also spending time on water-related issues. Together these specialists and technicians make up our Water Resources Program.

    4.    The Tribal Council has enacted or approved numerous Code and regulatory provisions for the protection and enhancement of the Reservation's water resources. These include the Band's Water Quality Certification and Water Quality Review Code (Chapter 324 of the Tribal Code) (Attachment A), its Water Quality Standards (Attachment B), its Wetland and

2

Watercourse Protection Ordinance ("WWPO") (Chapter 323 of the Tribal Code) (Attachment C), and its Environmental Response and Remediation Code (Chapter 380 of the Tribal Code) (Attachment D).

5. On June 26, 2009, after an extensive review process, the United States Environmental Protection Agency ("EPA") approved the Band's application for treatment-as-a-state status and found the Band eligible to administer the Clean Water Act's water quality standards program (Attachment E). As a result, the NRD has developed, and the Tribal Council has approved, water quality standards that govern the surface waters of the Reservation. These standards include designated uses for each surface water (including wetlands), water quality criteria to protect those uses, and an anti-degradation policy to ensure that surface waters are not unnecessarily degraded and continue, at a minimum, to support their designated and existing uses. Under Section 401 of the Clean Water Act ("CWA"), moreover, no federal permit that may result in a discharge to Reservation waters can be issued absent a certification by the Band under Section 401 of the Act that the activity can be approved consistent with the Band's Water Quality Standards, its anti-degradation policy, and other applicable laws, unless the Band waives its certification authority.

6. Enbridge Energy operates a pipeline known as Line 5 that traverses the Bad River Reservation from west to east, for a distance slightly greater than twelve miles. During my tenure with the NRD, Enbridge has generally recognized the Band's regulatory authority over its Reservation activities. In 2015, for example, Enbridge applied for authorization under the WWPO and the Clean Water Act to conduct an "integrity dig" on the Reservation. Such digs consist of excavating the soil surrounding a portion of the pipeline, inspecting the pipeline at that location, and performing any necessary repairs before re-covering the pipeline (Attachment F

3

(excerpts)). The NRD conducted the regulatory review of the dig application required under the WWPO and our Water Quality Standards, subsequent to which the Tribal Council issued a Section 401 certification and Anti-Degradation Decision (Attachments G and H), and the NRD issued a WWPO permit (Attachment I (excerpts)), all of which were contingent upon Enbridge's compliance with significant conditions designed to protect Reservation resources.

7. In 2016 Enbridge again applied for authorization to conduct additional integrity digs. (Attachment J (excerpts)). In the course of its regulatory review, the NRD raised significant concerns about the impact of Enbridge's proposed activities on Reservation water and land resources, including from the transportation of heavy equipment to the dig sites and the re-grading of slopes that Enbridge had proposed for that purpose. In response to these concerns, Enbridge agreed to conduct the digs only under frozen conditions which would better protect the access route, including important wetlands and watercourses, from permanent impacts. It further agreed that no grading of slopes would be permitted and Enbridge and the NRD agreed on equipment solutions to avoid that possibility. (Attachment K (excerpts)).

8. Enbridge applied for and received authorizations from the Band, under both its Clean Water Act authority and its WWPO, to conduct integrity digs in 2018 and in 2019. These authorizations again included a number of conditions significant to the protection of Reservation resources.

9. On December 6, 2019, the NRD received an application (Attachment L (excerpts)) to approve a plan by Enbridge to forestall further migration of the Bad River towards the pipeline at a location known as the Bad River meander, after having received design drawings for the project on November 25, 2019. At this location, both a southern and a northern bend in the River have experienced significant bank erosion that has resulted in the bends

4

moving ever closer to the pipeline, so that the southern bend is now only 28 feet away. Both the Band and Enbridge recognize that continued erosion will result in the Bad River exposing the pipeline and subjecting it to a variety of forces.

10. In its application Enbridge proposes installing a tree revetment (or channel armoring). The revetment will consist of two rows of approximately 425 trees that will stretch along approximately 1400 feet of shoreline at the southern meander bend, with the goal of protecting against erosion of the toe of the banks at that location. Enbridge proposes using a floating logging shovel or excavator in the River to move and place the trees to create the revetment. The trees would be anchored to the bank using steel cables. Given the remote location of the meander, four staging areas (at least three of them affecting water resources) and an access route across wetlands would need to be established to move in the necessary equipment, supplies and personnel, while the trees would be flown in by helicopter.

11. In 2018 an Enbridge helicopter that was monitoring the pipeline right of way crashed on the Reservation, taking the life of the pilot and narrowly missing one of the few residential locations on the Reservation. In 2019 another Enbridge helicopter inadvertently dropped 7,800 pounds of plastic mats in a Reservation forest that it had planned to use for an integrity dig, causing significant damage to the natural resources in that location.

12. In its application Enbridge seeks a permit under the Band's WWPO, a Section 401 certification (for the federal permit that it has simultaneously applied for), and an antidegradation determination. Its application has accordingly triggered the detailed NRD regulatory processes that pertain to these approvals.

13. Section 324.7 of Chapter 324 establishes the necessary contents of any application for a Section 401 certification and the Band's Water Quality Standards establish the necessary

contents of an antidegradation demonstration. Once an application is received, the NRD's water resources staff review the application for completeness, and request from the applicant any additional information that is needed. When the application is complete, the NRD holds a public comment period, and conducts a technical review of the application to determine whether the proposed activity will cause or contribute to a violation of the Tribe's Water Quality Standards. After this process is complete, the NRD recommends to the Tribal Council whether a water quality certification should be issued, and the Council then makes its decision.

14. Under the Band's Water Quality Standards, the Bad River at the location of the meander is classified as an Outstanding Tribal Resource Water (Chi minosingbii). As described in the Standards, "[t]hese waters are recognized as being largely pristine and important for the cultivation of wild rice or the spawning of lake sturgeon, or have other special resource values, and, therefore, [their] water quality shall be maintained and protected in all cases without degradation." For these waters, no new or increased discharges or alterations of background conditions are allowed. Only short-term, temporary decreases in water quality that satisfy certain conditions are permitted, and these can include no increased loads of bioaccumulative chemicals of concern. Nor can they result in a lowering of water quality below that required to fully support existing and designated uses. After conducting a full review of all relevant and available information, the NRD makes a recommendation about whether to issue an anti-degradation determination to the Tribal Council, and the Council then makes a final decision.

15. Under the WWPO, the NRD makes the final WWPO permit decision after reviewing detailed application information. The NRD may only issue a permit if "the proposed activity is in the Tribal interest and is otherwise lawful in all respects." Chapter 323.16. In determining whether the activity is in the Band's interest, the NRD must balance the benefits

expected to accrue from the activity against "reasonable foreseeable detriments," and Chapter 323.16 includes twelve separate factors for the NRD to consider in conducting this balancing. The NRD may not issue a permit unless it is shown that "[t]he proposed activity will result in the minimum negative effect upon protected wetlands, watercourses, and attendant natural resources."

16.     The NRD will conduct a fair and detailed review of Enbridge's tree revetment application in order to make its Section 401 and Water Quality Standards antidegradation recommendations and its WWPO permit decision.  While Enbridge's submissions will undoubtedly be of considerable significance to our determinations, the outcome of the regulatory process cannot prejudged in one direction or the other.  Just some of the important issues the NRD will have to address in conducting its assessments include:  whether the transportation and staging of equipment, including heavy machinery, across sensitive wetlands and watercourses can be carried out without producing impermissible impacts; whether the use of heavy machinery in the Bad River will lead to an impermissible lowering of water quality, including through the disturbance of sediment; whether the revetment is likely to be effective in preventing erosion; whether the revetment will hinder the uses supported by surface waters; and how durable the revetment will prove to be.  While the NRD granted Enbridge access permits this fall to delineate portions of the wetlands that would be affected by its bank armoring proposal, the NRD has not authorized that project to commence.

17.     The November 25, 2019 design drawings that Enbridge filed with the NRD also include a proposal to guard against the further development of overland channels that have formed at the Bad River meander where – at higher flow levels – the River has been carving channels across the meander neck, from the southern meander bend in the direction of the

7

northern bend. The Band has communicated to Enbridge that these channels represent a serious threat to water resources and treaty-protected uses, and Enbridge likewise recognizes the threat posed by the channels, as they could result in the complete erosion of the soil covering the pipeline and expose it in that manner. However, Enbridge's December 6, 2019 project application does not include any channel mitigation measures, and the NRD accordingly has no such measures before it for consideration at this time.

18. On August 21, 2019, I was in the field along with two of the NRD's outside experts when we discovered a forty-nine foot stretch of exposed pipeline in the vicinity of a Denomie Creek tributary, at a location that Enbridge has designated as Slope 18 as part of its "geohazard management program." Subsequent investigation has indicated that the soil that had once supported considerable portions of the exposed pipeline from underneath had been eroded away, along with approximately six feet of soil that had covered the pipeline. An additional forty-foot stretch of pipeline is vulnerable to exposure and undermining at this location. On September 18, 2019 we granted emergency authorization, and on September 20, 2019 we granted an after-the-fact permit, for Enbridge to install sandbags under the pipeline to support its weight and the considerable weight of the crude oil that passes through it. This measure was understood by both Enbridge and the Band to be temporary in nature.

19. On November 25, 2019, Enbridge submitted design drawings to the NRD regarding its proposed work at Slope 18, but it has not yet submitted an application for that work. Enbridge stated in its November submission that neither Clean Water Act nor WWPO jurisdiction exists over any Slope 18 project. The NRD disagrees, and with respect to the Clean Water Act we have not received any indication from the United States Army Corps of Engineers that it subscribes to Enbridge's position.

20. NRD review of any proposed Slope 18 project will be important. On August 30, 2019, Enbridge presented to the NRD a preliminary plan for the remediation of the exposed and undermined pipeline at Slope 18. The NRD and its outside experts in hydrology and geology studied the proposal closely, and the NRD conveyed to Enbridge a detailed set of comments, pointing out numerous ways in which the Enbridge plan might fail to address water flows and associated erosion in the Slope 18 gully that had contributed to the exposure of the pipeline in the first instance (Attachment M). Enbridge has yet to respond to those comments, and an evaluation as to whether its current plans adequately take them into account and provide for a long-lasting solution to the issues at Slope 18 will be an important part of the NRD review.

21. All documents attached to this Declaration are true and correct copies or excerpts thereof.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16th day of December, 2019.

By: /s/ Naomi Tillison
Naomi Tillison,
Director of Mashkiiziibii Natural Resources Department of
the Bad River Band of the Lake Superior Tribe of
Chippewa Indians of the Bad River Reservation

Dated this 17th Day of December, 2019  Respectfully Submitted,

By: /s/ Riyaz A. Kanji

Erick Arnold
BAD RIVER BAND OF THE
LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
Telephone: (715) 682-7107
attorney@badriver-nsn.gov

Oday Salim
NATIONAL WILDLIFE FEDERATION
231 West Liberty Street, Suite 200
Ann Arbor, Michigan 48104
Telephone: (586) 255-8857
salimo@nwf.org

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE &
WALLACE
126 S. Main Street
Ann Arbor, Michigan, 48104
Telephone: (734) 662-4426
bwallace@hooperhathaway.com

Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, Michigan 48104
Telephone: (734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Cory J. Albright
Jane G. Steadman
Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
401 2nd Avenue South, Suite 700
Seattle, Washington 98104
Telephone: (206) 344-8100
calbright@kanjikatzen.com
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com

*Counsel for the Bad River Band of the
Lake Superior Tribe of Chippewa Indians of
the Bad River Reservation and Naomi Tillison,
Director of Mashkiiziibii Natural Resources Department
of the Bad River Band of the Lake Superior Tribe of
Chippewa Indians of the Bad River Reservation,
in her official capacity.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 17, 2019, I served DECLARATION OF NAOMI TILLISON IN SUPPORT OF THE BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PHASED DISCOVERY AND TO BIFURCATE TRIAL by electronic filing through CM/ECF on counsel for the Enbridge Defendants as set forth below.

| | |
|---|---|
| Michael C. Davis | Eric M. McLeod |
| David L. Feinberg | Joseph S. Diedrich |
| VENABLE LLP | HUSCH BLACKWELL |
| 600 Mass. Ave., NW | 33 East Main Street, Suite 300 |
| Washington, DC 20004 | Madison, WI 53701-1379 |
| (202) 344-8278 | (608) 234-6056 |
| MCDavis@Venable.com | eric.mcleod@huschblackwell.com |
| DLFeinberg@venable.com | |

David H. Coburn
Shannen W. Coffin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-8063
dcoburn@steptoe.com
scoffin@steptoe.com

      DATED this 17th day of December, 2019

                      /s/ Riyaz A. Kanji
                      Riyaz A. Kanji
                      KANJI & KATZEN, P.L.L.C.
                      303 Detroit Street, Suite 400
                      Ann Arbor, Michigan 48104
                      Telephone: (734) 769-5400
                      rkanji@kanjikatzen.com

*Counsel for the Bad River Band of the*
*Lake Superior Tribe of Chippewa Indians of*
*the Bad River Reservation and Naomi Tillison,*
*Director of Mashkiiziibii Natural Resources Department*
*of the Bad River Band of the Lake Superior Tribe of*
*Chippewa Indians of the Bad River Reservation,*
*in her official capacity.*