# ATTACHMENT E

# DECISION DOCUMENT:

# APPROVAL OF THE BAD RIVER BAND OF LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS' APPLICATION FOR TREATMENT IN THE SAME MANNER AS A STATE FOR SECTIONS 303(c) AND 401 OF THE CLEAN WATER ACT

# TABLE OF CONTENTS

I. INTRODUCTION AND ADMINISTRATIVE RECORD ................................... 2
   A. INTRODUCTION .................................................................................................. 2
   B. ADMINISTRATIVE RECORD .............................................................................. 2
      1. *Application and Supporting Materials* .................................................. 2
      2. *Letters and Related Documents from EPA* ......................................... 3
      3. *Governmental Entity Comments Regarding Tribal Authority* ............. 4
      4. *Capability Review* ................................................................................ 5
      5. *Statutory and Regulatory Provisions* ................................................... 5
      6. *Policy Statements* ................................................................................. 6

II. REQUIREMENTS FOR TAS APPROVAL ........................................................ 6
   A. FEDERAL RECOGNITION .................................................................................... 7
   B. SUBSTANTIAL GOVERNMENTAL DUTIES AND POWERS .................................. 7
   C. JURISDICTION OVER "WATERS WITHIN THE BORDERS" OF THE BAD RIVER BAND OF LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS RESERVATION .......................... 8
      1. *Map or Legal Description* .................................................................... 8
      2. *Identification of the Surface Waters for which the Tribe Proposes to Establish Water Quality Standards* ........................................................ 8
      3. *Statement Describing Basis for the Tribe's Authority* ........................ 9
      4. *Authority over Reservation Waters* ..................................................... 9
   D. CAPABILITY ..................................................................................................... 13

III. CONCLUSION ..................................................................................................... 14

   Appendix I:     Index to the Administrative Record
   Appendix II:    Findings of Fact
   Appendix III:   Response to Comments
   Appendix IV:   Capability Memorandum from Dan Cozza, Tribal Program Manager, Water Division, Region 5 EPA, dated April 17, 2009

## I. Introduction and Administrative Record

### A. Introduction

Section 303(c) of the Clean Water Act (CWA) requires the States to develop, review and revise (as appropriate) water quality standards for surface waters of the United States. At a minimum, such standards must include designated water uses, in-stream criteria to protect such uses, and an antidegradation policy. 40 C.F.R. § 131.6. In addition, Section 401 of the CWA provides that States may grant or deny "certification" for federally permitted or licensed activities that may result in a discharge to the waters of the United States. The decision to grant or deny certification is based on the State's determination regarding whether the proposed activity will comply with, among other things, water quality standards it has adopted under Section 303. If a State denies certification, the federal permitting or licensing agency is prohibited from issuing a permit or license.

Section 518(e) of the CWA authorizes the United States Environmental Protection Agency (EPA or the Agency) to treat an eligible tribe in the same manner as a state (TAS) for certain CWA programs, including Sections 303 and 401. EPA regulations establish the process by which EPA implements that authority and determines whether to approve a tribal application for TAS for purposes of administering Sections 303 and 401 of the CWA. See 56 Fed. Reg. 64876 (December 12, 1991), as amended by 59 Fed. Reg. 13814 (March 23, 1994) (codified at 40 C.F.R. Part 131).

This Decision Document provides the basis and supporting information for EPA's decision to approve the Application from the Bad River Band of Lake Superior Tribe of Chippewa Indians (the "Tribe", "Band") for TAS for Section 303(c) and Section 401 of the CWA, pursuant to Section 518(e) of the CWA and 40 C.F.R. Part 131. CWA Section 518(e)(2) authorizes EPA to treat a tribe as a state for water resources "within the borders of an Indian reservation." This approval applies to all surface waters identified by the Band that lie within the exterior borders of the Bad River Indian Reservation.

### B. Administrative Record

The following documents comprise a portion of the administrative record for this decision. Appendix I contains a complete index to the administrative record for this decision.

1. Application and Supporting Materials

The Band's Application for TAS for purposes of the water quality standards and certification programs under Sections 303 and 401 of the CWA includes the following letters and related documents from the Band and its Counsel:

> 3/1/06 Letter from Eugene Bigboy, Sr., Tribal Chairman, Bad River Band of Lake Superior Tribe of Chippewa Indians to Thomas Skinner, U. S.

EPA Regional Administrator, enclosing CWA Section 303 and 401 Program Eligibility Application and tribal attorney letter.

7/23/08 Letter from Eugene Bigboy, Sr., Tribal Chairman, Bad River Band of Lake Superior Tribe of Chippewa Indians to Bharat Mathur, U.S. EPA, Acting Regional Administrator including supplemental information to the application.

10/15/08 Email from Naomi Tillison, Bad River Band, to Dan Cozza, U.S. EPA, Water Division, including supplemental information to the application regarding the WDNR's issuance of a general construction permit on the Reservation.

11/3/08 Email from Naomi Tillison, Bad River Band, to Dan Cozza, U.S. EPA, Water Division, including supplemental information to the application regarding uses of artesian wells found within the Reservation.

11/13/08 Email from Naomi Tillison, Bad River Band, to Dan Cozza, U.S. EPA, Water Division, including supplemental information to the application regarding population numbers – members vs. non-members on the Reservation.

2. Letters and Related Documents from EPA

9/1/06 Letter from Bharat Mathur, Acting Regional Administrator, Region 5, to Jim Doyle, Governor, State of Wisconsin, providing notification of the Bad River Application and comment period. Letter copied to Wisconsin Department of Natural Resources (WDNR), Wisconsin Attorney General's Office, Bad River Band, Congressmen Dave Obey, Ashland County Clerk, Iron County Clerk and Bayfield County Clerk.

9/9/06 Notice and Meeting Invitation regarding Bad River Band's application for Water Quality Program Authorization. Published in the Daily Press, Ashland, WI on 9/9/06.

9/12/06 Environmental News Release and meeting announcement for meeting on 9/21/06

9/06 Public Information Fact Sheet

2/10/09 Letter from Bharat Mathur, Acting Regional Administrator, Region 5, to Jim Doyle, Governor, State of Wisconsin, providing notice to the State of EPA's development of and comment period for the Proposed Findings of Fact. Letter included public review draft of the Proposed Findings of Fact, Fact Sheet, and CD with Bad River Band's supplemental information. Letter cc'd to Bad River Band, WDNR, WI Attorney General, Ashland County Clerk, Iron County Clerk, Bayfield County Clerk, and Senator Herb Kohl.

> 2/17/09 Environmental News Release regarding Proposed Findings of Fact comment period. Newspaper notice placed in the Daily Press, Ashland, WI.

3. Governmental Entity Comments Regarding Tribal Authority

On September 1, 2006, acting EPA Region 5 Regional Administrator Bharat Mathur sent a letter notifying appropriate governmental entities[1] of the substance and basis of the Band's assertion of authority in its Application as provided at 40 C.F.R. §131.8(c)(2). Notice went to the governor of Wisconsin. Consistent with Agency practice, EPA also provided an opportunity for local governments and the public to review and comment on the Application. A public informational session was held on September 21, 2006. Advertisements announcing the comment period and the public informational session were placed in the local newspaper.

Notice of the availability of the Bad River Band's Application for comment was sent to the following recipients:

Jim Doyle, Governor
State of Wisconsin
Madison, WI 53702

Mr. Scott Hassett, Secretary
Wisconsin Department of Natural Resources
P.O. Box 7921
Madison, WI 53707

Wisconsin Department of Justice
Attn: Attorney General's Office
P.O. Box 7857
Madison, WI 53707

Eugene Bigboy, Sr.
Bad River Band of Lake Superior Tribe of Chippewa Indians
P.O. Box 39
Odanah, WI 54861

Ashland County
Attn: County Clerk
201 W. Main Street
Ashland, WI 54806

Bayfield County
Attn: County Clerk
P.O. Box 878
Washburn, WI 54891

Iron County Courthouse
Office of the County Clerk
300 Taconite Street
Hurley, WI 54534

Congressman Dave Obey
WI 7th District
1401 Tower Ave., Suite 307
Madison, WI 54880-1553

---

[1] EPA defines the term "appropriate governmental entities" as "States, tribes, and other Federal entities located contiguous to the reservation of the tribe which is applying for treatment as a State." 56 Fed. Reg. 64876, 64884 (Dec. 12, 1991). The term does not include local governments such as cities and counties. *Id.*

EPA received comments in support of the Bad River Band's Application from the Lac du Flambeau Band of Lake Superior Chippewa, and several individual and public entities.

Comments on the Band's Application were received from Scott Hassett, Secretary of the Wisconsin Department of Natural Resources by letter dated November 16, 2006. In addition, the State of Wisconsin transmitted comments from the public. All the comments received on the Application are listed in the Administrative Record (See Administrative Record Index in Appendix I). EPA's consolidated responses to the comments on the Application and the Proposed Findings of Fact, described below, are contained in Appendix III.

Consistent with its practice, EPA prepared Proposed Findings of Fact and, on February 10, 2009, circulated them for comment to the State of Wisconsin. EPA also informed local governments and the public. A comment letter, dated March 19, 2009, on the Proposed Findings of Fact was received from Todd Ambs, Administrator, Division of Water, WDNR. The WDNR did not have any comments on the Proposed Findings of Fact but did transmit the one comment received from the public. The WDNR's letter and the one comment received from the public are listed in the Administrative Record (see Administrative Record Index in Appendix I). EPA's consolidated responses to the comments on the Proposed Findings of Fact and the Band's application are contained in Appendix III. EPA has finalized the Proposed Findings of Fact based on comments received and the Final Findings of Fact is contained in Appendix II.

4. Capability Review

In approving the Band's application under Section 106 of the CWA, the EPA determined that the Band is federally-recognized and possesses a government exercising substantial duties and powers. Bad River Band was approved for CWA Section 106 grant eligibility on September 27, 1991 and for CWA Section 319 eligibility on October 10, 2006. In addition, based upon the Band's successful implementation of other environmental programs and the review of this Application's supporting documentation, the Agency has determined that the Band satisfies the capability requirement. (See memo attached as Appendix IV dated April 17, 2009 by Dan Cozza, EPA Region 5, Water Division Tribal Program Manager).

5. Statutory and Regulatory Provisions

a. Section 518(e) of the Clean Water Act, 33 U.S.C. § 1377(e), authorizes EPA to treat an eligible Indian tribe in the same manner as a state if it meets specified eligibility criteria.

b. "Amendments to the Water Quality Standards Regulation that Pertain to Standards on Indian Reservations" 56 Fed. Reg. 64876 (codified at 40 C.F.R. Part 131.8), establish the requirements for a tribe to administer a water quality standards program.

6. Policy Statements

Including, but not limited to:

a. EPA Policy for the Administration of Environmental Programs on Indian Reservations, November 11, 1984, as reaffirmed most recently by EPA Administrator Johnson on September 26, 2005.

b. EPA Memorandum entitled "EPA/State/Tribal Relations," by EPA Administrator Reilly, July 10, 1991.

c. Memorandum entitled "Adoption of the Recommendations from the EPA Workgroup on Tribal Eligibility Determinations," by Robert Perciasepe and Jonathan Cannon, March 19, 1998.

d. Strategy for Reviewing Tribal Eligibility Applications to Administer EPA Regulatory Programs, dated January 23, 2008.

## II.  Requirements for TAS Approval

Under CWA Section 518(e) and EPA's implementing regulation at 40 C.F.R. § 131.8(a), four requirements must be satisfied before EPA can approve a tribe's TAS application for water quality standards under Section 303(c) and certification under Section 401.  These are:  (1) the Indian tribe is recognized by the Secretary of the Interior and exercises authority over a reservation; (2) the Indian tribe has a governing body carrying out substantial governmental duties and powers; (3) the water quality standards program to be administered by the Indian tribe pertains to the management and protection of water resources that are held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation, or otherwise within the borders of an Indian reservation; and (4) the Indian tribe is reasonably expected to be capable, in the Regional Administrator's judgment, of carrying out the functions of an effective water quality standards program in a manner consistent with the terms and purposes of the Act and applicable regulations.

EPA's regulation at 40 C.F.R. § 131.8(b) identifies what must be included in an application by an Indian tribe for TAS to administer a water quality standards program.  EPA separately reviews tribal water quality standards under 40 C.F.R. § 131.21, and TAS approval under 40 C.F.R. § 131.8 does not constitute an approval of such standards.  But approval of a tribe for TAS for purposes of water quality standards does authorize that tribe to issue certifications under Section 401 of the CWA, once the Tribe's water quality standards are federally approved, see 40 C.F.R. § 131.4(c), and provided that the tribe designates a "certifying agency" as defined in 40 C.F.R. § 121.1(e).

## A. Federal Recognition

Under section 518 of the CWA and its implementing regulations, EPA can approve a TAS application only from an "Indian tribe" that meets the definitions set forth in CWA Section 518(h) and 40 C.F.R. § 131.3(k), and (l). See 40 C.F.R. § 131.8(a)(1). The term "Indian tribe" is defined as "any Indian tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation." CWA § 518(h)(2), 40 C.F.R. § 131.3(l). The term "Federal Indian reservation" means "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." CWA § 518(h)(1), 40 C.F.R. § 131.3(k).

The Bad River Band of Lake Superior Tribe of Chippewa Indians of Wisconsin is included on the Secretary of the Interior's list of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs." 72 Fed. Reg. 13648 No. 55 (March 22, 2007). Furthermore, as discussed below, the Band is exercising governmental authority over a reservation within the meaning of the CWA. Thus, EPA has determined that the Tribe meets the requirements of 40 C.F.R. § 131.8(a)(1) & (b)(1).

## B. Substantial Governmental Duties and Powers

To show that it has a governing body currently carrying out substantial governmental duties and powers over a defined area, 40 C.F.R. § 131.8(b)(2) requires that the Tribe submit a descriptive statement that should: (i) describe the form of the tribal government; (ii) describe the types of governmental functions currently performed by the tribal governing body; and (iii) identify the source of the tribal government's authority to carry out the governmental functions currently being performed.

The Band's authority to govern its members and others' activities within its territory stems from two sources: the historically rooted general recognition and agreement of the Band's members pursuant to the tribal government's inherent sovereignty as an Indian tribe, as recognized by the United States government, provides the first basis. The Band's constitution, adopted under Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) provides the second source. The Constitution and Bylaws of the Bad River Band (Attachment B to the Application) adopted by the Band's members were duly approved by the Secretary of the Interior on June 12, 1936. The Constitution and Bylaws include amendments approved by the Secretary of the Interior on December 1, 1942, October 31, 1944, April 25, 1977, March 8, 1978, and February 3, 1984. The Band's Application and attachments further summarizes the Band's form of government and outlines their governmental duties and functions.

EPA has determined that the Band's submissions in its Application and supplemental information, including the prior CWA Section 106 TAS approval in 1991 and CWA Section 319 TAS approval in 2006, adequately demonstrates that the Band's governing body is currently carrying out substantial governmental duties and powers

over a defined area and that nothing has happened in the interim to change that determination. Thus the Band meets the requirements in 40 C.F.R. § 131.8(a)(2) & (b)(2).

### C. Jurisdiction Over "Waters Within the Borders" of the Bad River Band of Lake Superior Tribe of Chippewa Indians Reservation

Under 40 C.F.R. § 131.8(b)(3), the Band is required to submit a statement of authority to regulate water quality. The statement should include: (i) a map or legal description of the area over which the Tribe asserts authority over surface water quality; (ii) a statement by the Tribe's legal counsel (or equivalent official) that describes the basis for the Tribe's assertion of authority, which may include a copy of documents such as tribal constitutions, by-laws, charters, executive orders, codes, ordinances, and/or resolutions that support the Tribe's assertion of authority; and (iii) an identification of the surface waters for which the Tribe proposes to establish water quality standards. 40 C.F.R. § 131.8(b)(3).

1. Map or Legal Description

The Band has submitted maps and a legal description of the Reservation, which consists of 124,655 acres of land in northern Wisconsin, including 195.71 acres of land located on the northeastern part of Madeline Island. The Band's Application and the Findings of Fact (Appendix II) provide a legal description of the Reservation. Maps are included as Attachment D of the Application. In sum, in its application, the Band asserts jurisdiction over all waters within the formal Reservation. For purposes of its application, the Band reserves the right to assert authority over the entire length of Chequamegon Point in the future.

EPA has determined that the Band has satisfied 40 C.F.R. § 131.8(b)(3)(i) by providing a map and legal description of the area over which the Band asserts authority to regulate surface water quality.

2. Identification of the Surface Waters for which the Tribe Proposes to Establish Water Quality Standards

The Band's Application asserts authority over all surface waters within the Reservation. As noted on Page 22 of the Application, "The Band proposes to set standards for all surface waters of the Reservation that meet the EPA's regulatory definition of the "Waters of the United States." The Band has submitted maps attached to its Application (Attachment D) that show Reservation waters and provided a table of the Waters of the Bad River Reservation along with designated uses (Attachment H). The Band also has submitted draft water quality standards and designated uses that identify those Reservation waters for which it proposes to establish standards (included in Administrative Record). In the Application, the Band further defines the Bad River Reservation and details the hydrology and waters within the Reservation and highlights the importance of these waterbodies to the Band. EPA has determined that the Band has satisfied 40 C.F.R. § 131.8(b)(3)(iii).

3. Statement Describing Basis for the Tribe's Authority

Finally, the Application identifies the legal authorities under which the Band has demonstrated inherent authority over the regulation of these waters. These authorities include the provisions of the Bad River Band's Constitution and By-Laws, and various resolutions, codes and ordinances that have been enacted by the Tribal Council and its Committees. A letter dated March 1, 2006 to Chairman Eugene Bigboy, Sr., and included as part of the Band's Application, provides the Band's Legal Counsel's statement outlining the Band's jurisdictional basis and authorities to implement the CWA Section 303 and 401 Programs.

4. Authority over Reservation Waters

CWA Section 518(e)(2) authorizes EPA to treat a tribe in the same manner as a state for water resources "within the borders of an Indian reservation." EPA has interpreted this provision to require that a tribe show inherent authority over the water resources for which it seeks TAS approval. 56 Fed. Reg. at 64880. The Band has asserted that it has authority to set water quality standards and issue certifications for all surface waters that it has identified within the Reservation boundaries as described in the Application and supplemental information. As explained in the analysis below, including the analysis of the information in the Findings of Fact in Appendix II, EPA has determined that the Bad River Band has shown inherent authority over nonmember activities for purposes of the CWA water quality standards and water quality certification programs.

In *Montana v. United States*, 450 U.S. 544 (1981) ("*Montana* test"), the U.S. Supreme Court held that absent a federal grant of authority, tribes generally lack inherent jurisdiction over nonmember activities on nonmember fee land. However, the Court also found that Indian tribes retain inherent sovereign power to exercise civil jurisdiction over nonmember activities, even on nonmember-owned fee lands within the Reservation, where (i) nonmembers enter into "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" or (ii) ". . . [nonmember] conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."[2] In analyzing tribal assertions of inherent authority over nonmember activities on Indian Reservations, the Supreme Court has reiterated that the *Montana* test remains the relevant standard. See, e.g., *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) (describing *Montana* as "the pathmarking case concerning tribal civil authority over nonmembers"); see also *Plains Commerce Bank v. Long Family Land & Cattle Co., Inc.*, 554 U.S. ___, 128 S.Ct. 2709, 2723-24 (2008) ("*Montana* provides that, in certain circumstances, tribes may exercise authority over the conduct of nonmembers, even if that conduct takes place on non-Indian land"); *Nevada v. Hicks*, 533 U.S. 353, 358 (2001) ("Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in [*Montana*]"); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645 (2001).

---

[2] *Id.* at 565-66.

9

The first prong of the *Montana* test concerns whether the activity that the tribe is proposing to regulate involves nonmembers who have entered into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. The second prong of the *Montana* test analyzes whether the tribe is proposing to regulate activity that "threatens" or "has some direct effect" on tribal political integrity, economic security, or health or welfare. In the preamble to EPA's 1991 water quality standards regulation, the Agency noted that, in applying the *Montana* test and assessing the impacts of nonmember activities on an Indian tribe, EPA will rely upon an operating rule that evaluates whether the potential impacts of regulated activities on the tribe are serious and substantial. 56 Fed. Reg. 64876, 64878-79 (December 12, 1991) (noting that in *Brendale v. Confederated Tribes & Bands of the Yakama Indian Nation*, 492 U.S. 408, 431 (1989) (opinion of White, J.), several justices argued that for a tribe to have a "protectable interest" in a nonmember activity under *Montana*'s second exception, the activity's effect should be "demonstrably serious"); *see also Atkinson Trading Co.*, 532 U.S. at 659. EPA also recognized that the analysis of whether the *Montana* test is met in a particular situation necessarily depends on the specific circumstances presented by the tribe's Application. *Id.* In addition, in that rulemaking, EPA noted as a general matter "that activities which affect surface water and critical habitat quality may have serious and substantial impacts" and that "because of the mobile nature of pollutants in surface waters and the relatively small length/size of stream segments or other water bodies on Reservations... any impairment that occurs on, or as a result of, activities on non-Indian fee lands [is] very likely to impair the water and critical habitat quality of the tribal lands." *Id.* EPA also noted that water quality management serves the purpose of protecting public health and safety, which is a core governmental function critical to self-government. *Id.*

The CWA addresses the maintenance and restoration of the physical, chemical, and biological integrity of waters of the United States, including tribal waters, by providing, among other things, for tribes treated in the same manner as states, act to "prevent, reduce, and eliminate pollution." CWA Section 101(b), 33 U.S.C. §1251(b). The Act authorizes eligible tribes to carry out certain CWA functions that "pertain to the management and protection" of Reservation water resources. The *Montana* test analyzes whether the tribe is proposing to regulate activity that "threatens" or "has some direct effect" on tribal political integrity, economic security, or health or welfare. That test does not require a tribe to demonstrate to EPA that nonmember activity "'is actually polluting tribal waters,'" if the tribe shows "'a potential for such pollution in the future.'" *Montana v. EPA*, 141 F.Supp.2d 1259, 1262 (D. Mont. 1998), quoting *Montana v. EPA*, 941 F.Supp. 945, 952 (D. Mont. 1996), *aff'd* 137 F.3d 1135, 1140-41 (9th Cir. 1998) (citing "the threat inherent in impairment of the quality" of a source of reservation water) *cert denied* 525 U.S. 921 (1998). Thus, EPA considers both actual and potential nonmember activities in analyzing whether a tribe has demonstrated authority over nonmember activities under the *Montana* test.

EPA recognizes that under well-established principles of federal Indian Law, a tribe retains attributes of sovereignty over both its lands and its members. *See e.g. California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987): *U.S. v. Mazurie*, 419 U.S. 544, 557 (1975). Further, tribes retain the "inherent authority

10

necessary to self-government and territorial management" and there is a significant territorial component to tribal power. *Merrion v. Jicarilla Apache Tribe*, 450 U.S. 130, 141-142. *See also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151 (1980) (significant geographic component to tribal sovereignty).

And a tribe also retains its well-established traditional power to exclude non-members from tribal land, including "the lesser power to place conditions on entry, on continued presence, or on reservation conduct." *Merrion*, 455 U.S. at 144. See also *Plains Commerce Bank*, 128 S.Ct. at 2723 ("persons are allowed to enter Indian land only 'with the assent of the [tribal members] themselves,'" quoting *Worcester v. Georgia*, 6 Pet. 515, 561 (1832)). Thus a tribe can regulate the conduct of persons over whom it could "assert a landowner's right to occupy and exclude." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 651-652 (2001), quoting *Strate*, 520 U.S. at 456. See also *Plains Commerce Bank*, 128 S.Ct. at 2723, quoting *South Dakota v. Bourland*, 508 U.S. 679, 691 n. 11 (1993) ("Regulatory authority goes hand in hand with the power to exclude"). Activities regulated under the water quality standards program can, if not properly managed, threaten water quality regardless of whether they are carried out by tribal members or nonmembers. To protect against the harmful effects of such activities on tribes and their members, a tribe may use its inherent sovereign authority either to exclude nonmembers from tribal/trust land or, as a lesser included power, to condition entry for the purpose of conducting such activities on consent to proper regulatory control.[3]

The Band's Application letter makes the following statements about the importance of tribal water quality to the Band:

> "Fortunately, virtually all surface waters of the Bad River Indian Reservation are even today of very high quality, and the Tribe wishes to see them remain that way. The Tribe is proud of the fact that the Bad River Indian Reservation also contains high quality wildlife habitat for many species, including some which are rare and endangered, and many other species of plants and animals. Again, the Tribe wishes to maintain and, where necessary, improve the existing situation with an eye toward preserving the Bad River Indian Reservation for the long-term enjoyment and sustenance of present and future generations of its members. Present day threats to tribal members' health and welfare, and the political integrity and economic security of the Tribe, which are associated with cumulative surface water discharges of pollution on and near the Bad River Reservation include failing septic systems, sedimentation, runoff,

---

[3] As explained in this Decision Document, the Band, if necessary, also could show authority over nonmember activities on tribal/trust lands covered by the Application under the *Montana* "impacts" test.

and erosion from land uses such as agriculture and forestry, and municipal wastewater discharges. ..."

And later in the Application (Page 9), the Band states:

> "These water resources have provided subsistence, cultural and spiritual benefits to many generations of Bad River Ojibwe. The Kakagon Sloughs, at the mouth of the Kakagon River on Lake Superior, holds the largest remaining wild rice beds on the Great Lakes and is an integral part of the lives of the Tribal members. The Bad River Band's identity and social cohesion is dependent on the continuing supply and quantity of the Reservation's wild rice. ..."

As explained more fully below and in the Findings of Fact, Appendix II, the Band supported its claims with evidence that it uses the waters as it asserts and with information showing how current and potential nonmember activities on the Reservation have or may have direct effects on the Band's political integrity, economic security, and health and welfare.

The facts upon which EPA has relied in reviewing and making findings regarding the Band's assertion of authority to regulate the activities of nonmembers on the Reservation are presented in the Application, supplemental materials, and in the Findings of Fact, Appendix II, to this Decision Document. EPA also bases its findings and conclusions on its special expertise and practical experience regarding impacts to water quality and the importance of water quality management, recognizing that clean water may be crucial to the survival of the Band and its members. As explained more fully in Section A of the Findings of Fact, Appendix II, EPA makes several findings regarding the Band's uses of the waters of the Reservation, including the following:

> While the Band's Application emphasizes that water resources are integral to the life and culture of the Tribe as a whole, the Band has identified the following specific uses for water within the Reservation, and which all carry equal importance to the Tribe:
> - Tribal community water supplies
> - aquatic life and fish
> - recreation
> - wild rice
> - wildlife
> - cultural/ceremonial

Also, within Sections B and C of the Findings of Fact, Appendix II, EPA makes several findings based on the Band's statements regarding potential and actual impacts of nonmember activities on tribal resources. The Findings of Fact, Appendix II, states the following:

> The materials in the index for this matter demonstrate that the following activities occur or may occur on the Reservation. These include activities carried out by nonmembers:

- Agriculture
- Residential discharges
- Forestry
- Illegal dumping and Salvage Yards
- Sand/Gravel Mining and Energy Resources/Pipelines

Section C of the Findings of Fact, Appendix II, provides specific examples of activities by non-members and how these activities affect or may affect the Tribe and/or tribal members. Activities and impacts/potential impacts include sedimentation and water quality impacts from agricultural practices, discharges/contamination from failing septic systems, erosion and sedimentation from lumber/forestry practices, contamination and filling from illegal dumping, salvage yards and/or unpermitted construction activities and hydrologic disruptions and other impacts from sand/gravel mining and energy resources pipelines.

Based on the preceding findings, and additional findings and information, all described more fully in the Findings of Fact, Appendix II, EPA concludes that existing and potential future nonmember activities within the Reservation have or may have direct effects on the political integrity, economic security and health and welfare of the Band that are serious and substantial.

Thus the Agency has determined that the Band has satisfied 40 C.F.R. § 131.8(a)(3) & (b)(3)(ii) by providing a statement by the Band's legal counsel that describes the basis for the Band's assertion of authority over surface waters within the borders of the Reservation. And that determination, in conjunction with the previously stated findings, means that the Band has met the requirement set forth at 40 C.F.R. § 131.8(a)(3).

### D. Capability

To demonstrate that a tribe has the capability to administer an effective water quality standards program, 40 C.F.R. § 131.8(b)(4) requires that the tribe's application include a narrative statement of the tribe's capability. The narrative statement should include: (i) a description of the tribe's previous management experience, which may include the administration of programs and services authorized by the Indian Self-Determination and Education Assistance Act, the Indian Mineral Development Act or the Indian Sanitation Facility Construction Activity Act; (ii) a list of existing environmental and public health programs administered by the tribal governing body and copies of related tribal laws, policies, and regulations: (iii) a description of the entity (or entities) that exercise the executive, legislative, and judicial functions of the tribal government; (iv) a description of the existing, or proposed, agency of the tribe that will assume primary responsibility for establishing, reviewing, implementing and revising water quality standards; and (v) a description of the technical and administrative capabilities of the staff to administer and manage an effective water quality standards program or a plan that proposes how the tribe will acquire additional administrative and technical capabilities. 40 C.F.R. § 131.8(b)(4)(i)-(v).

The Band's Application shows that it is reasonably expected to be capable of carrying out the functions of an effective water quality standards program in a manner consistent with

the terms and purposes of the CWA and applicable regulations. The record includes a April 17, 2009 memorandum from Dan Cozza, EPA Region 5, Tribal Program Manager, within the Water Division (Appendix IV) that summarizes the experiences he and the different programs have had with the Band and explains the reasons for finding that the Band is capable of administering its water quality standards program. Mr. Cozza concluded that the Band has demonstrated the capability to administer an effective water quality standards program based on his review of the Application and other documents. The program offices within Region 5 that presently have or have had grants and programs with the Band have all provided positive feedback with regard to the capability of the Band. This, in addition to the information provided in the Band's Application, in which the Band highlights its past and ongoing environmental and public health programs, and includes the Band's draft proposed CWA 401 Certification process, provides the basis for this capability determination. The Application includes the position descriptions of the Band's primary staff that will be an integral part of the operating of the Band's Water Resource Program, including the Water Quality Standards Program. Based upon a review of these position descriptions, these staff members are expected to possess the necessary education and experience to administer the water quality standards and certification programs.

The Band has satisfied the requirements of 40 C.F.R. § 131.8(b)(4) by providing information that describes its capability to administer an effective water quality standards and certification program, and EPA has determined that the Band has met the requirements of 40 C.F.R. § 131.8(a)(4).

## III. Conclusion

EPA has determined that the Bad River Band of Lake Superior Tribe of Chippewa Indians has met the requirements of CWA Section 518(e) and 40 C.F.R. § 131.8, and therefore approves the Band's Application for TAS for eligibility to administer the water quality standards program pursuant to CWA Sections 518(e) and 303(c). Pursuant to 40 C.F.R. § 131.4(c), the Band is also eligible to the same extent as a state for the purposes of certifications under CWA Section 401.

_____  
Bharat Mathur  
Acting Regional Administrator

June 26, 2009
_____  
Date