IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER RESERVATION,

                              Plaintiff,                                  ORDER

      v.

ENBRIDGE, INC., *et al.*,                                      19-cv-602-wmc

                            Defendants.

Four discovery motions currently are pending before the court: defendant Enbridge's renewed motion to compel more disclosures from third party Sierra Club (dkt. 150), Enbridge's motion to compel the depositions of tribal council members (dkt. 157), Enbridge's motion to compel disclosures regarding abatement work (dkt. 160) and Enbridge's motion to compel disclosures regarding substantially similar projects. (Dkt. 177).  The Sierra Club and the Band oppose all of these motions.[1]  This order deals with the first two motions; I will issue a separate order on the third and fourth motions soon.  For the reasons stated below, I am granting in very small part Enbridge's renewed motion against Sierra Club while denying the rest of that motion; although it's a closer call, I also am denying Enbridge's motion to compel the deposition of tribal council members.

## Background on the Scope of Discovery

The Bad River Band of the Tribe of Chippewa Indians of the Bad River Reservation, ("the Band"), has sued Enbridge Energy Company, Inc. and Enbridge Energy, L.P. ("Enbridge") over the operation of the Line 5 pipeline across the Band's Reservation, asserting claims for

---

[1] Enbridge also filed two motions for leave to file replies in support of two of its motions, *see* dkts. 178 and 179, which the Band opposes in a document that reads more like a surreply, *see* dkt. 180.  Because I am not holding a hearing on any of these motions, I have considered all of these submissions.

trespass and nuisance.  With regard to the nuisance claim, the Band alleges that Enbridge is operating the pipeline on the Reservation under conditions that create an unreasonable risk of a pipeline release and degradation of the Band's natural and cultural resources.  According to the Band, the risk is most pronounced at two sites, the "Meander" site and Slope 18.

Enbridge has proposed several projects that it contends would abate the allege nuisance, including a proposal to install a new section of pipeline underneath the Bad River by means of horizontal directional drilling (HDD), and a proposal to install riprap along the banks of the Bad River at the meander in an effort to prevent the river from encroaching upon and rupturing the pipeline.  The Band's Tribal Council, which has been authorized by the Environmental Protection Agency to administer Sections 303 (pertaining to water quality standards) and 401 (water quality certifications) of the Clean Water Act, has denied Enbridge's applications for water quality certifications in connection with its proposed projects.

This lawsuit has been fraught with discovery disputes.  Last May, Judge Conley held a telephonic hearing on two then-pending motions to compel.  *See* 5/14/21 Hearing Tr., dkt. 147 and 5/15/21 Order, dkt. 144.  Enbridge was seeking information aimed at establishing that the Tribal Council's denials were pretextual and not based on legitimate water quality concerns.  Judge Conley made clear to Enbridge his view that the Band's motives were irrelevant:

> You can document what efforts you've made to try to get access to do the things you say you need to do.  You can document what the Bad River Band has done in response.  But what possible difference does their motive make to my resolving the disputes between the parties?  . . . I'm going to be hearing from expert witnesses as to what they believe the environmental impacts are and could be, as well as the structural soundness of the line. . . As far as the  . . . Band's motivation for not wanting a pipeline to breach the Bad River, I really don't see the relevance of that.  The only question is whether or not there's a reason to be concerned.

5/14/21 Hrg Tr., dkt. 147, at 7-8, 15.

2

Along the way, Judge Conley chastised Enbridge for "clearly adopting a scorched earth policy with respect to this litigation," *id.* at 15.  Judge Conley asked:

> Let me just assume for the moment hypothetically that the Band is acting purely to hold up Enbridge for as much money as possible or – and/or to just stop Line 5 in its tracks and that it is doing so despite not preserving the Bad River itself.  What . . . difference does that make for purposes of the issues before me in this lawsuit?
>
> *Id.* at 7.
>
> You can document what efforts you've made to try to get access to do the things you say you need to do [*to abate the alleged nuisance*].  You can document what the Bad River has done in response.  But what possible difference does their motive make to my resolving the disputes between the parties?
>
> *Id.*

When told that Enbridge intended to challenge the credibility of the claims that the Band was making, Judge Conley deemed that absurd:"I'm not going to be testing either side's credibility with respect to these issues.  I'm going to be hearing from expert witnesses as to what they believe the environmental impacts are and could be, as well as the structural soundness of the line." *Id.* at 7-8.  Enbridge also wanted information about how the Band operated its wastewater facility to prove that the Band was itself polluting the flora and fauna that it asserted it was trying to protect from Enbridge. Judge Conley labeled this argument "patently absurd, a complete distraction from the issues before the court." *Id*. at 14.

In his written order following the hearing, Judge Conley clarified that "actual *instances* (as opposed to imputed or actual motives) of the plaintiff refusing to cooperate with defendant in remediation measures to insure or increase the integrity of Line 5 *or the reverse*, if any, ARE relevant to this dispute, as are both sides' good faith cooperation during the pendency of this lawsuit more generally.") dkt. 144, at 2, emphasis in original.

**Dkt. 150: Enbridge's Renewed Motion To Compel Directed at Sierra Club**

This motion is a continuation of the dispute over how much information Enbridge is entitled to discover from the email communications between the Band and non-party Sierra Club.  I addressed this issue in a telephonic hearing on May 14, 2021, *see* text-only order, dkt. 145 and 5/14/21 Tr., dkt. 148.  On August 9, 2021 non-party Sierra Club submitted a supplemental brief reporting that disputes remained over the scope of disclosure, and that the court would have to weigh in.  *See* dkt. 149.  On August 26, 2021, Enbridge responded to Sierra Club's brief and renewed its motion to compel disclosure. *See* dkt. 150.  Particularly concerning– and irritating–to Enbridge was Sierra Club's redaction of major portions of the email strings underlying the specific emails that the court had ordered disclosed.  The court allowed a response by Sierra Club and ordered it to produce the redacted emails ex parte for in camera review by the court.  August 27, 2021 text-only order, dkt. 151.  On September 9, 2021, Sierra Club filed its opposition (dkt. 155) and its ex parte documents, the hard copies of which fill a three-inch binder.

This is a good a spot to note the obvious: Judge Conley's statements and rulings about what's discoverable in this lawsuit and what's not evince a narrower view than my statements about and my rulings on the instant dispute.  Judge Conley's view controls.  For instance, Judge Conley has ruled that the personal communications of four Band governing members are not discoverable (dkt. 144 at 2), so those are off the table.  Judge Conley also ruled that "actual *instances* (as opposed to imputed or actual motives) of the plaintiff refusing to cooperate with defendant in remediation measures to insure or increase the integrity of Line 5" are discoverable, *id.*, emphasis in original; beyond that, he cautioned the parties to approach discovery more circumspectly.  Similarly, although I was open to the notion that emails impeaching the Band's

motives for opposing Enbridge's actions could be relevant and discoverable, Judge Conley was not.

With that as the backdrop, let's start with the 19 emails that Sierra Club withheld on the basis that they were sent by Band members from personal accounts. *See* dkt. 155 at 4-5. These emails fit within the group that I have ordered disclosed, and the fact that they were sent from personal accounts doesn't affect my analysis, even under Judge Conley's narrower view of relevance. Sierra Club attempts to fit these "personal" emails into Judge Conley's ruling at his May 24, 2021 telephonic hearing, but Judge Conley's ruling (and ire) were directed against Enbridge's request to rummage unchecked through the Band members' personal cell phones. *See* dkt. 155-2 at 14-18. The overbreadth and invasiveness of that request cannot be compared to Enbridge's request to review emails sent by Band members to Sierra Club. Therefore, Sierra Club must disclose these emails. This is the "small part" in which I am granting Enbridge's motion.

Next, I am sticking with my earlier ruling that emails directly from Sierra Club's director (Elizabeth Ward) need not be disclosed. Sensitive to the "stalking horse" concerns that are floating through this lawsuit, I have reviewed these emails to see if any of them cross the line drawn by Judge Conley (actual instances of the Band refusing to cooperate with Enbridge in remediation efforts). None of them do. These emails primarily involve efforts to coordinate general opposition to the Line by its opponents, generously peppered with expressions of mutual admiration between the Band and Sierra Club. There is nothing in these emails that makes them discoverable in this lawsuit; frankly, there is nothing in them that actually would be of genuine interest to Enbridge.

This segues to the redacted emails about which Enbridge complains. I understand Enbridge's frustration and concern: many of the redactions remove all context from Sierra Club's emails, making some of them opaque and meaningless. For all Enbridge knows, the redactions mask communications that would support its suspicions of vexatious skullduggery by the people and entities who oppose the Line. That's why the court chose to review all of these redacted emails in camera. paying special attention to the emails flagged by Enbridge, *see* Exhs. F – I (dkts. 150-6 – 150-9).[2] Bottom line: there's nothing there. As with the Ward emails, none of these emails or the redactions from them cross the line drawn by Judge Conley. As with the Ward emails, these emails and the redactions from them primarily involve efforts to coordinate general opposition to the Line by its opponents. There is nothing in these emails that makes them discoverable and there is nothing in them that actually would be of genuine interest to Enbridge.

### Dkt. 157: Enbridge's Motion To Compel Depositions

Enbridge wants to depose of three of the Band's council members (Wiggins, Jennings and McFee), seeking to question them on the "circumstances, bases, and reasoning" for the Tribal Council's denials of Enbridge's proposed remediation projects, as well as "other information relevant to whether those denials were reasonable." *See* dkt. 157 at 2. Enbridge says this information is relevant to its affirmative defense that the Band is intentionally thwarting its attempts to abate any nuisance and not applying the Clean Water Act even-handedly. The Band and the Tribal Council members have taken the position that the information Enbridge seeks is not relevant or proportional to the needs of this case, and in any case is protected by the

---

[2] I could not discern any pattern or order governing how the emails were sequenced in the binder, but this did not affect my ability to review the documents.

legislative privilege.  *See* dkt. 161.  Both sides make valid points, but I am denying Enbridge's motion.

As an initial matter, I disagree with the Band that the council members' actions in connection with their denials of Enbridge's proposed projects are shielded by legislative immunity.  Such immunity attaches to "all actions taken 'in the sphere of legitimate legislative activity,'" and turns on "the nature of the act, rather than on the motive or intent of the official performing it."  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)).  Such actions include, for example, (1) core legislative acts such as introducing, debating, and voting on legislation, (2) activities that could not give rise to liability without inquiry into legislative acts and the motives behind them, and (3) activities essential to facilitating or preventing the core legislative process.  *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997).  On the other hand, acts which are administrative in nature, such as the termination of an employee, do not qualify for immunity.  *See, e.g., Baird v. Bd. of Educ. for Warren Cmty. School Dist. No. 205*, 389 F.3d 685, 696 (7th Cir 2004).

As Enbridge points out, the fact that the Band's Tribal Council is the body granting or denying project proposals does not, *ipsa*, make those decisions legislative, given that the Band's constitution vests *all* executive, legislative, and judicial functions in the Tribal Council.  *See* Bad River Band App. for Treatment as a State, dkt. 157-9, exh. I, at 31 ("Pursuant to the Bad River Constitution, all executive, legislative, and judicial functions are vested in the Tribal Council. The Council has retained and exercises primary functions of the executive and legislative branch.").  Thus, the fact that the council members voted on Enbridge's proposals at duly-constituted Tribal Council meetings does not establish that those acts were legislative in nature.

7

What matters is the nature of the Council's action, which here was quintessentially administrative. As described by the Band, the council members' acts consisted of reviewing Enbridge's application materials and determining whether they met certain regulatory and statutory criteria, taking into account the recommendations of the Mashkiiziibii Natural Resources Department ("MNRD"), which has primary responsibility for evaluating applications for Tribal Water Quality Certifications under the Clean Water Act. In doing so, the Council was not enacting policy or making legislative decisions, but rather was engaging in ad-hoc decision-making specific to Enbridge. Legislative immunity does not attach to such decisions. *Accord Skokomish Indian Tribe v. Forsman*, No. C16-5639 RBL, 2017 WL 1093294, at *6 (W.D. Wash. Mar. 23, 2017), aff'd, 738 F. App'x 406 (9th Cir. 2018) (legislative immunity protected tribal officials who promulgated hunting regulations but did not protect tribe's Fisheries Director "because his authority to issue hunting licenses involves ad hoc decision making, applied to individuals, that is non-legislative in character and does not bear the hallmarks of traditional legislation.").

Nevertheless, I am not persuaded that the council members' thought-processes for voting as they did are relevant to Enbridge's defense *and* proportional to the needs of this case, particularly given the parameters set by Judge Conley and quoted above. Enbridge argues that the Tribal Council's denials of its proposed remediation projects constitute "actual instances" of non-cooperation by the Band that fall within the proper scope of discovery as outlined by Judge Conley. But as it admits (in arguing that the council waived any legislative privilege), the council members "have described in detail . . . the purported bases for the Band's denials and have produced these materials as part of their discovery obligations." Dkt. 157, at 3. According to the Band, it already has provided Enbridge with copious discovery concerning what the Band

"did in response" to Enbridge's remediation proposals, including internal documents from the MNRD and audio and video recordings of Tribal Council meetings.  In addition, Enbridge has deposed the MNRD Director, Water Resource Specialist, and Wetlands Specialist about their evaluations of Enbridge's applications.  Dkt. 161, at 7.

All this being so, it is hard to fathom what additional information Enbridge could hope to discover by deposing the council members *except* for information showing or implying that the Tribal Council's public statements are not credible and that they were personally motivated by anti-Enbridge bias.  As Judge Conley has made clear, however, this case will turn on the reasonableness of the Band's *actions*, not the purity of its motivations, making the credibility evidence of this sort irrelevant.  Enbridge has not made a convincing argument, either in its initial brief or on reply, why it needs deposition testimony from the individual council members, in addition to all the other information it has already received, to understand how the Tribal Council arrived at its decisions or to show that the Band unreasonably or unlawfully rejected its nuisance abatement proposals.  Accordingly, I find that even if deposition testimony of the council members may have some relevance to Enbridge's defenses, it is not proportional to the needs of this case.  Accordingly, Enbridge's motion to compel the deposition testimony of Wiggins, Jennings, and McFee, is denied.

ORDER

IT IS ORDERED that:

1.  Enbridge's renewed motion to compel discovery from Sierra Club is GRANTED IN PART and DENIED IN PART in the manner described above;

2.  Enbridge's motion (dkt. 178) for leave to file a reply in support of its motion to compel depositions (dkt. 157) is GRANTED; and

3.  Enbridge's motion to compel the depositions of Mike Wiggins, Dylan Jennings, and Jay McFee, dkt. 157, is DENIED.

Entered this 4th day of April, 2022.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

10