**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION<br><br>*Plaintiff,*<br>v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.<br><br>*Defendants.* | Case No. 3:19-cv-00602<br><br>Judge William M. Conley<br><br>Magistrate Judge Stephen Crocker |
| ENBRIDGE ENERGY, L.P.<br><br>*Counter-Plaintiff,*<br>v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity<br><br>*Counter-Defendants.* | |

## <u>OPPOSITION TO BAND'S PARTIAL MOTION FOR SUMMARY JUDGMENT</u>

Enbridge Energy, Limited Partnership and Enbridge Energy Company, Inc. (collectively, "Enbridge"), by and through undersigned counsel, hereby file this Opposition to the Bad River Band of the Lake Superior Tribe of Chippewa Indians' ("Band's") Partial Motion for Summary Judgment (D.E. 167-168, *hereinafter* "Band Motion").

# <u>TABLE OF CONTENTS</u>

**Page**

I.   **The Band's Trespass Claim Fails Because The 1992 Agreement Contains The Band's Consent for Enbridge to Operate Line 5 Across The Entire Reservation Until 2043** ................................................................................................................ **8**

A.   Consent Is A Complete Defense to Trespass ....................................................... 8

B.   Rules of Contract Interpretation ....................................................................... 10

C.   The Primary Purpose of the 1992 Agreement Was to Permit and Authorize Line 5 Operations Across the *Entire* Reservation Until 2043 ...................................... 10

D.   The Band Made Two, Separate 50-Year Consent Promises Based on The Plain Text of The 1992 Agreement ...................................................................................... 15

  1.   Recitals and Definitions Reflect the Parties' Intent to Memorialize an Easement over the Entire Reservation ................................................... 15

  2.   Section 1: Consent to a 50-Year BIA Easement ..................................... 18

  3.   Section 3: Consent Over Other Lands Was Provided, and Future Cooperation Guaranteed, to Secure a 50-Year Right to Operate ............ 21

E.   The Band's Reading of the 1992 Agreement Is Incorrect And Unreasonable ... 25

  1.   The Band Cannot Read "Existing Rights of Way" Out of the Contract . 25

  2.   Enbridge's 1992 BIA Easement Application is Not Incorporated by Reference, and Does Not Contradict the Terms and Scope of the Agreement .................................................................................................................. 28

  3.   Section 3 is Not a "Ministerial" Clause ................................................. 33

F.   If The 1992 Agreement Is Ambiguous, The Extrinsic Evidence Supports Enbridge's Interpretation ................................................................................. 39

  1.   The Parties' Pre-1992 Practice and Pre-Execution Negotiations Confirm the Band Provided Consent for All Reservation Lands Subject to BIA Jurisdiction for 50 Years ........................................................................ 40

  2.   The Band Confirmed to the BIA Its Desire to Consent to a Binding 50-Year Term ........................................................................................................ 42

  3.   The Parties' Subsequent Course of Performance ................................... 44

G.   The Band Has Breached The 1992 Agreement ................................................. 51

II.  **The "Unmistakability Doctrine" Does Not Apply as a Defense to the Band's Breach** ............................................................................................................ **53**

A.   Analyzing The *Winstar* Opinion ...................................................................... 54

  1.   Pre-*Winstar* Development of the Doctrine ............................................ 54

  2.   The *Winstar* Opinion, Its Takeaways, and Its Impact ........................... 55

B.   Section 3 Of The 1992 Agreement Does Not Block Any "Sovereign Power" ... 56

|  | 1. | The 1992 Agreement Does Not Block A "Sovereign Power" As Protected by the Unmistakability Doctrine............................................................. 57 |
|  | 2. | The Band Has Not Enacted Subsequent Law That Has Caused the Band to Breach the Contract.................................................................................. 59 |
|  | 3. | The Band's 2017 Resolution is Intended Specifically to Repudiate the Contract.................................................................................................. 60 |

C.   The Band Unambiguously Agreed to Provide its Consent in The 1992 Agreement ..................................................................................................................... 61

D.   Application of The Unmistakability Doctrine Here Does Not Serve Its Purpose 63

**III.   Enbridge Still Has A Valid Right To Operate Line 5 Because Its BIA-Approved Easements Remain In Effect ........................................................................... 65**

A.   Procedural History of Enbridge's Renewal Application for Allotted Parcels .... 65

B.   5 U.S.C. § 558(c) Provides for Automatic Extension of BIA-Approved Easements Under Certain Circumstances ................................................................ 66

C.   Enbridge Satisfies All the Requirements of § 558(c) ......................................... 68

D.   The Band's Trespass Claim Did Not Exist When It Filed Its Complaint And Must Be Denied............................................................................................................. 71

**IV.   The Pipeline Safety Act Forecloses The Band's Attempts To Regulate Pipeline Safety .......................................................................................................... 73**

A.   Field Preemption ................................................................................................. 74

B.   Obstacle Preemption ........................................................................................... 79

C.   Displacement of Federal Common Law .............................................................. 79

**V.   The Band Is Not Entitled to Summary Judgment on Enbridge's Good Faith and Fair Dealing Counterclaim......................................................................... 82**

**VI.   The Band Is Not Entitled to Summary Judgment on Its Claim for Unjust Enrichment ................................................................................................ 90**

**VII.   The Band is Not Entitled to Any Profits-Based Damages ......................................... 93**

A.   The Band Has No Cause of Action for, and Has No Other Right to, an Accounting of Enbridge's Profits ........................................................................................... 93

B.   The Band's Request for Restitution Does Not Entitle it to Damages................. 94

C.   Damages for Trespass Are Fair Rental Value, Or Diminution in Value, not Profits ............................................................................................................................. 95

D.   Disgorgement of Profits is Only Available as a Measure of Damages for Trespass Where a Bad Faith Trespasser Removes Something from the Plaintiff's Land, Which Has Not Occurred Here .......................................................................... 97

E.   Even if Bad Faith Were Relevant, Enbridge Did Not Act in Bad Faith .......... 100

    F.    The Band is Not Equitably Entitled to Profits Because Awarding Profits Would Result in a Windfall .................................................................................. 102

**VIII.**    **The Court Should Deny The Band's Request For Injunctive Relief ...................... 104**

    A.    The Band is Not Entitled to an "Automatic" Injunction ................................... 104

    B.    The Equities Overwhelmingly Favor Rejecting an Injunction ........................ 108

        1.    An Injunction Is Contrary to the Public Interest .................................... 108

        2.    The Band Has Not Demonstrated Irreparable Harm ............................. 120

        3.    The Harm to Enbridge Is Significant .................................................... 123

        4.    At A Minimum, Factual Disputes Preclude Entry of An Injunction .... 124

**IX.**    **Enbridge's Defense Of Laches Precludes Summary Judgment On The Band's Requested Remedies ................................................................................................ 126**

    A.    The Band's Lack of Diligence in Filing for Trespass Six Years Later ............. 127

    B.    Enbridge Is Prejudiced by the Band's Delay Asserting Trespass .................... 131

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*188 LLC v. Trinity Indus., Inc.*,
   300 F.3d 730 (7th Cir. 2002) ...................................................28

*A-W Land Co. LLC v. Anadarko E & P Onshore LLC*,
   2014 WL 7051161 (D. Colo. Dec. 12, 2014)...................................100

*Abbott Labs. v. Mead Johnson & Co*.,
   971 F.2d 6 (7th Cir. 1992) ....................................................109

*Alto Dairy v. Veneman*,
   336 F.3d 560 (7th Cir. 2003) ...................................................70

*American Commercial Lines, LLC v. Lubrizol Corp.*,
   817 F.3d 548 (7th Cir. 2016) ...................................................89

*American Electric Power Co. v. Connecticut*,
   564 U.S. 410 (2011)......................................................79, 80, 81

*American Ins. Assoc. v. Garamendi*,
   539 U.S. 396 (2003)........................................................112, 113

*Andrews v. Columbia Gas Transmission Corp.*,
   2006 WL 8441747 (S.D. Ohio Oct. 23, 2006)..................................77

*Animal Welfare Institute v. Martin*,
   623 F.3d 19 (1st Cir. 2010).....................................................108

*ANR Pipeline Co. v. Iowa State Commerce Comm'n*,
   828 F.2d 465 (8th Cir. 1987) ...................................................77

*U.S. ex rel. Anti-Discrim. Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*,
   712 F.3d 761 (2d Cir. 2013)................................................62, 63

*Basicomputer Corp. v. Scott*,
   973 F.2d 507 (6th Cir. 1992) .................................................124

*Beck v. N. Nat. Gas Co.*,
   170 F.3d 1018 (10th Cir. 1999) ...........................................92, 98

*Beck v. Test Masters Educ. Servs. Inc*.,
   994 F. Supp. 2d 98 (D.D.C. 2014) ...........................................125

i

*Bedrossian v. Nw. Mem'l Hosp.*,
    409 F.3d 840 (7th Cir. 2005) ............................................................106

*Betco Corp., Ltd. v. Peacock*,
    No. 14-CV-193-WMC, 2016 WL 7429460 (W.D. Wis. Dec. 23, 2016)....................84, 87, 88

*Bishop v. Lamkin*,
    146 S.E.2d 772 (Ga. 1966)............................................................101

*Blesch v. Chicago & N.W.R. Co.*,
    43 Wis. 183 (Wis. 1877) ................................................................95

*Blodgett v. Hitt*,
    29 Wis. 169 (Wis. 1871) ............................................................95, 96

*Cayuga Indian Nation of New York v. Cuomo*,
    Nos. 80-cv-930, 80-cv-960, 1999 WL 509442 (N.D.N.Y. July 1, 1999) .............106, 109, 115

*Cayuga Indian Nation of New York v. Pataki*,
    413 F.3d 266 (2d Cir. 2005)....................................................106, 107, 126

*Childers v. Menard, Inc.*,
    No. 20-CV-107-JDP, 2020 WL 5303934 (W.D. Wis. Sept. 4, 2020) ...................83

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981)................................................................80, 81

*City of Sherrill v. Oneida Indian Nation of New York*,
    544 U.S. 197 (2005)..............................................................105, 106

*Clark v. CSX Transp., Inc.*,
    737 N.E.2d 752 (Ind. Ct. App. 2000).....................................................3

*Coast–to–Coast Financial Corp. v. United States*,
    45 Fed. Cl. 796 (2000) ................................................................60

*Components for Indus., & Others, Inc. v. Auto Kabel N. Am., Inc.*,
    No. 19-CV-7152, 2020 WL 4505878 (N.D. Ill. Aug. 5, 2020) ............................28

*Conoco Inc. v. United States*,
    35 Fed. Cl. 309 (1996) ................................................................60

*Costle v. Pacific Legal Foundation*,
    445 U.S. 198 (1980)....................................................................66

*County of Oneida, New York v. Oneida Indian Nation of New York State*,
    470 U.S. 226 (1985)....................................................................93

*Cuyahoga Metro. Hous. Auth. v. United States*,
  57 Fed. Cl. 751 (2003) ............................................................................54, 55, 60

*Dairyland Greyhound Park, Inc. v. Doyle*,
  719 N.W.2d 408 (Wis. 2006) ..................................................................................57

*Darby v. Cisneros*,
  509 U.S. 137 (1993) ...............................................................................................70

*Davilla v. Enable Midstream Partners L.P.*,
  913 F.3d 959 (10th Cir. 2019)  ............................................................107, 120, 121

*Davilla v. Enable Midstream Partners, LP*,
  No. CIV-25-1262-M (W.D. Okla. Jun. 14, 2019)..................................................94

*Deputy v. Lehman Bros., Inc.*,
  374 F. Supp. 2d 695 (E.D. Wis. 2005)..............................................................20, 26

*Dexter v. Brake*,
  269 P.3d 846 (Kan. Ct. App. 2012) .....................................................................101

*Diamondback Funding, LLC v. Chili's of Wis., Inc.*,
  2007 WI App 162, 735 N.W.2d 193 (Wis. Ct. App. 2007) ...........................122, 123

*Dieter v. Chrysler Corp.*,
  610 N.W.2d 832 (Wis. 2000)..................................................................................10

*E.E.O.C. v. CW Transp., Inc.*,
  658 F. Supp. 1278 (W.D. Wis. 1987) ...........................................................130, 132

*East Tennessee Natural Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ...............................................................................120

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)..............................................................................105, 108, 120

*Effex Capital, LLC v. National Futures Ass'n*,
  933 F.3d 882 (7th Cir. 2019) .................................................................................74

*Enable Oklahoma Intrastate Transmission, LLC v. A 25 Foot Wide Easement*,
  No. CIV-15-1250-M, 2016 WL 4402061 (W.D. Okla. Aug. 18, 2016) ................27

*Enbridge Energy L.P. v. Engelking*,
  2017 WI App 1, 372 Wis. 2d 833, 890 N.W.2d 48 (Wis. App. Ct. 2016).......95, 96

*Enbridge Energy Ltd. v. Whitmer*,
  No. 1:20-cv-01131-JTN-RSK, ECF No. 70 (Apr. 5, 2022)..........110, 111, 112, 114

iii

*Energy Complexes, Inc. v. Eau Claire County*,
   449 N.W.2d 35 (Wis. 1989) ................................................................47, 48

*English v. General Electric Co.*,
   496 U.S. 72 (1990) .........................................................................74, 79

*Fehrman v. Bissell Lumber Co.*,
   205 N.W. 905 (Wis. 1925) ..................................................................97

*First Bank & Tr. v. Firstar Info. Servs., Corp.*,
   276 F.3d 317 (7th Cir. 2001) .....................................................10, 32, 39

*Florida Southeast Connection, LLC v. 0.821 Acres of Land, More or Less, In Polk
   Cnty., Fla.*,
   223 F. Supp. 3d 1227 (M.D. Fla. 2016) ......................................................120

*Fromson v. RBP Chem. Corp.*,
   No. 82-C-0431, 1990 U.S. Dist. LEXIS 14264 (E.D. Wis. June 5, 1990) ...................130, 131

*GAF Building Materials Corp. v. Elk Corp. of Dallas*,
   90 F.3d 479 (Fed. Cir. 1996) ..................................................................72

*General Dynamics Corp. v. United States*,
   47 Fed. Cl. 514 (2000) ........................................................................61

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*,
   423 F.3d 539 (6th Cir. 2005) ...............................................................125

*GMAC Mortg. Corp. of Pa. v. Gisvold*,
   215 Wis. 2d 459, 572 N.W.2d 466 (Wisc. 1998) ............................................106

*Golden Hill Paugussett Tribe of Indians v. Weicker*,
   39 F.3d 51 (2d Cir. 1994) ...................................................................105

*Grandis Fam. P'ship, Ltd. v. Hess Corp.*,
   588 F. Supp. 2d 1319 (S.D. Fla. 2008) .......................................................29

*Gruenberg v. Tetzlaff*,
   13-CV-095-WMC, 2014 WL 6435069 .........................................................48

*Grygiel v. Monches Fish & Game Club, Inc.*,
   2010 WI 93, 328 Wis. 2d 436, 787 N.W.2d 6 (Wis. 2010) ..................................122

*Gupta v. Morgan Stanley Smith Barney, LLC*,
   934 F.3d 705 (7th Cir. 2019) ............................................................30, 31

*Hammond v. Cty. of Madera*,
   859 F.2d 797 (9th Cir. 1988) .................................................................96

*Hammonds v. Ingram Indus., Inc.*,
716 F.2d 365 (6th Cir. 1983) ...........................................................................97, 101

*Harold Wright Co., Inc. v. E.I. DuPont De Nemours & Co., Inc.*,
49 F.3d 308 (7th Cir. 1995) .........................................................................35

*Harris v. Harvey*,
436 F. Supp. 143 (E.D. Wis. 1977).................................................................101

*Hartford Fire Ins. Co. v. Henry Bros. Const. Mgmt. Svcs., LLC*,
No. 10-cv-4746, 2011 WL 3563138 (N.D. Ill. Aug. 10, 2011) ...........................29

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944).......................................................................................105

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ......................................................................120

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*,
588 F.Supp.2d 919 (S.D. Ind. 2008) ..............................................................120

*I.A.E., Inc. v. Shaver*,
74 F.3d 768 (7th Cir. 1996) ...................................................................... *passim*

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
682 F. Supp. 378 (N.D. Ill. 1988) ..................................................................83

*Johansen v. Combustion Eng'g, Inc.*,
834 F. Supp. 404 (S.D. Ga. 1993)...................................................................96

*Kernz v. J.L. French Corp.*,
677 N.W.2d 751 (Wis. Ct. App. 2003) ......................................................37, 39

*Kimberly Assocs. v. United States*,
261 F.3d 864 (9th Cir. 2001) .........................................................................57

*Kinley Corp. v. Iowa Utilities Board*,
999 F.2d 354 (8th Cir. 1993) .........................................................................75

*Kirchoff v. Moulder Bros.*,
391 So. 2d 347 (Fla. Dist. Ct. App. 1980) ......................................................96

*LAJIM, LLC v. Gen. Elec. Co.*,
917 F.3d 933 (7th Cir. 2019) ........................................................................108

*Lake Caryonah Improv. Ass'n v. Pulte Home Corp.*,
903 F.2d 505 (7th Cir. 1990) ........................................................................132

*Lexington Ins. Co. v. RLI Ins. Co.*,
 949 F.3d 1015 (7th Cir. 2020) ...................................................................43, 44, 46

*Lingenfelter v. Keystone Consol. Indus.*,
 691 F.2d 339 (7th Cir. 1982) ..............................................................................127

*Livingstone v. North Belle Vernon Borough*,
 91 F.3d 515 (3d Cir. 1996)....................................................................................83

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)...............................................................................................71

*Lynch v. United States*,
 292 U.S. 571 (1934)...............................................................................................55

*Machlett Laboratories, Inc. v. Techny Indus., Inc.*,
 665 F.2d 795 (7th Cir. 1981) ..............................................................................109

*Mandel Metals, Inc. v. Walker Group Hldgs.*,
 No. 14 CV 8493, 2015 WL 3962005 (N.D. Ill. June 26, 2015) .............................29

*Martin v. Comcast Cablevision Corp. of Cal.*,
 338 P.3d 107 (N.M. Ct. App. 2014) ............................................................ *passim*

*Maryland Arms Ltd. P'ship v. Connell*,
 786 N.W.2d 15 (Wis. 2010)...........................................................................24, 36

*MCI, LLC. v. Patriot Eng'g & Envtl., Inc.*,
 487 F. Supp. 2d 1029 (S.D. Ind. 2007) ..............................................................104

*McLawhorn v. Ocwen Loan Servicing, LLC*,
 No. 4:14-cv-02745-RBH, 2017 WL 624530 (D.S.C. Feb. 15, 2017)....................96

*Medeco Sec. Locks, Inc. v. Swiderek*,
 680 F.2d 37 (7th Cir. 1981) ...............................................................................125

*Merrion v. Jicarilla Apache Tribe*,
 455 U.S. 130 (1982)...................................................................................54, 57, 58

*Michigan v. Bay Mills Indian Community*,
 572 U.S. 782 (2014)...............................................................................................74

*Michigan v. Enbridge Energy, LP*,
 --- F. Supp.3d ---, 2021 WL 5355511 (W.D. Mich. Nov. 16, 2021) ...............76, 82, 109, 112

*Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*,
 708 F.3d 921 (7th Cir. 2013) .....................................................................72, 80, 81

*Minnwest Bank v. RTB, LLC (In re Minnwest Bank Litig.)*,
  873 N.W.2d 135 (Minn. App. 2015) ..................................................................96

*Mkt. St. Assocs. Ltd. P'ship v. Frey*,
  941 F.2d 588 (7th Cir. 1991) ............................................................88, 89, 90

*In re Modern Dairy of Champaign, Inc.*,
  171 F.3d 1106 (7th Cir. 1999) .......................................................................39

*N. Crossarm Co. v. Chem. Specialties, Inc.*,
  318 F. Supp. 2d 752 (W.D. Wis. 2004) .......................................................37, 89

*NAACP v. Town of E. Haven*,
  70 F.3d 219 (2d Cir. 1995) ...........................................................................120

*Nat. Res. Def. Council, Inc. v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988) .......................................................................69

*Nat'l Distillers & Chem. Corp. v. First Nat'l Bank of Highland Park*,
  804 F.2d 978 (7th Cir. 1986) .........................................................................39

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
  23 F.3d 1508 (9th Cir. 1994) .......................................................................108

*New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*,
  336 F.3d 495 (6th Cir. 2003) ..................................................................99, 110

*Nichia Corp. v. Eberlight Ams. Ins.*,
  855 F.3d 1328 (Fed. Cir. 2017) ....................................................................108

*Northern Border Pipeline Co. v. Jackson County*,
  512 F. Supp. 1261 (D. Minn. 1981) ................................................................77

*Northern Natural Gas Co. v. Munns*,
  254 F. Supp. 2d 1103 (S.D. Iowa 2003) ..........................................................77

*NRDC v. Kempthorne*,
  621 F. Supp. 2d 954 (E.D. Cal. 2009) ............................................................57

*Oil, Chemical & Atomic Workers Local Union 4-750 v. Goree*,
  1993 WL 278444 (E.D. La. July 16, 1993) .......................................................77

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*,
  498 U.S. 505 (1991) ......................................................................................35

*Olympic Pipe Line Co. v. City of Seattle*,
  316 F. Supp. 2d 900 (W.D. Wash. 2004) .........................................................78

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) ...................................................................76

*Oneida Indian Nation of New York State v. Oneida County*,
    719 F.2d 525 (2d Cir. 1983)...................................................................100

*Oneida Indian Nation v. County of Oneida*,
    199 F.R.D. 61 (N.D.N.Y. 2000).............................................................106

*Oneida Tribe of Indians of Wi. v. AGB Properties*,
    Nos. 02–CV–233LEKDRH, 2002 WL 31005165 (N.D.N.Y. Sept. 5, 2002).......................106

*Oneida Tribe of Indians of Wisc. v. Vill. of Hobart*,
    787 F. Supp. 2d 882 (E.D. Wis. 2011).....................................................70

*Optimus Steel, LLC v. U.S. Army Corps of Engineers*,
    492 F.Supp.3d 701 (E.D. Tex. 2020) .....................................................120

*Paiute-Shoshone Indians of Bishop Comm'y of Bishop Colony, Cal. v. City of Los Angeles*,
    No. 1:06-cv-00736 OWW LJO, 2007 WL 521403 (E.D. Cal. Feb. 15, 2007) .....................106

*Pan-Atl. S. S. Corp. v. Atl. Coast Line R. Co.*,
    353 U.S. 436 (1957)........................................................................66, 68, 69

*Park v. Forest Service*,
    205 F.3d 1034 (8th Cir. 2000) ...............................................................72

*Pennell v. Glob. Tr. Mgmt., LLC*,
    990 F.3d 1041 (7th Cir. 2021) ...............................................................72

*Perry v. United States*,
    294 U.S. 330 (1935).............................................................................55

*Perry v. Village of Arlington Heights*,
    186 F.3d 826 (7th Cir.1999) .................................................................72

*Petrocom License Corp. v. F.C.C.*,
    No. CIV. A. 00-3405, 2001 WL 46880 (E.D. La. Jan. 19, 2001).....................68, 70

*Peyser v. Searle Blatt & Co.*,
    99 Civ. 10785 (WK), 2001 U.S. Dist. LEXIS 20844 (S.D.N.Y. Dec. 13, 2001) .................130

*Pollack v. U.S. Dep't of Just.*,
    577 F.3d 736 (7th Cir. 2009) .................................................................72

*Pub. Serv. Co. of New Mexico v. Barboan*,
    857 F.3d 1101 (10th Cir. 2017) ..............................................................27

*Puttkammer v. Minth*,
   266 N.W.2d 361 (Wis. 1978)......................................................................................91

*Reprosystem B.V. v. SCM Corp.*,
   522 F. Supp. 1257 (S.D.N.Y. 1981)...........................................................................86

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947)....................................................................................................94

*Riddle v. Lodi Tel. Co.*,
   185 N.W. 182 (Wis. 1921)..........................................................................................95

*Rite-Hite Corp. v. Kelley Co.*,
   No. 96-C-1345, 1998 U.S. Dist. LEXIS 25002 (E.D. Wis. Sept. 15, 1998)..........127

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...................................................................................122

*Rondeau v. Mosinee Paper Corp.*,
   422 U.S. 49 (1975)....................................................................................................120

*Royal Indem. Co. v. Sangor*,
   164 N.W. 821 (Wis. 1917)..........................................................................................92

*Salix v. U.S. Forest Serv.*,
   944 F. Supp. 2d 984 (D. Mont. 2013) ......................................................................108

*Sarkis v. Costley*,
   No. CV 17-01851-AB, 2017 WL 7833609 (C.D. Cal. Apr. 5, 2017)......................121

*SAS Inst., Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) ...................................................................................109

*Sattelberg v. United States*,
   No. 12-CV-898-wmc, 2013 WL 6058955 (W.D. Wis. Nov. 18, 2013) .......................8

*Schafer v. Centerpoint Energy Okla. Gas*,
   No. 17-CV-365-GKD-FHM, 2018 WL 10140171 (N.D. Okla. May 21, 2018)...........90, 92

*Sea-Land Servs., Inc. v. Pepper Source*,
   993 F.2d 1309 (7th Cir. 1993) ...................................................................................91

*Sierra Club, Hawaii Chapter v. City & Cty. of Honolulu*,
   415 F. Supp. 2d 1119 (D. Haw. 2005) .......................................................................68

*Smith v. RecordQuest*,
   LLC, 989 F.3d 513 (7th Cir. 2021) .............................................................................92

*Socialist Workers Party v. Illinois State Bd. of Elections,*
566 F.2d 586 (7th Cir. 1977) ................................................................125

*Southern California Gas Co. v. Occupational Safety & Health Appeals Board,*
58 Cal. App. 4th 200 (Cal. App. 1997) ....................................................77

*Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC,*
2017 WL 1105400 (N.D. Ill. Mar. 24, 2017) ............................................92

*Sweeney v. Raoul,*
990 F.3d 555 (7th Cir. 2021) ...................................................................71

*Taylor v. Anderson,*
No. 88 C 3527, 1989 WL 152585 (N.D. Ill. Dec. 1, 1989) ......................102

*Tenneco Inc. v. Public Service Comm'n of West Virginia,*
489 F.2d 334 (4th Cir. 1973) ...................................................................77

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1973).................................................................................107

*Tex. E. Transmission., LP v. 7 Acres of Land,*
No. H-16-2498, 2016 WL 6901324 (S.D. Tex. Nov. 22, 2016) ...........96, 97

*Tilstra v. Bou-Matic, LLC,*
1 F. Supp. 3d 900 (W.D. Wis. 2014) ..................................................83, 86

*TKO Equip. Co. v. C & G Coal Co.,*
863 F.2d 541 (7th Cir. 1988) ...................................................................26

*Town Bank v. City Real Est. Dev., LLC,*
793 N.W.2d 476 (Wis. 2010)....................................................................21

*Truck Components Inc. v. Beatrice Co.,*
No. 94 C 3228, 1994 WL 520939 (N.D. Ill. Sept. 21, 1994).....................92

*U.S. v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001).........................................................................106, 108

*In re UAL Corp.,*
391 B.R. 791 (Bankr. N.D. Ill. 2008) ......................................................57

*Uebelacker v. Paula Allen Holdings, Inc.,*
464 F. Supp. 2d 791 (W.D. Wis. 2006) ....................................................89

*United Launch Servs., LLC v. United States,*
139 Fed. Cl. 664 (2018) ...........................................................................59

*United States v. Cherokee Nation of Okla.*,
480 U.S. 700 (1987) ................................................................. 55

*United States v. Imperial Irrigation Dist.*,
799 F. Supp. 1052 (S.D. Cal. 1992) ............................... 96, 107, 109, 115

*United States v. Lara*,
541 U.S. 193 (2004) ................................................................. 74

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ................................................. 125

*United States v. Pen Oreille Pub. Util. Dist. No. 1*,
28 F.3d 1544 (9th Cir. 1994) ............................................. 94, 100

*United States v. Santa Fe Pac. R.R. Co.*,
314 U.S. 339 (1941) ................................................................. 93

*United States v. W. Pac. R. Co.*,
352 U.S. 59 (1956) ................................................................... 69

*United Steelworkers of America, Local 12431 v. Skinner*,
768 F. Supp. 30 (D.R.I. 1991) ............................................... 77

*Utility Audit, Inc. v. Horace Mann Serv. Corp.*,
383 F.3d 683 (7th Cir. 2004) ................................................. 91

*W. Shoshone Bus. Council For & on Behalf of W. Shoshone Tribe of Duck Valley
Rsrv. v. Babbitt*,
1 F.3d 1052 (10th Cir. 1993) ................................................. 70

*W. Woodrow Metzger v. Acting Deputy Asst. Secretary-Indian Affairs*,
13 IBIA 314 (1985) ............................................................ 67, 68

*Wallace v. SMC Pneumatics, Inc.*
103 F.3d 1394 (7th Cir. 1997) ............................................. 102

*Williams Pipe Line Co. v. City of Mounds View*,
651 F. Supp. 544 (D. Minn. 1986) ....................................... 124

*Williams Pipe Line Co. v. City of Mounds View*,
651 F. Supp. 551 (D. Minn. 1987) ................................. 76, 120

*Williamson v. Hampton Mgmt. Co.*,
339 F. Supp. 1146 (N.D. Ill. 1972) ....................................... 73

*In re Winer Fam. Tr.*,
2006 WL 3779717 ............................................................ 34, 35

*Winstar v. United States*,
   518 U.S. 839 (1996) ........................................................................ *passim*

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................109

*Wisconsin Freeze Dried LLC v. Redline Chambers, Inc.*,
   375 F. Supp. 3d 1038 (E.D. Wis. 2019) ........................................17, 18

*Wisconsin v. Stockbridge-Munsee Cmty.*,
   67 F. Supp. 2d 990 (E.D. Wis. 1999) ........................................123

*Yankee Atomic Electric Co. v. United States*,
   112 F.3d 1569 (Fed. Cir. 1997) ........................................61

*Zenith Ins. Co. v. Employers Ins.*,
   141 F.3d 300 (7th Cir. 1998) ........................................83

## Statutes

5 U.S.C. § 704 ........................................................................70

5 U.S.C. § 551 *et seq.* ........................................................ *passim*

25 U.S.C. § 324 ........................................................................58

49 U.S.C. § 108(b) ........................................................................76

Pipeline Safety Act, 49 U.S.C. §§ 60101, *et seq.* ................................ *passim*

Pub. L. 105-277 (1998) ........................................................................103

Pub. L. 106-462 (2000) ........................................................................103

Trade and Non-Intercourse Act, 25 U.S.C. § 177 ................................7, 104-107

## Other Authorities

25 C.F.R. § 2.6 ........................................................................69, 70

25 C.F.R. § 169 (2013) ........................................................19, 58, 69

43 C.F.R. § 4.314 ........................................................................70

49 C.F.R. § 190.236 ........................................................................76

49 C.F.R. § 195 *et seq.* ........................................................75, 122

80 Fed. Reg. 72492 (Nov. 19, 2015)) ........................................69

81 Fed. Reg. 92122, 92197 (Dec. 19, 2016) ................................................................68

27A Am. Jur. 2d *Equity* § 131 ................................................................127, 131

75 Am. Jur. 2d *Trespass* § 74 ................................................................8

Wright & Miller, *Federal Practice and Procedure* § 3529 (3d ed. 2020)....................................71

INTEREST, Black's Law Dictionary (11th ed. 2019) ........................................................22

JOSHUA I. SCHWARTZ, "*The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of Winstar: An Interim Report,*" 51 Ala. L. Rev. 1177, 1197 (2000)................................................................61

LEGAL INTEREST, Black's Law Dictionary (11th ed. 2019)....................................17, 22

Restatement (Second) of Contracts (1981) ................................................................32, 33, 38, 83

Restatement (Second) of Torts § 929 (1979) ................................................................95

Restatement (First) of Restitution § 129 (1937) ................................................................94, 97

S. Exec. Rep. No. 95-9, 95th................................................................111

Secretarial Order No. 3367, U.S. Department of the Interior (June 15, 2018) ............................103

*Senate Committee on Foreign Relations, Agreement with Canada Concerning Transit Pipelines*, S. EXEC. REP. NO. 95-9 ................................................................113

U.S. Const., Art. II, § 2, Cl. 2 ................................................................113

U.S. Const., Art. III, § 2, cl. 1 ................................................................105

U.S. Const., Art. VI................................................................74, 113

White House Memo. on Finding of a Severe Energy Supply Interruption (March 31, 2022) ................................................................119

11 Williston on Contracts (4th ed.)................................................................26, 29, 33, 34

INTRODUCTION

The Band seeks summary judgment on its trespass and unjust enrichment claims. But no trespass can occur where, as here, the Band agreed to provide its express consent for Line 5 to operate across all the lands at issue in this lawsuit for 21 more years, until 2043. The Band provided this consent in the parties' contract known as the "1992 Agreement."[1] Consent is a complete defense – and therefore fatal – to the Band's trespass claim. Thus, its Motion must be denied.

The Band's own Chairman has publicly admitted that the 1992 Agreement provides Band consent for Line 5 to operate "across" the entire Bad River Indian Reservation ("Reservation") and prevents any Band interference with Line 5 for 50 years:

> [The] elephant in the corner is that this is in regard to our private property pieces that we've, you know, kind of reacquired interest in recently. ***There's still a – there's still an agreement out there that was signed in 1992 by our Tribal Council, giving Enbridge free operations for 50 years.*** At that time, the council took $800,000 for that. ***And there's a line in there that says the Tribal Council will not interfere – interfere with the operation of this line for 50 years.*** That's – in a legal sense, that's a massive – ***that's a massive weakness in our case.***

– Bad River Band Chairman Mike Wiggins, Jr. (February 2, 2018)

Chairman Wiggins' admission about the scope of the 1992 Agreement is confirmed by his predecessor, then-Chairman Donald Moore, Sr., who negotiated and signed the Agreement, when he explained the Band's conscious, deliberate choice to obligate itself to a 50-year easement across the entire Reservation. Shortly after the parties executed the 1992 Agreement, the Bureau of Indian Affairs ("BIA") asked the former Chairman why the Band would agree to permit Line 5 to remain on the entire Reservation for 50 years, as opposed to 20 years, when other BIA easements were set

---

[1] The December 23, 1992 contract (mutually referred to as the "1992 Agreement") is between the Band and Enbridge's predecessor-in-interest Lakehead Pipe Line Company (for simplicity, referred to herein as Enbridge).

1

to expire.  Specifically, the BIA asked Chairman Moore if the Band fully understood that based on the terms of the 1992 Agreement, "with a 50-year commitment, the Tribe would be **unable to exercise [any] alternatives in 20 years but instead find themselves burdened for 30 more years.**"  Chairman Moore confirmed this understanding and the Band's commitment to a 50-year (and not a 20-year) term.  He defended the Band's choice because the Band was receiving an "extremely good price" ($800,000 in 1992) and "there is no reason to believe the Tribe will be able to do any better [before 2043]."

Today, the Bad River Band Tribal Council (the "Tribal Council") seeks to terminate this deal, in part because it believes it was not paid an "extremely good price":

> [W]e need to communicate to Enbridge, that *even though back in 1992, the Tribal Council at that point in time authorized a 50-year contract for Enbridge to come across the reservation for $800,000,* in lieu of bringing us to the present date on January 4th when we passed this resolution, my conversation with Eric is that *we need to let Enbridge know in some fashion that there's – there's going to be a charge here.  There is no more free rides.  $800,000 for a 50-year passage across the reservation?  Those are pennies in the bucket for those guys.*

– Bad River Band Tribal Vice-Chairman Mike Berlin (July 6, 2017)

But the Band cannot change the terms of the Agreement. Indeed, these admissions by the Band's Chairman and Vice-Chairman as to the scope of the Band's consent are supported by the plain text of the 1992 Agreement.

The 1992 Agreement memorialized Enbridge's agreement with the Band to permit one or more renewed easements for Line 5 to cross the Reservation for 50 years.  Previously, from 1953 to 1993, Enbridge had a *single, unified* easement issued by the BIA to cover all lands across the entire Reservation subject to BIA jurisdiction (*i.e.,* lands held in trust by the United States or held by individual Indians subject to restrictions on alienation).[2]  This easement was first granted in

---

[2]     Lands subject to the BIA's jurisdiction are sometimes referred to in this brief as "BIA lands."

1953 and renewed again in 1973.  But the 1992 Agreement was negotiated under different circumstances.

Based on Enbridge's request in 1992 for a 50-year renewal easement, the BIA told the parties that, if an agreement was reached with the Band for it to provide 50 years' consent to a BIA easement, the BIA would issue two separate rights-of-way:[3] one for 20 years for the fifteen parcels that Line 5 crossed that that were owned, at least in part, by individual Indians (the "Allotted Parcels") because that was the longest duration the BIA would issue for such parcels; and another for 50 years over the thirteen parcels wholly owned by the Band and held in trust by the United States (the "Tribal Trust Parcels").  As a result, Enbridge knew it would need to renew the BIA easement for the Allotted Parcels after 20 years (and likely again after 40 years) to match the duration of the longer easement for the Tribal Trust Parcels.  The 1992 Agreement, particularly Section 3, addressed this by obligating the Band to assist Enbridge with one or more renewals from BIA after the first 20-year BIA approved easement ended in 2013.

Enbridge negotiated in the 1992 Agreement for two separate but complementary promises from the Band to reflect this initial discrepancy in BIA-issued easement durations. First, in Section 1(a), the Band consented to operation and maintenance of Line 5 for 50 years across all lands the Band "now has a legal interest" in (that is, had any ownership interest in at the time of contract execution on December 23, 1992).  Enbridge's Proposed Findings of Fact ("EPFF") ¶ 25 (Band Attach. E, *hereinafter* "1992 Agreement" ¶ 1(a)).  It is undisputed that, at the time of contract execution, the Band owned an interest in the thirteen Tribal Trust Parcels, as well as three of the

---

[3]     The official term for the instrument issued by the BIA that provides the right to cross over and use lands subject to its jurisdiction is called a grant of right-of-way.  In this brief, the terms "easement" and "right-of-way" are used interchangeably to describe this type of instrument. *See Clark v. CSX Transp., Inc.*, 737 N.E.2d 752, 758 (Ind. Ct. App. 2000) ("Akin to an easement," a right-of-way is "a right to cross over the land of another").

(now) fifteen Allotted Parcels. Section 1(a) provided Enbridge with the consent necessary to receive from the BIA the 50-year easement over the Tribal Trust Parcels, which it did receive, as well as consent over the three Allotted Parcels the Band then owned in part.

Second, the Band also provided Enbridge with 50 years of consent for Line 5 to be operated and maintained over Reservation lands which the pipeline crossed that the Band did *not* then own. Specifically, in Section 3 of the Agreement, the Band promised to cooperate with Enbridge's express objective of "obtaining from the Tribe":

> [A]ll consents and authorizations it is possible for the Company to obtain, whether necessary or not, to obtain a fifty (50) year easement for Right of Way for a pipeline over Company's existing pipeline Right of Way in which [the Band] has an interest.

*Id.* (emphasis added).

Notably, two terms in Section 3 differed from those in Section 1(a) to deliberately broaden the timing and scope of this Section. Unlike in Section 1(a), the parties omit the qualifying word "now" to encompass the Band's interests *beyond* the date of contract execution. Additionally, the parties replaced "legal interest" with the broader word "interest." It is undisputed that the "existing pipeline Right of Way" means the 1975 right-of-way issued by the BIA, which granted an easement for Line 5 to operate across all BIA lands within the Reservation that were traversed by Line 5. This includes all of the Allotted Parcels. It is also undisputed that the Band, through its Rule 30(b)(6) designee Chairman Wiggins, asserts an "interest" in all lands on the Reservation. EPFF ¶ 3; Resp. to PPFF ¶ 20. The plain text of the Agreement and these undisputed facts show that the Band's trespass claims fail because the Band has (and has always had) a duty to provide to Enbridge all "consents and authorizations" necessary for a renewed BIA easement on all the tracts – on which it now claims trespass – until 2043.

The Band contends that the 1992 Agreement only contains its consent for Enbridge to operate Line 5 for 50 years on a limited patchwork of thirteen disconnected Tribal Trust Parcels

and nothing more.  In particular, the Band claims that the 1992 Agreement does not apply to either the three Allotted Parcels in which it owned an interest *before* signing the 1992 Agreement or the other nine Allotted Parcels that it subsequently gained large or controlling interests in after executing the Agreement.  But the Band's position that the 1992 Agreement only applies to the Tribal Trust Parcels was invented for this litigation.  Nowhere in the 1992 Agreement is there a reference to such a limitation.  In fact, the terms of the Agreement and the Band's own Tribal Council resolutions authorizing the execution of the 1992 Agreement explicitly describe the parties' negotiations and agreement as applying to all lands across the Reservation over which the BIA can grant, and previously did grant, an easement for Line 5.  The Band's interpretation also is also inconsistent with its own statements about the scope of the 1992 Agreement, which the Band has repeated over and over: the Band responded to a "a written offer . . . for a 50 year renewal of the existing easement across the [Reservation]"; the 1992 Agreement provides to Enbridge the Band's consent "to come across the reservation for $800,000"; the Agreement provides consent for "a 50-year passage across the reservation"; the Agreement grants Enbridge a "fifty year right of way over its existing easement" that then (and since 1953) spanned the length of the pipeline on the *entire* Reservation; and the Agreement obligates the Band to "not interfere … with the operation of this line for 50 years."  EPFF ¶ 42 (citing Enbridge Exs. 1 and 4; Band Attach. Q at BRB044411) (emphasis added).

Furthermore, the Band's argument that Section 3 of the Agreement has no substantive meaning and is only a "ministerial" provision not only contradicts the terms of the Agreement, but also flies in the face of practical reason and commercial necessity: a promise to permit a pipeline to operate on only thirteen disconnected parcels is meaningless and, indeed, nonsensical.  That is why Enbridge bargained for and received consent from the Band to operate across *all* lands within

5

the Reservation over which the BIA could grant an easement until 2043.  Without securing Section 3's agreement by the Band to cooperate with the BIA on future renewals, the Band's 50-year consent in Section 1(a) of the 1992 Agreement would have no more value than a 20-year consent, even though the agreed upon price for 20-year consent was substantially less.  Enbridge asks that the Court reject the Band's interpretation of the 1992 Agreement or, at a minimum, determine that the issue is disputed and thus cannot be resolved against Enbridge on a motion for summary judgment.

Even without the 1992 Agreement, the Court should deny the Band's Motion for another independent reason.  As the Band concedes, there is no trespass: "Enbridge filed all required paperwork with the BIA on time, so they are technically not violating the original lease." EPFF ¶ 78.  Well before the Band filed this suit, Enbridge timely submitted applications for BIA rights of way for all of the Allotted Parcels.  By operation of law under 5 U.S.C. § 558, once the applications were submitted, the BIA's prior permission for Line 5's operations across the parcels at issue here was extended until the application is acted upon in a "final" manner.  As of the filing of the Band's complaint, these applications were still pending and no final action had occurred. Thus, as the Band itself puts it, "technically there is no trespass."

Lastly, the Band's requested remedies of "profits" and an "automatic injunction" are inappropriate as a matter of law.  The overwhelming weight of authority holds that fair rental value of the land occupied by the trespassing party, not profits, is the measure for calculating monetary damages.  Moreover, the Band never attempts to satisfy the summary judgment standard as to these remedies – *i.e.*, to demonstrate that there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a).  The Band's arguments should be rejected for that reason alone.  At a minimum, whether

Enbridge acted as a bad faith trespasser, as the Band contends, is certainly disputed, as Enbridge's counter-declarations submitted with this Opposition show.

The Band's request to immediately enjoin Line 5's operations must also fail. The Band argues that an injunction is mandatory under the Trade and Non-Intercourse Act, 25 U.S.C. § 177, but this argument is contrary to U.S. Supreme Court and other precedent interpreting this Act. In fact, those cases recognize that ejectment from an Indian reservation is *not* a proper remedy in cases where, as here, it would cause material and significant harm to innocent third parties. The Band alternatively argues that the traditional equitable factors compel issuance of the injunction. However, each and every one of those factors weighs in Enbridge's favor. For example, closure of Line 5 would cause irreparable harm to the large number of innocent households and businesses – both in Canada and the United States – that daily depend upon Line 5 to satisfy their energy needs. Those interests are recognized in a 1977 treaty in which the United States made a solemn commitment to Canada that no public authorities would interfere with an international pipeline, such as Line 5.

At a minimum, the Court must hear, weigh, and carefully consider the evidence relating to the injunction standards at trial. It is no exaggeration to state that any shutdown of Line 5 would cause a significant disruption in energy supply in Canada and the United States. The federally declared national energy shortage resulting from world oil market disruptions flowing from the war in Ukraine would obviously be worsened by closing a pipeline that transports large volumes of Canadian and U.S.-origin crude oil to U.S. and Canadian refineries. Alternative means of transportation to replace Line 5 are simply not available and, even under the most optimistic scenarios, would take many years to permit, construct, and place into operation. Against these real

and certain harms, the Band can show no need to close a pipeline that has been safely operated and maintained on the Reservation since the 1950s.

Even if the Court found a trespass – which the Court should not – there is no need to order a shutdown. Enbridge is well on the way to voluntarily re-routing Line 5 *completely off the Reservation* (the "Re-route").[4] To address the Band's request for Line 5 to no longer operate on the Reservation, Enbridge is currently engaged in the regulatory permitting process and anticipates that the Re-route will be permitted, completed, and operational within a few years. Line 5 will thereafter cease operations on the Reservation. During the interim, if a trespass is determined to exist, Enbridge would pay fair rental value for the property in question. But requiring Line 5 to be shut down before the planned Re-route becomes operational would result in many Americans and Canadians facing immediate fuel shortages and other significant economic hardships. For these and the other reasons set forth below, the Band's Motion must be denied.

ARGUMENT

**I.** **The Band's Trespass Claim Fails Because The 1992 Agreement Contains The Band's Consent for Enbridge to Operate Line 5 Across The Entire Reservation Until 2043**

**A. Consent Is A Complete Defense to Trespass**

To establish trespass, the Band must show Enbridge is operating Line 5 on lands the Band owns without its permission. *Sattelberg v. United States*, No. 12-CV-898-wmc, 2013 WL 6058955, at *3 (W.D. Wis. Nov. 18, 2013) (Conley, J.). Consent from the Band, therefore, is a complete defense to its claim of trespass. *See* 75 Am. Jur. 2d Trespass § 74. Here, the Band consented to Line 5's presence and operation on the twelve Allotted Parcels in which the Band

---

[4]      The Re-route, more officially referred to as the Wisconsin Segment Relocation Project, began in February 2020 when Enbridge submitted permit applications with the State of Wisconsin. *See* ENBRIDGE, *available at* https://www.enbridge.com/projects-and-infrastructure/public-awareness/line-5-wisconsin-segment-relocation-project (April 21, 2022). *See* EPFF ¶ 94.

claims to currently have an ownership interest.[5]  These twelve Parcels (each of which are marked with a green "BIA tract" identifier) are depicted below.[6]



This consent is contained in, and required by, the parties' 1992 Agreement, and specifically includes the Band's consent for Line 5 to operate across, in relevant part, the Tribal Trust Parcels and the Allotted Parcels, until 2043. If Enbridge prevails on its breach of contract counterclaim, this Court should order the Band to provide its consent to the BIA for Enbridge's pending easement applications.  The Band's consent is the only obstacle to Enbridge obtaining renewed 20-year easements over the Allotted Parcels from the BIA.  EPFF ¶¶ 79-80.  Thus, Enbridge establishing its contract counterclaim will defeat any possible trespass claim.

---

[5]     The Band misleadingly refers to these twelve Allotted Parcels as the "20 Year Parcels" in its Motion.  But the Band consented to Line 5's operations on these parcels for a total of 50 years, even if the BIA would only grant a series of 20-year easements across them, which would need to be periodically renewed.

[6]     The illustration is an accurate depiction of all fifteen Allotted Parcels on the Reservation that Line 5 crosses.  EPFF ¶ 139. The Band claims a trespass on only twelve of these Parcels, as it does not own any whole or fractional land interest in the other three.

### B. Rules of Contract Interpretation

Federal common law and Wisconsin law are consistent with respect to principles of contract interpretation. "When interpreting an agreement, the court's objective 'is to ascertain the true intentions of the parties as expressed by the contractual language.' In doing so, the court must first consider the plain language of the agreement." *First Bank & Tr. v. Firstar Info. Servs., Corp.,* 276 F.3d 317, 322 (7th Cir. 2001) (citations omitted). Contractual terms must be "given their plain and ordinary meaning" and "cannot be considered in isolation; rather, the court must consider the contract as a whole[.]" *Id.* at 322. If this inquiry indicates that the contract is unambiguous, the court "must give effect to the agreement as written." *Id.* If a contract is "fairly susceptible to more than one construction," however, it is ambiguous. *Dieter v. Chrysler Corp.,* 610 N.W.2d 832, 836 (Wis. 2000). Where ambiguity exists, the parties may provide "extrinsic evidence to explain the agreement" and the contract's interpretation "becomes a fact question." *Firstar Info. Servs., Corp.,* 276 F.3d at 322.

### C. The Primary Purpose of the 1992 Agreement Was to Permit and Authorize Line 5 Operations Across the *Entire* Reservation Until 2043

In 1953, Enbridge obtained permission to install and operate a pipeline across the *entire* Reservation, from one end to the other. For all lands in the Reservation that the pipeline was set to cross subject to BIA judication,[7] Enbridge obtained a single, unified BIA-approved right-of-way to construct, maintain and operate a pipeline now known as Line 5. EPFF ¶ 3. The term of this initial BIA easement was 20 years. *Id.* ¶ 4; Enbridge's Resp. to Bad River Band's Proposed Findings of Fact ("Resp. to PPFF") ¶ 13. This term was the same for all types of land addressed in

---

[7]    The BIA is the entity with legal responsibility for granting easements over those Reservation lands within its jurisdiction, which includes all of the Allotted Parcels on which trespass is alleged. However, portions of the Bad River Reservation are *not* subject to BIA jurisdiction or easement approval (*e.g.,* land owned in fee by individuals). Those lands are not relevant to this proceeding as no trespass is alleged on any such tracts. Thus, for simplicity of discussion, they are generally disregarded herein.

the 1953 BIA easement (both Tribal Trust Parcels and Allotted Parcels, which terms are defined above).   EPFF ¶ 3.

In 1975, Enbridge again secured from the BIA another single, unified right-of-way to continue to maintain and operate Line 5 in the same location across the *entire* Bad River Reservation.[8]  *Id.* ¶¶ 4, 5 (approving application from Enbridge "for a 20-year renewal of a crude oil pipeline right-of-way over and across allotted and [Band-owned] lands on the Bad River Reservation").  Like the 1953 BIA easement, this right-of-way covered all types of land subject to BIA jurisdiction (both Tribal Trust Parcels and Allotted Parcels) and was secured based on the consents of private Indian landowners and the Band.  *See id.* ¶ 5.  The 1975 easement, as initially issued, expressly stated that it was *perpetual* and thus had no termination date.  *Id.* ¶ 5 ("without limitation as to tenure").  In late 1991, however, the BIA informed Enbridge that it had made an error when granting a perpetual (as opposed to a 20-year) "renewal."  *Id.* ¶ 6.  Consequently, the BIA issued an "amendment" to the right-of-way, changing the term of the right-of-way to only 20 years and expiring on June 2, 1993.  *Id.*   That change left Enbridge scrambling to obtain a new easement before June 1993, the date on which the 1975 easement was now to expire. *Id.* ¶ 7.

The BIA promised to assist Enbridge in once again obtaining the necessary consents to continue to operate Line 5 across the *entire* Reservation in the same location it was currently operating – not just on Tribal Trust Parcels, but also on the Allotted Parcels (which it calls "heirship

---

[8]       At times in this brief, Enbridge refers to the Band's collective promise in the 1992 Agreement as one that conveys the Band's consent for Line 5 operations across the *entire* Reservation. Such consent was provided by the Band in Section 3 for *all* lands on the Reservation even though such consent was and is not legally required for all Reservation lands.  That is why Section 3 refers to all "consents and authorizations it is possible for the Company to obtain, whether necessary or not." EPFF ¶ 25 (emphasis added).  Moreover, as explained in footnote 7, the BIA only grants easements over the Allotted Parcels and the Tribal Trust Parcels, so BIA approvals are necessary only for those Reservation lands and not others.  As noted above, there are lands that Line 5 crosses on the Reservation that are *not* subject to BIA jurisdiction or easement approval and, as they are not at issue in this case, are disregarded for purposes of the Band's Motion.

lands"), both of which were subject to BIA jurisdiction. *Id.* ¶ 9. Enbridge informed the BIA that it was "requesting the new grant for a period of 50 years." *Id.* ¶ 8. While BIA could grant an easement for 50 years across the Tribal Trust Parcels, it told Enbridge that it would only recommend a shorter, 20-year easement, across the Allotted Parcels. *Id.* ¶¶ 10-11. Because of this likely variance in duration between (i) the Band's 50-year consent for all parcels, (ii) the BIA's acquiescence to grant a 50-year easement for the Tribal Trust Parcels, and (iii) the BIA's insistence on a 20-year easement for the Allotted Parcels, the BIA instructed Enbridge to complete negotiations in two phases: first with the Band, then, after the Band's consent had been obtained and "to assure conformity <u>granting provisions for all the parcels [over the Reservation within BIA jurisdiction</u>]," with the BIA for the Allotted Parcels. *Id.* ¶ 9 (emphasis added).

This was a change from previous BIA practices in 1953 and in 1975, when easement durations for both types of land were the same and thus a single right-of-way could be issued by BIA covering both Tribal Trust Parcels and Allotted Parcels. Resp. to PPFF ¶¶ 10-14. "Conformity" was a new issue unique to these negotiations because the BIA anticipated that the easement durations would be different for the two types of property at issue (that is, Tribal Trust Parcels and Allotted Parcels), assuming that the Band granted consent for any period longer than 20 years. EPFF ¶¶ 8-11, 20. Thus, if the parties were to agree to a 50-year term for Line 5 to cross the Reservation (which, as shown below, they did), it would be necessary for Enbridge to negotiate for additional consent – and security – from the Band to assist Enbridge in securing BIA authorization for a new easement on the Allotted Parcels after the initial, 20-year BIA-approved easement on those parcels ended. Without this advance consent, the parties' entire purpose in entering the Agreement – to allow Enbridge to operate a pipeline across the reservation for <u>50 years</u> – would be frustrated, resulting in the loss of use of the easement(s) across the Reservation

12

30 years early.  It would instead collapse into the shorter term 20-year BIA-approved easement for the Allotted Parcels.

Between April and December 1992, Enbridge and the Band negotiated a deal for a comprehensive easement renewal over *all* BIA lands within the Reservation.  *Id.* ¶¶ 12-22.  The parties initially reached agreement on a sum of money in exchange for the "initial period" of only 20 years of Band consent.  *Id.* ¶ 20.  If that was where the parties' negotiations ended, there would be no issue of conformity, as the BIA could have issued 20-year easements for *both* the Tribal Trust Parcels and the Allotted Parcels. If that had occurred, the easement durations for both types of property would have matched up perfectly with the consent durations from the Band and the present dispute would not have arisen.  But that is not what occurred.

Instead, the negotiations continued and with the "initial period" of 20 years that would match the easement on the Allotted Parcels secured, Enbridge discussed compensating the Band for 50 years of consent. *Id.* ¶¶ 21-22. The parties eventually agreed to a significantly increased sum (several hundreds of thousands of dollars more) in exchange for a longer, 50-year term of Band consent to operate Line 5 across the Reservation.  *Id.* ¶¶ 21-22, 25.  Because the BIA-issued easements for the Allotted Parcels, if provided for 20 years, would expire before the BIA's 50-year easement for the Tribal Trust Parcels, Enbridge knew it needed to obtain the Band's cooperation and consent *in advance* for future BIA easement renewal(s) over the Allotted Parcels so that their terms would match the 50-year term for the Tribal Trust Parcels and the 50 years of Band consent bargained and paid for by Enbridge.  *Id.* ¶¶ 25, 29, 42.  As shown below, this was specifically addressed in the parties' agreement.

On December 23, 1992, after months of negotiation, the Band and Enbridge executed the 1992 Agreement.  *Id.* ¶ 25.  The Band made two promises in the 1992 Agreement critical to keeping

Enbridge's Line 5 easement(s) intact across the entire Reservation until 2043.  First, in Section 1(a) of the Agreement, the Band provided Enbridge permission to operate for 50 years over *all* of the tracts it then owned (in whole or in part) as of the execution date of the 1992 Agreement (December 23, 1992).  *Id.* (1992 Agreement ¶ 1(a)).  It is undisputed that, as of the date of contract execution, the Band owned legal interests within the Line 5 footprint in (i) thirteen Tribal Trust Parcels and (ii) three Allotted Parcels.  *Id.* ¶ 30; Resp. to PPFF ¶ 20. *See also* EPFF ¶ 23.  Thus, this first promise contained the Band's express consent for the BIA to issue a 50-year easement over the Tribal Trust Parcels and a 20-year easement over the three Allotted Parcels in which it owned a fractional interest at the time.  However, because a 20-year term was the longest term the BIA would then grant over the Allotted Parcels, regardless of the longer term of the Band's consent, the Band's 50-year consent would allow these BIA easements to be renewed upon expiration.

Second, in Section 3, with respect to all Reservation lands within the pipeline corridor, including those that the Band did *not* then own (nine Allotted Parcels), the Band also promised that it would cooperate with Enbridge to ensure Line 5 could "operate" for "fifty (50)" years on the "existing" right-of-way, including by providing "all consents and authorizations" necessary to achieve a BIA easement for 50 years of operation and maintenance across the "existing" pipeline corridor. EPFF ¶ 25 (1992 Agreement ¶ 3).  This promise included the Band's agreement to future consent, during the next 50 years, to BIA easements across any Allotted Parcels traversed by Line 5, should such consent be necessary or helpful.  *Id.*  Notably, *both* of these consents from the Band are for 50 years.  Twenty years of Band consent is simply not provided in the 1992 Agreement.[9]

---

[9]      Except for the alternative 20-year arrangement that the parties agreed to in Section 6 of the 1992 Agreement in the event the BIA did not approve of a 50-year easement.  *Id.* ¶ 25 (1992 Agreement ¶ 6).

In sum, at least for the Tribal Trust Parcels, the duration of the Band's consent (50 years) matched the duration of the BIA-approved easement (also 50 years).

This was not the case for the Allotted Parcels.  Despite the Band's consent to operate for 50 years over all lands the Band then owned, which all parties agree includes three Allotted Parcels, the BIA would only grant a 20-year easement *Id.* ¶ 10.  As a result, the duration of the Band's consent for the Allotted Parcels it then owned (50 years per Section 1(a) of the 1992 Agreement) would not mirror the duration of the BIA-approved easement for the Allotted Parcels (20 years). To address this discrepancy, subsequent renewals of the BIA-approved easement across the Allotted Parcels would be necessary to achieve the total easement term of 50 years.  These renewals could be obtained based on the Band's 50-year consent and agreement to cooperate provided in advance in the 1992 Agreement via Section 3. *Id.* ¶¶ 25, 28, 29. Thus, as demonstrated below, the 1992 Agreement was intended to provide continued rights for Line 5 to operate across the entire Reservation until 2043 by pre-approving a succession of 20-year easements over the Allotted Parcels in the same location in which it was originally installed in 1953 to "conform" with the Band's 50 years of consent.  The Band's future cooperation would be required to achieve this conformity, and as shown below, that cooperation was specifically provided for in the Agreement.

### D. The Band Made Two, Separate 50-Year Consent Promises Based on The Plain Text of The 1992 Agreement

1. <u>Recitals and Definitions Reflect the Parties' Intent to Memorialize an Easement over the Entire Reservation</u>

The plain text of the 1992 Agreement confirms the Band provided consent for 50 years for more than just the Tribal Trust Parcels.  The 1992 Agreement's recitals describe the history of the existing easements and rights-of-way, which since 1953, have encompassed *all* BIA lands that Line 5 has crossed within the Reservation.  It sets forth the parties' express intention for the Band

to consent to a new BIA-issued easement (or renewals of such easements) for Line 5 to continue operations across the *entire* Reservation, both on Tribal Trust Parcels and the Allotted Parcels:

> WHEREAS in 1953, the Company acquired rights of way for a pipeline from the Secretary of Interior or from the Secretary's duly authorized representative (hereinafter "Secretary") over and across lands within and/or about the Bad River Reservation in Wisconsin (hereinafter "Reservation"), **including lands in which the Tribe had a legal interest <u>and</u> including lands generally known as allotted lands** (hereinafter "Original Rights of Way"), for a period of twenty (20) years; and WHEREAS, pursuant to such authorization, the Company constructed a 30-inch pipeline across the Original Rights of Way and other lands; and
> …
> WHEREAS, on July 21, 1975, the Company acquired from the Secretary of the Interior or from the Secretary's duly authorized representative a (20) twenty year extension of said Original Grant of Rights of way, commencing June 2, 1973, which grant will expire on June 2, 1993; and
> WHEREAS, the Company and the Tribe have conducted negotiations for a new right of way agreement **over the existing pipeline right of way**.

EPFF ¶ 25 (1992 Agreement at 1) (bold added for emphasis).

The pipeline footprint established in 1953 has never changed.  EPFF ¶ 3.  Because the "*Original Rights of Way*" includes "lands in which the Tribe had a legal interest" <u>and</u> also "allotted lands," the defined term plainly encompasses <u>all</u> lands subject to BIA jurisdiction inside the Reservation for Line 5's complete footprint, whether or not then owned by the Band.  This includes all of the twelve Allotted Parcels on which the Band contends Enbridge is trespassing.  The Band does not dispute this reading.  *Id.* ¶ 45 (Band Chairman testified that the term "Original Right of Way," as defined in the 1992 Agreement, refers to Enbridge's "rights-of-way across the <u>entire</u> Reservation [and] <u>not just 2.8 miles</u>.").

The recitals also define the term "*Existing Right of Way*" to mean the subset of lands in the "Original Rights of Way" in which the Band "*now* has a legal interest":

> [T]hat portion of the Original Rights of Way in which the Tribe <u>now</u> <u>has a legal interest</u> and any other land through which such pipeline was constructed which is subject to rights of way of the Company in which the Tribe <u>now</u> <u>has a legal interest</u> are hereinafter collectively referred to as the "Existing Rights of Way.

16

*Id.* ¶¶ 25, 32 (emphasis added).

The plain and ordinary meaning of "now has a legal interest" clearly refers to *any* lands in which the Band owned an interest as of contract execution on December 23, 1992.  *See* LEGAL INTEREST, Black's Law Dictionary ("An interest recognized by law, *such as legal title*.") (emphasis added); *Wisconsin Freeze Dried LLC v. Redline Chambers, Inc*., 375 F. Supp. 3d 1038, 1041 (E.D. Wis. 2019) ("Contract language is construed consistently with what a reasonable person would understand the words to mean under the circumstances.").  It is undisputed that as of December 23, 1992, the lands owned by the Band within the Original Rights of Way (*i.e.,* the pipeline corridor covered by this definition) included (i) the thirteen Tribal Trust Parcels **and** (ii) three Allotted Parcels.  *See* EPFF ¶ 30; Resp. to PPFF ¶ 20.

Importantly, in the final whereas clause quoted above, the parties do <u>not</u> use the defined term "*Existing Rights of Way*" to explain what the "Company and Tribe have conducted negotiations for."   They instead use the undefined (and broader) term "<u>existing pipeline right of way</u>."   By referring to Enbridge's "<u>existing pipeline right of way,</u>" the parties clearly meant the single, unified BIA approved right-of-way issued by the BIA in 1975 and in existence at the time of the 1992 Agreement, which indisputably covered Line 5's *entire* footprint across the entire Reservation and was set to expire in June 1993.  EPFF ¶ 3.

The Band does not dispute that this right-of-way covered all BIA lands on the Reservation traversed by the pipeline, both Tribal Trust Parcels and Allotted Parcels alike.  Resp. to PPFF ¶¶ 12-14.  It does not argue there was any other "existing" right-of-way in 1992.  Thus, the parties expressly stated that the Agreement memorialized their "negotiations" addressing *all* lands on the Reservation within BIA jurisdiction that Line 5 crossed, not just the Tribal Trust Parcels.  This makes sense considering Enbridge's stated purpose was to continue to operate and maintain a

pipeline through the entire Reservation. It would not have made sense to agree to merely to secure permission (which would have had no commercial value) for only those discrete segments of the pipeline on lands then owned by the Band.

### 2.  Section 1: Consent to a 50-Year BIA Easement

The two sections of the 1992 Agreement providing the Band's consent each state that consent is for 50 years, not 20.  Section 1(a) of the Agreement clearly conveys the Band's promise to provide consent to Enbridge for "a right of way for the construction, operation, and maintenance of a pipeline for fifty (50) years within the Existing Right of Way" (*i.e.,* all Tribal Trust Parcels and the three Allotted Parcels the Band then owned).  *See id.* ¶ 25 (1992 Agreement).  The Band's consent to a BIA-issued easement was to be conveyed pursuant to the "Tribal Council's Resolution Granting Pipeline Right of Way" attached as Exhibit A to the contract.  *Id.*   That resolution (No. 12/21/91-09, *hereinafter* the "Consent Resolution") mirrored Section 1(a) by consenting to: "a fifty (50) year right of way easement for a pipeline over and across <u>any lands in which the Tribe has a legal interest within the Company's existing right of way</u>."  EPFF ¶¶ 24-25 (emphasis added).[10]

The sub-provisions in Section 1 reflect a concerted effort by the parties to ensure that the Band would not subsequently challenge or undermine the validity of its 50-year consent.  The Band's duties to protect the 50-year easement term include: requiring that the Band expressly waive sovereign immunity to enforce the contract (1992 Agreement ¶ 1(b)), prohibiting the Band from contesting the validity of the 50-year BIA-approved easement duration for the Tribal Trust

---

[10]        The Bad River Band Tribal Council was also required to execute a second resolution "approving [the] Agreement."  1992 Agreement ¶ 1(d)(2).  That resolution ((the "Contract Resolution," No. 12/21/92-10) was passed at the same meeting at the Consent Resolution and also mirrors language in the Agreement, stating that the parties "have been engaged in negotiations regarding the granting of a new easement for right of way <u>within the Company's existing rights of way</u>**"** and have "prepared an Agreement setting for the terms of said negotiation." EPFF ¶¶ 24, 25 (Enbridge Ex. 1 at BRB044356) (emphasis added).

Parcels (¶ 1(c)) and stipulating that the Band submit at closing a written legal opinion confirming that the Band is "fully and legally committed" to granting a 50-year consent and waiving sovereign immunity, *see* ¶ 1(d).[11]

The notion that the Band did not provide consent in the 1992 Agreement for Line 5 to operate on the three Allotted Parcels in which the Band then owned an interest is meritless. Such compensation and consent *must* have been provided in the 1992 Agreement for two reasons. First, there is no evidence of any other resolution or agreement containing the Band's consent for an easement that would permit Enbridge to operate Line 5 on the three Allotted Parcels in which it then owned an interest after June 3, 1992. The Band did not execute any other contract with Enbridge, other than the 1992 Agreement. Nor did the Band pass any Tribal Council resolution conveying consent for Line 5 to cross any parcels within the Reservation after June 3, 1992, other than the two resolutions issued on December 21, 1992 as part of the 1992 Agreement. As the Band concedes, for any Allotted Parcel in which the Band owned any fractional interest, tribal consent was required before a BIA easement could be issued. *See* 25 C.F.R. § 169.107(a) (2016) ("For a right-of-way across tribal land, the applicant must obtain tribal consent, in the form of a tribal authorization and a written agreement with the tribe . . . ."); Band Mot. at 10; EPFF ¶¶ 52-53, 56. So, if the Band did not consent to an easement over these three Allotted Parcels in the 1992 Agreement, the BIA would have *illegally* approved the 20-year easement over these three Parcels. Because the BIA did issue 20-year easements, however, and since no other Band consent has been proffered, the BIA must have understood that tribal consent for these Allotted Parcels was reflected in the 1992 Agreement and Consent Resolution. Resp. to PPFF ¶¶ 40-41. Rules of construction

---

[11]    Section 6 contemplates an alternative agreement whereby Lakehead would pay the Band $450,000, not $800,000, for a 20-year easement over "the Existing Rights of Way" in the event the Secretary of Interior (that is, the BIA) did not approve a 50-year right-of-way for the Tribal Trust Parcels. *See* note 9. This eventuality did not occur. Resp. to PPFF ¶ 36.

compel this result: courts construe contracts to avoid illegality, not to create it.  *See Deputy v. Lehman Bros., Inc.*, 374 F. Supp. 2d 695, 706 (E.D. Wis. 2005) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'") (quoting Restatement (2d) of Contracts § 203(a)).

Second, the $800,000 of compensation under the 1992 Agreement is the only compensation paid to the Band for consent over the three Allotted Parcels it then owned. Compensation to all owners of the Allotted Parcels was required (and negotiated between BIA and Enbridge) before the BIA issued the 20-year easement over the Allotted Parcels in 1993.  EPFF ¶ 50. And after the 1992 Agreement was signed, Enbridge and BIA agreed for Enbridge to pay a total of $179,000 to the individual owners of the Allotted Parcels (not the Band), determining that this was at a minimum fair market value for a 20-year easement over the Allotted Parcels.  *See id.* ¶ 51. The Band at this time was a fractional owner in three of these Allotted Parcels, however, the Band did not receive any additional consideration beyond the $800,000 paid to it under the 1992 Agreement. EPFF ¶¶ 26, 54-55.   It logically follows that consideration for the Band's consent for these three parcels (which were included in the "*Existing Rights of Way*" lands) was included in the $800,000 sum established in the 1992 Agreement.

Construing the 1992 Agreement as the Band suggests – to only cover thirteen Tribal Trust Parcels and not the Allotted Parcels the Band then owned – would mean the Band takes the position that it owned those three Allotted Parcels, *never* provided consent for them, and was never paid for them, and yet the BIA illegally approved the June 3, 1993 right-of-way over the Allotted Parcels.  The Band has never taken this position nor suggested the BIA acted in an illegal or unauthorized manner in granting the 1992 right-of-way over the Allotted Parcels.

### 3. Section 3: Consent Over Other Lands Was Provided, and Future Cooperation Guaranteed, to Secure a 50-Year Right to Operate

Section 3 is materially distinct from Section 1(a). It discusses additional obligations that the parties must undertake, even if not "expressed in this Agreement," to achieve a 50-year right-of-way across the Reservation for the *entire* length of the pipeline (not just the segments of Line 5 on lands owned in 1992 by the Band). EPFF ¶¶ 25, 28-29. The first sentence broadly requires both parties to do "whatever they can reasonably do to ensure that all of the objectives of the Tribe and the Company, as those objectives are expressed in this Agreement, are achieved, even if it means that one or both of the parties must do something which is not expressly described herein." *Id.* ¶ 25 (1992 Agreement ¶ 3). The second sentence then goes on to include a specific obligation by the Band to obtain "all consents and authorizations" for a 50-year right-of-way "over the Company's *existing pipeline Right of Way* in which the Tribe has an interest":

> One of the Company's objectives under this Agreement is to obtain from the Tribe all consents and authorizations it is possible for the Company to obtain, whether necessary or not, to obtain a fifty (50) year easement for Right to Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest.

*Id.* (emphasis added).

The promise in Section 3 is materially broader than Section 1(a) in two key regards: (i) the scope of lands covered and (ii) the time of the Band's promise. First, Section 3 is not limited to lands the Band owned in 1992. The parties did not use the defined term "*Existing Rights of Way*" – as they did in Section 1(a) – which by definition is a specific subset of lands in which the Band had a "legal" (that is, ownership) interest in 1992. Instead, Section 3 uses the broadly worded, undefined phrase – "existing pipeline right of way" – that is not so limited in scope and refers to the entire pipeline corridor. *See Town Bank v. City Real Est. Dev., LLC*, 793 N.W.2d 476, 484

(Wis. 2010) ("[T]he best indication of the parties' intent is the language of the contract itself for that is the language the parties 'saw fit to use.'") (internal citation omitted).

Further, unlike in Section 1(a), which is limited to tracts in which the Band then had only a "legal" or ownership interest, Section 3 pertains to tracts in which the Band has *any* "interest." *Compare* LEGAL INTEREST, Black's Law Dictionary ("An interest recognized by law, *such as legal title*.") *with* INTEREST, Black's Law Dictionary (11th ed. 2019) (an interest "refers to any one right, privilege, power, or immunity"). The clear omission of the limiting word "*legal*" from the required "interest" reflects a deliberate effort to include within this broader obligation not only lands within the Reservation that the Band may have an ownership interest in, but also any broader type of additional non-"legal" interest.[12]   For purposes of considering this Motion, the Band admits that it has an "interest" in all lands within the Reservation. EPFF ¶ 33.

The second distinction is timing.  Unlike Section 1(a) (and its parallel reference in the Consent Resolution), Section 3 does not limit its obligation to providing consent over lands in which the Band **"*now*** has a legal interest" (*i.e.*, "now" meaning at the time of contract execution). Instead, Section 3 refers to lands in which the Band "*has an interest.*"  EPFF ¶ 25.  This is the only place in the contract in which this phrase is used.  The omission of the word "now" is critical to the plain reading of this sentence.

In *Carcieri v. Salazar,* the Supreme Court analyzed the meaning of the phrase "now under Federal jurisdiction" (emphasis added) and determined that "now" referred to the time of the statute's enactment in 1934 rather than to the time when the government accepted a tribal tract into trust 1998.  *See* 555 U.S. 379, 391-96 (2009).  In doing so, the Court reasoned that the "ordinary

---

[12]     This is also reinforced by the phrase "whether necessary or not."  The Band agreed to provide consent even if such consent is not legally required or necessary to obtain an easement.  So, for example, the Band consented to Line 5 crossing lands its does not now own even though the BIA does not require such consent to grant an easement.

meaning" of "now" meant "at the present time [or] at this moment," and that such a reading "aligns with the natural reading of the word within the context of the [statute]" because, by contrast, the statute used other language to reference both "contemporaneous *and* future events." *See id.* at 392-94 (emphasis in original).  Applying canons of statutory interpretation, the Court determined that Congress intentionally "limited the statute by the word 'now'" and had it wanted to broaden the meaning to "now or hereafter," it "could have omitted the word 'now' altogether.  *Id.* at 391.

Applying the same logic here, when the parties used the phrase "<u>now has</u> a legal interest" in this Agreement, it reflected an intention to limit the lands for which the Band would provide consent in Section 1 to those it had a legal interest "at this moment" (*i.e.,* at the time of execution in 1992).  Conversely, the omission of the word "now" in Section 3 ("has an interest") reflects a deliberate intent to broaden the time period for which the Band owned an interest to *any* time after 1992 during the 50-year consent period contained within Sections 1(a) and 3—not just at the time of execution.[13]

This interpretation makes perfect sense considering that the parties' primary objective was to provide Enbridge with a 50-year "right of way agreement over the existing pipeline right of way."  EPFF ¶ 25 (1992 Agreement at 1); *Id.* ¶ 26 ("These documents express the terms by which the Bad River Tribe has agreed to grant to [Enbridge] a fifty year right of way over its existing easement.").  It is undisputed that the parties were aware during negotiations that the BIA intended to issue a 20-year easement over the Allotted Parcels even if the Band agreed to consent to a 50-year easement.  EPFF ¶ 10.  The parties, therefore, knew there would be a discrepancy in the initial easement terms within the Reservation and pre-approved consent would be necessary to secure the

---

[13]    In the alternative, as shown above, the Band had an "interest" in all fifteen of the Allotted Parcels *in 1992*.  *See infra* at Section I.D.  Thus, even if the term "has an interest" refers to interests existing in 1992, the Band admits it possessed such interests at the time of contract execution in 1992.

full 50-year commitment.  Even though the Band now disputes this reading, it *agrees* that the Band had lawful authority to provide such "advance consent" for Line 5 to operate on lands it did not own when the 1992 Agreement was signed.  *See* Band Mot. at 36, 46 ("Had Enbridge desired to protect itself against that possibility in the 1992 Agreement, it could have sought to bargain (and pay) for such protection.").  The question is not whether the Band could legally provide such consent, but whether it did.

The Band's contention that Section 3 has no independent or substantive meaning cuts against common sense and would produce an absurd result.  It defies credulity that Enbridge would pay a large sum ($800,000 in 1992, which is the equivalent of over $1.5 million in today's dollars)[14] – substantially more than what it was willing to pay (and what the Band was willing to accept) for 20-year consent – if it believed *the Band* could effectively cancel the Agreement after 20 years without any recourse.  If that were the case, Enbridge paid more for nothing.  It would have no reason to provide any more consideration than it offered for the 20-year term.  And under such a reading, the Band could take the $800,000 and the day after closing, buy 0.001% interest in any of the Allotted Parcels it did not then own for $1, withhold consent to an extension of the 20-year term, and then assert that Enbridge should shut down Line 5 after 20 years without ever getting the benefit of the 50-year term.  *See Maryland Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 26 (Wis. 2010) ("Such a construction . . . comports with another principle of contract interpretation – it avoids a construction that produces an absurd result.").  Section 3 exists to prevent this (and other similar attempts to thwart Enbridge's rights, including access for maintenance, across the entire Reservation).  Yet that is precisely what the Band is attempting to argue here.

---

[14]    *See* SMART ASSET, Inflation Calculator, *available at* https://smartasset.com/investing/inflation-calculator.

Accordingly, a plain text reading of the contract unambiguously supports a finding that (a) the Band provided 50 years of consent in Section 1(a) for more than just Tribal Trust Parcels and (b) Section 3 obligates the Band to assist Enbridge in obtaining a 50-year right-of-way (through a series of renewed 20-year BIA easements) across the entire Reservation, including all Allotted Parcels.  As such, the Band's motion should be denied.

### E.  The Band's Reading of the 1992 Agreement Is Incorrect And Unreasonable

According to its Motion, the Band reads the 1992 Agreement as limiting the 50-year consent to *only* "thirteen entirely distinct parcels within the pipeline corridor" (the Tribal Trust Parcels) and not to *any* Allotted Parcels.  Band Mot. at 5.  It argues that consent is provided only in Section 1(a) of the Agreement, and the defined term "*Existing Rights of Way*" should be disregarded and superseded by a document that is not attached to the Agreement. It also argues that Section 3 does not have any independent meaning or provide any additional consent or material obligations.  According to the Band, Section 3 does not require the Band to assist Enbridge in obtaining the consents necessary to renew the 20-year easement over the Allotted Parcels after its expiration for a total combined period of 50 years, and instead, is only a ministerial "further assurances" clause that does not require the Band to do anything not required elsewhere.  The Band's post-hoc, self-serving reading of the contract is incorrect.

### 1.  The Band Cannot Read "Existing Rights of Way" Out of the Contract

The Band argues in its Motion that the 1992 Agreement provided consent for Line 5 to operate only on thirteen Tribal Trust Parcels "then owned in full by the Band," and nothing more.  Band Mot. at 38.  The Agreement, in the Band's view, "said nothing about Band consent to easements over any other lands."  *Id.* But the Band's interpretation squarely conflicts with the defined term "*Existing Rights of Way.*"

As demonstrated above, the contract's definition of "*Existing Rights of Way*" includes all lands, whether Tribal Trust or Allotted, which the Band owned, in whole or in part, in 1992. EPFF ¶ 25 (1992 Agreement at 1). It unambiguously includes "*any*" lands "through which [the] pipeline was constructed which is subject to right of way of the Company" in which the "Band now has a legal interest." *See TKO Equip. Co. v. C & G Coal Co*., 863 F.2d 541, 545 (7th Cir. 1988) (parties "may use words [or definitions] as they please . . . provided parties share th[e] meaning."). It says nothing about being limited to a certain number of tracts (*e.g.,* thirteen parcels) or a certain type of ownership (*e.g.,* tribal trust or owned in full or in part by the Band). It is undisputed that at the time of the contract's execution, the Band had an ownership interest in thirteen trust parcels and three allotted parcels over which Line 5 crossed. *See* Resp. to PPFF ¶ 20 ("At that time . . . the Band also held fractional ownership in three of those [allotted] parcels."); EPFF ¶ 34. Thus, there can be no question that in Section 1(a) the Band provided a 50-year easement as to both types of parcels. *See id.* ¶ 25 (1992 Agreement 1(a)) ("grant to the Company a right of way for . . . a pipeline for fifty (50) years *within the Existing Right of Way*.") (emphasis added).

The Band is asking this Court to *add* material terms to the contract to make this definition read "wholly owned," rather than owned, where no such limitation exists in the contract. But the law does not permit the Court to do so. *See Deputy v. Lehman Bros*., 374 F. Supp. 2d 695, 704 (E.D. Wis. 2005) ("[C]ourts cannot rewrite contracts or insert terms that the parties did not intend."); 11 Williston on Contracts § 31:5 (4th ed.) ("[A] court cannot change the words of a written contract so as to make it express the claimed real intention of one or the other of the parties."). Nor would such a reading make any sense, as the Band's consent is required by the BIA before it will grant an easement over land even fractionally owned by the Band. *See supra* at Section I.D.2. This is so even if the Band's ownership share is small. *See* Band Mot. at 40 (tribal

consent is required "even where a tribe owns only fractional interests"); *Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1110 (10th Cir. 2017) ("Thus, even if tribal interest does not constitute a majority interest, tribal consent is still required for a right-of-way."); *Enable Oklahoma Intrastate Transmission, LLC v. A 25 Foot Wide Easement*, No. CIV-15-1250-M, 2016 WL 4402061, at *3 (W.D. Okla. Aug. 18, 2016) (requiring tribal consent where "the Kiowa Tribe owns an undivided 1.1% interest in the [allotted] tract").

Furthermore, language by the Band attached to, and issued contemporaneously with, the Agreement confirms the scope of the Agreement.  In addition to the Consent Resolution (Exhibit A to the Agreement), the Band also issued a second Tribal Council resolution (Exhibit B to the Agreement) at this December 21, 1992 Tribal Council meeting necessary for "approving [the] Agreement."  *See supra* at note 10 (the "Contract Resolution").  The Band conveniently omits this Resolution from its papers in the hope that the Court does not consider it.  But the Contract Resolution, which mirrors the recitals in the Agreement, states that the parties "have been engaged in negotiations regarding the granting of a new easement for right of way within the Company's existing rights of way" and have "prepared an Agreement setting for the terms of said negotiation." EPFF ¶ 24 (Enbridge Ex. 1 at BRB044353) (emphasis added).  The Band's own Resolution describes the terms of the Agreement as one providing Enbridge for rights within the *entire* existing pipeline corridor, not some subset of wholly owned lands.  *See id.*

Finally, the record evidence reveals that both before and after execution the Band itself understood the language to mean *all* lands owned by the Band, as the Agreement plainly states. *See infra* at Section I.F.2.a (citing EPFF ¶¶ 41-42).  In any event, the Band cannot possibly obtain summary judgment on in its favor on the terms of this Agreement where, as the moving party, the Band's own designee testified that the Band has "no way of ascertaining what [Enbridge]'s desires

were" in negotiating the Agreement, did "not know" whether there was a negotiation as to the easement duration, stated there is "no way to ascertain what ['Existing Rights of Way'] means" and understood that terms at issue in the Agreement could "means a lot of different things" and are not "possible to define."  EPFF ¶¶ 44-48.  This testimony is fatal to the Band's Motion.

2.   Enbridge's 1992 BIA Easement Application is Not Incorporated by Reference, and Does Not Contradict the Terms and Scope of the Agreement

Despite the Agreement's clear language in Section 1(a), the Band argues that the Agreement is limited to only the thirteen Tribal Trust Parcels.  Tellingly, it bases this argument not on the language of the 1992 Agreement, which it does not discuss in detail in its Motion, but on a vague reference to a document neither attached to nor expressly referenced in the actual text of the 1992 Agreement.  Specifically, the Band argues that (1) Tribal Council Resolution No. 12-21-92-9 (the "Consent Resolution"), which is Exhibit A to the Agreement, references an "Application" that the Band asserts is a particular right-of-way application filed by Enbridge on June 10, 1992, (2) that this "Application" only pertains to the thirteen Tribal Trust Parcels, and (3) because this "Application" is, it claims, incorporated into the terms of 1992 Agreement, the Agreement is limited to these thirteen Tribal Trust Parcels.  *See* Band Mot. at 34-35.  This reading is flawed for several reasons.

The application at issue is not incorporated into the 1992 Agreement.  To incorporate terms by reference into a contract, the parties must have used "clear and specific" language demonstrating an intent that the document(s) was meant to be part of the contractual terms.  *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("a document is incorporated by reference into the parties' contract only if the parties intended its incorporation."); *Components for Indus., & Others, Inc. v. Auto Kabel N. Am., Inc.,* No. 19-CV-7152, 2020 WL 4505878, at *3 (N.D. Ill. Aug. 5, 2020) ("Such intent to incorporate must 'be clear and specific.'") (citation omitted).

28

*See also* 11 Williston on Contracts § 30:25 (4th ed.) (parties must have "expressed their intention to have one document's provision read into a separate document" and made "clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt").

Here, there is no "clear and specific" language reflecting any intent to incorporate the terms of an application. The four corners of the six-page 1992 Agreement do not even mention any right-of-way application. EPFF ¶¶ 24-25. And while the Consent Resolution (as Exhibit A) to the Agreement does mention an "application," none was attached to the Consent Resolution. EPFF ¶¶ 24, 35. For this reason alone, the Band's argument must fail.[15]

The Consent Resolution itself is <u>not</u> limited to the thirteen Tribal Trust Parcels. Instead, it tracks the Agreement's broadly defined "*Existing Rights of Way*" term, covering all land in which the Band then had any ownership interest, as the highlighted section below demonstrates:

RESOLUTION NO. 12/21/92-9
RESOLUTION GRANTING
CONSENT TO RIGHTS OF WAY

WHEREAS, the Lakehead Pipe Line Company, Limited Partnership (hereinafter "Company") has requested consent from the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation in Wisconsin (hereinafter "Tribe") for a fifty (50) year right of way easement for a pipeline over and across any lands in which the Tribe has a legal interest within the Company's existing rights of way, all as is described more fully in the Company's Application For Right of Way dated June 10, 1992 (hereinafter "Application"); and

*See* EPFF ¶ 24 (quoting Enbridge Ex. 1 at BRB044355).

---

[15]      *See also Grandis Fam. P'ship, Ltd. v. Hess Corp.*, 588 F. Supp. 2d 1319, 1328 (S.D. Fla. 2008) ("Even if the drafter personally intended to incorporate by reference the Hess Purchase Orders, the document's reference to purchase orders was oblique and did not 'identif[y] beyond all reasonable doubt' the non-contemporaneous document he sought to incorporate"); *Mandel Metals, Inc. v. Walker Group Hldgs.*, No. 14 CV 8493, 2015 WL 3962005, at *4-5 (N.D. Ill. June 26, 2015) (a "provision stating that each Purchase Order 'must be confirmed within 24 hours of receipt' per [defendant's] 'Terms and Conditions…'" was silent as to whether the entire Terms and Conditions should be fully incorporated into the contract); *Hartford Fire Ins. Co. v. Henry Bros. Const. Mgmt. Svcs., LLC*, No. 10-cv-4746, 2011 U.S. Dist. LEXIS 88718, 2011 WL 3563138, at *6 (N.D. Ill. Aug. 10, 2011) (provision explaining that a contract "is intended to be used in conjunction with the 1992 edition [ ] of AIA Document * * * A201/CMa" did not clearly and specifically incorporate the A201/CMa by reference).

The Consent Resolution then states that Enbridge's request for consent over lands that the Band "has a legal interest in within the Company's existing rights of way" (*i.e.,* thirteen trust and three Allotted Parcels) is "described more fully in the Company's Application for Right of Way dated June 10, 1992 (hereinafter 'Application')." *Id.* (emphasis added). Once again, that Application was not actually attached. Had the parties intended to qualify or limit the Band's consent in the 1992 Agreement to tracts specifically identified in an application, that application would have either been attached to the document, referenced in the contract's defined "Existing Rights of Way" term, or both. *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 715 (7th Cir. 2019) ("Mere reference to another contract or document is not sufficient to incorporate its terms into a contract."). It was not, and no such limitation otherwise exists by the terms of the Agreement. Because there is no "clear and specific" reference to this application, the 1992 Agreement does not include the terms of this "tribal lands" application and the Band's entire reading collapses.

Furthermore, both the contract language and the parties' contemporaneous statements do not reveal any intention to include a "tribal lands" application as part of the Agreement. The Band conveniently neglects to mention in its Motion that Enbridge submitted a single, combined "application" to the BIA for an easement(s) for the pipeline over *all* lands within the BIA's jurisdiction on the Reservation, specifically including the Allotted Parcels. EPFF ¶ 17. There were actually **two** applications submitted by Enbridge, both dated June 10, 1992 – one for "allotted" lands and one for "tribal lands," each of which was accompanied by its own "schedules of land ownership." *Id.* These applications together cover the entire footprint of the pipeline through the BIA lands on the Reservation, including all Allotted Parcels and the Tribal Trust Parcels, but were ultimately submitted to the BIA as one package on June 12, 1992 and referred to collectively as

one "application."  *Id.* (quoting Band Attach. R) (Enbridge submitted these "documents and schedules [to be] filed as part of the [Enbridge] **application** for renewal of Right of Grant **across the Bad River Indian Reservation**.") (emphasis added).

Prior to being submitted as a single application, the evidence confirms the parties understood that the scope of their negotiations encompassed the Band's consent over lands from *both* applications, including the Allotted Parcels.  On November 5, 1992, Enbridge made an offer to obtain the Band's consent for a "20 year *initial period* over the existing pipeline right-of-way" and that offer was contingent upon "an adoption of a resolution of the Tribal Council accepting said offer and consenting to the company's request and **applications**."  EPFF ¶ 19 (Enbridge Ex. 13) (emphasis added).  There is no evidence the Band responded and disagreed with this contingency; in fact, Enbridge's offer for the "20-year initial period" was ultimately accepted by the Band (as reflected in Section 6 of the 1992 Agreement). *Id.* ¶ 20, 25 (1992 Agreement ¶ 6).  Had there been an intent to specifically reference only the "tribal lands" application, the parties would have done so, especially given the broader language in the Agreement about granting a renewal over the *existing* unified right-of-way.

The Band's own contemporaneous statements corroborate that  the parties had no intention to reference or incorporate a "tribal lands" application into the Agreement.  On December 23, 1992 – the same date as contract execution – Band Chairman Moore wrote a letter to BIA Superintendent Jaeger.  EPFF ¶ 34 (Enbridge Ex. 1).  The subject of Chairman Moore's cover letter discussed one application: "[Enbridge] Pipe Line Right of Way Application (6/10/1992)." *Id.*  Chairman Moore wrote that he was enclosing three documents that "**express the terms** by which the Bad River Tribe has agreed to grant to [Enbridge] a fifty year right **over its existing [1975] easement**," an easement which was not limited to only Tribal Trust Parcels and specifically included each of the

31

Allotted Parcels at issue here as well.  *Id.*   The three letters enclosed with the Band Chairman's letter: the 1992 Agreement, the Consent Resolution (Ex. A), and the Contract Resolution (Ex. B) "Approving Agreement with [Enbridge]."  *Id.*  The Band's letter did <u>not</u> include a "tribal lands" application.  Nor did the letter state or even imply that the Agreement was limited to the Tribal Trust Parcels or subject to the previously submitted "tribal lands" application.  *See id.*  To the contrary, it referenced the comprehensive scope of the 1975 easement.  Thus, the terms of this "application" also support Enbridge's interpretation of the 1992 Agreement, not the Band's.

Finally, even if this Court determined that the term "Application" indicated an intention by the parties to incorporate the terms of an application into the Agreement, but it was ambiguous as to which application(s) or document(s) were intended to be incorporated, then the Band's Motion still fails for two reasons.  First, if the "tribal lands" application was incorporated and narrowed the scope of the Agreement, it would directly contradict with the consent granted in Section 1(a) for all "*Existing Rights of Way*" lands, which expressly refers to more lands than just the Tribal Trust Parcels.  It would also not explain where the Band provided the legally required consent to Line 5 crossing the three Allotted Parcels it then owned.   *See supra* at Section I.F.3.a.  The Agreement cannot be read in a manner that requires contradiction with theits express terms.  *See* Restatement (2d) of Contracts § 202 (1981) ("A meaning consistent with all the circumstances is preferred to a meaning which requires that part of the context be disregarded.").  Second, any ambiguity must be resolved against the drafter of the Consent Resolution, which is the Band.  *See also First Bank & Tr. v. Firstar Info. Servs., Corp.,* 276 F.3d 317, 322 (7th Cir. 2001) ("[A] court construes them strongly against the party who drafted the contract.") (citing *Strong v. Shawano*

*Canning Co.,* 109 N.W.2d 355, 357 (Wis. 1961)); 11 Williston on Contracts § 32:12 (4th ed.) (same).[16]

In sum, the parties clearly did not intend to incorporate any "application" into the 1992 Agreement nor did the Band use any "clear and specific" language to incorporate an application into the 1992 Agreement. Whether the Court agrees or determines that a jury must resolve the parties' intent, in either event, the Band's Motion fails.

### 3.   Section 3 is Not a "Ministerial" Clause

Section 3 is not, as the Band now argues, merely a meaningless, boilerplate "further assurances" clause. Band Mot. at 35-38. Instead, it serves an important purpose and Instead, it serves an important purpose and contains obligations not set forth elsewhere. Whereas Section 1(a) reflects the Band's consent for Line 5 to operate across the Tribal Trust Parcels and three Allotted Parcels the Band owned in 1992 (the "*Existing Rights of Way*" lands), Section 3 is demonstrably broader and reflects an additional commitment to obtain from the Band "all consents and authorizations it is possible for the Company to obtain, whether necessary or not, to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's *existing pipeline Right of Way* in which the Tribe has an interest." The language used makes this clear. *See supra* at Section I.E.1.

The Band argues that Section 3 is merely a "further assurances" clause, which obligates the parties only to "undertake any ministerial actions beyond execution of the agreement reasonably required to consummate it." Band Mot. at 35. To support this theory, the Band argues

---

[16]   The Court could find, alternatively, that the parties expressed an intent to incorporate by reference the *unified* June 12, 1992 BIA submission containing applications for all of the BIA lands over which Enbridge required an easement. Understanding the "application" to include Enbridge's applications for both the Tribal Trust and Allotted Parcels harmonizes the scope of consent in the Consent Resolution and the 1992 Agreement. *See* Restatement (2d) of Contracts § 202.

that (1) this clause, as Enbridge reads it, would provide "broad substantive rights" that are not mentioned in other provisions, (2) similar language is used in "further assurances clauses," and (3) the language used in Section 3 is the same as in the 1992 Consent Resolution (Exhibit A to the 1992 Agreement), which, according to the Band, only applies to thirteen Tribal Trust Parcels because part of Enbridge's 1992 right-of-way "application" included a schedule of these parcels. *See id.* at 35-38. Each of these arguments misses the mark.

First, that the obligations in Section 3 are not mentioned anywhere else makes sense and is certainly no argument to limit its scope. If the obligations in Section 3 were required elsewhere in this relatively brief contract (seven sections in total), Section 3 would be duplicative and more likely to be ministerial. But Section 3 expresses a separate commitment <u>by the Band</u> to cooperate with Enbridge in providing consents <u>beyond those</u> already found in Section 1 – *i.e.*, beyond the thirteen Tribal Trust Parcels and three Allotted Parcels owned at least in part by the Band in 1992. Contracts are required to be construed to give each unique provision independent meaning. *See also* 11 Williston on Contracts § 32:5 (4th ed.) (reading the contract as a whole, "[e]very word, phrase or term of a contract must be given effect."). Thus, that Section 1(a) is different from Section 3 supports, not undermines, the idea that they each contain separate, substantive obligations.

Second, the "further assurances" language found in the cases on which the Band relies are *not used* in Paragraph 3. *See* Band Mot. at 36 & n.15. For example, in *Boyd Grp. (U.S.) Inc. v. D'Orazio,* the further assurances clause contained language requiring parties "to execute and deliver" instruments or to do actions that either party "may reasonably request" to execute the "documents referred to in this Agreement." *See* No. 14 CV 7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015). And in *In re Winer Fam. Tr.,* the further assurances clause reflected an

agreement "to cooperate with each other," to "execute and deliver all such other instructions" or to take other action "*as either party may reasonably request from time to time* . . . to effectuate the transactions provided for herein." 2006 WL 3779717, at *3 n.6 (3d Cir. Dec. 22, 2006) (emphasis added).

Unlike those clauses, which require both parties to undertake additional actions at the request of the other to formally "effectuate" or "execute" documents or transactions specifically referenced within the contract, the documents necessary for the Band and BIA approval of an easement grant pursuant to Section 1(a) are already separately and specifically described and required by *other* subsections of Section 1. *See* EPFF ¶ 25 (1992 Agreement ¶¶ 1(d)(1)-(3)). Thus, there was no need for a "further assurances" clause to effectuate the purposes of Section 1(a). Instead, Section 3 relates to a new and different obligations. The Band must take these actions after, and in addition to, "ensur[ing]" that the Band and the BIA approve the grant of right-of-way over the "*Existing Rights of Way*" in Section 1(a), as specified in Sections 1(d)(1)-(3). *Id.* ¶¶ 25, 27-28. Thus, unlike a "further assurances" clause, Section 3 requires a specific action from one of the parties to achieve a separate and distinct objective under the contract, not merely to "effectuate" the consent provided in Section 1(a). *Compare In re Winer Fam. Tr.,* 2006 WL 3779717, at *3 n.6 (parties agreed to "execute and deliver all such other instructions" or to take other action "as either party may reasonably request . . . to effectuate the transactions provided for herein.") . *with id*. ¶ 3 (requiring the *Band* to provide to Enbridge "all consents and authorizations . . . to obtain a fifty (50) year easement . . . over the Company's existing pipeline right of way").[17] Those actions

---

[17]   Looking to custom or usage in other contracts is only permitted if this Court determines this term is ambiguous. *See Harold Wright Co., Inc. v. E.I. DuPont De Nemours & Co., Inc.,* 49 F.3d 308 (7th Cir. 1995) (overturning granting of summary judgment, finding it "premature" where the controversy could not "be resolved without resort to extrinsic evidence [such as] a custom in the [] trade") (Posner, J.); *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 772, 778 (7th Cir. 1996) (affirming decision where court "concluded that [a] contract was not ambiguous, and thus did not need clarification through extrinsic evidence of 'practice and

contemplate the Band's full cooperation to assist Enbridge in securing "from the Tribe" any and all consents, whether necessary or not, to continue to operate and maintain Line 5.

Moreover, if Section 3 was only a "further assurances" provision included to effectuate the deal, as the Band contends, then it would render other parts of the 1992 Agreement superfluous. Section 1(d) already addresses the "ministerial" actions that the Band was required to do to execute the Agreement and have it approved by the BIA. That provision required the Band to provide to Enbridge (1) an executed Consent Resolution, (2) an executed resolution approving the 1992 Agreement, and (3) a letter from the Band's counsel stating the Band's commitment to the terms of the 1992 Agreement and the Consent Resolution. *See* EPFF ¶ 25 (1992 Agreement ¶ 1(d)(1)-(3)). Not only is there a provision explicitly listing the enumerated documents the Band was required to either execute or provide and that constituted its "consent," but both the Consent Resolution itself (Exhibit A) and the Contract Resolution (Exhibit B) stated that the Tribal Council was "hereby authorized and directed to do all things and sign all documents reasonably necessary to accomplish the purposes of this Resolution." EPFF ¶¶ 24 (quoting Enbridge Ex. 1). *See also Maryland Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 25 (Wis. 2010) (quoting *Karsten v. Doral Dental USA, LLC*, 733 N.W.2d 300, 316 (Wis. 2007) (contract language should be construed to give meaning to every word, "avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage")).

Further, it makes little sense to read Section 3 to require the Band to take purely "ministerial" action to effectuate a 50-year consent over the "*Existing Rights of Way*" lands where Section 3 noticeably *avoids* using the defined term "*Existing Rights of Way*" used in Section 1(a)

---

custom in the industry'"). But, even if the Court did find Section 3 to be ambiguous and considered these authorities, the negotiations, context, and intent of the parties unequivocally establish why this provision was necessary to address the asymmetry between the 20-year and 50-year BIA-approved easements granted over the Reservation at the same time.

and instead uses different and broader language. It would also make little sense to place such a clause in the middle of the Agreement, where it is followed by an alternative substantive section. Any such ministerial clause would have been relegated to the "housekeeping" provisions at the end of the Agreement.

Third, the Band incorrectly argues that the consent language in Section 3 "parallels" the Consent Resolution and, therefore, refers only to the thirteen trust parcels identified in the 1992 application. The Consent Resolution does not parallel Section 3; instead, the Consent Resolution actually <u>mirrors Section 1(a)</u>. *Compare* Band Attach. E ¶ 1(a) (Agreement providing consent to a 50-year right-of-way "within the Existing Right[s] of Way," which is defined as "any . . . land . . . *in which the Tribe now has a legal interest*") *with* Enbridge Ex. 1 (Consent Resolution authorizing 50-year easement "across any lands *in which the Tribe has a legal interest*"). In any event, the Band again ignores that the "Application" referenced in the Consent Resolution refers to the BIA application package as a whole (for all allotted lands as well as tribal lands). *See supra* at Section I.F.1.

Finally, the Band argues that the parties should have somehow phrased Section 3 more precisely. *See* Band Mot. at 36-37. But there is no rule of contract interpretation that a contract is ambiguous simply because it could – with the hindsight afforded by the passage of almost 30 years – have been more specific. *See N. Crossarm Co. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d 752, 759 (W.D. Wis. 2004) ("It is true that language used in contracts may be broad without being ambiguous."); *Kernz v. J.L. French Corp.,* 677 N.W.2d 751, 757 (Wis. Ct. App. 2003) ("[A] phrase is not ambiguous simply because it is general or broad.").

The undisputed record evidence establishes that (a) Enbridge's express and obvious objective during these negotiations was to secure contiguous easement rights for the operation of

Line 5 over the Reservation for a total of 50 years, *see* EPFF ¶¶ 4, 8, 9, 17, 21, 27, 34, 36-37, (b) the parties were aware during negotiations of a looming discrepancy in BIA-approved easement periods for different types of land due to the Band's 50-year consent, *see id.* ¶¶ 10-11, and (c) Enbridge in 1992 was a "sophisticated corporation[] with highly skilled negotiators," which would not have agreed to pay the Band for 50 years of consent if that really meant, as the Band now argues, only 20 years of consent.  D.E. 42 ¶ 76 (Band Answer to Counterclaim); Restatement (2d) of Contracts § 220 (1981) ("An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage").

At the time of execution, the parties could – and did – anticipate that a number of events could serve to undercut Enbridge's ability to operate Line 5 for the remaining 30 years (for a total of 50 years) after the 20-year BIA easement term for the Allotted Parcels expired.  For example, the Band could attempt to challenge the validity of the 50-year term (which Section 1 prevents); the Band or Indian landowners could submit a formal objection to the BIA to voice its disapproval of any renewals after 2013; the Band could attempt to dissuade Allotted Parcel landowners not to renew easements in 2013; or the Band could even acquire fractional ownership interests in these parcels and formally withhold consent itself (as it has now, in fact, done).  Enbridge could not necessarily anticipate every potentiality, but it *could* negotiate to prevent the Band from taking action inconsistent with the Agreement and to assist with removing third-party obstacles to consent.  As a result, Section 3 reflects an intention that not only prohibits the Band from dissuading, preventing, or otherwise stopping *other* landowners from offering consent to a renewed easement, but to provide to Enbridge its "consents and authorizations" for Line 5's operation, and maintenance across the Reservation.   The Band's "further assurances" argument fails.

## F. If The 1992 Agreement Is Ambiguous, The Extrinsic Evidence Supports Enbridge's Interpretation

The contract's plain language is confirmed by the record in discovery. If a contract is ambiguous, extrinsic evidence can be used to determine the parties' intent. *See Kernz v. J.L. French Corp.,* 677 N.W.2d 751, 755 (Wis. Ct. App. 2003). Admissible extrinsic evidence includes past practices between the parties, "the surrounding circumstances including factors occurring before and after the signing of an agreement," *see id.*, negotiations before execution of the 1992 Agreement, and the parties' subsequent conduct. *See In re Modern Dairy of Champaign, Inc.*, 171 F.3d 1106, 1108 (7th Cir. 1999) (noting it appropriate to look to "documents that record the parties' deal" to resolve contractual ambiguity); *Nat'l Distillers & Chem. Corp. v. First Nat'l Bank of Highland Park*, 804 F.2d 978, 981 (7th Cir. 1986) (finding it necessary to look to "bargaining history of the lease" to resolve contractual ambiguity); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 772, 778 (7th Cir. 1996) (acknowledging that a court can resolve ambiguity by seeking "clarification through extrinsic evidence of 'practice and custom in the industry'").

The Band contends that even if Sections 1(a) or 3 are ambiguous, it is still entitled to summary judgment on its trespass and contract claims because the "extrinsic evidence demonstrates unequivocally that the parties understood the 1992 Agreement to apply to the thirteen 50-Year Parcels and no others." Not so. To the contrary, each type of extrinsic evidence that this Court may consider to resolve an ambiguity confirms Enbridge's interpretation of both provisions and the scope of the 1992 Agreement as a whole. However, if this Court were to determine that a jury is required to resolve any ambiguity, the Band's summary judgment must still be denied. *See First Bank and Trust v. Firstar*, 276 F.3d 317, 326 (7th Cir. 2001) (summary judgment not warranted where court found it necessary to consult extrinsic evidence).

1.   The Parties' Pre-1992 Practice and Pre-Execution Negotiations Confirm the Band Provided Consent for All Reservation Lands Subject to BIA Jurisdiction for 50 Years

The history of the parties' relationship and the circumstances leading to the 1992 negotiations support Enbridge's interpretation of Sections 1(a) and 3. The Band claims the negotiation record supports its reading that the 1992 Agreement is limited to the "tribal lands" application. Band Mot. at 42. To support this position, the Band points only to Enbridge's initial offer in July 1992, the "tribal lands" application itself (without ever mentioning the "allottee lands" application contemporaneously submitted to the BIA), and a statement by the BIA which merely purports to confirm that the "tribal lands" application supports an easement for the Tribal Trust Parcels. *Id.* at 42-43; PPFF ¶ 31. These arguments ignore that consent was provided for the Allotted Parcels as well. Ignoring that evidence does not make it disappear.

The parties' negotiations for the 1992 Agreement took place between April and December 1992. As Enbridge had previously informed both the BIA and the Band following the amendment to the 1975 easement, Enbridge sought the Band's consent to Line 5 *traversing the entire Reservation* until 2043. *See* Resp. to PPFF ¶¶ 21, 31-33; EPFF ¶ 8, 9, 17, 21, 24-25, 27, 34, 36-37. Indeed, on April 16, 1992, the Band's Tribal Attorney wrote to Enbridge that he "understand[s] that you are requesting a 50-year renewal of the existing easement across parcels owned by the Bad River Tribe within the Bad River Indian Reservation," and he would be "happy to consider" a written offer. EPFF ¶ 13 (emphasis added). In November 1992, Enbridge's increased offer of $450,000 for a "20 year initial period *over the existing pipeline right-of-way*" required the Band to adopt a resolution accepting the offer and consent to Enbridge's "applications." EPFF ¶ 19 (emphasis added)). That Enbridge used the plural "applications" evidences a clear intent to negotiate over the Band's consent for more than just consent to an easement over the Tribal Trust Parcels, which were reflected in only the "tribal lands" component of the application.

40

At the same time, however, there were parallel discussions of a 50-year easement term instead.  Enbridge made a separate offer to pay the Band substantially more, a total of $758,061.00, for the granting of a 50-year easement "over the *existing pipeline right-of-way*,"[18] with the understanding that if the above offer for the 50-year easement is not accepted by the Band," the original 20-year term for $450,000 would be "honored" by the parties.  *Id.* ¶ 20-21.  Regardless of the term of consent, however, it is quite clear the *scope* of consent on the Reservation was the same: across the *entire* Reservation along the existing right-of-way.[19]

On December 15, 1992, the parties met and agreed on a fifty-year term of consent.   EPFF ¶ 22.  The contract was submitted to the Band's Tribal Council to review and to vote on the two resolutions that were necessary to pass in order to execute the contract.  *See id.* ¶ 24.  On December 21, 1992, the Tribal Council approved both resolutions, specifically reflecting its express preference to be bound by a 50-year term of consent for all Reservation lands.  *Id.*  Nowhere in these documents is the Band's consent limited to either 20 years or to only the thirteen Tribal Trust Parcels.  Instead, the Tribal Council voted (1) to "accept[] the offer" of Enbridge for a 50-year easement "across *any lands* in which the Tribe has a legal interest within the Company's *existing right of way*," and (2) to "expressly approve the terms of the Agreement" that reflect the "granting of a new easement for right of way within the company's *existing rights of way*," as reflected by the June 10, 1992 applications submitted to BIA.   *Id.*

On December 23, 1992, two days later, the parties executed the contract.  EPFF ¶ 25. That same day, Band Chairman Moore sent a letter to BIA enclosing the Agreement (and both resolutions) stating that "[t]hese documents express the terms by which the Bad River Tribe has

---

[18]      As discussed above, the existing right-of-way, issued in 1973, was across the entire Reservation, including all the Allotted Parcels.  Resp. to PPFF ¶¶ 11-12, 14.
[19]      This language matches the language used in the Section 3, which broadly refers to *all* lands covered by the 1975 BIA easement across the entire Reservation as the "existing pipeline Right of Way." *Id.*

agree to grant to Lakehead a fifty year right of way *over its existing easement.*" This existing easement was, and since 1953 had been, across the *entire* length of the pipeline located on the Reservation (including *all* Tribal Trust Parcels and *all* Allotted Parcels and any other lands subject to BIA jurisdiction along the pipeline corridor). Resp. to EPFF ¶¶10-14 (emphasis added). Put simply, the Band told BIA it was consenting to 50 years of operation and maintenance "over [Enbridge's] existing easement" for one contiguous right of way across the Reservation.

> 2. The Band Confirmed to the BIA Its Desire to Consent to a Binding 50-Year Term

Following the execution of the 1992 Agreement by the Band, but before it was approved by the BIA, the BIA pointedly asked the Band about the breadth of the 50 years of consent provided for in that agreement. EPFF ¶ 36 (Band Attach. U at ENB00010942). The BIA explained to the Band that it was consenting to Line 5's use across the Reservation for 50 years, and that the Band could not change its mind after 20 years and ask that the Line then be removed. *Id.* In response, the Band affirmed its commitment to Line 5 being present on the Reservation for the full 50 years, until 2043. *Id.* ¶ 37.

It was the BIA's "recommendation" "that the Bad River Band endorse an easement for a 20-year period at the negotiated figure" of $450,000. *Id.* ¶ 36. The BIA official commented that "the Bad River people may want to explore alternative uses for their lands in 20 years," and that the 1992 Agreement would preclude that, because "with a 50-year commitment, the Tribe would be ***unable to exercise such alternatives in 20 years but instead find themselves burdened for 30 more years***." *Id.* (quoting Band Attach. U, emphasis added). The BIA stated that if the Band still wanted to issue a 50-year easement to Enbridge, the BIA "will require that you provide full justification expressing why a 50-year Grant would be in the best interest of the Bad River

Community" and BIA will then forward the recommendation to the "Area Director for his review and decision." *Id.*

The BIA's comments would not be necessary if the Band could – as it attempts to do in this litigation – object to continued use by Line 5 after only 20 years. The Band, however, did not take this position in responding to the BIA's express warnings. The Band did not argue that the 1992 Agreement only applied to trust land. The Band did not argue that the Band could object to continued use of Allotted Parcels after only 20 years. The Band did not argue that Section 3 was not binding or a mere "further assurances" clause without any real meaning. The Band did not argue that the 1992 Agreement could be "terminated." It made <u>none</u> of the arguments the Band currently advances.

Instead, the Band approved of Line 5 operating on the Reservation for 50 years and discussed this 50-year period as one that could not be cut short. *See id.* ¶ 37. The Chairman confirmed in a letter to BIA that the Band understood it would be "<u>unable</u> to exercise [any] alternatives in 20 years." *See id.* (quoting Enbridge Ex. 16). Yet, this is exactly what the Band now seeks to do. The Band's statements, made shortly after negotiating the 1992 Agreement and expressly referring to its terms, prove that the Band understood it could <u>not</u> revoke its consent to Line 5 operating on the Reservation for the full 50 years. *See* EPFF ¶¶ 42-43. *See also Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1025 (7th Cir. 2020) (the parties' statements during contract negotiations and their conduct afterward carry more weight than legal interpretations offered in the run-up to litigation).

The Chairman justified the Band's 50-year consent on economic grounds, telling the BIA that the Band believed it received "an extremely good price" for the 50 years of consent because it could invest the sum now and likely outperform any new deal in 20 years which would depend

43

on the uncertain state of the oil market at that time.  *See id.* ¶ 37.   His responses were accepted by the BIA. *Id.* ¶ 38. As a result, on April 20, 1993, the BIA recommended approval of the 50-year consent term "[s]ince the Bad River Band through its governing council favors a 50 year grant." *See id.*; Resp. to PFFF ¶ 36.

### 3.   The Parties' Subsequent Course of Performance

#### a)   *The Band's Subsequent Conduct*

The parties' statements and actions following the 1992 Agreement further corroborate Enbridge's contract interpretation.  First, the Band has never once contended – and still does not contend – that Enbridge was in trespass before 2013 on the three Allotted Parcels it owned an interest in at the time of execution.  To believe the Band's interpretation of the 1992 Agreement that it did not consent in the Agreement to an easement on the three Allotted Parcels it owned at the time, the Band would have raised a trespass claim or objected to the BIA's illegally-issued easement at any point since 1993.  *See supra* at I.F.3.a.  But over the last 30 years, the Band has never once asserted that Enbridge lacked a valid right-of-way over those parcels, never once argued that the Band did not consent, and never once advanced the argument its attorneys now press.  Further, the Band has not identified any other contract or resolution conveying the Band's consent for Line 5 to operate on these parcels after 1992 when its last easement expired.  The Band's silence and subsequent conduct completely contradict its position in this litigation and reveal that it has, in fact, understood the 1992 Agreement to have reflected its consent for these three Allotted Parcels.  *See Lexington Ins. Co.*, 949 F.3d at 1215.

Second, in stark contrast to the Band's summary judgment submission – which provided no evidence illustrating how Enbridge subsequently understood the 1992 Agreement – Enbridge offers such evidence from the Band, which is fatal to the Band's motion.  Specifically, in addition to the evidence cited above concerning discussions with the BIA, Enbridge offers more recent

admissions from the Tribal Council confirming that (i) the 1992 Agreement covers the *entire* Line 5 right if way on the Reservation and (ii) the Band breached the 1992 Agreement by failing to consent to Line 5's continued operation on the Reservation.

For example, at an October 1, 2016 Tribal Council meeting that was open to the public, the Band's Tribal Attorney explained that even though the "tribal [easement] goes for another 30 years . . . ***there's a hook there***.  Individual allottees agreed for a short[er] period of time, and those are up and that's really what [our] tribal government [is trying to] gain interest in a bunch of those short-term rights-of-way."  EPFF ¶ 71 (quoting Enbridge Ex. 4 at 10/1/16 Tribal Council Meeting Part I at 3) (emphasis added).  In July 2017, Vice Chair Berlin admitted that the 1992 Agreement was "for a 50-year passage ***across the Reservation.***"  EPFF ¶ 42 (quoting Enbridge Ex. 4 at 7/6/17 Tribal Council Meeting) (emphasis added).  Several months later, another Tribal Council member stated that even though the "lease isn't up until sometime in 2040 that the tribe entered into with them years ago . . . ***we're contending [] that the parcels of land that we recently [purchased] are grounds to request for [decommissioning of the pipeline]***."  EPFF ¶ 71 (quoting Enbridge Ex. 4 at 10/5/17 Tribal Council Meeting at 1).  In 2018, Chairman Wiggins repeated his recognition to the Tribal Council that "there's still an agreement out there that was signed in 1992 by our Tribal Council, giving Enbridge ***free operations for 50 years***."  *Id.* ¶ 40, 42 (quoting Enbridge Ex. 4 at 2/8/18 Tribal Council Meeting at 2).

Put simply, the Chairman acknowledged that the Band's legal position was weak and conflicted with the terms of the 1992 Agreement:

> [The] elephant in the corner is that this is in regard to our private property pieces that we've, you know, kind of reacquired interest in recently.  ***There's still a – there's still an agreement out there that was signed in 1992 by our Tribal Council, giving Enbridge free operations for 50 years***.  ***At that time, the council took $800,000 for that.  And there's a line in there that says the Tribal Council will***

***<u>not interfere – interfere with the operation of this line for 50 years.  That's – in a legal sense, that's a massive – that's a massive weakness in our case.</u>***

*Id.* (emphasis added).

Less than one month before the Band filed this lawsuit, Chairman Wiggins made explicit statements during a public community meeting that:

> The Enbridge crude oil pipeline has been running through 12 miles of Bad River lands since 1953. The Bureau of Indian Affairs (BIA) gave Enbridge permission. In the 1970s, the 20-year lease expired and the BIA renewed it. In 1993, the lease expired, and at that time **our Council chose to re-enter into a 50-year lease agreement for $800,000. *There's certain language within that agreement that we take issue with today*.**

*Id.* (quoting Enbridge Ex. 5 at BRB038660) (emphasis added).  In the same meeting, Chairman Wiggins stated his intent to withhold consent and demand rejection of the pipeline  "***regardless of any lease [agreement].***"  *Id.* (emphasis added).  The Chairman's own forthright language reveals the Band's recognition that the 1992 Agreement contains terms the Band "take[s] issue with *today*" (that is, will not comply with) because it conflicts with the current Tribal Council's desire to remove Line 5.  *See id.*  This is consistent with the Chairman's testimony that the Band has somehow "terminated" the 1992 Agreement.   EPFF ¶ 57.  Such termination is, at bottom, an admission that the Band has breached the 1992 Agreement.

b)   <u>*Enbridge's Subsequent Conduct*</u>

The Band argues Enbridge's employees' statements made more than 20 years after execution of the 1992 Agreement contradict Enbridge's current interpretation of Section 3.  It contends these statements demonstrate Enbridge's "understanding that it would need to obtain the Band's consent to new easements over any expired parcels the Band owned or co-owned."  Band Mot. at 44.  The Band is wrong.  These statements would only be relevant to the meaning of Section 3 of the 1992 Agreement if the statements in question were *about* Section 3.  They were not and the Band supplies no evidence – must less undisputed evidence – that they were.  This is because

46

*none* of the persons who made those statements were expressly or implicitly commenting on the 1992 Agreement. None so much as references it.

Instead, the statements merely reflect a fact no one contests--that the June 2013 termination date of the BIA approved easements across the Allotted Parcels had passed. As the meaning and import of these statements is, at most, a contested factual issue which must be resolved by the finder of fact, they may not be relied upon in seeking summary judgment. Thus, even if the Enbridge employee statements are considered as extrinsic evidence that may assist the Court in resolving contractual ambiguity, the declarations submitted by Enbridge (as well as the contrary evidence from the Band which refers directly to the 1992 Agreement), at a minimum, reflect a genuine dispute of material fact over the meaning and weight of these statements which must be resolved by a jury. *Energy Complexes, Inc. v. Eau Claire County*, 449 N.W.2d 35, 41 (Wis. 1989) (holding that summary judgment should have been denied after considering affidavits of the parties to determine intent and resolve ambiguity).

As the declarations submitted by Enbridge demonstrate, the Band fundamentally misconstrues the referenced statements. They merely reflect that the BIA approved easements on the Allotted Parcels are (or would be) "expired" as of June 2, 2013, subject to (possibly) being renewed by the BIA. *See* EPFF ¶¶ 60-61 (citing, *e.g.,* Band Attach. II at ENB00001460 (Enbridge Lands Department employee stating that BIA official informed him that "the Easements with Bad River Tribe expire June of 2013.")). This is not disputed as June 2013 has come and gone. Resp. to PPFF ¶ 41.[20] But such statements have nothing to do with, and do not mention Section 3 of the

---

[20]     *But see* Resp. to PPFF ¶ 49. While the stated terms of these 20-year easements is not in dispute, Enbridge does indeed dispute that the 1993 easements have "expired" because, under operation of federal law, its renewal applications in 2013 have not been denied by the BIA while pending on agency appeal and the force of its previous license remains in effect unless and until it has been denied. *See infra* at Section III.

1992 Agreement.  EPFF ¶¶ 67-68.  Section 3 is not referenced, summarized or quoted in any of these statements.  *Id.*  Nor do they mention any other section of the 1992 Agreement, or any of its other terms.  *Id.*  Indeed, the 1992 Agreement is not alluded to at all.  *Id.*  Thus, these statements cannot possibly contradict, or have any bearing on, its terms.

Other statements from Enbridge employees cited by the Band are irrelevant for similar reasons.  Statements by Enbridge employees that Enbridge is in "trespass" have nothing to do with the 1992 Agreement.  Once again, the cited statements do not explicitly or implicitly mention that Agreement.  *See id.*  Moreover, as shown below, the persons making those statements were not making any reference to Section 3 or the Agreement.  Thus, they cannot possibly have any bearing on the meaning of the Section 3 "consent" obligation.

Each of the persons making the statements in question submits with this brief an explanatory affidavit.  *See Gruenberg v. Tetzlaff*, 13-CV-095-WMC, 2014 WL 6435069, at *4 (W.D. Wis. Nov. 14, 2014 (Conley, J.) (denying defendant's motion for partial summary judgment where plaintiff's declarations were "detailed, specific, and based on personal knowledge" and rebutted contrary evidence in the defendant's motion); *Energy Complexes, Inc. v. Eau Claire Cty.*, 449 N.W.2d 35, 41 (Wis. 1989) (considering affidavits from each party to determine intent of the parties).  In these affidavits, each declarant makes clear that they wrote or made these comments without reference to the 1992 Agreement's requirements (and in most cases without any knowledge of the existence at all of the 1992 Agreement) and merely intended to use the term "trespass" as a way to describe that the BIA-issued easement end date had passed or was about to pass:

- Trent Wetmore, Enbridge Midwest Director of Operations.  On March 16, 2020, Mr. Wetmore stated that Enbridge is "operating in trespass as spelled out in th[e Band's] lawsuit."  Band Attach. II at ENB003159856.  Mr. Wetmore was only "reiterat[ing] what the Bad River Band had already alleged" and identifying the allegation as "an

48

operational risk." D.E. 203, Wetmore Decl. ¶ 5-6.[21]  Mr. Wetmore also used the term "trespass" in two budget proposal documents (Band Attachs. OO and SS).  Wetmore was describing the basis for requesting funds for the Re-route, which was the "operational risk arising from expired BIA-approved easements" and, at the time of creating, "was not aware, had not reviewed, and did not know or understand the terms of" the 1992 Agreement.  *Id.* ¶¶ 8-10.

- Paul Eberth, Director of Tribal Engagement and Public Affairs, Communication, & Sustainability ("PACS").  In June 2017, Mr. Eberth sent the two identified emails (Band Attach II. at ENB00023512 and ENB00014479).  Mr. Eberth used the word "trespass" as way to describe lands where Enbridge "does not currently have an existing easement," and to describe the "expiration [a]s an operation risk."  D.E. 194, Eberth Decl. ¶¶ 7-8.  Mr. Eberth did not consider the "terms or significance of the 1992 Agreement."  *Id.* ¶ 12.

- Paul Meneghini, Community Engagement Manager.  Mr. Meneghini sent an email in March of 2017 requesting a map that would reflect the allotted parcels in the Bad River Reservation.  Ex. II at ENB00016416.  He did not know about the 1992 Agreement (¶¶ 9, 11), has never seen the contract or any easement documents (¶ 7), and only was repeating his understanding, after reading the Band's 2017 Resolution, of the Band's claims that Enbridge is in trespass and, as a result, that the Band would not provide consent for new easements. D.E. 199, Meneghini Decl. ¶ 10.

- Kyle Miller, Project Development Lead.  On October 13, 2016, Miller sent an email related to creating a cost and scheduling estimate for the Line 5 relocation.  Band Attach. II. (ENB00020820).  In Mr. Miller's project development role, he used the trespass to describe "expired easements" and "had never seen or been informed" of the 1992 Agreement.  D.E. 200, Miller Decl. ¶ 7-10.  The same applies to 2017 monthly Enbridge "Project Development" update documents regarding the Re-route. *See id.* ¶.

- Amber Pastoor, Project Manager.  Ms. Pastoor forwarded a re-route strategy summary in September 2018.  *See* Band Attach. II (ENB00025413).  She "had never seen or been informed" about the 1992 Agreement and used "trespass" to describe her understanding that Enbridge's BIA easement expired in 2013.  D.E. 202, Pastoor Decl. ¶ 2-10.

- Jeff Paetz, Supply Chain Management.  Mr. Paetz was not aware of "any specific terms of the 1992 Agreement," and was "merely intending to communicate the ordinary process for obtaining and renewing BIA-approved easements" after he learned of the "lapse of permit" from his colleagues in Land Service.  D.E. 201, Paetz Decl. ¶¶ 5-8.

---

[21]    The Band repeatedly displays this particular statement in its Motion, including at the outset, but it does not support a finding of intentional trespass or the conclusion that Enbridge understood Section 3 to be meaningless.  Mr. Wetmore merely repeats the Band's allegations in this suit.

Thus, their statements cannot possibly undermine Enbridge's position and rights as to the 1992 Agreement.

Lastly, the Band also points to statements where Enbridge employees discussed a "need" for Band approval to extend the BIA approved easements after they expired in 2013.  *See* Resp. to PPFF ¶ 61(citing Band Attachs. HH, BB, II at ENB00104034, ENB00001460).  But, for the same reasons, these statements also do not support the Band's argument.  These documents and emails, which also do not mention Section 3 or the 1992 Agreement, merely reflect the Lands Department's "routine course of business" to analyze the status of easements along Enbridge pipelines and explain typical renewal negotiations with a tribe.  *See, e.g.,* Band Attach. II at ENB00104034 ("where the Tribe holds any undivided interest, Tribal Council Resolution is required to obtain their consent"); *id.* at ENB00001460 ("Tribal Council will need to approve the agreements"); Band Attach. BB ("Enbridge should strongly engage the Band regarding allottee negotiations").  *See also* EPFF ¶ 62-63 (citing D.E. 195, Mike Harris Decl. ¶¶ 7-13) (Harris, the author of the email in Band Ex. HH, did not know anything about the 1992 Agreement or its terms and followed Enbridge's "routine course of business" which was to initiate process to request consent from a tribe that owns an interest in allotted land "in order to maintain a good relationship between the parties"); *see also* D.E. 197, Steve Johnson Decl. ¶¶ 5-7.

In contrast to the above statements, which had nothing to do with the 1992 Agreement, Enbridge has submitted admissions from the Band <u>directly addressing the meaning of, and its understanding of, the 1992 Agreement</u>.  *See supra* at I.F.3.a.  These statements show the Band acknowledges that the 1992 Agreement imposed an "advance consent" obligation and requires the Band to permit Enbridge operation across the Reservation until 2043.  *Id.*  EPFF ¶ 40 ("[T]here's still an agreement out there that was signed in 1992 by our Tribal Council, giving Enbridge free

operations for 50 years.").  This alone requires denial of the Band's summary judgment motion because any disputed facts must be resolved in Enbridge's favor.

Accordingly, for the reasons described above, the Band's motion for summary judgment on the trespass and Enbridge's contract counterclaim must be denied.  A jury must consider and weigh extrinsic evidence to resolve any ambiguities that exist in the 1992 Agreement.

### G.  The Band Has Breached The 1992 Agreement

In Section 3 of the 1992 Agreement, Enbridge sought to address the risk that the Band itself would pose future obstacles to operating the pipeline and required the Band to provide additional assistance, including "consents and authorization" to secure a 50-year right to operate and maintain Line 5 across the entire Reservation.  EPFF ¶ 28.  The Band has now created the exact scenario Section 3 was intended to prevent.

The Band declared, in a 2017 Tribal Council Resolution, that it is actively seeking the shutdown and decommissioning of Line 5 across **all** tracts in the Reservation, whether or not those lands have a Band and BIA approved right-of-way until 2043.[22]  Resp. to PPFF ¶ 55.  The Band has thereby materially breached Sections 1(a) and 3 and frustrated the entire purpose of the 1992 Agreement and Enbridge's BIA-issued rights-of-way across the Reservation.

Despite describing Enbridge's right to operate until 2043 on the Reservation as a "**massive weakness**" to the Tribal Council even after the 2017 Resolution (EPFF ¶ 58), the Chairman confirmed that the Band's 2017 Resolution and lawsuit constitute its attempt to "terminate" – and thereby repudiate and breach – the 1992 Agreement:

> Q:  Sir, are you saying a few years back that the Band essentially terminated this 1992 agreement?

---

[22]     That the Resolution did not seek removal from only the Allotted Parcels owned by the Band is additional strong evidence that the Band drew no distinction between the Allotted Parcels it owned and the Tribal Trust Parcels.

A: In effect, yes.

\*\*\*

Q: What I said is correct, the Band's position was that Enbridge has no current permission to operate the line anywhere in the Reservation?

A: Yeah. The Band's position is it's time to decommission and remove the line safely.

EPFF ¶ 61 (quoting D.E. 192, Rule 30(b)(6) deposition of Band, Chairman Mike Wiggins, Jr., *hereinafter* "Wiggins Depo.") at 64:10-12, 123-18:22). This testimony is clear: The Band has breached the 1992 Agreement even if, as it now argues, it only provides consent to operate for 50 years on the Tribal Trust Parcels. EPFF ¶ 39 (Band Chairman testifying that the Agreement is in force and creates a "current obligation" for the Band). Enbridge's counterclaim for this breach must proceed to trial.

Now, in moving for summary judgment and trying to get around its consent problem, the Band has changed course. The Band's testimony was replete with inconsistent statements about whether it intends to comply with the terms of the 1992 Agreement because it concedes Enbridge has the Band's permission to operate on some lands but not others, or whether it believes it repudiated the Agreement. These blatant contradictions at the core of its lawsuit belie the weakness of its claim. The Band cannot run from its own Chairman's testimony and its own Tribal Council's statements, which are binding on it. At a bare minimum, they create a disputed issue of material fact precluding summary judgment in the Band's favor.

The Band's material breaches of these contractual obligations are clear. It publicly seeks removal of Line 5 from the *entire* Reservation, indeed from the entire watershed, which is larger than the Reservation. Resp. to PPFF ¶ 55; EPFF ¶¶ 87, 89 (2017 and 2019 Resolutions). It violated Section 1(a) by seeking removal of Line 5 from the parcels of land that it owned at the time of execution in 1992, which included three of the Allotted Parcels. It also refuses, in violation of

Section 3, to provide the BIA with consent to operate on nine additional Allotted Parcels the Band acquired after the 1992 Agreement was executed and in which it currently has a substantial or majority ownership interest.  The <u>only reason</u> that Enbridge has not obtained a final *renewed* right-of-way from the BIA to operate Line 5 across the at-issue Allotted Parcels is because the Band has repudiated its Section 3 obligations and has refused to provide its current consent to BIA. *Id.* ¶ 80.

As demonstrated above, the Court should deny the Band's Motion for Partial Summary Judgment because the plain text of the 1992 Agreement does not support the Band's interpretation, and if the Court were to find that the 1992 Agreement is ambiguous, the extrinsic evidence in the record raises a genuine issue of material fact requiring the ultimate factfinder to resolve the Agreement's meaning.

In either event, the Band's Motion for Summary Judgment must be denied.

## II.    <u>The "Unmistakability Doctrine" Does Not Apply as a Defense to the Band's Breach</u>

The Band contends that if this Court finds that Section 3 is ambiguous, then the 1992 Agreement cannot be read to require the Band's "consents and authorizations" over the Allotted Parcels on which it alleges Enbridge is in trespass.  The Band invokes the "unmistakability doctrine," a poorly named rule of contract construction providing that an ambiguous or unstated term in a contract with a sovereign government will not be read to "block the exercise of a sovereign power of the Government."  *Winstar v. United States,* 518 U.S. 839, 879 (1996).

This doctrine cannot not apply to Section 3 of the 1992 Agreement for three reasons.  First, even if Section 3 of the 1992 Agreement is ambiguous, no law or facts show the ambiguity would interfere with or block any exercise of a "sovereign power."  The Band's ability to consent, in its capacity as landowner, to a right-of-way is most assuredly *not* a sovereign power as protected by this doctrine.  Second, the doctrine cannot apply where the sovereign power that is purportedly being blocked is a specific and targeted act seeking to repudiate the sovereign's contract and avoid

complying with its contractual duties.  Here, the Band issued a Tribal Council resolution declaring its intent to avoid complying with Section 3 of the Agreement.  That is precisely the type of "change in law" that this doctrine does not protect.  Third, even if consent for Line 5 to traverse the Reservation somehow implicated a sovereign power, the Band unambiguously agreed to provide its consent in the 1992 Agreement and, thus, the "unmistakability doctrine" does not apply. *See supra* at Section I.D.3 (Section 3 textual analysis).

The Band relies on *Winstar v. United States,* 518 U.S. 839 (1996) to invoke the "unmistakability doctrine," arguing that through *Winstar,* "[t]he Supreme Court has spoken clearly."  Band Mot. at 40.  But *Winstar* is neither binding Supreme Court precedent nor is it clear.  Although a majority of justices concluded the doctrine did not apply in that case, there was no majority opinion (and four separate opinions).  *See Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 763 (2003) (the doctrine is "as easily summarized as it is poorly delineated, the latter owing to a welter of conflicting opinions, no less than four of which are in *Winstar* itself.").  As a result, because this doctrine is poorly delineated and *Winstar* itself is unclear at best, a brief review of the history and cases is necessary to understand its purpose, its limits, and its lack of applicability in this case.

### A.  Analyzing *Winstar*

#### 1.  Pre-*Winstar* Development of the Doctrine

There are several key principles the Supreme Court established prior to the *Winstar* opinions throughout the doctrine's history.

First, surrendering or waiving a sovereign power requires a statement indicating an intention to do so.  A sovereign will not be deemed to have abandoned its authority where a

contract is <u>completely silent</u> as to the purportedly blocked power.[23]   Second, not all acts by a sovereign are a "sovereign power" that justify excusing a sovereign entity from breaching its duties.   And, if it is not a sovereign power that excuses repudiation, the government's obligations when entering into a contract are enforced in the same manner as private parties.   *Perry v. United States,* 294 U.S. 330, 353 (1935) (the "right to make binding obligations is a competence attaching to sovereignty").   Third, courts should not approve a governmental act when it is an attempt to repudiate a contract.   *See, e.g., Perry,* 294 U.S. at 350-54; *Lynch v. United States,* 292 U.S. 571, 577-80 (1934) (refusing to excuse the legislative repudiations and holding the government to its contractual bargains). These principles set the stage for *Winstar.*

## 2.   The *Winstar* Opinion, Its Takeaways, and Its Impact

The facts of *Winstar* are straightforward: certain businesses contracted with the federal government to allow them special regulatory treatment when acquiring insolvent thrift institutions, but the government subsequently discharged itself from the contract by passing new regulations. *See* 518 U.S. 839, 844-848 (1996).   The government asserted two defenses as a bar to liability for damages: the "unmistakability" doctrine and the related "sovereign acts" doctrine.   A plurality of the Court rejected both defenses and concluded that the government was liable for its breach of contract.   In other words, the case that the Band chiefly relies upon to justify its breach of Section 3 of the 1992 Agreement did exactly the opposite of what the Band urges here – that is, the Supreme Court enforced the contracts at issue.

---

[23]     *See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 135, 147-48 (1982) (upholding subsequent oil and gas tax where lease from tribe to private developer was silent on taxation, which the Court specifically characterized as "an exercise of legitimate sovereign authority"); *United States v. Cherokee Nation of Okla.,* 480 U.S. 700, 706-07 (1987) (declining to find waiver of federal government's sovereign powers under the navigational servitude in an Indian treaty that said nothing about the servitude). "[N]one of these cases appears actually to have employed the term 'unmistakable,' let alone the paradigmatic 'unmistakability doctrine.'" *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 764-65 (2003).

All the justices, however, agreed on one issue, which is dispositive here.  Each *Winstar* opinion agreed that a government is not shielded from liability where the change in law was enacted to avoid complying with a particular contract.  *See id.* at 878-80 (plurality); *id.* at 910-11 (Breyer in a concurrence, reasoning the doctrine "was not intended to displace the rules of contract interpretation applicable to the Government."); *id.* at 842 (Justices Scalia, Kennedy and Thomas, in their concurrence, agreed the doctrine "cannot be relied upon where the Government has attempted to abrogate the essential bargain of the contract."); *id.* at 929 (Rehnquist, J. and Ginsburg, J., dissenting) ("But the law is well established that Congress may not simply abrogate a statutory provision obligating performance without breaching the contract and rendering itself liable for damages.") and *id.* at 921 (Scalia, J., concurring) (noting that if the doctrine were to apply to every sovereign act, a government's contract would be "an absolutely classic description of an illusory promise").   As shown below, that is exactly what is occurring here.  The Band has admitted it attempted to "terminate" the 1992 Agreement.  EPFF ¶ 57.  This it may not do.

**B.  Section 3 Of The 1992 Agreement Does Not Block Any "Sovereign Power"**

The doctrine cannot apply to this case for four reasons: (1) consenting to an easement is not the type of "sovereign power" protected here, as both private landowners and governments alike routinely consent to easements over their land and those easements are routinely enforced against governments and private parties alike; (2) there has been no "subsequent legislation" or change in law preventing the Band from complying with the contract; and (3) the Band's refusal to provide consent – and its statements demanding that Line 5 be removed from the Reservation as a whole – was issued specifically to abrogate the Band's contractual duties, which the *Winstar* court unanimously concluded is not protected by the doctrine.  Enbridge addresses each of these in turn.

1.  The 1992 Agreement Does Not Block A "Sovereign Power" As Protected by the Unmistakability Doctrine

The Band incorrectly argues that its ability to "consent to an encumbrance of its land is an act of sovereignty."  Band Mot. at 39. As support, the Band only cites its Constitution as authorizing the Tribal Council to approve encumbrances on land[24]  and a federal regulation for the position that requiring tribes to consent to BIA-issued rights-of-way helps protect tribal sovereignty over its lands.  *See id.*  But these authorities are inapposite, and the Band offers no case that strikes down a contract where, as here, the contract requires the Band's consent to a federally granted easement.

The Band's decision to provide "contractual consent" to an easement is not one implicating a sovereign power.  Instead, it involves consent to property, just like a private landowner might provide.  Unlike the power to tax or impose other laws, such as those at issue in cases like *Merrion*, 455 U.S. at 144, this is not a power special or unique to a sovereign government; *any* landowner can "consent to an encumbrance of land."[25]

---

[24]       To the extent the Band argues, by citing to its constitution, that *any* act by the Band Tribal Council constitutes the exercise of a sovereign power, the Band is wrong and supplies no case for this novel notion.  *See* Band Mot. at 39.  In fact, this exact position was rejected in *Winstar*.  *See* 518 U.S. at 879 (plurality opinion explaining that *Merrion,* among others, did not change the fundamental rule which only applies to protect some "sovereign powers"); *see also Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 494 (Wis. 2006) (Prosser, J., concurring in part) ("*Winstar* explained that the unmistakability doctrine was not universally applied because of 'the different kinds of obligations the Government may assume and the consequences of enforcing them.'").

[25]       *See, e.g., In re UAL Corp.*, 391 B.R. 791, 804 (Bankr. N.D. Ill. 2008) (refusing to apply the doctrine where United Air Line's contract with the City of Los Angeles for preferential use of gate position and loading ramps was "a financial transaction" as opposed to one "essential to protect public safety"); *Kimberly Assocs. v. United States*, 261 F.3d 864, 869 (9th Cir. 2001) ("[w]hen the government is acting as a private contracting party, then the doctrine does not apply, and the government's rights and duties are governed by law applicable to private parties"); *NRDC v. Kempthorne*, 621 F. Supp. 2d 954, 984 (E.D. Cal. 2009) ("The unmistakability doctrine does not apply when the government is acting as a private contracting party."). *See also Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 429 (Wis. 2006) ("When a state is acting, 'not in its capacity as a sovereign, but in its proprietary capacity' as a party to a contract, the state 'is bound by the same rules as those which it applies to its citizens.'") (citation omitted).

To support its position, the Band offers dicta from a Tenth Circuit opinion to, at best, support the idea that tribal consent to rights-of-way on tribal lands "promote" or "strengthen" a Congressional policy of tribal independence. *See* Band Mot. at 39-40 (citing *Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1112 (10th Cir. 2017) (discussing 25 U.S.C. § 324)). That case had nothing to do with interpreting or voiding tribal contracts or applying the "unmistakability" doctrine. Thus, it is completely irrelevant. Moreover, there is simply no caselaw standing for the proposition that a tribe may unilaterally cancel a binding contract if doing so in some indirect way is alleged to "*promote*" sovereignty. The fact remains that 25 U.S.C. § 324 and the Department of the Interior's Indian right-of-way regulations both require consent to the BIA issuing a right-of-way over tribal or individual Indian land. The action is not an act of tribal taxation as in *Merrion*; this is a tribal cotenant—one that holds undivided fractional interests in tracts of land that it shares with many individual Indian cotenants—agreeing to provide its consent to an easement.

Further, the Interior regulations governing rights-of-way within a Reservation that require consent clearly apply to both Indian tribes and individual Indian landowners: "for a right-of-way across tribal land, the applicant must obtain tribal consent,"[26] but "[f]or a right-of-way *across individually owned Indian land*, the applicant must notify all Indian landowners, and . . . must obtain written consent from the owners of the majority interest . . . ." 25 C.F.R. § 169.107(a), (b). Thus, for the at-issue Allotted Parcels on "individually owned Indian land," the applicable BIA regulations provide the Band and individual Indian landowners with the *same* ability to provide or withhold their consent. *See id.* § 169.108(a) ("Indian tribes, adult Indian landowners and emancipated minors may consent to a right-of-way over or across their land . . . ."). There is no

---

[26]     The Band concedes that Enbridge already secured tribal consent for its easement across "tribal land" until 2043 via the 1992 Agreement. Resp. to PPFF ¶ 36.

special tribal consent *in addition to* the landowner's consent over these tracts. It follows, then, that the Band can contract for its ability to provide consent under ordinary principles of contract interpretation, just like any other landowner.

        2.   <u>The Band Has Not Enacted Subsequent Law That Has Caused the Band to Breach the Contract</u>

Second, the Band has not enacted, passed or created any "subsequent governmental act," as defined in *Winstar*. *See Winstar,* 518 U.S. at 881 (doctrine applies where breach occurs due to a "new law" or "regulatory change"); *United Launch Servs., LLC v. United States,* 139 Fed. Cl. 664, 686 (2018) ("*Winstar* was the effect of the subsequent change in law"). The type of "subsequent governmental actions" described – and that trigger any protection to a sovereign entity – in *Winstar* are changes in law, regulation, or legislative action that ultimately lead to a breach. What "subsequent governmental actions" are not, according to every *Winstar* opinion, are calculated governmental actions taken with the intent to renege on bargains previously and legitimately struck with third parties.

This latter action is precisely the type the Band seeks to undertake here under the guise of "subsequent governmental acts." The Band simply issued decrees calling for Enbridge to decommission Line 5 and stating that it will not comply with the contract.[27] But this is not a "sovereign power" as defined by *Winstar*. *See* 518 U.S. at 879 (plurality defining "sovereign power" as a power that "could otherwise affect the Government's obligation under the contract. ***The Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract***.") (emphasis added). Rather, as discussed below, the

---

[27]     Such concerns are an impermissible basis for other reasons as well. *See infra* Section IV concerning federal supremacy over any safety issues related to Line 5.

Band's efforts are an attempt to avoid the bargain struck by its predecessor Tribal Council.  The Supreme Court in *Winstar* made it clear:  this is not allowed.

        3.   <u>The Band's 2017 Resolution is Intended Specifically to Repudiate the Contract</u>

The Band's repudiation of the 1992 Agreement is precisely the type of governmental action that is *never* protected under *Winstar* because it is explicitly intended to void its contract with Enbridge.  The *Winstar* Court unequivocally agreed that the governmental action at issue must "otherwise" or "incidentally" affect its contractual duty, ***and the action cannot be specifically to impact (or abandon) that duty***.  *See Winstar,* 518 U.S. at 898 (observing "the greater the government's self-interest, . . . the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence") (emphasis added); *id.* at 924 (Scalia, J., concurring) ("sovereign acts" do not include legislation that is designed to "repudiate[e]" the government's contract obligations).  To told otherwise would mean any government could cancel any contract at any time for any reason.  That is not the law.

The *Winstar* progeny conclude the same.  *See Conoco Inc. v. United States,* 35 Fed. Cl. 309, 334 (1996) (after oil and gas companies purchased lease for offshore oil exploration from the United States and Congress subsequently enacted a comprehensive oil spill law prohibiting the Department of Interior from approving any permits required to conduct exploration under the lease, court rejected government's "unmistakability" defense because "the legislation was narrowly tailored to target the specific contracts and sought to abate the accompanying rights here at issue"); *Coast–to–Coast Financial Corp. v. United States,* 45 Fed. Cl. 796, 803 (2000) ("[T]he *Winstar* plurality supports [the] argument that an inquiry into the alleged 'targeted' nature of the ... legislation is relevant to determining whether the Government can take advantage of the unmistakability doctrine" and "[f]or an act of Congress to qualify as an exercise of sovereign power, it cannot have been designed merely to eliminate a [contractual] obligation"); *Cuyahoga,*

57 Fed. Cl. at 769 (the doctrine does not apply where "for example, the challenged legislation represents a bald 'repudiation' of a contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal.").[28]

Here, the Band's simple refusal to provide consent and its statements declaring it will not consent to *any* Enbridge easement is intended to repudiate the Band's obligation in the 1992 Agreement to provide all "consents and authorizations . . . whether necessary or not to obtain a fifty (50) year easement for Right of Way."   EPFF ¶ 25 (1992 Agreement ¶ 3).  This refusal does not impact the Band's right to withhold or provide consent to any *other* rights-of-way within the Bad River Reservation.  *See* EPFF ¶¶ 90-92 (the Band has been freely discussing easement renewal with other companies that operate hydrocarbon pipelines on Reservation, as well as permitting them to operate on expired easements).  Nor does this refusal seek to create a specific exemption to a subsequent law or regulation imposed by the Band on rights-of-way or pipelines generally. *See* EPFF ¶ 57 (quoting Wiggins Depo. at 65:14-15) (Enbridge's "right to operate was rejected"). Rather, the Band's refusal is targeted on reneging obligations it agreed to in one particular contract: the 1992 Agreement. Accordingly, *Winstar* protection for the Band's breach of the 1992 Agreement is not available.

### C.  The Band Unambiguously Agreed to Provide its Consent in The 1992 Agreement

Even if this Court were to conclude that the Band's ability to withhold "contractual consent" to the right-of-way was a "sovereign power," the doctrine still cannot apply to the 1992

---

[28]     *See also Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569, 1577 (Fed. Cir. 1997) (the doctrine applied because the Energy Policy Act "constitutes a general exercise of Congress' taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties"); *General Dynamics Corp. v. United States,* 47 Fed. Cl. 514, 542 (2000) (same); JOSHUA I. SCHWARTZ, "*The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of Winstar: An Interim Report*," 51 Ala. L. Rev. 1177, 1197 (2000) ("The government is not entitled to any exceptional sovereignty-based defense when it singles out a particular contracting partner for impairment of its contract rights.").

Agreement because the Band agreed to give up that power for Enbridge's Line 5 right-of-way in clear and express terms.

For the reasons described more fully in Section I.D., Section 3 of the 1992 Agreement contains express language in which the Band agreed to provide "all consents and authorizations" to Enbridge for it to "obtain a fifty (50) year easement . . . for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest." *See supra* at Section I.D.2. This contractual duty is not inferred from silence. The Court need not imply or speculate what kind of action the Band is required (or prohibited from) taking. It is stated in clear and unmistakable terms that the Band must obtain the "consents and authorizations" that are necessary to execute or maintain a 50-year right-of-way over all the existing right-of-way lands.[29]

Further, the Supreme Court has expressly stated that no "special language of 'unmistakability'" in a contract is required "beyond that discernible using ordinary principles of contract interpretation." *Winstar*, 518 U.S. at 912 (Breyer, J., concurring). The Band cites to just one "unmistakability" case besides *Winstar*, which only holds that a sovereign power will not be waived from silence. *See* Band Mot. at 39, 41 (citing *Merrion*, 455 U.S. at 144). The facts here are nothing like the cases above that justified a governmental breach from a silent contract. Rather, these facts are akin to those in *U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, 712 F.3d 761 (2d Cir. 2013). In that case, a consent decree required the County of Westchester to "promote . . . legislation currently before the Board of Legislators to ban 'source-of-income' discrimination in housing." *Id.* at 768. When the County was accused of breaching this decree, it asserted the unmistakability doctrine, claiming the consent decree "did

---

[29]     Moreover, the Band expressly agreed in the 1992 Agreement to a "waiver of sovereign immunity" with respect to any dispute or enforcement of the contract's terms, such as this one. *See* EPFF ¶ 25 (1992 Agreement ¶ 1(b)). Thus, it can hardly be said that the Band is immune from judicial enforcement of the contractual terms simply because it thereafter issued a tribal decree repudiating the contract.

not surrender a sovereign power of the County Executive in unambiguous terms." *Id.* at 772-73. The Second Circuit rejected this argument for two reasons. First, it held that the obligation at issue was not ambiguous because, under any "reasonable definition of the word 'promote,'" it required "affirmative action by the obligated party to help bring the object in question into being" and is "not met by taking no action or taking an action that detracts from, rather than furthers, the end goal." *Id.* at 773 (emphasis added). Thus, the court applied traditional rules of contract interpretation to discern the meaning of the contract.[30]

Similar to these facts, the obligation in Section 3 of the 1992 Agreement – requiring the Band to provide, and for Enbridge to "obtain," any and all consents "to obtain a fifty (50) year easement . . . over [Enbridge]'s existing pipeline right of way" – plainly compels the Band to take "affirmative action." If the Band is "taking an action that detracts from, rather than furthers," Enbridge's objective of obtaining an easement over the BIA lands for 50 years, then the Band is violating this clear an express duty it promised to uphold. Accordingly, this doctrine cannot shield the Band from its Agreement.

### D. Application of The Unmistakability Doctrine Here Does Not Serve Its Purpose

Finally, expanding the application of the unmistakability doctrine to this case undermines the purpose of the doctrine. In his plurality opinion, Justice Souter warned about a "conceptual expansion of the unmistakability doctrine." *Winstar,* 518 U.S. at 884-85. A broad application of the doctrine excusing governmental breaches of its contracts posed two issues in the plurality's mind: first, it would impair an important aspect of sovereignty – the Government's practical capacity to make contracts – because broad application would undermine the Government's

---

[30]     The *Westchester* court also reasoned that even if the promotion obligation was unclear, the doctrine may still not apply because "there is no subsequent change in the law." *Id.* The County was not "*incidentally* disabled" from undertaking any sovereign acts; rather, the County *expressly* agreed to action related to a single piece of legislation." *Id.* (emphasis in original).

credibility when making deals.  *Id.* ("From a practical standpoint, it would make an inroad on this power . . . with the certain result of undermining the Government's credibility."); *id.* at 921 (Scalia, J., concurring) (noting that if the doctrine were to apply to every sovereign act, a government's contract would be "an absolutely classic description of an illusory promise").

Undermining a tribe's ability to validly consent to use of its land would not only effectively repeal the BIA right-of-way regulations to which the Band cites, but it would also make doing business on Indian reservations (or any government owned or controlled property) impossible if the Band could not be bound by agreed upon terms.   If any sovereign government could cancel consents and easements at its discretion, it would be impossible for any private infrastructure to utilize or cross public lands.  This would be a commercial disaster, with huge implications for not only pipelines but for roads, cellular towers, farms and grazing land, internet cables, electric transmission lines, mines, water lines, sewers, and the many other uses routinely taking place on or across government land.  There is not a single case so holding, and for good reason.

Second, applying the doctrine to the Band's withholding of consent to an easement would, indeed, create a new wave of "unmistakability litigation" that would undermine trust in sovereign contracts.  Tribes, local, and state governments and the federal government could issue executive orders, laws, or ordinances to specifically repudiate a contract with a private party (such as an easement or lease) that would not impact any other contract or sovereign act by that government.

In sum, the Band's ability to provide consent to an easement is not a "sovereign power" and therefore does not fall within the scope of sovereign interest protected by the unmistakability doctrine.

### III.   Enbridge Still Has A Valid Right To Operate Line 5 Because Its BIA-Approved Easements Remain In Effect

Independent of the meaning of the 1992 Agreement, the Court should deny the Band's Motion for another reason.  Federal law confirms that Enbridge has authority to remain and continue operations on the rights-of-way over the Allotted Parcels.  By operation of law, Enbridge's prior BIA-approved easements on the Allotted Parcels have been continued.

Section 558(c) of the Administrative Procedure Act (5 U.S.C. §§ 551 et seq.) ("APA") provides that, because Enbridge submitted timely applications for renewal of its easements across the Allotted Parcels before expiration on June 2, 2013, and no final agency decision has yet been rendered as to those applications, its rights-of-way do not expire until the applications have been "finally determined by the agency." 5 U.S.C. § 558(c). Until the Department of the Interior's Interior Board of Indian Appeals ("IBIA") renders its final decision on those applications, which has not yet occurred, Enbridge's continued use of the rights-of-way remains authorized.  Such authorization from the United States as trustee for the Band is fatal to the Band's trespass claim, which is based entirely on a theory that the BIA rights-of-way over the Allotted Parcels have expired.  They have not.  Because the BIA rights-of-way are still in effect and in good standing, Enbridge's operations within rights-of-way are authorized, and, therefore, there can be no trespass. *See* Band Mot. at 16, 18.

#### A.  Procedural History of Enbridge's Renewal Application for Allotted Parcels

On March 8, 2013, Enbridge submitted 15 written applications for renewal of the Line 5 easements across the Allotted Parcels, approximately three months before terms of the easements would end on June 2, 2013. EPFF ¶ 72; Resp. to PPFF ¶ 48.  On November 5, 2020, these applications were denied by the BIA.  EPFF ¶ 74.  Enbridge then filed timely administrative appeals. *Id.* ¶ 75.

Enbridge's appeals are now pending before the Interior Board of Indian Appeals ("IBIA").[31]   *Id.* ¶ 76. When docketing the appeal, the IBIA stated that the "effectiveness of the [denials] [are] "automatically stayed."   *Id.*   (quoting Enbridge Ex. 28 at 22). Thus, the BIA's November 5, 2020, denials have not gone into effect – as discussed below, the BIA has expressly stated that the denials are stayed under the appeal regulations of the Department of the Interior.

### B.  5 U.S.C. § 558(c) Provides for Automatic Extension of BIA-Approved Easements Under Certain Circumstances

Section 558(c) addresses the effect of a timely application to renew permits and licenses issued by federal agencies, including BIA-approved rights-of-way.[32] Section 558(c) provides that "[w]hen the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency."   *See also Pan-Atl. S. S. Corp. v. Atl. Coast Line R. Co.*, 353 U.S. 436, 439 (1957). In applying the provision, the Supreme Court explained that it protects "person[s] with a license from the damage [they] would suffer by being compelled to discontinue a business of a continuing nature, only to start it anew after the administrative hearing is concluded."   *Pan-Atl. S. S. Corp.*, 353 U.S. at 439.

Courts have applied Section 558(c) in situations analogous to those presented here. For example, the Supreme Court held that, by operation of Section 558(c), a Clean Water Act discharge permit remained effective after its expiration date because the permittee (the City of Los Angeles) timely filed an application for renewal, and the Environmental Protection Agency had not yet ruled on the application. *Costle v. Pac. Legal Foundation*, 445 U.S. 198, 210 n.10 (1980) (citing 5 U.S.C.

---

[31]    The Band is participating in the IBIA appeals as an interested party.

[32]    For purposes of the APA, including Section 558(c), the term "license" is defined to include "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8).

§ 558(c)) (because "the EPA has not yet acted upon the city's application, filed July 30, 1976, for a new NPDES permit, the terms and conditions of the 1975 permit have remained in effect by operation of law, even though the permit expiration date has now passed.").

The Interior Board of Indian Appeals ("IBIA") also adheres to a similar construction of Section 558(c).   In *W. Woodrow Metzger v. Acting Deputy Asst. Secretary-Indian Affairs (operations)*, 13 IBIA 314 (1985), the IBIA considered a case involving a BIA lease of Indian trust land for cattle grazing.  The lessee complained the BIA advertised and awarded his lease to other individuals while his renewal application was pending. *Id.* at 314.  The Board found that Section 558(c) covered those allotments for which the lessee had filed a timely application because cattle grazing is an "activity of a continuing nature," the lessee had "filed timely applications for new leases," and those applications "had not been finally determined by the Department."  *Id.* at 318 (emphasis added).

In another example, the Department of the Interior promulgated amendments to its Bureau of Land Management ("BLM") regulations under the Mineral Leasing Act and included a provision clarifying that Section 558(c) applies to rights-of-way across BLM land.  The preamble to the final rule amending the regulations included the following statement:

> Section 2887.12 adds paragraph (d), to be consistent with the revisions made to section 2807.22, explaining that if a holder makes a timely and sufficient application for renewal, the existing grant or lease does not expire until BLM issues a decision on the application for renewal. This provision is derived from the APA (5 U.S.C. 558(c)(1)), and it protects the interests of existing right-of-way holders who have timely and sufficiently made an application for the continued use of an existing authorization. In this situation, the authorized activity does not expire until the application for continued use has been evaluated and a decision on the extension is made by the agency. This reiterates and clarifies existing policy and procedures.

81 Fed. Reg. 92122, 92197 (Dec. 19, 2016) (emphasis added).[33]

### C. Enbridge Satisfies All the Requirements of § 558(c)

As interpreted by the Supreme Court, Section 558(c) applies when four elements are satisfied: (1) "By its terms there must be a license outstanding"; (2) "it must cover activities of a continuing nature"; (3) "there must have been filed a timely and sufficient application to continue the existing operation"; and (4) "the application for the new or extended license must not have been finally determined." *Pan-Atl.*, 353 U.S. at 439; *see* 5 U.S.C. § 558(c). Here, Enbridge's timely submitted rights-of-way applications satisfy all four of those requirements. Even members of the Band's Department of Natural Resources agree, writing in 2017 that "Enbridge filed all required paperwork with the BIA on time, ***so they are technically not violating the original lease***." EPFF ¶ 78 (quoting Enbridge Ex. 29) (emphasis added). This admission is telling.

First, "there [is] a license outstanding." *Pan-Atl.*, 353 U.S. at 439. That "license" is the 20-year rights-of-way issued by the BIA effective June 2, 1993, for the construction, maintenance and operation of Line 5. *See* Resp. to PPFF ¶ 41.

Second, Enbridge's rights-of-way are of a "continuing nature." *Pan-Atlantic*, 353 U.S. at 439. Courts have held that grants like special use authorizations for pipelines across U.S. Forest Service land and grazing permits on BIA leaseholds are sufficiently continuous. *Sierra Club*, 2015 WL 5729091 at *10; *W. Woodrow Metzger*, 13 IBIA 314. Enbridge's right-of-way is analogous to

---

[33]     These decisions are not isolated examples. *See also Ctr. For Biological Diversity v. United States Forest Serv.*, No. EDCV 15-2098-JGB (DTBx), 2016 WL 5334474, at *7 (C.D. Cal. Sept. 20, 2016) (holding water transmission right-of-way still valid by operation of § 558(c)), *judgment entered*, 2016 WL 5339565 (C.D. Cal. Sept. 21, 2016); *Sierra Club, Hawaii Chapter v. City & Cty. of Honolulu*, 415 F. Supp. 2d 1119, 1127 (D. Haw. 2005), *on reconsideration in part*, 486 F. Supp. 2d 1185 (D. Haw. 2007), and *on reconsideration in part sub nom. Sierra Club v. City & Cty. of Honolulu*, No. CV0400463DAE-BMK, 2008 WL 515963 (D. Haw. Feb. 26, 2008); *Petrocom License Corp. v. F.C.C.*, No. CIV. A. 00-3405, 2001 WL 46880, at *4 (E.D. La. Jan. 19, 2001).

those situations. Since the rights-of-way issued by the BIA govern on-going access to and operation of Enbridge's pipeline, they are "with reference to an activity of a continuing nature."

Third, Enbridge made a "timely and sufficient application for a renewal of [its] existing grant." *Pan-Atl.*, 353 U.S. at 439; EPFF ¶ 72. Enbridge submitted applications to BIA for each of the Allotted Parcels about three months before the expiration date of its right-of-way in June 2013. Resp. to PPFF ¶ 48. The applications complied with BIA procedural requirements; they are therefore sufficient. *See Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 215 (D.C. Cir. 1988) (adopting EPA's position that sufficiency requirement in Section 558(c) "means only that the application must be procedurally proper"). And, even if the Band could somehow contest the sufficiency of Enbridge's applications (which it has not done to date), that dispute of fact would preclude summary judgment, because the agency with responsibility for that determination has not yet rendered its final decision.[34] *See, e.g.*, *United States v. W. Pac. R. Co.*, 352 U.S. 59, 70 (1956).

Fourth, Enbridge's right-of-way applications have not yet been "finally determined by the agency." *Pan-Atl.*, 353 U.S. at 437. Because Enbridge filed a timely appeal, no decision can become final until the end of the agency appeal process. EPFF ¶ 76; *see also* 25 C.F.R. § 2.6(a)

---

[34]     Under the applicable BIA regulations in effect when the applications were submitted, an applicant was not required to submit landowner consents with a right-of-way application, even though the BIA would have to have landowner consent prior to *granting* a right-of-way. *Compare* 25 C.F.R. § 169.5 (2013) (listing in detail what an application must include and *not* listing landowner consents) with 25 C.F.R. § 169.3 (2013) (requiring landowner consent is required before *granting* the right-of-way). The new BIA right-of-way regulations published in 2015 (80 Fed. Reg. 72492 (Nov. 19, 2015)), changed that rule by adding a requirement that a right-of-way applicant must submit landowner consents *with the right-of-way application*. *See* 25 C.F.R. § 169.102 ("What must an application for a right-of-way include?"), which provides that, "with the application" the applicant must submit "Record of consent for the right-of-way meeting the requirements of § 169.107, or a statement requesting a right-of-way without consent under § 169.107(b)...." 80 Fed. Reg. at 72539. However, Enbridge's applications are subject to the old, and not the new, regulations. *See* 25 C.F.R. § 169.7(c) (providing that applicants who submitted an application for a right-of-way before December 21, 2015 "may choose to proceed without withdrawing [their application], in which case. . . [w]e will review the application under the regulations in effect at the time of your submission. . ."). 80 Fed. Reg. at 72537. Enbridge chose to have its applications reviewed under the "prior version of the regulations," not the new regulations revised effective April 21, 2016, and the BIA has agreed with that. EPFF ¶ 82.

("No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704, unless when an appeal is filed, the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately.") and 43 C.F.R. § 4.314 ("No decision of a[] . . . BIA official that at the time of its rendition is subject to appeal to the Board, will be considered final so as to constitute agency action subject to judicial review under 5 U.S.C. 704, unless it has been made effective pending a decision on appeal by order of the Board.").  Both the text of the APA and Seventh Circuit precedent establish that a lower agency decision subject to appeal and inoperative during the period of appeal is not "final" for purposes of the APA. *See* 5 U.S.C. § 704; *Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003).[35] Enbridge has appealed the decisions to IBIA, the appeals are still pending, and the lower agency decisions are stayed pending appeal. EPFF ¶ 76. Accordingly, the applications have not yet been finally determined by the agency. *Oneida Tribe of Indians of Wisc. v. Vill. of Hobart*, 787 F. Supp. 2d 882, 887 (E.D. Wis. 2011), *aff'd sub nom. Oneida Tribe of Indians of Wis. v. Vill. of Hobart, Wis.*, 732 F.3d 837 (7th Cir. 2013).[36]

---

[35]     On this point, the *Alto Dairy* court quotes the Supreme Court in *Darby v. Cisneros*, 509 U.S. 137, 152 (1993): "Agencies may avoid the finality of an initial decision, first, by adopting a rule than an agency appeal be taken before judicial rule is available, and second, by providing that the initial decision is inoperative pending appeal. Otherwise, the initial decision becomes final and the aggrieved party is entitled to judicial review." 336 F.3d at 568-69. The Department of the Interior has adopted such regulations. *See* 25 C.F.R. § 2.6 and 43 C.F.R. § 4.314.

[36]     The IBIA's regulations automatically stay a lower agency decision from taking effect pending appeal unless the IBIA orders otherwise. 43 C.F.R. § 4.314. Here, no such order has been issued.  EPFF ¶¶ 76-78 (IBIA Order). Moreover, the IBIA has explicitly confirmed such a stay is in place with respect to Enbridge's applications. *See* EPFF ¶ 76 (*Enbridge Energy, L.P. v. Acting Midwest Regional Director, Bureau of Indian Affairs*, IBIA Pre-Docketing Notice, Order Consolidating Appeals, Order Concerning Petition for Stay, and Order for the Administrative Record at 2, (Aug. 16, 2021) ("[T]he effectiveness of the Regional Director's decisions is automatically stayed as a matter of law.").  *See also W. Shoshone Bus. Council For & on Behalf of W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*, 1 F.3d 1052, 1055 (10th Cir. 1993) ("For purposes of the APA, the IBIA decision was final agency action."); *Petrocom License*

As the Band's Natural Resources Department concluded, "Enbridge filed all required paperwork with the BIA on time, so they are technically not violating the original lease." EPFF ¶ 78. Because Enbridge's right-of-way applications are currently pending before the agency and Section 558(c) provides that its existing right-of-way is continued in such circumstances, the Court cannot enter summary judgment on the Band's trespass claims.

### D. The Band's Trespass Claim Did Not Exist When It Filed Its Complaint And Must Be Denied

Even assuming, counterfactually, that the extension of the terms of the 20-year rights-of-way under Section 558(c) ended on November 5, 2020, when the Great Lake Agency issued its 15 denials of Enbridge's applications, the Band's trespass and unjust enrichment claims still must fail. That is because the Great Lake Agency's denial occurred over 15 months *after* the Band filed its Complaint. By virtue of Section 558(c) Enbridge was not in trespass when the Complaint was filed in July 2019.

The Band's trespass claim presents a classic example of non-justiciability for lack of ripeness. As the Seventh Circuit observed in *Sweeney v. Raoul*, 990 F.3d 555 (7th Cir. 2021):

> [...] Article III prevents federal courts from answering legal questions, however important, before those questions have ripened into actual controversies between someone who has experienced (or imminently faces) an injury and another whose action or inaction has caused (or risks causing) that injury. See *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). These limitations, requirements, and prohibitions are embodied in the so-called justiciability doctrines—*standing, mootness, ripeness, and the prohibitions on providing advisory opinions* and answering political questions. See 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3529 (3d ed. 2020).

> *Id.*, 990 F.3d at 559 (emphasis added).

---

*Corp*, No. CIV. A. 00-3405, 2001 WL 46880, at *2 (holding that licensee was likely to prevail on merits of claim that license was automatically extended until such time as FCC could review Mass Media Bureau's decisions).

In the context of standing under Article III, the Seventh Circuit applies what is sometimes referred to as the "time of filing" rule, meaning that standing is established at the time the complaint is filed and, if it is lacking at that time, cannot be cured by subsequent events. The time of filing rule should be applied with equal force in the ripeness context, since standing and ripeness are both facets of the same constitutional limitation. In this case, that means the Band must prove a trespass existed *on the date it filed its complaint*, not thereafter. *See Pennell v. Glob. Tr. Mgmt., LLC,* 990 F.3d 1041, 1044 (7th Cir. 2021) ("The plaintiff 'must establish standing at the time suit is filed and cannot manufacture standing afterwards.'") (internal citations omitted); *Pollack v. U.S. Dep't of Just.*, 577 F.3d 736, 742 n.2 (7th Cir. 2009) (same); *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (same).

The fact that the Band filed an amended complaint after November 5, 2020, is of no avail. *See Laidlaw,* 528 U.S. at 180 (stating that the court considers whether a plaintiff had standing "at the outset of the litigation") (citations omitted); *Perry v. Village of Arlington Heights,* 186 F.3d 826, 830 (7th Cir.1999) (stating that "[t]he requirements of standing must be satisfied from the outset"); *Park v. Forest Service*, 205 F.3d 1034, 1037-38 (8th Cir. 2000) ("It seems to us that if redressability may not be established by a development that occurs after the commencement of the litigation, neither may an injury-in-fact.); and *Perry v. Village of Arlington Heights,* 186 F.3d 826, 830 (7th Cir. 1999) ("[i]t is not enough for [the plaintiff] to attempt to satisfy the requirements of standing as the case progresses. The requirements of standing must be satisfied from the outset"). *See also GAF Building Materials Corp. v. Elk Corp. of Dallas,* 90 F.3d 479, 482-483 (Fed. Cir. 1996) (applying the time of filing rule in a case involving lack of ripeness).

72

Even if it is assumed (which, again, it should not be) that Section 558(c) extended the right-of-way only until November 5, 2020, the Band had already filed its complaint in July 2019.  At that time, its trespass and unjust enrichment claims were not ripe, and accordingly, the Band's Motion for Partial Summary Judgment on these claims must be denied.

## IV.   The Pipeline Safety Act Forecloses The Band's Attempts To Regulate Pipeline Safety

Even assuming, counterfactually, that the Band had discretion under the 1992 Agreement to withhold its consent to the renewal of easements, the Band's withholding of permission here is contrary to federal law and thus invalid.  As the Band states in its 2017 Resolution, it would not consent to new easements because of its concerns that Line 5 is not safe enough.  *See* Resp. to PPFF ¶¶ 51-55.[37]  The federal Pipeline Safety Act, however, precludes domestic authorities – such as the Band – from regulating interstate pipeline safety.  That Act establishes a comprehensive regime of safety requirements for interstate pipelines, administered by an expert federal agency, and evinces Congress' intent to occupy the field of interstate pipeline safety and to make safety requirements uniform throughout the United States.  Because the Band's withholding of consent contravenes federal law, it is void.  *See, e.g., Williamson v. Hampton Mgmt. Co*., 339 F. Supp. 1146, 1147–49 (N.D. Ill. 1972) (landlord's withholding of consent to sublease apartment on the basis of race is unlawful under federal law and thus void).  The Pipeline Safety Act similarly precludes enforcement of the Tribe's injunctive request for an immediate shutdown of Line 5 due to the pipeline safety concerns.

---

[37]    As explained in Section II.B.1 *supra*, the Band, although a sovereign, was not engaging in a "sovereign power" as protected by the "unmistakability doctrine" in 1992 when contracting with Enbridge and giving its consent to Enbridge for an easement renewal over lands in which it had an "interest" within the Reservation.  This Section explains that, even assuming the Band had some discretion to withhold consent under the 1992 Agreement, which it does not, the Band was by its own admissions acting as a sovereign regulator in 2017 when it issued the 2017 Resolution refusing to consent to a renewed easement over the relevant Allotted Parcels.

### A. Field Preemption

The Constitution's Supremacy Clause declares that "the Laws of the United States … shall be the supreme Law of the Land." U.S. Const. Art. VI, cl. 2. As a result, federal law preempts inconsistent actions by other domestic authorities, including states, territories, and tribes. While preemption case law generally focuses on federal preemption of state law, federal law is also supreme in relation to tribal law. Indeed, congressional authority to preempt tribal law is greater than its authority over state law. "Indian tribes are 'domestic dependent nations.'" *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788 (2014) (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*, 498 U.S. 505, 509 (1991)). Whereas the Constitution places certain limits on federal control over the States, it is established that "the tribes are subject to plenary control by Congress." *Id.*; *United States v. Lara*, 541 U.S. 193, 200 (2004) (Congress has "plenary and exclusive" authority to "legislate in respect to Indian tribes").

One way that Congress preempts other laws is by "occupying the field." Field preemption prevents other domestic authorities from "regulat[ing] conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. General Electric Co.*, 496 U.S. 72, 79 (1990). "Such an intent may be inferred from a 'scheme of federal regulation … so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also, e.g.*, *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 893 (7th Cir. 2019) (preemption occurs "where Congress manifests an intent to occupy exclusively an entire field of regulation through a comprehensive federal regulatory scheme").

The Pipeline Safety Act evinces a clear congressional intent to occupy the field of interstate pipeline safety. Rather than allow each individual locality that an interstate pipeline passes through to burden interstate commerce with a patchwork of policymaking, the Act assigns exclusive

authority to regulate pipeline safety to the U.S. Secretary of Transportation.[38]  The Act aims to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities."  49 U.S.C. § 60102(a)(1).  To achieve that goal, the Act gives the Secretary broad authority to promulgate federal "safety standards" for interstate pipeline transportation and facilities.  *Id.* § 60102(a)(2).  Such standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  *Id.* § 60102(a)(2)(B).  The federal standards must be "designed to meet the need for … pipeline safety and … protecting the environment."  *Id.* § 60102(b)(1).  Congress thus determined that pipeline safety must be set and enforced uniformly to meet the *Nation's* interests.[39]  "This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."  *Kinley Corp. v. Iowa Utilities Board*, 999 F.2d 354, 359 (8th Cir. 1993).

The Secretary has delegated authority to implement the Act to an expert federal agency – Pipeline and Hazardous Materials Safety Administration ("PHMSA") – which has in turn promulgated an extensive body of federal safety rules that pervasively regulate the design, construction, and operation of interstate pipelines like Line 5.  *See* 49 C.F.R. § 195 *et seq.*  These regulations are designed to comprehensively meet the need for "safely transporting hazardous liquids" and "protecting the environment" on a national basis.  49 U.S.C. § 60102(b)(1)(B)(ii).  In addition to promulgating regulatory requirements that interstate pipelines must satisfy, PHMSA

---

[38]   It is undisputed that Line 5 is an interstate pipeline: The Band acknowledges that it begins in Wisconsin, crosses through Michigan, and ends in Ontario, Canada.  Dkt. 123 at 2-3 (TAC ¶ 5); *see also* 49 U.S.C. § 60101(a)(4), (5), (7), (18), (19) (definitional provisions).

[39]   No regions or parts of the country are exempt from this federal regulatory regime.  *See* 49 U.S.C. § 60101(a)(5) (defining hazardous liquid pipeline facility broadly to include any "right of way, … or equipment used or intended to be used in transporting hazardous liquid ….").

"is vested with exclusive jurisdiction to issue an emergency order requiring pipeline closure 'when an unsafe condition or practice, or a combination of unsafe conditions or practices, constitutes or is causing an imminent hazard.'" *Michigan v. Enbridge Energy, LP*, --- F. Supp.3d ---, 2021 WL 5355511, at *6 (W.D. Mich. Nov. 16, 2021) (quoting 49 U.S.C. § 60117(p)); *see also* 49 C.F.R. § 190.236 (implementing the PIPES Act of 2016). No function of PHMSA is more important than ensuring safety of pipeline operations. Congress has mandated that when implementing pipeline policy, PHMSA's Administrator must "assig[n] and maintai[n] safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in pipeline transportation and hazardous materials transportation." 49 U.S.C. § 108(b).

Under the Pipeline Safety Act ("PSA"), interstate pipelines obey one set of regulations, heed a single set of admonishments, consult a single set of authorities, and inform a central depository of critical information. If a problem arises, one regulator investigates; one regulator decides; one regulator takes ownership. Numerous courts have thus confirmed that the Act prohibits other domestic authorities from seeking to shut down a pipeline based on safety concerns. *See, e.g.*, *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877-83 (9th Cir. 2006) (given the "superordinate federal need to maintain the PSA's policy of providing national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations," City of Seattle preempted from imposing safety standards in an easement); *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 569-70 (D. Minn. 1987) (federal law "preempts … County's claim for injunctive relief" regarding concerns over danger posed by interstate pipeline). Indeed, as further confirmation of its intent to occupy the field, Congress provided in the Act that "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or

interstate pipeline transportation."  49 U.S.C. § 60104(c).  The federal scheme "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards."  *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987).

Case law confirms that the Pipeline Safety Act and its two predecessor statutes[40] occupy the field of interstate pipeline safety.  *See, e.g.*, *Tenneco Inc. v. Public Service Comm'n of West Virginia*, 489 F.2d 334, 336 (4th Cir. 1973) ("The Act's text, its legislative history, administration implementation, and judicial interpretation, attest to federal preemption of the field of safety with respect to the establishment and enforcement of standards regulating the interstate transmission of gas by pipeline.") (footnotes omitted); *Andrews v. Columbia Gas Transmission Corp.*, 2006 WL 8441747, at *2 (S.D. Ohio Oct. 23, 2006) ("the Natural Gas Pipeline Safety Act … completely preempts the field of pipeline safety"); *Northern Natural Gas Co. v. Munns*, 254 F. Supp. 2d 1103, 1110 (S.D. Iowa 2003) ("Congress has occupied the field of interstate gas pipeline regulation"); *Oil, Chemical & Atomic Workers Local Union 4-750 v. Goree*, 1993 WL 278444, at *1 (E.D. La. July 16, 1993) ("The Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquid Pipeline Safety Act of 1979 preempt the entire field of pipeline transportation safety.") (citations omitted); *United Steelworkers of America, Local 12431 v. Skinner*, 768 F. Supp. 30, 35 (D.R.I. 1991) ("Federal statutes preempt the entire field of gas pipeline safety."); *Northern Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1264 (D. Minn. 1981) ("[T]he provisions and legislative history of the Natural Gas Pipeline Safety Act indicate quite clearly that federal legislation has preempted the entire field of gas pipeline safety…"); *Southern California Gas Co. v. Occupational*

---

[40]     The current Pipeline Safety Act is a re-codification, without substantive change, of two earlier laws: the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979.  Case law concerning the earlier acts is thus fully applicable here.

*Safety & Health Appeals Board*, 58 Cal. App. 4th 200, 209-10 (Cal. App. 1997) ("We find that it was the clear and manifest purpose of Congress to occupy the field of interstate natural gas pipeline safety, in the broadest sense possible.") (quotation marks omitted); 49 C.F.R. App'x A to Part 195 ("The [Hazardous Liquids Pipeline Safety Act] leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce.").

Here, the Band purports to position itself as a pipeline safety regulator for Line 5, thereby encroaching on a federally occupied field and usurping the role of an expert federal regulator. In Counts 3 and 4, the Band claims Enbridge is trespassing and should be ejected because the Band purportedly refused to renew Enbridge's easement. D.E. 123 at 56-57 (Third Am. Compl. ¶¶ 152-63). As the Band admits in its Proposed Findings of Fact, it refused to renew the easement because it purportedly determined that the pipeline was not safe enough: When "Enbridge sought to obtain new easements," "[t]he Band insisted instead on receiving from Enbridge detailed environmental, pipeline safety, oil spill, and emergency response information pertaining to Line 5 as a condition of moving forward with renewal negotiations." Resp. to PPFF ¶¶ 50-51. The Band then purportedly determined that "Enbridge's information was deficient and contained critical omissions" and then "enacted a Resolution expressing its grave concerns … and directing Band staff to instead take steps to ensure the removal of the pipeline." *Id.* ¶¶ 54-55. This is precisely the sort of action that Congress expected PHMSA – and only PHMSA – to perform where it deemed appropriate. The Band thus sought to establish itself as safety regulator for the portion of Line 5 that crosses the reservation, contrary to Congress's intent that interstate pipeline safety regulation should be committed to a single expert federal agency and should be uniform across the United States. *See also Olympic Pipe Line Co. v. City of Seattle*, 316 F. Supp. 2d 900, 904-07

(W.D. Wash. 2004) (a locality cannot use its status as a party to a contract to regulate in preempted fields), *aff'd*, 437 F.3d 872, 880 (9th Cir. 2006).[41]

**B. Obstacle Preemption**

The same result follows if the issue is analyzed in terms of obstacle preemption rather than field preemption. As the supreme law of the land, federal law preempts the law of another domestic authority where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As set forth above, Congress's goal in enacting the Pipeline Safety Act was to ensure that interstate pipelines would be governed by *uniform* safety standards, not standards that differed across the many jurisdictions that an interstate pipeline crosses as it traverses the country. The Band's attempt to subject Line 5 to its own set of safety standards on the reservation poses an unmistakable obstacle to the congressional goal of uniformity and is thus foreclosed.

**C. Displacement of Federal Common Law**

The Band asserts that its trespass claim arises under federal common law. *See* Dkt. 123 at 56. But the Act forecloses any attempt to regulate interstate pipeline safety under the guise of federal common lawmaking. Indeed, establishing that a federal statute displaces federal common law is easier than establishing that it preempts state law, as the Supreme Court explained in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011). "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *Id.* at 423 (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981)). That is because "'[d]ue regard for the presuppositions of our embracing federal system … as a promoter of democracy' does not enter

---

[41]   The Band's Count 6 ("Unjust Enrichment") apparently seeks a restitution remedy for the alleged trespass and therefore falls along with the trespass claim (Count 3). *See* D.E. 123 at 59.

the calculus, for it is primarily the office of Congress, not the federal courts, to prescribe national policy." *Id.* at 423-24 (quoting *Milwaukee*, 451 U.S. at 316). "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." *Id.* at 424.

It is beyond question that the Pipeline Safety Act "speaks directly" to questions of interstate pipeline safety. The Act thus displaces any use of federal common law to provide judge-made answers to such questions. Even assuming a court could otherwise have determined whether Line 5 poses an excessive risk of a release under the common law of public nuisance, the existence of the Act takes such claims off the table. In passing the Act, "Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert federal agency." *Milwaukee*, 451 U.S. at 317.

The Supreme Court reached the same conclusion under similar circumstances in both *Milwaukee* and *American Electric Power*. In *Milwaukee*, that city pursued "a claim for abatement of a nuisance caused by interstate water pollution" allegedly emanating from Illinois and Michigan. *Id.* at 307. In 1972, the Supreme Court had "recognized the existence of a federal 'common law'" claim. *Id.* Shortly thereafter, however, "Congress enacted the Federal Water Pollution Control Act Amendments of 1972." *Id.* Applying the presumption "that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law," the Court held that the 1972 amendments displaced the previously recognized common-law cause of action. *Id.* at 317. "Congress' intent in enacting the Amendments was clearly to establish an all-encompassing program of water pollution regulation." *Id.* at 318; *see*

*also id.* ("The 'major purpose' of the Amendments was 'to establish a *comprehensive* long-range policy for the elimination of water pollution.'" (quoting S. Rep. No. 92-414, at 95)). "The establishment of such a self-consciously comprehensive program by Congress … strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Id.* at 319. And the alleged pollution sources at issue in *Milwaukee* were operated under EPA permits and regulations. *See id.* at 319-20. "Although a federal court may disagree with the regulatory approach taken by the agency with responsibility for issuing permits under the Act, such disagreement alone is no basis for the creation of federal common law." *Id.* at 323.

Similarly, the Court held in *American Electric Power* that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." 564 U.S. at 424. The Clean Air Act charges the EPA with regulating such emissions. *See id.* The plaintiffs argued that the Clean Air Act did not displace federal common law because the EPA had not actually exercised that authority, but the Court rejected that argument. *See id.* at 425-26. "The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants; the delegation is what displaces federal common law." *Id.* at 426. Even if the EPA declined to impose limits on those emissions, "the federal courts would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination." *Id.*

*Milwaukee* and *American Electric Power* foreclose the Band's attempted use of federal common law to regulate interstate pipeline safety. Congress has spoken directly to that issue through the Pipeline Safety Act and has delegated authority to the expert federal regulatory agency. That delegation displaces federal common law. While the Band may be dissatisfied with

PHMSA's regulation of Line 5, it cannot circumvent congressional delegation to PHMSA by recourse to federal common law.

*     *     *

The entire thrust of the Band's trespass claim is the Band's contention that Line 5 is unsafe and should therefore be shut down. The United States takes the safety of interstate pipelines like Line 5 seriously and has enacted a comprehensive federal law and created an expert federal agency to ensure that the regulation of interstate pipeline safety is effective, appropriate, and nationally uniform. The comprehensive federal scheme forecloses the Band's attempts to impose safety standards on Line 5, whether through Wisconsin law, tribal law, or federal common law. The Band's withholding of permission for the easement renewals based on any safety concerns violates federal law and is void. The Pipeline Safety Act also forecloses the Band's injunctive request for an immediate shutdown of Line 5 based on safety concerns. *See Michigan v. Enbridge Energy,* 2021 WL 5355511, at *6.[42] As such, the Band's Motion must be denied.

## V.   The Band Is Not Entitled to Summary Judgment on Enbridge's Good Faith and Fair Dealing Counterclaim

The Band is also not entitled to summary judgment on Enbridge's counterclaim for the Band's violation of its duty of good faith and fair dealing implied in the 1992 Agreement. *See* D.E. 146 (Enbridge Countercl. ¶ 98). Enbridge contends, and has argued in Section I.G. of this brief, that the Band has breached the terms of Section 3 of the 1992 Agreement or that, at a minimum, there are disputed issues of fact concerning whether such a breach has occurred. In the

---

[42]      As explained *infra* in Section VIII.B.1.a, the Band is also precluded from attempting to shutdown Line 5 by the Foreign Affairs doctrine. The 1977 Transit Pipeline Treaty, ratified by President Carter with the advice and consent of the Senate, expresses a federal policy supporting the unimpeded operation of international pipelines like Line 5 and the bilateral resolution of disputes between the United States and Canada. Canada and the United States are now engaged in a bilateral dispute resolution process under the Treaty over Line 5's continued operations.

alternative, however, if Section 3 is determined not to provide the Band's advance consent for Line 5 to traverse the Allotted Parcels for 50 years – as the Band's Tribal Council has admitted – the Band has breached its implied duty of good faith.[43]

It is well-settled law[44] that every contract imposes a duty of good faith and fair dealing. *See Tilstra v. Bou-Matic, LLC*, 1 F. Supp. 3d 900, 910 (W.D. Wis. 2014). This duty is breached when "the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties." *Zenith Ins. Co. v. Employers Ins.,* 141 F.3d 300, 308 (7th Cir. 1998); *Livingstone,* 91 F.3d at 526 n.11 ("The duty of good faith and fair dealing . . . will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract'") (quoting Rest. (2d) of Contracts § 205).

The Band has breached its implied duty of good faith and fair dealing in three ways: (1) by attempting to remove Line 5 from the *entire* Reservation, including lands the Band agrees are expressly subject to the 1992 Agreement's 50-year term, (2) by refusing to provide consent to the BIA to extend the right-of-way across the Allotted Parcels (both the three that the Band owned when it signed the Agreement and the other nine in which it purchased interests thereafter), and

---

[43]     This alternative argument should not be construed to undermine Enbridge's primary position that the Band breached the 1992 Agreement. Enbridge recognizes that if it prevails on its breach of contract claim at trial, the good faith and fair dealing counterclaim would then become unnecessary. *See Interim Health Care,* 225 F.3d at 884 (defendants' acts did not violate duty of good faith because "terms of contract [explicitly] permitted [] activity"). But, until that time, pleading in the alternative is proper. *See Childers v. Menard, Inc.,* No. 20-CV-107-JDP, 2020 WL 5303934, at *5 (W.D. Wis. Sept. 4, 2020).

[44]     The Band only cites to cases interpreting Wisconsin law, but does not dispute that this contract is governed by federal common law. *See* Band Mot. at 31. The federal common law borrows from the Restatement (Second) of Contracts. *See Livingstone v. North Belle Vernon Borough,* 91 F.3d 515, 526 n.11 (3d Cir. 1996) ("The duty of good faith and fair dealing exists . . . under federal common law"); *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 682 F. Supp. 378, 380 (N.D. Ill. 1988) ("[F]ederal common law imposes a duty of good faith in the performance of all contracts, *see* Restatement (2d) of Contracts, § 205.").

(3) by unreasonably refusing to permit maintenance on the Line where it crosses the Reservation and, in particular, at the locations where it asserts a nuisance exists.  *See* EPFF ¶¶ 57, 80, 93; Resp. to PPFF ¶ 55.  The record reflects genuine disputes of material fact for each, and thus, summary judgment must be denied.

"The first step in evaluating whether there has been a breach of the duty of good faith and fair dealing is to determine the reasonable contractual expectations of the parties, including the primary purpose of the agreement."  *Betco Corp., Ltd. v. Peacock*, No. 14-CV-193-WMC, 2016 WL 7429460, at *6 (W.D. Wis. Dec. 23, 2016) (Conley, J.), *aff'd*, 876 F.3d 306 (7th Cir. 2017).

Here, the parties' "contractual expectations" with the 1992 Agreement are explicitly set forth therein: the primary purpose was indisputably to permit Enbridge to benefit from a 50-year easement to operate Line 5 across the entire Reservation, *i.e.*, the "*existing pipeline right of way*." *See* EPFF ¶¶ 11, 13, 21, 24-25; *supra* at Section I.D.2.[45]  The Band's efforts to acquire property it did not own when the 1992 Agreement was signed to shorten that 50-year period clearly violates this purpose.  Indeed, the Band's statements *before* signing the Agreement, *in* the Agreement, and *after* the Agreement all reflect the Band's intention to consent to a right-of-way over the <u>entire Reservation</u> until 2043.  EPFF ¶¶ 18-22, 58-59.

Given the parties' objectives in signing the Agreement, the Band has unquestionably sought to frustrate the purpose of that contract.  The Band's own statements – the 2017 Resolution, Chairman Wiggins' deposition testimony, and repeated Tribal Council statements made in the last five years – reflect this bad faith attempt by the Band to use the interests in the Allotted Parcels it acquired after signing the Agreement to try to terminate Enbridge's easement rights to operate Line 5 until 2043 across the Reservation, even though the Band <u>admits</u> Enbridge has the right to

---

[45]      The background and meaning of the 1992 Agreement is established above in Section I.D, and Enbridge will not repeat in full here.

operate until 2043 within the Reservation. EPFF ¶¶ 58-59. Further, record evidence reflects the Band has used government funds to acquire ownership interests in the Allotted Parcels in a deliberate attempt to withhold consent to a new BIA easement, thereby preventing Enbridge from continuing its operations on the Reservation.[46] *See* EPFF ¶¶ 64-71.[47]

In addition, the Band's interference with Enbridge's operation and maintenance of Line 5 within the Reservation has deliberately frustrated the 1992 Agreement. Enbridge's right-of-way, originally established in 1953, renewed pursuant to the 1992 Agreement, is for "the construction[,] operation and maintenance" of Line 5. EPFF ¶ 25 (1992 Agreement ¶ 1(a)). The Band is required by contract to permit reasonable "maintenance" so that Line 5 can continue to operate safely. In the alternative, the obligation of good faith and fair dealing prevents the Band from refusing to approve virtually all maintenance so as to prevent Enbridge from addressing the Band's alleged nuisance. But this is exactly what the Band has done. EPFF ¶ 91 (citing Enbridge Ex. 39 at BRB001145 (Chairman Wiggins stating that "the Tribe is not going to allow" the company to "engineer their way out," and Natural Resources Director Tillison stating "we aren't going to allow the company to engineer a solution")). The Band's Tribal Council has recognized that its conduct undermines the intent of the 1992 Agreement. *See* EPFF ¶ 58-59.[48] (quoting Enbridge Ex. 4 at 2,

---

[46]    It is undisputed that Line 5 cannot function as currently constructed without permission to cross the *entire* Reservation, and not only certain tracts.

[47]    *See, e.g.,* Enbridge Ex. 4 at 10/1/16 Tribal Council Meeting Part 1 at 3 (Enbridge's "tribal right-of-way goes for another 30 years, but there's a – *there's a hook there*. Individual allottees agreed for a short period of time, and those are *up and* that's really what tribal governments [INDISCERNIBLE 00:08:27] gain interest in a bunch of those short-term rights-of-way); Enbridge Ex. 25 (in an internal Band email, stating the "potential Land Buy Back tracts alongside the Enbridge Line 5 pipeline" would give "the Tribe an opportunity to gain land interests while capturing majority ownersipa around the pipeline while utilizing LBBP funding to accomplish this goal").

[48]    One Tribal Council member has told the Chairman and an Enbridge employee that he understands the 1992 Agreement to require the Band to help Enbridge remain operational on the Reservation until 2043, which he believed the Band was not doing. *See* EPFF (citing Declaration of April Holdren ¶¶ 4-5). And in 2018, another Tribal Council member asked "if this company hence comes forward and says, 'We need to do some repairs right in this area here.' And if we were to deny them that right to do that, those repairs, how does that look in any kind of litigation . . .?" Enbridge Ex. 4 at 1/11/18 Tribal Council Meeting at 2.

Council member asking at a Tribal Council meeting in 2018 what the implications would be "if we were to deny [Enbridge] that right to do [maintenance and] repairs, how does that look in any kind of litigation" where the 1992 Agreement permits a 50-year easement). Based on this evidence, the Band's motion for summary judgment as to this claim must be denied as numerous facts require resolution by a jury. *See Tilstra v. Bou-Matic, LLC,* 1 F. Supp. 3d 900, 911 (W.D. Wis. 2014) ("[A] jury reasonably could conclude that Bou–Matic evaded the spirit of the termination clause" where "Bou–Matic's intent and the validity of its reasoning are in dispute").

Enbridge has also submitted evidence that the Band is withholding consent and interfering with Enbridge's right to operate as a means to rectify what it now views as a bad deal. EPFF ¶¶ 59 ("There is no more free rides. **$800,000 for a 50-year passage across the reservation**? Those are pennies in the bucket for those guys."). It appears the Band's current governing body wishes its predecessor had required Enbridge to renegotiate for additional compensation after a shorter easement period. But that is decidedly what the parties agreed against and what the Band told the BIA it would not do after the BIA sought to confirm the Band's objective. *See Reprosystem B.V. v. SCM Corp.*, 522 F. Supp. 1257, 1279 (S.D.N.Y. 1981) (duty of good faith "required [defendant] to act otherwise than to single-mindedly bail out of what it came to see as a bad deal"). The Band does not – and cannot – argue that the record is devoid of "bad faith" conduct by the Band or that the Band's actions have not thwarted Enbridge's bargain. Based on its 2017 Resolution, the Band knows it would be unable to do so.

The Band instead avoids the disputed facts and raises two legal arguments in its Motion. Neither compel summary judgment. First, the Band claims that an implied duty of good faith and fair dealing cannot exist in contracts with the Band if such a duty would prevent it from exercising a "sovereign power." Band Mot. at 49-50. However, for the reasons already addressed in Section

II, granting consent to renew an easement is not a sovereign power and the "unmistakability" doctrine does not apply as a bar to supplying an implied duty of fair dealing in contracts with the Band.

Second, the Band contends that Enbridge and the Band were aware, prior to execution of the 1992 Agreement, that the Band could acquire interests in additional Allotted Parcels after signing the Agreement "giving it the power to withhold consent to new easements in such parcels in 2013," and that, as a result of this knowledge, Enbridge should have included a provision to protect itself from this scenario.[49]  *See* Band Mot. at 46-48.  It argues that this alleged failure to do so[50] precludes application of the duty of good faith and fair dealing.  *See id.*  The Band relies on several authorities interpreting Wisconsin contract law as purported support for the notion that the implied duty of good faith "implies no obligations where the circumstances giving rise to the dispute were *foreseeable at the time of drafting*, giving the parties all the information necessary to address the disputed issues explicitly had they wished to do so."  *See* Band Mot. at 46-47 (emphasis added) (citing *Mkt. St. Assocs. Ltd. P'ship v. Frey,* 941 F.2d 588, 595–96 (7th Cir. 1991) and *Betco Corp. v. Peacock*, 14-cv-193-wmc, 2016 WL7429460, at \*9 (W.D. Wis. Dec. 23, 2016) (Conley, J.)).  But these cases do not so hold.

These two cases dealt with either a duty to disclose during negotiations or a fiduciary duty of candor, respectively.  *See Betco Corp.*, 2016 WL7429460, at \*8 (regarding an alleged failure to disclose relevant facts about the assets of a business being sold, this court found as a matter of fact after trial – not on summary judgment – that there was no breach of the duty of good faith where the problem was "obvious" to both parties and there was enough time to investigate the problem

---

[49]    The Band is not correct that the parties failed to address this in the 1992 Agreement.  *See supra* at Section I.D.3.

[50]    As noted above, this count is pled in the alternative to the breach of contract count.  *See* note 50.

before closing); *Frey*, 941 F.2d at 593-97 (in a case about whether one party needed to remind the other of a contractual term before triggering rights under it, holding that commercial contracts do not automatically create fiduciary relationships and trigger a duty of candor).

Nothing in *Betco* holds that there can be no violation of the duty of good faith and fair dealing if the disputed issue could have been addressed more clearly in the contract but was not. And, even if it was, those would be disputes of fact not susceptible to resolution on summary judgment. Further, this Court makes clear in *Betco* that the *Frey* quote the Band relies upon regarding foreseeability merely reaffirms settled law that a court must look at the parties' "contractual expectations," determine whether one party "acted, or failed to act in a way" that violates those expectations, and, once understanding the parties' expectations, avoid enforcing the implied duty in a way that would "rewrite a contract." *See id.* at *6.

And in *Frey,* the Seventh Circuit did not hold that a "foreseeability" requirement is dispositive of a breach of the implied duty of good faith. We know this from the Court's discussion of a "familiar example of the operation of the duty of good faith":

> In just the same way . . . parties to a requirements contract surely do not intend that if the price of the product covered by the contract rises, the buyer shall be free to increase his "requirements" so that he can take advantage of the rise in the market price over the contract price to resell the product on the open market at a guaranteed profit. *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333 (7th Cir. 1988). If they fail to insert an express condition to this effect, the court will read it in, confident that the parties would have inserted the condition if they had known what the future held.

*Id*. at 596. It is "foreseeable at the time of drafting" that the price of a product may increase because prices fluctuate, but the Seventh Circuit recognizes that a court may still use the implied duty to require or prevent a party from acting, during the course of performance, if the court finds that the parties "would have inserted the condition" if they knew the specific circumstances that

have arisen during the course of performance that deprives the other party of the benefit of the deal.[51]  *See id.*

Not only are the circumstances in these cases distinguishable from the circumstances in this litigation,[52] but, more fundamentally, other cases have specifically rejected the notion that a claim for breaching the implied duty of good faith cannot lie where parties could have drafted a more specific provision to protect against an uncertainty in performance.  *See, e.g., Uebelacker v. Paula Allen Holdings, Inc.,* 464 F. Supp. 2d 791, 803–04 (W.D. Wis. 2006) (the "court did ***not*** lay down a general rule that the implied duty of good faith is inapplicable where the non-breaching party has the ability to protect itself from harm.") (emphasis added).  *See also N. Crossarm Co., Inc. v. Chemical Spec., Inc.*, 318 F. Supp. 2d 752, 764 (W.D. Wis. 2004) (Crabb, J.) (denying summary judgment, reasoning that a contract's silence as to performance, which could have been specifically addressed in the contract but was not, is not dispositive of a breach of the implied duty of good faith claim).  There is no legal requirement that a specific clause must address *every* foreseeable action post-contract execution.  If so, this would be an exception that would swallow the rule, as virtually all actions are foreseeable.  *See id.* (such a rule "assumes that a party expects only that the other party will perform the obligations the parties agreed to expressly" and "contracting parties expect also that the other party will refrain from acting in a way that would undermine the purpose or benefit of the arrangement").

---

[51]     Ultimately, the Seventh Circuit reversed the court's granting of summary judgment on the bad faith issue and remanded for trial.  *Id.* at 597-98 ("The district judge jumped the gun in choosing between these alternative characterizations . . . To decide what Orenstein believed, a trial is necessary.").

[52]     The Band's reliance on *American Commercial Lines, LLC v. Lubrizol Corp.*, 817 F.3d 548, 552 (7th Cir. 2016) is also unpersuasive.  In that "constructive fraud" case, there was no contract at all between the parties (lubricant supplier and additive distributer) and the supplier asked the Court to enforce an implied duty of good faith based on a supposed "special relationship" between the parties.  *Id.*  The court held that a sophisticated entity like the supplier should have entered into a contract with the distributor to protect its business relationship rather than rely on "a nebulous body of jargony legal theories."  *Id.*  Here, there is a valid contract between the parties, which neither party asserts is void or unenforceable.

Here, the parties' "contractual expectations" were indisputably to permit Enbridge to benefit from a 50-year easement to operate Line 5 across the entire Reservation. *See supra* at Section I.D.2. The Band's efforts to acquire property it did not own when the 1992 Agreement was signed to shorten that 50-year period clearly violates this purpose. The same can be said of its interference with Line 5 maintenance and operation. Both are "opportunistic" maneuvers to deprive Enbridge of the 50-year easement term the Band promised and are just the type of actions the implied covenant prohibits. *See Frey*, 941 F.2d at 595 (the implied duty of good faith "forbid[s] the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule.").

## VI.   The Band Is Not Entitled to Summary Judgment on Its Claim for Unjust Enrichment

In Section IV.B of its Motion, the Band asserts it is entitled to summary judgment on its claim for "profits-based restitution" for Enbridge's alleged unjust enrichment. Band Mot. at 25-29. The Band bases its claim on Enbridge's "conscious wrongdoing." *Id.* at 25 (quoting the Restatement (3d) of Restitution § 1 cmt. e (3)). The Band is incorrect and, in any case, it is certainly not entitled to summary judgment on these issues, which are based on contested facts.

First, no federal cause of action for unjust enrichment exists and, thus, summary judgment on this count must be denied. The Band cites no cases – and Enbridge has found no cases – that recognize a federal common law claim for unjust enrichment arising from a purported trespass on Indian land. *See Schafer v. Centerpoint Energy Okla. Gas*, No. 17-CV-365-GKD-FHM, 2018 WL 10140171 at *5 (N.D. Okla. May 21, 2018) (holding that the plaintiff had "presented no authority that federal common law provides the elements of an unjust enrichment claim"). For this reason alone, the motion must fail.

Second, relying on Wisconsin law and assuming it to be applicable,[53] in order to prevail on an unjust enrichment claim, a plaintiff must prove that (1) a benefit was conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value.  *See Puttkammer v. Minth*, 266 N.W.2d 361, 363 (Wis. 1978).  The Band is not entitled to summary judgment on this claim for two reasons.

There are hotly disputed issues of material fact concerning whether Enbridge has been "unjustly enriched," including whether the Band has conferred a benefit to Enbridge (consent to operate Line 5 over certain lands) *without* payment of its value and whether Enbridge had "knowledge" that such a benefit was conferred without payment.  As has been established in Section I, the 1992 Agreement contained the Band's consent to Line 5 remaining in its current location, including on the parcels alleged to be in trespass, until 2043.  *See supra* at Section I.  At a minimum, there are disputed issues of material fact regarding the Band's interpretation of the 1992 Agreement and whether Enbridge already paid full consideration ($800,000) for the Band's consent to operate across the Reservation until 2043.  Thus, summary judgment is not appropriate, since the Band's consent would defeat the basis for their claim.  *See Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir. 1993) ("We have defined 'unjust enrichment' as the receipt of money or its equivalent under circumstances that, in equity and good conscience, suggest that it ought not to be retained because it belongs to someone else.") (internal citation omitted); *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment

---

[53]    *See id.* (citing Cohen's Handbook on Indian Law § 16.03[3][b] (noting "federal law may sometimes adopt state law as the rule of decision" when an allottee seeks to enforce an interest in allotted land)).

unless the claim falls outside the contract."); *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 2017 WL 1105400, at *13 (N.D. Ill. Mar. 24, 2017) ("[E]ven where a contract does not address a specific service to be rendered by one of the parties, the contract's existence precludes an unjust enrichment claim based upon the benefits conferred by the service as long as the contract generally governs the parties' business relationship.").

In addition, the Court must deny summary judgment on Count VI for the fundamental reason that a party cannot pursue an equitable remedy, like unjust enrichment, where, as here, there is an adequate remedy at law.  *See Schafer*, 2018 WL 10140171, at *5 (N.D. Okla. May 21, 2018) (dismissing plaintiff's unjust enrichment claim because of adequacy of plaintiff's trespass claim); *Smith v. RecordQuest*, LLC, 989 F.3d 513, 520 (7th Cir. 2021) (dismissing plaintiff's unjust enrichment claim where plaintiff had an adequate remedy at law); *Royal Indem. Co. v. Sangor*, 164 N.W. 821, 822 (Wis. 1917) ("Hence it follows necessarily that an action at law furnishes complete and adequate relief, and when that is the case there is no excuse for resorting to equity, because the equitable action only lies when there is no adequate remedy at law.  This is fundamental."); *Truck Components Inc. v. Beatrice Co.*, No. 94 C 3228, 1994 WL 520939, at *13 (N.D. Ill. Sept. 21, 1994) ("The general rule is that an equitable action may not be pursued if an adequate remedy exists at law") (citing *Royal Indem. Co. v. Sangor,* 164 N.W. 821 (Wis. 1917)).

There is no argument in the Band's Motion that the legal remedy is in any way inadequate nor would it be.  If Enbridge is found to be in trespass, it will pay the fair rental value determined to be due.

Third, as discussed below, courts around the country have held that a plaintiff has no right to profits where the only alleged "benefit" is merely the use of plaintiff's land (as opposed to removal of timber, minerals, or some other valuable property *from the plaintiff's land*).  *See Beck*

92

*v. N. Nat. Gas Co.*, 170 F.3d 1018, 1024 (10th Cir. 1999); *Martin v. Comcast Cablevision Corp. of Cal.*, 338 P.3d 107, 111 (N.M. Ct. App. 2014). The facts of this case only involve crossing the Band's land, not use or dissipation of a finite resource on the Reservation. Thus, the Band has not conferred a benefit upon Enbridge other than the use of its fractional interests in the at-issue parcels (which the Band already provided in the 1992 Agreement). Accordingly, the Court should deny the Band's Motion as to its unjust enrichment claim under Count VI.

## VII.   The Band is Not Entitled to Any Profits-Based Damages

Assuming for purposes of this Section that the Band prevails on its trespass claim, the Band argues it is entitled to profits-based damages. It is not. Black letter law is clear that fair rental value is the proper measure of damages in trespass cases, especially those involving pipelines. Nothing about this case or its circumstances change this well-settled rule. This measure of damages is applicable to the Band's unjust enrichment claim as well should that claim succeed.

### A.   The Band Has No Cause of Action for, and Has No Other Right to, an Accounting of Enbridge's Profits

The Band argues in its Motion that if it succeeds on its trespass claim, it is entitled to an "accounting" for as-yet unquantified Line 5 "profits." Band Mot. at 21-24. An "accounting" is not a remedy for a trespass action, but a separate, standalone cause of action that is not pled by the Band. *See, e.g.*, *United States v. Santa Fe Pac. R.R. Co.,* 314 U.S. 339, 344 (1941) ("The bill prayed, inter alia, that title be quieted and that respondent 'account for all rents, issues, and profits derived….use of the lands subject to said right of occupaycy [sic] by the Indians."); *County of Oneida, New York v. Oneida Indian Nation of New York State,* 470 U.S. 226, 235-36 (1985) ("Numerous decisions of this Court … recognized at least implicitly that Indians have a <u>federal common-law right to sue to enforce their aboriginal land rights</u> … Indians have a <u>common-law right of action for an accounting</u> of 'all rents, issues and profits' against trespassers on their land.")

93

(emphasis added) (quoting *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 344 (1941));

*United States v. Pen Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994) (also

citing *Santa Fe Pac. R.R. Co.,* 314 U.S. at 359) (observing that the Supreme Court "has recognized

a variety of <u>federal common law causes of action</u>…, including actions for ejectment, accounting

of profits, and damages.") (emphasis added).[54]   Because the Band has <u>not</u> pleaded any action for

accounting, *see* Band Mot. at 23, it is not entitled to this claim nor can it assert this claim for the

first time in its reply brief to its Motion for Summary Judgment.

**B.  The Band's Request for Restitution Does Not Entitle it to Damages**

The Band next contends that it is entitled to "restitution" as a form of relief for its trespass

claim.   It cites a hodge-podge of cases for the proposition that the Restatement (Third) of

Restitution, as opposed to the Restatement for Trespass, governs its claim for its trespass damages.

*See* Band Mot. at 23-24.   None of the cases cited by the Band for this unlikely proposition have

anything to do with trespass.   Instead, the Band relies on an ERISA case, an embezzlement case,

an SEC enforcement action, and a brokerage fee dispute.   *Id.*   <u>None</u> of the Band's Indian cases

hold that the Restatement of Restitution provides damages for trespass.   *Id.* at 23.   Indeed, the

Band does not cite <u>any</u> trespass cases awarding restitution as a form of relief.   Nor does it cite <u>any</u>

Wisconsin cases awarding restitution as a form of relief.   To Enbridge's knowledge, none exist.

---

[54]      The only exception is *Davilla v. Enable Midstream Partners, LP,* an unreported case that has never
been cited by any court. No. CIV-25-1262-M, 2016 WL 6952356, at *3 & n.2 (W.D. Okla. Nov. 28, 2016).
("<u>Remedies</u> for trespass under federal common law include…accounting…") (emphasis added).   The
*Davilla* court's reasoning is flawed because it relies on a serious misinterpretation of *Santa Fe* for this
proposition.  *Santa Fe* did not involve a trespass claim and the word "trespass" is never used in the opinion.
Nor did *Santa Fe* identify an accounting as a form of remedy; it was the form of the "bill" filed by the
plaintiff United States.   In any case, the *Davilla* lawsuit settled before any damages were awarded and
therefore provides no guidance on whether fair rental value or some other measure is the proper measure
of damages.  *See* Administrative Closure Order, *Davilla v. Enable Midstream Partners, LP*, No. CIV-25-
1262-M (W.D. Okla. Jun. 14, 2019), ECF No. 144.

### C.  Damages for Trespass Are Fair Rental Value, Or Diminution in Value, not Profits

The law is clear on the Band's request for profits. Not only is there a lack of legal support in favor of its position, there is ample legal authority on this question affirmatively confirming that the Band's position is *wrong*.  It is well-settled among the authoritative treatises governing trespass and property claims, including in the Restatement for Trespass itself, that <u>rental or market value of the land</u> – not profits – is the proper measure of value for a successful trespass claim.  *See, e.g.*, Restatement (2d) of Torts § 929 (1979) ("If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for (a) the difference between the value of the land before the harm and the value after the harm…"); *see also* Eric C. Surette, *Trespass*, 75 Am. Jur. 2d (Trespass) § 106 (a "plaintiff may not recover more than the preinjury value of the land"); 9 Powell on Real Property § 64A.05(4)(a) (courts generally measure damages by "the difference in the value of the land before and after the trespass").

The overwhelming weight of authority in Wisconsin, and across the country, also reveals that fair rental value of land occupied by the trespassing party, not profits, is the controlling measure for damages.  *See, e.g.*, *Enbridge Energy L.P. v. Engelking*, 2017 WI App 1 ¶¶ 77-83, 372 Wis. 2d 833, 890 N.W.2d 48 (Wis. App. Ct. 2016) (damages are measured by the "rental value of the land"); *Blodgett v. Hitt*, 29 Wis. 169, 181 (Wis. 1871) (holding, in an ejectment action, that the defendant is  "charged with the rent of the <u>land</u> occupied by him") (emphasis in original); *Blesch v. Chicago & N.W.R. Co.*, 43 Wis. 183, 195 (Wis. 1877) ("the measure of damages [for trespass] would be the difference between the annual rental value of the premises with the railroad track where it was, and the road operated as it was, and what the rental value of the premises would have been had not the road been upon his land"); *Riddle v. Lodi Tel. Co.*, 185 N.W. 182, 184 (Wis. 1921) (holding that for a trespass claim, the measure of damages was limited to "the difference

between the value of the premises as they were without the telephone line and the value of the premises after the telephone line was erected").[55]

Indeed, in *Engelking,* the court was faced with a request for the same profits-based damages against Enbridge that the Band seeks here. *Engelking,* 2017 WI App ¶ 77 ("[T]he question they raise is how do you measure mesne profits—rental value of the land or all of the profit Enbridge earned during the trespass"). The court rejected that request. *See id.* ¶ 78 (affirming trial court decision "h[o]ld[ing] that under Wisconsin law, the measure of those profits to which a landowner is entitled from a trespasser is the rental value of the land for the duration of the trespass.") (emphasis added). The opinion noted the trial court's observation that *Blodgett*, "consistent with the other cases on mesne profit," measured "mesne profits for unlawfully occupying another's land" by "the value of 'the rent of the *land* occupied.'" *Id.* Finding no other cases measuring mesne profits the way those landowners—and now, the Band—asked, the court declined to be the first to do so. *Id.* ¶ 79.

Numerous other courts have reached the same conclusion and have noted a lack of authority for the profits-based relief the Band is seeking. *See, e.g., Hammond v. Cty. of Madera,*

---

[55]      *See also Johansen v. Combustion Eng'g, Inc.*, 834 F. Supp. 404, 406-407 (S.D. Ga. 1993) (recognizing that damages for past trespass are measured by "diminution in the land's value, if the injury is permanent, or the land's yearly rental value for the period during the invasion's presence and within the statute of limitations, if the injury is only temporary"); *United States v. Imperial Irrigation Dist.*, 799 F. Supp. 1052, 1068 (S.D. Cal. 1992) (recognizing, in a case involving a tribal claim of trespass on tribal land, that "the proper measure of damages for trespass is the fair rental value of the property, assuming that the property is being put to its highest and best use"); *McLawhorn v. Ocwen Loan Servicing, LLC*, No. 4:14-cv-02745-RBH, 2017 WL 624530, at *4 (D.S.C. Feb. 15, 2017) ("The general rule in South Carolina is that in the case of an injury or damage of a permanent nature to real property, the proper measure of damages is the diminution of the market value by reason of that injury."); *Minnwest Bank v. RTB, LLC (In re Minnwest Bank Litig.)*, 873 N.W.2d 135, 147 (Minn. App. 2015) ("'It is well established that a proper measure of damages for continuing trespass to land is the reasonable rental value of that land during the period of trespass.' The proper damages award for a permanent trespass is one measured by diminution in market value."); *Kirchoff v. Moulder Bros.*, 391 So. 2d 347, 349 (Fla. Dist. Ct. App. 1980) ("generally the proper measure of damages in an action for trespass to realty is the difference in value of the property trespassed upon before and after the trespass is committed").

859 F.2d 797, 802 (9th Cir. 1988) (rejecting plaintiffs' argument that disgorgement and not fair rental value was proper measure of damages for trespassing roadway that provided access to subdivision), *abrogated on other grounds as stated in L.W. v. Grubbs*, 92 F.3d 894, 897–98 (9th Cir. 1996); *Tex. E. Transmission., LP v. 7 Acres of Land*, No. H-16-2498, 2016 WL 6901324, at *5 (S.D. Tex. Nov. 22, 2016) ("The Property Owners offer no authority, and the court can find none, for the proposition that they are entitled to disgorgement relief.").  That is so in part because a defendant's profits from its business venture are derived from that venture, and not the act of trespass.  *See Martin v. Comcast Cablevision Corp. of Cal.*, 338 P.3d 107, 111 (N.M. Ct. App. 2014) ("Appellants' argument rests on the premise that Comcast benefitted unjustly because it earned income by providing cable service to customers using the lines crossing Appellants' property. But the provision of cable television and resulting income were the product of Comcast's business enterprise and not the use of Appellants' land.").  These cases hold that the benefit to a defendant of a trespass is the rent-free usage of the land, not all profits derived from the defendant's business.

### D. Disgorgement of Profits is Only Available as a Measure of Damages for Trespass Where a Bad Faith Trespasser Removes Something from the Plaintiff's Land, Which Has Not Occurred Here

In rare cases, a party who trespasses *willfully and in bad faith* may face an award of profits if the trespasser removes a valuable resource (such as, for example, timber or minerals) from the plaintiff's land.  *See Fehrman v. Bissell Lumber Co.*, 205 N.W. 905, 906 (Wis. 1925) (wrongful cutting of timber from another's land); *Hammonds v. Ingram Indus., Inc.*, 716 F.2d 365, 371-72 (6th Cir. 1983) (dredging sand from islands owned by another); *see also* Restatement (First) of Restitution § 129 (1937) ("A person who trespasses upon land and removes a portion of the soil or of a structure thereon or who takes minerals, liquids or gases from within it, is liable in an action of restitution for the value of the thing taken immediately after severance; under such

circumstances an action of trover would also lie."). That is not the situation here. There is no allegation that Enbridge has removed anything from the Reservation. Line 5 only transports oil and other petroleum products generated elsewhere, not from the Reservation. *See* EPFF ¶ 1.

Courts around the country have held that a plaintiff has no right to profits where, as here, the only alleged "benefit" is use of plaintiff's land (but not removal of timber, minerals, or some other valuable property from that land). *See Beck*, 170 F.3d at 1024 (affirming verdict that the defendant trespassed and was unjustly enriched, but recognizing that the only benefit conferred upon the defendant was use of the plaintiff's land, and affirming the district court's holding that fair rental value was the proper measure of damages, not disgorgement of the defendant's profits); *Martin*, 338 P.3d at 111 ("Here, since nothing was taken from the land, Comcast's gain was simply the rent-free use of Appellants' land.") (emphasis added).

Several other cases illustrate this with facts similar to those in the instant case. In *Mullins v. Equitable Production*, a gas company trespassed by locating its gas line across the plaintiff's land. *See* No. 2:03CV00001, 2003 WL 21754819 (W.D. Va. July 29, 2003). The defendant later removed and rerouted the line, and the court found that the plaintiff was unable to prove any actual damages to his property. *Id.* at *3. The court specifically rejected the plaintiff's claim for disgorgement of the defendant's profits from its use of the line on a theory of unjust enrichment. *Id.* at *4 ("Mullins' property was not the unique cause of any of Equitable's revenues. None of the gas transmitted came from Mullins' land and the evidence is that Equitable's business could have just as easily been conducted without the use of Mullins' property."). In another case involving a gas pipeline, *Scott Hutchison Enterprises v. Cranberry Pipeline*, a court rejected the plaintiff's claim for profits even though the line remained on the plaintiff's land for well over a year after the plaintiff's revocation of permission. *See* No. 3:15-13415, 2016 WL 6585284, at *2.

98

The court held that the damages award for the defendants' trespass "should be limited to the rental value of the land or amount required to obtain a proper easement" because there was no benefit conferred upon the defendants by the plaintiff:

> As in those cases, <u>the instant case does not support a damages award amounting to the profits gained by Defendants from the continued use of the natural gas pipeline. Rather, the benefits to Defendants amounted only to the use of the land for the pipeline, and that is all Plaintiff can recover.</u> There is nothing in the evidence to show that Plaintiff conferred any other benefit to Defendants other than the use of the land, <u>and the reasonable rental value or the reasonable cost of a right-of-way over that tract is the appropriate restitution. Thus, Plaintiff can introduce evidence to show the reasonable rental value of the land or the cost of a right-of-way for an underground natural gas pipeline, but Defendants' revenues from the pipeline will be inadmissible for irrelevancy.</u> Plaintiff's demand to designate Defendants' discovery responses as non-confidential is hereby denied because the net revenues from the pipeline are irrelevant to the determination of appropriate restitution. Likewise, Defendants' motion to exclude all evidence of their overall finances and revenues must be granted to prevent the jury from considering profits as part of a possible damage award.

*Id.* (citing cases) (emphases added).

Similarly, in *Young v. App. Power Co.*, profits were not awarded in a trespass case with an expired easement. No. CIV.A.2:07-479, 2008 WL 4571819, at *8 (S.D. W. Va. Oct. 10, 2008). In *Young*, the plaintiffs granted the defendant a right-of-way (for the use of power lines across their property) that had expired. *Id.* at *1. The court further held that there was "no authority" for awarding royalties in a trespass case where the defendant's trespass did not involve removing articles from the plaintiffs' land. *Id.* at *9. As in *Cranberry Pipeline*, the court's sound reasoning fully supports Enbridge's position:

> Indeed, if a trespass involves removing something from the land, the trespasser should be required to place the landowner in the position he would have been in had no trespass occurred; namely, the landowner should be reimbursed for whatever has been wrongfully taken from the land. <u>Here, nothing was taken from plaintiffs' land. Plaintiffs were, and continue to be, deprived only of the rental value of the land trespassed upon by the defendant. The value of which they have been deprived is all to which they are entitled.</u> To afford plaintiffs royalties for the value of the power transmitted through the defendant's lines would be to grant them

an undeserved windfall, as defendant's wrong did not deprive plaintiffs of that value in the first place.  <u>Thus, the court agrees with the magistrate judge that there is no authority for awarding royalties in a trespass case such as this one</u>.

*Id.* (emphases added).

In contrast, courts find that a defendant must disgorge profits where the party has benefited from the use of a finite resource it removed from the land trespassed upon, e.g., removal of minerals, which has not occurred here.  *See, e.g.*, *A-W Land Co. LLC v. Anadarko E & P Onshore LLC*, No. 09-cv-02293, 2014 WL 7051161, at *3 (D. Colo. Dec. 12, 2014) ("[A] defendant who trespasses in knowing disregard of the plaintiff's rights can be compelled to disgorge the full benefit or gain accrued to the defendant.").

The cases the Band cites do not establish otherwise.  To the contrary, they confirm a fair market value measure of damages for trespass (rather than the removal of valuable items from the land).  *See Oneida Indian Nation of New York State v. Oneida County*, 719 F.2d 525, 541 (2d Cir. 1983) ("Neither party appears to question Judge Port's fair rental value method of calculating damages."); *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549-50 (9th Cir. 1994) (proper measure of damages was fair market rental value of land as part of dam project rather than for purposes of grazing).

### E.  Even if Bad Faith Were Relevant, Enbridge Did Not Act in Bad Faith

Even if the Court were to find (incorrectly, in Enbridge's view) that profits are potentially available for bad faith conduct where nothing was removed from the Band's land, the Band's Motion for Partial Summary Judgment must still be denied because numerous material facts are genuinely disputed.  As shown above in Section I, Enbridge disputes that it has trespassed at all, much less willfully trespassed, because the Band agreed to provide "all consents and authorizations … whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the band has an interest."  EPFF ¶

25 (1992 Agreement ¶ 3). *See Hammonds v. Ingram Indus., Inc.*, 716 F.2d 365, 371-72 (6th Cir. 1983) ("The law is well-settled that an intentional trespasser is one who trespasses knowing that he is wrong, *while an innocent trespasser believes that he is right*") (emphasis added); *Dexter v. Brake*, 269 P.3d 846, 861 (Kan. Ct. App. 2012) ("We find that Brake was a good-faith trespasser because he had an honest and reasonable belief in the superiority of his title."); *Bishop v. Lamkin*, 146 S.E.2d 772, 775 (Ga. 1966) (additional damages for aggravating circumstances not available where defendant believed he had right to enter land and, therefore, did not act in bad faith).

The Band contends that Enbridge acted willfully and that this fact is uncontested, but it has put forth no evidence to show that Enbridge intentionally trespassed or acted in bad faith. Instead, the Band only cites to a handful of emails and documents which the Band contends reflect statements by Enbridge employees "acknowledg[ing]" that the BIA-approved easements for the Allotted Parcels had expired. *See* Band Mot. at 13, 26, 45. None of these documents evidence bad faith, or even have any bearing on Enbridge's intent. EPFF ¶¶ 60-63. Indeed, none of the persons who authored these documents was making any comment about the promises made by the Band in the 1992 Agreement. *Id.* As the declarations from each Enbridge employee who made the cited statements prove, these employees were corresponding without knowledge of and/or without reference to Section 3 of the 1992 Agreement, and thus, were not offering any opinion as to whether or not the Band had consented to continued use of the lands in question in the 1992 Agreement. *See id.* ¶¶ 67-68; *see supra* at Section I.F.3.b.

Whether Enbridge acted *innocently* is a disputed fact for the jury to resolve and one that is inappropriate for summary judgment. *See Harris v. Harvey*, 436 F. Supp. 143, 149 (E.D. Wis. 1977) ("The question whether a given act was motivated by racial discrimination requires inquiry into the subjective intent of the actor and therefore is particularly inappropriate for resolution by

101

summary judgment."); *Wallace v. SMC Pneumatics, Inc.* 103 F.3d 1394, 1396 (7th Cir. 1997)

("[C]ourts should be careful . . . in any case not to grant summary judgment if there is an issue of

material fact that is genuinely contestable, which an issue of intent often though not always will

be."); *Taylor v. Anderson*, No. 88 C 3527, 1989 WL 152585, at *3 (N.D. Ill. Dec. 1, 1989) ("Intent

is necessarily a subjective inquiry.  Even if the facts surrounding the incident were not in dispute,

it is difficult to determine the defendant's subjective intent through the affidavits and briefs

available in summary judgment.") (internal citation omitted).  The Court must, therefore, deny the

Band's Motion as contested facts cannot be resolved adversely to Enbridge on a motion for

summary judgment.[56]

### F.  The Band is Not Equitably Entitled to Profits Because Awarding Profits Would Result in a Windfall

Enbridge raises equitable estoppel as an affirmative defense to the Band's claims, which

the Band does not address in its Motion. Such an equitable consideration serves as an independent

bar to the Band's request for profits as a measure of trespass damages or, at a minimum, precludes

summary judgment on this issue and requires the Court to consider the disputed facts at the

remedies phase of trial should a trespass be found to have occurred.

The Band procured its interests in most of the Allotted Parcels through a total of

approximately 280 transactions, almost all at taxpayer expense through federal programs, and for

a minute fraction of the amounts it is now seeking in damages as a result of its ownership in these

---

[56]      At page 23 of its Motion, the Band contends that the "specific amount of monetary relief owed" "can best be determined through subsequent proceedings…once this Court has confirmed the proper measure of damages."  If the Court were to rule that the Band is entitled to profits, which the Court should not, Enbridge requests the opportunity to present evidence concerning the profits potentially attributable to any trespass found to exist, which in fact are quite small, because the vast majority of Line 5 is not in trespass (or even on the Band's Reservation).  In the case of Line 5, the proportion of the Line alleged to be in trespass on the Reservation as compared with its entire length is approximately 0.5%.  *See* EPFF ¶ 2.

lands. EPFF ¶¶ 67-69.[57]   The Band availed itself of these programs to obtain, through the federal government, large or majority interests in the Allotted Parcels.  *Id.* ¶ 70.  The "fair value" paid to the Indian landowners from whom the Band's interests were purchased was calculated based on a well-recognized and government approved appraisal methodology that, on average, valued the lands at approximately $850 per acre.  EPFF ¶ 68.  These interests were almost all at taxpayer expense, specifically through a 1999 omnibus appropriations bill ("Land Buy Back Pilot Program"),[58] the Indian Land Consolidation Act Amendments of 2000 ("ILCA"),[59] or the Land Buy Back Program for Tribal Nations established pursuant to the Claims Resolution Act of 2010 ("LBBP").[60]

As but one example, the Band presently owns 100% of Tract 430 3H308 (an 80-acre parcel), one of the 12 Allotted Parcels.  EPFF ¶ 69.  Subsequent to the signing of the 1992 Agreement, the Department of the Interior acquired in trust for the Band a 25% interest pursuant to the Land Buy Back Pilot Program, an 18.75% interest pursuant to the ILCA, and most recently for $56,587.50, the remaining 56.25% interest pursuant to the LBBP, which it represented to the selling individual was fair market value.  *Id.*

---

[57]   The Band filed excerpts, but not the entirety, of the BIA-produced "Tract History Reports" for each of the at-issue Allotted Parcels.  *See* Band Attach. X.  A review of the complete Tract History Reports for the Allotted Parcels at issue in this trespass action reveals that the Band acquired its interests in these parcels through a total of approximately 280 transactions and may have used its own funds to complete less than 10 of these acquisitions.  Due to the sheer size (over 1100 pages) of these Tract History Reports, Enbridge is not filing these reports in their entirety to reflect the Band's total acquisitions in these Parcels, but if there is any good faith dispute over the fact asserted above, which there should not be, Enbridge can submit this documentation identifying each and every transaction.

[58]   Pub. L. 105-277 (1998).

[59]   Pub. L. 106-462 (2000).  ILCA included a provision whereby fractionated interests in individual Indian allotments were acquired by the United States in trust for Indian tribes, subject to a lien.  It was the intend of ILCA that income generated from acquired parcels would be remitted to the U.S. Department of the Interior to fund further land consolidation efforts.  These liens were later removed at the direction of the Secretary of the Interior (See Secretarial Order No. 3367, U.S. Department of the Interior (June 15, 2018)).

[60]   Pub. L. 111-291 (2010).

It is inequitable for the Band to benefit from receiving interests in Allotted Parcels that were acquired (at taxpayer expense) for fair market appraised prices, then use such interests to justify a demand in this litigation for damages, such as profits, many orders of magnitude higher.   Such damages would be a windfall and should not be awarded.  *See MCI, LLC. v. Patriot Eng'g & Envtl., Inc.*, 487 F. Supp. 2d 1029, 1039–40 (S.D. Ind. 2007) (noting that the law disfavors windfall, and that the purpose of damages is to compensate fairly and adequately).

**VIII.   The Court Should Deny The Band's Request For Injunctive Relief**

The Band next asks for permanent injunctive relief requiring immediate removal of Line 5 from the relevant parcels on the Reservation, which would require Line 5 to completely cease operations throughout the United States and Canada.  *See* Band Mot. at 50-59 (D.E. 168).   This request is premature, as remedies have been bifurcated to a later phase of the case.  D.E. 122 at 10-11.  But, even if considered now, no permanent injunction should be granted because the Band has failed to establish the prerequisites for injunctive relief.   At a minimum, factual disputes preclude entry of such relief before a trial.

**A.  The Band is Not Entitled to an "Automatic" Injunction**

The Band argues that "issuance of an injunction is mandatory" if the Court finds Enbridge in trespass.  Band Mot. at 51.  According to the Band, allowing Enbridge to continue operating on the relevant parcels would extinguish the Band's possessory land rights without congressional approval, in violation of the Indian Non-Intercourse Act ("INA"), 25 U.S.C. § 177.  *See* Band Mot. at 52, 54.  The Band's novel argument is contrary to well-settled authority in INA (and other) cases.

As an initial matter, the INA would not be implicated by a Court order addressing remedies. An order allowing Enbridge to operate on the parcels at issue pending completion of the Re-route would not extinguish the Band's asserted possessory rights.  Rather, the Court would be fashioning

a remedy for the Band's cause of action.  As the Supreme Court has explained, the "substantive question whether the plaintiff has any right" under the INA is very different from "the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is."  *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197, 213 (2005) (quoting D. Dobbs, Law of Remedies § 1.2 at 3 (1973)).

The Band mistakenly assumes that denial of injunctive relief would necessarily amount to a violation of the INA.[61]  This assumption is wrong, as shown by *City of Sherrill*.  The Supreme Court in *City of Sherrill* praised the district court judge for what it called a "pragmatic approach," in which the judge <u>denied ejectment as a remedy for an INA violation and instead looked to money damages</u>.  *Id.* at 210-11, 213, 219.  The Court emphasized that "'[t]here is a sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right.'"  *Id.* at 213 (quoting *Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61, 90 (N.D.N.Y. 2000)).

Further, the INA does not supersede the well-settled rules governing injunctive relief.  The Supreme Court, backed by hundreds of years of common law history, has consistently recognized that equity courts have discretion to decide whether to issue injunctive relief based on a variety of fact-intensive factors (none of which are undisputed here).  *E.g.*, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944); *see also* U.S. CONST. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity ….").

---

[61]     The Band never alleged an INA violation in its complaint, nor could there be such a violation in light of the BIA's grant of a valid right-of-way over the Allotted Parcels.  *See* EPFF ¶ 5.  *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56 (2d Cir. 1994) (to establish a prima facie violation of the INA a plaintiff must show, among other things, that "the United States has never consented to or approved the alienation of this tribal land").  Moreover, any court order permitting Line 5 to temporarily remain in place pending the Re-route does not convey title in the land to Enbridge.  It would thus not be a "grant…or other conveyance of lands…from any Indian nation…" 25 U.S.C. § 177.  Thus, the INA is not implicated.

105

Courts will not interpret a federal statute to <u>require</u> an injunction without regard to equitable principles, unless this is "textually required" by a "'clear and valid legislative command' …." *U.S. v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001); *see also Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005); *GMAC Mortg. Corp. of Pa. v. Gisvold*, 215 Wis. 2d 459, 480, 572 N.W.2d 466, 480 (Wisc. 1998).   The INA, however, does *not* contain such a clear legislative command.  To the contrary, "that Act is silent as to remedies, thus leaving courts to resort to the common law as a means of assisting … in formulating a statutory [Nonintercourse Act] damages remedy." *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266, 276 (2d Cir. 2005) (internal citation omitted).

The Band's "mandatory" injunction argument is not supported by a single INA case.  No INA case holds that Congress circumvented the traditional injunction inquiry.  Indeed, the Band cites <u>no</u> INA cases in support of its "automatic" injunction argument, and, to Enbridge's knowledge, no court has ever adopted the Band's INA reasoning.  Instead, INA cases make clear that ejectment is not only not mandatory but is typically not even an appropriate remedy for an INA violation after the traditional injunction factors are weighed and considered.  *See, e.g., City of Sherrill*, 544 U.S. at 210-11, 213, 219; *Paiute-Shoshone Indians of Bishop Community of Bishop Colony, Cal. v. City of Los Angeles*, No. 1:06-cv-00736 OWW LJO, 2007 WL 521403, at *9-11 (E.D. Cal. Feb. 15, 2007) (holding that ejectment was not an available remedy in an action seeking to recover Indian lands under the INA), *aff'd*, 637 F.3d 993 (9th Cir. 2011); *Oneida Indian Nation v. County of Oneida*, 199 F.R.D. at 89-93 ("ejectment is not a viable remedy here"); *Cayuga Indian Nation of New York v. Cuomo*, Nos. 80-cv-930, 80-cv-960, 1999 WL 509442, *1 (N.D.N.Y. July 1, 1999) (granting defendant's motion *in limine* seeking to preclude ejectment as a remedy for an INA violation), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005); *Oneida Tribe of Indians of*

*Wi. v. AGB Properties*, Nos. 02–CV–233LEKDRH, 02–CV–0233, 02–CV–0235, 02–CV–0236, 02–CV–0237, 02–CV–0238, 02–CV–0239, 02–CV–0240, 02–CV–0241, 2002 WL 31065165, at *6 (N.D.N.Y. Sept. 5, 2002); *Construction and Application of the Non-Intercourse Act*, 73 A.L.R. Fed. 221, § 2  (2013) ("As to remedies in Indian land claim litigation under the Non-Intercourse Act, courts have determined that ejectment is not available").[62]

Instead, courts look to federal common law to assist in formulating remedies for any possessory violation.  *See Cayuga Indian Nation of New York v. Pataki*, 413 F.3d at 276.  Under federal common law, courts are *required* to consider the traditional, four-factor test for injunctions. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 972-974 (10th Cir. 2019) (holding that, in trespass action filed by individual tribal owners against the pipeline, "the district court erred in failing to apply the federal permanent-injunction standard even though it properly applied Oklahoma trespass law"); *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1069 (S.D. Cal. 1992) (denying ejectment on equitable grounds in cases of Indian tribes seeking ejectment under federal common law property rights).  Accordingly, the Court must reject the Band's position that an injunction should follow automatically from any trespass finding.

As no INA cases support its argument, the Band relies on *Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1973), which analyzed a different statutory scheme:  the Endangered Species Act ("ESA").  There, the Court held the ESA required the district court to enjoin completion of a dam where it was undisputed that its construction would cause the complete elimination of an endangered species.  *See id*. at 171.  In those circumstances, an injunction was the only means of ensuring compliance with the ESA.  *See id*. at 194-95.  The result in *TVA* thus stemmed from the

---

[62]     Similarly, there are several common law causes of action in which the plaintiff asserts a "possessory" right, but where possession is not a compulsory remedy.  *E.g., United States v. Imperial Irrigation District*, 799 F. Supp. 1052, 1068-69 (S.D. Cal. 1992) (damages deemed appropriate remedy in trespass action).

strong and undisputed factual showing that the entire species would become extinct, making an injunction appropriate under traditional rules, not from a Congressional usurpation of the court's discretion in fashioning equitable relief.  *See United States v. Oakland Cannabis Buyers' Coop.,* 532 U.S. 483, 496-97 (2001).[63]

**B. The Equities Overwhelmingly Favor Rejecting an Injunction**

Even if the Court finds Enbridge in trespass, the Band's motion for a permanent injunction fails.  As shown above, the Band must satisfy the traditional federal-law test for injunctive relief. *See eBay*, 547 U.S. at 393-94; *LAJIM, LLC v. Gen. Elec. Co*., 917 F.3d 933, 945 (7th Cir. 2019) ("We reiterate . . . that a permanent injunction does not automatically follow from success on the merits.").  If the Band fails to meet just *one* factor of the test, the court must deny the motion.  If the Band fails to meet just *one* factor of the test, the court must deny the motion. *Nichia Corp. v. Eberlight Ams. Ins*., 855 F.3d 1328, 1341 (Fed. Cir. 2017).  Here, the Band's motion falls far short of satisfying *any* of the equitable factors for a permanent injunction.  At a minimum, factual disputes preclude entry of an injunction on a motion for summary judgment.  *See infra* at Section IX.B.4.

1.  An Injunction Is Contrary to the Public Interest

---

[63]    Following the Court's opinion in *TVA*, lower courts have repeatedly recognized that courts should continue to apply the traditional, four-factor injunction standards for any ongoing violation of the ESA.  *See Animal Welfare Institute v. Martin*, 623 F.3d 19, 26-27 (1st Cir. 2010) ("AWI argues that where a court finds an ongoing violation of the [Endangered Species Act], the court is indeed obligated automatically to issue an injunction with terms stringent enough to end the violation, regardless of what the facts may be. That is not so.  AWI's claims are based on a mistaken reading of a line of cases beginning with [*TVA*]…") (emphasis added); *Nat'l Wildlife Fed'n v. Burlington N. R.R*., 23 F.3d 1508, 1511 (9th Cir. 1994) ("Nevertheless, these cases do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the [Endangered Species Act]."); *Salix v. U.S. Forest Serv*., 944 F. Supp. 2d 984, 1001 (D. Mont. 2013), *aff'd and remanded sub nom. Cottonwood Env't L. Ctr. v. U.S. Forest Serv*., 789 F.3d 1075 (9th Cir. 2015) ("Despite this liberal standard for imposing injunctive relief under section 7, Plaintiffs are still obligated to show an irreparable injury to support the issuance and scope of an injunction.").

Several courts have denied ejectment based largely on public interest grounds.[64]   The Supreme Court has emphasized the importance of the public interest prong, explaining that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  And courts weigh the public interest precisely by evaluating "the consequences . . . to nonparties" from "granting or denying the injunction."  *Abbott Labs. v. Mead Johnson & Co*., 971 F.2d 6, 11 (7th Cir. 1992).  "Direct effects on innocent third parties have frequently grounded courts' denials of injunctions."  *SAS Inst., Inc. v. World Programming Ltd*., 874 F.3d 370, 388 (4th Cir. 2017) (citing, *e.g*., *Machlett Laboratories, Inc. v. Techny Indus., Inc*., 665 F.2d 795, 798 (7th Cir. 1981)); *see also Winter*, 555 U.S. at 23-26 ("any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors"); *Machlett Lab., Inc. v. Techny Industries, Inc*., 665 F.2d 795, 798 (7th Cir. 1981).  Enbridge therefore begins with this factor.

In this case, the public interest powerfully supports denial of an injunction.  It is undisputed that if Enbridge were forced to immediately close and remove pipeline from the relevant parcels, all of Line 5 will be forced to close.[65]  Preemptive federal law – under the Pipeline Safety Act and Foreign Affairs doctrine – preclude entry of an injunction here.  *See Michigan v. Enbridge Energy, LP*, 2021 WL 5355511, at *6.  Further, a shutdown of Line 5 would have immediate and severe adverse impacts on many innocent third parties in two separate countries.

a)  _Adverse Impacts on Relations with an Important U.S. Ally: Canada_

---

[64]        *See, e.g., Imperial Irrigation District*, 799 F. Supp. at 1068 (relying on the hardship to the agricultural industry in nearby counties); *Cayuga Indian Nation of New York v. Cuomo*, Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *28 (describing the negative consequences to the economy—particularly the local banking industry—as reasons for denying ejectment).

[65]        A linear pipeline obviously cannot operate with gaps in its span.

The Band's proposed injunction is not a practical or equitable remedy in light of the severe adverse impacts it would have on Canada as well as U.S.-Canada relations.  As the Government of Canada recently explained, "Line 5 is vital to Canada's energy security and economic prosperity …."  Government of Canada Brief of *Amicus Curiae* Brief, filed in *Enbridge Energy Ltd. v. Whitmer*, No. 1:20-cv-01131-JTN-RSK, ECF No. 70, PageID.494 (filed Apr. 5, 2022) ("Canada Amicus Br.").[66]  "Canada has a strong and important sovereign interest, protected by [a U.S.-Canada] Treaty, in ensuring the uninterrupted flow of hydrocarbons through Line 5." *Id.* at PageID.487.

In 1977, the United States undertook a solemn and reciprocal commitment to Canada that no public authority within the United States would interfere with the operations of energy (hydrocarbon) transit pipelines operating between the two countries absent specific justifications not relevant here.  Transit pipelines are those that, like Line 5, transport energy originating in one nation to another point in the same nation through a different nation.  The non-interference agreement is embodied in the 1977 Transit Pipeline Treaty ("1977 Treaty"), ratified by President Carter with the advice and consent of the Senate.[67]  EPFF ¶ 133.  That Treaty established an historic framework for addressing each country's vital interests in sharing and protecting an uninterrupted supply of hydrocarbon products (oil and natural gas liquids).  *See id.*[68] The U.S. political branches

---

[66]    The Court can take judicial notice of the Government of Canada's amicus brief and its representations therein.  *See New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500 n.2 (6th Cir. 2003) (taking judicial notice of an SEC amicus brief).

[67]    *Agreement between the Government of Canada and the Government of the United States Of America Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731. *See also* Enbridge Ex. 43.

[68]    As the lead U.S. treaty negotiator explained, "both the United States and Canada recognized that security of throughput is a fundamental requirement and both countries have made binding, reciprocal commitments to non-interference.  *See* S. Exec. Rep. No. 95-9, 95th Congress, 1st Session (July 15, 1977), p. 38 (testimony of Julius Katz, Assistant Secretary for Economic and Business Affairs).

have recognized that Line 5 falls within the Transit Treaty's protection.[69]  The 1977 Treaty remains in effect today.[70]

The 1977 Treaty expressly governs not only the "pipeline or any part thereof" but also "all real …property … connected therewith."  Art. I(a).  Its obligations extend to measures instituted by a "public authority in the territory of either Party" – including the Band and this Court.  Article II of the treaty declares: "*[n]o public authority* in the territory of either Party *shall institute any measures* … which are intended to, or *which would have the effect of*, *impeding … or interfering with in any way the transmission of hydrocarbons in transit*."  Art. II(1) (emphasis added).[71]  The Treaty also prescribes a specific procedure for the handling of disputes: any dispute "over the [Treaty's] interpretation, application, or operation" shall be settled at the national level through negotiation and, if necessary, international arbitration.  Art. IX.  Thus, the express federal policy is to protect the uninterrupted flow of hydrocarbons between the United States and Canada and to funnel disagreements through the bilateral dispute resolution process.

The United States and Canada are now actively engaged in the Treaty's Article IX bilateral dispute resolution process.  *See Michigan v. Enbridge Energy, LP*, --- F. Supp. 3d --, 2021 WL

---

[69]     During the Senate hearings prior to its advice and consent, a State Department representative submitted a list of pipelines transiting the United States that would be covered by the Treaty.  That list includes a detailed description of Line 5 and the network of connecting pipelines that originate in Western Canada: "At Superior, Wisconsin, the system divides into two pipelines, one leg following a northeastern route through Michigan and then south to Sarnia, Ontario …."  S. Exec. Rep. No. 95-9, 95th Congress, 1st Session (July 15, 1977), at 40, 80.  Other witnesses testifying before the Senate Committee referred to Line 5 as one of the covered pipelines.  *See id.* at 58 (prepared statement of Ashland Oil executive) ("The Lakehead system is routed through the states of Minnesota, Wisconsin, and Michigan in its principal route to the Sarnia-Toronto area.").

[70]     *See* U.S. DEPARTMENT OF STATE, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020*, at 67, www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf.

[71]     Article II(1) references an exception in Article V, which allows for a "temporary" reduction or stoppage in the transit pipeline when a "disaster, emergency, or other demonstrable need occurs."  Art. V(1).  Since the Tribe's injunction would result in Line 5's permanent closure, Article V is not at issue here.  Moreover, whether a "disaster, emergency, or other demonstrable need" for a short-term shutdown exists is certainly contested and the Band does not argue otherwise in its Motion.

5355511, at *2 (W.D. Mich. Nov. 16, 2021).  On October 4, 2021, the Government of Canada invoked the Treaty's dispute resolution provision in direct response to an order by the Governor of Michigan to shut down the portion of Line 5 traversing the bottomlands of the Straits of Mackinac.  *See id*. *See also* EPFF ¶ 134.  The Article IX negotiations are currently ongoing. *See* Canada Amicus Br. at PageID.484.  As the Government of Canada explained, "Canada's decision to invoke Article IX reflects the importance of this matter to Canada's energy security and its relationship with the United States." *Id.* PageID.513.  "For a domestic court in the United States to enforce a shutdown of the Line 5 pipeline while Canada and the United States are engaged in discussions under the 1977 Treaty … would undermine confidence in the reciprocal commitments that provide the legal framework for the U.S.-Canada relationship." *Id.* at PageID.497.

The Foreign Affairs doctrine preempts domestic public authorities from "interfer[ing] with the National Government's conduct of foreign relations." *American Ins. Assoc. v. Garamendi*, 539 U.S. 396, 401 (2003).  In *Garamendi*, the U.S. Presidential policy – as embodied in statements to European allies – was to encourage settlement of Holocaust-era insurance claims through inter-governmental negotiations rather than coercive sanctions.  *See id*. at 421-23.  Although there was no direct conflict between state law and federal policy, California's indiscriminate disclosure provisions diminished the effectiveness of the President's chosen approach.  *See id*. at 424-25. The Court thus found that the California law was "an obstacle to the success of the National Government's chosen 'calibration of force' in dealing with Europeans by using a voluntary approach." *Id.* at 425.

Here, the express foreign policy is far more compelling than in *Garamendi*.  Rather than the unilateral presidential statements and agreements at issue in *Garamendi*, this case concerns a

112

federal policy expressed through a ratified treaty.[72]  A ratified treaty is the formal expression of *both* the federal executive and legislative branches in matters of foreign policy.  *See* U.S. Const., Art. II, § 2, Cl. 2 (Treaty Clause); U.S. Const., Art. VI (Supremacy Clause).  And, while the state law in *Garamendi* merely "undercut" the President's chosen approach (539 U.S. at 423-24), any shut down order of the sort sought by the Band here *directly* conflicts with the express federal policies embodied in Articles II and IX the Treaty.

Furthermore, the impact of any injunction in this case would be widespread and harsh in Canada.[73]  Line 5 serves six oil refineries directly or through connecting lines in Ontario and Quebec, including a major petrochemical refining center in Sarnia, Ontario. EPFF ¶ 112.  It also serves three specialized facilities, including a major facility in Sarnia, where the natural gas liquids it transports are separated out ("fractionalized") into propane and butane.  *Id.* ¶¶ 102-103.  That propane is used for home heating while the butanes are used as fuel additives and for other industrial purposes.  *Id.* ¶ 103.  According to the Government of Canada, any Line 5 "shutdown would cause a massive and potentially permanent disruption to Canada's economy and energy security."  Canada Amicus Br. at PageID.504.  The Government of Canada has detailed some of the reasons why:

- Since 1953, Canada has relied on Line 5 to transport vital fuels from producers in Western Canada to users in central Canada;
- Line 5 currently transports up to 540,000 barrels of predominately western Canadian hydrocarbons per day, consisting crude oil and natural gas liquids;

---

[72]     President Carter transmitted the signed treaty agreement to the Senate, which consented to its ratification in August 1977 by a vote of 92-1.  When submitting the signed agreement to the Senate, the Executive Branch maintained that the "agreement is self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required."  *Senate Committee on Foreign Relations, Agreement with Canada Concerning Transit Pipelines*, S. EXEC. REP. NO. 95-9 at 83 (1977) (Senate Report).  In *Garamendi*, by contrast, the President was "acting without express congressional authority." 539 U.S. at 424 n.14.

[73]     The impacts would also be severe in the United States, as discussed below.

- Line 5 supplies about 66% of Quebec's crude oil needs and about 50% of Ontario's crude oil;

- The Greater Toronto area—including its Pearson International Airport—is heavily reliant on Line 5 for jet fuel and gasoline supplies;

- A Line 5 shutdown would severely disrupt the supply and increase the price consumers pay for fuel across Quebec and Ontario;

- In western Canada (where the products shipped on Line 5 originate), the loss of Line 5 would have a devasting impact on the energy industry and economy, just as it is struggling to recover from the impacts of COVID-19;

- Canada does not have alternative means of transporting the large volumes of crude oil supplied by Line 5 to the parts of the country that depend on that oil;

- Thousands of homes in Canada depend on the propane derived from the natural gas liquids transported on Line 5 for heating, and any shutdown would cause disruption and long-term uncertainty on a massive scale; and

- At peak demand Line 5 provides Ontario with 16 million litres of propane, 25 per cent of which is used by hospitals, schools and businesses.

*See id.* at PageID.497-98.  There is no immediate fix for the problems caused by closing Line 5 because alternative transportation of the crude oil handled by Line 5 is not readily available in Canada (or the United States).  *Id.* ¶¶ 105-106.[74]

The Government of Canada recently reiterated its significant interests in Line 5's uninterrupted operations in a letter to the U.S. Army Corps of Engineers supporting Enbridge's proposed Re-route of Line 5 around the Band's Reservation.  *See* EPFF ¶ 135.

In short, the Band's proposed injunction would have a devastating impact on great numbers of innocent third parties, all of whom depend on Line 5 in Canada.  These hardships are more widespread than those that courts have relied upon to deny an injunction seeking ejectment for a trespass.  *See*, *e.g*., *Imperial Irrigation District*, 799 F. Supp. at 1068 (relying on the hardship to

---

[74]    While some of the Line 5 crude oil could be shifted to other pipelines, those pipelines would not be able to transport hundreds of thousands of additional barrels of crude oil given capacity limits.  *Id.* ¶ 116. Also, none of these other pipelines are or could be configured to handle natural gas liquids, which would leave the fractionators now served by Line 5 with no alternative pipeline transportation options.  *Id.* ¶ 106. Nor is shipping by truck or rail feasible, as detailed in the attached declarations.

114

the agricultural industry in nearby counties); *Cayuga Indian Nation of New York v. Cuomo*, Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *28 (describing the negative consequences to portions of New York economy—particularly the local banking industry—as reasons for denying ejectment).  As Canada explained, "[t]hese weighty issues of international law and foreign policy should be resolved at the national governments/Treaty level," rather than by a U.S. domestic court.[75]  In these circumstances, given the impacts on both Canadian citizens and businesses, as well as the impacts on foreign relations, no injunction forcing immediate closure of Line 5 would be appropriate.

> b)    *Adverse Impacts on U.S. Energy Markets.*

Line 5's continued operation is not only critical to Canada's energy market, but to that of the United States as well.  Any closure of Line 5 will leave individuals and businesses in the United States that depend on the energy transported by Line 5 without viable alternatives.  EPFF ¶ 124. Shortages and price increases will result.  EPFF ¶ 108.  Any shutdown would also exacerbate the recognized national shortage of energy resulting from the Ukraine war's disruption of world energy supplies and undermine the efforts of the U.S. federal government to grow U.S. imports of oil, including Canadian oil.  EPFF ¶ 136.  The public interest in retaining the flow of oil into the United States via Line 5 is compelling.

In addition to the six oil refineries it serves in Canada, Line 5 serves four crude oil refineries in the States of Michigan, Ohio, and Pennsylvania.  *See* EPFF ¶ 112.  From one of the Michigan delivery points, Line 5 supplies connecting lines that feed the Detroit refinery and two refineries in Toledo, Ohio.  The crude oil transported by Line 5 constitutes about 40% of the total crude oil demand for refineries in the U.S. and Canada.  *See* EPFF ¶ 113.  Thus, closing Line 5 would have

---

[75]        *Id.* at PageID.505.

an immediate and severe impact on all of these refineries, and could even result in the closure of one or more of them.

Most of the oil refinery output is transportation fuels – gasoline, jet fuel, and diesel.  EPFF ¶ 114.  With refineries forced to cut back their production or close, fuel shortages and price hikes will follow.  The implications of these disruptions will be substantial and region-wide.  *Id.* ¶ 117.  The shortages of crude oil measured in hundreds of thousands of barrels per day ("b/d").  *Id.* ¶ 102.  As a result, price increases for gasoline, jet fuel, diesel, and asphalt will occur.  Higher costs associated with non-Line 5 sourced propane would result in material price increases, amounting to nearly $75 million per year for consumers in Michigan and Ontario.  *Id.* ¶ 111.  Moreover, the adverse region-wide economic impacts of the closure of Line 5 are immense.  *Id.* ¶ 117.  For example, there would be an annual loss of over 6,000 jobs and $4.82 billion of economic output due to reductions in refinery output or refinery closures in Ohio, Michigan, and Pennsylvania.  *Id.* ¶ 125.  Likewise, in Ontario the cutbacks at oil refineries would lead to nearly a $6 billion loss in economic output and almost 8,000 fewer jobs annually.  *Id.* ¶ 126.

As is the case in Canada, alternative transportation of the crude oil handled by Line 5 is not readily available.  *Id.* at ¶¶ 121–123.  No other pipeline capacity exists.  *Id.* ¶ 116.  Rail is also not available, as the required rail loading and unloading infrastructure is either completely lacking at some of the refineries that depend on Line 5 or this infrastructure is inadequate at others.  *Id.* ¶ 123.  It could take years before that infrastructure is developed, assuming that financing could be made available and the needed infrastructure permitted.  *Id.* ¶ 123.  Meanwhile, shortages in critical energy products would persist.  EPFF ¶ 124.

These losses do not include the additional adverse economic implications related to the loss of Line 5 as an option for transporting natural gas liquids.  Enbridge's Line 5 supplies the natural

gas liquids to three fractionator facilities (in Superior, WI; Rapid River, MI; and Sarnia, ON). *See Id.* ¶ 102. For the markets Enbridge serves, each of these facilities is the largest single source of propane. *Id.* ¶ 103. For example, the Superior facility serves portions of Wisconsin and Minnesota, while the Rapid River facility supplies 65% of Michigan's Upper Peninsula's propane needs for heating homes and other uses. *Id.* ¶ 104. The remainder is transported by Line 5 to a much larger fractionator in Sarnia. *Id.* ¶ 104. That facility services the Michigan and Ontario propane markets, mainly for residential and commercial heating. *Id.* ¶ 104.

The Superior, Rapid River, and Sarnia fractionator facilities fully depend on Line 5. There are no alternative means of transporting natural gas liquids to these facilities and, even if there were, these facilities have no rail unloading capacity (which would take years to plan, permit, finance and construct). *Id.* ¶ 105. These facilities could not continue to operate if Enbridge were forced to immediately remove Line 5 from the relevant parcels on the Band's Reservation. *Id.* ¶ 107. In fact, the operator of these three facilities has publicly stated that it will close the fractionators were Line 5 closed. *Id.* ¶ 107. Even apart from significant job losses, the loss of nearly 100 million gallons of propane delivered annually from these facilities would be expected to have a devasting price impact on the region, and more acutely the State of Michigan. *Id.* ¶ 110. In addition, a Line 5 shutdown would be expected to have adverse economic impacts of over $6 billion in the region the Line services. *Id.* ¶ 126.

Several businesses have raised significant concerns about a Line 5 shutdown. PBF Energy, Inc., which employs 4,000 workers at its Line 5-served Toledo, Ohio oil refinery, states that "[c]rude oil transported via Line 5 is critical to support the operations of PBF' Energy's Toledo Refinery and other Northwest Ohio fuel manufacturers." *Id.* ¶ 118 (quoting Enbridge Ex. 43 at 2). Shell Canada, which refines Line 5 products, states that "[i]f Line 5 remains down, it may force

the shutdown of refinery process units, which will further impact the supply of fuel … The Line 5 shutdown will have ripple effects throughout the Canadian supply chain." *Id.* ¶ 119 (quoting Enbridge Ex. 44). Husky Energy, a refiner in Ohio, states that "sustained shutdown of Line 5 is expected to require refiners to significantly reduce or halt refinery operation based on lack of feedstock. This will likely result in regional fuel shortages and subsequent impact on public and industrial consumers in terms of both cost and availability of gasoline and diesel fuel." *Id.* ¶ 120 (quoting Enbridge Ex. 45).

The adverse impacts of propane shortages would be both immediate and long-term. And, as explained in the attached declarations, those adverse impacts could not be addressed by alternative transportation arrangements. *Id.* ¶ 105. Without the ability to transport energy, a shutdown of Line 5 will result in propane disruptions – a critical heating fuel – for at least several years in the Upper Midwest and Ontario. *Id.* ¶ 108. And, where there is propane to be had, its price will be elevated and volatile. *Id.* ¶ 108.

c) *Adverse Impacts to National Energy Interests.*

The national setting in which these disruptions would occur could hardly be worse. The United States is already facing an energy crisis. The White House on March 31, 2022 acknowledged that the Ukraine war "has had a profound impact on global oil markets resulting in a severe energy supply interruption …. and a national energy supply shortage . . .."[76] The United States Government has therefore opted to make unprecedented withdrawals from the nation's Strategic Petroleum Reserve to at least partially address war-related disruptions and the ban imposed on the importation of Russian oil and other energy products into the United States. *Id.*

---

[76]     White House Memorandum on Finding of a Severe Energy Supply Interruption (March 31, 2022), *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/31/memorandum-on-finding-of-a-severe-energy-supply-interruption/.

¶ 137.   Further, the U.S. federal government is reportedly in talks with Canada, among other nations, to increase oil imports.  *Id.* ¶ 138.  A shutdown of Line 5, a major conduit for Canadian oil and natural gas liquids on which U.S. refineries and other businesses rely, would only exacerbate this national energy supply shortage.  *Id.* ¶ 115.  It would also directly undermine federal energy policy designed to grow the amount of oil available to the U.S. economy. *Id.* ¶ 138.

A shutdown will cause households in certain areas of Wisconsin and Michigan's Upper Peninsula to be without adequate fuel for heat, heating water, and cooking.  *Id.* ¶ 109.  Increases in the price of propane to those who are able to obtain it will have a severe negative impact on low-income households, forcing them to decide whether to "heat or eat."  *Id.* ¶ 109.

Relatedly, lost tax revenue for governments, particularly state, local, and provincial governments in Ohio, Pennsylvania, Wisconsin, Michigan, and Ontario, resulting from reduced economic activity, will also be substantial.  *Id*. ¶ 127.  In sum, shutting down Line 5 would have substantial adverse impacts on the economy, workers in a variety of sectors, and households throughout Michigan, Wisconsin, and Ontario.  *Id*. ¶ 125–126.

The Band never addresses any of these harms to the public – even though it is well-aware of them – in its Motion.  On this record, the public interest would be best served by denying the Band's injunction motion until the Re-route construction is completed so that Line 5's operations are not interrupted.[77]

---

[77]    *See Guardian Pipeline, L.L.C. v. 295.49 Acres of* Land, No. 08-C-0028, 2008 WL 1751358, at *23 (E.D. Wis. Apr. 11, 2008) (recognizing that "the 'need for natural gas supply' is a 'substantial public interest.'"); *Williams Pipe Line Co. v. City of Mounds View, Minn*., 651 F. Supp. 551, 570 (D. Minn. 1987) (recognizing that "an interest in the continued operation of petroleum pipelines" is in the public interest); *see also East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004) (affirming district court's grant of injunction in favor of natural gas pipeline company, noting that the public interest was served by making natural gas available to underserved consumers); *Optimus Steel, LLC v. U.S. Army Corps of Engineers*, 492 F.Supp.3d 701, 727 (E.D. Tex. 2020) (finding that the public interest favored the "efficient, reliable, and safer transportation of crude oil" through pipeline); *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.,* 588 F.Supp.2d 919, 934 (S.D. Ind. 2008) (finding that public interest

## 2.  The Band Has Not Demonstrated Irreparable Harm

To obtain a permanent injunction, the Band must show it would suffer irreparable harm and the absence of an adequate remedy at law.  *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975); *see also eBay*, 547 U.S. at 391.  To satisfy the irreparable harm requirement, a party seeking injunctive relief ordinarily "must show that the injury it will suffer is likely imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages."  *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995).  In the absence of a showing of irreparable harm, the Court must deny the Band's motion for permanent injunction.  *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (reversing grant of injunction in the absence of irreparable harm because "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the" movant).

Here, the Band makes only a perfunctory argument regarding irreparable harm, claiming that a continued trespass is always irreparable as a matter of law.  *See* Band Mot. at 55-56.  The Band is wrong.  In *Davilla v. Enable Midstream Partners L.P.,* for example, the Tenth Circuit upheld the pipeline's liability for trespass but remanded the case to the district court to reconsider whether a permanent injunction was appropriate.  913 F.3d 959, 973-74 (10th Cir. 2019).  As the appellate court explained, "the sheer right to exclude simply cannot begin and end the equitable analysis." *Id*. at 974.  "Injunctive relief is, by its very nature, fact-sensitive and case-specific." *Id*. (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002)).  The district court thus erred in failing to consider whether the injunctive remedy was "necessary to prevent 'irreparable harm.'" *Id*.; *Sarkis v. Costley*, No. CV 17-01851-AB (PLAx), 2017 WL

---

favored continued transmission of electrical power to Indiana homes, farms, businesses and industries); *Florida Southeast Connection, LLC v. 0.821 Acres of Land, More or Less, In Polk Cnty., Fla*., 223 F.Supp.3d 1227, 1234 (M.D. Fla. 2016) (supplying natural gas for clean energy production is in the public interest and citing *East Tennessee*).

7833609, at *3 (C.D. Cal. Apr. 5, 2017) (rejecting request to enjoin continuing trespass where harm could be remedied by monetary damages).

The Band makes no showing that the pipeline's presence creates any actual and demonstrable harm, much less any irreparable harm. It is uncontested that the pipeline has been present and operating in the same location on the Reservation since 1953 and no harm has occurred. EPFF ¶ 128. Moreover, the Band alleges that Enbridge has been in trespass since 2013—a period of almost ten years—yet offers not a single fact (must less any undisputed facts) to show any actual harm caused by the pipeline's alleged trespass. While the Band mentions that it has sovereign rights to reservation land (Band Mot. at 55), the Band has failed to prove that the subject land is so unique that the objectives it seeks could not be achieved by a remedy other than ejectment. As the Band admits, the relevant parcels were previously owned by individual Indians and were purchased by the Band in 2013. *See* D.E. 167 (PPFF) ¶ 46. None of the cases cited by the Band hold or even imply that a temporary trespass on less than three miles out of twelve miles across a Reservation (or on 0.05% of a 645-mile pipeline) somehow constitutes irreparable harm or prevents the Band from governing itself. EPFF ¶ 2. And the alleged trespass has been occurring since 2013, but the Band points to no instance of this actually interfering with its ability to govern the Reservation.

Pursuant to the Pipeline Safety Act, 49 U.S.C. §§ 60101, *et seq.*, PHMSA – the expert federal pipeline safety agency – has promulgated an extensive body of federal safety regulations governing the operation of interstate pipelines that apply to Line 5. See 49 C.F.R. §§ 195, *et seq*.

Under PHMSA regulations and that agency's oversight, Enbridge implements a robust, comprehensive pipeline integrity program to ensure Line 5 is operating safely across the Reservation. This includes assessment of potential risks to the pipeline due to natural factors and

conditions, such as erosion.  EPFF ¶¶ 129-130, 132.  Enbridge also relies on regularly conducted internal inspections of the pipeline using highly technical, in-line inspection ("ILI") tools that allow Enbridge to proactively identify and manage potential integrity risks.  *Id.* ¶ 130.  Enbridge's integrity program has confirmed that the segment of Line 5 crossing the Bad River Reservation is operating safely, and repair or replacement is not required at this time.  *Id.* ¶ 131.  Recognizing this, the Band does not even try to argue in its Motion that there is evidence of irreparable harm to it should Line 5 continue to operate, which it has argued for decades.

Any alleged harm from a trespass, assuming any existed, can be remedied by monetary damages.  *See, e.g., Diamondback Funding, LLC v. Chili's of Wis., Inc.*, 2007 WI App 162, ¶ 26, 303 Wis. 2d 746, 735 N.W.2d 193 (unpublished) (reversing trial court's order on ground that court confused irreparable harm and damages, noting "[t]here must be an analysis as to whether continued future violations . . . would cause [plaintiff] irreparable harm, not merely an examination of past pecuniary loss.").[78]  Indeed, the Band requests monetary relief as part of its case, demonstrating that its harms can be remedied monetarily without the necessity for injunctive relief.  If the Court found Enbridge to be in trespass and permitted the Line to remain in place pending the Re-route becoming operational, the Band would be fairly compensated for that period of time.  As set forth in Section VII.C., if the Court were to find for the Band on its trespass claims, the Band would be entitled to fair market value (*i.e.*, a fair market rental rate) for the tracts that are

---

[78]     This rule has not been abrogated for a temporary trespass.  *See Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶ 44, 328 Wis. 2d 436, 787 N.W.2d 6 (Wis. 2010) (Under Wisconsin law, "compensatory damages may . . . be awarded" on a civil trespass claim.).  There is no irreparable harm when the plaintiff may be compensated after the fact by monetary damages.  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Since "[t]he absence of an adequate remedy at law is a precondition to any form of equitable relief," a plaintiff seeking injunctive relief must establish an award of damages following trial is "seriously deficient as a remedy for the harm suffered").  By recognizing that monetary damages are available, the Band implicitly concedes that its harms can be remedied monetarily, which is antithetical to injunctive relief.

encumbered by Line 5.  Accordingly, the Court must deny the Band its requested permanent injunction.[79]

### 3.  The Harm to Enbridge Is Significant

Balanced against the complete lack of any tangible harm to the Band, Enbridge would suffer significant economic harm if an injunction were entered.  Based on the fact that all of Line 5 would become inoperable if Enbridge were required to ceased operation of that segment crossing the Bad River Reservation,[80] Enbridge would lose significant revenue from a shutdown.   But Enbridge cannot get that money back from the Band, even if it was found to have breached the 1992 Agreement.  This is so because the Band only waived sovereign immunity for monetary damages up to $800,000.  *Id.* ¶ 25 (1992 Agreement ¶ 1(b)).  Under these circumstances, no injunction should issue.  *See Wisconsin v. Stockbridge-Munsee Cmty.*, 67 F. Supp. 2d 990, 1019-20 (E.D. Wis. 1999) (finding irreparable harm where Tribe's sovereign immunity barred state from recovering damages).

Further, Enbridge will suffer other damages as well if Line 5 is forced to cease operations.  It will not be able to service its customers if Line 5 is shutdown, likely damaging its relationship with those customers, and in the industry generally.  This loss of customer goodwill is irreparable harm.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer good will often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.").  Enbridge also risks losing existing shippers that it has spent years and significant resources obtaining.  Enbridge's ability to timely service shippers is critical to its ability to compete in the marketplace.

---

[79]     Monetary damages are especially appropriate as Enbridge's continued presence on the Reservation will be temporary to the extent that the Re-route is completed.
[80]     *See* EPFF ¶ 101 (quoting Maxwell Decl. ¶ 14).

In *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 544 (D. Minn. 1986), the district court enjoined the city and county from interfering with the reopening of the pipeline, finding that the pipeline operator had shown irreparable harm from a shutdown:

> [The pipeline operator] is, of course, concerned with its own economic losses, but the record also indicates that idling of the line is likely to cause fuel shortages. State officials have expressed concern about "serious short term supply problems." Such shortages may result in higher prices and may also necessitate more dangerous means of transporting petroleum products, such as trucking.    [The pipeline operator] has shown that any unnecessary delay in restarting the pipeline will cause irreparable harm.

*Id.* at 570 (citations omitted).  The same reasoning applies here.

In short, the Band's motion for permanent injunction should be denied because the Band has failed to show that any of the relevant facts are uncontested, as it must on a motion for summary judgment.  Enbridge's harm is irreparable while the Band's is not.  The public interest would be disserved by an injunction.

The Band attempts to make light of any harm to Enbridge, but even if the Band were correct, because of the impact on the public, no injunction should issue.  But the Band is not correct, and the irrelevant copyright infringement, patent infringement, and Lanham Act cases it cites do not mandate a different result.  As an initial matter, the question of whether Enbridge acted willfully, which Enbridge denies, is both a question of intent and a disputed issue of fact that is unsuitable for summary judgment.  *See supra* at Section VII.D.  But more importantly, Enbridge will be irreparably harmed for the reasons given above related to the public.  *See* Section VIII.B.4. All of these reasons support the denial, not the grant, of injunctive relief.

### 4.    At A Minimum, Factual Disputes Preclude Entry of An Injunction

The Band has sought injunctive relief prematurely on a motion for summary judgment.  At a minimum, there are numerous material factual disputes precluding injunctive relief.  It is "a cardinal principle of our system of justice that factual disputes must be heard in open court and

resolved through trial-like evidentiary proceedings." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001).  This Court has already ruled that remedies will be separately decided at trial.  *See* D.E. 122 at 10-11.  Moreover, where, as here, there is a factual dispute as to the issuance of an injunction, the court will not issue the injunction without an evidentiary hearing.  *See Medeco Sec. Locks, Inc. v. Swiderek*, 680 F.2d 37, 38 (7th Cir. 1981); *Socialist Workers Party v. Illinois State Bd. of Elections*, 566 F.2d 586, 587 (7th Cir. 1977) (recognizing the need for an evidentiary for a permanent injunction where there are material facts in dispute); *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005) ("A district court normally must hold an evidentiary hearing prior to issuing a permanent injunction.").[81]

For example, the Band argues that Enbridge cannot claim harm where its "trespass has been willful."  Band Mot. at 56.  But Enbridge's position is that there has been no trespass – and certainly not a willful trespass.  Thus, the Band's efforts to discount Enbridge's harm at most raise a disputed issue of fact that is unsuitable for summary judgment.

Further, the Band's economic experts attempt to minimize the harm to the public, while at the same time acknowledging significant, albeit understated economic losses – *e.g.*, an annual loss of over 6,000 jobs in Ohio, Michigan, and Pennsylvania, in addition to other economic harms in Michigan, Wisconsin, and other states, in addition to a loss of approximately 8,000 jobs in Ontario and a $6 billion loss in economic output.  EPFF ¶¶ 125-126.  These acknowledged losses unrealistically underestimate the scope and nature of the effects of a Line 5 closure and give rise to a significant factual dispute as to the scope of Line 5's economic impact.  Enbridge therefore intends to call economic experts and third parties to testify on the actual implications of closing

---

[81]    *See also Beck v. Test Masters Educ. Servs. Inc*., 994 F. Supp. 2d 98, 101 (D.D.C. 2014) ("An evidentiary hearing on whether to grant injunctive relief is required when 'there are genuine issues of material fact' or 'when a court must make credibility determinations to resolve key factual disputes in favor of the moving party.'").

Line 5, which are much more significant.  Given the significant issues in dispute that the Court will need to address in weighing whether an injunction is appropriate or not, a hearing on these matters is warranted.

In short, at a minimum, the Band's motion must be denied because of material factual disputes related to the injunction factors.

## IX.   Enbridge's Defense of Laches Precludes Summary Judgment On The Band's Requested Remedies

The Band's requested remedies for trespass (profits since 2013 and injunctive relief) are also barred by equitable considerations such as laches.  *See* D.E. 146 at 47 ¶ 20 (Enbridge's 20th Affirmative Defense).  Laches operates as an equitable limitation on a party's right to bring suit or seek certain remedies.[82]  To establish the defense of laches under federal common law, Enbridge must show both "[(1)] a lack of diligence by the party against whom the defense is asserted and [(2)] prejudice to the defending party." *Lingenfelter v. Keystone Consol. Indus.*, 691 F.2d 339, 340 (7th Cir. 1982) (citing *Costello v. United States*, 365 U.S. 265, 282 (1961)).  "The defense of laches ultimately turns on underlying factual determinations." *Rite-Hite Corp. v. Kelley Co.*, No. 96-C-1345, 1998 U.S. Dist. LEXIS 25002, *54 (E.D. Wis. Sept. 15, 1998).

The Band does not move for summary judgment on this affirmative defense[83] or even address it in its Motion.[84]  For this reason alone, the Band's request for profits and injunctive relief

---

[82]    An Indian tribe's asserted "possessory land claim," especially where it is "disruptive [and] forward-looking" – such as here where the Band seeks the immediate decommissioning and ejectment of a 645-mile international pipeline that would cause significant economic and energy-related consequences throughout the Midwest and beyond – are "subject to equitable defenses, including laches." *Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 273 (2nd Cir. 2005) ("[E]quitable doctrines, such as laches . . . can, in appropriate circumstances, be applied to Indian land claims."). For a full discussion of the impacts and consequences of a shutdown and/or ejectment of Line 5, *see infra* at Section IX.B.

[83]    It should not be permitted to do so for the first time in a reply to which Enbridge will be unable to respond.

[84]    The Band also does not address a number of other affirmative defenses raised by Enbridge in this case which, if successful, would serve as a bar to the Band's claims and/or remedies, including: equitable estoppel; license; acquiescence; unclean hands; and equitable easement. *See* D.E. 146 at 44-45.  For similar

126

on summary judgment must be denied.  There are material facts (that the Band presumably disputes), namely the Band's "lack of diligence" and prejudice to Enbridge, which if established, would at a minimum serve to defeat the Band's entitlement to immediate shutdown of Line 5 before the Re-route is complete.

### A.  The Band's Lack of Diligence in Filing for Trespass Six Years Later

The Band has shown unreasonable delay in informing Enbridge that it desires Line 5 to be removed from the Reservation and in asserting Enbridge is in trespass on the at-issue Allotted Parcels.  *See* 27A Am. Jur. 2d *Equity* § 131 ("Whether a party's delay is unreasonable depends on the circumstances of the particular case.").  The Band asserts that Enbridge's BIA-approved right-of-way to operate on the Allotted Parcels expired on June 2, 2013.[85]  *See* Band Mot. at 23.  But the Band was discussing with Enbridge a renewal of the BIA easement years after 2013, including up until this suit was filed in 2019.  *See* EPFF ¶ 81.  It did not tell Enbridge it believed Line 5 was in trespass until initiating this litigation on <u>July 23, 2019</u> – more than six years later. This delay was unreasonable.[86]

On March 8, 2013, Enbridge submitted an application with the BIA for a renewal of its right-of-way, which was otherwise set to expire on June 2, 2013.  Resp. to PPFF ¶¶ 48-49.  On April 19, 2013, Enbridge informed the Band of its intention to renew its right-of-way in an effort to initiate a dialogue with the Band.  EPFF ¶ 73 (requesting "an opportunity to meet with the

---

reasons raised in this Section *infra*, there are triable issues as to the aforementioned equitable defenses that would preclude the Band from establishing a trespass claim.  The Band does not even mention these defenses let alone move for summary judgment on them.  As a result, the Band's motion must be denied.

[85]     As shown above in Section III.B., this is not correct.  Enbridge still has a valid right to operate on the Allotted Parcels unless and until a final agency action denies its renewal applications.

[86]     At a minimum, such unreasonable delay should preclude any injunction mandating removal of Line 5 before the Re-route around the Reservation is operational.  Instead, if a trespass is found to have occurred, Enbridge should be permitted to continue operating on the Reservation until Enbridge's Re-route is complete.  Under those circumstances, and if a trespass were determined to exist, Enbridge would of course pay the fair rental value for the land in question.

appropriate Tribal officials to discuss the renewal process").   At the time, the Band owned interests in at least ten of the Allotted Parcels, including the three it owned when the 1992 Agreement was signed.  *See id.* ¶ 80.   But the Band did not object, or even meaningfully respond to Enbridge for <u>more than two years</u>.

On June 10, 2015, the Band finally responded – more than two years after the Band knew the terms of the Allotted Parcels easement had run. *See id.* ¶ 81.   At this time, the Band did not assert any trespass or demand that Enbridge cease operations or remove Line 5 from the Reservation.   Instead, the Band informed Enbridge it planned to conduct an "environmental review" and requested that Enbridge provide pipeline integrity and emergency response information "to inform . . . the decision-making process of the Bad River Tribal Council" as to whether it would object to the BIA issuing another right-of-way.  *See id.*   On September 1, 2015, Enbridge provided the Band with a detailed "Environmental Report."  *Id.* ¶ 82.  For the rest of 2015 and in 2016, the Band periodically discussed this information with Enbridge and began developing coordinated maintenance and emergency response protocols for Line 5 on the Reservation to be implemented <u>in the future</u>.  *See id.* ¶ 83.  During this time, the Band never once indicated that it believed Enbridge had been in trespass, that it intended to bring any claim or litigation against Enbridge, or that it demanded that Enbridge cease operating on any lands within the Reservation.  *See id.*  ¶¶ 83-85 (Enbridge requested for the Band's Natural Resources Department personnel "to meet every two weeks [to] continue working renewal process.").

Two more years of sporadic discussions and requests for information took place.  *Id.*  Then, without warning, on January 4, 2017, the Bad River Band Tribal Council issued Resolution No. 1-4-17-738 ("2017 Resolution") declaring that the Bad River Band "shall not renew its interests in the rights of way across lands within the Reservation" and called for Line 5 to be removed from

all "Bad River lands and watershed." *See* EPFF ¶ 83-85; Resp. to PPFF ¶ 54.   But this Resolution

did not constitute an assertion that Enbridge was in trespass, nor does the Resolution ever mention

trespass.   In fact, this declaration was undercut by another Tribal Council Resolution issued several

months later whereby the Tribal Council approved a "Memorandum of Agreement" with Enbridge

to "facilitate discussions and negotiations between Enbridge and the Band to enter into a mediation

or other agreement regarding the Enbridge right-of-way or easement [for] Line 5."   EPFF ¶ 86

(quoting Enbridge Ex. 36 (BRB105901)).   The Band had still not asserted – or threatened to assert

– that Enbridge was in trespass and would not do so for another two-and-a-half years as discussions

about improving pipeline safety within the Reservation continued.

    In June 2017, as a result of the 2017 Resolution, the parties entered into a confidential

mediation to resolve the disputes.   *See id.* ¶ 87.   The mediation continued for two years until the

Band suddenly terminated these discussions by filing this lawsuit alleging, for the first time (and

about six years after it now contends the trespass started), that Enbridge was trespassing on its

property.   *See id.* ¶ 88.   The Band's initial complaint alleged trespass commencing on June 2, 2013.

*See* D.E. 1 ¶ 61.   This delay showed a "lack of diligence" in asserting a claim that Enbridge was

in trespass on the Allotted Parcels by waiting more than six years to file this lawsuit.   *See E.E.O.C.

v. CW Transp., Inc.,* 658 F. Supp. 1278, 1290 (W.D. Wis. 1987) ("[D]elays of between four years,

five months and nine years, three months have been held unreasonable as a matter of law in cases

initiated by the filing of a charge with the EEOC."); *Peyser v. Searle Blatt & Co.,* 99 Civ. 10785

(WK), 2001 U.S. Dist. LEXIS 20844, *12 (S.D.N.Y. Dec. 13, 2001) ("Plaintiffs' decision to

commence this action after unreasonably sleeping on their rights for five years was objectively

unreasonable."); *Fromson v. RBP Chem. Corp.*, No. 82-C-0431, 1990 U.S. Dist. LEXIS 14264,

*47 (E.D. Wis. June 5, 1990) (in patent infringement cases, delay exceeding six years is presumptively unreasonable).

The Band does not offer any excuse for its delay.  Indeed, during the time it was requesting pipeline information from Enbridge and remaining silent as to its purported trespass claim, the Band was deliberately and secretly acquiring "controlling" interests in the Allotted Parcels to purportedly control the rights around Enbridge's easements.  *See* EPFF ¶¶ 70-71 (Band employees in 2016 and 2017 discussed trying to "captur[e] majority ownership around the pipeline" and "tip[] the scale on Tribal control over parcels" involving "Enbridge Line 5 on [the] Reservation").

And the Band's delay in asserting trespass cannot be viewed in isolation.  Currently, there are at least four other utility lines or pipelines that continue to operate on the Reservation on lands under which the BIA easements expired in 2017 or 2018.  *See* EPFF ¶ 90.  The Band, too, initiated "environmental reviews" for those pipelines for years after expiration and have allowed those companies to continue operation without threat of asserting trespass. *See id.* ¶ 91.  If the Band wanted to assert those rights upon expiration of the easements, it could and should have done so much more quickly.

To the extent the Band might argue on reply that the Band's six-year delay was justified because it was negotiating for continued operation of Line 5 in its present location, then one of two things are true.  Either (1) the Band now contradicts and disputes its *own* position where it claims that as of June 2013, Enbridge knew "consent was not forthcoming" (Band Mot. at 11), or (2) the Band's understanding of *active* negotiation or extra-judicial resolution consists of a single request for information two years after expiration and an abandonment of that discussion because the Band "responded that Enbridge's information contained critical omissions and was deficient in other ways."  *See id.* at 11.  Either way, Enbridge has raised a dispute of material fact as to

130

whether the Band acted in good faith and its related laches defense which requires denial of the Band's motion.

### B. Enbridge Is Prejudiced by the Band's Delay Asserting Trespass

The Band's delay also caused significant prejudice to Enbridge for at least two reasons.[87] First, if Enbridge had known of the Band's position in a timely manner, it could have started the Re-route of Line 5 off the Reservation much earlier. *See* EPFF ¶¶ 95-100. Enbridge did not do so in reliance of the Band's statements and conduct before 2019. Had Enbridge been told earlier by the Band that it contended Enbridge was in trespass and demanded Line 5 be removed from its Reservation entirely, this entire litigation could have been avoided and the Re-route process would now very likely be complete. *Id.*[88] But because the Band offered the prospect of providing its consent to the BIA for a renewed right-of-way for more than *six years*, Enbridge did not initiate a plan to move (or reroute) the pipeline outside the Reservation – as the Band now wishes – *until after* the Band filed this suit demanding ejectment. *See* EPFF ¶ 95. This six-year period would have been sufficient for Enbridge to have had the Re-route approved and operational. *See id.* ¶ 97.

Further, by waiting for six years, the Band strategically and unfairly used its significant delay to potentially subject Enbridge to larger damages.[89] Remaining silent for six years caused Enbridge to operate for a longer period of time on the Reservation. *See id.* ¶ 96-97. Further, by remaining silent on its purported trespass claim while accruing greater ownership in the Allotted

---

[87]   27A Am. Jur. 2d *Equity* § 131 ("What amounts to prejudice . . . depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position.").

[88]   By agreeing to voluntarily Re-route Line 5 outside the Reservation, Enbridge does not contend that it was (or is), in fact, in trespass on the Allotted Parcels or that Enbridge does not already have the Band's consent to renewal. However, Enbridge would have earlier made the decision (as it did after the Band filed suit) to Re-route the pipeline outside the Reservation's boundaries (even where it still has rights until 2043) out of respect the Band's wishes and attempt to avoid a protracted litigation with the Band. *See* EPFF ¶¶ 95-96.

[89]   Notably, the Band did not even seek damages until its Second Amended Complaint that was filed more than a year after instituting its trespass suit. D.E. 73 (Nov. 19, 2020).

Parcels, the Band has used this time to potentially subject Enbridge to exponentially larger trespass damages, especially if the Court were to agree with the Band's (incorrect) legal positions and award the Band damages in the form of Enbridge's profits.  *See* Band Mot. at 22-29.  It would be inequitable to permit the Band to tacitly permit Enbridge to continue operating Line 5 for years only to use that permission against Enbridge when it eventually decided to file its lawsuit and assert a trespass claim.  *See Lake Caryonah Improv. Ass'n v. Pulte Home Corp.*, 903 F.2d 505, 510 (7th Cir. 1990) ("Prejudice is established when a party 'remains passive while an adverse claimant incurs risk'") (internal citation omitted); *E.E.O.C. v. CW Transp., Inc.*, 658 F. Supp. 1278, 1292 (W.D. Wis. 1987) ("[C]ourts have recognized as an element of prejudice an unfair enlargement of the defendant's potential back pay liability" due to passage of time).

## CONCLUSION

For the foregoing reasons, Enbridge respectfully requests that the Court deny the Band's Motion for Partial Summary Judgment.

Dated: April 21, 2022 Respectfully submitted,

/s/ David H. Coburn                      /s/ David L. Feinberg
David H. Coburn                          Michael C. Davis
Shannen W. Coffin                        David L. Feinberg
STEPTOE & JOHNSON LLP                    Justin B. Nemeroff
1330 Connecticut Avenue, NW              VENABLE LLP
Washington, DC 20036-1795                600 Massachusetts Ave., NW
(202) 429-8063                           Washington, DC 20001
dcoburn@steptoe.com                      (202) 344-8278
scoffin@steptoe.com                      MCDavis@venable.com
                                         DLFeinberg@venable.com
                                         JBNemeroff@venable.com

                                         /s/ Eric M. McLeod
                                         Eric M. McLeod
                                         Joseph S. Diedrich
                                         HUSCH BLACKWELL
                                         33 East Main Street, Suite 300
                                         Madison, WI 53701-1379
                                         (608) 234-6056
                                         eric.mcleod@huschblackwell.com

                                         *Counsel for Enbridge Energy Company,
                                         Inc., and Enbridge Energy, Limited
                                         Partnership*


## CERTIFICATE OF SERVICE

I certify that on April 21, 2022 I served the foregoing document on all counsel of record using the Court's ECF system.

                                         /s/ *David L. Feinberg*
                                         David L. Feinberg