# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION

       *Plaintiff,*

  v.

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.

      *Defendants.*

Case No. 3:19-cv-00602

---

ENBRIDGE ENERGY, L.P.

     *Counter-Plaintiff,*

  v.

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION and
NAOMI TILLISON, in her official capacity

     *Counter-Defendants.*

Judge William M. Conley
Magistrate Judge Stephen Crocker

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

ARGUMENT .........................................................................................................2

I.      Federal law forecloses the Band's public nuisance, regulatory authority, and
        ejectment counts...........................................................................................2

        A.      The Pipeline Safety Act forecloses the Band's attempts to regulate pipeline
                safety (Counts 1, 2, 4, 5) ................................................................ 2

                1.      Field preemption ................................................................. 3

                2.      Obstacle preemption. ........................................................... 9

                3.      Displacement of federal common law. ................................. 10

        B.      The Band's ejectment count is preempted by the Foreign Affairs Doctrine
                (Count 4) ........................................................................................ 13

II.     The Band's ejectment and regulatory authority counts fail as a matter of law
        (Counts 4 and 5)...........................................................................................18

III.    The Band's public nuisance claims fails as a matter of law ............................20

        A.      The Band does not have standing to sue for a public nuisance under
                Wisconsin law (Count 2) ................................................................. 20

        B.      The Band fails to establish the necessary elements of its nuisance claims
                (Counts 1 and 2).............................................................................. 21

CONCLUSION.....................................................................................................26

i

TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Ins. Assoc. v. Garamendi*,
    539 U.S. 396 (2003)..........................................................................14, 17

*American Electric Power Co. v. Connecticut*,
    564 U.S. 410 (2011)......................................................................10, 11, 12

*Andrews v. Columbia Gas Transmission Corp.*,
    No. 2:05-cv-501, 2006 WL 8441747 (S.D. Ohio Oct. 23, 2006) ...............................6

*ANR Pipeline Co. v. Iowa State Commerce Comm'n*,
    828 F.2d 465 (8th Cir. 1987) .................................................................6

*Barry-Wehmiller Co. v. Marschke*,
    No. 09-CV-674-BBC, 2010 WL 693630 (W.D. Wis. Feb. 23, 2010) ....................................19

*Borzych v. Frank*,
    No. 06-C-475-C, 2006 WL 3254497 (W.D. Wis. Nov. 9, 2006) ...........................................18

*Brooks Jay Transp., Inc. v. FedEx Ground Package Sys., Inc.*,
    No. 17-CV-084-WMC, 2017 WL 5136014 (W.D. Wis. Nov. 3, 2017) ................................18

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981)......................................................................11, 12, 13

*City of Milwaukee v. NL Industries*,
    2008 WI App 181, 315 Wis. 2d 443, 762 N.W.2d 757 .......................................21

*Colo. Interstate Gas Co. v. Wright*,
    707 F. Supp. 2d 1169 (D. Kan. 2010) .....................................................5

*Effex Capital, LLC v. Nat'l Futures Ass'n*,
    933 F.3d 882 (7th Cir. 2019) .............................................................3

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990).......................................................................3, 9

*FAS, LLC v. Town of Bass Lake*,
    733 N.W.2d 287 (2007)....................................................................20

*Hines v. Davidowitz*,
    312 U.S. 52 (1941).......................................................................14

*Horstman v. Cnty. of Dupage*,
284 F.Supp.2d 1125 (N.D. Ill. 2003) .................................................................19

*Japan Line, Ltd. v. Cnty. of Los Angeles*,
441 U.S. 434 (1979)...............................................................................................14

*Kinley Corp. v. Iowa Utils. Bd.*,
999 F.2d 354 (8th Cir. 1993) ..................................................................................6

*Kirkland & Ellis v. CMI Corp.*,
No. 95 C 7457, 1996 WL 559951 (N.D. Ill. Sept. 30, 1996)..................................19

*Krueger v. AllEnergy Hixton, LLC*,
2018 WI App 60, 384 Wis. 2d 127, 918 N.W.2d 458 ...............................21, 23, 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...............................................................................................22

*Lynch v. Three Hammer Const., Inc.*,
No. 89 C 20071, 1990 WL 304248 (N.D. Ill. May 9, 1990) ...................................19

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)...................................................................22

*Meyers v. Oneida Tribe of Indians of Wis.*,
836 F.3d 818 (7th Cir. 2016) .................................................................................20

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014).............................................................................................3, 14

*Michigan v. Enbridge Energy, LP*,
No. 1:20-cv-1142, --- F. Supp.3d ---, 2021 WL 5355511 (W.D. Mich. Nov. 16, 2021) ........................................................................................................5, 9, 16

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001).............................................................................25

*Michigan v. U.S. Army Corps of Eng'rs*,
758 F.3d 892 (7th Cir. 2014) (*Asian Carp II*)............................................21, 24, 25

*Michigan v. U.S. Army Corps of Engineers*,
667 F.3d 765 (7th Cir. 2011) (*Asian Carp I*) ........................................................21

*Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*,
2005 WI 8, 277 Wis. 2d 635, 691 N.W.2d 658 .....................................................21

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) ...........................................................................14

*N. Natural Gas Co. v. Munns*,
   254 F. Supp. 2d 1103 (S.D. Iowa 2003) ...............................................................7

*Native Village of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) .............................................................................13

*New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*,
   336 F.3d 495 (6th Cir. 2003) ..............................................................................1

*Northern Border Pipeline Co. v. Jackson Cnty.*,
   512 F. Supp. 1261 (D. Minn. 1981) .....................................................................7

*Oil, Chemical & Atomic Workers Local Union 4-750 v. Goree*,
   No. 92-4196, 1993 WL 278444 (E.D. La. July 16, 1993) .....................................7

*Olympic Pipe Line Co. v. City of Seattle*,
   437 F.3d 872 (9th Cir. 2006) ..............................................................................6

*Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*,
   2002 WI 80, 254 Wis. 2d 77 ..............................................................................21

*S. Cal. Gas Co. v. Occupational Safety & Health Appeals Bd.*,
   58 Cal. App. 4th 200 (Cal. App. 1997) ................................................................7

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ..........................................................................................19

*State v. Zawistowski*,
   2008 WI App 51, 309 Wis. 2d 233, 747 N.W.2d 527 .........................................23

*Stearns v. State Comm. on Water Pollution*,
   274 Wis. 101, 79 N.W.2d 241 (1956) .................................................................23

*Tenneco Inc. v. Pub. Service Comm'n of W. Va.*,
   489 F.2d 334 (4th Cir. 1973) ..............................................................................6

*United States v. ExxonMobil Pipeline Co.*,
   28 F. Supp. 3d 843 (E.D. Ark. 2014) .................................................................13

*United States v. Lara*,
   541 U.S. 193 (2004) ............................................................................................3

*United States v. Pink*,
   315 U.S. 203 (1942) ..........................................................................................14

*United Steelworkers of Am., Local 12431 v. Skinner,*
    768 F. Supp. 30 (D.R.I. 1991) ................................................................7

*Vulcan Golf, LLC v. Google, Inc.,*
    552 F. Supp. 2d 752 (N.D. Ill. 2008) ..................................................20

*In re Weinhold,*
    347 B.R. 887 (Bankr. E.D. Wis. 2006) ...............................................23

*Wergin v. Voss,*
    179 Wis. 603, 192 N.W. 51 (1923) .....................................................23

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989) ...............................................................................20

*Williams Pipe Line Co. v. City of Mounds View, Minn.,*
    651 F. Supp. 551 (D. Minn. 1987) ...................................................5, 6

**U.S. Constitution**

U.S. Const. art. VI, cl. 2 ...........................................................................3, 14

**Statutes**

33 U.S.C. § 1311(a) ......................................................................................13

33 U.S.C. § 1342 ..........................................................................................12

49 U.S.C. § 108(b) ........................................................................................5

49 U.S.C. § 60101(a) ..................................................................................4, 7

49 U.S.C. § 60104(c) .................................................................................6, 10

Wis. Stat. ch. 120 ........................................................................................20

Wis. Stat. § 823.01 ......................................................................................20

Wis. Stat. § 823.02 ......................................................................................20

**Regulatory Materials**

49 C.F.R. App'x A ........................................................................................7

49 C.F.R. § 1.96 ............................................................................................4

49 C.F.R. § 190.236 ......................................................................................5

49 C.F.R. § 195 *et seq.* ................................................................................4

49 C.F.R. § 195.452 ........................................................................................................5

**Federal Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................1, 2

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................................22

Restatement (Second) of Torts............................................................................21

GLOSSARY<sup>∗</sup>

| Short version | Description |
|---|---|
| Band | The Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation—the Plaintiff in this action. |
| CWA | Clean Water Act, 33 U.S.C. § 1251 *et seq.* |
| Dkt. __ | Docket number entry for the Court's electronic filing system. |
| Enbridge | Enbridge Inc., Enbridge Energy Partners, L.P., Enbridge Energy Company, Inc. and Enbridge Energy, L.P.—named Defendants in this action |
| EPA | U.S. Environmental Protection Agency |
| FoF | Defendants' Proposed Findings of Fact in support of Motion for Partial Summary Judgment (filed contemporaneously with this brief) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration—a federal regulatory agency within the U.S. Department of Transportation |
| PSA | Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* |
| Secretary | Secretary of the U.S. Department of Transportation |
| TAC | Third Amended Complaint (Dkt. 123) |
| 1977 Treaty | *Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731. |

---

<sup>∗</sup> Although not required, a glossary is provided for the Court's convenience.

Defendants (collectively, "Enbridge") respectfully submit this brief in support of their motion for partial summary judgment on Counts 1, 2, 4, and 5 of the Third Amended Complaint (TAC).  *See* Fed. R. Civ. P. 56(a).

### INTRODUCTION

Enbridge operates a pipeline—known as Line 5—that transports crude oil and natural gas liquids from Superior, Wisconsin, to Sarnia, Ontario.  Dkt. 123 at 2-3, 21 (TAC ¶¶ 5, 6, 55-56); Defendants' Proposed Findings of Fact in support of Motion for Partial Summary Judgment ("FoF") at ¶¶ 1, 2, 4.  When crossing the northern part of Wisconsin, Line 5 traverses through part of the Bad River Reservation ("Reservation").  Dkt. 123 at 21 (TAC ¶ 55); FoF at ¶ 2.  Since Line 5's construction in 1953, large markets have become dependent upon this pipeline.  Line 5 serves ten oil refineries in the United States and Canada, provides more than 50% of the crude oil needs for two Canadian provinces, and supplies more than 50% of Michigan's propane needs.  Dkt. 207 at 113-15.  As the Government of Canada recently explained, "Line 5 is vital to Canada's energy security and economic prosperity …."[1]

The Band now seeks to close this international pipeline.  The Band's complaint is rooted in the alleged safety risk that Line 5 poses to the Reservation.  *E.g.*, Dkt. 123 at 32-53 (TAC ¶¶ 65-137).  In January 2017, after requesting and reviewing documents about Line 5's safety, the Band's Tribal Council enacted a Resolution that the Band would not consent to easement renewals on certain allotted lands on the Reservation in which it held an interest based on concerns that "a pipeline break at [the Bad River and the White River] will nullify [the Band's] long years of effort

---

[1]     Government of Canada Brief of Amicus Curiae Brief, filed in *Enbridge Energy Ltd. v. Whitmer*, No. 1:20-cv-01131-JTN-RSK, ECF No. 70, PageID.494 (W.D. Mich. Apr. 5, 2022) ("Canada Amicus Br.").  The Court can take judicial notice of the Government of Canada's amicus brief and its representations therein.  *See New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500 n.2 (6th Cir. 2003) (taking judicial notice of an SEC amicus brief).

to preserve health, subsistence, culture and ecosystems…."  Dkt. 123 at 22-23 (TAC ¶ 62 & n.12).
The Resolution directed Band employees to take steps to ensure the removal of Line 5 from the
Reservation.  *Id.*

The Band's complaint alleges six separate counts.  Dkt. 123.  On February 14, 2022, the
Band moved for partial summary judgment on Count 3 (trespass) and Count 6 (unjust enrichment).
Dkt. 165.  In its opposition, Enbridge explained that Line 5 is not in trespass and, even if it were,
the proper remedy would be damages for the fair rental value.  Dkts. 207-210.  In this motion,
Enbridge moves for partial summary judgment on the remaining claims in the complaint:  Count
1 (public nuisance—federal law), Count 2 (public nuisance—Wisconsin law), Count 4
(ejectment—federal law), and Count 5 (Band regulatory authority—federal law).  *See* Dkt. 123 at
54-69 (TAC ¶¶ 139-51, 159-70).[2]  As explained below, these counts are foreclosed by federal law
and are not otherwise valid claims.

**ARGUMENT**

I.   **Federal law forecloses the Band's public nuisance, regulatory authority, and
     ejectment counts**

     A.    **The Pipeline Safety Act forecloses the Band's attempts to regulate pipeline
           safety (Counts 1, 2, 4, 5)**

     The Band asserts that Line 5 is a public nuisance under state and federal common law due
to an alleged risk of rupture (Counts 1, 2).  The Band further asserts that it has regulatory authority
under federal common law to assess Line 5's safety (Count 5) and to eject Line 5 from the
Reservation (Count 4).  These counts—which seek "Enbridge to cease the operation of Line 5"
(Dkt. 123 at 6-7)—are barred by the federal Pipeline Safety Act ("PSA"), 49 U.S.C. § 60101 *et*

---

[2] Pursuant to the parties' agreement and to avoid duplicative briefing (Dkt. 175 at 3-4), Enbridge
does not address in this motion the merits of the Band's trespass and unjust enrichment counts.
Enbridge's arguments with respect to those counts are addressed in its opposition to the Band's
motion for partial summary judgment.  Dkts. 207-210.

2

*seq.*  The PSA establishes a comprehensive regime of safety requirements for interstate pipelines, administered by an expert federal agency, and evinces Congress's intent to occupy the field of interstate pipeline safety and to make safety requirements uniform throughout the United States. The PSA thus preempts attempts by other domestic authorities to regulate interstate pipeline safety. It also displaces attempts to use federal common law for that purpose.  Accordingly, Enbridge is entitled to judgment as a matter of law on Counts 1, 2, 4, and 5.

### 1.    Field preemption

The Constitution's Supremacy Clause declares that "the Laws of the United States … shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  As a result, federal law preempts inconsistent actions by other domestic authorities, including states, territories, and tribes.  While preemption case law generally focuses on federal preemption of state law, federal law is also supreme in relation to tribal law.  Indeed, congressional authority to preempt tribal law is greater than its authority over state law.  "Indian tribes are 'domestic dependent nations.'"  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Oklahoma*, 498 U.S. 505, 509 (1991)).  Whereas the Constitution places certain limits on federal control over the states, it is established that "the tribes are subject to plenary control by Congress."  *Id.*; *see United States v. Lara*, 541 U.S. 193, 200 (2004) (Congress has "plenary and exclusive" authority to "legislate in respect to Indian tribes").

One way that Congress preempts other laws is by "occupying the field."  Field preemption prevents other domestic authorities from "regulat[ing] conduct in a field that Congress intended the Federal Government to occupy exclusively."  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "Such an intent may be inferred from a 'scheme of federal regulation … so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'"  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also, e.g., Effex Capital, LLC v.*

*Nat'l Futures Ass'n*, 933 F.3d 882, 893 (7th Cir. 2019) (preemption occurs "where Congress manifests an intent to occupy exclusively an entire field of regulation through a comprehensive federal regulatory scheme").

The PSA evinces a clear congressional intent to occupy the field of interstate pipeline safety: Rather than allow each individual locality that an interstate pipeline passes through to burden interstate commerce with a patchwork of policymaking and parochial interests, the PSA assigns exclusive authority to regulate pipeline safety to the Secretary of Transportation ("Secretary"). The PSA aims to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1).  To achieve that goal, the PSA gives the Secretary broad authority to promulgate federal "safety standards" for interstate pipeline transportation and facilities.  *Id.* § 60102(a)(2).  Such standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  *Id.* § 60102(a)(2)(B). The federal standards must be "designed to meet the need for … pipeline safety and … protecting the environment."  *Id.* § 60102(b)(1).  Congress thus determined that pipeline safety must be set and enforced uniformly to meet the *Nation's* interests.[3]

The Secretary has delegated authority to implement the PSA to an expert federal agency— the Pipeline and Hazardous Materials Safety Administration (PHMSA).  *See* 49 C.F.R. § 1.96. PHMSA, in turn, has promulgated an extensive body of federal safety rules that pervasively regulate the design, construction, and operation of interstate pipelines like Line 5.  *See* 49 C.F.R. § 195 *et seq.*  These rules include a set of requirements imposed on pipeline operators with respect

---

[3] No regions or parts of the country are exempt from this federal regulatory regime.  *E.g.*, 49 U.S.C. § 60101(a)(5) (defining hazardous liquid pipeline facility broadly to include any "right of way, … or equipment used or intended to be used in transporting hazardous liquid….").

to ensuring safety at so-called "high consequence areas", which include river and other waterbody crossings.  *See* 49 C.F.R. § 195.452.[4]

No function of PHMSA is more important than ensuring the safety of pipeline operations. Congress has mandated that when implementing pipeline policy, PHMSA's Administrator must "assig[n] and maintai[n] safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in pipeline transportation and hazardous materials transportation."  49 U.S.C. § 108(b).  Accordingly, in addition to promulgating regulatory requirements that interstate pipelines must satisfy, PHMSA "is vested with *exclusive jurisdiction* to issue an emergency order requiring pipeline closure 'when an unsafe condition or practice, or a combination of unsafe conditions or practices, constitutes or is causing an imminent hazard.'"  *Michigan v. Enbridge Energy, LP*, No. 1:20-cv-1142, --- F. Supp.3d ---, 2021 WL 5355511, at *6 (W.D. Mich. Nov. 16, 2021) (emphasis added) (quoting 49 U.S.C. § 60117(p)); *see also* 49 C.F.R. § 190.236.

The PSA establishes "a comprehensive and uniform scheme" for the regulation of interstate pipelines that traverse numerous jurisdictions.  *Colo. Interstate Gas Co. v. Wright*, 707 F. Supp. 2d 1169, 1181, 1188 (D. Kan. 2010) (finding the PSA created "a comprehensive and uniform scheme"); *see also Williams Pipe Line Co. v. City of Mounds View, Minn.*, 651 F. Supp. 551, 571 (D. Minn. 1987) ("Congress stressed the need for uniform federal regulation of interstate pipeline safety.").  Under the PSA, interstate pipeline operators obey one set of regulations, consult with a single set of federal officials, and share a central depository of critical information.  If a problem arises, one regulator investigates; one regulator decides; one regulator

---

[4] A fuller description of the extensive PHMSA pipeline safety regulations may be found in the declaration of Mark Maxwell submitted in support of Enbridge's opposition to the Band's motion for summary judgment.  Dkt. 198.

takes ownership.  Numerous courts have thus confirmed that the PSA prohibits other domestic authorities from seeking to shut down a pipeline based on safety concerns.  *See, e.g.*, *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877-83 (9th Cir. 2006) (given the "superordinate federal need to maintain the PSA's policy of providing national uniformity," City of Seattle preempted from imposing safety standards in an easement); *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) (the federal schemes "leaves nothing to the states in terms of substantive safety regulation"); *Williams Pipe Line Co.*, 651 F. Supp. at 569-70.  Indeed, as further confirmation of its intent to occupy the field to the exclusion of other regulators, Congress provided in the Act that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."   49 U.S.C. § 60104(c).

Case law confirms that the PSA and its two predecessor statutes occupy the field of interstate pipeline safety.[5]  *See, e.g.*, *Tenneco Inc. v. Pub. Service Comm'n of W. Va.*, 489 F.2d 334, 336 (4th Cir. 1973) ("The Act's text, its legislative history, administration implementation, and judicial interpretation, attest to federal preemption of the field of safety with respect to the establishment and enforcement of standards regulating the interstate transmission of gas by pipeline." (footnotes omitted)); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 359 (8th Cir. 1993) ("This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."); *Andrews v. Columbia Gas Transmission Corp.*, No. 2:05-cv-501, 2006 WL 8441747, at *2 (S.D. Ohio Oct. 23, 2006) ("the

---

[5] The PSA is a re-codification, without substantive change, of two earlier laws: the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979.  Case law concerning the earlier acts is thus fully applicable here.

Natural Gas Pipeline Safety Act … completely preempts the field of pipeline safety"); *N. Natural Gas Co. v. Munns*, 254 F. Supp. 2d 1103, 1110 (S.D. Iowa 2003) ("Congress has occupied the field of interstate gas pipeline regulation"); *Oil, Chemical & Atomic Workers Local Union 4-750 v. Goree*, No. 92-4196, 1993 WL 278444, at *1 (E.D. La. July 16, 1993) ("The Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquid Pipeline Safety Act of 1979 preempt the entire field of pipeline transportation safety." (citations omitted)); *United Steelworkers of Am., Local 12431 v. Skinner*, 768 F. Supp. 30 (D.R.I. 1991) ("Federal statutes preempt the entire field of gas pipeline safety."); *Northern Border Pipeline Co. v. Jackson Cnty.*, 512 F. Supp. 1261, 1264 (D. Minn. 1981) ("the provisions and legislative history of the Natural Gas Pipeline Safety Act indicate quite clearly that federal legislation has preempted the entire field of gas pipeline safety"); *S. Cal. Gas Co. v. Occupational Safety & Health Appeals Bd.*, 58 Cal. App. 4th 200, 209-10 (Cal. App. 1997) ("We find that it was the clear and manifest purpose of Congress to occupy the field of interstate natural gas pipeline safety, in the broadest sense possible." (internal quotation marks omitted)); 49 C.F.R. App'x A to Part 195 ("The [Hazardous Liquids Pipeline Safety Act] leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce.").

Here, it is undisputed that Line 5 is an interstate pipeline subject to PHMSA's regulatory jurisdiction. *See* Dkt. 123 at 2-3, 6 (TAC ¶¶ 5, 18); FoF ¶ at 3 *see also* 49 U.S.C. § 60101(a)(4), (5), (7), (18), (19) (definitional provisions). Yet the Band purports to position itself as another pipeline safety regulator for Line 5, thereby encroaching on the federally occupied field and usurping the role of the expert federal regulator. In Counts 1, 2, and 5, the Band contends that Line 5 should be shut down because it allegedly "presents a grave threat of a rupture." Dkt. 123 at 54 (TAC ¶ 143); *see also id.* at 54-55 (TAC ¶¶ 140-44, 147-50); *id.* at 58-59 (TAC ¶¶ 168-70).

The notion that Line 5 falls short of some safety standard imposed by the common law of public nuisance, and that Line 5 is insufficiently safe to continue to operate on the Reservation, thus lies at the heart of the claims.  The Band even expressly asserts that its "regulatory authority applies to the question whether the pipeline can appropriately and safely continue to be sited" at "the Bad River meander and in the vicinity of the Denomie Creek tributary."  *Id.* at 58 (TAC ¶ 170). Regardless of whether the Band would possess such "regulatory authority" in the absence of the PSA, the PSA makes clear that Congress sought to occupy the field and vest all such authority in a single federal agency.  Federal law thus forecloses the Band's attempt to usurp PHMSA's regulatory role by seeking to force closure of the pipeline.  Enbridge is entitled to judgment on Counts 1, 2, and 5.

In Count 4, the Band seeks "an order of ejectment … requiring Enbridge to cease the operation of Line 5 on the Reservation …."  Dkt. 123 at 6-7; *see also id.* at 56-57 (TAC ¶¶ 160-63).  By its own admission, the Band refused to renew Enbridge's easement due to concerns over pipeline safety.  When "Enbridge sought to obtain new easements," "[t]he Band insisted instead on receiving from Enbridge detailed environmental, pipeline safety, oil spill, and emergency response information pertaining to Line 5 as a condition of moving forward with renewal negotiations."  Dkt. 167 at 7 (¶¶ 50-51).  The Band then purportedly determined that "Enbridge's information was deficient and contained critical omissions," then subsequently "enacted a Resolution expressing its grave concerns … and directing Band staff to instead take steps to ensure the removal of the pipeline."  *Id.* at 8 (¶¶ 54-55).  This is precisely the sort of action that Congress expected PHMSA to perform where it deemed appropriate.  The Band thus sought to establish itself as safety regulator for the portion of Line 5 that crosses the Reservation, contrary to Congress's intent that interstate pipeline safety regulation should be committed to a single expert

federal agency and should be uniform across the United States.  PHMSA "is vested with ***exclusive jurisdiction*** to issue an emergency order requiring pipeline closure" based on safety concerns.  *See Michigan v. Enbridge Energy, LP*, 2021 WL 5355511, at *6 (emphasis added).  Here, PHMSA has not issued an order stating that Line 5 has an unsafe condition or practice, or a combination of unsafe conditions or practices, that constitute or is causing an imminent hazard at any location on the Bad River Reservation.  The Band's ejectment claim (Count 4), which seeks to "requir[e] pipeline closure," is therefore foreclosed by Congress' exclusive grant of authority to PHMSA over closure decisions.

### 2.     Obstacle preemption.

The same result follows if the issue is analyzed in terms of obstacle preemption rather than field preemption.  As the supreme law of the land, federal law preempts the law of another domestic authority where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *English*, 496 U.S. at 79 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Congress's goal in enacting the PSA was to ensure that interstate pipelines would be governed by *uniform* national safety standards, not standards that differed across the many jurisdictions, tribal or otherwise, crossed by the pipeline as it traverses the country.  The Band's attempt to subject Line 5 to its own set of safety standards on the Reservation, and to apply those standards so as to seek closure of the pipeline, poses an unmistakable obstacle to the congressional goal of uniformity and is thus foreclosed.

9

### 3.    Displacement of federal common law.

The Band asserts that five of its six counts arise under federal common law.  *See* Dkt. 123 at 54-59.[6]  But the PSA forecloses any attempt to regulate interstate pipeline safety under the guise of federal common lawmaking.[7]  Indeed, establishing that a federal statute displaces federal common law is easier than establishing that it preempts state law, as the Supreme Court explained in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011).  "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law."  *Id.* at 423 (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981)).  That is because "'[d]ue regard for the presuppositions of our embracing federal system … as a promoter of democracy' does not enter the calculus, for it is primarily the office of Congress, not the federal courts, to prescribe national policy."  *Id.* at 423-24 (quoting *Milwaukee*, 451 U.S. at 316).  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue."  *Id.* at 424.

It is beyond question that the PSA "speaks directly" to questions of interstate pipeline safety.  The PSA thus displaces any use of federal common law to provide judge-made answers to such questions.  Even assuming that a court could otherwise have determined whether Line 5 poses an excessive risk of a release under the common law of public nuisance, the existence of the PSA takes such claims and any related remedy of forcing pipeline closure off the table.  In passing the

---

[6] The exception is Count 2, for public nuisance under Wisconsin law.  That state-law claim is preempted by the PSA for the reasons given above, including the express federal preemption of state pipeline safety standards for interstate pipelines.  *See* 49 U.S.C. § 60104(c).

[7] In its opposition to the Band's summary judgment motion, Enbridge addressed the PSA arguments with respect to the Band's trespass count (Count 3).  Dkt. 207 at 73-82.

PSA, "Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert federal agency." *Milwaukee*, 451 U.S. at 317.

The Supreme Court reached the same conclusion under similar circumstances in both *Milwaukee* and *American Electric Power*. In *Milwaukee*, that city pursued "a claim for abatement of a nuisance caused by interstate water pollution" allegedly emanating from Illinois and Michigan. *Id.* at 307. In 1972, the Supreme Court had "recognized the existence of a federal 'common law'" claim. *Id.* Shortly thereafter, however, "Congress enacted the Federal Water Pollution Control Act Amendments of 1972." *Id.* Applying the presumption "that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law," the Court held that the 1972 amendments displaced the previously recognized common-law cause of action. *Id.* at 317. "Congress' intent in enacting the Amendments was clearly to establish an all-encompassing program of water pollution regulation." *Id.* at 318; *see also id.* ("The 'major purpose' of the Amendments was 'to establish a *comprehensive* long-range policy for the elimination of water pollution.'" (quoting S. Rep. No. 92-414, at 95)). "The establishment of such a self-consciously comprehensive program by Congress … strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Id.* at 319.

Similarly, the Court held in *American Electric Power* that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." 564 U.S. at 424. The Clean Air Act charges the EPA with regulating such emissions. *See id.* The plaintiffs argued that the Clean Air Act did not

11

displace federal common law because the EPA had not actually exercised that authority, but the Court rejected that argument. *See id.* at 425-26. "The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants; the delegation is what displaces federal common law." *Id.* at 426. Even if the EPA declined to impose limits on those emissions, "the federal courts would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination." *Id.*

 *Milwaukee* and *American Electric Power* foreclose the Band's attempted use of federal common law to regulate interstate pipeline safety. Congress has spoken directly to that issue through the PSA and has delegated authority to the expert federal regulatory agency, including authority to address the continued operation of pipelines deemed to be an imminent hazard. That delegation displaces federal common law. While the Band may be dissatisfied with PHMSA's regulation of Line 5, it cannot circumvent congressional delegation to PHMSA by recourse to federal common law.

 To the extent Counts 1, 2, 4 and 5 are based on impacts from a *future* spill to waterways, those claims would be displaced by the Clean Water Act ("CWA"). The potentially impacted waterbodies listed by the Band—the Bad River, White River, Kakagon River, the Kakagon-Bad River Sloughs, and Lake Superior—are all jurisdictional waters under the CWA.[8] The CWA

---

[8] All "waters of the United States" are subject to federal jurisdiction under the CWA. *See* 33 U.S.C. § 1342 (regulating discharges of pollutants from "point sources" to "waters of the United States"). "Waters of the United States" includes waters that are navigable in fact, as well as interstate waters, certain tributaries, and adjacent wetlands. *See* Current Implementation of Waters of the United States | US EPA(last visited May 6, 2022). The Bad River, White River, and Lake Superior are all navigable waters, and are therefore jurisdictional. *See* USACE, Navigable Waters of the United States within the State of Wisconsin, available at: https://www.mvp.usace.army.mil/Missions/Regulatory/Additional-Information/ (last visited May 6, 2022). In addition, the Kakagon River and Kakagon-Bad River Sloughs are jurisdictional as tributaries and adjacent waterbodies to Lake Superior. For ease of reference, this brief refers to waters subject to the jurisdiction of the Clean Water Act as "jurisdictional waters."

establishes a comprehensive federal regime for regulating discharges of contaminants into the waters of the United States, including an oil discharge from a pipeline. *See* 33 U.S.C. § 1311(a); *see also id.* at § 1321 (addressing federal authority to respond to oil releases from pipelines); *United States v. ExxonMobil Pipeline Co.*, 28 F. Supp. 3d 843 (E.D. Ark. 2014) (applying CWA to discharge from ruptured oil pipeline). That scheme displaces federal common law nuisance claims filed by Indian Tribes challenging alleged releases of pollution sources on the Reservation. *E.g., Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012). Because Congress has already provided a mechanism for regulating releases into these jurisdictional waters, there is no room for federal courts to craft their own rules under common law. *See City of Milwaukee v. Illinois*, 451 U.S. at 314.

*     *     *

The entire thrust of this action is the Band's contention that Line 5 is unsafe and should therefore be shut down. The United States takes the safety of interstate pipelines like Line 5 seriously and has enacted a comprehensive federal law and created an expert federal agency to ensure that the regulation of interstate pipeline safety is effective, appropriate, and nationally uniform. The comprehensive federal scheme forecloses the Band's attempts to impose safety standards on Line 5 and to apply those standards to force closure, whether through Wisconsin law, tribal law, or federal common law. On this basis alone, Enbridge is entitled to summary judgment on Counts 1, 2, 4, and 5.

## B.    The Band's ejectment count is preempted by the Foreign Affairs Doctrine (Count 4)

In Count 4, the Band pleads a cause of action that it calls ejectment, seeking immediate closure and removal of Line 5 from the Reservation. Dkt. 123 at 56-57 (TAC ¶ 159-63). This count contravenes the federal government's foreign affairs policy, as expressed in a 1977 treaty

13

with Canada.  As such, Count 4 is foreclosed by the Foreign Affairs doctrine.  *E.g. Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1069, 1077 (9th Cir. 2012) (directing district court to dismiss plaintiff's claims as preempted under the Foreign Affairs Doctrine).

To ensure that the United States speaks with one voice in matters of international relations, the Constitution commits those matters to the President and Congress.  *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 401 (2003).  "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power."  *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979); *see, e.g., Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("The Federal Government *** is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties.").  Because Indian tribes are subject to plenary control by Congress, see *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. at 788, it necessarily follows that the power over external affairs is not shared by the Indian Tribes and is instead vested in the national government exclusively.  *See generally United States v. Pink*, 315 U.S. 203, 233 (1942) (explaining that states have no powers over external affairs).

As the Band acknowledges, Line 5 crosses the border between the United States and Canada.  Dkt. 123 at 2-3, 21 (TAC ¶¶ 5, 6, 55-56); FoF at ¶¶ at 2, 4 .  In 1977, the United States and Canada entered into a treaty concerning so-called Transit Pipelines.  *Agreement between the Government of the United States and the Government of Canada concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, TIAS 8720 ("1977 Treaty").  The 1977 Treaty—ratified by President Carter with the advice and consent of the Senate—became part of the "supreme law of the land" under the Supremacy Clause of the U.S. Constitution.  U.S. Const. Art. VI, cl. 2.  The Treaty defines the Transit Pipelines to which it applies as pipelines that transport hydrocarbons

(i.e., energy products) that originate in one nation through the second nation to a destination in the originating nation.  *See* 1977 Treaty, Article 1 (defining "Hydrocarbons in transit" to mean "hydrocarbons transmitted in a "Transit Pipeline" located within the territory of one Party, which hydrocarbons do not originate in the territory of that Party, for delivery to, or for storage before delivery to, the territory of the other Party.").  The U.S. political branches have recognized that Line 5 is within this defined class of pipelines that fall within the 1977 Treaty's protection.[9]

The 1977 Treaty governs the "pipeline" and "all real … property … connected therewith" and restricts measures instituted by a "public authority in the territory of either Party." This broad restriction includes the Band and this Court.  *See* 1977 Treaty, Articles I & II.  In fact, the core purpose of the treaty is to afford Transit Pipelines special protection from governmental interference with the transit of one nation's energy products through the other nation.  The Treaty thus declares: "*[n]o public authority* in the territory of either Party *shall institute any measures …* which are intended to, or *which would have the effect of*, *impeding … or interfering with in any way the transmission of hydrocarbons in transit*."  Art. II(1) (emphasis added).

The Treaty also prescribes a specific procedure for the handling of disputes.  Any dispute "over the [1977 Treaty's] interpretation, application, or operation" shall be settled at the national level through negotiation and, if necessary, international arbitration.  *See* 1977 Treaty, Article IX.

---

[9]      During the Senate hearings prior to its advice and consent, a State Department representative submitted a list of pipelines transiting the United States that would be covered by the Treaty.  That list includes a detailed description of Line 5 and the network of connecting pipelines that originate in Western Canada: "At Superior, Wisconsin, the system divides into two pipelines, one leg following a northeastern route through Michigan and then south to Sarnia, Ontario …."  S. Exec. Rep. No. 95-9, 95th Congress, 1st Session (July 15, 1977), at 40, 80.  Other witnesses testifying before the Senate Committee referred to Line 5 as one of the covered pipelines. *See id.* at 58 (prepared statement of Ashland Oil executive) ("The Lakehead system is routed through the states of Minnesota, Wisconsin, and Michigan in its principal route to the Sarnia-Toronto area.").

Thus, as reflected in the 1977 Treaty, the United States' express federal policy is to protect the uninterrupted flow of hydrocarbons between the United States and Canada and to funnel disagreements through the bilateral dispute resolution process.

The United States and Canada are now actively engaged in the 1977 Treaty's Article IX bilateral dispute resolution process. *See Michigan v. Enbridge Energy, LP*, 2021 WL 5355511, at *2. On October 4, 2021, the Government of Canada invoked the 1977 Treaty's dispute resolution provision in direct response to an order by the Governor of Michigan to shut down the portion of Line 5 traversing the bottomlands of the Straits of Mackinac. *See id*. The Article IX negotiations are currently ongoing. *See* FoF at ¶ 6. As the Government of Canada explained, "Canada's decision to invoke Article IX reflects the importance of this matter to Canada's energy security and its relationship with the United States."[10] "For a domestic court in the United States to enforce a shutdown of the Line 5 pipeline while Canada and the United States are engaged in discussions under the 1977 Treaty … would undermine confidence in the reciprocal commitments that provide the legal framework for the US-Canada relationship."[11] Last year, the Trudeau Administration stated that keeping Line 5 open was "non-negotiable."[12] One year later, on May 6, 2022, the Trudeau Administration reiterated that position: "The continued operation of Line 5 is non-

---

[10] Government of Canada Brief of Amicus Curiae Brief, filed in *Enbridge Energy Ltd. v. Whitmer*, No. 1:20-cv-01131-JTN-RSK, ECF No. 70, PageID.513 (filed Apr. 5, 2022).

[11] *Id*. at PageID.497.

[12] Parliament of Canada Committee Report, *Enbridge's Line 5: An Interim Report, Report of the Special Committee on the Economic Relationship between Canada and the United States* at p. 5 (dated April 15, 2021), *available at* https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/report-1/ (last visited May 6, 2022); Financial Post, *Enbridge's Line 5 pipeline is 'non-negotiable,' Trudeau's Government Tells Biden* (Mar. 9, 2021) (quoting the Canadian natural resources minister Seamus O'Regan as saying: "We have signalled very clearly that this is non-negotiable ….We have made our case extremely clear directly to the President of the United States."), *available at* https://financialpost.com/commodities/energy/oil-gas/enbridges-great-lakes-pipeline-is-non-negotiable-for-canada (last visited May 6, 2022).

negotiable * * * We will take appropriate steps to ensure the continued safe operation of this critical infrastructure."[13]

Prime Minister Trudeau himself has made clear that Line 5 is critical to Canada's energy security.  In remarks delivered to the House of Commons on May 4, 2022, Prime Minister Trudeau explained that his Administration has taken strong steps to defend Line 5 and that he had raised Line 5 directly with President Biden:

> Line 5 is critical infrastructure for Canada and the United States.  We have taken strong steps to defend Line 5 including formally invoking the Bilateral Pipeline Treaty.  I have raised Line 5 directly with President Biden, where I have emphasized its importance to the Canadian economy and North American energy security.  Ambassador Hillman and other members of our Government continue to raise Line 5 with U.S. officials.  We will always stand up for Canadian workers and Canadian industry.[14]

The Foreign Affairs doctrine preempts domestic public authorities from "interfer[ing] with the National Government's conduct of foreign relations."  *Garamendi*, 539 U.S. at 401.  In *Garamendi*, the Court struck down a California law that "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments to resolve claims against European companies arising out of World War II."  *Id.* at 424.  Here, the Band's attempted interference with the continued operation of Line 5 must yield to the Federal Government's express policy that the operation of international pipelines between the United States and Canada, including Line 5, must be maintained unimpeded, with any disputes to be

---

[13] Toronto Star, *Still 'non-negotiable:' Canada's natural resources minister redraws line on Line 5* May 6, 2022*), available at* https://www.thestar.com/business/2022/05/06/still-non-negotiable-canadas-natural-resources-minister-redraws-line-on-line-5.html (last visited May 6, 2022).

[14] The Prime Minister's remarks are available on the Canadian Parliamentary steaming website: https://parlvu.parl.gc.ca/Harmony/en/PowerBrowser/PowerBrowserV2/20220504/-1/37009?mediaStartTime=20220504150615&mediaEndTime=20220504150950&viewMode=3&globalStreamId=29 (last visited May 5, 2022).  The Prime Minister's statement quoted above appears at 15:09:14 to 15:09:46 of the video.

resolved bilaterally between those two countries.  Accordingly, Enbridge is entitled to judgment as a matter of law on Count 4.  *See* Dkt. 207 at 104-130 (in opposing Band's motion for partial summary judgment, Enbridge explains that the Band's request for injunctive relief should be denied due to weighty foreign affairs interests and significant harm to innocent third parties from any Line 5 closure).

Even assuming the Band's counts are not displaced or preempted by the federal regulatory regimes and/or the Foreign Affairs Doctrine, Enbridge is entitled to summary judgment on these claims on alternative grounds, discussed next.  *See* Section II, *supra* (explaining additional legal defects in Counts 4 and 5); Section III, *supra* (explaining additional legal defects in Counts 1 and 2).

## II.    The Band's ejectment and regulatory authority counts fail as a matter of law (Counts 4 and 5)

The Band's Count 4 for ejectment duplicates the trespass claim.  In both counts, the Band allege that the 1993 easements have expired, that the Band has refused to give Enbridge consent to continue operating its pipeline on the relevant parcels, and that Enbridge's continued operations on the Reservation constitute wrongful use and possession.  *See* Dkt. 123 at 55-56 (TAC ¶¶ 153-163).  Although styled as a separate count, Band's ejectment count merely rephrases the same allegations as in the trespass count.  Furthermore, the Band's trespass count seeks ejectment as a remedy.  *See id.* at 56 (TAC ¶ 158); *see id.* at 60.  As a result, the ejectment count is redundant and should be dismissed with prejudice.  *See Borzych v. Frank*, No. 06-C-475-C, 2006 WL 3254497, at *8 (W.D. Wis. Nov. 9, 2006) (dismissing an equal protection claim as "simply a repackaging" of First Amendment claims since it relies on the same operative facts); *Brooks Jay Transp., Inc. v. FedEx Ground Package Sys., Inc*., No. 17-CV-084-WMC, 2017 WL 5136014, at *3 (W.D. Wis. Nov. 3, 2017) (dismissing a breach of oral contract claim as duplicative because "the allegations

18

supporting [it] are the same allegations as those underlying the breach of contract claim based on the Operating Agreement"); *Horstman v. Cnty. of Dupage*, 284 F.Supp.2d 1125, 1129 (N.D. Ill. 2003) (dismissing duplicative claims that arise out of the same facts and seek the same remedy); *Kirkland & Ellis v. CMI Corp.*, No. 95 C 7457, 1996 WL 559951, at *9 (N.D. Ill. Sept. 30, 1996) (dismissing count that duplicates the same operative facts); *Lynch v. Three Hammer Const., Inc.*, No. 89 C 20071, 1990 WL 304248, at *3 (N.D. Ill. May 9, 1990) (dismissing gross negligence count that seeks no additional or different relief than the negligence count).

The Band's Count 5 similarly pleads the same operative facts and injury as the trespass, ejectment, and nuisance counts. Styled as "Band regulatory authority—federal law," Count 5 alleges that the Band has the sovereign right to exclude non-members from the reservation, that the 1993 easements have expired, and that a release of crude oil or natural gas liquids from Line 5 on the Reservation threatens the Band's treaty protected rights. Dkt. 123 at 57-59 (TAC ¶¶ 165-70). This count merely rephrases the same operative facts as the trespass, ejectment and nuisance counts and seeks the same remedy. *See* Dkt. 123 at 60. Moreover, Count 5 is not cognizable as a separate cause of action. The Band has not identified any case that recognizes Tribal "regulatory authority" as a cause of action under federal common law or what the elements for such federal common law claim might be. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 741 (2004) (quotations omitted). Accordingly, Count 5 should be dismissed as redundant and not a valid separate cause of action. *See Barry-Wehmiller Co. v. Marschke*, No. 09-CV-674-BBC, 2010 WL 693630, at *1 (W.D. Wis. Feb. 23, 2010) (noting that a claim that is "a mirror image [of another claim] or completely redundant" is amenable to dismissal (alteration original) (quoting *U.S. Bank Nat'l Ass'n v. Alliant Energy Resources, Inc.*,

No. 09–cv–78–bbc, 2009 WL 1850813, *3 (W.D. Wis. June 26, 2009))); *Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 778 (N.D. Ill. 2008) (dismissing declaratory judgment count because it "fail[ed] to add anything that will not be decided by the other pending counts.").

## III.   The Band's public nuisance claims fails as a matter of law

### A.   The Band does not have standing to sue for a public nuisance under Wisconsin law (Count 2)

Count 2 of the Band's complaint is grounded in Wisconsin state law. *See* Dkt. 123 at ¶¶ 20, 146–51. The Band, however, does not have standing to sue for a public nuisance under Wisconsin law. Entitled "Jurisdiction over Nuisances," Wisconsin Statutes section 823.01 identifies parties eligible to maintain a public nuisance action:  "[a]ny person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance . . . ." Wis. Stat. § 823.01.

Section 823.01's list of eligible plaintiffs conspicuously omits any mention of Indian tribes. As for political entities, the Legislature took a surgical approach, specifically identifying counties, cities, villages, and towns—but not, for instance, school districts. *See* Wis. Stat. ch. 120 (setting forth authority of public school districts).[15]  The Legislature could have included Indian tribes in that list, but it chose not to. And while section 823.01 also refers to a "person," that term is typically construed to exclude tribes. *E.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("[I]n common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it."); *Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 827 (7th Cir. 2016).  Because section 823.01 does not mention Indian tribes, they are excluded from the statute's coverage. *See FAS, LLC v. Town of Bass Lake*, 733 N.W.2d 287 ¶ 27 (2007) ("Under the doctrine of *expressio unius est exclusio alterius*, the express mention of one

---

[15] The State, for its part, gets its own statutory section. *See* Wis. Stat. § 823.02.

matter excludes other similar matters [that are] not mentioned." (citation and marks omitted))).

The Band therefore lacks standing to bring public-nuisance claim under state law.

**B.     The Band fails to establish the necessary elements of its nuisance claims (Counts 1 and 2)**

Counts 1 and 2 fail as a matter of law because the Band cannot establish the necessary elements of the public nuisance actions.  The Band complains about hypothetical exposure of Line 5 through exposure at the Bad River meander on the Reservation.  However, the Band has refused Enbridge repeated requests to physically access the site at issue (known as "the meander") to conduct preventive maintenance to remedy the hypothetical future exposure there about which the Band complains.  *See* FoF ¶ 8.  As a matter of law, there is no imminent or unreasonable interference with public safety and health on the Reservation.

Public nuisance is defined similarly under Wisconsin law and federal common law, as Wisconsin closely follows the Restatement (Second) of Torts, *see Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2002 WI 80, ¶ 21 n.5, 254 Wis. 2d 77, and federal courts have essentially adopted the Restatement, *see Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) (*Asian Carp II*).  Public nuisance has at least three elements:  First, there must be unreasonable interference with public rights, health, safety, or welfare.  *See Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶ 28, 277 Wis. 2d 635, 691 N.W.2d 658; *Asian Carp II*, 758 F.3d at 900.  Second, if not presently occurring, interrereference must be imminent or certain to occur.  *See Krueger v. AllEnergy Hixton, LLC*, 2018 WI App 60, ¶ 14, 29, 384 Wis. 2d 127, 918 N.W.2d 458; *Asian Carp II*, 758 F.3d at 905.  Third, the defendant must cause the nuisance.  *See City of Milwaukee v. NL Industries*, 2008 WI App 181, ¶¶ 21–23, 315 Wis. 2d 443, 762 N.W.2d 757; *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 771 (7th Cir. 2011) (*Asian Carp I*).

In this case, the second element is not satisfied as a matter of law because, by the Band's own admission, the risk of any release is not imminent or certain.  Over the 65 years that Line 5 has been operating, there has never been a release on the Reservation.  *See* FoF ¶ 9.  Line 5 currently is buried in this area and is not exposed to the Bad River.  *See* FoF ¶¶ 7, 10.  There is no impending or imminent risk that Line 5 will rupture or release in the Bad River or on the Reservation.  *See* FoF ¶ 10.  The Band has alleged that the Band "anticipate[s] that the Bad River will reach the pipeline within the next two to five years …."  Dkt. 123 at 5, 37 (TAC ¶¶ 14, 96).  While the Band asserts that there is a risk of exposure within the next five years, the Band's expert has opined that the probability of the pipeline becoming exposed in any single year is one percent (1%).  To be clear, Enbridge does not agree with the Band's position that pipeline operations at the meander (or elsewhere on the Reservation) present a safety risk.  *See* FoF ¶ 10.  Nevertheless, for purposes of this motion only, it is clear that the Band's nuisance claim must fail because a period of "within five years" is distant, not imminent.[16]

Moreover, the alleged harm is contingent upon events that are not certain to occur, and that are easily preventable through the maintenance Enbridge has proposed to conduct.  According to the Band, *if* the bank of the Bad River erodes in the vicinity of Line 5, and *if* Line 5 is exposed, and *if* Line 5 is undermined or "spanned" so that it is unsupported for a significant distance, and *if*

---

[16] An imminent threat must be "about to happen" or "urgent."  *See* Imminent, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "imminent" as "threatening to occur immediately," "dangerously impending," or "[a]bout to take place").  Although there are not many federal common law cases concerning public nuisances, this requirement that a nuisance be imminent to be actionable is independently derivable from Article III standing requirements. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 226 (2003) (finding that a senator's challenge to the Bipartisan Campaign Reform Act of 2002, which he alleged would injury him in five years when he intended to seek reelection, was "too remote temporally to satisfy Article III standing"), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

the Bad River then makes a "cutoff" so that water flows perpendicular to the Line, then Line 5 *could* rupture *if* the river causes "vortex-induced vibration" and *if* these vibrations then cause "a complete severance of the pipeline." Dkt. 123 at 37-38 (TAC ¶¶ 98–101). Thus, under the Band's own theory and evidence, the alleged interference is speculative and not imminent or certain to occur—including because each and every one of these events are readily preventable. Enbridge has in fact proposed preventative erosion control maintenance or other means to address the Band's meander concerns, and the Band has consistently barred Enbridge from moving forward with any work at the meander. *See* FoF at ¶ 8.

The Wisconsin Supreme Court has held that, "[w]hile a court of equity may enjoin a threatened or anticipated nuisance, public or private, it should do so only where it clearly appears that a nuisance will *necessarily result* from the contemplated act or thing which it is sought to enjoin." *Wergin v. Voss*, 179 Wis. 603, 192 N.W. 51, 53 (1923) (emphasis added). *See Krueger*, 2018 WI App 60, ¶¶ 29–30 (interpreting *Wergin* to require that a defendant "necessarily" or "certainly" create a private nuisance). There is simply no such certainty or necessity here. Rather, the Band's alleged, hypothetical causal chain has many links, any one of which is uncertain to occur. Indeed, in *Krueger*, the Wisconsin Court of Appeals dismissed a private nuisance claim, which also requires certainty of interference, because the plaintiff advanced only a "general and vague allegation as to what frac sand mines in general are 'known to' do." 2018 WI App 60, ¶ 37.[17]

---

[17] *See also Krueger*, 2018 WI App 60, ¶ 20("The mere possibility of a future nuisance and future resulting harm will not suffice to justify a court's intervention."); *In re Weinhold*, 347 B.R. 887, 895–96 (Bankr. E.D. Wis. 2006) ("Where injuries are simply too remote and speculative, they cannot support a cause of action in nuisance."); *Stearns v. State Comm. on Water Pollution*, 274 Wis. 101, 79 N.W.2d 241, 245 (1956) (affirming denial of injunctive relief where allegations that diversion of waste water would create an "algal nuisance" in river were nothing more than "imaginary conditions" that were "based on speculation"); *State v. Zawistowski*, 2008 WI App 51,

Under federal common law, the Band's public nuisance claim fails because the alleged anticipated interference with public rights, health, safety, or welfare by a Line 5 rupture is not imminent, even if it were certain to occur.  In *Asian Carp II*, the Seventh Circuit upheld the dismissal of a public nuisance claim against the Army Corps of Engineers and a water district for allegedly operating a waterway system in such a way as to threaten the release of Asian carp into the Great Lakes.  *See* 758 F.3d at 904–06.  The Court did so because the plaintiffs did "not plausibly allege that the [defendants] are creating a current or *imminent* public nuisance by their manner of operating the [waterway]."  *Id.* at 905 (emphasis added).  "There is a notable lack of factual allegations," the Court explained, "that Asian carp are passing or *are about to pass* the barriers that the Corps has established, and the complaint does not plausibly allege that the Corps cannot or will not respond to *more urgent threats* if and when they arise."  *Id.* (emphasis added).

In addition to not satisfying the second element of the cause of action, the Band also fails to satisfy the first and third elements.  A public nuisance claim is not meant to address a defendant's *unwanted presence* but only an unreasonable interference with public rights, health, safety, or welfare.  If the latter is adequately addressed by other solutions, such as those Enbridge has offered, then Enbridge's continued presence on the Reservation after decades of such presence on the Reservation is, by itself, not an actionable basis for a public nuisance claim.  In *Asian Carp II*, for example, the Seventh Circuit noted that the plaintiffs did not allege that the waterway itself was a nuisance but "that the *manner* in which defendants are operating the [waterway] creates a public nuisance."  758 F.3d at 904.  Here, the Band claims that "Enbridge's continued use of Line 5 …

---

¶ 15, 309 Wis. 2d 233, 747 N.W.2d 527 ("'probable or contingent' injury is not sufficient" to issue an injunction to prevent a future nuisance) (quoting *Wergin*, 192 N.W. at 51).

*under these circumstances* presents a grave threat of a rupture." Dkt. 123 at 54, 55 (TAC ¶¶ 143, 150) (emphasis added). But "these circumstances" are due to *the Band's* actions, not Enbridge's.

On at least nine occasions, Enbridge has submitted applications to the Band to either further protect the pipeline by lowering it to eliminate the alleged threat or to take other remedial measures that would address the Band's erosion concerns. *See* FOF at ¶ 8. Each time, the Band has refused, with the consequence that Enbridge has been unable to seek the required permitting for its proposed remedial actions. *See* FOF at ¶ 8.[18] Enbridge stands ready to address the potential exposure at the meander, thereby eliminating the alleged risk of rupture relied upon by the Band's expert. FOF at ¶ 8. Under these circumstances, Line 5's operation cannot be an unreasonable interference with the Band's rights. *See Asian Carp II*, 758 F.3d at 904 ("The manner of operation … involves the steps that the Corps is taking and has already taken to prevent the carp from passing through the CAWS to Lake Michigan …."). Thus, like the plaintiffs in *Asian Carp II*, the Band has not made an "unusually strong showing" for its insistence on a particular solution, and the Court should refuse to exercise its discretion to enjoin Enbridge from continuing to operate Line 5. If the nuisance can be redressed by simpler means like the work that Enbridge wants to do, then the Court should not order a costly shutdown based on the Band's nuisance allegations.[19]

---

[18] Under the CWA, states are responsible for administering certain aspects of the CWA within their regulatory jurisdiction, and the EPA is authorized to treat Indian tribes as states. Under the EPA's Tribal Authority Rule, a Tribe with "treatment as state" status may regulate water pollution within the exterior boundaries of its reservation. *See Michigan v. EPA*, 268 F.3d 1075, 1077 (D.C. Cir. 2001). The EPA has granted the Band "treatment as state" status. *See* https://www.epa.gov/tribal/tribes-approved-treatment-state-tas (last visited May 6, 2022). Thus, the Band acts with the same powers as a state would in considering Enbridge's remediation applications.

[19] *See* Dkt. 207 at 104-130 (in opposing Band's motion for partial summary judgment, Enbridge explains that the Band's request for injunctive relief should be denied due to weighty foreign affairs interests and significant harm to innocent third parties from any Line 5 closure).

## CONCLUSION

This Court should grant summary judgment for Enbridge on Counts 1, 2, 4, and 5 of the

Third Amended Complaint.

Dated this 6th day of May, 2022                    Respectfully submitted,

/s/ David H. Coburn                            /s/ David L. Feinberg
David H. Coburn                                Michael C. Davis
STEPTOE & JOHNSON LLP                          David L. Feinberg
1330 Connecticut Avenue, NW                    Justin B. Nemeroff
Washington, DC 20036-1795                      VENABLE LLP
(202) 429-8063                                 600 Massachusetts Ave., NW
dcoburn@steptoe.com                            Washington, DC 20001
                                               (202) 344-8278
                                               MCDavis@venable.com
                                               DLFeinberg@venable.com
                                               JBNemeroff@venable.com

                                               /s/ Joseph S. Diedrich
                                               Eric M. McLeod
                                               Joseph S. Diedrich
                                               HUSCH BLACKWELL LLP
                                               33 East Main Street, Suite 300
                                               Madison, WI 53701-1379
                                               (608) 255-4440
                                               eric.mcleod@huschblackwell.com
                                               joseph.diedrich@huschblackwell.com

*Counsel for Enbridge Energy Company, Inc., and*
*Enbridge Energy, Limited Partnership*

26

**CERTIFICATE OF SERVICE**

I certify that on May 6, 2022, I served the foregoing document on all counsel of record using the Court's ECF system.

/s/ Joseph S. Diedrich
Joseph S. Diedrich

27