**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

              *Plaintiff*,

v.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

              *Defendants*.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

              *Counter-Plaintiffs*,

v.

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION and NAOMI TILLISON,
in her official capacity,

              *Counter-Defendants*.

Case No. 3:19-cv-00602-wmc

Judge William M. Conley
Magistrate Judge Stephen L. Crocker

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA
INDIANS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………...i

INTRODUCTION………………………………………………………………………...1

ARGUMENT………………………………………………………………………………...1

I.   Enbridge's Preemption Arguments under the Pipeline Safety Act Fail as a
     Matter of Law……………………………………………………………………….…1

     A.   Federal Law Does Not Preempt Federal Law………..……………………………1

     B.   The Band's Claims Fall Well Outside the Preemptive Scope of the PSA……...…...2

          1.   The Band is not a "State authority."……………………………….…....2

          2.   The Band has not adopted any "safety standards" for Enbridge to
               follow……………………………………………………………….…......2

          3.   The PSA expressly preserves the Band's claims from its preemptive
               reach……………………………………………………………….………7

          4.   The Band's ejectment claim is not preempted by PHMSA's emergency
               order authority…………………………………………………………...8

II.  Enbridge's Displacement Arguments Fail as a Matter of Law…………………………...9

III. The Band's Ejectment Claim is Not Preempted by the Foreign Affairs
     Doctrine………………………………………………………………………………13

IV.  The Band's Ejectment and Regulatory Authority Counts Are Not Subject
      to Dismissal…………………………………………………………………………17

     A.   The Band Has Pled a Distinct, Viable Ejectment Count……………………..…....17

     B.   The Band's Regulatory Account Can Be Held in Abeyance as It Is Not
          Presently Ripe……………....…………………………....………………….…......19

V.   The Band Has Standing to Bring Its State Law Nuisance Claim...……………………20

VI.  Genuine Issues of Material Fact Exist as to the Band's Public Nuisance Claim………21

     A.   Genuine Issues of Fact Exist as to Whether the Risk at the Meander is
          "Imminent" Under the Governing Law of Public Nuisance……………………....22

B. Enbridge's Proposed Mitigation Measures Are Legally Infirm, and Genuine Issues of Material Fact Exist as to Their Viability....……………………………26

 1. Enbridge's abatement proposals would place Enbridge in trespass……….27

 2. Genuine issues of material fact exist as to whether Enbridge's abatement proposals are viable…………....………………….……....…31

CONCLUSION………………………………………………………………………32

# TABLE OF AUTHORITIES

**Cases**

*Air France v. Saks*, 470 U.S. 392 (1985) ……………………………………………………..16

*American Electric Power Company, Inc. v. Connecticut*, 564 U.S. 410 (2011) …………..…10, 11

*American Energy Corp. v. Texas Eastern Transmission, LP*, 701 F. Supp. 2d 921
(S.D. Ohio 2010) ……………………………………………………….…………….………8

*American Insurance Association v. Garamendi*, 539 U.S. 396 (2003) …………………….....14, 15

*Baker v. IBP, Inc.*, 357 F.3d 685 (7th Cir. 2004) …………………………………………………1

*Berry v. Wisconsin Central Ltd.*, 21-cv-220-wmc, 2022 WL 1451635
(W.D. Wis. May 9, 2022) …………………………………………………………………...1

*Bertrang v. City of Mondovi*, 17-cv-918-bbc, 2018 WL 3978109
(W.D. Wis. Aug. 20, 2018) ……………………………………………………….………18

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ……………………….……………………...19

*Brooks Jay Transportation, Inc. v. FedEx Ground Package System, Inc.*,
17-cv-084-wmc, 2017 WL 5136014 (W.D. Wis. Nov. 3, 2017) ………….……………….……18

*Cheverez v. Plains All American Pipeline, LP*, Case No. CV15-4113 PSG (JEMx),
2016 WL 4771883 (C.D. Cal. Mar. 4, 2016) ……………………………………..……7

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981) …………………….……10

*CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993) …………………..……….....2

*Enbridge Energy, Ltd. Partnership v. Town of Lima*, 13-cv-187-bbc,
2013 WL 12109106 (W.D. Wis. Apr. 4, 2013) ………………………………….……..……3

*Exxon Shipping Company v. Baker*, 554 U.S. 471 (2008) …………………………………12

*Geier v. American Honda Motor Company, Inc.*, 529 U.S. 861 (2000) ………………………7

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785 (7th Cir. 2013) …….……..6

*Grygiel v. Monches Fish & Game Club, Inc.*, 787 N.W.2d 6 (Wis. 2010) ………………...……31

*Joy v. City of St. Louis*, 201 U.S. 332 (1906) ………………………………..……17, 19

*Kasten v. Saint-Gobain Performance Plastics Corp.*, No. 07-cv-449-jcs,
2007 WL 5414927 (W.D. Wis. Dec. 7, 2007) ……………………………….…………18

*Kinley Corp. v. Iowa Utilities Board*, 999 F.2d 354 (8th Cir. 1993) ……………………….………4

*Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496 (7th Cir. 2014) ………………………….………20

*Matter of Enbridge Energy, Ltd. Partnership*, 964 N.W.2d 173
 (Minn. Ct. App. 2021) …………………………………………………………………….……5, 6

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) …………………………………………….………13

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) ……………………………….………..13, 14

*Michigan v. Enbridge Energy, Ltd. Partnership*, Case No. 1:20-cv-1142,
2021 WL 5355511 (W.D. Mich. Nov. 16, 2021) ………………………………………….……………..8

*Michigan v. U.S. Army Corps of Engineers*, No. 10-CV-4457,
2010 WL 5018559 (N.D. Ill. Dec. 2, 2010) …………………………………………………………23

*Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011) ………………..*passim*

*Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892 (7th Cir. 2014) ………………...21, 26

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ……………………14

*Native Village of Kivalina v. Exxonmobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ………………..12

*Northern Border Pipeline Company v. Jackson County*, 512 F. Supp. 1261
(D. Minn. 1981) ………………………………………………………………………………..3

*Northern Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin*,
 431 F.3d 1004 (7th Cir. 2005) …………………………………………………………………...4

*Northern Natural Gas Company v. Munns*, 254 F. Supp. 2d 1103
(S.D. Iowa 2003) …………………………………………………………………………………4

*Oil, Chemical & Atomic Workers Local Union 4-750 v. Goree*, CIV. A.
No. 92-4196, 1993 WL 278444 (E.D. La. July 16, 1993) ………………………………………..4

*Oneida Nation v. Village of Hobart*, 968 F.3d 664 (7th Cir. 2020) ………………………………14

*Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722
(7th Cir. 2020) ………………………………………………………………………………...21

*Randolph v. IMBS, Inc.*, 368 F.3d 726 (7th Cir. 2004) ………………………………………...1

*Sattelberg v. United States*, No. 12-cv-898-wmc, 2013 WL 6058955
(W.D. Wis. Nov. 18, 2013) …………………………………………………….…………..17

*Southern California Gas Company v. Occupational Safety & Health Appeals Board*,
67 Cal. Rptr. 2d 892 (1997) …………………………………………………………………4

*Stutler v. Marathon Pipe Line Company*, 998 F. Supp. 968 (S.D. Ind. 1998) …………………8

*Swinomish Indian Tribal Community v. BNSF Railway Co.*, 951 F.3d 1142
(9th Cir. 2020) ………………………………………………………………………………1

*Tenneco Inc. v. Public Service Commission of West Virginia*, 489 F.2d 334
(4th Cir. 1973) ………………………………………………………………………………4

*United States v. Dion*, 476 U.S. 734 (1986) …………………………………………………14

*United States v. Thomas* 151 U.S. 577 (1894) …………………………………………………13

*Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019) …………………………………4

*Wisconsin v. Hitchcock*, 201 U.S. 202 (1906) …………………………………………………13

*Wisz v. Kijakazi*, 20-cv-690-wmc, 2021 WL 2947737 (W.D. Wis. July 14, 2021) ……………19

## Statutes

1 U.S.C. § 1……………………………………………………………………………………7

28 U.S.C. § 1367………………………………………………………………….……………20

33 U.S.C. § 1321(e)(1)………………………………………………………………………12

49 U.S.C. § 60101(a)(17) ……………………………………………….…………....7

49 U.S.C. § 60101(a)(20)……………………………………………………………...2

49 U.S.C. § 60102(a) ………………………………………………………………10

49 U.S.C. § 60102(a)(2) ………………………………………………….………...3

49 U.S.C. § 60104(c) ………………………………………………………………2

49 U.S.C. § 60117(p) ……………………………………………….…………....8

iii

49 U.S.C. § 60117(p)(1) ………………………………………………………...8

49 U.S.C. § 60117(p)(8) ………………………………………………………...8

49 U.S.C. § 60120(c) …………………………………………………………...7, 10

49 U.S.C. § 60121(a) …………………………………………………….......8, 10

49 U.S.C. § 60121(d) …………………………………………………….…..8, 10

1854 Treaty with the Chippewa, 10 Stat. 1109……………………………………13

Energy and Water Development and Related Agencies Appropriations
Act of 2010, Pub. L. No. 111-85, 123 Stat. 2845 (2009) ………………………………..9

Pipeline Safety Act, 49 U.S.C. §§ 60101–60143………………………………...1

**Legislative Materials**

H.R. Rep. No. 90-1390 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3223………………………...7, 10

**Regulatory Materials**

49 C.F.R. § 195.0……………………………………………………………3

49 C.F.R. § 195.112(a) ………………………………………………………...3

49 C.F.R. § 195.118(c) ………………………………………………………...3

49 C.F.R. § 195.206 ……………………………………………………………3

49 C.F.R. § 195.248 ……………………………………………………………3

49 C.F.R. § 195.250 ……………………………………………………….......3

49 C.F.R. § 195.304 ……………………………………………………………3

49 C.F.R. § 195.406(b) ………………………………………………………3

49 C.F.R. § 195.438 ……………………………………………………………3

49 C.F.R. § 195.501(a) ………………………………………………………...3

49 C.F.R. § 195.575(d) ………………………………………………………3

**Other Authorities**

25 Am. Jur. 2d *Ejectment* § 1………………………………………………………….……………7

*Agreement Between the Government of the United States and the Government
of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449,
1977 WL 181731…………………………………………………………….……13, 14, 15, 16

Brief for the United States as Amicus Curiae Supporting Petitioners, *American
Insurance Association v. Garamendi*, 539 U.S. 396 (No. 02-722), 2003 WL 721754………….14

*Enbridge Energy, Ltd. Partnership*, Docket No. PL-9/CN-14-916, Order Granting
Certificate of Need as Modified and Requiring Filings (MPUC Sept. 5, 2018) ………………5

Presidential Permit: *Authorizing Lakehead Pipeline Company, Limited Partnership
to Operate and Maintain a Pipeline at the International Boundary
Line Between the United States and Canada* (Dec. 12, 1991) …………………………………16

Reply Brief of Relators Red Lake Band of Chippewa Indians, White Earth Band
of Ojibwe, Honor the Earth, and the Sierra Club, *In re Application of Enbridge
Energy, Ltd. Partnership*, 964 N.W.2d 173 (Minn. Ct. App. 2021)
(A20-1071, A20-1072, A20-1074, A20-1075, A20-1077), 2021 WL 1587179…………………5

Restatement (Second) of Torts (Am. Law Inst. 1979) ………………………………………..7, 21

U.S. Const. art. VI, cl. 2…………………………………………………………………………13

## INTRODUCTION

Enbridge has moved for summary judgment on the Band's public nuisance and ejectment claims, as well as on the Band's request for a declaratory ruling that Enbridge is subject to the Band's regulatory authority on the Reservation.  Enbridge has failed to establish its entitlement to summary judgment on these claims as a matter of both law and fact.

## ARGUMENT

**I.      Enbridge's Preemption Arguments under the Pipeline Safety Act Fail as a Matter of Law.**

Enbridge contends that the Band's nuisance, ejectment, and regulatory authority claims are preempted by the Pipeline Safety Act, 49 U.S.C. §§ 60101–60143 ("PSA").  Enbridge Br. at 2–12.[1]  The argument suffers from numerous flaws, each of them fatal.

A.      <u>Federal Law Does Not Preempt Federal Law</u>.

The Band's federal nuisance (Count 1), ejectment, and regulatory authority claims sound in federal common law and are grounded in its treaty-guaranteed rights to its Reservation and an array of federal statutes safeguarding those rights.  *See* Third Am. Compl. ("Compl.") (Dkt. 123) (Counts 1, 4–5), ¶¶ 1, 27, 32–33, 39–40, 167.  Enbridge directs its preemption arguments at these counts and in doing so misses the mark entirely because federal statutes including the PSA do not preempt other federal law.  *See*, *e.g.*, *Berry v. Wis. Cent. Ltd.*, 21-cv-220-wmc, 2022 WL 1451635, at *2 (W.D. Wis. May 9, 2022) (Conley, J.) ("[A] federal statute cannot preempt … another federal statute."); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004) (substantially same); *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004) (substantially same); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1153 (9th Cir. 2020)

---

[1] "Enbridge Br." refers to Defendants' Brief in Support of Motion for Partial Summary Judgment (Dkt. 231).

("[F]ederal laws do not 'preempt' treaties.").  Enbridge's contention that "federal law is also supreme in relation to tribal law," Enbridge Br. at 3, is likewise misplaced because the Band has brought no tribal law claims, Compl. (Counts 1–6).

The arguments that follow in Section I.B. are hence relevant to the Band's state law nuisance claim (Count 2), and to Counts 1, 4, and 5 only if the Court disagrees with the Band and determines that preemption can apply to assertions of federal law.

B.    The Band's Claims Fall Well Outside the Preemptive Scope of the PSA.

The Band's claims, including its state law nuisance claim, fall well outside the preemptive scope of the PSA.  Where a statute contains an express preemption clause, "the plain wording of the clause … contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).  The PSA provides: "**Preemption**.—… A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  This and other text of the PSA foreclose Enbridge's preemption arguments.

1.    *The Band is not a "State authority."*

Enbridge nowhere explains how the Band qualifies as a "State authority."  The PSA makes clear that it does not:  "'State' means a State of the United States, the District of Columbia, and Puerto Rico[.]"  49 U.S.C. § 60101(a)(20).

2.    *The Band has not adopted any "safety standards" for Enbridge to follow.*

The PSA prohibits state authorities from adopting pipeline "safety standards."  It instead directs the Secretary of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities," which "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation,

replacement, and maintenance of pipeline facilities[.]"  49 U.S.C. § 60102(a)(2).  The Secretary

has done just that, *see* 49 C.F.R. § 195.0 ("This part prescribes safety standards … for pipeline

facilities used in the transportation of hazardous liquids[.]"), and those standards mirror the

statutory directive in scope and substance:  They set forth largely technical requirements for the

design, installation, and operation of pipelines.[2]

No aspect of the Band's positive law—statutory or regulatory—establishes pipeline

safety standards of this sort, or any other requirement remotely analogous to the standards

promulgated by the Secretary under the PSA.  Accordingly, no aspect of that law is subject to

preemption.  *Compare*, *e.g.*, *Enbridge Energy, Ltd. P'ship v. Town of Lima*, 13-cv-187-bbc, 2013

WL 12109106, at *4 (W.D. Wis. Apr. 4, 2013) ("[B]ecause defendants' road use proposal and

demands are not safety regulations, they do not come within the express preemption provision of

the Pipeline Safety Act."), *with N. Border Pipeline Co. v. Jackson Cty.*, 512 F. Supp. 1261, 1264

(D. Minn. 1981) (county pipeline depth requirement preempted by PSA because "[t]he

---

[2] *See*, *e.g.*, 49 C.F.R. § 195.112(a) ("The pipe must be made of steel of the … type that is able to withstand the internal pressures and external loads and pressures anticipated for the pipeline system."); *id*. § 195.118(c) ("The fitting must be suitable for the intended service and be at least as strong as the pipe[.]"); *id*. § 195.206 ("No pipe or other component may be installed … unless it has been visually inspected at the site of installation to ensure that it is not damaged in a manner that could impair its strength[.]"); *id*. § 195.248 (establishing depth requirements for various categories of pipelines); *id*. § 195.250 ("Any pipe installed underground must have at least 12 inches … of clearance between the outside of the pipe and the extremity of any other underground structure[.]"); *id*. § 195.304 ("The test pressure for each pressure test … must be maintained throughout the part of the system being tested for at least 4 continuous hours at a pressure equal to 125 percent, or more, of the maximum operating pressure[.]"); *id*. § 195.406(b) ("No operator may permit the pressure in a pipeline during surges or other variations from normal operations to exceed 110 percent of the operating pressure limit established under paragraph (a) of this section."); *id*. § 195.438 ("Each operator shall prohibit smoking and open flames in each pump station area … where there is a possibility of the leakage of a flammable hazardous liquid[.]"); *id*. § 195.501(a) (setting forth "the minimum requirements for operator qualification of individuals performing covered tasks on a pipeline facility"); *id*. § 195.575(d) ("If you install an insulating device in an area where a combustible atmosphere is reasonable to foresee, you must take precautions to prevent arcing.").

Department of Transportation is vested with the authority to adopt safety standards; it did so ... and one of those standards is the requirement that the pipe be buried a minimum of 36 inches").

Enbridge's case law is not to the contrary.  The cases finding preemption do so with respect to state efforts to regulate technical design, operation, and maintenance standards of the type covered by the Secretary's regulations.  The Band addressed many of those cases in its reply brief in support of its motion for partial summary judgment, *see* Band Reply Br. at 37–38,[3] and Enbridge's additional cases are to the same effect, discussing the preemptive reach of the PSA with respect to "safety standards" or "regulation."[4]

Rather than identifying a safety standard that the Band has impermissibly sought to impose upon it, Enbridge can only argue that the Band's actions, including the filing of this lawsuit, have been motivated by its concerns about "'a grave threat of [pipeline] rupture.'" Enbridge Br. at 7.  But preemption does not turn on a sovereign's motivations.  *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1905–06 (2019) (preemption turns "on *what* the State did, not *why* it did it"); *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it[.]").

---

[3] "Band Reply Br." refers to the Band's Reply Brief in Support of Its Motion for Partial Summary Judgment and for Summary Judgment on Defendants' Counterclaims (Dkt. 256).

[4] *See*, *e.g.*, *Tenneco Inc. v. Pub. Serv. Comm'n of W. Va.*, 489 F.2d 334, 336 (4th Cir. 1973) ("enforcement of standards regulating" pipelines); *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 359 (8th Cir. 1993) ("safety standards"); *N. Nat. Gas Co. v. Munns*, 254 F. Supp. 2d 1103, 1110 (S.D. Iowa 2003) ("pipeline regulation"); *Oil, Chem. & Atomic Workers Local Union 4-750 v. Goree*, CIV. A. No. 92-4196, 1993 WL 278444, at *2 (E.D. La. July 16, 1993) ("[F]ederal pipeline safety standards preempt any analogous state regulations[.]"); *S. Cal. Gas Co. v. Occupational Safety & Health Appeals Bd.*, 67 Cal. Rptr. 2d 892, 899 (1997) (state preempted "from regulating the design of equipment or its use in the operation or maintenance of interstate natural gas pipelines").

4

Indeed, Enbridge has previously argued—successfully—against a motivation-based preemption standard when doing so suited its interests.  In 2015, Enbridge applied to the Minnesota Public Utilities Commission ("MPUC") for a certificate of need to decommission and relocate portions of its Line 3 pipeline that traverse Minnesota.  *See Matter of Enbridge Energy, Ltd. P'ship*, 964 N.W.2d 173, 184–86 (Minn. Ct. App. 2021).  Among the factors the MPUC had to consider under Minnesota law in ruling upon the rerouting of the pipeline were the consequences for "the natural and socioeconomic environments" from "the continued operation of existing Line 3."  *Id*. at 204.  The MPUC did so, concluding that "Line 3 is an aging, deteriorating pipeline" that "is corroding and cracking at an accelerating rate," and that "continued operation of Existing Line 3 … would increase the risk of an oil spill."  *Enbridge Energy, Ltd. P'ship*, Docket No. PL-9/CN-14-916, Order Granting Certificate of Need as Modified and Requiring Filings (MPUC Sept. 5, 2018), at 5, 23 (citing Minn. R. 7853.0130).[5]

Parties in the path of the chosen reroute challenged the MPUC decision in the Minnesota Court of Appeals and argued, echoing Enbridge's arguments here, that the decision was preempted by the PSA because the MPUC had

> found, contrary to federal law, that existing Line 3 poses an unacceptable safety risk … and therefore ordered it to be replaced for safety reasons…. [T]he federal courts have ruled that the field of pipeline safety is subject to field preemption, [and] the PSA contains enforcement mechanisms (not just safety standards) that expressly authorize only the U.S. Department of Transportation to order replacement of an interstate crude oil pipeline for safety reasons[.]

Reply Brief of Relators Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth, and the Sierra Club, *In re Application of Enbridge Energy, Ltd. P'ship*, 964

---

[5] https://efiling.web.commerce.state.mn.us/edockets/searchDocuments.do?method=showPoup&documentId=%7b8077AB65-0000-C610-98DE-18780AEB54E9%7d&documentTitle=20189-146227-01.

N.W.2d 173 (Minn. Ct. App. 2021) (A20-1071, A20-1072, A20-1074, A20-1075, A20-1077)

("*In re Application*"), 2021 WL 1587179, at *20–21.

Enbridge argued against preemption. It urged—in clear contradiction to its arguments to

this Court—that the MPUC "prudently consider[ed] the safety and environmental risks of

allowing existing Line 3 to continue to operate" and "properly evaluated the safety-related

'consequences' to society" of existing Line 3. Brief of Respondent-Intervenor Enbridge Energy,

*In re Application*, 2021 WL 1586927, at *26, *46. It noted that arguments "that federal law

preempts the MPUC from considering safety …. are wrong." *Id.* at *45.

The Minnesota Court of Appeals agreed:

> We easily reject this preemption argument because the commission has not
> adopted any safety standards—for existing Line 3 or for the new pipeline. Rather,
> the commission has *considered* the safety of existing Line 3 in deciding whether
> to grant a certificate of need for replacement Line 3[.]

*Matter of Enbridge*, 964 N.W.2d at 204.

Enbridge was right the first time, and there is no warrant other than its desire for a

different result to justify its complete about-face on preemption principles. Not only should its

new position be disregarded for lack of merit, but adoption of that position is barred by the

doctrine of judicial estoppel as (1) it is clearly inconsistent with a position on which Enbridge

prevailed in a prior proceeding, *id.* at 204–05; (2) its acceptance "would create the perception

that either the first or second court was misled"; and (3) such acceptance would operate to the

Band's disadvantage. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th

Cir. 2013) (citation omitted).

3.   *The PSA expressly preserves the Band's claims from its preemptive reach.*

The Band's public nuisance and ejectment causes of action are torts.[6]  Accordingly, they not only fall well outside the PSA's express preemption provision, but they also fall squarely within its express savings clause, which states, in language that admits of no doubt, that "[t]his chapter does not affect the tort liability of any person."  49 U.S.C. § 60120(c).[7]  That language was "designed to assure that the tort liability of any person existing under common law or any statute will not be relieved by reason of the enactment of this legislation[.]"  H.R. Rep. No. 90-1390 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3223, 3239.

Enbridge nowhere mentions this provision or explains how its preemption arguments can be squared with it, and they cannot be.  The situation is much like that in *Geier v. American Honda Motor Company, Inc.*, 529 U.S. 861, 867–68 (2000).  There, a statute expressly preempting "safety standard[s]" for motor vehicles contained a savings clause preserving common law liability.  The Supreme Court held that the preemption provision did not apply to common law claims because "a reading of the express pre-emption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language[.]"  The same holds true here.  Indeed, courts have consistently interpreted the PSA to allow for such claims even if they implicate pipeline operations.  *See, e.g.*, *Cheverez v. Plains All Am. Pipeline, LP*, Case No. CV15-4113 PSG (JEMx), 2016 WL 4771883, at *7 (C.D. Cal. Mar. 4, 2016) (§ 60120(c) protects tort claims "even where they bear on the operation of pipes otherwise regulated by the PSA"); *Am. Energy Corp. v. Tex. E. Transmission, LP*, 701 F. Supp. 2d 921,

---

[6] *See* 25 Am. Jur. 2d *Ejectment* § 1 ("Ejectment is an action sounding in tort."); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771 (7th Cir. 2011) (looking to Restatement (Second) of Torts for elements of public nuisance).

[7] "Person" includes corporations and other business entities.  49 U.S.C. § 60101(a)(17) (cross-referencing 1 U.S.C. § 1).

931 (S.D. Ohio 2010) ("The PSA does not preempt Ohio property or tort law."); *Stutler v. Marathon Pipe Line Co.*, 998 F. Supp. 968, 970 (S.D. Ind. 1998) (PSA "clearly sets forth Congress' intention not to preempt tort claims").

> ### 4. *The Band's ejectment claim is not preempted by PHMSA's emergency order authority.*

Enbridge further contends that because the Band's ejectment claim is based on "concerns over pipeline safety," Enbridge Br. at 8, and seeks a shutdown of Line 5 on the affected parcels, it is preempted because "PHMSA 'is vested with **exclusive jurisdiction** to issue an emergency order requiring pipeline closure' based on safety concerns," *id.* at 9 (quoting *Michigan v. Enbridge Energy, Ltd. P'ship*, Case No. 1:20-cv-1142, 2021 WL 5355511, at *6 (W.D. Mich. Nov. 16, 2021) (emphasis added by Enbridge)).

Enbridge's misplaced (and newfound) focus on safety motivations is addressed above. In addition, the PSA confirms that PHMSA's authority to take action against pipeline operators is not exclusive.  *See* 49 U.S.C. § 60121 (a), (d) (authorizing private civil actions "for an injunction" against pipeline operators and stating that "[a] remedy under this section is in addition to any other remedies provided by law.  This section does not restrict a right to relief that a person or a class of persons may have under another law or at common law").  Section 60117(p) of the PSA, cited by the district court in *Enbridge Energy*, 2021 WL 5355511, at *6, simply recognizes the authority of the Secretary of Transportation to "impos[e] emergency restrictions … on owners and operators" in response to an imminent hazard "without prior notice or opportunity for a hearing" where the hazard "may occur before the reasonably foreseeable completion date" of proceedings in place for the operator to challenge such an order.  49 U.S.C. § 60117 (p)(1), (8).  The Band's ejectment claim does not seek an emergency order to be accomplished without due process as provided for by that provision, and nothing about that

provision purports to foreclose more conventional suits such as the one brought by the Band here.

## II.     Enbridge's Displacement Arguments Fail as a Matter of Law.

Enbridge contends that the Band's federal claims are displaced by the PSA and the Clean Water Act.  Enbridge hits upon the correct doctrine this time, but its arguments still flounder.  In *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011) ("*Asian Carp I*"), the Seventh Circuit considered a federal common law public nuisance claim brought by five states and a tribe against the Army Corps of Engineers, alleging that a ship canal operated by the Corps threatened the introduction of invasive carp into the Great Lakes.  *Id.* at 768–69.  The Corps predicated its displacement argument on several statutes that directly address the problem of invasive species, including one requiring the Secretary of the Army to "implement measures ... to prevent aquatic nuisance species" from entering the Great Lakes through the canal at issue.  *Id.* at 779 (quoting Energy and Water Development and Related Agencies Appropriations Act of 2010, Pub. L. No. 111-85, § 126, 123 Stat. 2845, 2853 (2009)).  The Circuit held that the existence of these statutes concerning the same subject matter as plaintiffs' common law claims did not suffice to displace them.  The Circuit emphasized instead that "[t]he important displacement question is whether Congress has provided a sufficient legislative solution to the particular interstate nuisance here to warrant a conclusion that this legislation has occupied the field to the exclusion of federal common law."  *Id*. at 777.

Enbridge nowhere establishes that the PSA provides a legislative solution to the Band's claims, let alone one that operates to the exclusion of other remedies.  The Band's federal ejectment claim seeks a solution to Enbridge's unlawful interference with the Band's possessory and sovereign property interests.  *See* Compl. ¶¶ 160–163.  The PSA does not speak to that issue,

much less provide any legislative answer for it.  The Band's federal nuisance claim seeks a solution to the threat posed by the looming exposure of Line 5 at the Bad River meander.  No provision of the PSA provides a legislative solution to that issue.  The PSA says nothing, for example, about how close a river can come to exposing a pipeline, or how much of the pipe must be exposed, or what relief might be had in such circumstances.  The PSA instead presents a targeted answer to one aspect of oil spill prevention—the safety standards that govern pipeline construction and operation, *see* 49 U.S.C. § 60102(a)—and explicitly disclaims any intent to "affect the tort liability of any person," *id*. at § 60120(c), in order "to assure that the tort liability of any person existing under common law or any statute will not be relieved by reason of the enactment of this legislation," H.R. Rep. No. 90-1390.[8]

Ignoring all of this, Enbridge relies on cases finding *different* statutes to have preempted *different* federal common law claims, while offering no more than conclusory generalities as to why they dictate the result here.  Enbridge Br. at 11–12.  They do not.

In *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981), the Court found a federal common law action to abate a nuisance caused by a city's point-source discharges of sewage effluent into Lake Michigan displaced by the Clean Water Act.  It did so because under the Act, "[e]very point source discharge is prohibited unless covered by a permit [which the city had], which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals."  *Id*. at 318 (footnote and emphasis omitted).  The permits incorporated "the specific effluent limitations established by [the] EPA" under the statute, and

---

[8] While Congress provided a private right of action for injunctive relief "for a violation of" the PSA, that right expressly does not displace "a right to relief that a person … may have under another law or at common law."  49 U.S.C. § 60121 (a), (d).  *See Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 425 (2011) (the "reach of remedial provisions is important to [the] determination [of] whether [a] statute displaces federal common law").

thus there was "no question that the problem of effluent limitations has been thoroughly addressed through the administrative scheme established by Congress," and therefore "no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law[.]"  *Id*. at 319–20.  *See also Asian Carp I*, 667 F.3d at 778 (discussing *Milwaukee* and stating that "[t]his permitting requirement brought every potential interstate water polluter within Congress's administrative scheme; any discharge had to be done with the permission of the EPA or a qualifying state agency; and there were enforcement options available when polluters failed to meet the conditions of permits that had been issued").  Nothing about the Band's claims parallels any provisions of the PSA in comparable fashion.

The same is true for *American Electric Power Co. v. Connecticut*, where plaintiffs asserted a federal common law public nuisance claim against power generators "ask[ing] for a decree setting carbon-dioxide emissions for each defendant[.]"  564 U.S. at 415.  The Court found the claim displaced by the Clean Air Act because the Act already provided "a means to seek limits on emissions of carbon dioxide from domestic powerplants" on precisely the same terms as sought by the plaintiffs' public nuisance claim.  *Id*. at 425.  Again, nothing of the sort exists here.

Enbridge's displacement argument under the Clean Water Act ("CWA"), Enbridge Br. at 12–13, fares no better.  Enbridge again fails to explain how Congress has provided a legislative solution occupying the field to the exclusion of the Band's claims.

To the contrary, the Supreme Court has held that "we see no clear indication of congressional intent [in the CWA] to occupy the entire field of pollution remedies," and that "[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486, 489 (2008)

(quotation marks omitted) (rejecting claim that common law punitive damages remedies for an oil spill were "displaced by federal statutes, including the CWA").  In so stating, the Court distinguished *Milwaukee*, "where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA," and thus "threaten[ed] … interference with federal regulatory goals" in a way that the remedies sought in *Exxon Shipping* did not.  554 U.S. at 489 n.7.

Reminiscent of *Exxon Shipping*, Enbridge has failed to establish that the Band's claims would interfere with federal regulatory goals.  It identifies no pollution or spill prevention standards in the CWA that duplicate or conflict with the Band's claim; no administrative means by which either individuals or non-federal sovereigns can seek federal action to prevent a spill; and nothing suggesting that any federal action is meant to be exclusive of action by other governments.  The CWA in fact provides directly to the contrary.  *See* 33 U.S.C. 1321(e)(1).

Displacement is a far more fine-grained analysis than Enbridge would have it be.  It does not suffice to simply point to a federal statute speaking to the same general subject matter as a federal common law suit.  Enbridge's own cited case makes this clear.  *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 856 (9th Cir. 2012) ("The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry" (citing *Asian Carp I*)).  Congress must have instead evinced an intent to provide remedies occupying the field with respect to the particular issues raised.  It has not done so here under either the PSA or the CWA, and Enbridge accordingly is not entitled to summary judgment on displacement grounds.

### III.    The Band's Ejectment Claim Is Not Preempted by the Foreign Affairs Doctrine.

Enbridge contends that the Band's federal ejectment claim is preempted by the foreign

affairs doctrine.  Enbridge Br. at 13–18.  In doing so, it relies heavily on the *Agreement Between*

*the Government of the United States and the Government of Canada Concerning Transit*

*Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Agreement").  The

argument misapprehends both fundamental principles of federal Indian law and the terms of the

Transit Agreement.

The Band's ejectment claim rests on its possessory rights in its land, *see* Compl. ¶ 163,

which are guaranteed by the 1854 Treaty with the Chippewa, 10 Stat. 1109.  That Treaty created

a permanent reservation for the Band with permanent rights of occupancy and possession, *see*

*Wisconsin v. Hitchcock*, 201 U.S. 202, 214–15 (1906); *United States v. Thomas*, 151 U.S. 577,

582 (1894), and is the "'supreme law of the land,'" *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462

(2020) (quoting U.S. Const. art. VI, cl. 2).  With a treaty-guaranteed reservation comes the

"power to exclude non-Indians from the reservation," and "[w]hen a tribe grants a non-Indian the

right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-

Indian as long as the non-Indian complies with the initial conditions of entry."  *Merrion v.*

*Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982).

According to Enbridge, the Transit Agreement overrode (or "preempted," in Enbridge's

parlance) these treaty-guaranteed rights.  But the bar for this Court to so find is exceedingly high,

and Enbridge cannot meet it:

> Congress may abrogate Indian treaty rights, but it must clearly express its intent to
> do so.  There must be "clear evidence that Congress actually considered the
> conflict between its intended action on the one hand and Indian treaty rights on
> the other, and chose to resolve that conflict by abrogating the treaty."

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999) (citations omitted) (quoting *United States v. Dion*, 476 U.S. 734, 740 (1986)).  *See also Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 674 (7th Cir. 2020) ("Congress may exercise this power to break a treaty, but it must do so clearly, not by inference or indirection.").

In *Mille Lacs*, the Court found no clear evidence that a subsequent statute abrogated a treaty right because the statute "makes no mention of Indian treaty rights; it provides no clue that Congress considered the reserved rights of the Chippewa and decided to abrogate those rights when it passed the Act," and there existed no "legislative history describing the effect of the Act on Indian treaty rights."  526 U.S. at 203.  The situation is exactly the same here:  The Transit Agreement contains no mention of tribal treaty rights.  There is absolutely no indication in its text or legislative history that Congress considered the Band's reserved rights (or those of any other federally recognized tribe in the United States) and intended to abrogate them when it approved the Transit Agreement.

Nor does *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), save Enbridge's argument.  *See* Enbridge Br. at 17.  *Garamendi* emphasized "the weakness of the State's interest[.]"  539 U.S. at 425.  Here, by contrast, the Band's treaty-based federal right to exclude trespassers from its land "is a hallmark of Indian sovereignty," *Merrion*, 455 U.S. at 141.  That its preservation is a paramount priority of the United States is rendered beyond doubt by the exacting abrogation standard set forth in *Mille Lacs*.  In *Garamendi*, moreover, the United States filed an amicus brief asserting that the state statutes at issue "directly interfere with the national government's authority over foreign affairs and foreign commerce."  Brief for the United States as Amicus Curiae Supporting Petitioners, *Garamendi*, 539 U.S. 396 (No. 02-722), 2003 WL 721754, at *1.  Here, by contrast, the United States has expressed no such concerns with the

14

Band's claims.  While Enbridge contends that the foreign affairs doctrine assures "that the United States speaks with one voice in matters of international relations," Enbridge Br. at 14, the only voice sounded in its briefing is Canada's.  *See id.* at 16–18.  With all respect to Prime Minister Trudeau and his cabinet ministers, they clearly are not expositors of American foreign policy.  Indeed, because Prime Minister Trudeau has discussed Canada's position "directly with President Biden," *id.* at 17, the United States' silence on Line 5 in this litigation speaks volumes.  If the federal government viewed legal challenges to Line 5 as interfering with the United States' foreign affairs, it could readily so signal to the courts, as it did in *Garamendi*.  Nothing of the sort has taken place here.

Relatedly, while Enbridge emphasizes that "[t]he United States and Canada are now actively engaged in the 1977 Treaty's Article IX bilateral dispute resolution process" regarding Michigan's litigation against Enbridge to shut down Line 5 at its crossing under the Straits of Mackinac, *id.* at 16, that fact leads to a very different conclusion than the one Enbridge advances.  Article IX provides that "[a]ny *dispute between the Parties* regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them."  Transit Agreement, art. IX (emphasis added).  Canada's formal invocation of Article IX clearly evidences, then, that there exists dispute between Canada and the United States over the interpretation of the Transit Agreement, which runs directly counter to Enbridge's attempted imputation of Canada's views to the United States.

Enbridge is left to argue that the foreign policy of the United States regarding cross-border pipelines was set in concrete forty-five years ago when the Transit Agreement was signed.  *See, e.g.*, Enbridge Br. at 13–14 (referring to "the federal government's foreign affairs policy, as expressed in a 1977 treaty with Canada").  But the plain text of the Agreement does

not support Enbridge's position.  While Enbridge suggests that Article II of the Agreement

constitutes an absolute ban on any public authority taking any measure that could interfere with

the flow of oil under any circumstances, *id.* at 15, it nowhere mentions Article IV, which states

that "*[n]otwithstanding the provisions of Article II* … a Transit Pipeline ... shall be subject to

regulations by the appropriate governmental authorities having jurisdiction over such Transit

Pipeline … with respect to such matters as … a. [p]ipeline safety … b. environmental

protection," Transit Agreement, art. IV(1) (emphasis added).  The Transit Agreement is patently

not an absolute ban on government action affecting the cross-border flow of oil.

And the United States has not interpreted it that way.  In 1991, the federal government

issued a "Presidential Permit" to Enbridge for continued operation of at least one of its two

transit pipelines crossing beneath the St. Clair River into Canada near Marysville, Michigan

(either Line 5 or Line 6B).  Presidential Permit: *Authorizing Lakehead Pipeline Company,*

*Limited Partnership to Operate and Maintain a Pipeline at the International Boundary Line*

*Between the United States and Canada* (Dec. 12, 1991).[9]  That Permit subjects the pipeline "to

the limitations, terms and conditions contained in … *any* orders issued by … the State of

Michigan," and further provides that "[t]his permit shall continue in force and effect only so long

as the permittee shall" comply with such orders.  *Id.* art. 6 (emphasis added).  The United States

thus clearly did not view the Transit Agreement as foreclosing an order by the State of Michigan,

based on safety or any other concerns, that might impede the flow of oil.  Neither did Enbridge,

as the Permit is conditioned on "the acceptance of the conditions, provisions, and requirements

hereinafter set forth" by Enbridge.  *Id.* Preamble.  *See Air France v. Saks*, 470 U.S. 392, 396

---

[9] 869f65_5373ff87997c4b499195c3b3022b5971.pdf (filesusr.com).  The Band has been unable
to determine whether the Permit was for Enbridge's Line 5 or Line 6B, but the issue is
immaterial as both are transit pipelines and subject to the 1977 Transit Treaty.

(1985) (to interpret treaties, courts may look to "the practical construction adopted by the parties" (citation omitted)).

In sum, there exists no basis for this Court to find the Band's ejectment claim "foreclosed by the Foreign Affairs Doctrine," Enbridge Br. at 14. Enbridge has adduced nothing to support its suggestion that in 1977 the United States declared its foreign policy to be that unilateral statements by a foreign head of state can override the United States' solemn treaty promises to federally recognized tribes. The argument is as breathtaking as it is incorrect.

## IV. The Band's Ejectment and Regulatory Authority Counts Are Not Subject to Dismissal.

### A. The Band Has Pled a Distinct, Viable Ejectment Count.

Enbridge next contends that the Band's ejectment count should be dismissed because,

> [a]lthough styled as a separate count, [the] Band's ejectment count merely rephrases the same allegations as in the trespass count. Furthermore, the Band's trespass count seeks ejectment as a remedy. As a result, the ejectment count is redundant and should be dismissed with prejudice.

Enbridge Br. at 18 (citations omitted). This argument is meritless.

First, the Band's trespass and ejectment counts are not redundant. Trespass turns on a defendant's presence on a plaintiff's land "without a privilege to do so created by the possessor's consent or otherwise." *Sattelberg v. United States*, No. 12-cv-898-wmc, 2013 WL 6058955, at *3 (W.D. Wis. Nov. 18, 2013) (Conley, J.) (citation omitted). The Band's trespass count speaks directly to those elements. Compl. ¶¶ 155–57 ("The Band has expressly disclaimed any consent …. No other lawful basis exists for Enbridge's continued use of the aforementioned parcels to transmit crude oil and other hazardous liquids across the Reservation…. Enbridge is accordingly committing an intentional, ongoing trespass on the Band's Reservation under federal law.").

17

Ejectment, as a legal cause of action, requires a showing "that plaintiff is the owner of the premises described, and entitled to the possession, and that defendant wrongfully withholds such possession[.]" *Joy v. City of St. Louis*, 201 U.S. 332, 340 (1906). The Band's ejectment count speaks directly to those distinct elements. *See* Compl. ¶¶ 160–61, 163 ("The Band holds valid and lawful ownership interest in [the] twelve parcels …. Enbridge's maintenance and operation of the pipeline on those parcels constitutes the wrongful use and possession of them and operates to withhold rightful possession from the Band.").

Nor does it matter that the counts share operative facts. As Judge Crabb has explained:

> A "claim" is simply a set of facts producing an injury. The "counts" in plaintiff's complaint are not necessarily "claims," but rather are the articulation of legal theories on which plaintiff's claims are premised. Under the federal rules, a plaintiff may advance more than one legal theory in support of a single claim, and those alternative theories may, but need not be, set forth in separate counts. Fed. R. Civ. P. 8(d)(2). This does not mean that plaintiff would be able to recover twice for the same injury. Rather, plaintiff can recover only once for each injury she alleges, regardless how many legal theories she raises. In other words, the federal rules permit plaintiffs to include multiple legal theories based on the same set of allegations. That the theories may be duplicative is not reason to dismiss them.

*Bertrang v. City of Mondovi*, 17-cv-918-bbc, 2018 WL 3978109, at *4 (W.D. Wis. Aug. 20, 2018) (citations omitted). *See also Kasten v. Saint-Gobain Performance Plastics Corp.*, No. 07-cv-449-jcs, 2007 WL 5414927, at *2 (W.D. Wis. Dec. 7, 2007) ("Plaintiffs have done nothing more than plead alternative theories of relief by pleading their state common law claims along with claims under the FLSA and Wisconsin state statutes …. [and] are free to plead such alternative theories.").

This Court's decision in *Brooks Jay Transportation, Inc. v. FedEx Ground Package System, Inc.*, 17-cv-084-wmc, 2017 WL 5136014 (W.D. Wis. Nov. 3, 2017), *see* Enbridge Br. at 18–19, is not to the contrary. There, the plaintiff had failed to state a separate claim at all. 2017

18

WL 5136014, at *3 ("[P]laintiff has failed to adequately plead a separate 'claim upon which relief can be granted.' Accordingly, the court will dismiss this claim under Rule 12(b)(6)[.]"). Enbridge has made no argument that the Band has not adequately stated a claim for ejectment, and its opportunity to do so has passed. *See Wisz v. Kijakazi*, 20-cv-690-wmc, 2021 WL 2947737, at *2 (W.D. Wis. July 14, 2021) (Conley, J.) ("[A]rguments raised for the first time in reply are waived[.]").

Finally, that the Band seeks a remedy of ejectment for Enbridge's trespass does not render the counts impermissibly duplicative. Ejectment as a cause of action is distinct from ejectment as a remedy. The former alleges that the plaintiff has been ousted, *Joy*, 201 U.S. at 340, while the latter asks that the defendant be ousted, *see Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (referring to the "specific relief" of "an order providing for ... ejectment from land" (quotation marks omitted)).

B.   <u>The Band's Regulatory Count Can Be Held in Abeyance as It Is Not Presently Ripe</u>.

Enbridge contends that Count 5 of the Band's Complaint is subject to dismissal because it "merely rephrases the same operative facts as the trespass, ejectment and nuisance counts and seeks the same remedy. Moreover, Count 5 is not cognizable as a separate cause of action." Enbridge Br. at 19 (citation omitted). Neither of these points is correct. The count seeks a declaratory judgment as to the Band's regulatory authority over Enbridge's pipeline-related activities while the pipeline remains in operation on the Reservation. *See* Compl., Prayer for Relief ¶ G. This is clearly distinct from the Band's other counts, which seek a cessation of those pipeline operations, and it is an entirely conventional invocation of the declaratory judgment process.

However, the Band believes that this Court should not rule on the Band's request at present.  When the Band filed its Complaint (and subsequent amendments), it believed that a ripe controversy might exist as to the existence and scope of its regulatory authority over Enbridge, as Enbridge had suggested resistance to the same.  *See* Compl. ¶ 166; Answer ¶ 166.[10]  But as its own summary judgment papers demonstrate, Enbridge now recognizes that the Band possesses that authority.  It is challenging the reasonableness of the Band's denial of various permits for its proposed mitigation measures at the meander, not the Band's permitting authority in the first instance.  *See* Enbridge PFF ¶ 8.[11]  The Band accordingly requests that the Court hold its regulatory authority count in abeyance unless and until a live controversy develops.  *See Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 499 (7th Cir. 2014) ("Declaratory judgments are permitted but are limited … to … actual legal disputes.").

## V.     The Band Has Standing to Bring Its State Law Nuisance Claim.

Enbridge contends that the Band lacks standing in this Court to bring that claim because

> Wisconsin Statutes section 823.01 identifies parties eligible to maintain a public nuisance action: "[a]ny person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance...."  Wis. Stat. § 823.01.

> ... Because section 823.01 does not mention Indian tribes, they are excluded from the statute's coverage.  The Band therefore lacks standing to bring public-nuisance claim under state law.

Enbridge Br. at 20–21 (brackets and first ellipses in original) (citation omitted).

Enbridge misunderstands the law of standing.  The Band brought its Wisconsin nuisance claim under this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  *See* Compl. ¶

---

[10] "Answer" refers to Enbridge's Second Amended Answer, Defenses, and Counterclaims to Plaintiff's Third Amended Complaint (Dkt. 146).

[11] "Enbridge PFF" refers to Enbridge's Proposed Findings of Fact in Support of Motion for Partial Summary Judgment (Dkt. 232).

22.  Wisconsin law hence supplies the substantive rules of decision.  But that is not true for standing and other procedural requirements, which remain fully the province of the federal courts.  As then-Judge Barrett, writing for the Seventh Circuit, explained when a party raised a similar argument:

> The plaintiffs misapprehend the doctrine of standing, which is a corollary of Article III's limitation of the "judicial power" to the resolution of "cases" and "controversies."  U.S. CONST. art. III, § 2, cl. 1….  The requirement limits the power of *federal* courts and is a matter of *federal* law.  It does not turn on state law, which obviously cannot alter the scope of the federal judicial power.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (asserting that standing in federal court "does not depend on [a] party's ... standing in state court").

*Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 730–31 (7th Cir. 2020) (brackets and second ellipses in original) (citation omitted).

## VI.    Genuine Issues of Material Fact Exist as to the Band's Public Nuisance Claim.

"A public nuisance is 'an unreasonable interference with a right common to the general public,' usually involving a significant interference with public health, safety, peace, comfort, or convenience."  *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) ("*Asian Carp II*") (quoting Restatement (Second) of Torts § 821B).  Enbridge does not contest that if the Bad River reaches Line 5 and exposes it at the Bad River meander, the pipeline rupture and catastrophic consequences likely to follow would qualify as a public nuisance.  Rather, it argues that the Band has failed to establish the necessary elements of its nuisance claim because (1) such an outcome is not sufficiently "imminent," and (2) it is not unreasonable to ask the Band to live with the risk because Enbridge has offered to mitigate it.  Enbridge Br. at 21.  Therefore, "[a]s a matter of law, there is no imminent or unreasonable interference with public safety and health on the Reservation."  *Id.*

Notably, Enbridge never once affirmatively states that genuine issues of material fact do not exist on these points, and no counsel could responsibly sign papers to that effect. In addition to significant legal infirmities, Enbridge's arguments necessarily implicate contested factual issues and are entirely misplaced at this stage of the proceedings.

A.   Genuine Issues of Fact Exist as to Whether the Risk at the Meander is "Imminent" Under the Governing Law of Public Nuisance.

Enbridge asserts that "there are not many federal common law cases" discussing imminence in the context of public nuisance. Enbridge Br. at 22 n.16. That is of little moment, because the Seventh Circuit has addressed the issue in detail. In *Asian Carp I*, the Circuit explained that the distinction between "'imminent … threat'" and "'significant threat'" is "a distinction without a difference[.]" *Asian Carp I*, 667 F.3d at 780. A public nuisance may be enjoined wherever "harm is threatened that would be significant if it occurred," and "relief will be warranted when the risk of its happening is greater than a reasonable man would incur[.]" *Id.* at 781 (quotation marks omitted). At bottom,

> [t]here is no meaningful legal difference for purposes of the ultimate resolution of a public nuisance claim between a threatened nuisance that is "imminent" and one that is "immediate," "significant," "real," an "unreasonable risk," or anything similar. The job of a court considering the merits of a public nuisance claim is simply to determine whether the activity complained of is a nuisance and, if so, whether it is sufficiently close to occurring that equitable relief is necessary to prevent it from happening.

*Id.* at 782.[12]

Moreover, the Circuit stressed that where "[t]he nature of the threat [is] an ecological harm … a broader perspective" should be taken. *Id.* at 785. The district court had not done so,

---

[12] While *Asian Carp I* involved a request for a preliminary injunction, the Court emphasized that "[t]he principles that we just reviewed relate to the ultimate outcome of a public nuisance proceeding." 667 F.3d at 782.

finding that "the evidence does not support the existence today (or even in the short-term future) of any unreasonable nuisance," in part because there was no evidence that Asian carp had yet entered Lake Michigan in sufficient numbers to establish a successful breeding population. *Michigan v. U.S. Army Corps of Eng'rs*, No. 10-CV-4457, 2010 WL 5018559, at *21, *28 (N.D. Ill. Dec. 2, 2010) (quotation marks omitted).

The Seventh Circuit disagreed, stating that "[i]t is hard to see 60 miles of separation between the carp invasion front and the Great Lakes … as a particularly safe margin, even with functioning electric barriers," and that "[i]t is especially chilling to recall that in just 40 years the fish have migrated all the way from the lower Mississippi River to within striking distance of the lakes[.]" 667 F.3d at 785. The Court concluded that

> invasive carp are knocking on the door to the Great Lakes. We need not wait to see fish being pulled from the mouth of the Chicago River every day before concluding that a threat of a nuisance exists. It is enough that the threat is substantial and that it may be increasing with each day that passes. Unlike many nuisances that can be eliminated after they are discovered, this one in all likelihood cannot be. The fact that it would be impossible to un-ring the bell in this case is another reason to be more open to a conclusion that the threat is real.

*Id*. at 786.

These principles, authoritatively laid out by the Seventh Circuit, fully apply here. This Court need not wait until oil is gushing into the Bad River to conclude that the nuisance presented by Line 5 is actionable. The relentless shrinking of the distance between the carp and Lake Michigan bears striking parallels to the inexorable closing of the gap between Line 5 and the Bad River. "Over the past 60 years, the Bad River has migrated nearly 300 feet toward Line 5 ... reducing what once was a 310-foot separation between the pipeline and the river to a 26.5-

foot separation distance."  PPFF ¶ 1(d) (WWE Report at ES-1).[13]  Both parties' experts agree

that the remaining distance will likely be erased within the next 3–5 years.  *Id.* ¶ 1(a), (g).  And

they further agree that pipeline exposure "could occur in significantly less time depending on

flow conditions in the Bad River, and other factors[.]"  *Id.* ¶ 1(a) (WWE Report at ES-12).  Thus,

the Band's experts have observed that "[t]he 26.5-foot remaining separation distance ... between

the Bad River channel bank and the Line 5 pipeline falls within the range of bank erosion that

could occur during a single flood event."  *Id.* ¶ 1(e) (WWE Report at ES-12).  ███████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████  It is uncontroverted, moreover, that

once the pipeline is breached, the length of exposed pipeline could expand rapidly and

unpredictably, resulting in pipeline failure and the release of oil in as little as one storm event.

*Id.* ¶ 2 and evidence cited therein.[14]

     At the very least, then, there exists a genuine issue of material fact as to whether

the threat of a Line 5 rupture is "sufficiently close to occurring that equitable relief is necessary

to prevent it from happening."  *Asian Carp I*, 667 F.3d at 782.  And Enbridge cannot avoid that

conclusion by (and there is no more polite way of putting this) making facts up.  Enbridge asserts

that "the Band's expert has opined that the probability of the pipeline becoming exposed in any

---

[13] "PPFF" refers to Plaintiff's Proposed Findings of Fact in Opposition to Enbridge's Motion for
Partial Summary Judgment.  "WWE Report" refers to the expert report of Wright Water
Engineers, Inc., *Engineering Evaluation of the Bad River Meander Adjacent to Enbridge Line 5
and Related Water Resources Issues* (Jan. 2022), filed contemporaneously with this brief (Dkt.
268).
[14] Enbridge's efforts to concoct a convoluted causal chain from the Band's allegations, Enbridge
Br. at 22–23, not only misrepresent those allegations but ignore the uncontroverted expert
evidence that has since been developed in the case.

single year is one percent (1%)."  Enbridge Br. at 22.  Enbridge provides no citation for this assertion, and none exists.

After expressing the opinions in their report, summarized above, regarding the likely timing of pipeline exposure—opinions grounded in a searching examination of the aerial imagery showing the river's progression over time, as well as in field observations at the meander, *see* WWE Report at 58–78—the Band's experts further noted that a generalized empirical analysis of river bends in the United States (the Sikder regression analysis) suggests that there is a five percent chance of more than nineteen feet of bank erosion occurring in a single year, and a one percent chance of more than thirty-one feet of such erosion taking place, *id.* at 79.  The Band's experts then observed that "the various confidence levels of maximum channel migration are based on a broad survey of meandering rivers and do not incorporate site-specific conditions that could either accelerate or decelerate the rate of channel migration."  *Id.* And they noted as one example in this regard that "[t]he potential presence of highly erodible material ... in the alluvium between the Bad River bank and Line 5 could cause the erosion rate to increase."  *Id.*  None of this supports Enbridge's attempted minimization of the opinions proffered by the Band's experts.  Indeed, Enbridge's own contractors' takeaway from the Sikder analysis is that while "the likelihood of the upstream bank moving 20 feet closer to the pipeline during a single year [is] low ... the bank will continue to move and the risk of a large movement in a single year is possible."  *Id.* at 80 (quoting NRE report, *Enbridge Line 5 Bad River Bend Migration Study January 2019 HEC-RAS Model*).

Enbridge, moreover, misapprehends the significance of the probabilities that it posits. Even if the chance of the pipeline being exposed this year were one percent, the Seventh Circuit has made clear that in determining whether an actionable nuisance exists, the "gravity of a risk

involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Asian Carp I*, 667 F.3d at 785 (quotation marks omitted).  Here there is no dispute as to the extraordinary nature of the Reservation resources.  PPFF ¶ 3(a).  There is likewise no dispute that the release of oil into the Bad River would cause potentially catastrophic harm to the Bad River watershed and Lake Superior, including to the river itself and surrounding wetlands, the downstream sloughs and their stands of wild rice, and the flora and fauna that thrive in the watershed.  *Id.* ¶ 3 and evidence cited therein.  Indeed, Enbridge's own oil spill modeling expert has testified as to ███████████████████████████████ from a spill at the Bad River, *id.* ¶ 3(e) (Horn Dep.); *see also* ¶ 3(f)–(h), and has provided a ████████████ ████████████████████████████ *id.* ¶ 3(i) (Horn video).

A one percent chance of a plane crash, or of a power plant explosion, or of a substance being carcinogenic, is not considered acceptable in our society, and numerous regulatory regimes reflect that fact.  The same regard is owed the resources in the Bad River watershed and the Band's way of life that depends on them.  While Enbridge may be cavalier about the true nature of the threat posed by its pipeline to the Band and its Reservation, the Seventh Circuit has made amply clear that the law is not.

B.   Enbridge's Proposed Mitigation Measures Are Legally Infirm, and Genuine Issues of Material Fact Exist as to Their Viability.

In *Asian Carp I*, the Seventh Circuit denied preliminary injunctive relief in part because it doubted whether that relief "would reduce by a significant amount the risk" that the carp would enter the Great Lakes "between now and the time that a full trial on the merits is completed," 667 F.3d at 789, given the "powerful array of expert federal and state actors that are engaged in a monumental effort to stop invasive carp from entering the Great Lakes," *id.* at 790.  In *Asian Carp II*, the Court found that same effort adequate to bring the risk level below that sufficient to

26

constitute a nuisance.  *See* 758 F.3d at 906 ("It is the defendants' apparent diligence … that is key to our holding today.").

Invoking that holding, Enbridge contends that the threat posed by its pipeline is "not an actionable basis for a public nuisance claim," Enbridge Br. at 24, because "Enbridge stands ready to address the potential exposure at the meander, thereby eliminating the alleged risk of rupture ….  Under these circumstances, Line 5's operation cannot be an unreasonable interference with the Band's rights," *id.* at 25.  But no remotely plausible analogy can be drawn between this case and the *Asian Carp* cases on this score.

Enbridge has proposed two principal solutions to guard against the looming exposure and rupture of its pipeline: (1) installing a new pipe, buried lower than the existing pipe and below the path of the meandering river, by means of a horizontal directional drill ("HDD"); and (2) armoring the banks of the river, either with trees or rock riprap, in an effort to prevent further erosion towards the pipeline.  Decl. of Julie Molina in Support of Defs.' Mot. for Partial Summ. J. ("Molina Decl.") ¶¶ 11–15; *see also* Enbridge Br. at 25.  Remarkably (and tellingly), Enbridge has elected not to provide this Court with any substantive details about its proposals, instead asserting in conclusory fashion that they would "address the Band's concerns at the Meander," Molina Decl. ¶ 7; Enbridge Br. at 24 (meander will be "adequately addressed" by Enbridge's proposals), and inviting the Court to assume both their legality and their viability.  Neither assumption would be warranted.

       1.   *Enbridge's abatement proposals would place Enbridge in trespass.*

 Figure 1 below depicts the parcel ownership of the lands surrounding the Meander:



**FIGURE 1**[15]

The land shaded in yellow is owned by a township. The land shaded in purple within the loop of

the meander is owned by Enbridge. But the land shaded in pink on the right side of the map is

parcel 430-S13, in which the Band holds ownership interests, and which is subject to a twenty-

year easement that expired on June 2, 2013. *See* PPFF ¶¶ 7–9 and evidence cited therein;

Enbridge's Opp'n to Band's Partial Mot. for Summ. J. (Dkt. 207) at 9 (illustrative map).

While Enbridge's various bank armoring (or revetment) proposals are of differing

lengths, all include the installation of armoring material within parcel 430-S13. The revetment

proposal shown in Figure 2 is representative in this regard (with yellow highlighting added and

reflecting the reach of the armoring):

---

[15] WWE Report at 17; *see also* PPFF ¶ 7(b).



**FIGURE 2**[16]

Comparing Figures 2 and 1 shows that Enbridge's installation and maintenance of the revetment would place it in trespass on parcel 430-S13.  PPFF ¶ 8 and evidence cited therein.  And this would be the case even under Enbridge's contention that it continues to have an easement over the allotted parcels, including parcel 430-S13, until 2043.  Accepting that proposition *arguendo*, any such easement would still be limited to "[a] strip of land 60 feet in width[.]"  *Id.* ¶ 7(e) (ENB00000749).  The mileage legend in Figure 1 depicts a distance of 500 feet, making clear that Enbridge's bank revetment would extend far beyond a 60-foot right-of-way.  PPFF ¶ 9 and evidence cited therein.

The same is true for Enbridge's HDD proposal, shown in Figure 3 (with added yellow highlighting showing the length of the new pipe and green added highlighting showing the meander):

---

[16] PPFF ¶ 8(c).



**FIGURE 3**[17]

Comparing Figures 3 and 1, the HDD would plainly extend the new pipe onto and across parcel

430-S13, and hence into trespass.  PPFF ¶ 7 and evidence cited therein.  And again, this would

be so even under Enbridge's theory that it holds an easement over that parcel until June 2, 2043.

The easement provides that when the term of the easement ends, "Grantee shall remove all

materials, equipment and associated installations within six months of termination," *id.* ¶ 7(e)

(ENB00000750)—i.e., by December 2, 2043.  Enbridge cannot accomplish that with an HDD-

installed pipe.  Its engineering consultant has stated that



PPFF ¶ 6(a), Tinker Decl. ¶ 22 &

Ex. K (ENB00389479).  Likewise, an Enbridge senior engineer has stated that

PPFF ¶ 6(a), Tinker Decl. ¶ 23 & Ex. L

(BARR0144407).  He further stated at his deposition that

---

[17] PPFF ¶ 7(c).

████████████████████████████████████████████████  PPFF ¶ 6(b)

(Hendi Dep.).

Thus, both of Enbridge's proposals to abate the nuisance at the meander would exceed the scope of the easement it claims to enjoy and would place it in trespass.  *See Grygiel v. Monches Fish & Game Club, Inc.*, 787 N.W.2d 6, 18 (Wis. 2010) ("[W]hen an easement holder's use of an express easement contravenes its express terms, absent consent … the easement holder may be held liable for trespass.").  What Enbridge is proposing in both cases, then, is *to abate one tort by committing another*.

Nor is the Band being unreasonable—under any definition of that term—in withholding its consent to either proposal.  As discussed below, Enbridge's revetment proposals present significant feasibility and environmental concerns.  And any HDD-installed pipeline would constitute a public nuisance in its own right.  Under Enbridge's proposal, the Band will be left with an abandoned 8,200-foot steel pipeline decomposing in its Reservation soils and groundwater, likely in perpetuity.  It is no wonder that Enbridge chose to supply this Court with no details of its proposals.

2.  *Genuine issues of material fact exist as to whether Enbridge's abatement proposals are viable.*

As with its arguments regarding imminence, Enbridge goes badly astray in presenting as uncontroverted factual claims that are clearly the subject of serious dispute.  Enbridge suggests that the threat of pipeline exposure at the meander is "easily preventable," Enbridge Br. at 22, and would be "adequately addressed" by its proposed remediation projects, *id.* at 24.  But simply saying these things in a brief does not make them so.

The Band and its experts have detailed the numerous feasibility concerns with Enbridge's proposed projects, concerns significant enough that it simply cannot be said with any certainty

that those projects would eliminate the threat posed by Line 5 at the meander.  PFFF ¶ 4 and evidence cited therein.  The Band and its experts have further detailed significant concerns regarding the threat of adverse environmental consequences posed by the projects.  *Id.* ¶ 5 and evidence cited therein.  These twin concerns persist with respect to Enbridge's most recent project submissions.  *Id.* ¶¶ 4(g), 5(h).  Thorough explanations of the concerns have been provided to Enbridge through the Band's permitting processes.  *Id.* ¶ 10 and evidence cited therein.  Enbridge certainly has every right to disagree with the Band's position, but has no basis to suggest to this Court that the viability of its project proposals is uncontroverted, such that its mere proffering of those proposals can operate to defeat the Band's nuisance claims.

## CONCLUSION

For the foregoing reasons, the Band respectfully requests that the Court deny Enbridge's motion for partial summary judgment in its entirety.

Dated: June 10, 2022                  Respectfully submitted,

                                      /s/ Riyaz A. Kanji
Erick Arnold                          Riyaz A. Kanji
BAD RIVER BAND OF THE LAKE SUPERIOR   David A. Giampetroni
TRIBE OF CHIPPEWA INDIANS OF THE BAD  KANJI & KATZEN, P.L.L.C
RIVER RESERVATION                     303 Detroit Street, Suite 400
72682 Maple Street                    Ann Arbor, MI 48104
Odanah, Wisconsin 54861               rkanji@kanjikatzen.com
attorney@badriver-nsn.gov             dgiampetroni@kanjikatzen.com
Ph: (715) 682-7107                    Ph: (734) 769-5400

Bruce Wallace                         Cory J. Albright
HOOPER HATHAWAY PRICE BEUCHE          Jane G. Steadman
& WALLACE                             Philip H. Tinker
126 S. Main Street                    KANJI & KATZEN, P.L.L.C
Ann Arbor, MI 48104                   811 1st Avenue, Suite 630
bwallace@hooperhathaway.com           Seattle, WA 98104
Ph: (734) 662-4426                    calbright@kanjikatzen.com
                                      jsteadman@kanjikatzen.com
Oday Salim                            ptinker@kanjikatzen.com
NATIONAL WILDLIFE FEDERATION          Ph: (206) 344-8100
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104
salimo@nwf.org
Ph: (586) 255-8857

*Counsel for the Bad River Band of the Lake Superior Tribe of Chippewa Indians and Naomi Tillison, Director of the Mashkiiziibii Natural Resources Department of the Bad River Band, in her official capacity*

## **CERTIFICATE OF SERVICE**

I certify that on June 10, 2022, a copy of the foregoing was filed through the Court's

CM/ECF management system and electronically served on all counsel of record.


*/s/ Riyaz A. Kanji*
Riyaz A. Kanji