IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

                    Plaintiff and Counter Defendant,

                                                            OPINION AND ORDER

          v.

                                                            19-cv-602-wmc

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

                    Defendants and Counter Claimants.

          v.

NAOMI TILLISON,

                    Counter Defendant.

———————————————————————————————————————

          Enbridge Energy owns and operates an oil and natural gas pipeline that extends 645

miles between Superior, Wisconsin to Sarnia, Ontario.  By virtue of various, long-term

easement agreements, the pipeline was constructed in part on the Bad River Reservation

in northern Wisconsin on parcels of land allotted to individual Indians, owned by non-

Indians and owned in whole or in part by the Bad River Band of the Lake Superior Tribe

of Chippewa Indians.  In recent years, the Bad River Band has grown concerned about the

potential environmental impacts this pipeline may have on its lands, and it has

consequently refused to renew Enbridge's easement on 12 parcels now owned in whole or

in part by the Band.  Although the easements expired in 2013, Enbridge has refused to

remove the pipeline from these 12 parcels.

The Band filed this lawsuit, accusing Enbridge of trespass and unjust enrichment for continuing to operate across the Reservation without valid easements, as well as nuisance, ejectment, and a violation of the Band's regulatory authority.  In turn, Enbridge counterclaimed that the Band breached its contract granting an easement and its related duty of good faith and fair dealing.  Before the court now are the parties' cross motions for summary judgment.

The Band moves for summary judgment on its claims of trespass and unjust enrichment, and on its entitlement to a monetary remedy, arising out of Enbridge's continued operations of the pipeline across the 12 parcels on which its easements have expired.  The Band also moves for summary judgment on Enbridge's counterclaims for breach of contract, and further requests a permanent injunction requiring Enbridge to cease operation of the pipeline and to safely decommission and remove it.  (Dkt. #165.)[1]  In turn, Enbridge moves for summary judgment on the Band's remaining claims of nuisance, ejectment and violation of the Band's regulatory authority.

For the reasons discussed below, the court will grant the Band's motion with respect to its trespass and unjust enrichment claims, Enbridge's counterclaims and the Band's entitlement to a monetary remedy.  Nevertheless, the court must deny the Band's request for an automatic injunction, as an immediate shutdown of the pipeline would have significant public and foreign policy implications.  While inclined to grant alternative injunctive relief to the Band, requiring Enbridge to reroute its pipeline outside the

---

[1] Several interest groups filed amicus briefs in this case articulating their views on the legal questions and factual issues before the court, and on potential injunctive relief in particular.  The court has considered all of the amicus briefs.

Reservation, the court will seek input from the parties before deciding the terms of a permanent injunction. Finally, the court will grant Enbridge's motion with respect to the Band's state law nuisance, ejectment and regulatory authority claims, but will deny the motion as to the Band's federal nuisance claim.

## OVERVIEW OF UNDISPUTED FACTS[2]

### A. Enbridge's Line 5 Pipeline

Enbridge operates a network of pipelines and other infrastructure to transport Canadian oil and natural gas liquids to refineries in the United States and Canada, including Line 5 that is the subject of this lawsuit ("the pipeline"), which transports about 23 million gallons of crude oil and natural gas liquids daily. In northern Wisconsin, the pipeline traverses through 12 miles of the Bad River Reservation, which was established by the Treaty with the Chippewa Tribe in 1854. The pipeline corridor through the Reservation is approximately 60 feet wide and constitutes less than 1.9% of the entire pipeline. At the time the pipeline was built in 1953, some parcels on the Reservation were owned by the Band and held in trust by the United States; some were owned by individual tribal members; and some were owned by non-Indians. In 1952, the United States Department of the Interior, Bureau of Indian Affairs ("BIA"), granted Enbridge a single, 20-year easement, which covered all the parcels on the Reservation owned either by the Band or by individual Indians. In the early 1970s, the BIA renewed that easement for another 20-year term.

---

[2] The following facts are undisputed except where noted. Additional, undisputed facts will be discussed as they become relevant in the opinion itself.

**B. Negotiation of the 1993 Easements**

Because that second, 20-year easement was set to expire in June 1993, Enbridge, the Band, and the BIA began discussing potential renewal of the easement in the early 1990s. At that time, the Band was the sole owner of 13 parcels all held in trust by the United States, which accounted for approximately 2.8 miles of the length of the pipeline corridor through the Reservation, with the 60-foot-wide easement covering approximately 20.1 acres in total area. In addition, the pipeline ran across another 15 "allotment parcels" owned by individual Indians, with multiple individuals holding fractional ownership in each of those parcels, all of which were also held in trust by the United States. The Band further held a small percentage of ownership in three of the allotment parcels.

Naturally, Enbridge wanted an easement that would run for longer than 20 years. However, the BIA, which was responsible for negotiating easements on the 15 allotment parcels, notified Enbridge that it would not issue easements longer than 20 years on the allotment parcels. Still, the BIA advised that the Band could grant longer easements on its 13 wholly owned parcels were it inclined to do so. Thus, the BIA told Enbridge to negotiate directly with the Band for new easements on those 13 parcels.

In June 1992, Enbridge submitted several easement renewal applications to the BIA. The first was an application for new easements on the 13, Band-owned parcels, referred to as "Tribal Lands." (Dkt. #166-19.) That application stated the right-of-way over those parcels would be "2.8 miles" in length, and it attached a "Tribal Lands Schedule" listing all parcels by their precise township and range legal descriptions. (Tribal Lands Application (dkt. #166-20).) The second actually consisted of 15, separate applications for the

allotment parcels, which also described the precise land at issue for each allotment parcel easement.  (Dkt. #210-2.)

### 1. Band's wholly owned parcels

The Band and Enbridge proceeded to negotiate for an easement over the Band-owned parcels and had agreed that Enbridge would pay the Band $800,000 for a 50-year easement over the 13 Band-owned parcels by December 1992, subject to the BIA's approval.  If the BIA did not approve, Enbridge had further agreed to pay the Band $450,000 for a 20-year easement.  Also, in December 1992, the Bad River Tribal Council passed two resolutions providing the Band's consent and approval for a 50-year easement over its wholly-owned parcels in exchange for $800,000.  Enbridge and the Band then memorialized their agreement by contract ("the 1992 Agreement"), with the two Tribal Resolutions attached as exhibits to the contract.

As required under 25 U.S.C. § 323, the Band next submitted the two Tribal Resolutions and the 1992 Agreement to the BIA for its approval, along with a cover letter from the Band's Chairman, David Moore, stating that "[t]hese documents express the terms by which the Bad River Tribe has agree to grant to Lakehead [Enbridge's predecessor] a fifty year right of way over its existing easement."  (Dkt. #166-23.)  In response, the BIA asked the Band to explain why a 50-year easement would be in the best interest of the Bad River community, as opposed to one again renewing the 20-year easement, *and* suggested that the Band might want to explore alternative uses for their lands in 20 years.  (Dkt. #166-21.)  The Band responded that it had received a good price, which it intended to invest.  At that point, the BIA issued a 50-year easement expressly covering the 13, Band-

owned parcels, with the term beginning on June 3, 1993, and ending on June 2, 2043. (Dkt. #166-14.)  Enbridge then paid the Band the $800,000 payment required under the parties' 1992 Agreement.

### 2.  15, separate allotment parcels

The BIA negotiated separately with Enbridge for 20-year easements over the 15 allotment parcels, including the three parcels in which the Band had a small ownership interest.  In particular, Enbridge and the BIA eventually agreed that Enbridge would pay $179,000 total to the individual owners of the 15 allotment parcels for a 20-year easement, although the Band did not receive any compensation for its small interest in three of those parcels.  Those easements issued in May 1993.  The easements expressly stated that they were "limited as to tenure for a period not to exceed 20 (Twenty) years, beginning on June 3, 1993, and ending on June 2, 2013."  They also provided as follows:

> At the termination of this Grant of Easement, Grantee shall remove all materials, equipment and associated installations within six months of termination, and agrees to restore the land to its prior condition.  Such restoration may include but not be limited to filling, leveling and seeding the right-of-way area.

(Dkt. #166-15.)

### C.  The Band's Acquisition of Additional Ownership Interests in Allotted Parcels

Many parcels of land on the Bad River Reservation are owned by various individual landowners because of historical allotment policies that had divided up tribal land.  In 1982, Congress enacted the Indian Land Consolidation Act, 25 U.S.C. § 2202–2221, to counter past policies strongly encouraging allotment of Reservation lands to individual

tribal members, and to assist tribes in acquiring full or fractional ownership on lands within their reservation generally.  Under this Act, the BIA was responsible for assisting the Band in obtaining ownership interests in land within the Bad River Reservation borders. Between 1994 and 2013, therefore, the BIA assisted the Band in acquiring ownership interests in 12 of the 15 allotment parcels in the pipeline corridor for which the BIA had issued 20-year easements in 1993.  The Band presently owns 100% of two of the parcels and more than 45% fractional ownership in the remaining 10.

### D. The Band Refuses to Renew Easements on the Allotment Parcels

In January 2013, with the 20-year easements expiring in June 2013, the BIA reminded Enbridge of the approaching end of the easements over the 15 allotment parcels. In March 2013, Enbridge submitted applications to the BIA to renew the easements on those allotment parcels for yet another 20-year period.  At the same time, Enbridge failed to submit with its applications any documents showing that the owners of the allotment parcels had *consented* to the renewal of these easements, despite the Band's consent now being necessary to renew the easements on 12 of those 15 parcels because the Band now had a full or fractional ownership in each of them.

In fairness, Enbridge had notified the Band that it *wanted* to renew these easements. Moreover, the Band requested detailed environmental, pipeline safety, and emergency response information from Enbridge pertaining to its operation of the pipeline, including records of spills and regulatory violations.  The Band was particularly concerned about these issues because a different pipeline operated by Enbridge had failed and spilled more than a million gallons of crude oil into a Michigan river in 2010, and federal investigators

had concluded that Enbridge's actions were responsible for the environmental consequences of the spill. While Enbridge provided some information requested, the Band responded that the information produced was deficient.

During 2015 and 2016, the Band and Enbridge continued to discuss potential renewal of the easements on the allotment parcels, as well as operation and maintenance protocols for the pipeline going forward. However, the Band remained unconvinced that the easements should be renewed, and on January 4, 2017, the Band's governing body enacted a resolution affirming the Band's unwillingness to consent to new easements. (Dkt. #166-33.) That resolution asserted that: the lands, rivers and wetlands in the Bad River and Lake Superior watersheds were sacred to the Band; an oil spill on the Reservation "would be catastrophic" and would "nullify our long years of effort to preserve our health, subsistence, culture and ecosystems"; the Band would not renew the easements; and Band staff would take steps to initiate the pipeline's decommissioning. (*Id.*) Nonetheless, Enbridge has refused to remove the pipeline from Reservation lands, and continued to transport petroleum and natural gas liquid products across the Bad River Reservation.

When further efforts to reach an understanding failed, the Band filed this lawsuit against Enbridge in July 2019, raising trespass and unjust enrichment claims against Enbridge based on its refusal to remove the pipeline from the 12 former allotment parcels in which the Band now had full or fractional ownership, and for which the easements expired in 2013. As mentioned, the Band also raises nuisance, ejectment, and violation of regulatory authority claims against Enbridge for its operation of the pipeline on tribal trust parcels, for which Enbridge has a 50-year easement expiring in 2043. In response, Enbridge

then filed its counterclaims for breach of contract and its underlying duty of good faith and fair dealing.  Specifically, Enbridge contends that the parties' 1992 Agreement granting the 50-year easement on the Band's wholly-owned parcels, implicitly obligates it to consent to renewed easements over *all* parcels in which the Band has an ownership interest, including the 12, former allotment parcels.

OPINION

As discussed at the outset, the Band seeks partial summary judgment on its trespass and unjust enrichment claims, which relate solely to Enbridge's refusal to vacate the 12 former allotment parcels, and on Enbridge's counterclaims for breach of contract and its underlying general duty of good faith and fair dealing.  In turn, Enbridge seeks summary judgment on the Band's remaining claims for nuisance, ejectment, and violation of the Band's regulatory authority.  The court will address the Band's motion first, followed by Enbridge's motion.

## I.  The Band's Motion for Partial Summary Judgment

The Band contends that Enbridge has been trespassing on the 12 allotment parcels now owned in whole or in part by the Band since the 20-year lease with the BIA granting the easements expired in June 2013.  More specifically, because the easements were not renewed, the Band contends that Enbridge was required by the plain language in the leases to remove the pipeline within six months of expiration, and in continuing to operate the pipeline through the Bad River Reservation, has been unjustly enriched by its trespass.

To succeed on its trespass claim, the Band must prove three elements:  (1) it has an ownership interest in the parcels; (2) Enbridge physically entered or remained, or it caused something to enter or remain, upon the property; and (3) Enbridge lacked a legal right -- express or implied -- to enter or remain.  *See Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶ 40, 328 Wis. 2d 436, 461, 787 N.W.2d 6, 18; Restatement (Second) of Torts § 329 (1965)).[3]  Enbridge does not challenge the Band's ability to prove the first and second elements of its trespass claims, nor could it, since the undisputed evidence establishes that the Band owns or co-owns 12 allotment parcels through which Enbridge's pipeline passes and has continued to operate despite the easements expiring in 2013. However, Enbridge argues that the Band cannot succeed on the third element of its trespass claim for three basic reasons:  (a) the Band is obligated to consent to Enbridge's pipeline running on the 12 allotment parcels for 50 years under the parties' 1992 Agreement; (b) Enbridge's easements have not actually expired because it filed timely applications for renewal of the easements; and (c) the Band's attempt to remove or interfere with Enbridge's operation of the pipeline violates federal statutory law.  The court addresses each of these arguments below.

---

[3] The parties agree that federal law applies to the Band's trespass and Enbridge's contract claims, while the court may look to state law and the Restatement (Second) of Contracts for guidance, so the court has assumed the same.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002) ("[T]here's no discussion of choice of law issues, and so we apply the law of the forum state."); *see also Davilla v. Enable Midstream Partners*, L.P., 913 F.3d 959, 965 (10th Cir. 2019) (considering federal and state common law to resolve trespass claim brought by Indian landowners).

### A. The 1992 Agreement

As an initial matter, Enbridge argues that the 1992 Agreement granting 50 year leases on other parcels, somehow requires the Band to consent to easements over the 12 allotment parcels under both the agreement's express terms and implied duty of good faith and fair dealing.  In particular, Enbridge argues that because the so-called "objective" of the 1992 Agreement was to permit Enbridge to operate its pipeline across the Reservation for 50 years, the agreement should be interpreted as providing the Band's "advanced consent" to easements over *all* parcels in which it had or might in the future acquire an ownership interest, however small.  As discussed below, however, the Band only consented under the 1992 Agreement to a 50-year easement on the 13 parcels that were, at that time, wholly owned by the Band, and nothing more.

### 1. Contract language

To determine whether the Band is obligated by the 1992 Agreement to consent to renewed easements over the 12 allotment parcels, the court begins with the language of the agreement itself.  *See First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (to determine contractual intent of the parties, court must first consider the plain language of their agreement).  The consent provision of the 1992 Agreement states:

> The Secretary may grant to the Company a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years within the Existing Right of Way.  Said pipeline right of way shall be granted pursuant to and in accordance with the Tribal Council's Resolution Granting Pipeline Right of Way, the form of which is attached and marked Exhibit "A." The consideration and damages to be paid by the Company for

> such pipeline operation and right of way and associated damages is the sum of Eight Hundred Thousand Dollars ($800,000.00), which sum shall be paid as set forth herein.

(1992 Agreement (dkt. #166-5) § 1.a.)  "Existing Right of Way" is defined in the 1992

Agreement as the portion of the land in Enbridge's "Original Rights of Way" in which the

Band had a "legal interest."  (*Id.* at 2.)  "Original Rights of Way" was defined as both tribal

land and allotment land over which Enbridge operated its pipeline on the Reservation.

(*Id.*)

Under this consent provision, the Band's consent to an easement in the 1992

Agreement was coterminous with the consent reflected in the Tribal Resolution attached

as Exhibit A to the 1992 Agreement.  *See Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d

547, 554 (7th Cir. 2008) (where contractual provision required performance "in a manner

that is consistent with" specific referenced policies, the contract "clearly and expressly

incorporates" those policies as part of the contract); *see also* 11 Williston on Contracts

§ 30:25 (4th ed.)  ("When a writing refers to another document, that other document, or

the portion to which reference is made, becomes constructively a part of the writing, and

in that respect the two form a single instruction.").

For its part, the Tribal Resolution stated that the Band consented to an easement

that was coterminous with the easement identified in Enbridge's Tribal Lands Application

to the BIA.  The Tribal Resolution unambiguously limited the Band's consent to the lands

covered by that application:

> WHEREAS, the Lakehead Pipe Line Company [Enbridge's predecessor] . . . has requested consent from the Bad River Band . . . for a fifty (50) year right of way easement for a pipeline over and across any lands in which the Tribe has a

12

> legal interest within the Company's existing rights of way, all as is described more fully in the Company's Application of Right of Way dated June 10, 1992 (hereineafter "Application"); and
>
> WHEREAS, the Tribal Council . . . has reviewed the Application and has been advised by the Tribe's attorney with respect to the Application; and
>
> WHEREAS, the Company has offered to pay Eight Hundred Thousand Dollars ($800,000.00) in full consideration for such fifty (50) year Right of Way Easement for a pipeline;
>
> THEREFORE BE IT RESOLVED, that the Tribal Council . . . hereby accepts the offer of the Company, consents to the Company's requests and Application, and requests the Secretary of Interior . . . to approve and grant the Application and the rights of way[.]

(1992 Tribal Resolution (dkt. #166-22).)

Enbridge's Tribal Lands Application, in turn, identified an easement for which the "[a]pproximate distance of the right-of-way will be 2.8 miles[.]" (Tribal Lands Application (dkt. #166-19).) That distance was the lineal distance of the 13 parcels within the pipeline corridor then wholly owned by the Band, in other words, *not* the allotment parcels. The "Tribal Lands Schedule," attached as part of the Tribal Lands Application, listed those same 13 parcels by their precise township and range legal descriptions, listed a cumulative length of the right-of-way of approximately 2.8 miles and identified the parcels as "Bad River Tribal Trust Indian Lands." (Tribal Lands Schedule (dkt. #166-20).)

The obvious import of these documents is that Enbridge's Tribal Lands Application was limited to the 13 Band-owned parcels, the Band's 1992 Resolution limited the Band's easement approval to the 13 parcels in the Application, and the 1992 Agreement, which was entered "pursuant to and in accordance with the" Resolution, was likewise limited to

the 13 Band-owned parcels identified in the Application.  Certainly, this is how the BIA interpreted the parties' 1992 Agreement, as it issued an easement after receiving these documents that was expressly "limited to and more particular described as" the same 13 parcels covered by Enbridge's Tribal Lands Application, which were again set forth by their precise township and range legal descriptions.  (BIA Tribal Land Easement (dkt. #166-14).)  *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (stating federal principles of contract interpretation) ("A document should be read as a whole with all its parts given effect, and related documents must be read together.").

Despite the clarity of these documents, Enbridge argues that that 1992 Agreement also addressed the allotment parcels over which the Band later obtained an ownership interest.  But Enbridge's arguments rely on a strained and unpersuasive reading of the 1992 Agreement.  First, Enbridge argues that the terms of its Tribal Lands Application were not incorporated into the 1992 Agreement because it does not mention the Tribal Lands Application.  But this argument ignores that the 1992 Agreement *expressly* incorporates the Band's 1992 Resolution, which expressly limited its reach to the lands identified in the Tribal Lands Application.  Similarly, the cases Enbridge relies on are inapposite, as they address situations in which a contract mentioned additional terms, but unlike here, failed to attach or identify specifically the terms or documents that were incorporated.  *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 715 (7th Cir. 2019) (contract contained merger clause and did not incorporate any other terms or documents); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 737 (7th Cir. 2002) (contract did not identify specifically any terms or documents that were incorporated).

14

Second, Enbridge tries to end run the limited parcels on which the 50-year easement was actually granted by arguing that § 3 of the 1992 Agreement implicitly granted the same 50-year easement on allotment land over which the Band had no interest or a de minimis (2%) interest.  Section 3 states:

> The Tribe and the Company will do whatever they can reasonably do to ensure that all of the objectives of the Tribe and the Company, as those objectives are expressed in this Agreement, are achieved, even if it means that one or both of the parties must do something which is not expressly described herein.  One of the Company's objectives under this Agreement is to obtain from the Tribe all consents and authorizations it is possible for the Company to obtain, whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest.

(1992 Agreement (dkt. #166-5) § 3.)  Thus, Enbridge now argues that since its "objective" under the 1992 Agreement was to obtain consent to operate its pipeline across the entire reservation for 50 years, and because the Band agreed in § 3 to provide "all consents and authorizations" necessary to achieve this objective, the Band is obligated to provide consent for Enbridge to operate across allotment parcels, even those parcels that the Band obtained an interest in *after* signing the 1992 Agreement.

However, § 3 does not expressly or implicitly impose such an obligation on the Band.  Indeed, the provision says nothing about the Band assisting Enbridge in obtaining a right-of-way across *allotment land*, let alone the entire Reservation.  If the provision was intended to address a 50-year right of way across the entire Reservation, if could have said so simply by using the term "Original Rights of Way," which the contract defined specifically as both tribal land and allotment land on the Reservation.  Instead, the

15

provision uses "Existing Pipeline Right of Way," which is defined as the land owned by the Band at the time of the 1992 Agreement.  As telling, the provision would also have expressly included additional consideration if it had imposed additional, specific obligations, such as "advance consent" to future easements.  But the 1992 Agreement mentions no consideration to be paid to the Band besides the $800,000 set forth in § 1, in exchange for the 50-year easement across tribal land.  To the contrary, that compensation was paid to the majority owner(s) of each allotment parcel, and then for only a 20-year easement just as the BIA directed.

Thus, contrary to Enbridge's arguments and as the Band argues, § 3 is simply a "further assurances" or "best efforts" clause that required the parties to take actions necessary to consummate the contract, even if the actions were not required specifically by the contract.  *See Boyd Grp. (U.S.) Inc. v. D'Orazio*, No. 14 CV 7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015) (clause requiring parties "to do such acts and things, all as the other parties may reasonably request for the purpose of carrying out the intent of this Agreement" was a further assurances clause that did not impose new or different obligations on the parties not set out elsewhere in the contract).  In this regard, § 3 is akin to the contract's implied duty of good faith recognized by Wisconsin common law and discussed below, rather than a provision expanding the four corners of the contract itself beyond recognition.  For example, the Band was obligated by this provision to explain persuasively to the BIA why it was requesting a 50-year easement on its then, wholly-owned parcels, as opposed to the historical and BIA-required, 20-year easement assigned to the allotment parcels.  The provision required nothing more, and certainly did not

16

constitute an open-ended promise for easements over an unspecified number of parcels the Band might acquire in material part or in while sometime in the future, and that appeared nowhere else in the Agreement or referenced documents.  To hold otherwise would be to "read language into a contract which is not there."  *Dakota, Minnesota & E. R.R. Corp. v. Wisconsin & S. R. Co.*, No. 09-CV-00516-WMC, 2010 WL 3282936, at *5 (W.D. Wis. Aug. 19, 2010).  This is particularly true where, as here, the contract is between "sophisticated parties . . . who know how to say what they mean and have an incentive to draft their agreement carefully."  *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 955 (7th Cir. 2006).

Third and finally, Enbridge argues that the court must interpret the 1992 Agreement as applying to allotment parcels, as well as Band-owned parcels, "to avoid an absurd result," arguing that it never would have paid $800,000 for a 50-year easement on specific tribal parcels if it knew that the Band could block renewal of easements on other parcels after 20 years.  However, Enbridge knew full well at the time it signed the 1992 Agreement that there *was* a substantial risk its easements on the allotment parcels would expire after 20 years, having been apprised that the BIA would *only* grant 20-year easements on the allotment parcels, and that there was no guarantee these easements would be renewed, regardless of who owned them at that time.  Individual landowners did not have to consent to renewal, so there was always the possibility that Enbridge would not be able to operate its pipeline across the Reservation for 50 years.  That Enbridge did not chose to pay less for a 20-year easement on the Band-owned parcels as it had for the allotment parcels or paid more for the Band's express guarantee as to its future easements, were both

its choice.  Instead, Enbridge accepted the risk and paid $800,000 for a 50-year easement over the Band-owned parcels, while paying less for 20-year easements on the other parcels. Although Enbridge's gamble did not pay off, it is not absurd for the court to enforce the contract provisions to which the parties plainly agreed.

### 2.  Duty of Good Faith and Fair Dealing

Enbridge next argues that even if the contract language did not require the Band to consent to easements over the allotment parcels, an implied duty of good faith and fair dealing imposed that obligation under Wisconsin common law, and the Band breached that duty by refusing to provide consent to the BIA to extend the right-of-way across the allotment parcels.[4]  The Band argues in response that the implied duty of good faith does not require it to give up its sovereign power to control its territory.

Wisconsin recognizes a duty of good faith and fair dealing as being implied in every contract. *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 885 n. 5 (7th

---

[4] Enbridge also says that the Band breached its applied duty of good faith and fair dealing by attempting to remove the pipeline from the parcels covered by the 50-year easement and by refusing to permit Enbridge to conduct maintenance on the pipeline.  (Enbridge Opp. Br. (dkt. #207) 100–101.)  However, Enbridge failed to develop any breach of contract or bad faith arguments about the 50-year easement or maintenance requests in its opposition brief; instead, it included two conclusory proposed findings of fact, apparently to support these claims.  (Enbridge PFF (dkt. #209) ¶ 57) (alleging that Tribal Council is trying to terminate 1992 Agreement and remove pipeline from entire Reservation), ¶ 93 (alleging that the Band "unreasonably refused to permit Enbridge (and its contractors) to conduct maintenance on the Line where it crosses the Reservation, primarily on the purported justification that Enbridge is in trespass").)  Such "perfunctory and undeveloped arguments" are waived. *M.G. Skinner & Associates Insurance Agency v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (same).  Further, the Band also moved for summary judgment on Enbridge's breach of contract claims, so this was the time for Enbridge to support those claims with sufficient evidence and argument to raise a genuine dispute of material fact.  Having failed to do so, the Band is entitled to summary judgment on Enbridge's breach of contract and duty of good faith claims relating to the 50-year easement and maintenance disputes as well.

Cir. 2010) (Wisconsin law).[5]   However, the duty of good faith requires no more from a party then to honor the other party's rights under the contract, *id.* at 829, and precludes parties from engaging in conduct that "denie[s] the benefit of the bargain originally intended by the parties," *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th Cir. 1998), or "frustrat[es] the purpose of the agreement."   *Estate of Chayka*, 47 Wis. 2d 102, 107, 176 N.W.2d 561 (Wis. 1970).   Conduct that violates the duty of good faith may include:   "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."   *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 797, 541 N.W.2d 203 (Ct. App. 1995).   Thus, the similarity between this duty and the contractual duty of both parties in § 3, quoted in full above, to "do whatever they can reasonably do to ensure that all of the objectives of the Tribe and Company, as those objectives are expressed in the Agreement."

Nevertheless, Enbridge argues that the Band violated the duty of good faith because of its refusal to consent to easements over the now 12, Band-owned allotment parcels somehow frustrates the purpose of the parties' 1992 Agreement.   However, that argument has no more traction than that under § 3.   Certainly, Enbridge's 50-year easement over the Band-owned tribal land is of little import unless Enbridge has permission to operate its pipeline across the entire Reservation, and without the Band's consent to easements on the

---

[5] Some courts have found that the duty of good faith is implied under federal common law well. *E.g.*, *Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 828 (Fed. Cir. 2010) ("The duty of good faith and fair dealing is inherent in every contract, including contracts to which the federal government is a party.") (citing Restatement (Second) of Contracts § 205).

12 Band-owned allotment parcels, Enbridge cannot obtain the permission that it needs. Still, Enbridge's argument ultimately fails for at least two reasons. First, the *only* purpose or objective shared by and express in the 1992 Agreement was to grant Enbridge an easement to operate across the then Band-owned parcels for 50 years. As discussed above with respect to § 3, the agreed upon purpose was not, as Enbridge now asserts, to permit it to operate across the *entire* Reservation for 50 years. Moreover, Enbridge *knew* of the risk that its 20-year easements contemporaneously granted by the BIA might not be renewed, and yet failed to protect itself from that risk. In the end, the duty of good faith and fair dealing cannot be used to add obligations and conditions to an agreement that go beyond the agreement reached by the parties. *Betco Corp., Ltd. v. Peacock*, No. 14-CV-193-WMC, 2016 WL 7429460, at *6 (W.D. Wis. Dec. 23, 2016), aff'd, 876 F.3d 306 (7th Cir. 2017) ("implied duty of good faith is not a license to rewrite a contract").

Second, and as importantly, the implied duty of good faith and fair dealing cannot be applied to deprive the Band of its sovereign authority over its land. Rather, the court must interpret all contracts in light of the Band's sovereign power and must construe contracts to avoid, if possible, foreclosing the exercise of sovereign authority. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982). A sovereign will be found to have surrendered a sovereign power by contract *only if* the surrender was explicit and unambiguous. *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986) (quoting *Merrion*, 455 U.S. at 148) ("[S]overeign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."). In this case, nothing

in the 1992 Agreement clearly and unmistakably surrenders the Band's power to exclude Enbridge from parcels of land acquired after the agreement was signed; nor are there explicit or unmistakable terms in the 1992 Agreement by which the Band agreed to grant Enbridge a right-of-way across all parcels owned by the Band for the next 50 years.

Accordingly, on this record, the only way to find a waiver of the Band's broader sovereign power over other parcels would be to infer one under the contractual implied duty of good faith, but to do so would be contrary to law. *See United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987) ("[A] waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakable terms'") (citations omitted); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59 (1978) (waiver of sovereign powers "cannot be implied but must be unequivocally expressed") (citations omitted); *Grand Canyon Skywalk Dev. v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1195, 1205 (9th Cir. 2013) (sovereign powers must be "expressly waived in unmistakable terms within the contract").  While Enbridge argues that the Band's power to exclude is not a sovereign power, and the Band simply has the same authority to exclude that belongs to any landowner, which can be limited by contract, the Supreme Court has expressly rejected the view that tribal power to exclude from its land is akin to "the power possessed by any individual landowner or any social group to attach conditions . . . to the entry by a stranger onto private land." *Merrion*, 455 U.S. at 146.  Instead, the Court explained that "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands" and "to control economic activity within its jurisdiction." *Id.* at 140.  Indeed, the Bad River Band's sovereign power over its lands was acknowledged in the 1854 Treat with the Chippewa,

*State of Wisconsin v. Hitchcock*, 201 U.S. 202, 214 (1906), which created a permanent reservation for the Band with permanent rights of occupancy and possession, including the power to exclude and to "place conditions on entry, on continued presence, or on reservation conduct." *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235 (1985).

Further, Congress recognized the extent of tribal sovereign authority in this area by making tribal consent a statutory requirement to an encumbrance on tribal land. Under the Nonintercourse Act, a transfer of any rights in tribal land to a non-Indian person or entity requires the consent of both the Secretary of the Interior and the tribe itself. *See* 25 U.S.C. § 177; *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). With respect to right-of-way easements across tribal lands in particular, the Secretary of the Interior has the authority to grant an easement for a pipeline through a Reservation or individual Indian allotment, 25 U.S.C. § 321, but cannot authorize a right-of-way easement across land owned or co-owned by a tribe "without the consent of the proper tribal officials." 25 U.S.C. § 324; *see also* 25 C.F.R. § 169.4.[6] Thus, in exercising its power to exclude non-Indians, the Band is acting not only as a landowner, but as a local government and sovereign. *Merrion*, 455 U.S. at 146, n.12 ("Over tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well

---

[6] Both case law and BIA regulations also recognize that these statutory requirements arise from the Band's tribal sovereignty. *See Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1112 (10th Cir. 2017) (discussing § 324 and noting that, "unlike ordinary heirs inheriting interests in land, tribes are sovereign political entities possessed of sovereign authority") (citation omitted); "Rights-of-Way on Indian Land," 80 Fed. Reg. at 72,505–06 (BIA acknowledging that "[c]onsenting to rights-of-way on trust or restricted land is one of several tools . . . that animate the traditional notions of sovereignty").

as sovereignty.").  Moreover, the Band's decision effectively to refuse additional, 30-year easements to Enbridge on allotment parcels was not just was the exercise of a sovereign power to which Enbridge was always subject, which the implied duty of good faith and fair dealing cannot waive, but to do otherwise would be effectively renewing these easements without BIA approval.

In sum, the Band did not breach the 1992 Agreement and did not violate its implied duty of good faith and fair dealing by refusing to grant Enbridge easements over the 12 allotment parcels acquired after signing the agreement; nor did the 1992 Agreement provide the Band's consent to Enbridge for continued operation of its pipeline on the allotment lands now owned by the Band beyond the express, 20-year easement approved by the BIA and long since expired.  Instead, the 1992 Agreement expressly limited the 50-year easement to the 13 Band-owned parcels identified and created no obligation as to any other parcels along the pipeline corridor. Accordingly, Enbridge cannot rely on the 1992 Agreement as a source of consent or legal authorization to continue operating its pipeline on the allotment parcels without a valid easement.

### B.  Enbridge's Efforts to Renew the Easements

Next, Enbridge argues that the Band's trespass claim fails because, regardless of the 1992 Agreement, the Administrative Procedures Act, 5 U.S.C. § 558(c), gives Enbridge the right to continue operations on the allotment parcels.  Section 558(c) states that a timely application for renewal of an easement or license form a federal agency stays expiration of an easement or license until a final decision is made, so long as the application was made "in accordance with agency rules."  *See also Pan-Atl. S. S. Corp. v. Atl. Coast Line R. Co.*, 353

U.S. 436, 439 (1957) (describing requirements of § 558(c)). Thus, Enbridge argues that because it submitted applications for renewal of its easements on the allotment parcels *before* they expired, and there is no final decision from the Interior Board of Indian Appeals on those applications, Enbridge can continue operating its pipeline without being in trespass indefinitely.

This argument fails lacks support in the evidence. While Enbridge submitted 15 written applications for renewal of the allotment parcels in March 2013, approximately three months before the easements would expire by their terms in June 2013, the BIA denied those applications in November 2020 because Enbridge had "*failed to obtain landowner consents*" (*id.* at 2) (emphasis added) with its right-of-way applications. Although Enbridge filed timely administrative appeals from the denials, which are technically still pending before the Interior Board of Indian Appeals, Enbridge's renewal applications did *not* comply with the BIA's rules for seeking renewal of easements over tribal land on their face. In particular, Enbridge asserts that there was no *regulation* at the time expressly requiring the submission of landowner consents with its applications, but the application forms submitted in 2013 identified the documents that the BIA required to be submitted with a renewal request, including "Written consent of landowner (ROW Form 94.7)." (Dkt. #258-3.)

Plus, contrary to Enbridge's assertion, the regulations at the time of submitting the renewal applications, 25 C.F.R. § 169.14 (2013), required it to deposit "the total estimated . . . consideration for the right-of-way" as "specified in the consent covering that parcel." The BIA guidance at the time likewise listed "Written consent of landowner" as a

"Required" item to be submitted with the renewal application.  *See* https://iltf.org/wp-content/uploads/2016/11/BIA-Procedural-Handbook-Grant-of-Easement-for-Right-of-Way-on-Indian-Lands.pdf (last visited September 7, 2022).  In light of this guidance, Enbridge had and has no plausible argument that its 2013 renewal applications complied with the BIA's rules, much less were sufficient to stay expiration of its easements under § 558(c).  To hold otherwise would lead to Enbridge being permitted to operate its pipeline indefinitely on the Band's land without its consent, so long as the BIA failed to issue a final decision on the applications despite their patent invalidity.

### C. Pipeline Safety Act and Federal Preemption

Enbridge's final argument is that the Band's trespass claim is barred by the federal Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.*, which establishes a comprehensive regime of safety requirements for interstate pipelines and precludes domestic authorities from regulating pipeline safety.  49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.")  Enbridge also cites several cases holding that state or local actions are preempted by the Act.  *E.g., Olympic Pipe Line Co. v. City of Seat*tle, 437 F.3d 872 (9th Cir. 2006) (Pipeline Safety Act preempted City of Seattle from enforcing its own more stringent pipeline safety provisions); *Kinley Corp. v. Iowa Utilities Board, Utilities Division, Department of Commerce*, 999 F.2d 354 (8th Cir. 1993).  Enbridge argues that because the Band is withholding its consent to renewed easements on the allotment parcels based on safety concerns, the Band's actions are preempted by the Act.

The glaring problem with this argument is that while the Band's refusal to consent to easements may be based in part on safety concerns (at least environmental in nature), it is *not* based on any imposition of safety *standards*. Nor has Enbridge been able to cite *any* legal authority supporting its argument that the Pipeline Safety Act would *require* a tribe (or any other landowner for that matter) to grant or renew an easement for a pipeline across its land simply because it has concerns about the safety of doing so. *See Enbridge Energy v. Town of Lima*, No. 13-CV-187-BBC, 2013 WL 12109106, at *4 (W.D. Wis. Apr. 4, 2013) ("[B]ecause defendants' road use proposal and demands are not safety regulations, they do not come within the express preemption provision of the Pipeline Safety Act.")

For all of the reasons explained above, therefore, Enbridge has failed to undermine plaintiff's overwhelming evidence of the three elements of the Band's trespass claim or asserted any viable defense. Thus, the Band is entitled to summary judgment on its trespass claim, as well as on Enbridge's counterclaims for breach of contract and related implied duty of good faith and fair dealing.

### D. Unjust Enrichment and Restitution

The Band has also moved for summary judgment on its claim of unjust enrichment. To succeed on this claim, the Band must show that Enbridge obtained a benefit at its expense, or in violation of its legally protected rights. *See* Restatement (Third) Restitution and Unjust Enrichment § 1 ("Restatement of Restitution"); *see also See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Lab'ys of Arkansas, P.A.*, 71 F.3d 1251, 1254 (7th Cir. 1995) (federal common law on restitution and unjust enrichment "tracks the

consensus of the states," which is summarized in the Restatement of Restitution).  The Band claims that Enbridge benefited monetarily by trespassing in violation of its legally protected rights and should be found liable for unjust enrichment, including payment of restitution.  Enbridge raises three arguments in opposition to the Band's unjust enrichment claim, but none is persuasive.

First, Enbridge argues that there is no federal cause of action for unjust enrichment, relying on a single, district court decision that found "no authority" in federal common law setting forth "the elements of an unjust enrichment claim."  *Schafer, Tr. of Wayne Penn Schafer Separate Prop. Tr. Established Oct. 5, 1982 v. Centerpoint Energy Oklahoma Gas*, No. 17-CV-365-GKF-FHM, 2018 WL 10140171, at *5 (N.D. Okla. May 21, 2018).  As far as this observation goes, it is certainly not precedential, or even persuasive.  Regardless, the Seventh Circuit has recognized unjust enrichment claims under federal common law, equating them with common law principles of restitution.  *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957 (7th Cir. 2006); *Cent. States*, 71 F.3d at 957.  More specifically, "A person who is unjustly enriched at the expense of another is subject to liability in restitution."  Restatement of Restitution § 1; *see also id.* § 40 ("A person who obtains a benefit by an act of trespass . . . is liable in restitution to the victim of the wrong."); *Bobak v. Fed. Exp. Corp.*, No. 97 C 7066, 1999 WL 160223, at *7 (N.D. Ill. Mar. 10, 1999) (recognizing common law theory of unjust enrichment).

Second, Enbridge argues that there are disputed issues of fact precluding summary judgment on the Band's unjust enrichment claim.  However, the only disputed issues that Enbridge discusses relate to the 1992 Agreement, and in particular whether Enbridge had

27

permission under that agreement to maintain its pipeline on the allotment parcels owned by the Band.  As discussed above, there are no genuine factual disputes regarding the 1992 Agreement, and Enbridge had no valid basis for believing that it could maintain its pipeline on tribal land without the Band's permission and a valid easement from the BIA, leaving only a question as to the appropriate remedy.

Third, and relatedly, Enbridge argues that the Band cannot pursue an equitable remedy for unjust enrichment because it can seek fair rental value for Enbridge's trespass, which provides an adequate legal remedy.  However, as discussed more in the section below, addressing a "profits-based remedy," the basis for the Band's restitution claim is that an award of fair rental value alone would *not* be an adequate remedy, and similarly that ordinary trespass damages would be inadequate to address Enbridge's actions. Enbridge has failed to refute this argument sufficiently to prevent the Band from being allowed to seek an appropriate remedy for unjust enrichment.

In sum, the Band has submitted evidence sufficient to compel a reasonable jury's finding of unjust enrichment, and Enbridge has failed to raise any legal or factual dispute that would preclude entry of summary judgment on liability as to that claim.  Therefore, the Band is entitled to a finding at summary judgment that Enbridge is liable for unjust enrichment, as well as unlawful trespass.

### E.  The Band's Remedies

This brings us to the Band's motion for summary judgment on its entitlement to certain remedies.  As an initial matter, Enbridge concedes that if the Band is successful on its trespass claim, the Band is entitled to fair market rental value on the expired easements

for the 12 allotment parcels.  As noted, the Band in turn contends that the rental value of the easement would not be a sufficient damage award, and seeks a ruling that it is entitled to recover a profits-based remedy for its trespass and unjust enrichment claims.  The Band also seeks a permanent injunction requiring Enbridge to cease operation of the pipeline, to safely decommission it, and to remove it.

### 1. Accounting and profits

The court also agrees that the Band is entitled to a profits-based remedy for Enbridge's trespass and unjust enrichment.  Specifically, the Supreme Court has recognized that an accounting for profits is available under federal common law specifically for trespass to Indian lands.  *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 344 (1941) (railroad that unlawfully used Indian lands was required to "account for all rents, issues and profits derived from the leasing, renting or use of the lands"); *Oneida Cnty., N.Y.*, 470 U.S. at 235–36 ("Indians have a common-law right of action for an accounting of 'all rents, issues and profits' against trespassers on their land.") (quoting *Santa Fe*, 314 U.S. at 344); *see also Davilla v. Enable Midstream Partners, L.P.*, No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016) (where pipeline found in trespass after expiration of BIA easements, Indian landowners entitled, under federal common law, "to an accounting of defendants' profits from the operation of their pipeline and recovery of the pro-rata share of those profits that is attributable to the portion of the pipeline that has been located on their property").

As explained in the Restatement on Restitution, an appropriate remedy for unjust enrichment is also "the amount of profit wrongfully obtained."  Restatement on Restitution

§ 49.  Similarly, "[e]nrichment resulting from intentional trespass is not properly measured by ordinary rental value," as that remedy would leave the conscious wrongdoer "on a parity with a person who—pursing the same objectives—respects the legally protected rights of the property owner."  *Id.* § 40, cmt. b.  Instead, the proper remedy for willful or intentional trespass includes "consequential gains" in the form of profits that the trespasser achieved by violating the property owner's rights.  *Id.  See also* Restatement (Second) of Torts § 929 ("[I]f the defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry.").

Enbridge also raises several arguments in opposition to the Band's request for a profits-based remedy, but none is persuasive.  First, Enbridge contends that the Band did not plead a claim for accounting, but this is simply incorrect.  Indeed, the Band sought in its complaint "an order awarding the Band damages for trespass and restitution for unjust enrichment, including for profits derived from Enbridge's unlawful transmission of petroleum products across the Band's lands."  (3d Am. Cpt. (dkt. #85-1) Prayer for Relief, ¶ H).)  A request for profits and restitution for unjust enrichment is the equivalent of a request for an "accounting."  *See* Restatement of Restitution § 51(4) ("Restitution remedies that pursue this object [depriving a wrongdoer of profits] are often called 'disgorgement' or 'accounting'"); *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1942 (2020) ("depriv[ing] wrongdoers of their net profits from unlawful activity" has "gone by different names," including "restitution," "disgorgement," "accounting" and "accounting for profits").  Accordingly, the Band adequately pleaded its request for a profits-based remedy following an accounting.

30

Second, Enbridge argues that restitution or a profits-based remedy is not appropriate for trespass cases, and that the only appropriate remedy is a rental fee or market value of the land, particularly if nothing was removed from the property. However, the only cases that Enbridge cites in support concern *innocent* trespassers. *E.g.*, *Enbridge Energy, Ltd. P'ship v. Engelking*, 2017 WI App 1, ¶ 22, 372 Wis. 2d 833, 890 N.W.2d 48 (landowner entitled to rental value of the land for duration of the trespass, where trespasser "did not act willfully or wantonly in disregard of the [landowner's] rights, but rather committed an honest mistake when they located the three additional pipelines in an area they erroneously believed, based on the language of the Right of Way Grant, was part of the conveyed right of way"); *Young v. Appalachian Power Co.*, No. CIV.A.2:07-479, 2008 WL 4571819, at *8 (S.D.W. Va. Oct. 10, 2008) ("Plaintiffs have adduced no evidence that the defendant was a "conscious wrongdoer."); *Mullins v. Equitable Prod. Co.*, No. 2:03CV00001, 2003 WL 21754819, at *1 (W.D. Va. July 29, 2003) (rental value was appropriate remedy where pipeline was built on plaintiff's property "in error").

Here, although initially an owner of an easement, Enbridge is now a conscious or willful trespasser. A "'conscious wrongdoer' is a defendant who is enriched by misconduct and who acts (a) with knowledge of the underlying wrong to the claimant, or (b) despite a known risk that the conduct in question violates the rights of the claimant." Restatement of Restitution § 51(3). For the reasons discussed above, a reasonable jury would have to find that Enbridge was enriched by trespassing on the Band's land and had no reasonable basis for believing that its presence continued to be lawful. To the contrary, Enbridge knew that: its easements had expired; and it was required by federal statute to have permission

31

from the Band, as well as a valid easement from the BIA.  Instead, Enbridge continued operating its pipeline on the allotment parcels.  Moreover, contrary to its argument, Enbridge could neither have reasonably believed that the 1992 Agreement, nor that its incomplete renewal applications permitted Enbridge to continue operating on the allotment land owned by the Band.  Instead, on this record, a reasonable jury would have to find that Enbridge was a conscious trespasser from whom the Band can recover a profits-based remedy.  *See In re de Jong*, 793 F. App'x 659, 660 (9th Cir. 2020) (trespasser who knew lease would expire but did not vacate premises was a conscious trespasser liable for "disgorgement of all profits derived from the trespass," because "a conscious trespasser will be stripped of all gains from unauthorized interference with another's property").

Third, Enbridge argues that the Band's request for restitution, profits, or any other relief, including injunctive relief, is barred by the doctrine of laches, since the Band waited several years after Enbridge's easements expired before filing this lawsuit.[7]  Laches is an equitable doctrine that considers the inequity of permitting a claim to be enforced.  *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 217 (2005) (laches is an equitable remedy that may "bar long-dormant claims for equitable relief").  To support a defense of laches, however, Enbridge would have to show (1) a lack of diligence by the

---

[7] Enbridge says in a footnote that it has "a number of other affirmative defenses" that would bar the Band's claims and that preclude summary judgment on the Band's trespass claim.  (Enbridge's Opp. Br. (dkt. #207) 143, n.84.)  However, if Enbridge wanted to raise affirmative defenses in opposition to the Band's trespass or unjust enrichment claims, summary judgment was obviously the time to do so.  By failing to develop these arguments in its opposition brief, Enbridge has waived those affirmative defenses to the Band's trespass and unjust enrichment claims.

Band, and (2) prejudice to Enbridge. *See Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982). Neither have been established here.

Nevertheless, Enbridge argues that it engaged the Band in good faith negotiations before easements on the allotment parcels expired in 2013, and that the Band failed to meaningfully respond for more than two years to its offer. It further alleges that the Band never demanded that Enbridge cease operations or remove the pipeline until January 2017, when the Tribal Council passed a resolution stating that it would not renew the easements for the pipeline, and that the Band did not accuse Enbridge of trespass until it filed this lawsuit in July 2019. Enbridge also argues that it was prejudiced by the Band's delay in crying foul, because (1) it could have started working sooner on a plan to reroute the pipeline outside of the Reservation boundaries, and (2) the lapsed time has increased Enbridge's potential liability for damages to the Band.

The court is not persuaded that the doctrine of laches bars any of the Band's claims in this case. Enbridge relies on cases in which equitable principles barred the enforcement of rights that had long gone stale. For example, in *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 (2d Cir. 2005), the Cayuga Indian Nation filed suit against the State of New York, claiming that a flaw in the original transfer of its reservation land over 200 years ago violated federal law, so it was entitled to possession of the land. The Second Circuit found the claim was barred by laches because "this type of possessory land claim— seeking possession of a large swath of central New York State and the ejectment of tens of thousands of landowners—is indisputably disruptive." *Id.* at 275–277. In so holding, the Second Circuit relied on *City of Sherrill*, 544 U.S. 197, in which the Supreme Court held

that equitable principles precluded the Oneida Indian Nation from reviving its sovereignty over land that was formerly part of its historic reservation.  The Tribe resisted payment of property taxes to the City of Sherrill on the ground that its acquisition of fee title to the parcels revived the Tribe's sovereignty over the land.  *Id.*  The Supreme Court rejected that claim, concluding that the "long lapse of time" and "dramatic changes in the character of the properties" precluded the Tribe from gaining "the disruptive remedy it now seeks."  *Id.* at 216-217.  Specifically, referring to the doctrines of laches, acquiescence and impossibility, the Court held that the "Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations," rendered the shift in governance sought by the Tribe inequitable.  *Id.* at 221.

The equitable considerations in this case are not remotely analogous to the circumstances in *Cayuga* or *Sherrill*.  The Band's enforcement of its sovereign authority over the allotment parcels will not disrupt significant and justified expectations concerning the character of the land.  The Band's claims are also not long-dormant claims that it has sought to revive after 200 years.  Although the Band did not seek to enforce its rights over the allotment parcels until it filed suit in 2019, Enbridge had no justified expectations in continuing to operate the pipeline over the allotment parcels for years without paying compensation.  Regardless, Enbridge was well-aware that it lacked a valid easement over the parcels, and it knew or should have known that federal law required both the Band's and BIA's approval.  Lastly, Enbridge has cited no legal authority suggesting that a court

in law or equity should apply principles of laches to protect individuals who have been knowingly operating contrary to federal law.

Fourth, and finally, Enbridge argues that permitting the Band to recover a profits-based remedy would be a "windfall" to the Band because it obtained ownership of the allotment parcels "at taxpayer expense through federal programs, and for a minute fraction of the amounts it is now seeking in damages as a result of its ownership in these lands." (Enbridge Opp. Br. (dkt. #207) 120.)   This argument is tone-deaf and meritless.   As Enbridge is well-aware, the allotment parcels were part of the Band's original territory, and were severed as a result of the federal government's allotment policy, the purpose of which was "simple and clear cut:  to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into society at large."  *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, – F.4th –, 2022 WL 3355076, at *6 (7th Cir. Aug. 15, 2022) (quoting *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992)); *see also Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 670–71 (7th Cir. 2020) ("as a result of allotment, Indians drift[ed] toward complete impoverishment and lost their land") (citations omitted).   The land consolidation and reorganization programs by which the Band acquired the 12 allotment parcels at issue here were intended to reverse the decimation of tribal land wrought by the government's allotment policy, and to "give tribes the opportunity to re-establish their governments and land holdings."  *Oneida Nation*, 968 F.3d at 671.  In light of this historical background, Enbridge's argument that the Band would receive a "windfall" by enforcing its sovereign rights over the land it has recovered is meritless.

Accordingly, the court is persuaded that restitution or a profits-based remedy is appropriate and necessary in this case, *both* to address the violation of the Band's sovereign rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future exactly as it did here.  If Enbridge was required to pay only what it would have paid the Band for an easement, the court would essentially be granting Enbridge a de facto condemnation power, and excusing it from complying with the bargaining and easement process for Indian lands established by federal law.  *Cf. Pearson v. Target Corp.*, 968 F.3d 827, 831 (7th Cir. 2020) ("We base our decision here on long-established principles of equity. It has long been axiomatic 'that no person shall profit by his own wrong.'"); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("[O]ne way to deter [an intentional tort] is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act.").  For all of these reasons, the court will grant summary judgment to the Band on its request for a profits-based remedy.

The Band did not request a specific amount of monetary relief in its motion for summary judgment, and neither side addressed how a profits-based remedy should be calculated in this case.  Accordingly, the court will direct the parties to submit supplemental briefing on how the court should determine the amount of profits-based relief to which the Band is entitled, including the ordering of a third-party accounting, and whether the ultimate question as to a final dollar amount should be resolved by the court or a jury.

### 2. Permanent injunction

Finally, the Band argues that if the court finds Enbridge in trespass, it should issue a permanent injunction prohibiting the further flow of crude oil and natural gas across the relevant parcels and requiring the safe removal of Line 5 from the 12 allotment parcels owned by the Band.   However, a finding of liability on a defendant's part does not automatically give rise to an entitlement to injunctive relief, even if the defendant's actions clearly violate federal law.  *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021).  To the contrary, an injunction issues "only as necessary to protect against otherwise irremediable harm." *LAJIM, LLC v. Gen Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) ("Ordinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief.")

Nonetheless, the Band argues that this court should not weigh the equities in deciding whether to enjoin Enbridge permanently from using the pipeline in its Tribal lands, because an injunction is mandatory under the circumstances here.  In particular, the Band says that permitting Enbridge to operate in trespass would violate the Nonintercourse Act, which requires tribal consent to any conveyance of a right on Indian land.  25 U.S.C. § 177 ("No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.")

In so arguing, the Band relies on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), a case that analyzed a different statute and statutory scheme under the Endangered Species Act.  *Id.* at 171.  The Court held that the Endangered Species Act required the district court to enjoin completion of a dam where it was undisputed further construction would cause the complete elimination of an endangered species.  *Id.*  Under these circumstances, an injunction was the only means of ensuring compliance with the Endangered Species Act.  *Id.* at 194.  However, the Band cites no cases applying *Hill* to a trespass or unjust enrichment claim, nor any case applying *Hill* to prevent a violation of the Nonintercourse Act.  Nor has the Band cited any case in which a court disregarded traditional equitable principles and issued an automatic injunction to prevent a Nonintercourse Act violation.

Instead, the Supreme Court noted that "the Nonintercourse Act does not address directly the problem of restoring unlawfully conveyed land to the Indians," *Oneida Cnty.*, 470 U.S. at 239, and recognized that "equitable considerations" might limit the relief available to Indians seeking to enforce their property rights.  *Id.* at 253, n.27.  In rejecting an Indian tribe's request for injunctive relief for equitable reasons, the Supreme Court also explained that "[t]he substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is."  *City of Sherrill*, 544 U.S. at 213 (citing *Oneida Indian Nation of New York State v. Cnty. of Oneida, N.Y.*, 199 F.R.D. 61, 90 (N.D.N.Y. 2000) ("[T]here is a sharp distinction between the existence of a federal common law right to Indian homelands and how to

vindicate that right.")); *see also Yankton Sioux Tribe v. United States*, 272 U.S. 351, 357 (1926) (recognizing the impracticability of returning to Indian control land that generations earlier passed into numerous private hands).

Although this case is distinguishable from the *City of Sherrill* and other cases involving land that has been held by non-Indians for decades, or even centuries, there are still equitable considerations that affect the Band's injunction request.  *See City of Sherrill*, 544 U.S. at 219 (recognizing that certain requests for injunctive relief may be "impractical").  In particular, there are concerns raised by Enbridge and several amici about the impact on foreign relations, consumers, refineries, regional economies, and international energy supply, resulting from an immediate shutdown of the Line 5 pipeline. Under the circumstances, therefore, the court will follow the Supreme Court's guidance that in choosing between various methods of enforcing Congress's policy choices, discretion be exercised as to "whether a particular means of enforcing the statute should be chosen over another permissible means."  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–98 (2001).

Applying this principle, the court concludes that the Band is entitled to a remedy for Enbridge's trespass and unjust enrichment, particularly in light of Congress's clear statement in the Nonintercourse Act, but that the court is *not* required to issue a permanent injunction that would eject Enbridge immediately from the allotment parcels without considering the relevant equities.  *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019) (holding that district court erred by ordering defendant to remove pipeline "on the basis of liability alone").

Generally, in determining whether to enjoin a continuing trespass permanently, a federal district court must consider whether:  (1) an injunction is necessary to prevent irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *Liebhart*, 998 F.3d at 779 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).)  Here, the Band has submitted ample evidence to show that an injunction is necessary to prevent irreparable harm, and that remedies available at law, such as monetary damages, would be inadequate compensation.  Indeed, "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989).  This is particularly true here, where the harm of a continuing trespass would dispossess the Band of its *sovereign* right to control its own land.  *See Merrion*, 455 U.S. at 141 ("power to exclude non-Indians from Indian lands" is "a hallmark of Indian sovereignty").  For the same reason, interference with the Band's sovereignty cannot be adequately remedied with monetary damages.

As for the third factor, the court agrees the balance of hardship between the parties weighs heavily in the Band's favor since Enbridge's conduct was willful.  *See Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008) ("[I]t is an accepted equitable principle that a court does not have to balance the equities in a case where the

defendant's conduct has been willful.") (citation omitted).  However, genuine disputes of material fact exist regarding the fourth factor:  the public interest.

Certainly, the Band persuasively argues that the public interest is served by protecting the Band's treaty rights, sovereignty and rights of self-government, as well as advancing Congress's policy choices as articulated in the Nonintercourse Act's prohibition on unconsented conveyances of Tribal land.  Enbridge does not counter any of the Band's arguments in that regard, but it raises several other, valid and significant public interest concerns.  In particular, Enbridge, and several amici, argue that an immediate shutdown of the Line 5 pipeline would have widespread economic consequences.  Both sides have submitted expert opinions from oil industry economists and experts in the logistics of shipping crude oil and natural gas liquids, who provide varying opinions regarding the impact of shutting down the pipeline, as well as whether there are viable mechanisms for replacing the energy products currently conveyed by Line 5.  Indeed, the Band concedes, as it must, that genuine factual disputes exist regarding Enbridge's economic arguments and the impact that decommissioning the pipeline would have on energy supply and local economies.  (Band's Reply Br. (dkt. #256) 88.)

Further, there is little question that an immediate shutdown of the pipeline would have significant public policy implications on the trade relationship between the United States and Canada.  As the Band concedes, Line 5 falls under a treaty between the two nations regarding pipeline transit:  1977 Transit Pipeline Treaty (Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Treaty").  A

41

provision of the Transit Treaty prohibits any "public authority" of either nation from "institut[ing] any measures" that would impede the flow of oil in certain cross-border pipelines, including Line 5.  *See* Transit Treaty, Art. II.  Disputes about the pipeline must, according to the treaty, be subject to international arbitration, a procedure that Canada recently requested with respect to Line 5.  (Statement by Canadian Minister (dkt. #357-2).)  The Canadian Minister of Foreign Affairs, Melanie Joly, recently issued a statement expressing concern about a shutdown of the pipeline on the Bad River Reservation, and supporting a proposal by Enbridge to relocate that segment of Line 5 outside and around the Reservation.  (*Id.*)  Indeed, Enbridge goes so far as to argue that Canada's request for international arbitration precludes this court from issuing any injunctive relief or, at the very least, requires this court to stay the Band's request for an injunction.

Even so, the court is not persuaded that it must stay resolution of the parties' ongoing dispute, given that:  there is no indication the Band will be involved in any arbitration between the United States and Canada; and the Band's property rights are themselves recognized in a federal treaty -- the 1854 Treaty between the United States and the Chippewa; and again, a court cannot find that Congress abrogated Indian treaty rights absent unambiguous language to that effect.  *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *see also United States v. Dion*, 476 U.S. 734, 739–40 (1986) ("What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the

42

treaty.").  There is no such abrogation language in the 1977 Transit Treaty, as the Transit Treaty does not mention Indian treaties or treaty rights at all, let alone the 1854 Treaty with the Chippewa.

Regardless, it is possible to craft injunctive relief that would not interfere with the Transit Treaty or Canada's concerns about the economic impact of an immediate shutdown.  Enbridge has represented to this court that it is working on a reroute of the pipeline, which would take Line 5 completely outside of the Bad River Reservation, and should take only six years to complete.  (Enbridge Opp. Br. (dkt. #207) 148.)  Thus, if Enbridge has been working diligently on the reroute plan, it should be able to complete that reroute within five years.  Thus, the court is inclined to issue an injunction that: (1) requires Enbridge to complete a reroute of the pipeline outside the Bad River Reservation within five years; (2) requires Enbridge to pay the Band a fee for the easement in the interim; and (3) would subject Enbridge to a doubling of that fee if the reroute is not completed within five years.  Such an injunction would balance the equities between the Band's sovereign interests, broader economic concerns, and foreign relations.

However, the court will not issue any permanent injunctive relief without further input from the parties.  Specifically, the court will hold a status conference with the parties at which the parties should be prepared to provide input on: (1) Enbridge's likelihood of completing the reroute within five years; (2) how to determine the appropriate measure of past and future rent and damages to the Band; and (3) what issues, if any, must be resolved by a jury or this court.  After the court receives the parties' input on these issues, it will determine the type of trial necessary to resolve this case.

## II. Enbridge's Motion for Summary Judgment

In addition to its trespass and unjust enrichment claims addressed above, the Band claims that the pipeline is a public nuisance under state and federal common law due to the risk of a rupture near the Bad River, which could have devastating environmental impacts to the Band's Reservation Lands.  The Band also asserts its own regulatory authority under federal common law to assess the pipeline's safety and to eject the pipeline from the Bad River Reservation.  Enbridge moves for partial summary judgment on these remaining counts in the Band's third amended complaint: count 1 (federal nuisance); count 2 (state law nuisance); count 4 (ejectment); and count 5 (Band regulatory authority).  The court will briefly address Enbridge's arguments as to count 2, count 4, and count 5, before considering Enbridge's arguments regarding the Band's federal nuisance claims in count 1.

### A.  State law nuisance

Enbridge argues that the Band is not within the class of eligible plaintiffs who may bring a public nuisance action under Wisconsin law.  Specifically, Wis. Stat. § 823.01 provides that "[a]ny person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance[.]"  Enbridge argues that because the statute does not list tribes, and because the term "person" is not typically construed to include tribes, *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989), the Band lacks standing to sue under that particular statute.  The Band fails to address this argument in its opposition brief; instead, it argues general standing to bring suit under Article III of the United States Constitution.  (Band's Opp. Br. (dkt. #282) 28–29.)  However, the Band's Article III standing is not in dispute.  Enbridge is only challenging the Band's eligibility to maintain

a public nuisance action under Wisconsin law.  *See Tucker v. U.S. Dep't of Com.,* 958 F.2d 1411, 1416 (7th Cir. 1992) (whether plaintiff is "within the class of persons who have been given a right to litigate the violation" is "[an]other sense[] of standing besides the Article III sense").  By failing to respond to Enbridge's argument, the Band has effectively conceded that it does not fall within the class of persons who may bring a public nuisance claim under Wisconsin law, at least for purposes of summary judgment in this case.  *See Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.,* 260 F.3d 742, 747 (7th Cir. 2001) (failure to respond to nonfrivolous argument in opposition brief "acquiesces" to the argument, and "[t]hat acquiescence operates as a waiver").

### B. Ejectment

The court agrees with Enbridge that the Band's ejectment claim (count 4) is duplicative of the Band's trespass claim.  In fact, the Band acknowledges the ejectment claim is based on its holding "valid and lawful ownership interest in twelve [allotment] parcels[, and] Enbridge's maintenance and operation of the pipeline on those parcels constitute[ing] the wrongful use and possession of them," which "operates to withhold rightful possession from the Band."  (Band's Opp. Br. (dkt. #282) 26 (citing 3d Am. Compl. (dkt. #85-1) ¶¶ 160–61, 163).)  Of course, these are the *same* basic allegations that support the Band's trespass claim; plus, the Band seeks the same remedy -- ejectment -- for both claims.  As discussed above, the court is not going to order immediate ejectment of Enbridge from Reservation land because of larger public policy concerns, but will consider input from the parties in crafting an appropriate equitable remedy in this case.  Because it is entirely duplicative and adds nothing further to the court's equitable analysis, therefore,

45

the court will dismiss the Band's ejectment claim.  *See Brooks Jay Transportation, Inc. v. FedEx Ground Package Sys., Inc.*, No. 17-CV-084-WMC, 2017 WL 5136014, at *3 (W.D. Wis. Nov. 3, 2017) (dismissing duplicative breach of contract claims that were based on same allegations and sought same remedy); Borzych v. Frank, No. 06-C-475-C, 2006 WL 3254497, at *8 (W.D. Wis. Nov. 9, 2006) (dismissing duplicative claim that was "simply a repackaging" of another claim).

## C.  The Band's regulatory authority

The court will also dismiss the Band's regulatory authority claim (count 5) in light of the Band's concession that the claim is not yet ripe.  (Band's Opp. Br. (dkt. #282) 27.) While the Band also requests that the court hold this claim in abeyance "unless and until a live controversy develops" (*id.* at 28) the court has no such authority.  *See Med. Assur. Co. v. Hellman*, 610 F.3d 371, 375 (7th Cir. 2010) (district court erred by staying unripe claim, and stating that the "proper disposition . . . would have been to dismiss").  Accordingly, the court will dismiss the regulatory authority claim without prejudice for lack of subject matter jurisdiction.

## D.  Federal nuisance claim

This leaves the Band's federal common law nuisance claim (count 1).  The Band alleges that, as a result of bank erosion, high river flows, and local geomorphology, the Bad River is encroaching on and will soon reach the Line 5 pipeline to the east of where it is presently buried.  When this happens, the Band has offered evidence that the river will strip the pipeline of its supporting soils, exposing it to currents and other stresses that,

according to the Band, the pipeline was never designed to withstand, leading to a high risk of pipeline rupture.  Moreover, there is no reasonable dispute that a rupture would cause significant environmental damage to the Bad River and its surrounding natural resources, including wild rice beds and fisheries on which the Band depends.  Accordingly, the Band argues that Enbridge's continued operation of the pipeline in the face of such a rupture presents a grave risk of harm in violation of the federal common law of public nuisance, and it asks the court for declaratory and injunctive relief at summary judgment enjoining Enbridge from further use of Line 5 for the transmission of crude oil and natural gas liquids across the Reservation.  The Band also seeks an injunction requiring Enbridge to remove the pipeline from the Reservation in a prompt and safe manner, and for such other relief as the court deems just under the circumstances.

On the other hand, Enbridge argues that *it* is entitled to summary judgment on the Band's federal nuisance claim fails because:  (1) Congressional regulation under the Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.* has displaced the federal common law on which the Band's claim rests; and (2) the Band cannot prove the elements of a public nuisance claim.  Since the outcome of the two arguments dictates the disposition of both parties' motions for summary judgment as to count 1, the court addresses each argument below.

### 1.  Displacement by the Pipeline Safety Act

The doctrine of displacement rests on the premise that federal common law is subject to the paramount authority of Congress.  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 777 (7th Cir. 2011) ("Asian Carp I"); *see also Am. Elec. Power Co. v.*

*Connecticut*, 564 U.S. 410, 423–24 (2011) ("[I]t is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest.")   The important question for displacement analysis is "whether Congress has provided a sufficient legislative solution" to the particular nuisance at issue to warrant a conclusion that the legislation "has occupied the field to the exclusion of federal common law." *Asian Carp I*, 667 F.3d at 777.   Said another way, the question "is simply whether the statute 'speak[s] directly to [the] question' at issue." *Id.* at 2537 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978).)[8]

Enbridge points out that the very purpose of the Pipeline Safety Act is to protect against risks of damage posed by interstate pipelines. *See* 49 U.S.C. § 60102(a)(1) (purpose of Act is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation").   Moreover, to achieve this purpose, Congress instructed the Department of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities." *Id.* § 60102(a)(2).   In addition, the Act contains an express preemption provision that preempts at least all *state* laws and regulations purporting to impose additional safety requirements on interstate

---

[8] Enbridge argued in its opening brief that the Band's federal common law nuisance claim was "preempted" by the Pipeline Safety Act.   (Enbridge Br. (dkt. #231) 11–17.) After the Band argued that federal statutory law does not *preempt* federal common law, Enbridge limited its argument about the Band's federal claims to a "displacement theory" in its reply brief.   (Enbridge Reply Br. (dkt. #323) 8–9.)

pipeline operations:  "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  *Id.* § 60104(c).[9]

The court is unpersuaded by Enbridge's argument for several reasons.  First, Enbridge's argument relies primarily on cases concluding that different statutes -- not the Pipeline Safety Act -- preempt certain types of federal common law claims.  For example, Enbridge discusses *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981), in which the Supreme Court held that a federal common law action to abate a nuisance caused by a city's discharges of sewage effluent into Lake Michigan was displaced by the Clean Water Act, because under that Act, "[e]very point source discharge is prohibited unless covered by a permit [which the city had], which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals."  *Id.* at 318 (footnote and emphasis omitted).  In particular, the Court explained that the permits at issue incorporated "the specific effluent limitations established by [the] EPA" under the Act, and there was "no question that the problem of effluent limitations has been thoroughly addressed through the administrative scheme established by Congress."  *Id.* at 319–20. Thus, the Court found "no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law."  *Id.* Similarly, in *Am. Elec. Power Co.*, the Supreme Court found a public nuisance claim displaced by the Clean Air Act because the plaintiffs were "ask[ing] for a decree setting

---

[9] In reply, Enbridge also concedes both that the Band's actions do not constitute safety standards under *state law* that would fall under the Act's express preemption provision, this Federal Act does not *preempt* federal common law.  However, it argues that because the Band's public nuisance claim is based on safety concerns, the Pipeline Safety Act *displaces* the Band's nuisance claim.

carbon-dioxide emissions for each defendant[,]" which was something Congress had addressed already in the Act.  564 U.S. at 415.  Specifically, that Act already provided "a means to seek limits on emissions of carbon dioxide from domestic powerplants" on the same terms as sought by the plaintiffs' public nuisance claim.  *Id.* at 425.

In this instance, however, the Band is not seeking an injunction that would impose safety regulations addressed already by the Pipeline Safety Act or federal regulation. Rather, the Band seeks a solution to the threat posed by the alleged imminent exposure of the pipeline at the Bad River meander.  Enbridge identifies no provision of the Act that provides a legislative solution to that issue, such as how close a river can come to exposing a pipeline or what to do when a pipeline faces an imminent threat of exposure to a river. It is not sufficient that the Pipeline Safety Act addresses pipeline safety generally, that federal regulations prescribe *some* standards governing pipeline construction and operation, or even that the Department of Transportation could order a pipeline to be shut down. *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 856 (9th Cir. 2012) ("The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry.") *(citing Asian Carp I*, 667 F.3d at 777*).*  Under *City of Milwaukee* and *Am. Elec. Power*, the question for displacement is whether the statute has provided a "sufficient legislative solution" to the particular nuisance at issue.  *Asian Carp I*, 667 F.3d at 777.  Because the Pipeline Safety Act does not address the particular situation at issue, the Band's claim is not displaced.

Second, Enbridge cites some decisions by other federal circuit courts of appeals addressing the Pipeline Safety Act in particular, but each involved state laws or regulations

regarding interstate pipeline safety that violated the *express preemption provision* of the Act discussed above. *E.g.*, *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006) (Pipeline Safety Act preempted the City of Seattle from enforcing its own more stringent pipeline safety provisions); and *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465 (8th Cir. 1987) (Iowa law imposing safety standards for pipelines preempted by the Act). Here, again, the Band is not seeking to impose specific pipeline safety standards on Enbridge, so its nuisance claim is not barred by the Act's express preemption provision as Enbridge itself conceded. 49 U.S.C. § 60104(c) (preempting only state law "*safety standards* for interstate pipeline facilities or interstate pipeline transportation") (emphasis added).

Third, the Pipeline Safety Act contains a savings clause that expressly preserves tort claims. That clause states that the Act "does not affect the tort liability of any person." 49 U.S.C. § 60120(c); *see also* 49 U.S.C. § 60121(d) ("This section does not restrict a right to relief that a person . . . may have under another law or at common law."). Relying on this savings clause provision in particular, other district courts have rejected the argument that federal common law tort claims against pipeline operators were barred by the Pipeline Safety Act. *E.g.*, *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *5 (C.D. Cal. Mar. 4, 2016); *Am. Energy Corp. v. Texas E. Transmission, LP*, 701 F. Supp. 2d 921, 925, 927 (S.D. Ohio 2010) (holding that claim seeking injunctive relief against pipeline company that would require it to "develop and implement a mitigation plan to protect its pipelines" not preempted by Pipeline Safety Act).

There is no dispute that the Band's nuisance claim is a common law tort action. *See* Restatement (Second) of Torts § 821B (identifying elements of the tort of public nuisance).

Nonetheless, Enbridge argues that the savings clause in § 60120(c) was only intended to preserve tort claims for *money damages*, not claims for injunctive relief.  In other words, Enbridge suggests that the Band could sue for money damages in the event the pipeline ruptured and caused harm to the Band's land, but cannot sue to *prevent* damage from occurring in the first place.  Not only is this language contradicted by Congress' adoption of the generic word "relief," rather than "money damages," in the savings clause, but Enbridge cites no legal authority suggesting that the savings clause is so limited.  Moreover, injunctive relief is typically an available remedy against someone found liable in tort for nuisance, assuming a plaintiff demonstrates the likelihood of irreparable harm.  *See LAJIM,* 917 F.3d at 944 ("[O]nce a court finds a defendant liable for creating a risk of imminent and substantial danger, it will usually be the case that injunctive relief is warranted.") (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. . . . [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *see also Cheverez*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *5.  Of course, as discussed above, an injunction is not automatic, and courts must consider the traditional equitable factors.  But the mere fact that the Band has requested injunctive relief because of safety concerns does not mean that its nuisance claim is displaced by the Pipeline Safety Act.

### 2.  Merits of the Band's nuisance claim

Enbridge also contends that the Band cannot establish the necessary elements of a

public nuisance action.  The Band's nuisance claim has three elements: (1) unreasonable interference with public rights, health, safety or welfare; (2) if not presently occurring, interreference must be imminent or certain to occur; and (3) the defendant must have caused the nuisance.  *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) (Asian Carp II).  Enbridge does not and cannot deny that a pipeline rupture on the Bad River Reservation would cause significant and negative environmental consequences. Instead, Enbridge argues that the Band's nuisance claim fails because it cannot show that a rupture is sufficiently "imminent," and because the Band has rejected Enbridge's numerous offers to mitigate the risk of rupture by either lowering the pipeline or taking other remedial measures that would address the threat.

"Imminence," for purposes of public nuisance law, considers whether the alleged harm is "sufficiently close to occurring" such that the court "should order the defendants to take some new action that will be effective to abate the public nuisance." *Asian Carp I*, 667 F.3d at 781–82.  As the Seventh Circuit has explained:

> There is no meaningful legal difference for purposes of the ultimate resolution of a public nuisance claim between a threatened nuisance that is "imminent" and one that is "immediate," "significant," "real," an "unreasonable risk," or anything similar. The job of a court considering the merits of a public nuisance claim is simply to determine whether the activity complained of is a nuisance and, if so, whether it is sufficiently close to occurring that equitable relief is necessary to prevent it from happening.

*Id.* at 782.

In this instance, there are genuine disputes of material fact regarding whether the threat of rupture is "imminent," as well as the adequacy of Enbridge's proposed abatement

measures.  In particular, the parties have submitted differing expert opinions regarding the likely timing of pipeline exposure, with the Band's experts opining that the pipeline will be exposed to the Bad River within 2 to 5 years, though it could be significantly less time, and that such exposure would likely lead to pipeline damage and release of oil into the Bad River watershed.  (WWE Rep. (dkt. #269) 17).  Not surprisingly, Enbridge's experts disagree with the Band's assessments and argue that, in any event, 2 to 5 years does not qualify as "imminent."  The Band's experts have also evaluated Enbridge's mitigation proposals and explain why the proposals would be ineffective, as well as require a further, unwanted expansion of Enbridge's easements on Reservation land.  Enbridge's experts again disagree.  The court cannot resolve these disputes at summary judgment.  Certainly, the mere possibility of a rupture occurring would not be sufficient to sustain a nuisance claim.  Ultimately, though, whether a pipeline rupture is sufficiently imminent to sustain a public nuisance claim depends on whether the risk is "unreasonable," and "granter than a reasonable [person] would incur." *Asian Carp I*, 667 F.3d at 781 (citation omitted).  The factual disputes regarding this issue must be resolved at a trial.  Accordingly, Enbridge's motion for summary judgment on the Band's public nuisance claim must be denied.

For public policy reasons explained above, however, the court would not grant an immediate injunction requiring Enbridge to remove Line 5 from the Band's lands, even if the Band succeeded in proving its nuisance claim.  Instead, the court will consider requiring Enbridge to work with the Band to create an effective mitigation plan that could be implemented on the pipeline while Enbridge completes its reroute.  The court will direct

the Band to explain whether it wishes to continue pursuing its nuisance claim in light of the court's conclusions.

## ORDER

IT IS ORDERED that:

1) Plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation's motion for partial summary judgment (dkt. #165) is GRANTED IN PART and DENIED IN PART as set forth above.

2) Defendants Enbridge Energy Company, Inc., and Enbridge Energy, L.P.'s motion for partial summary judgment (dkt. #230) is GRANTED IN PART AND DENIED IN PART as set forth above.

3) The various motions for leave to file amicus briefs (dkt. ##213, 235, 239, 294, 340) are GRANTED.

4) Plaintiff's motion for leave to file supplemental authority (dkt. #353) is GRANTED.

5) Defendants' motion for leave to file supplemental brief (dkt. #357) is GRANTED.

6) The court will hold a video conference on Friday, September 9, at 2 p.m., at which time the parties should be prepared to discuss: (1) whether Enbridge can complete a reroute of the pipeline within five years or less; (2) how the appropriate measure of past and future rent and damages to the Band should be determined; (3) what issues, if any, must be resolved by a jury, and what issues may be resolved by the court; and (4) whether the Band wishes to continue pursuing its federal common law public nuisance claim for injunctive relief.

7) The parties' deadline for *all* final pretrial submissions, including exhibit lists and deposition designations, is extended by one week, to September 16, 2022. Objections are due by September 30, 2022.

8)  The parties' motion for clarification (dkt. #359) is DENIED as moot.

Entered this 7th day of September, 2022.

> BY THE COURT:
>
> /s/
>
> _____
>
> WILLIAM M. CONLEY
> District Judge