**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, <br><br> *Plaintiff,* <br><br>    v. <br><br> ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, LP, <br><br> *Defendants* | Case No. 3:19-cv-00602 <br><br><br> Judge William M. Conley <br><br> Magistrate Judge Stephen Crocker |
| ENBRIDGE ENERGY, LP, <br><br> *Counter-Plaintiff,* <br><br>    v. <br><br> BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity, <br><br> *Counter-Defendants.* | |

**ENBRIDGE'S MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF DAN LEISTRA-JONES
(Motion 2 of 3)**

Pursuant to Federal Rule of Evidence 702, Defendants Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership (collectively, "Enbridge") move to exclude the opinions and testimony of Dan Leistra-Jones, Plaintiff/Counterclaim Defendant Bad River Band's proffered rebuttal expert witness on the issue of profits-based trespass damages.

1

## BACKGROUND

As part of its initial expert disclosures, Enbridge disclosed Dr. Laura Olive, an expert witness economist with substantial experience with pipelines and other rate regulated industries. Her testimony concerns the proper methodology for computing, and the actual computation of, Line 5 profits-based damages if the Court found Enbridge to be in trespass on the twelve allotted parcels at issue in this case. In its summary judgment decision, the Court did, in fact, find that Enbridge is in trespass on those parcels and that profits-based damages are appropriate. Dr. Olive's testimony is now necessary and relevant.

Dr. Olive calculated the overall profits for Line 5, as distinct from other Enbridge-affiliated pipelines.[1] She then determined the amount of such profits allocable to the twelve allotted parcels based on a barrel mile methodology commonly used for pipelines when similar allocations are needed, such as for ratemaking or tax purposes. Boiled down to its essentials, Dr. Olive calculated a barrel mile ratio by comparing (i) the volume of product transported through the length of pipe found to be in trespass on the Reservation (2.33 miles), with (ii) the volume of product transported through the entire length of the pipeline (645 miles), and then determined how many barrel miles were in trespass and how many were not. That barrel mile ratio was then used to allocate Line 5 profits to the trespassed land in a manner consistent with pipeline allocations applicable to Line 5 for other purposes, such as taxes or ratemaking.

In response, the Band disclosed Dan Leistra-Jones to rebut Dr. Olive's opinion. Leistra-Jones largely agrees with Dr. Olive as to the sum of Enbridge's profits attributable to Line 5 (as distinct from the profits the company has earned as a whole). Notably, he concedes that a barrel mile allocation is a reasonable proxy in determining what revenues belong to Line 5 as compared

---

[1] Enbridge's books are kept company wide, and not just for Line 5, or any other pipeline. *See* Dkt. 372 (Yaremko Dep., Aug. 15, 2022) 22:5–8. Thus, Dr. Olive had to separate Line 5's profits from company's total profits.

to other pipelines operated by Enbridge. *See* Dkt. 373 (Leistra-Jones Dep., June 17, 2022) 56:13–57:11. Given that Leistra-Jones agrees with the reasonability of Dr. Olive's approach, any accounting of Enbridge's profits allocable to Line 5 should be based on the barrel-mile method.

Leistra-Jones bases his ultimate opinion on the legal premise that Enbridge must be *punished* for trespass under what he calls a "penalty policy." This "penalty policy" is based on assessment of fines for environmental noncompliance and releases of pollutants into the environment, neither of which has occurred here and neither of which is related to an award of trespass damages as ordered by the Court.

Specifically, Leistra-Jones renders two main opinions. First, he opines that *all* of Enbridge's Line 5 profits—not just those allocable to the 12 allotted parcels—must be paid to the Band. Leistra-Jones, in other words, opines that a damage award equal to "100 percent of the profits from Line 5," which operates for 645 miles in the United States and in Canada, is appropriate in this case. Dkt. 227-1 (Leistra-Jones Rebuttal Disclosure, Apr. 8, 2022) at ECF p. 10.[2] Second and alternatively, Leistra-Jones approximates Enbridge's supposed economic benefit from having delayed construction of a reroute to avoid land on which trespass has been found. *Id.* at ECF p. 22–27 (§ IV.C).

The Court should exclude Leistra-Jones from testifying about the amount of profits owed, or the proper method of calculating that amount, pursuant to Federal Rule of Evidence 702 for two principal reasons. First, Leistra-Jones impermissibly offers legal conclusions concerning the appropriateness and reasoning for why Enbridge should be punished and why the Band should be awarded all of Enbridge's profits attributable to every mile of Line 5 since the start of the trespass. Leistra-Jones not only impermissibly offers legal conclusions, but he offers conclusions that are

---

[2]  Docket No. 227-1 contains the Rebuttal Report of Leistra-Jones as well as his disclosure and CV. For ease of reference, Enbridge will be relying on the ECF pagination when citing to this filing.

3

contrary to law. The Court has already ruled what the legally correct measure of damages for trespass is (fair rental value) and what the Band is entitled to under the law (profits-based restitution). Such an opinion improperly invades the province of the Court and rehashes a legal conclusion already reached by the Court. This opinion also contradicts the Court's holding. His alternative opinion, which does not calculate profits, does not even fall within the type of damages that this Court has ordered the Band be awarded. Second, both of his theories are unreliable because they are based on wholly inapplicable punishment and deterrence policy objectives used by the federal government in prosecuting environmental crimes or other violations of environmental law—none of which are at issue here in this civil-trespass action—and because they cherry-pick evidence and selectively apply a methodology to achieve a predetermined result: awarding 100% of Line 5's profits to the Band.

The Court should thus exclude Leistra-Jones' testimony in its entirety.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Expert testimony is inadmissible unless it is both relevant and reliable. Expert testimony does not assist the trier of fact if it is not tied to the facts of the case. *See* FED. R. EVID. 702(a); *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018). Rule 702 and *Daubert* also require the judge to act as a "vigorous gatekeeper to ensure the reliability of expert testimony." *Robinson v. Davol, Inc.*, 913 F.3d 690, 696 (7th Cir. 2019).

The Seventh Circuit has held that "[u]nder Federal Rule of Evidence 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to

determine a fact in issue.'" *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). The expert's proponent bears the burden of production in showing that the *Daubert* standard is satisfied. *See Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005), *cert. denied,* 545 U.S. 1140 (2005).

## ARGUMENT

## I.     Leistra-Jones' Opinions Are Inadmissible Because they Constitute Legal Conclusions and Are Contrary to Law

Leistra-Jones' damages opinion rests on his legal conclusion that an award of damages must "penalize" and "fine" Enbridge for any trespass. Dkt. 373 at 151:12–152:8; *see also* Dkt. 227-1 at ECF p. 15. But expert testimony concerning what the law requires (or what is appropriate) constitutes an impermissible legal conclusion. Leistra-Jones' opinion is also impermissible because it is contrary to the law that the Court relied upon in its summary judgment opinion and order.

First, Leistra-Jones' reasoning leads him to back into finding that the Band should be awarded all of the profits Enbridge has made since 2013 based on his conclusion that such an award would sufficiently achieve the policy objectives of deterrence and punishment which are associated with distinguishable environmental enforcement actions not in play here. *Id.* at ECF p. 17. Leistra-Jones' reasoning rests on his legal conclusion that trespassers should be "penalized" or "fined." It is well-established that legal conclusions offered by an expert witness are *per se* impermissible. *Raab v. Wendel*, No. 16-CV-1396, 2017 U.S. Dist. LEXIS 217704, at *15 (E.D. Wis. Dec. 18, 2017) (excluding expert's opinions because, among other reasons, it was "an impermissible legal opinion that no witness may offer"); *see also United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (affirming district court's exclusion of expert testimony on grounds

it was an impermissible legal conclusion and recognizing that the "only legal expert in a federal courtroom is the judge"). Under this well-established rule, Leistra-Jones's opinion is *per se* inadmissible and should be excluded.

Second, expert opinions that are contrary to law are also *per se* inadmissible. *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005), *amended*, 01 C 9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005); *see also Est. of DiPiazza v. City of Madison*, No. 16-CV-60-WMC, 2017 WL 1910055, at *9 (W.D. Wis. May 8, 2017) (a witness "may not render legal opinions or reach legal conclusions" (Conley, J.). Leistra-Jones proposes to testify that a purported "penalty policy" should govern the appropriate measure of damages for trespass. Dkt. 227-1 at ECF p. 17.

Indeed, Leistra-Jones concludes that the Band is entitled to <u>all</u> of Line 5's profits regardless of whether this case involved a trespass on one parcel or twelve parcels. *Id.* at ECF p. 10; Dkt. 373 at 59:16–22, 61:24–62:5, 80:9–17. If his formulation were adopted, Enbridge would hypothetically be liable for the full amount of its profits to every single property owner along the 645-mile pipe for which it could be in trespass.[3] Moreover, Leistra-Jones fails to account for the fact that some of the parcels are highly fractionated—many owners have an interest in these at issue tracts. Acknowledging this could cause his damage award to soar even higher because *each owner*, of which there are many, would under his reasoning be entitled to Enbridge's entire profits, but, when pressed, he admitted this is wrong and he would need to undertake further analysis,

---

[3]      He also proposes to testify that the damages would be the same if the land allegedly trespassed upon was worth $100 or $10 million. Dkt. 373 at 80:9–17. Under this theory, a stock trader trespassing on another's land to obtain a cellular signal to make a phone trade that earned her $100 million dollars in profits would have to pay those profits to the owner, even if the land had a value of $1,000. On the other hand, a trespasser who makes no profit would not have to pay *any* damages. *Id*. at 117:18–118:15. No caselaw stands for this proposition.

which he has not performed. *Id.* at 65:7–10 ("I don't have an opinion how to work out that—that split between the majority and the minority landowners of a given parcel.").

Indeed, he concedes the profits awarded cannot ever exceed 100% and recognizes the "need to figure out a division somehow or other." *Id.* at 67:1–6. But Leistra-Jones did not consider the actual facts of this case—the Band is not the sole owner of many of the at-issue parcels—and he has no allocation methodology to account for either (i) the different parcels at issue or (ii) the fact that they have many different owners with fractional interests. *Id.* at 66:19–69:6. When asked how he would allocate profits if Enbridge was in trespass along the entire 600+ mile pipe, his answer comes apart on subjective, outcome-driven considerations:

> A. **Yeah, that's not something that I've, you know, really given thought to.** You know, I—again, I would take the starting point of, you know, 100 percent of— of the profits that they gained and—from operation of Line 5, but I—I, there could be—**there could be a number of different factors of, you know, tribal versus— versus nontribal or, you know, I mean, if there's public land versus private land. And I could see how, you know, there might be a number of different factors that would—that would come into play, so I'm—I'm not sure without knowing more specifics.**
>
> Q. What would the various factors be?
>
> [Band Counsel]: Objection, asked and answered.
>
> A. Yeah, I mean, certainly, you know, **the length of the—the pipeline crossing each would be one relevant consideration**, but, again, I could imagine, you know, that tribal versus nontribal lands could potentially be addressed differently. Or public lands versus private lands, you know, if there's—you know—**I don't know if—if there would be other—other considerations regarding the nature of the trespass**, so...
>
> Q. What would the difference be between public lands and private lands? How would that make a difference to allocation of profits?
>
> [Band Counsel]: Objection, calls for a legal conclusion.
>
> A. Yeah, again, I'm really not sure. **I'm just trying to identify, you know, what are different things that—that could potentially be relevant, so I'm—I'm not sure**.

*Id.* at 67:23–69:6 (emphasis added).

Leistra-Jones' opinions are also contrary to the primary authority the Court relied upon in its summary judgment opinion and order. Dkt. 360 (Opinion and Order on Summary Judgment) at 29–30; *see also Davilla v. Enable Midstream Partners, L.P.*, No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016) (recognizing, in a trespass case, that plaintiff was entitled only to recover the "pro-rata share of those profits that is attributable to the portion of the pipeline that has been located on their property"); Restatement (Third) Restitution and Unjust Enrichment §§ 40, 51. The Restatement observes that a measure of proportionality between the profits to be paid to the plaintiff and the market value of the trespass must exist. As a result, the Restatement notes that "courts are sometimes visibly reluctant to measure the unjust enrichment of a conscious trespasser by the … full extent of consequential gains that an intentional trespass may have facilitated. Even against a conscious wrongdoer, restitution may be limited to avoid a liability for gains that are unduly remote (§ 51(5)(a)) or disproportionate to the loss on which liability is based (§ 58(3)(c)). *See* Illustrations 2, 4, and 6, and § 53, Illustration 11." *Id.* § 40, cmt. b.

Illustration 4 is perhaps most on point:

Edwards owns Blackacre; Lee owns Whiteacre, an adjoining tract. Blackacre contains the only known entrance to a magnificent cave. Edwards develops the cave as a tourist attraction, installing illumination and walkways and offering guided tours to paying visitors. About 30 percent of the cave area being exhibited in this manner actually lies beneath the surface of Whiteacre. Edwards is aware of this fact, which he attempts to disguise from Lee. Lee eventually obtains a survey and an injunction against further trespass. By the rule of this section, Lee has a claim to the profits realized by Edwards in conscious violation of Lee's rights. The court determines that Lee is entitled to 30 percent of Edwards's profits from operation of the cave. Lee's further claim to 30 percent of the profits from a hotel operated by Edwards near the cave entrance is rejected on the ground that the hotel profits are too remote from the trespass.

Leistra-Jones' opinions deviate from the illustration, as well as many of the other principles articulated in the Restatement. Under the Restatement, an allocation of profits limited to the 12 parcels on which the Court has found Enbridge in trespass, such as that illustrated above, is proper, not a general forfeiture of *all* profits, which would include those entirely unrelated to the underlying trespass. *See, e.g.*, *id.* § 51, cmt. e ("The application of the disgorgement remedy turns on problems of *attribution*, as the court attempts to decide <u>what portion of the defendant's assets or income</u> is properly attributable to the underlying wrong to the claimant."); *see also id.* § 51, cmt. g; *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 55 (2d Cir. 1939) (reversing district court's award of the defendants' entire net profits and stating that defendants were entitled to prove, if they could, the proportion of the profits that arose from copyright infringement), *aff'd*, 309 U.S. 390 (1940); *Kansas v. Nebraska*, 574 U.S. 445, 135 S. Ct. 1042, 1057–58 (2015) (holding that "a disgorgement order constitutes a 'fair and equitable' remedy," but affirming an award of less than net profits after "[b]alancing of equities and hardships").

One case decided earlier this year is directly on point. In *Moore v. Equitrans, L.P.*, the Fourth Circuit upheld the district court's decision to exclude the testimony of the plaintiff's "trespass damages" expert because his opinion was contrary to the law of trespass damages in West Virginia. *See* 27 F.4th 211, 224 (4th Cir. 2022). That expert "recommend[ed] a measure of damages based upon the profits" of the pipeline. *Id.* at 223. But the Fourth Circuit determined that this expert opinion testimony was "neither likely to assist the jury nor based on any reliable principles or methodology" because his profits opinion was "contrary to controlling law" holding that profits are not the proper measure of damages in West Virginia. *Id.*

Moreover, although he offers a legal conclusion that a damages award should be tied to the legal concepts of deterrence and penalty, Leistra-Jones' application of penal theory to trespass law

is not legally supported.  Leistra-Jones could not identify *any* caselaw, or other law, that supports

the use of penalty policy to assess the measure of trespass damages. Dkt. 373 at 71:7–10 (indicating

he was not aware of any caselaw adopting his approach for trespass damages).  Leistra-Jones also

openly admitted that his methodology and theory have *nothing* to do with the law of trespass but,

instead, draws from inapposite enforcement actions. *Id.* at 123:2–13; 124:12–20.  For example,

even though Leistra-Jones concedes that only 2.33 miles of the 645-mile pipeline are alleged to be

in trespass, he concludes based on "penalty policy" that "fines should restore the status quo ante

so that violators are not better off after paying a fine than they would have been if they had not

committed an offense in the first place." Dkt. 227-1 at ECF p. 15.  Nothing in the law permits the

imposition of a "fine" for a civil trespass.  Indeed, all of Leistra-Jones' purported "support" for

this theory (as well as his delayed-reroute-benefit opinion) comes from the criminal (or sometimes

civil) *governmental* enforcement context based on violations of environmental statutes, which are

not at issue in this case. *Id.* at ECF p. 8 n.20; Dkt. 373 at 11:20–12:4 (conceding no such issues

have occurred in this case).  He states:

> In the field of environmental penalty policy in particular, the idea that a penalty
> should recover the full amount of a violator's gain or "economic benefit" from its
> illegal activity is well established.  The violator's economic benefit is calculated by
> comparing an actual scenario with a counterfactual scenario based on full
> compliance. Economic benefit of noncompliance is specified as a factor that courts
> must consider when determining penalty amounts in a number of environmental
> statutes, such as the Clean Air Act and the Clean Water Act.

Dkt. 227-1 at ECF p. 16 (footnotes omitted), *see also* Dkt. 373 at 83:25–84:17.

There has been no environmental noncompliance in this case.  Nor could there.  It is

undisputed that Line 5 has not spilled a drop of oil on the Reservation. *See id.* at 11:20–12:4,

80:18–23.  And the Band has not sought in its complaint any "penalty" or any punitive damages.

*Id.* at 75:19–24.  Simply put, the alleged "punishment" calculations offered by Leistra-Jones are inapplicable.  Accordingly, Leistra-Jones' opinions should be excluded from evidence.

## II.    Leistra-Jones Uses an Unprecedented, Outcome-Driven Method to Calculate Profits

Leistra-Jones' opinions also rest on an unreliable methodology for two main reasons. *See* FED. R. EVID. 702.  He deviates from well-established financial principles that are applied to calculate profit.  As a result, he offers an opinion that is not a sound financial analysis of Enbridge's Line 5 profits.

A court should exclude an expert whose testimony rests on an unreliable methodology. *Robinson*, 913 F.3d at 696; *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("[E]xperience without reliable, testable methodology is not sufficient.").  An expert's methodology is unreliable if it is result-driven and cherry-picks evidence to arrive at a preordained result. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (excluding as unscientific an expert who "cherry-picked the facts he considered" and "did not adequately explain why he ignored certain facts and data, while accepting others"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Products Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis . . . is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

An expert's method is also unreliable if the expert relies on "too many extrapolations from dissimilar data, too many analytic leaps, and involves a loose application of purportedly objective scientific causation standards." *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F. Supp. 2d 1046, 1049 (S.D. Ill. 2001).  For instance, in *Baldonado v. Wyeth*, the court excluded an expert who opined that the punitive damages in a tort case should be measured according to "[Securities and Exchange Commission] fines, antitrust violations, and speeding fines." No. 04 C 4312, 2012 WL 1520331, at *1–3 (N.D. Ill. Apr. 30, 2012).  The court explained that his opinion was "irrelevant

11

and misleading," and therefore inadmissible, because the expert "failed to provide any connection between these three areas and the facts of th[e] case." *Id.* at *3. This is precisely what Leistra-Jones has done here in offering an opinion that Enbridge should be fined for its trespass in the same manner as a polluter would be fined in an environmental enforcement action. Leistra-Jones does not demonstrate any connection between a trespass and the kind of deterrence that applies in environmental enforcement actions.

Leistra-Jones also ignores the fundamental methodology for calculating profits. Put simply, profit is revenue minus costs. Dkt. 373 at 35:7–14 (indicating Line 5's profit is the extent to which Line 5's revenue exceeds its operation costs). But Leistra-Jones has no experience calculating a pipeline's revenue or costs. He does not know how pipeline operators charge their customers, which is essential to understanding and calculating revenue. *Id.* at 31:7–12, 35:20–23 (admitting he does not "have any particular insight into [Enbridge's] rate-setting process"). He even testified that because he "really do[es]n't know details," he would have to "speculate" on how Enbridge sets rates for Line 5. *Id.* at 41:23–42:12. Leistra-Jones fails to account for these key facts because they are beyond his expertise. *See* Dkt. 227-1 at p. 2 ¶ 2; Dkt. 373 at 21:24–22:9 (indicating his experience is in determining a company's "economic benefit from regulatory noncompliance and ability to pay" and analyzing "corporate strategy relating to clean energy" and "target setting for a low-carbon future"); *id.* at 180:10–14 (stating he has no experience estimating the cost of constructing crude oil pipelines).[4]

It is no surprise that Leistra-Jones cannot allocate profits according to the relevant considerations. He has no experience calculating the profits of a midstream oil and gas company,

---

[4] Leistra-Jones claims to have only once before, 15 years ago, somehow "calculate[ed] the economic benefit of noncompliance" from a pipeline operator in Alaska—but he could not recall any relevant details. *See* Dkt. 373 at 17:1–19:8; Dkt. 227-1 at ECF p. 34.

and his experience determining a penalty amount sufficient to punish polluters under EPA guidance is inapposite. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'") (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994)); Dkt. 373 at 12:16–14:14 (stating his only experience with pipeline profits involved "reviewing prior calculations that someone else had made, in essence, to determine whether there were any calculation errors").

Leistra-Jones' lack of familiarity with how pipeline operators allocate costs and generate revenue along segments of a pipeline system leads him to purportedly rely on Dr. Olive's barrel-rate methodology. *Id.* at 56:13–57:11 (indicating he did "use the same barrel mileage methodology for moving from the Lakehead System to the–the Line 5" and agrees that barrel miles are a "reasonable . . . proxy . . . for how to determine which costs and which revenues relate to which specific piece" of pipeline). However, he deviates from Dr. Olive's methodology by *ignoring Line 5's depreciation costs*, which comprise a substantial category of costs incurred in maintaining a pipeline, including Line 5. His selective departure from Dr. Olive's methodology by ignoring certain costs to increase the total profits amount renders his methodology unreliable.

## III. Leistra-Jones' "Alternate" Delayed-Reroute-Benefit Opinion Is Also Improper

Leistra-Jones alternatively proposes to testify to the amount of money that Enbridge purportedly saved by constructing the proposed re-route around the Reservation now rather than in 2013, when the trespass allegedly commenced. *See* Dkt. 227-1 at ECF p. 11 (estimating that Enbridge allegedly saved about $300 million by "delaying" construction of the reroute). But, like the rest of Leistra-Jones' opinions, this opinion is both substantively and procedurally improper.

Like his other profit calculations, his alternate delayed-reroute-benefit measure impermissibly imports environmental penalty policy that is contrary to the law of trespass.[5] *See supra* at Sections I–II; Dkt. 227-1 at ECF p. 22 ("This concept of economic benefit from delayed costs is widely established in the context of setting penalties for regulated entities that delay compliance with applicable regulations.") (citing EPA enforcement and penalty policies).

Moreover, his method for calculating this alternative damages theory likewise implements an unsound methodology and unreliable evidence. His estimate of Enbridge's benefit from delaying reroute construction did not price the different construction components that would actually be used, and instead substituted the general Construction Cost Index, which simply assumes that construction costs always increase. Dkt. 373 at 94:23–95:8. But construction costs do not uniformly increase, especially as construction techniques progress and become more efficient. *Id*. at 96:1–5. Moreover, Leistra-Jones does not account for the increased costs borne by Enbridge in a post-COVID world where material costs and supply chain contracts have substantially increased expenses compared to 2013—this consideration is wholly ignored.[6] And again, these methodological errors that serve only to increase his proposed damages award arise from substantial knowledge gaps. Leistra-Jones knows nothing about the relevant construction techniques—including, for example, the horizontal directional drilling Enbridge will implement in constructing the reroute—or their actual costs. *Id.* at 96:13–23.

[5]    *Compare* ENVIRON. PROTECTION AGENCY, *Penalty and Financial Models*, https://www.epa.gov/enforcement/penalty-and-financial-models (last updated July 11, 2022) (indicating the EPA's BEN (2022.0.0) method "[c]alculates a violator's economic benefit of noncompliance from delaying or avoiding pollution control expenditures") *with* Dkt. 227-1 at ECF p. 22–27 (Leistra-Jones Rebuttal § IV.C) ("estimate[ing] Enbridge's economic benefit from delaying any construction of the pipeline segment").

[6]    *See* Susan Helper and Evan Soltas, "Why the Pandemic has Disrupted Supply Chains", The White House, June 17, 2021. Available at https://www.whitehouse.gov/cea/written-materials/2021/06/17/why-the-pandemic-has-disrupted-supply-chains/.

Leistra-Jones' alternate damage measure is also procedurally improper as a rebuttal opinion because it exceeds the scope of Dr. Olive's testimony. Leistra-Jones' opinion that the damages award should be equal to or greater than Enbridge's benefit from delaying reroute construction does not rebut any opinions contained in Dr. Olive's report, which focused exclusively on measuring profits. Indeed, even Leistra-Jones identifies this as an "alternate basis of calculating an award of damages." Dkt. 227-1 at ECF p. 17; *see also Hibu, Inc. v. Peck*, 16-1055-JTM, 2017 WL 11504219, at *1–2 (D. Kan. Nov. 6, 2017) (excluding a rebuttal report that offered an "alternative theory of lost profits in lieu of lost revenue" as "exceed[ing] the scope of proper rebuttal"); *see also Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 5085338, at *2 (N.D. Ill. Oct. 10, 2019), *objs. overruled*, 2020 WL 5691596 (N.D. Ill. Sept. 3, 2020) ("[T]he measure of proper rebuttal is . . . whether it directly refutes arguments offered by the opposition."); *Cage v. City of Chicago*, No. 09 C 3078, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012) ("A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief."); *Larson v. Wis. Cent. Ltd.*, No. 10–C–446, 2012 WL 368379, at *4 (E.D. Wis. Feb. 3, 2012) (rebuttal report should be limited to contradicting or rebutting evidence on the same subject matter identified by another party and cannot be used to advance new arguments or new evidence).

## CONCLUSION

For the foregoing reasons, the Court should exclude Leistra-Jones' testimony and opinions.

Dated: September 21, 2022          Respectfully submitted,

/s/ *Justin B. Nemeroff* _____
Michael C. Davis
David L. Feinberg
Xochitl S. Strohbehn
Justin B. Nemeroff
VENABLE LLP
600 Mass. Ave., NW
Washington, DC 20004
(202) 344-8278
MCDavis@venable.com
DLFeinberg@venable.com
XSStrohbehn@venable.com
JBNemeroff@venable.com

Eric M. McLeod
Joseph S. Diedrich
HUSCH BLACKWELL
33 East Main Street, Suite 300
Madison, WI 53701-1379
(608) 234-6056
eric.mcleod@huschblackwell.com

David H. Coburn
Shannen W. Coffin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-8063
dcoburn@steptoe.com
scoffin@steptoe.com

*Counsel for Enbridge Energy Company, Inc.,*
*and Enbridge Energy, Limited Partnership*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on September 21, 2022 I served the foregoing document on all counsel of record using the Court's ECF system.

<u>/s/ *Justin B. Nemeroff*</u>
Justin B. Nemeroff