**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION | |
| *Plaintiff,* | |
| v. | |
| ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P. | Case No. 3:19-cv-00602 |
| *Defendants.* | |
| | |
| ENBRIDGE ENERGY, L.P. | Judge William M. Conley<br>Magistrate Judge Stephen Crocker |
| *Counter-Plaintiff,* | |
| v. | |
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity | |
| *Counter-Defendants.* | |

## <u>DEFENDANTS' PRETRIAL BRIEF</u>

Pursuant to the Court's Orders dated September 9, 2022 (Dkt. 362), September 14, 2022 (Dkt. 367), September 16, 2022 (Dkt. 369) and September 23, 2022 (Dkt. 430), Defendants Enbridge Energy, Limited Partnership and Enbridge Energy Company, Inc. (collectively "Enbridge") hereby submit this pretrial brief.

## I.     Overview of Scope and Timing of Trial

The five key issues remaining to be tried and/or decided are: (1) whether a public nuisance exists, (2) whether the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation (the "Band") has unreasonably interfered with Enbridge's attempts to abate the alleged nuisance, (3) whether the Band has also improperly prohibited or inhibited Enbridge's access to Line 5 and the surrounding areas for inspection, maintenance, and similar actions, (4) the amount of profit-based money damages to award the Band,[1] and (5) the form of injunctive relief to be awarded to the parties.  Each of these claims or issues will be discussed further below.

### A.  Timing of Trial

Enbridge currently anticipates that the bench trial will last 3 or more weeks: (i) 1.5 to 2 weeks for public nuisance liability, (ii) 1 to 2 days for profit damages, and (iii) 1.5 to 2.5 weeks for the hearing on injunctive relief (for such relief that may be awarded to the Band and Enbridge).[2]

Sensitive to the Court's statements on September 23, 2022 (Dkt. 430), this schedule can be materially shortened in three primary ways, each of which Enbridge has proposed to the Band but each of which the Band rejected:

- First, the liability portions of the case (public nuisance and Enbridge's The liability portions of the case (public nuisance and Enbridge's Counterclaims 4 and 5) could be significantly streamlined if the Band voluntarily dismisses its nuisance claim. This would eliminate the need for testimony on oil spills, oil spill modeling, and the effects of an oil spill.  It would also eliminate, more generally, evidence concerning whether a nuisance exists.  While the Band cannot prove that there is a public nuisance or an imminent threat at the Meander or elsewhere on the Reservation, regardless, this claim is moot, as the relief the Court indicated that it is inclined to grant if a nuisance were to be found—namely implementing "an

---

[1]      Pursuant to the Court's order (Dkt. 367) instructing the parties to submit briefing on "how the Court should determine the amount of profits-based relief to which the Band is entitled," that information is provided herein.  *See infra* at Section IV.

[2]      The scope and duration of the trial related to injunctive relief is largely dependent on whether this Court intends to hear additional evidence relating to the public interest in keeping Line 5 operational and the Band's contention that there are viable alternatives to transporting Line 5's energy products by other means. Enbridge discusses this in greater detail below, *see infra* at Section III.

effective mitigation plan"—is the type of equitable relief Enbridge itself desires under Counts 4 and 5 of its Counterclaim. Since Enbridge desires to take corrective action at the Meander and needs regular access to Line 5 to conduct maintenance while it continues to operate on the Reservation, Enbridge suggests that the nuisance claim need not be heard at trial. Instead, the Court and the parties should focus the trial on hearing evidence concerning access to the pipeline and the prudent protective actions and maintenance to be taken at the Meander and any other areas that require attention. The Court should decide what work may proceed now (e.g., at the Meander where all of Enbridge's work proposals have been rejected and the Band has proposed none of its own) and how future disputes about inspections and work, if any, are resolved so it can proceed without years of undue delay, such as has occurred at the Meander to date.

- Second, the trial can be materially shortened by foregoing the Band's proffered testimony that third-party alternatives to transport Line 5 products are available before the Line 5 reroute is complete. Unless the Court desires to revisit that issue, such testimony, which Enbridge estimates would take the vast majority of the 1.5 to 2.5 weeks for the injunctive remedy phase, is not needed. Moreover, there are no alternatives to the re-route of Line 5 operated by Enbridge (as opposed to third parties not before the Court) which could replace it in full. The only such alternatives the Band has mentioned involve Enbridge pipeline Lines 78A and 9 which would need substantial upgrades and approvals which have not been comprehensively studied, defined or permitted and which, in any case, do not now, and cannot in the future, transport natural gas liquids, or NGLs, which Line 5 currently carries. Thus, it must be conceded that none could even potentially replace all of the energy produces currently delivered by Line 5 and would leave the Line 5 service area without viable future supplies of propane and other products made from NGLs.

- Third, if the Court decides how profits are to be determined under the law (for example, whether the Band is entitled to the pro-rata share of those profits that are attributable to the portion of the pipeline determined to be in trespass or whether the Band is entitled to all of Line 5's profits for all 645 miles), trial testimony on these issues can be materially reduced, if not completely eliminated as the parties' main disputes are not factual but legal in nature.

Other suggestions which can shorten the trial are provided below.

**B.  Structure of Trial**

For the purposes of streamlined and logical presentations, Enbridge believes that the remaining liability portions of the case (public nuisance, if that claim proceeds, and Enbridge's Counterclaims 4 and 5) should be tried first before the remaining issues of equitable remedies

(damages and injunctive relief).  This way, the Court can receive a focused presentation of the alleged nuisance and related issues and how they should be addressed, which is a complex, scientific subject matter, without the distraction of unrelated evidence and witnesses related to Enbridge's profits, Enbridge's proposed reroute project or other topics unrelated to nuisance liability or remedy.

Once the parties rest their case on nuisance liability and the related counterclaims,[3] the parties can then immediately turn to trying the remaining issues of equitable relief.

### C.  Opening Statements

Enbridge respectfully suggests the Court would benefit from opening statements from the parties, either comprehensively at the start of trial or, if liability and remedies are separated as proposed, at the start of both phases of the bench trial.  Enbridge would appreciate any guidance from this Court on its expectations and preferences for opening remarks at trial.

### D.  Witness List

As directed by the Court, Enbridge hereby submits with this filing a revised witness list that reduces Enbridge's "will call" witnesses to 14 for the nuisance liability phase of trial and 14 for the injunctive relief and remedies phase of trial.  These numbers can be even further reduced if, as Enbridge proposed to the Band, the trial is focused on the narrowed issues as explained above (Section I(A), *supra*).  Obtaining clarity from the Court about what witnesses and issues can be eliminated to focus the scope of trial would also facilitate additional narrowing of Enbridge's witness list.

### E.  Exhibit List

---

[3]      The Court does not need to waste any time between these two phases and could begin to hear argument and evidence in the remedies phases immediately following the liability phase.

Enbridge is making deliberate efforts to substantially streamline its exhibit list, as directed by the Court.  *See* Dkt. 430.  Pursuant to that order, Enbridge submits with this filing a revised exhibit list that contains less than 1,000 exhibits.  Given the time constraints since the Court's order and the pressing need to comply with the deadlines to file its pretrial briefing and respond to the Band's pretrial submissions, however, Enbridge has not yet completed its efforts to reduce its exhibit list further.  Moreover, and based on the above (Section I(A), *supra*), any clarity from this Court about what witnesses and issues can be eliminated to focus the scope of trial would also facilitate significant narrowing of its exhibit list.

## II.   Public Nuisance Liability

### A.  The Band Can Only Advance a Prospective Nuisance Theory

The Band attempts to try a claim that Line 5 is a public nuisance on the Bad River Reservation.  But the Band readily admits there is no *current* nuisance, no *current* harm to its land, and no *current* interference with use of any public right from Line 5.  The Band will not offer any evidence that an unreasonable interference or significant harm *currently exists* due to Line 5's operation on the Reservation.

Instead, the Band's public nuisance theory is limited to the idea that while the nuisance has not yet occurred, it is (according to the Band) likely to occur in the future.  The Band's claim is premised on potential, future harm to its land and water at two areas called the Meander and Slope 18.  The claim is based on a series of contingencies that are all highly unlikely to occur—that the pipe in these locations may become exposed to nature's elements due to erosion, which could in turn lead to damage to the pipe and, if numerous highly unlikely conditions exist, the release of oil.  *See* Dkt. 123 (Third Am. Compl.) ¶¶ 139–45 (public nuisance claim consists of six paragraphs addressing only a future "threat" that "the Bad River . . . will soon reach the Line 5 pipeline," the encroaching riverbank "present[s] a high risk of pipeline rupture" and these "circumstances

present[] a grave threat of rupture, which would unreasonably interfere with the treaty-protected rights of the Band").

In fact, the Band's Rule 30(b)(6) representative on the factual bases supporting its nuisance claim confirmed that its entire nuisance claim relates to these two areas in which the pipeline is not currently exposed:

> Q.   Now, in connection with the Band's nuisance claims, can you tell me the areas where the Band alleges there is presently a nuisance caused by Line 5?
>
> A.   <u>Yes.  The Band has concerns about the entirety of Line 5, specifically where Line 5 crosses the Bad River.  This area is called the Meander. And then an area that's referred to as Slope 18, which is an area where Line 5 crosses a tributary to Denomie Creek</u>.
>
> Q.   Okay.  Any other areas where the Band contends that Line 5 constitutes a nuisance or just the Meander and Slope 18?
>
> A.   There are other areas on the reservation.  The Band is concerned about Line 5 and its impacts and threats to the natural resources.  <u>The two main ones are the ones I described</u>.
>
> * * * *
>
> Q.   Okay.  Any other areas where the Band contends there's a nuisance?
>
> A.   <u>Not beyond what I have already described</u>.

*See* Dkt. 275 (Tillison Dep. May 9, 2022) 9:7–22; 11:20–21, 23 (emphasis added); *see also id.* at 103:19–23 ("[T]he Band's concern -- nuisance concern related to the Meander is -- is about the increase[d] risk associated with spills and releases when a pipeline segment becomes exposed and gets exposed to forces that it's not normally designed for.").  Further, the Band's counsel has made numerous representations throughout this litigation also confirming this anticipatory nuisance theory. *See* Dkt. 282 (Band Opp'n to Enbridge Mot. for Partial Summ. J.) at 21 ("[I]f the Bad River reaches Line 5 and exposes it at the Bad River meander . . ."); *id.* at 23 ("This Court <u>need not wait</u> until oil is gushing into the Bad River to conclude that the nuisance presented by Line 5 is actionable,"); *id.* at 24 ("There exists a genuine issue of material fact as to whether the

threat of a Line 5 rupture is 'sufficiently <u>close to occurring</u> that equitable relief is necessary to prevent it from happening.'") (emphasis added).[4]

The law recognizes a heightened standard to prove a prospective (future) nuisance.  A future nuisance claim requires a factual showing that the threatened nuisance is "real and immediate,"[5] certain to result,[6] "inevitable and undoubted,"[7] presents an "imminent and dangerous harm,"[8] and is "actually threatened, not merely anticipated [and] it must be practically certain, not merely probable."[9]  Indeed, some courts have imposed a higher burden of proof.  *See, e.g.*, *Cal. Tahoe Reg'l Planning Agency v. Jennings*, 594 F.2d 181, 193 (9th Cir. 1979) (applying a "determinate and satisfactory evidence" test, and denying injunction when plaintiff failed to establish the danger of nuisance was "real and immediate"); *Otto Seidner, Inc. v. Ralston Purina Co.,* 24 A.2d 902, 910 (R.I. 1942) (denying injunction where plaintiff had not "proved by clear and convincing evidence that such damage will be practically certain to result").

---

[4]      *See also* Dkt. 44 (Band Opp'n to Mot. for Phased Disc. and  Bifurcated Trial)  at 6–7 (describing its nuisance claim as one that "presents a grave threat of a rupture, which *would* unreasonably interfere" with rights to fish and hunt and describing discovery on this claim as focusing on "understanding of th[e]se threats," "the nature and timing of those threats," and Enbridge's plans "in the event of exposure"); Dkt. 70-1 (Mot. for Leave to File Second Am. Compl.) at 2 (public nuisance is "based on Enbridge's continued operation of the pipeline under circumstances posing an unreasonable **risk of harm** to Reservation resources.") (emphasis added); Dkt. 162 (Tinker Decl. Feb. 9, 2022) (declaration of Band counsel describing its expert witnesses' omnibus report as one that concludes the Meander poses a "risk of Line 5 releasing oil" and "pose[s] a risk of adverse environmental impacts to the Reservation").

[5]      *Cal. Tahoe Reg'l Plan. Agency v. Jennings*, 594 F.2d 181, 193 (9th Cir. 1979) (a plaintiff must "establish that the danger of a nuisance in this case is real and immediate").

[6]      *See Meghrig v. KFC W., Inc.,* 516 U.S. 479, 480, 116 S. Ct. 1251, 1252, 134 L. Ed. 2d 121 (1996) ("[A]n endangerment can only be 'imminent' if it threatens to occur immediately"); *Wallace v. Andersonville Docks, Inc.*, 489 S.W.2d 532, 535 (Tenn. Ct. App. 1972) (finding where "harm is uncertain or contingent, such nuisance will not be enjoined anticipatory to its going into operation."); *Leatherbury v. Gaylord Fuel Corp.*, 347 A.2d 826, 833 (Md. 1975) (denying injunction where plaintiffs "failed to establish with reasonable certainty that a nuisance will result."); *King v. Hamill*, 54 A. 625, 627 (Md. 1903) (requiring proof that acts would "certainly constitute or result in a grievous nuisance" in order to grant injunction); *Lauderdale Cty. Bd. of Educ. v. Alexander*, 110 So. 2d 911, 916 (Ala. 1959) ("And if . . . the threatened injury is uncertain or indefinite or the use of the project only possible of injury. . . then it would be proper to refuse the injunction"); *St. James Church v. Arrington*, 36 Ala. 546, 548 (1860) (denying injunction where injury was "uncertain").

[7]      *Wergin v. Voss*, 179 Wis. 603, 606–07 (1923).

[8]      *Harrison v. Ind. Auto Shredders Co.,* 528 F.2d 1107, 1122 (7th Cir. 1975) (discussing a "standard of imminent and dangerous harm").

[9]      *Pa. Co. for Ins., Inc. v. Sun Co*., 138 A. 909, 912 (Pa. 1927) (holding "injury must be actually threatened, not merely anticipated; it must be practically certain, not merely probable.").

As this Court aptly stated in its summary judgment order, the issue of "imminence" is the key factual dispute and "the mere possibility of a rupture occurring would not be sufficient to sustain a nuisance claim." Dkt. 360 (Op. and Order on Summ. J.) at 54 (citing *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 781 (7th Cir. 2011)). Thus, the Band should not be permitted to introduce evidence unrelated to this *prospective* theory, including unrelated "concerns" or general critiques about Enbridge's operation of Line 5 on or near the Reservation. Such evidence would create a sideshow about Enbridge's operations that will needlessly lengthen the trial and has nothing to do with whether a nuisance at the Meander or Slope 18 is imminent.

To this end, Enbridge has filed several motions *in limine* to prevent the Band from expanding the scope of its nuisance claim to wide-ranging and irrelevant attacks, such as unrelated past spills and releases and the age of Line 5. None of this has anything to do with whether erosion at the Meander or any concerns elsewhere on the Reservation will imminently expose the pipeline, and whether such exposure, if it were to occur, would imminently cause a release.

## B. Enbridge Requests the Right to Access its Pipeline and to Conduct Maintenance Work

In its summary judgment order, this Court contemplated "requiring Enbridge to <u>work with the Band to create an effective mitigation plan</u> that could be implemented on the pipeline while Enbridge completes its reroute." *Id.* (emphasis added).

While disputing that any nuisance exists, Enbridge requires the Court's assistance to implement protective measures at the Meander (<u>all</u> of which the Band has unreasonably rejected) and to ensure Enbridge's ability to access and, where appropriate, maintain Line 5 elsewhere on the Reservation. The evidence will also show that the Band has unreasonably interfered with all of Enbridge's attempts to abate any alleged nuisance by implementing anti-erosion measures and performing preventative maintenance (or "mitigation" work) for years. For example, the Band has

not allowed access to install additional cameras on Enbridge's own tracts for purposes of monitoring at the Meander.  The Band has refused **every** proposed fix at the Meander and offered **none** of its own.  In response to those repeated rejections, and pursuant to the Band's permitting requirements which only allow re-applications (no appeals), Enbridge has re-applied, and that new application is currently pending before the Band, in which Enbridge proposes yet another project to be designed and implemented specifically to satisfy virtually all of the Band's and its experts' criticisms of similar projects Enbridge previously proposed. *See, e.g.,* **Exhibit A** (ENB00706748- May 27, 2022 Riprap Appl. Cover Letter) (application offering to pay tribal monitors, install and remove revetment with great care, pay expenses for the duration of the project, and offering to work with the Band on a solution); **Exhibit B** (ENB00708614- Sept. 21, 2022 Email from Kloss to Tillison) (same).

Even in the absence of a nuisance, the Court's assistance is needed.  Unfortunately, it is next to impossible to access the Reservation to do even routine maintenance.  Nothing is approved at the Meander or anywhere else and no work can occur.  This is hardly prudent and is certainly not acceptable.  The Court's order allowing Line 5 to continue operating until such time as the relocated segment is operational implies safe and reliable operation, which requires reasonable access to the pipeline for monitoring and maintenance.  Enbridge, as a prudent operator, is open to a form of injunctive relief requiring the parties to work together to implement any of its proposed projects at the Meander, or any reasonable project requested by the Band (none have been proposed or requested to date).  But the Court must stop the Band from unreasonably disapproving every project—or simply failing to respond to requests for access—such as to install additional cameras at the Meander, and be available to facilitate (and order, where required) resolutions if the parties are unable to agree.  Enbridge would welcome the Court's guidance on this issue so it can present

the evidence most relevant to the manner in which the Court believes disputes about requested maintenance work should be resolved.

Such an order would be completely **independent of** any nuisance claim or liability. A public nuisance need not exist, and liability need not attach to Enbridge, to achieve this outcome. Even though no nuisance exists, a mitigation plan ensuring the continued safe operation of Line 5 on the Reservation until the relocated segment is operational is prudent and sensible. Moreover, ensuring that such work takes place seems to be the Court's contemplated form of permanent injunction. In fact, giving Enbridge permission to conduct its recommended work at the Meander, and elsewhere where needed, is the exact remedy requested **by Enbridge** in its Counterclaim Counts 4 and 5, which allege that the Band has unreasonably interfered with Enbridge's ability to access the pipeline on the Reservation and perform reasonable maintenance projects. These claims relate to Enbridge's right to access the pipeline corridor on the Reservation for operation and maintenance of Line 5, including but not limited to, lands in which Enbridge possesses unchallenged property rights (such as at the Meander).[10]

Specifically, Enbridge will present evidence in support of these claims that will show the Band has (i) unreasonably interfered with Enbridge's operations and maintenance ("O&M") work, including at Slope 18 and the Meander; and (ii) declared that it has "taken over" O&M work at Slope 18 but, since this alleged takeover, the Band has done nothing. Because Enbridge will still be operating on the Reservation for a limited period under the Court's proposed injunction for the

---

[10]     At the September 9, 2022 telephonic status conference, Enbridge raised the fact that these claims have not been resolved and Enbridge intends to advance them at a bench trial. The Court stated that it "viewed the[se counterclaims] as defenses to the public nuisance" and acknowledged that "both will have to be decided . . . as part of the public nuisance" issue. Dkt. 363 (Sept. 9, 2022 Status Conf. Tr.) 20:19–21:2. Enbridge appreciates the Court's recognition that these claims will be heard, however, to avoid any confusion, Enbridge's position is that even if the Band were to abandon its nuisance claim or Enbridge were to prevail on the nuisance claim, Counts 4 and 5 of Enbridge's Counterclaim would nonetheless still need to be heard. Put another way, Enbridge requires access for reasonable inspections and maintenance even though no nuisance exists.

trespass and unjust enrichment claims, Enbridge requires reasonable access to its pipeline to ensure safe and reliable operation, which includes inspections, monitoring, and maintenance.  Enbridge thus seeks declaratory judgments and an injunction to ensure: that (1) the Band and its Natural Resources Department ("NRD") Director Naomi Tillison ("Tillison") cannot deny, delay, condition or interfere with access to the pipe; (2) the Band and Tillison cannot "takeover" O&M work on the pipe on the Reservation; and (3) the Band and Tillison will work in good faith and cooperatively with Enbridge, to promptly approve temporary mitigation measures on the Reservation and, if the parties cannot agree, a third party will promptly resolve the dispute.

In sum, the Band could (and should) dismiss its nuisance claims.  Enbridge needs the Court's equitable powers to take corrective action at the Meander as well as address other maintenance and inspection work that will need to be done while Line 5 continues operations on the Reservation until the relocated segment is operational. Dkt. 360 at 54.

## III.   <u>Injunction Hearing</u>

### A.  **Scope of the Injunction Hearing**

The Court was clear in its summary judgment order (Dkt. 360) that it only wishes to hear evidence on a narrow set of remaining topics regarding how to fashion injunctive relief.  The Court stated it has already weighed the public's interest and does not wish to consider more evidence or witnesses about whether a shutdown of Line 5 without an available alternative is appropriate. *See* Dkt. 360 at 2 ("[A]n immediate shutdown of the pipeline would have significant public and foreign policy implications"); *id.* at 39 ("the court is *not* required to issue a permanent injunction that would eject Enbridge immediately from the allotment parcels without considering the relevant equities"); *id.* at 41 ("there is little question that an immediate shutdown of the pipeline would have significant public policy implications"); *id.* at 43 (Court's proposed injunction "would

balance the equities between the Band's sovereign interests, broader economic concerns, and foreign relations").

The Court confirmed this at the parties' September 9 telephonic status conference during which it reiterated that an injunction based on decommissioning Line 5 before the reroute is operational is not an appropriate remedy:

> I'm satisfied with the basic remedy I've arrived at. The only questions I have are those that I've left open to address. I'm not going to invite another trial over w[h]ether -- or how to balance the basic requirements for a permanent injunction. I've done that for the parties, based on their written submission. . . . I'm just not going to revisit the question that it would be significant.

Dkt. 363 at 14:17–23, 15:3–4. Indeed, the Court repeated that it would not "revisit my finding that stopping the pipeline at any point is going to be substantial. And my principal remedy to require that, including [implementing] the reroute, is to develop a schedule consistent with the evidence [already] provided by the parties." *Id.* at 23:15–21.

Instead, the Court expressly stated that it wishes only to receive input about two topics: (1) Enbridge's ongoing maintenance efforts and what, if anything, is necessary to ensure safe operation of Line 5 on the Reservation until the reroute is operational; and (2) the status, timing, and challenges of a reroute outside of the Bad River Reservation. *See* Dkt. 360 at 43.

Enbridge is prepared to try the case in accordance with those rulings subject, of course, to rights on appeal. The Band, however, is not. It seeks to present evidence at trial to challenge conclusions the Court has already reached.[11]  But no such challenge is warranted, as it is well-settled law that a finding of trespass does not *require* the grant of any particular injunctive relief, such as ejectment. *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 213 (2005)

---

[11]      *See* Dkt. 360 at 38–41 (recognizing that the Court's proposed injunctive relief to the Band for trespass would not violate the Non-Intercourse Act) (citing *Cnty. of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 253, n.27 (1985)).

("'The substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred....'"); *id.*, *citing Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 199 F.R.D. 61, 90 (NDNY 2000) ("'[T]here is a sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right....'").  Neither the Non-Intercourse Act,[12] nor applicable rights-of-way statutes, nor the Band's 1854 treaty[13] limits the Court's equitable powers to fashion a remedy that allows Enbridge to continue operating and accessing Line 5 until a reroute outside the Reservation boundaries is operational.

The Non-Intercourse Act does not constrain the Court's ability to craft particularized injunctive relief.  Where such arguments have been made, courts have rejected them. *See Shinnecock Indian Nation v. United States*, 112 Fed. Cl. 369, 380 (2013), *aff'd in part and vacated in part on other grounds*, 782 F.3d 1345 (Fed. Cir. 2015) ("nothing in the plain language of the [Non-Intercourse] Act suggests that any trust relationship would extend to the judicial branch and function to bar equitable defenses from the adjudication of [Non-Intercourse] Act claims."); *City of Sherrill*, 544 U.S. at 213–21 (2005) (in reaching its holding, the Sherrill Court expressly engaged in a balancing of equities, including acquiescence, impossibility, and laches); *Shinnecock Indian Nation v. New York*, 628 F.App'x. 54, 55 (2d Cir. 2015) (plaintiff-appellant's trespass claims based on the Non-Intercourse Act were foreclosed by "equitable considerations, including laches...."); *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 276–78 (2d Cir. 2005) (rejecting plaintiff-appellant's demand for ejectment of all defendant-respondents based on Non-Intercourse Act claims).

---

[12]    25 U.S.C. 177 (R.S. §2116, derived from the Act June 30, 1834, ch. 161, §12, 4 Stat. 730).
[13]    Treaty with the Chippewa, 1854, 10 Stat. 1109 (Sept. 30, 1854) ("1854 Treaty").

Similarly, nothing in the Act of February 5, 1948 ("1948 Act"),[14] prevents the Court from granting an injunction like that described in its summary judgment order.  The recent opinion of the Tenth Circuit in *Davilla v. Enable Midstream Partners*, 913 F.3d 959 (10th Cir. 2019), persuasively confirms this result.  There, the panel was confronted with a similar fact pattern and reversed the district court's grant of an injunction that would have resulted in the shutdown of a natural gas pipeline.  Citing the need for a "uniform federal standard" with regard to remedies available for trespass claims arising from the expiration of a 1948 Act right-of-way,[15] the Tenth Circuit reversed the district court's entry of a permanent injunction and remanded for application of the Supreme Court's four-factor test guiding analysis of injunctive relief. *Id*. at 974.

Finally, the 1854 Treaty has no provisions that prohibit the Court from fashioning equitable relief pursuant to normal equitable standards.  The 1854 Treaty's general language does not dictate, expressly or even impliedly, how this Court should exercise its equitable powers—much less mandate the immediate ejectment of the pipeline from the allotted tracts.[16]

With this information in mind, Enbridge requests confirmation from the Court that it will not permit the Band's attempt to challenge conclusions that this Court has already stated have been determined.  That is, does the Court intend to receive more evidence and hear witnesses on (i) economic impacts resulting from a Line 5 shutdown (or according to the Band, lack thereof),

---

[14]     25 U.S.C. §§ 323–28.  This brief addresses only the 1948 Act, as this statute was specifically cited by the Band in its Statement of Contested Issues of Law.  The analysis is the same, however, for other Indian rights-of-way statutes, including the Act of March 11, 1904, 25 U.S.C. § 321.

[15]     *Id*. at 972.  *See also United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 614–15 (9th Cir. 1998) (upholding the stay of a permanent injunction for trespass on the Kalispel Indian Reservation based on flooding that exceeding the public utility's Federal Power Commission project boundary license).

[16]     There is nothing in the 1854 Treaty, for example, like the proscriptive access language found in the Treaty with the Navaho, 1868.  There, and as discussed in *Donovan v. Navajo Forest Products Industries*, a provision that prohibited reservation access to all but certain categories of persons was found to render the Occupational Safety and Health Act ("OSHA") inapplicable to tribal enterprises, given OSHA's reliance on inspections by OSHA compliance officers.  692 F.2d 709, 714 (10th Cir. 1982).

and/or (ii) possible (or infeasible) alternatives for transporting energy products besides Line 5?[17] If it does, Enbridge intends to introduce substantial evidence to show (i) that there will be severe, real-world impacts to the public if Line 5 is shut down before a reroute is operational, and (ii) there are no viable or feasible alternatives to transporting all or substantially all of the lost volume of Line 5's products **other than** Line 5. Any such expanded scope could take three weeks as Enbridge will have to present expert and lay testimony to respond to each of the many infeasible alternative theories the Band wants to present.

Enbridge requests clarity from the Court so it can effectively prepare its trial strategy (and shorten its exhibit and witness lists, as the Court has directed) as well as accommodate witnesses' schedule and travel.

### B. The Band's Opposition to the Reroute is an Essential Factor to Consider in Fashioning an Injunction

In crafting a permanent injunction for Enbridge's trespass, the Court should be aware of the following high-level points and arguments that Enbridge will present at trial.

Enbridge is working diligently to permit and construct its Line 5 Wisconsin Segment Relocation Project ("L5 WSRP"), which would relocate a segment of Line 5 outside of the Bad River Reservation. For example, Enbridge applied for the necessary federal and state permits in 2020 (each of which is pending) and has been diligently pursuing these permits with the relevant agencies ever since. As another example, Enbridge has already successfully obtained **all** landowner permission for the L5 WSRP.

---

[17] The Band has indicated it may seek to introduce evidence that Enbridge could expand Line 78 to handle Line 5 product if Line 5 were closed. If the Court decides to evaluate this proposal, Enbridge will present evidence that a Line 78 expansion is not a viable option and, in any event, because Line 78 cannot carry NGLs, would not in any map0miknner address the significant propane shortages that would result from a Line 5 shutdown.

The Band, by contrast, has been working intensively to delay or impede the permitting of the L5 WSRP on both the federal and state levels. The evidence will show that the L5 WSRP can be built within five (5) years **if** the Band ceases its active opposition to the L5 WSRP permitting process. The Band—as a downstream neighboring entity claiming to be impacted by the potential reroute—is trying to use that status to delay, rather than expedite the permitting process. Enbridge will present evidence at trial that progress on Enbridge's L5 WSRP has been slowed by the Band's and its allied groups' active advocacy for delays by, among other things, filing thousands of pages of meritless objections.[18] If the Band continues its bad faith challenges to permit approval, including by challenging and subsequently appealing any approved permits, this too could potentially delay the project for many years. While Enbridge is confident the reroute will ultimately be approved and built, the Band is uniquely positioned to continue to materially delay (but not stop) that process.

Thus, in crafting a permanent injunction for trespass, it is imperative for the Court to consider the Band's ongoing and future opposition to the L5 WSRP permits and the impact of its actions on potentially extending by years the permitting timeline. For example, there should not be increased financial penalties on Enbridge if the L5 WSRP takes longer than 5 years to construct

---

[18]     Enbridge will demonstrate at trial that the Band's active efforts to delay construction of the L5 WSRP consist of numerous activities. For example, although the U.S. Army Corps of Engineers ("Corps") announced in February 2022 that it decided to prepare an Environmental Assessment ("EA") under the National Environmental Policy Act that will compare various reroute alignment alternatives, the Band is pressing for the Corps to prepare its own Environmental Impact Statement ("EIS"), instead of the more expeditious EA. If the Corps requires a separate federal EIS, that could **add an additional two or more years** to the issuance of the Corps' permits. As another example, in December 2021 the Wisconsin Department of Natural Resources ("WDNR") issued for public comment an extensive draft EIS addressing the issues raised by the Enbridge permit applications. In response, the Band has attempted to inject delay at every turn. The Band's delay tactics include, among other things, submitting thousands of pages of written comments and attachments arguing for a full rewrite of the draft EIS – if successful, this would **add a year or more** to the WDNR permitting review process. As yet another example, in March 2022, the Band was given 45 days to complete certain elder interviews, the Band requested a **four month** extension, which was granted on September 8, 2022. The work assigned in March—approximately 6 months ago—should have been done long ago. Instead, the Band's time to complete this limited work has now extended into January 2023, adding months (almost **a year**) of delay to a part of the process.

especially if the Band, directly and indirectly, is the cause of the L5 WSRP being delayed. The reason for this request is simple: the Band should not benefit monetarily from itself extending a trespass. Otherwise, the Band is further incentivized to delay the L5 WSRP, a result Enbridge suggests would not be appropriate. Instead, the Band should be incentivized to have the L5 WSRP become operational as soon as reasonably possible.

The Court should encourage cooperation as to the L5 WSRP. Enbridge would be a willing partner with the Band in effectuating such cooperation and expediting the approval, construction, and completion of the L5 WSRP.

## IV. Enbridge's Position as to the Band's Award for Profit-Based Relief

Enbridge submits its position on the Band's entitlement to "profits-based relief" pursuant to the Court's order. *See* Dkt. 367. In this Section IV, Enbridge (a) argues that statute of limitations and/or equitable defenses of laches and estoppel limit the time period for which the Band may recover profits-based relief, (b) explains how profit-based damages should be determined and allocated to the Band for its interests in the twelve parcels on which the Court determined a trespass exists, and (c) explains why a special master is unnecessary.

### A. Time Period of Band's Profits Recovery Should Be Limited

#### 1. Statute of Limitations Limits Recovery to Three Years Prior to Suit

The Band's ability to recover damages for trespass or unjust enrichment begins, at the earliest, in July 2016 because of Wisconsin's three-year statute of limitations, which precludes recovery for the time period more than three years prior to the filing of this action. *See* Dkt. 1 (Band Compl. July 23, 2019).

There is no dispute that Wisconsin law applies here. *See* Dkt. 168 (Band. Mot. for Summ. J.) at 15 ("[T]his Court need not decide between Wisconsin law and the Restatement as the substantive basis for defining [a trespass claim based upon] federal common law because the two

are consistent."); *see also Stockbridge-Munsee Cmty. v. Wisconsin*, 299 F. Supp. 3d 1026, 1030–31 (W.D. Wis. 2017) (when federal substantive law "does not contain an express statute of limitations, federal courts must 'borrow' . . . [from] the most closely analogous statute of limitations under state law."), *aff'd*, 922 F.3d 818 (7th Cir. 2019).

Wisconsin's statute of limitations for intentional trespass is three years. Wis. Stat. § 893.57. In *Munger v. Seehafer*, the Wisconsin Court of Appeals held that the three-year limitations period for intentional torts (§ 893.57) governs trespass claims. *See* 2016 WI App 89, ¶¶ 19, 29, 890 N.W.2d 22 (Wis. App. 2016) ("Accordingly, we conclude the statute of limitations governing intentional torts, Wis. Stat. § 893.57, is applicable to claims for intentional trespass"). The Band filed its trespass claim on July 23, 2019. *See* Dkt. 1. Thus, the Band is only entitled to recover trespass damages beginning on July 23, 2016 to the present.

When there is a continuing tort like trespass, an overwhelming number of jurisdictions, including the Seventh Circuit, allow the injured party to recover damages only during the statutory period preceding the filing of the suit. *See Burns Philp Food, Inc. v. Cava lea Cont'l Freight, Inc.*, 135 F.3d 526, 531 (7th Cir. 1998) (limiting damages for an unjust enrichment claim to the applicable statute of limitations period preceding the suit); *McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2006 WL 1476110, at *17 (N.D. Ill. May 23, 2006) (for actions of continuing trespass, plaintiffs can "recover damages for the duration of the applicable statute of limitations"); *Skokomish Indian Tribe v. U.S.*, 410 F.3d 506, 518 (9th Cir. 2005) ("Where a plaintiff can show that its claim is a 'continuing' violation, 'the statute of limitation serves only to limit damages to those incurred in the three-year period before the suit was filed.'"); *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1196 (S.D. Cal. 2016) (trespass and nuisance three-year limitations period allows recovery "only for three years preceding the filing of the nuisance

and trespass claims"); *Raymond Slate v. Pierce Cty.*, No. 3:14-cv-05161-KLS, 2016 WL 410182, at *4 (W.D. Wash. Feb. 3, 2016) ("The three year trespass statute of limitations 'does not preclude a property owner from bringing an action against the trespasser' for continuing trespass, but instead 'it serves only to limit damages.'"); *Ramik v. Darling Intern., Inc.*, 60 F. Supp. 2d 680, 690 (E.D. Mich. 1999) (Michigan statute of limitations precluded recovery of damages on nuisance and negligence claims for any injuries which were sustained more than three years prior to filing complaint); *L'Enfant Plaza E., Inc. v. John McShain, Inc.*, 359 A.2d 5, 7 (D.C. 1976) (after a finding of continuing trespass, recovery of trespass damages was "limited to damages resulting from the trespass during 'the (three-year) statutory period preceding the filing of the suit.'"). *See also* Restatement (Second) of Torts § 899, cmt. d (1979) ("[F]or example, when there has been the tortious emission of fumes from a factory, the plaintiff is not required to treat the harm as a unit and is entitled to recover for <u>damages for harm that has accrued within the period provided by statute for that type of tort</u>.") (emphasis added).

Accordingly, the Band may only recover trespass damages for any of the at-issue parcels from, at the earliest, July 23, 2016 to the present.[19]

2. <u>Equitable Defenses of Laches, License and Estoppel Also Limit the Period of Recovery</u>

Enbridge also intends to prove at trial that the evidence supports the application of laches, acquiescence and/or estoppel to impose a shorter time period for equitable, profits-based relief awarded to the Band. Enbridge has raised defenses of laches, acquiescence and estoppel based on a similar factual predicate as its summary judgment argument that laches and estoppel preclude

---

[19]   The Band may argue that the Supreme Court has held that state statutes of limitation do not apply. *See Oneida County, N.Y. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226 (1985). However, those cases hold that state statute of limitations do not bar claims outright, not that they do not limit the period of recovery. *Oneida* says nothing about applying a time bar only to limitation of recover *after* liability has already been established. Enbridge is not aware of authority holding that it is inconsistent with federal policy to apply statute of limitations solely to limit the time period of recovery for trespass on Indian lands.

liability because the Band offered its implied consent—as it is currently doing with three other utilities or pipelines with expired rights-of-way on the Reservation—or, at a minimum, led Enbridge to believe it could remain on the property based on the Band's conduct and representations. *See* Dkt. 207 (Enbridge Opp'n to Band Mot. for Summ. J.) at 102–04 (estoppel), 126–32 (laches). *See also Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 186–87 (N.D.N.Y. 2001) (leaving open the possibility of laches application for remedies after it struck the defense "at least for liability purposes"); *Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York*, 278 F. Supp. 2d 313, 333 (N.D.N.Y. 2003) (the defense of "laches may become relevant down the line as to remedies"); *Cayuga Indian Nation of N.Y. v. Cuomo,* Nos. 80–CV–930, 80–CV–960, 1999 WL 509442, at *25, 30 (N.D.N.Y. July 1, 1999) (laches did have bearing on the pre-judgment interest award and, after considering all of the equities including laches, the court granted the defendants' motion *in limine* precluding ejectment as a remedy).

Specifically, the Band waited four years—until its January 2017 Resolution—after the easements over allotted parcels expired in 2013 to even mention that the Band would not renew those easements or did not want Enbridge operating over those lands.  During those four years, the evidence will show that Enbridge frequently reached out to the Band about renewing the easements.  Until the 2017 Resolution, the Band never asked for Line 5 to be removed.

While the Court held in its summary judgment order that it was "not persuaded that the doctrine of laches *bars any of the Band's claims in this case,*" similar **and additional** evidence presented at trial could lead the Court to conclude that the Band may not recover profit-based relief for an intentional trespass until it informed Enbridge Line 5 was no longer welcome on the Reservation.  The Band can still recover for a trespass from its commencement, but the Court

should not apply its equitable powers to award profits until January 2017 when Enbridge first learned the Band refused to renew Enbridge's easement as to the 12 parcels the Court has deemed Enbridge in trespass on.

Further, Enbridge also contends (and will present evidence to prove) that laches and estoppel should apply to limit or eliminate any *increased* penalties after five years (or whatever time period the Court ultimately deems appropriate) if Line 5 still remains on the Reservation if the delay is caused by the Band. Enbridge will introduce evidence that Enbridge's ongoing L5 WSRP project has been, and continues to be, substantially delayed because of the Band's *own, ongoing* opposition to the project. The Court should hear this evidence and, in crafting an equitable restitution award, conclude that the Band should not be monetarily rewarded for *extending* Enbridge's trespass when Enbridge is actively and diligently trying to reroute Line 5 outside of the Band's Reservation.

**B. Computation of Profits-Based Relief**

In the Court's September 7, 2022 order, it determined that "the Band is entitled to a profits-based remedy for Enbridge's trespass and unjust enrichment." Dkt. 360 at 29. This calculation is straightforward, and the Court can complete it by relying on the objective and reasonable methodology that Dr. Laura Olive opined should apply and that the Band's expert concedes, in part, should apply. *See* Dkt. 373 (Leistra-Jones Dep. June 17, 2022) 56:13–57:11 (conceding Dr. Olive's barrel-mile methodology is a reasonable proxy to determine what profits are allocable to a given portion of Line 5). Under Dr. Olive's methodology, profits attributable to Line 5 are segregated from profits earned by other Lakehead system pipelines by applying a barrel-mile calculation and then using that methodology to apportion the profits attributable to the parcels as to which Enbridge is in trespass. With respect to apportioning profits pro-rata per parcel,

21

Enbridge's approach[20] accords with both the Restatement and the *Davilla* case the Court cited in its September 7, 2022 order for the proposition that "the pro-rata share of those profits *that is attributable to the portion of the pipeline that has been located on their property*" are recoverable. Dkt. 360 at 29 (emphasis added).

The first topic, addressed here, is how any profits to be paid to the Band from Enbridge should be determined.  In order to determine the profits to be awarded, the following steps must be taken:

> **Step 1.**  *Determine Enbridge's total profits for the Lakehead Pipeline System for the years for which an award of profits will be granted (the "Total Lakehead System Profits").*

This is the necessary starting point as Enbridge's profits are determined (as set forth in its audited books and records) for the **entire** Lakehead pipeline system.[21]  That is, profits are not determined separately for any particular pipeline of the Lakehead system (such as Line 5) but for the Lakehead pipeline system **as a whole**. *See* Dkt. 372 (Yaremko Dep., Aug. 15, 2022) 22:5–8. Fortunately, the Total Lakehead System Profits can be easily determined from the FERC Form 6, a form Enbridge files with the FERC on a quarterly basis.  That form was used as the starting point by the profit experts of both parties.[22] Dkt. 434 (Dr. Olive Expert Report, Jan. 31, 2022) at ¶ 41, Table 7; Dkt. 227-1 (Leistra-Jones Rebuttal Disclosure, Apr. 8, 2022) at ECF p. 19 (calculating net income "based on information in Enbridge Energy, LP's FERC Form 6.")[23]

> **Step 2.**  *Determine the profits attributable to Line 5, as opposed to Enbridge's other pipelines not at issue here (the "Total Line 5 Profits").*

---

[20]  Enbridge's calculation was and is without prejudice to its position that fair market value/diminution in value is the proper measure of damages.

[21]  The Lakehead system is a series of pipelines that consists of Line 5 and several other Enbridge operated pipelines that carry various energy products.

[22]  Leistra-Jones seeks to remove depreciation from those profits but has absolutely no basis to do so. *See* Dkt. 398 (Mot. to Exclude Leistra-Jones) at 13.

[23]  Docket 227-1 contains the Rebuttal Report of Leistra-Jones as well as his disclosure and CV.  For ease of reference, Enbridge will be relying on the ECF pagination when citing to this filing.

There seems to be no dispute this is necessary as the Band's own expert, Dan Leistra-Jones, testified he *agreed* both that this step was necessary and with how Enbridge's expert, Dr. Olive, did so. *See* Dkt. 373 at 56:13–57:11.  Dr. Olive used a barrel-mile[24] methodology to compare the barrel miles of product transported on Line 5 versus other Lakehead system pipelines.  It is notable that Leistra-Jones agrees with the reasonableness of Dr. Olive's approach because any accounting of Enbridge's profits allocable to Line 5 should also be based on the barrel-mile method, as discussed below. *Id.* (Leistra-Jones "use[d] the same barrel mileage methodology for moving from the Lakehead System to the–the Line 5" and agrees that barrel miles are a "reasonable . . . proxy . . . for how to determine which costs and which revenues relate to which specific piece" of pipeline). He agreed also that this methodology is frequently used in the pipeline industry for other purposes, such as rate making. *Id.* at 115:2–14.[25]

**Step 3.**   *Determine the share of the entirety of Line 5's profits attributable to the portion of Line 5 found to be in trespass (the "Total Trespass Related Line 5 Profits").*

As the Court knows, Line 5 is not in trespass along its entire 645 mile length or, indeed, even across the entire Reservation.  In fact, the vast majority of Line 5's twelve-mile crossing of the Reservation is not in trespass.  But the Court has determined that a portion of the pipeline on certain parcels is, and these parcels amount to about 2.33 miles of pipeline, a little less than 20% of the length of Line 5 on the Reservation as a whole.  To address this, Dr. Olive allocated the Line 5 profits to the parcels on which trespass was found using the same barrel-mile methodology discussed above.  Dr. Olive calculated a barrel mile ratio by comparing (i) the volume of product transported through the length of pipe found to be in trespass on the Reservation (2.33 miles), with

---

[24]   A barrel-mile methodology compares the volume of product transported over a mile of pipeline.  Since pipelines have different diameters and pressures, a mile of transportation on one may not transport the same volume as a mile of transportation on another line.  The barrel-mile methodology accounts for this.

[25]   This methodology is also used in the context of allocating income taxes for pipelines. *See* Wis. Tax § 2.48 (available at https://docs.legis.wisconsin.gov/code/admin_code/tax/2/48?view=section).

(ii) the volume of product transported through the entire length of the Line 5 pipeline (645 miles), and then determined how many barrel miles were in trespass and how many were not.

> ***Step 4.*** *Determine the share of the portion of Line 5 found to be in trespass payable to the Band as a result of the fact that the Band has not owned, and does not currently own, 100% of all the properties on which trespass was found during the entire time of the trespass (the "Band's Trespass Profit Award").*

To account for this, the recovery must be reduced proportionate to the share of each property at issue owned by the Band, as that changed over time (and may change in the future). This methodology is required by the law. For example, *Davilla v. Enable Midstream Partners, L.P.*, cited by this Court in its summary judgment order, recognized that the plaintiff was entitled only to recover the "pro-rata share of those profits that is attributable to the portion of the pipeline that has been located on their property." No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016). The Restatement (Third) Restitution and Unjust Enrichment ("Restatement") is in accord. *See* §§ 40, 51. Illustration 4 is perhaps most on point:

> Edwards owns Blackacre; Lee owns Whiteacre, an adjoining tract. Blackacre contains the only known entrance to a magnificent cave. Edwards develops the cave as a tourist attraction, installing illumination and walkways and offering guided tours to paying visitors. About **30 percent of the cave area being exhibited in this manner actually lies beneath the surface of Whiteacre**. Edwards is aware of this fact, which he attempts to disguise from Lee. Lee eventually obtains a survey and an injunction against further trespass. By the rule of this section, Lee has a claim to the profits realized by Edwards in conscious violation of Lee's rights. The court determines that Lee is entitled to **30 percent of Edwards's** profits from operation of the cave. Lee's further claim to 30 percent of the profits from a hotel operated by Edwards near the cave entrance is rejected on the ground that the hotel profits are too remote from the trespass.

*Id* § 40 (emphasis added).

Disgorgement "does not impose a general forfeiture." Restatement § 51, cmt. i; *see also Kansas v. Nebraska*, 574 U.S. 445, 464 (2015) ("[D]isgorgement need not be all or nothing."). Instead, the "defendant's liability in restitution is . . . the amount of the gain that is attributable to the underlying wrong. . ." Restatement § 51, cmt. i; *see also id.* at § 51, n. i; *FTC v. Verity Int'l,*

*Ltd.*, 443 F.3d 48, 68–70 (2d Cir. 2006) (remanding the matter for recalculation of the disgorgement figure and directing the district court "to entertain only reasonable approximations of the defendants-appellants' unjust gains, rather than [approximations of] their overall gains. . .").

A defendant's profit may be attributable to both permissible conduct and to acts for which compensation is owed, such as trespass, and a claimant seeking disgorgement is only entitled to the unjust portion of the profit, not the entire profit. *See, e.g.*, *United States v. Pend Oreille Cty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 611–12 (9th Cir. 1998) (apportioning the net benefit from a trespass between landowners and trespassers, since the net benefit would not exist "without both [owners'] land and [trespasser's] improvements").  Many cases are in accord. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 55 (2d Cir. 1939) (reversing district court's award of the defendants' entire net profits and stating that defendants were entitled to prove, if they could, the proportion of the profits that arose from copyright infringement), *aff'd*, 309 U.S. 390 (1940); *Pend Oreille*, 135 F.3d at 611–12, 615 (apportioning a tribe's share of a net benefit according to the acreage of the tribe's land and the role it played in realizing the net benefit); *Edwards v. Lee's Adm'r*, 265 Ky. 418, 428–29, 96 S.W. 2d 1028, 1033 (1936) (awarding the claimant a proportionate third of the net proceeds from a business venture, since one-third of the value of the venture was based on defendant's unauthorized use); *Bruce v. Weekly World News, Inc.*, 150 F. Supp. 2d 313, 318 (D. Mass. 2001) (awarding the claimant four percent of the profits because plaintiff's intellectual property contributed only that fraction to the profits), *vacated in part by* 310 F.3d 25 (1st Cir. 2002).  Here, the evidence to be adduced at trial will show such an apportionment is warranted.

The Band's position in response is simple yet incorrect: all of Line 5's profits should be awarded to the Band.  Leistra-Jones opines that a damage award equal to "100 percent of the profits

from Line 5," which operates for 645 miles in the United States and in Canada, is appropriate in this case. Dkt. 227-1 at ECF p. 10.  But Enbridge is unaware of a single case or authoritative treatise that adopts this approach. Dkt. 398 at 8–10 (Leistra-Jones' methodology, based on inapplicable penalty policy, is contrary to the Restatement and lacks support in case law).

This position also makes no practical sense.  If it were correct, Enbridge would be liable for the full amount of its profits to every single property owner along the 645-mile pipe for which it could be in trespass.  Moreover, Leistra-Jones fails to account for the fact that some of the parcels are highly fractionated with multiple owners holding an interest in the at issue tracts.  At his deposition, he admitted he was incorrect not to have accounted for the fractionization of the parcels but offered no analysis to address this error. *See* Dkt. 373 at 65:7–10, 66:19–69:6.

### C.  Enbridge's Computation of Profit-Based Damages

Relying on FERC Form 6 financial data dated through September 30, 2021, Dr. Olive concluded that, for the period June 3, 2013-September 30, 2021, the profits attributable to a 100% ownership interest in all twelve parcels on which the Court found trespass totals $2,816,719.[26] Dkt. 434 at ¶ 41, Table 7; *see* § IV(B), *supra*.

As explained above, § IV(B), *supra*, these profits would need to be reduced to account for the fact that the Band did not own a 100% interest in them for the entire time period (and currently does not own a 100% interest in all of these parcels) and based on estoppel, laches, and applicable statute of limitations.  To the extent the Court determines that such limitations are appropriate, the above amounts would need to be further adjusted.

### D.  The Court, and not a Special Master, should determine the profits.

---

[26]     Dr. Olive will update this computation of profits in advance of trial.

The Court need not appoint a special master to determine the amount of profits to award the Band.   In the Seventh Circuit, special masters are only to be appointed in exceptional circumstances such as those involving a "difficult computation of damages." FED. R. CIV. P. 53. Those circumstances do not exist here as the computation of profits is fairly straightforward, and the methodology is, at least in part, substantially agreed upon by the parties.   The issues the Court must decide—the applicable methodology for calculating profits and whether the Band is entitled to all of Line 5's profits or only a portion thereof proportionate to its interests on the twelve parcels—straightforward.   Indeed, if the Court informs the parties of its view of the law on this issue, and how profits should be computed, Enbridge believes there is a very real possibility that the parties will be able to stipulate to the amount of profits meeting the Court's instructions.   At a minimum, the issues to be tried will be materially limited.

The Seventh Circuit has cautioned district courts that special masters are to be appointed sparingly. *Clark v. Weisberg*, No. 98 C 6214, 1999 U.S. Dist. LEXIS 11341, at *6 (N.D. Ill. July 22, 1999) (denying request for special master because the issues were not complicated and recognizing that "[w]hen considering the appointment of a special master, the Seventh Circuit has warned district courts that 'in this more than in any other circuit we must be alert to the danger of overusing special masters, for it was overuse by one of our district judges that led to the Supreme Court to issue a writ of mandamus in (1957)'" (citing *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 712 (7th Cir. 1984))).   Courts in the Seventh Circuit recognize that "no presumption exists under Rule 53 that a reference to a special master is permissible" to provide an accounting.  *Id.* at *9; *Home Indem. Co. v. Farm House Foods Corp.*, 770 F. Supp. 1339, 1347–48 (E.D. Wis. 1991) (denying special master where the calculation of damages involved straightforward issues).  Where an accounting is sought, a special master is only appointed where

"the 'issues are complicated.'" *Clark*, 1999 U.S. Dist. LEXIS 11341, at *9.  The issues here are simple and do not justify appointment of a special master.

To determine the amount of damages to which the Band is entitled, the Court must decide two straightforward issues: (1) which methodology should apply, and (2) whether the Band is entitled to an award of *all* Line 5 profits earned by Enbridge since June 2013 regardless of whether the profits were primarily generated by shipments across parcels on which Enbridge is not in trespass (or even on the Reservation).

As to the first issue, there is little the Court must decide.  Both parties' experts agree that it is appropriate to use publicly available data filed with the FERC and to segregate Line 5 profits from overall Lakehead system profits using the barrel-miles methodology applied by Dr. Olive.  *See* §IV(B), *supra*.  The only dispute is whether—in contrast to virtually every other calculation of profits or net income—depreciation should be excluded to calculate Line 5 profits.  That dispute—which is one courts routinely decide—is easily decided. *See, e.g.*, *Fid.-Phenix Fire Ins. Co. v. Benedict Coal Corp.*, 64 F.2d 347, 353 (4th Cir. 1933) (recognizing that depreciation "must be considered in estimating profits"); *see also Cedarburg Fox Farms, Inc. v. United States*, 283 F.2d 711, 713 (7th Cir. 1960) (recognizing under IRS regulations that depreciation is deducted to determine net income).

The second issue is a legal one that is just as straightforward as the first.  The Court must simply decide whether, and if so how, to allocate profits to the Band's property on which a trespass was found.

Far from presenting the exceptional circumstances that are required for a special master, the Court can determine the amount of profits to award the Band.

### E. Enbridge's Opinion of Fair Market Value Damages Evidence Should Be Permitted

The Band has confirmed to this Court that it only seeks a remedy of profits-based disgorgement. *See* Dkt. 354 (Band Notice of Corr. and Suppl. Auth.) at 2; Dkt. 355 (Enbridge Resp. to Band Notice of Corr. and Suppl. Auth.) at 2; Dkt. 365 (Joint Stipulation on Profits-Based Restitution) at p. 2 ¶ 3; Dkt. 369 (Op. and Order Sept. 16, 2022) at 1.

Nonetheless, Enbridge seeks to introduce evidence of these damages in the amount of fair rental value damages by offering the testimony of its expert witness Ed Steigerwaldt.   Mr. Steigerwaldt's testimony will last several hours at the most.   The Band did not disclose any similar expert witness to offer an opinion on the fair rental value of these properties nor did it disclose any rebuttal witness to Mr. Steigerwaldt.   In essence, his testimony is, and will be, unrebutted (although the Band has advised it will not stipulate to his fair rental value opinions).

Enbridge seeks to introduce this evidence into the record for several reasons, including for purposes of appeal and to ensure that the profits to be awarded bear some reasonable relationship to the value of the properties at issue. Restatement § 40, cmt. b.

Dated this 28th day of September, 2022                      Respectfully submitted,


                                                            /s/ *Justin B. Nemeroff*
David H. Coburn                                             Michael C. Davis
Alice E. Loughran                                           David L. Feinberg
Mark C. Savignac                                            Xochitl S. Strohbehn
STEPTOE & JOHNSON LLP                                       Justin B. Nemeroff
1330 Connecticut Avenue, NW                                 VENABLE LLP
Washington, DC 20036-1795                                   600 Massachusetts Ave., NW
(202) 429-3000                                              Washington, DC 20001
dcoburn@steptoe.com                                         (202) 344-8278
aloughran@steptoe.com                                       MCDavis@venable.com
msavignac@steptoe.com                                       DLFeinberg@venable.com
                                                            Xochitl.Strohbehn@venable.com
                                                            JBNemeroff@venable.com

Eric M. McLeod
Joseph S. Diedrich
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300

Madison, WI 53701-1379
(608) 234-6056
eric.mcleod@huschblackwell.com
joseph.diedrich@huschblackwell.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 28, 2022, I served the foregoing document on all counsel of record using the Court's ECF system.

/s/ *Justin B. Nemeroff*

Justin B. Nemeroff