**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, <br><br> *Plaintiff*, <br><br> v. <br><br> ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P., <br><br> *Defendants*. | Case No. 3:19-cv-00602-wmc <br><br> Judge William M. Conley <br> Magistrate Judge Stephen L. Crocker |
| ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P., <br><br> *Counter-Plaintiffs*, <br><br> v. <br><br> BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity, <br><br> *Counter-Defendants*. | |

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS'
RESPONSE TO ENBRIDGE'S MOTION TO EXCLUDE THE OPINIONS AND
TESTIMONY OF DAN LEISTRA-JONES**

**INTRODUCTION**

As the Court clearly provided in its summary judgment order, profits-based restitution "is

appropriate and necessary in this case, *both* to address the violation of the Band's sovereign

rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future exactly as it did here."  Op. and Order ("S.J. Op."), Dkt. #360, at 36 (emphasis in original).  Even though ample authority underpins the Court's emphasis on deterrence, *see*, *e.g.*, *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("[O]ne way to deter [an intentional tort] is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act."); Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e (Am. Law Inst. 2011) ("Restatement") ("The object of the disgorgement remedy [is] to eliminate the possibility of profit from conscious wrongdoing[.]"), Enbridge's motion evidences that it remains in willful denial of the centrality of deterrence to the restitution remedy.  *See*, *e.g.*, Mot. to Exclude Ops. and Testimony of Dan Leistra-Jones, Dkt. #398 ("Mot."), at 5 (asserting that the objective of deterrence is "not in play here").  The motion hinges on this denial, and on significant mischaracterizations of Mr. Leistra-Jones's testimony.  It should never have been filed.

In his expert report, Mr. Leistra-Jones addresses two principal subjects.  First, he demonstrates that Enbridge's expert, Dr. Olive, has vastly underestimated the total Line 5 profits from 2013 to 2021.  He shows that an appropriate treatment of the expenses that Dr. Olive improperly seeks to attribute to Enbridge's operation of Line 5 increases her finding of $779 million in Line 5 profits to more than $1.8 billion.  *See* Expert Rebuttal Report of Dan Leistra-Jones, Dkt. #396 ("Leistra-Jones Rep."), at ECF p. 11.  Second, he explains why her proposal to require disgorgement of less than $3 million in Line 5 profits would utterly defeat the objective of deterrence when Enbridge has saved more than $300 million from its conscious trespass on the Band's lands even under the most Enbridge-friendly counterfactual scenario imaginable—

one in which Enbridge avoided trespass by timely constructing a reroute along its preferred, least-expensive path.  *See id.* at 21–26.

In advancing these opinions, Mr. Leistra-Jones does not "largely agree[] with Dr. Olive as to the sum of Enbridge's profits attributable to Line 5[.]"  Mot. at 2.  To the contrary, he believes her methodology is deficient for numerous reasons:  She deducts far too much depreciation expense, she uses inflated tax rates, she does not account for the different tariff rates for different products moved by Lakehead System pipelines, and she uses the wrong party's time value of money to convert profits to present-day value.  *See* Leistra-Jones Rep. at ECF pp. 16–21.[1]  Enbridge's effort to gloss over these very real differences is misguided, as are its specific attacks on Mr. Leistra-Jones's ability to testify.

## ARGUMENT

### I.    Mr. Leistra-Jones Does Not Offer Any Legal Opinions.

Enbridge's arguments for how Mr. Leistra-Jones's opinions are somehow impermissible "legal conclusions," *see* Mot. at 5–11, do not withstand scrutiny.

---

[1] The only thing Mr. Leistra-Jones "agreed" to was that, in the absence of cost and revenue data specific to Line 5, using barrel-miles is a "reasonable" starting point for estimating how much of a pipeline system's profits are attributable to a particular pipeline.  *See* Tr. of Dep. of Dan Leistra-Jones, Dkt. #373, at 57:2–6 ("I would say that I agreed conceptually that barrel miles is a reasonable allocation basis for that specific step."); *id.* at 58:9–18 (testifying that barrel-miles are "a better … approximation of revenues and expenses than, for instance, using just straight mileage"); *id.* at 58:19–23 (rejecting the suggestion that using barrel-miles is the "best" way to "separate out profits for Line 5 from profits for the entire Lakehead System").  Enbridge tries to use this testimony to assert that the experts agree as to the reasonableness of the barrel-miles methodology as a starting point and thus "any accounting of Enbridge's profits allocable to Line 5 should be based on the barrel-mile method."  Mot. at 3.  It is unclear why Enbridge insists that this method must be used rather than Enbridge's own pro forma estimate of Line 5 profits, which uses revenue data *specific to Line 5* and which the Band intends to use as the basis for its affirmative case showing how much Enbridge wrongfully gained from operating Line 5 while consciously trespassing.  *See* Band Trial Brief, Dkt. #453, at 7–17.

1. Enbridge first focuses on two pages of Mr. Leistra-Jones's report, *see* Leistra-Jones Rep. at ECF pp.14–15, in which Mr. Leistra-Jones draws on economic principles applied in the context of environmental enforcement to explain why a small amount of disgorgement would not achieve deterrence. He describes the work of Nobel Prize-winning economist Gary Becker, who wrote that to achieve deterrence, fines of individuals and firms generally must "restore the status quo ante so that violators are not better off after paying a fine than they would have been if they had not committed an offense in the first place." *Id.* at ECF p. 14. As an example of the application of this principle, Mr. Leistra-Jones discusses the environmental enforcement context, in which EPA policy requires that "to deter people from violating the law," a minimum penalty must "remove any significant economic benefits resulting from failure to comply with the law." *Id.* at ECF p. 15 (citing U.S. EPA, Policy on Civil Penalties, EPA General Enforcement Policy #GM-21, Feb. 16, 1984, p. 3).

In response, Enbridge declares that this case is not an environmental enforcement action. *See* Mot. at 10. That is obviously true and completely beside the point. Neither Mr. Leistra-Jones nor anybody else thinks the Court in this case is applying an environmental penalty. Mr. Leistra-Jones is simply drawing on economic principles applied in other contexts to illuminate how large the disgorgement must be here to achieve a deterrent effect. That is not a legal opinion. It is an expert opinion bearing on an important economic question (i.e.*,* how much disgorgement is necessary to achieve deterrence), one highly relevant to determining the proper size of the restitution award in this case. *See*, *e.g.*, *Kansas v. Nebraska*, 574 U.S. 445, 463, 465 (2015) (upholding disgorgement award as consistent with the "[b]alancing of equities and hardships" because it was sufficient to "deter[] future violations" (citation omitted)). The "legal conclusion" cases cited by Enbridge, in contrast, involve experts engaging in improper statutory

4

interpretation. *Raab v. Wendel*, Case No. 16-CV-1396, 2017 WL 7371180, at *6 (E.D. Wis. Dec. 18, 2017) (RICO case in which expert wished to opine on whether certain transactions met the definition of "interstate commerce"); *see also United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (upholding exclusion of expert who "would have testified about the meaning of the statute and regulations").  Mr. Leistra-Jones does nothing of the sort here.

Enbridge does not even try to argue that Mr. Leistra-Jones's discussion of deterrence-related economics principles is *incorrect* regarding how to fashion a monetary remedy capable of deterrence.  Instead, Enbridge simply pretends that deterrence is "not in play here," Mot. at 5, completely disregarding the case law—and the Court's summary judgment opinion—saying otherwise.

And Enbridge cannot possibly argue that, as a general matter, it is improper for an expert to draw on principles from another legal setting, given that Enbridge's *own expert* applies a methodology that she takes from the utility ratemaking context—a methodological choice that she does not even attempt to justify based on any principles relevant to this remedy, such as causation or deterrence.  *See*, *e.g.*, Tr. of Dep. of Laura T.W. Olive, Dkt. #395 ("Olive Dep."), at 112:18–113:9.

2.  Enbridge next claims that Mr. Leistra-Jones's opinion on the proper magnitude of an award of profits-based restitution "rests on his legal conclusion that an award of damages must 'penalize' and 'fine' Enbridge[.]"  Mot. at 5.  This is a brazen distortion.  Mr. Leistra-Jones never says any such thing.  Although he mentions penalties and fines when discussing economic principles bearing on deterrence, he does not treat the remedy here as a penalty or fine, and he does not suggest that the remedy should exceed Enbridge's ill-gotten gains.  As the Band has explained, *see* Band Trial Br., Dkt. #453, at 22 n.14, requiring disgorgement of the wrongdoer's

full ill-gotten gains is not "punitive" or a "penalty"—it is the *standard measure* of profits-based restitution. *See* Restatement § 40 cmt. b (explaining that disgorgement is necessary to put a conscious wrongdoer "on a parity with a person who—pursuing the same objectives—respects the legally protected rights of the property owner"); *see also id.* § 51 cmt. a ("[T]he object of restitution is to strip the defendant of a wrongful gain." (citations omitted)); *Kansas v. Nebraska*, 574 U.S. at 463 (explaining that a wrongdoer should not "come out ahead" as a result of wrongdoing).

3.   Enbridge also faults Mr. Leistra-Jones for not having provided a method of allocating profits among the Band and its cotenants. Mot. at 6–7. But neither does Dr. Olive. That is beyond the scope of both of their reports. The Band will seek its proportional share of the full profits-based amount based on its percentage ownership of the twelve parcels on which Enbridge is consciously trespassing, as it committed to doing when the issue of joinder was briefed and as it explained in its Trial Brief. Band Trial Br. at 5–6, 40.

4.   Enbridge further accuses Mr. Leistra-Jones of offering an opinion that would make Enbridge hypothetically "liable for the full amount of its profits to every single property owner along the 645-mile pipe for which it could be in trespass." Mot. at 6. Again, this is simply not an opinion that Mr. Leistra-Jones offers. Nor is it a position that the Band takes. As the Band explained in its Trial Brief, Enbridge's hypothetical-other-trespasses argument willfully disregards the Court's equitable discretion and the difference between tribal land, which cannot be condemned by pipeline companies, and non-tribal land, which typically can. *See* Band Trial Br. at 34–35.

5.   Enbridge also argues that Mr. Leistra-Jones's opinions are "contrary to the primary authority the Court relied upon in its summary judgment opinion and order." Mot. at 8. But as

explained in the Band's Trial Br., Enbridge's ensuing description of the law governing profits-based restitution is highly misleading:  It appeals to principles of "remoteness" and "attribution" while ignoring that those principles relate to causation; it never confronts the fact that Enbridge's trespass caused *all* the profits earned from Line 5; and it willfully disregards the relevance of deterrence.  *See* Band Trial Br. at 29–32.  Indeed, the three cases cited by Enbridge to show that it should disgorge less than its full wrongful gain are cases in which deterrence could be achieved by requiring disgorgement of less than full profits.  *See id.* at 30–31.  In one, the Supreme Court expressly based its decision on the fact that the less-than-full award could, under the unique circumstances of the case, reasonably be expected to deter future wrongdoing.  *See Kansas v. Nebraska*, 574 U.S. at 465–66.  And the one case that Enbridge says limits profits-based restitution of a pipeline company to a pro rata award holds nothing of the sort.  *See* Band Trial Br. at 33 (discussing *Davilla v. Enable Midstream Partners, L.P.*, Case No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016)).  Enbridge's account of the law utterly fails to undermine the significance of deterrence to restitution, and likewise fails to show that Mr. Leistra-Jones's opinions about economic principles of deterrence are somehow inconsistent with the law.

How far Enbridge goes astray in its briefing is perhaps best illustrated by its declaration that one case, *Moore v. Equitrans, L.P.*, 27 F.4th 211 (4th Cir. 2022), "is directly on point."  Mot. at 9.  That case could not in fact be *less* on point.  The Fourth Circuit upheld the exclusion of a profits expert because the claim at issue was an *unintentional* trespass for which the remedy was compensatory damages, *not* profits.  *See Moore*, 27 F.4th at 220–223.  In that situation, of *course* testimony from an expert about the defendant's profits would be irrelevant and "contrary

to controlling law." Mot. at 9 (quoting *id.* at 223). The parallel here would be if one of the parties tried to call to the stand an expert on fair market value.

Enbridge is as incorrect in its rendition of the law as it is in its assertion that Mr. Leistra-Jones offers legal opinions in the first place.

## II.   Mr. Leistra-Jones's Calculations Are Based on a Reliable Methodology.

Enbridge next attacks the methodology by which Mr. Leistra-Jones calculates total Line 5 profits. Enbridge begins by asserting that "[h]e has no experience calculating the profits of a midstream oil and gas company" and thus he "cannot allocate profits according to the relevant considerations." Mot. at 12. Enbridge does not explain which "relevant considerations" Mr. Leistra-Jones might have better understood if he had worked specifically with a gas company before, nor does Enbridge identify a single shortcoming in Mr. Leistra-Jones's analysis that might be attributable to his lack of such experience. The paragraph attacking his lack of industry-specific expertise amounts to a series of pointless potshots.

Enbridge's substantive argument is as follows: Mr. Leistra-Jones's lack of experience calculating pipeline profits leads him to use Dr. Olive's methodology as a starting point (a methodological step that Enbridge surely cannot take issue with), after which he engages in "result-driven" and "cherry-picked" analysis by "selective[ly] depart[ing]" from Dr. Olive's analysis. Mot. at 11, 13. The problem with Enbridge's argument is that Mr. Leistra-Jones does not "cherry-pick." He exposes fundamental flaws in Dr. Olive's analysis. This is clear from the one example Enbridge gives of Mr. Leistra-Jones purportedly engaging in a "selective departure" from Dr. Olive's methodology: his opinion that Dr. Olive allocates far too much depreciation to Line 5.

In his report, Mr. Leistra-Jones explains that depreciation should not be included in the calculation of profits because depreciation represents capital investments made at a previous date, which Enbridge would have recorded regardless of whether it was trespassing and which thus did not affect the cash flow generated by Line 5 during Enbridge's trespass.  Leistra-Jones Rep. at ECF pp. 17–18.  Indeed, Dr. Olive has conceded that Enbridge would have taken the depreciation regardless of whether it trespassed, Olive Dep. at 148:16–149:15, and accordingly that excluding depreciation would be consistent with the principles of the Restatement. Restatement § 51 cmt. h ("[T]he defendant will not be allowed to deduct expenses … that would have been incurred in any event[.]").

Moreover, Mr. Leistra-Jones explains that even if one were to conservatively include depreciation in the award of profits-based restitution, only a tiny fraction of Lakehead System depreciation is attributable to Line 5.  It is a seventy-year-old pipeline for which the original pipeline and construction have fully depreciated, and which does not appear to have undergone substantial capital investment in recent years.  Leistra-Jones Rep. at ECF p. 18.  Accordingly, Dr. Olive *vastly* over-allocates depreciation to Line 5 by allocating an amount proportional to Line 5's portion of Lakehead barrel-miles, which ranged from 13.1 percent to 22.1 percent of Lakehead depreciation depending on the year.  *See* Expert Report of Dr. Laura T.W. Olive, Dkt. #434, at 18 (showing proportion of Lakehead barrel-miles attributable to Line 5 each year); Olive Dep. at 93:21–95:9 (acknowledging that by allocating all Lakehead net income to Line 5 based on barrel-miles, she is allocating all of the inputs to net income, including depreciation, to Line 5 based on barrel-miles).  Dr. Olive does this despite not being aware of the cost of a single capital expenditure on Line 5 and acknowledging that the original pipeline and construction would have fully depreciated well before 2013.  *See* Olive Dep. at 152:13–153:12.

9

If both experts testify the Court will, of course, have an opportunity to assess the strength of their respective approaches to depreciation and other expenses.  Enbridge's efforts to pretermit that process by launching ill-advised pejoratives at Mr. Leistra-Jones's analysis should be rejected.

III.    **Mr. Leistra-Jones's Analysis of the Saved Expense from Delaying the Reroute Exposes the Inadequacy of Dr. Olive's Miles-Based Allocation and Is Entirely Consistent with the Law on Profits-Based Restitution.**

Finally, Enbridge argues that, for several reasons, it is improper for Mr. Leistra-Jones to have calculated how much Enbridge has benefited from delaying the reroute.  None of Enbridge's reasons hold water, and they all hinge on Enbridge's willful disregard for the deterrence purposes served by the restitution remedy.

As explained in more detail in the Band's Trial Brief, Mr. Liestra-Jones opines that Enbridge has saved more than $300 million simply by delaying the construction of a reroute. *See* Trial Br. at 22–24 (discussing Leitra-Jones Rep. at ECF pp. 21–26).  This is an extremely conservative calculation that assumes completion of the least expensive feasible reroute and uses Enbridge's own representation as to the cost of that reroute.  *Id*.  In doing this calculation, Mr. Leistra-Jones shows just how deficient Dr. Olive's proposed damages award of less than $3 million would be for achieving deterrence:  It amounts to less than 1/100th of the benefit Enbridge derived from avoiding trespass under the most conservative counterfactual scenario imaginable.  *Id.*

According to Enbridge, Mr. Leistra-Jones's calculation of the delayed expense is improper because it "does not rebut any opinions contained in Dr. Olive's report[.]"  Mot. at 15. A rebuttal expert report must "contradict, impeach or defuse" the opposing expert's report. *Eliason v. Superior Ref. Co., LLC*, 19-cv-829-wmc, 2021 WL 2947736, at *1 (W.D. Wis. July

14, 2021) (Conley, J.) (quoting *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008)).  Here, Mr. Leistra-Jones's opinion at the very least "defuses" Dr. Olive's report by showing that her proposed measure of profits-based restitution would constitute a tiny fraction of the amount necessary to disgorge Enbridge of its ill-gotten gains and to deter Enbridge's wrongdoing.  To argue otherwise requires willful disregard for the fact that deterrence is of primary relevance to determining the appropriate amount of profits-based restitution.

Enbridge also argues that this calculation is "impermissibly import[ed]" from the environmental penalty policy and is "contrary to the law of trespass."  Mot. at 14.  But the Restatement specifically says that although "net income" is the common measure of a conscious trespasser's ill-gotten gains, courts may also consider "avoidance of an otherwise necessary expenditure."  Restatement § 51 cmt. e.  Measuring the benefit derived from delaying construction of the reroute is therefore consistent with, not contrary to, restitution principles.

Enbridge levels additional criticisms at Mr. Leistra-Jones's calculation of the benefit of delaying the reroute that Enbridge must know are appropriate for cross-examination, not a motion to exclude.  First, Enbridge faults Mr. Leistra-Jones for using the Construction Cost Index to adjust for inflation instead of "pric[ing] the different construction components that would actually be used[.]"  Mot. at 14.  The implication that using an inflation index renders this methodology inadmissible is facially absurd, and Enbridge cites no case law to support it.  Enbridge also faults Mr. Leistra-Jones for ignoring how the COVID-19 pandemic has disrupted supply chains and increased costs.  This argument is flawed for several reasons.  Most fundamentally, *Enbridge has taken the position that the expected cost of the inner reroute is still $450 million*.  The Band asked in a Federal Rule of Civil Procedure 30(b)(6) notice for Enbridge to provide testimony on its current estimate of the cost of the reroute.  Enbridge prepared its

corporate designee only to say that "I believe Enbridge has publicly disclosed an estimated cost of $450 million."  Tr. of Dep. of Robert Yaremko, Dkt. #372, at 76:23–24.  Having done so, Enbridge is precluded from challenging the Band's expert for utilizing that very figure.

## CONCLUSION

For the foregoing reasons, Enbridge's Motion to Exclude the Opinions and Testimony of Dan Leistra-Jones should be denied.

Dated: October 3, 2022

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
attorney@badriver-nsn.gov
(715) 682-7107

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
bwallace@hooperhathaway.com
(734) 662-4426

Respectfully submitted,
*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
lbraun@kanjikatzen.com
(734) 769-5400

Jane G. Steadman
Philip H. Tinker
Claire R. Newman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com
cnewman@kanjikatzen.com
(206) 344-8100

*Counsel for the Bad River Band of the Lake Superior
Tribe of Chippewa Indians and Naomi Tillison, Director
of the Mashkiiziibii Natural Resources Department of
the Bad River Band, in her official capacity*

12