IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION,<br><br>*Plaintiff*,<br><br>v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,<br><br>*Defendants*.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,<br><br>*Counter-Plaintiffs*,<br><br>v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity,<br><br>*Counter-Defendants*. | Case No. 3:19-cv-00602-wmc<br><br>Judge William M. Conley<br>Magistrate Judge Stephen L. Crocker |

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS' RESPONSE TO ENBRIDGE'S MOTION TO EXCLUDE INJUNCTION-RELATED EXPERT WITNESSES FROM TRIAL (Enbridge Motion to Exclude 3 of 3)**

Enbridge has moved to exclude the testimony of all five of the Band's experts who opine on the market's ability to develop alternatives to Line 5 in the event that this Court issues an injunction with a defined shutdown date: Sarah Emerson, Chris Barber, Jill Steiner, Graham

1

Brisben, and Randy Meyer (the "Injunction Experts"). *See* Enbridge's Motion to Exclude Plaintiff's Injunction-Related Expert Witnesses, Dkt. #399 ("Injunction-Related Witnesses Mot.").

Enbridge's motion betrays more commitment to poisoning the well than to in fact having any witness excluded. This is apparent from the belligerent overreach on display throughout the motion. Enbridge dedicates the majority of its motion to leveling criticisms that plainly go to weight, not admissibility. In doing so, it distorts the Injunction Experts' testimony and reports, mischaracterizing some parts and disregarding others—even going so far as to criticize one of the Injunction Experts for an opinion that Enbridge's own expert shares. Enbridge also cannot decide whether the Injunction Experts' opinions are duplicative or not duplicative enough. It repeatedly attacks them for not offering opinions on topics that another expert opines about. And Enbridge spills pages of ink attacking the Injunction Experts for lacking specific types of specialized work experience—a requirement that plainly does not exist for expert testimony and that Enbridge does not even attempt to substantiate with case law.

The Band respectfully urges the Court to deny this ill-conceived Motion.

**I.     Testimony Relevant to the Ability of the Market to Develop Alternatives to Line 5 Is Relevant to the Fashioning of an Injunction.**

Enbridge argues that the Injunction Experts should be excluded because the Court has "already ordered" that it will grant no injunctive remedy independent of a reroute and because discussion of alternatives to Line 5 involving third parties is a "nonstarter." Injunction-Related Witnesses Mot. at ECF pp. 4, 6–7. However, as the Band explained in its Trial Brief, Enbridge is trying to recharacterize the Court's inclination as decree. *See* Band Trial Brief, Dkt. #453, at ECF p. 60. The Court has expressed interest in evidence regarding the existence and timing of alternatives to Line 5 and the viability and timing of a reroute. *See id.* Furthermore, it would be

2

entirely appropriate for the Court to consider evidence of market resiliency, despite not having jurisdiction over third parties. *See id.* at ECF pp. 89–90 n.24 (citing cases). Any suggestion by Enbridge that consideration of alternatives relying on third party actions is off limits would indeed preclude the ordering of its own favored option—as predicating the decommissioning of the trespassing pipeline on completion of a reroute turns on the decisions of numerous government agencies that fall outside of the Court's control. *See id.* at ECF pp. 76–78, 89–90.

## II. The Injunction Experts' Opinions Are Distinct and Complementary, Not Duplicative.

Enbridge argues that the Band's Injunction Experts are "unduly cumulative and duplicative" because multiple experts "opine that rail can be used to ship crude oil" and "assert that trucks can be used to ship energy products[.]" Injunction-Related Witnesses Mot. at ECF p. 29. Yet, at the same time, Enbridge attacks the experts because each one of them does not address all possible issues associated with the alternatives to Line 5. This "damned if you do and damned if you don't" approach does not withstand scrutiny.

For example, Enbridge criticizes Mr. Barber, Ms. Emerson, and Ms. Steiner for not analyzing whether sufficient railcars exist to transport crude oil and natural gas liquids ("NGLs"). *See* Injunction-Related Witnesses Mot. at ECF pp. 9–10. They do not, but Mr. Brisben does. *See* Expert Rebuttal Report of Graham Brisben, Dkt. #440 ("Brisben Rebuttal"), at ECF p. 33. Likewise, Enbridge attacks Mr. Barber, Ms. Emerson, and Ms. Steiner for not analyzing the available capacity on existing rail lines. Injunction-Related Witnesses Mot. at ECF p. 10. But again, Mr. Brisben does, *see, e.g.,* Brisben Rebuttal at ECF pp. 45–46, and if the other experts had opined on those subjects, Enbridge would have surely attacked the testimony as duplicative.

By Enbridge's reasoning, it seems, the only non-duplicative expert testimony on the market's ability to develop alternatives to Line 5 would need to come from a Soviet-style central planner who could testify about every step necessary to implement each possible alternative. The Band did not locate any such expert. Instead, the Band retained experts with complementary experience and expertise in different aspects of the oil and NGL markets. They offer opinions on related but independent subjects that, taken together, make clear that viable alternatives to Line 5 exist for the delivery of both crude oil and NGLs.

Sarah Emerson is the President of ESAI Energy, LLC ("ESAI"), an independent oil and energy market research and forecasting firm. *See* Expert Report of Sarah Emerson, Dkt. #265-1, at ECF p. 3. She is the co-author of an expert report and expert rebuttal report with Chris Barber, the Refining Manager at ESAI. *See* Expert Report of Christopher Barber, Dkt. #388, at ECF p. 2. As the Band informed Enbridge before their depositions, Ms. Emerson and Mr. Barber are testifying as to specific opinions expressed in their reports: Ms. Emerson as to the economics surrounding the conveyance of crude oil, and Mr. Barber as to refinery margins and refined products.[1]

Ms. Emerson's opinions cover topics including: how Line 5 throughput is distributed among the refineries receiving Line 5 crude oil; alternatives for replacing the crude oil at American refineries (*e.g.,* Line 78, pipelines carrying Bakken crude, rail carrying Bakken crude); alternatives for replacing the crude oil at the Canadian refineries (*e.g.,* Line 78, crude by rail, and

---

[1] Ms. Emerson's opinions are those expressed in their initial report (Dkt. #265-1) at ECF pp. 15–29, 37–42, and in their rebuttal report (Dkt. #265-2) at ECF pp. 16–25. Mr. Barber's opinions are those expressed in their initial report (Dkt. #265-1) at ECF pp. 29–37, 42–48, and in their rebuttal report (Dkt. #265-2) at ECF pp. 25–34. *See* Tr. of Dep. of Christopher Barber, Dkt. #375 ("Barber Dep."), at 7:16–9:4; Tr. of Dep. of Sarah Emerson, Dkt. #376 ("Emerson Dep."), at 11:12–12:15.

4

waterborne deliveries); and the transportation costs associated with these alternatives. Mr. Barber's opinions cover topics including: the option of shipping refined product from the U.S. Gulf Coast by refined-product pipelines; the ability of other refineries in the Midwest to increase utilization; and the transportation costs associated with bringing refined products by other means to the Line 5 area.

Whereas Mr. Barber and Ms. Emerson opine on alternatives to the *crude oil* transported on Line 5, Jill Steiner—an energy economist with experience specifically in the economics of propane supply—opines on the market's ability to replace Line 5 *NGLs*. Among other things, she opines on the widespread production and availability of propane in the American market, the transportation costs associated with moving propane by rail instead of pipeline, and the ways in which Enbridge's expert, Dr. Corbett Grainger, vastly overstates the economic impact of possible fractionator closures. *See, e.g.,* Expert Rebuttal Report of Jill Steiner, Dkt. #439 ("Steiner Rebuttal"), at ECF pp. 15–31, 32–37, 60–68.

Graham Brisben, by comparison, opines on the logistical feasibility of the various alternatives to Line 5, rebutting opinions to the contrary proffered by Enbridge's experts, Mr. Rennicke and Mr. Earnest. *See* Brisben Rebuttal at ECF p. 20. Drawing on his more than 30 years in transportation logistics, he demonstrates that substantial infrastructure already exists to transport replacement products to the area served by Line 5 and that more can be developed quickly. Among other things, he opines on the existence of rail facilities in the areas served by Line 5 already capable of offloading crude oil and NGLs, the availability of land to build railroad unloading facilities near refineries served by Line 5, recent examples of the market developing crude-by-rail facilities within 18 months, and the availability of rail cars to transport crude oil and NGLs. *See, e.g.,* Brisben Rebuttal at ECF pp. 29–30, 33–36, 47–50.

5

Drawing on his 44 years of industry experience, Mr. Meyer also rebuts Mr. Rennicke's opinions about logistics, but with a different focus than Mr. Brisben. *See* Expert Rebuttal Report of Randy Meyer, Dkt. #261-1 ("Meyer Rebuttal"), at ECF p. 22. In addition to opining on various specific logistical issues (*e.g.,* the ease of obtaining permits for rail facilities in Canada, *see id.* at ECF pp. 26–28), he describes the slate of market actors that would compete to put rail services in place: marketers and arbitrage players delivering products on short-term contracts (including one Enbridge subsidiary that has worked to facilitate NGL transportation), rail-terminal developers, and midstream companies with the ability to quickly develop unloading facilities. *Id.* at ECF pp. 31–33, 37.

Taken together, the Injunction Experts' testimony evidences that there exist many feasible alternatives to Line 5 capable of replacing several times the amount of capacity that would be lost from a Line 5 shutdown. Although there is unavoidably a small amount of overlap between the experts' opinions, they offer distinct and complementary testimony. Enbridge's claims to the contrary run headlong into the facts.

**III. The Injunction Experts Offer Reasoned Opinions, Not Speculation.**

Enbridge spends most of its motion attacking purported shortcomings in the analysis of the Injunction Experts. *See* Injunction-Related Witnesses Mot. at ECF pp. 8–25. Enbridge is blatantly trying to poison the well by leveling criticisms of the Band's experts that "go[] to the weight of the opinions, not their admissibility[.]" *Holder v. Interlake S.S. Co.*, No. 16-CV-343-WMC, 2018 WL 1725694, at *17 (W.D. Wis. Apr. 10, 2018) (Conley, J.); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact"). In doing so, Enbridge dramatically

6

mischaracterizes the Injunction Experts' opinions. The Band will not burden the Court's time by refuting each of Enbridge's attacks on its experts' analysis (all of which can be brought up by Enbridge on cross-examination and addressed by the experts themselves), but a few examples are in order.

Enbridge criticizes Mr. Brisben for not knowing the specific number of rail cars that are available to transport crude oil. *See* Injunction-Related Witnesses Mot. at ECF p. 10. True, Mr. Brisben does not claim to know the *exact number* of tank cars capable of transporting crude oil that are immediately available in the marketplace. Rather, he gives a *well-reasoned explanation based on facts* as to why there are far more tank cars available than the 4,000 that Mr. Rennicke opines would be necessary to replace all of Line 5's throughput by rail (assuming the market even sought to do this, as opposed to the more diversified response that Mr. Brisben believes will take place, *see* Brisben Rebuttal at ECF pp. 60–66). Specifically, Mr. Brisben explains that there are over 120,000 cars suitable for crude-by-rail service, including about 86,000 of the specific type preferred by rail companies. Brisben Rebuttal at ECF pp. 33–34. He explains that the amount of crude being moved by rail has declined by 83% in the last 7 years, indicating that much of the enormous fleet—certainly far more than 4,000 cars—is not being utilized. *Id.* at ECF pp. 33, 35. He further substantiates this logical inference with data specifically showing that 24,273 of the leading type of car used for transporting crude by rail were available as of September 2021. *Id.* at ECF p. 35. Thus, Mr. Brisben's opinion that sufficient tank cars are available is not speculation; it is an expert opinion substantiated with data and reason. *Est. of DiPiazza v. City of Madison*, No. 16-CV-60-WMC, 2017 WL 1910055, at *3 (W.D. Wis. May 8, 2017) (Conley, J.) ("[W]itnesses are permitted to make inferences reasonably based on their knowledge and experience.").

Or consider another example:  Enbridge attacks Mr. Meyer and Brisben for opining that railcar unloading facilities can be built without knowing "whether any such land is for sale, could be purchased, or what work would be necessary to build any such facilities."  Injunction-Related Witnesses Mot. at ECF p. 11.  Again, Enbridge completely disregards the relevant testimony that Mr. Brisben and Mr. Meyer give on these subjects.  Mr. Brisben specifically identifies existing rail facilities adjacent to refineries in Sarnia that can be connected by a short pipeline to those refineries, as well as land adjacent to a third refinery at which there is brownfield property suitable for building a rail terminal.  *See* Brisben Rebuttal at ECF pp. 38–39.  He also gives examples of recent instances of crude-by-rail terminals being built within 15–16 months.  *See id.* at ECF p. 30.  That is, Mr. Brisben gives compelling reasons to conclude that market actors can readily develop more rail unloading capacity in Sarnia.  His uncertainty about unknowable specifics—*e.g.,* Which of the multiple locations in Sarnia available for new crude-by-rail facilities will be developed?  Which of the many possible companies will fund the construction? How many days will it take to construct? Which subcontractor will supply the steel?—does not make his opinions inadmissibly "speculative."  Rather, it renders them responsible and credible.

And, contrary to Enbridge's assertions, Mr. Meyer knows very well "what work would be necessary for building such facilities."  Injunction-Related Witnesses Mot. at ECF p. 11.  He has personally worked on the development of numerous large rail terminals.  *See* Meyer Rebuttal at ECF p. 21.  He even explains in his report that he is working on the development of a facility in the Greater Toronto Area that will have a rail unloading terminal for refined petroleum products.  *See id.* at ECF p. 55.  By moving to exclude Mr. Brisben and Mr. Meyer's opinions about the feasibility of developing rail facilities, Enbridge is asking the Court to simply stick its head in the sand.

Or consider a third and final example: Enbridge asserts that Mr. Barber does not know whether refined-product pipelines have excess capacity to ship refined products to the areas served by Line 5. Injunction-Related Witnesses Mot. at ECF p. 18. This is an entirely disingenuous argument. The reason Mr. Barber does not state with certainty the available capacity on specific refined-product pipelines is that such information is proprietary and hence not accessible to him or to any other expert. Barber Dep. at 98:5–9. He explains, however, that the system of refined-product pipelines has shown the flexibility to take on more capacity, and he points out that *Enbridge's own expert shares this opinion*. *See* Barber Dep. at 111:14–112:9; Expert Report of Neil K. Earnest, Dkt. #262, ECF pp. 72–73, ¶¶ 7.10, 7.13 (stating that "[t]he existing northbound refined product pipelines are believed to have sufficient available capacity" and thus predicting an increase in gas prices in Michigan and Wisconsin of less than a cent a gallon in the event of a Line 5 shutdown).

The fact that Enbridge is attacking an opinion *shared by its own expert* as inadmissible speculation says all that one needs to know about its motion.

**IV.     The Injunction Experts Are Qualified.**

Enbridge argues that four of the five Injunction Experts are unqualified (the lone exception being Mr. Brisben). Enbridge's arguments rely on distortions of the experts' testimony, disregard for the topics the experts are in fact offering opinions about, and an unprecedently high bar for expert qualifications that finds no support in the case law.

For Mr. Barber, Enbridge asserts that he has "no experience with transportation logistics or refinery operations or economics." Injunction-Related Witnesses Mot. at ECF p. 26 (citing Barber Dep. at 23:1–24:4). That is a highly misleading account of Mr. Barber's testimony. While Mr. Barber has not been employed by a refinery, he testified that he considers himself an

9

expert in various aspects of refinery operations. And he never said anything about lacking expertise or experience in refinery economics. *See* Barber Dep.at 23:1–24:4. To the contrary, Mr. Barber, a consultant with over a decade of experience specializing in the refining industry, testified that he regularly analyzes "the flows or movements of gasoline, diesel, refined products globally and what supply/demand balances look like in given regions and markets in which they participate," as well as "forecast[ing] prices for refiners" and analyzing refining margins. Barber Dep. at 19:16–25. Such expertise fits the opinions Mr. Barber gives in this case about the flows of refined products, the price of alternate means of transportation of those products, and refinery margins.

The rest of Enbridge's laundry list of attacks on Mr. Barber's qualifications boil down to this: Mr. Barber has not personally worked on arranging logistics to transport oil, has not personally worked on refinery optimization, and is not an expert in the specific means of transportation that are "necessary for his opinions to be feasible," such as rail, trucks, and barges. *See* Injunction-Related Witnesses Mot. at ECF p. 26. But Enbridge does not explain why Mr. Barber would need to have personal experience working at a refinery or for a transportation company to serve as an expert on those areas of economic activity. No such requirement exists. *See Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound. . . . Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness."). Such specialization is especially unnecessary here given that it is Mr. Brisben and Mr. Meyer—not Mr. Barber—who opine about the logistical details and feasibility of setting up new alternative means of transportation.

10

Similarly, Enbridge attacks Ms. Emerson for not having specialized expertise in the logistics of rail, truck, or waterborne transportation, including for not knowing how many rail cars are available. Injunction-Related Witnesses Mot. at ECF p. 27 (citing Emerson Dep. at 94:22–97:2). But Ms. Emerson is an expert in crude oil flows. *See* Emerson Dep. at 94:20–21. And, although humble enough not to declare herself a "logistics expert," she testified that she knows a significant amount about transportation logistics because it is "adjacent to her expertise" in crude oil flows. *Id* at 94:22–95:2. Enbridge provides no explanation as to why Ms. Emerson would need specialized expertise in the logistics of rail, truck, and waterborne delivery to give the opinions in her report. Moreover, Ms. Emerson specifically does *not* opine on certain logistical issues including the number of rail cars available. *See* Emerson Dep. at 96:13–21 ("I would defer to the rail experts on that."). As discussed above, that is something Mr. *Brisben* addresses. *See supra* at 5. Enbridge is therefore arguing that Ms. Emerson is unqualified to give opinions that *she does not give*, and which Enbridge would no doubt call "duplicative" if she *did*.

As for Ms. Steiner, Enbridge faults her for not having expertise in "designing logistical chains" or "figuring out how to use combinations of pipelines, railroads, and trucking to ship energy products or evaluating technical work at fractionators." Injunction-Related Witnesses Mot. at ECF p. 28. Indeed, she does not have any such experience. She is an energy economist with over thirty years of experience working for government agencies and as a consultant, including prior work on the economics of propane supply. *See* Steiner Rebuttal at ECF pp. 2–3. She does not need specific experience in transportation logistics to opine on the North American propane market, to model the costs associated with various means of transportation, or to explain why the economic-impact modeling of Enbridge's expert is deficient.

11

Finally, Enbridge argues that Mr. Meyer should be excluded from testifying about "the feasibility of establishing logistics or supply chains, or constructing or permitting facilities inside the United States because he simply has no experience doing either in the United States." Injunction-Related Witnesses Mot. at ECF p. 29.  Mr. Meyer has over 44 years of experience in the rail industry, during which he started in the rail yard, rose to being a senior executive at multiple corporations, and worked extensively on developing large rail facilities capable of unloading crude oil and natural gas liquids, including a facility currently in development in the Greater Toronto Area.  Meyer Rebuttal at ECF pp. 3, 20–21.  It is unclear why the logistics and supply chains for developing rail terminals would be so drastically different across the border as to circumscribe Mr. Meyer's expertise to Canadian rail logistics, and Enbridge cites no authority to support its proposed restriction on Mr. Meyer's logistical expertise.  And although Mr. Meyer might not be qualified to opine on the specifics of the permitting process for a rail facility in the United States, he does not give any such opinion in his report. The closest he comes is when he cites data showing that North Dakota experienced a rapid explosion of crude-by-rail capacity a decade ago—hardly an observation that requires country-specific experience.  *See id.* at ECF p. 27.

## CONCLUSION

For the foregoing reasons, the Band respectfully requests that Enbridge's Motion to Exclude Injunction-Related Expert Witnesses from Trial be denied.

Dated: October 4, 2022

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
attorney@badriver-nsn.gov
(715) 682-7107

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
bwallace@hooperhathaway.com
(734) 662-4426

Respectfully submitted,
*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
lbraun@kanjikatzen.com
(734) 769-5400

Jane G. Steadman
Philip H. Tinker
Claire R. Newman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com
cnewman@kanjikatzen.com
(206) 344-8100

*Counsel for the Bad River Band of the Lake Superior*
*Tribe of Chippewa Indians and Naomi Tillison, Director*
*of the Mashkiiziibii Natural Resources Department of*
*the Bad River Band, in her official capacity*