# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION<br><br>*Plaintiff*,<br><br>v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.<br><br>*Defendants*. | Case No. 3:19-cv-00602 |
| ENBRIDGE ENERGY, L.P.<br><br>*Counter-Plaintiff*,<br><br>v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity<br><br>*Counter-Defendants*. | Judge William M. Conley<br>Magistrate Judge Stephen Crocker |

**ENBRIDGE'S BENCH MEMORANDUM REGARDING THE TRANSIT TREATY**

In its September 9, 2022 Order, this Court indicated that it was possible "to craft injunctive relief that would not interfere with the Transit Treaty or Canada's concerns about the economic impact of an immediate shutdown."[1]  During trial, Enbridge requested an opportunity for briefing on the "court's equitable authority . . . [and] the fact that the Transit Treaty . . . provides limitations on the Court's authority to issue an injunction that may interfere with the operation of Line 5." 10/28/22 Afternoon Trial Tr. at 4:16-5:5.  Enbridge respectfully submits the following memorandum on the importance of adherence to the commitments that the United States made in that Treaty.

Consistent with the Court's suggestion that it may forgo a "specific shutoff day" and instead require Enbridge to pay the Band an "appropriate charge for ongoing trespass," Enbridge maintains that future monetary relief is the most equitable and appropriate relief for trespass. 10/31/22 Afternoon Trial Tr. (Draft) at 79:2-22.  Any injunction should be—and can be—crafted consistent with the Transit Treaty.

**I.      Any injunction should be consistent with the Transit Treaty.**

"[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts weigh the public interest by evaluating "the consequences . . . to nonparties" from "granting or denying the injunction."  *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th

---

[1] Dkt. 360 at 43, referring to the *Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Treaty").  Enbridge continues to oppose the Band's motion today on all four prongs of the *eBay* test for injunctive relief but rather than repeat those same arguments, Enbridge focuses here on the critical public interest prong.

Cir. 1992). Both the U.S. Supreme Court and the Seventh Circuit have denied injunctive relief when weighty public interest concerns are implicated.[2]

Consistent with this precedent, this Court found that it "must deny the Band's request for an automatic injunction, as an immediate shutdown of the pipeline would have significant public and foreign policy implications." Dkt. 360 at 2. "In particular, there are concerns raised by Enbridge and several amici about the impact on *foreign relations*, consumers, refineries, regional economies, and international energy supply, resulting from an immediate shutdown of the Line 5 pipeline." *Id.* at 39 (emphasis added). "Further, there is little question that an immediate shutdown of the pipeline would have significant public policy implications on the trade relationship between the United States and Canada." *Id*. at 41.

Line 5 is indisputably covered by the Transit Treaty. *Id.* at 41. The Transit Treaty expressly governs not only the "pipeline or any part thereof" but also "all real … property … connected therewith." Art. I of Transit Treaty. As this Court has recognized, the Transit Treaty prohibits any measures that have the effect of permanently stopping the cross-border flow of hydrocarbons through a transit pipeline. Dkt. 360 at 41; *see also* Dkt. 207 at 110-11. It provides: "No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit." Art. II of Transit Treaty.[3]

---

[2] *E.g.*, *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. at 23-26 ("any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors"); *Machlett Lab., Inc. v. Techny Industries, Inc*., 665 F.2d 795, 798 (7th Cir. 1981) (public interest in low-cost health care warrants that no injunction be issued).

[3] The Article V exception by its terms involves only "temporary reduction[s] of the flow of hydrocarbons," whereas the Band seeks to force Enbridge to "permanently" shutdown Line 5. Further, the exception in Article V can only be invoked or authorized by a "Party" to the Transit Treaty, and the Party is the United States, not the Band.

Just like all other governmental bodies in the United States, the Band's tribal council is a public authority covered by the Transit Treaty.[4]

The Transit Treaty also contains its own international dispute resolution mechanism. *See* Art. IX. On August 29, 2022, the Government of Canada formally invoked Article IX in direct response to the Band's efforts to shutdown Line 5. Dkt. 357-2 (Statement by the Honourable Mélanie Joly, Canada's Minister of Foreign Affairs). The bilateral negotiation process, the first step in dispute resolution under Article IX, is currently underway. As the Government of Canada explained, Article IX is the process that the United States and Canada selected for resolving disputes "over the [Treaty's] interpretation, application, or operation"—including any measures to impede the transmission of hydrocarbons in transit pipelines such as Line 5. *See id*.

According to the Government of Canada, any Line 5 "shutdown would cause a massive and potentially permanent disruption to Canada's economy and energy security."[5] The harm to Canada is so significant that any closure of Line 5 could impact U.S.-Canada relations. As the Government of Canada explained, "For a domestic court in the United States to enforce a shutdown of the Line 5 pipeline while Canada and the United States are engaged in discussions under the 1977 Treaty … would undermine confidence in the reciprocal commitments that provide the legal framework for the U.S.-Canada relationship."[6] The same would hold true of any shutdown order issued in this litigation, even one whose effectiveness is delayed for some period of time.

---

[4] As Enbridge has explained, there is no inconsistency between the Transit Treaty and the 1854 Treaty such that both cannot be given full effect. Dkt. 589 at 10 n.7.

[5] Government of Canada Brief of *Amicus Curiae* Brief, filed in *Enbridge Energy Ltd. v. Whitmer*, No. 1:20-cv-01131-JTN-RSK, ECF No. 70, PageID.504 (filed Apr. 5, 2022).

[6] Government of Canada Brief of *Amicus Curiae* Brief, filed in *Enbridge Energy Ltd. v. Whitmer*, No. 1:20-cv-01131-JTN-RSK, ECF No. 70, PageID.497 (filed Apr. 5, 2022). When transmitting the Transit Treaty to the Senate for ratification on March 30, 1977, President Carter highlighted the dispute resolution provision: "The Transit Pipeline Agreement provides a formal basis for

4

In the best of times, the Band's desired shutdown injunction would create enormous disruptions for individuals and businesses in both the United States and Canada, as well as undermine the Transit Treaty's objectives which include energy security. But during the current energy crisis—resulting in large part from Russia's war in Ukraine—any shutdown injunction would be directly contrary to the national interest in energy security. One of Enbridge's oil market experts, Neil Earnest, quoted from a June 2022 letter written by President Biden to a group of refiners that includes four refiners served by Line 5: "my Administration is prepared to use all reasonable Federal Government tools and emergency authorities to increase refinery and appropriate capacity and output in the near term, and to ensure that every region of this country is appropriately supplied." Dkt. 514 at 5-6. Mr. Earnest also notes that the U.S. Secretary of Energy, during a June 2022 meeting with refiners, "made it clear that the Administration believes it is imperative that companies bring supply online to get more gas to the pump at lower prices." *Id.* at 6. He opines, however, that "retaining the high utilization rate sought by the Administration will be challenged by a closure of Line 5 and the consequent loss of access to a significant source of crude oil for the refineries that depend on Line 5." *Id.* at 7. It is noteworthy that the Transit Treaty's origins were in the late 1970s oil crisis. It would be profoundly counter-productive to enjoin Line 5's operations during the country's current energy crisis.

Further, even apart from the Transit Treaty, the public's interest on both sides of the border weighs heavily in favor of a strong, uninterrupted national energy supply. *E.g., Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*, No. 08-C-0028, 2008 WL 1751358, at *23 (E.D. Wis. Apr. 11, 2008) ("The need for natural gas supply is a 'substantial public interest.'"); *Williams Pipe Line*

---

United States-Canadian cooperation on hydrocarbon transportation systems, should both governments decide cooperation is advantageous." President Carter's Message to the Senate on the United States-Canada Transit Pipeline Agreement, March 30, 1977, United States, Office of the Federal Register, pp. 534-535.

*Co. v. City of Mounds View*, Minn., 651 F. Supp. 551, 570 (D. Minn. 1987) (stating that "important" public interests include "an interest in the continued operation of petroleum pipelines"); *Texas Eastern Transmission Corp. v. Giannaris*, 818 F. Supp. 755, 760-61 (M.D. Pa. 1993) (stating that the public interest is served by enjoining landowners from impeding access to a pipeline). Here, the Treaty underscores the public's interest in promoting the continued cross-border flow of energy through Line 5 and resoundingly disfavors any shutdown injunction.

**II.     Any injunction can be crafted to avoid a conflict with the Transit Treaty.**

As this Court explained, "it is possible to craft injunctive relief that would not interfere with the Transit Treaty or Canada's concerns about the economic impact of an immediate shutdown." Dkt. 360 at 43. To that end, the Court expressed an inclination to issue an injunction that would require Enbridge to work diligently to obtain the required relocation project permits, pay a fee to the Band for retaining Line 5 on the Reservation for a period of 5 years to allow the relocation project to be completed, and pay an escalated fee if the project is not completed in that time frame. *Id*. According to the Court, "Such an injunction would balance the equities between the Band's sovereign interests, broader economic concerns, and foreign relations." *Id*. This Court has since heard uncontroverted testimony from Julie Molina (Enbridge Senior Environmental Advisor) that the "worst case" for the relocation project being permitted is in the late 2025-early 2026 time-frame, with pipeline construction completed 12-18 months after it is permitted, and the relocated pipeline in service in mid-2027 to mid-2028 at the latest, thereby allowing Line 5 to continue to operate without interruption as contemplated by the Transit Treaty. 10/31/22 (Afternoon) Trial Tr. 3:24-25.

When necessary to effectuate a remedy, the Court's powers include the authority to require that the parties maintain an ongoing relationship—here, consistent with the rights-of-way that were negotiated by the parties and issued by the BIA in 1993. *See Paice v. Toyota Motor Co.*, 504 F.3d

1293, 1314-15 (Fed. Cir. 2007); *see also Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009) (patent context); *United States v. Imperial Irrigation District*, 799 F. Supp. 1052, 1068 (S.D. Cal. 1992) (land context). As part of that continuing relationship, Enbridge would retain the right to operate and maintain Line 5 until the relocation project is completed. *See Imperial Irrigation*, 799 F. Supp. at 1068 ("[D]eclin[ing] to grant injunctive relief" and instead "award[ed] monetary damages equal to the fee value of the property to compensate the band for all future damages based upon trespass[.]"). Enbridge is thus prepared to pay an appropriate fee to the Band for retaining its Line 5 operation on the Reservation until the relocation project is completed and is likewise prepared to bear a higher fee should the relocation project be delayed beyond a 5-year period set by the Court due to Enbridge's failure to diligently pursue the permitting and construction of the project. Imposing such a requirement is in the interest of both parties, the interest of the public, and is fully consistent with the Transit Treaty.

Notably, the Transit Treaty prohibits not only *direct* but also any *indirect* impediment or interference with the operation of a covered transit pipeline. *See* Transit Treaty, Art. II(1). Just as consideration of the Transit Treaty led this Court to posit an injunction under which Enbridge would be allowed to remain on the Reservation until the relocation project is completed, such consideration must also lead the Court to conclude that Line 5's operation must be continued under terms that allow its safe operation until the relocation is completed. *See* Transit Treaty, Art. II(1) (forbidding "interfer[ence]" "in any way"); INTERFERENCE, Black's Law Dictionary (11th ed. 2019) (defining the term primarily as "[t]he act or process of obstructing *normal operations* or intervening or meddling in the affairs of others" (emphasis added)). This means that the Band should be required to allow Enbridge to access, maintain, and repair Line 5 as it did up until the point where the Band ceased to allow Enbridge necessary access for maintenance, that is, as under

7

the terms of the easement agreements. And so too the Band should be required to act, consistent with Article IV of the Transit Treaty, in a manner such that its environmental regulations are "just and reasonable" and "applied equally to all persons and in the same manner." [7]

In short, Enbridge urges the Court to carry its inclination "to craft injunction relief that would not interfere with the Transit Treaty" to its logical and proper conclusion—to allow Line 5 to continue operating safely on the Reservation until the relocated pipeline is operational. This necessarily implies allowing Enbridge reasonable access to the pipeline for essential monitoring, maintenance, and repair – including at the Meander -- so that normal and safe operations consistent with federal pipeline safety standards can continue.

---

[7] The Court's authority to issue an injunction requiring the Band to comply with the Transit Treaty in respect of Enbridge's ability to address the Meander just as another Canadian hydrocarbon pipeline operator has been allowed by the Band to address a substantially similar circumstance was discussed in Enbridge's October 28, 2022 Bench Memorandum, Dkt 589 at 8-11.

| | |
|---|---|
| Dated this 1st day of November, 2022 | Respectfully submitted, |

| | |
|---|---|
| /s/ David H. Coburn | /s/ David L. Feinberg |
| David H. Coburn | Michael C. Davis |
| STEPTOE & JOHNSON LLP | David L. Feinberg |
| 1330 Connecticut Avenue, NW | Justin B. Nemeroff |
| Washington, DC 20036-1795 | VENABLE LLP |
| (202) 429-3000 | 600 Massachusetts Ave., NW |
| dcoburn@steptoe.com | Washington, DC 20001 |
| aloughran@steptoe.com | (202) 344-8278 |
| msavignac@steptoe.com | MCDavis@venable.com |
| | DLFeinberg@venable.com |
| | JBNemeroff@venable.com |
| /s/ Joseph S. Diedrich | |
| Eric M. McLeod | |
| Joseph S. Diedrich | |
| HUSCH BLACKWELL LLP | |
| 33 East Main Street, Suite 300 | |
| Madison, WI 53701-1379 | |
| (608) 234-6056 | |
| joseph.diedrich@huschblackwell.com | |

Counsel for Enbridge Energy Company, Inc., and
Enbridge Energy, Limited Partnership

CERTIFICATE OF SERVICE

I certify that on November 1, 2022, I served the foregoing document on all counsel of record using the Court's ECF system.

/s/ Joseph S. Diedrich