**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

---

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

          *Plaintiff*,

v.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

          *Defendants*.

---

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

          *Counter-Plaintiffs*,

v.

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION and NAOMI TILLISON,
in her official capacity,

          *Counter-Defendants*.

Case No. 3:19-cv-00602-wmc

Judge William M. Conley
Magistrate Judge Stephen L. Crocker

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS'**
**BRIEF ADDRESSING PUBLIC NUISANCE LIABILITY AND REMEDIATION ISSUES**

**INTRODUCTION**

This brief addresses whether Enbridge can avoid liability and an injunctive remedy because the Band has thus far declined to adopt Enbridge's proposals that it contends would abate the threat at the meander. The answer is no. In certain cases, a defendant can avoid nuisance liability by taking voluntary actions on property it lawfully controls to abate an otherwise actionable nuisance. *See, e.g., Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892 (7th Cir. 2014) ("*Asian Carp II*"). But this is not such a case. Enbridge's proposals would require unconsented entry upon and physical alteration of Band-owned lands that are not subject to an extant easement or other basis giving Enbridge any right to enter or alter the land. The law is clear that a nuisance defendant cannot escape nuisance liability or an injunction by offering to undertake unconsented and highly invasive abatement measures on the plaintiff's land. Nor does any principle of equity suggest a plaintiff should be denied relief for withholding consent to such intrusions.

Ordering the Band to acquiesce in these measures (even if the Court views them as otherwise reasonable) would contravene not only basic principles of equity, but also the Nonintercourse Act, the Band's sovereign and treaty rights to exclude, and the 1948 Right of Way Act. Enbridge effectively asks this Court to exercise the power of condemnation over the Band's lands, but Congress has studiously avoided granting pipeline companies such authority.

The legal infirmities in Enbridge's request of this Court are further underscored by the fact that Enbridge has, in contrast to its preferred proposals, *lawful* opportunity to effectively abate the threat at the meander. The Band has proposed reasonable alternative mitigation measures—on which it is open to cooperative engagement—that do not require immediate shut-

1

down of the pipeline (consistent with the Court's economic concerns) and that fall squarely within the Court's authority to order.  That is the far preferable equitable approach here.

## ARGUMENT

I.      **Enbridge's Bank Revetment Proposals Would Require Entry Upon and Significant Disruption of Band Lands That Are Not Subject to Any Valid Easement.**

Enbridge's proposed abatement projects would result in a new trespass on Band lands. Enbridge has offered two types of rock riprap proposals to modify the banks of the Bad River at and around the meander, including the December 2020 and May 2022 proposals discussed in the expert reports and live expert testimony at trial.  Both categories of proposals involve depositing vast quantities of fifteen-to-eighteen-inch boulders and gravel on the banks and in the channel of the Bad River at the meander.[1]  MacDonald Testimony, Rough Trial Tr. ("Tr.") (10/26/22 a.m.) at 91:12–18 (size of boulders); WWE Report, Dkt. #268-3, at 15–35 (discussion of Dec. 2020 proposal); Trial Ex. 140 (May 2022 proposal); Jones Decl., Dkt. #279, ¶¶ 15, 21 (discussion of May 2022 proposal).  A significant portion of that work would take place on Parcel 430-S13, a trespass parcel in which Enbridge no longer has any valid easement and the Band possesses a 50.791% interest.  Trial Ex. 1456 (percentage Band ownership); Trial Ex. 398 at PDF pp. 920–1,086 (underlying ownership data); McKay Testimony, Tr. (10/26/22 a.m.) at 71:9–18 (approximately fifty percent of revetment on Parcel 430-S13); WWE Report App. E, Bad River

---

[1] Enbridge has also proposed a tree revetment that would likewise be located in significant part on Parcel 430-S13.  Trial Ex. 133 at PDF p. 64 (showing location of revetment).  Approximately half of the tree revetment's 1,400-foot length would extend onto Parcel 430-S13.  Trial Ex. 133 at PDF p. 64.  Beyond the trespass concerns, the tree revetment design would require helicopters for transport of the large trees and construction.  Trial Ex. 133 at PDF p. 585.  In addition to these concerns, the tree revetment is an inappropriate engineering design for this site and would have its own set of environmental impacts.  WWE Report, Dkt. #268-3, at 35–40; WWE Rebuttal Report, Dkt. #269, at 36–42; Jones Testimony, Tr. (10/24/22 p.m.) at 23:25–25:19; Trial Ex. PDX009 at PDF p. 1.

Meander Property Ownership, Dkt. #484-8, at 2–3; Trial Ex. PDX009 (citing Trial Exs. 133, 138, 140, 402); Tillison Testimony, Tr. (10/25/22 a.m.) at 51:11–52:19 (admitting PDX009).

Beyond a new physical trespass onto Band-owned lands in the form of the revetments themselves, the various revetment proposals would also require thousands of helicopter trips over the Bad River Reservation to transport boulders and gravel to the site. MacDonald Testimony, Tr. (10/26/22) at 80:17–20 (Dec. 2020 proposal); *id.* at 86:15–87:13 (May 2022 proposal). The December 2020 riprap proposal involves placing gravel and boulders from a helicopter onto the lands and waters around the meander, including extending the revetment for nearly a football field's distance onto Parcel 430-S13. MacDonald Rebuttal Report, Dkt. #501, at 6; McKay Testimony, Tr. (10/26/22 a.m.) at 71:9–18 (approximately fifty percent of revetment on Parcel 430-S13); Trial Ex. 138 at PDF p. 65; Trial Ex. PDX009 at PDF p. 2; *see also* Trial Ex. 139 at PDF p. 8 (explaining that December 2020 and July 2021 riprap revetment proposals were substantially similar). The May 2022 riprap proposal would likewise require thousands of helicopters to deliver the rocks and gravel to the revetment site, which would extend along approximately 400 feet of Parcel 430-S13, but in this proposal, the helicopters would not be used for actual construction. MacDonald Testimony, Tr. (10/26/22 a.m.) at 86:15–87:13 (helicopters used for transport); Trial Ex. 140 at PDF pp. 3, 48, 458.

In fact, this variation in construction methods and the ground access required to get heavy equipment to the site is the primary difference between the two revetment proposals. The May 2022 proposal would require an access road and bridge to reach the meander. Heavy machinery would reach the proposed bridge via the access road Enbridge proposes to build eastward from Government Road (having completed no wetlands delineation), across a trust allotment parcel held by an individual Band member who has refused to provide Enbridge with access rights to

3

his land.  Trial Ex. 140 at PDF p. 48 (location of proposed access road); Jones Testimony, Tr.

(10/26/22 p.m.) at 148:3–149:1 (lack of wetlands delineation); McKay Testimony, Tr. (10/26/22

a.m.) at 70:1–70:23 (no access granted); Defs.' Demonstrative 32 (map showing yellow

allotment trust tract in northwest corner of figure west of Bad River Meander).

From the west side of the Bad River, Enbridge proposes to build a bridge into an unstable

slope (Slope 6) next to a landside, a situation that threatens to hasten the very bank loss the

revetment is intended to arrest.

> Bank erosion observed along the toe of the upland scarp associated with the
> meander bend could lead to destabilization of Slope 6 and trigger a landslide.
> This occurrence has been observed in several locations along the Bad River where
> a meander bend interacts with the upland scarp on either side of the floodplain.
> The most recently observed landslide occurred immediately upstream of the
> Enbridge Line 5 corridor (Figure 4).  A landslide in the near vicinity could exert
> large forces on Line 5.  Additionally, the flow of the Bad River could be restricted
> if landslide debris flow extends into the Bad River channel.  The restriction may
> result in localized scour in the Bad River channel or blockage of flow, which may
> direct flow elsewhere and promote an avulsion event across the nearby meander
> neck.

Trial Ex. 67 at PDF pp. 138, 139 (Figure 4: photo of Slope 6 and upstream landslide) (admitted

via deposition designations, *see* Dkt. #581).  No actual engineering design has yet been

completed for a bridge at this precarious location.  MacDonald Testimony, Tr. (10/26/22 a.m.) at

99:7–17; Trial Ex. 140 at PDF p. 464 (bridge diagram).

The proposed projects would all cause environmental disturbance to Band lands on which

Enbridge is already in trespass.  *See* WWE Report, Dkt. #268-3, at 30–34, 36, 45–46; WWE

Rebuttal Report, Dkt. #269, at 37–38, 43, and Dkt. #269-2, at 8–9; Decl. of Jon Jones, Dkt. #279,

¶ 21; Jones Testimony, Tr. (10/24/22 p.m.) at 36:8–37:18; *see also* Tillison Testimony, Tr.

(10/25/22 a.m.) at 44:12–45:18.  The May 2022 proposal design even calls for temporary water

access occurring directly in habitat of the Wood Turtle, a species listed as threatened by the state

of Wisconsin.  *See* WWE Report, Dkt. #268-3, at 46; Tillison Testimony, Tr. (10/25/22 a.m.) at 44:23–45:2; Trial Ex. 140 at PDF p. 458; MacDonald Testimony, Tr. (10/26/22 a.m.) at 89:10–90:4.  Finally, Enbridge's expert (the individual who designed both proposals) was not asked by Enbridge to determine whether removing the revetment materials would be feasible, nor did he believe that all such materials could be removed from the meander.  MacDonald Testimony, Tr. (10/26/22 a.m.) at 82:9–18.

In short, Enbridge's mitigation proposals require encroachment upon and alteration of lands for which no valid easement exists—that is, they require an entirely new round of trespass on those lands.

## II. The Band's Unwillingness Thus Far To Consent to Enbridge's Proposed Trespass Does Not Foreclose Nuisance Liability or the Award of Equitable Relief to the Band.

### A. Nuisance Liability

A party may avoid nuisance liability where it voluntarily abates the nuisance on property it owns or controls.  That was the case in *Asian Carp II*.  There, the Seventh Circuit found no nuisance liability in the defendant agencies (the Army Corps of Engineers and a municipal water district) based on the array of preventive measures those agencies were undertaking within the Chicago Area Waterway System ("CAWS"), waters and facilities wholly subject to their mutual jurisdiction, ownership, and control.  *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 768 (7th Cir. 2011) ("*Asian Carp I*") (the two agencies "together own and operate the facilities that make up the CAWS").  According to the Circuit,

> the steps that the Corps is taking and has already taken to prevent the carp from passing through the CAWS to Lake Michigan … include[e] the presence of the electronic barriers, the regular monitoring activity, installation of screens on sluice gates, and the application of rotenone when a potential threat is spotted.  The ongoing effort on the part of the Corps along with many other actors to craft a plan to combat the eventual migration of the carp to Lake Michigan is yet another aspect of these operations.  The issuance of the [congressionally

mandated] Report [on options to abate the threat] was an important step in that effort[.]

*Asian Carp II*, 758 F.3d at 904.  None of these measures involved acts to be undertaken on the lands or waters of the plaintiff states or tribe.  The Army Corps made no suggestion that it had the right to defeat the plaintiffs' nuisance liability by engaging in such measures, and the Circuit nowhere made the suggestion itself.

Enbridge's claim is a radical one, and case law addressing it directly is accordingly hard to find—the argument simply does not get made often.  But the courts that have faced the issue have seen it the Band's way.  As the Supreme Court of Wisconsin has declared, "that the defendant cannot enter to abate the nuisance does not excuse his liability, for it is his own wrong which has involved him in trouble."  *Kamke v. Clark*, 67 N.W.2d 841, 845 (Wis. 1955) (citation omitted).  In *Woody v. Machin*, 380 N.W.2d 727 (Iowa 1986), the lower court had found defendants liable for nuisance and ordered them to take abatement measures "on their land" and to install drain tile "across plaintiffs' land."  *Id*. at 729.  The Iowa Supreme Court held that "the court lacked authority to authorize defendants to construct and maintain a tile line on plaintiffs' property in abating the nuisance….  The court in this case had no authority to give defendants an easement in plaintiffs' land.  Such a right could be acquired by defendants only through means recognized in our law."  *Id*. at 731.

The Pennsylvania cases relied on by Enbridge in its Bench Memorandum, Dkt. #589, are not to the contrary.  In *McNanamy v. Firestone Tire & Rubber Co.*, 173 A. 491 (Pa. Super. Ct. 1934), which is not a nuisance case, the court allowed a defendant to enter plaintiff's land to remove a trespassing structure, not to install one.  Moreover, removal of the structures was the very relief plaintiffs sought.  *Id*. at 491 ("[P]laintiffs sought … a mandatory injunction to compel the defendant to remove certain portions of a foundation, wall, windows, and coping which they

alleged encroached upon their land."). In *Pennsylvania Railroad Co. v. Sagamore Coal Co.*, 126 A. 386 (Pa. 1924), the Court did not allow an unconsented entry to abate a nuisance. It enjoined the nuisance and allowed defendants to transport mine water (presumably) across plaintiffs' properties but only "so far as this can … legally be done" and noted plaintiff's "willingness" to consent to the order. *Id.* at 392.

Nor do the cases Enbridge cited in its trial brief support its position. In *Harrison v. Ind. Auto Shredders Co.*, 528 F.2d 1107 (7th Cir. 1975), an industrial landowner had made alterations to its own land to mitigate the nuisance. *See id*. at 1118 ("[T]he company constructed a deep trench along its boundary with adjoining property owners in an attempt to reduce the vibrations crossing its property lines."). And it was given reasonable time to make further alterations to that land in the form of a "buffer strip [of landscaping] surrounding the operation[.]" *Id*. at 1123. Enbridge's attempt to analogize that case to its position here would hold up only if the court had permitted the defendant to defeat nuisance liability by installing a landscape buffer and excavating "a deep trench" on the claimants' land. It did no such thing. *Citizens for Odor Nuisance Abatement v. City of San Diego*, 213 Cal. Rptr. 3d 538 (Cal. App. 2017), likewise does not support Enbridge's position. There, the court held that the City of San Diego did not cause a public nuisance under a failure-to-act theory where it took measures on its own property—a city nature preserve—to mitigate odors from animal waste. *Id*. at 550.

**B.    Equitable Relief**

A plaintiff's reluctance to acquiesce in trespass or other impairment of its rights cannot be held against it as a matter of equity. *Asian Carp II* involved no inquiry as to whether the plaintiffs were, as Enbridge alleges here, contributing to the seriousness of the nuisance through

their actions or inactions as governments or litigants.  Instead, "[i]t is the defendants' apparent diligence … that is key to our holding today."  758 F.3d at 906.

In *Asian Carp I*, the Seventh Circuit (in considering the balance of harms) faulted the plaintiff states for having "adopted a rather insouciant attitude about the potential harm that their proposal might inflict" on the defendant governments' coffers, and for "scoffing at the defendants' concerns about the costs of relief …. when they apparently feel no obligation to contribute to the costs of averting this crisis," 667 F.3d at 794.  But the Band has taken no analogous position here.  The Band is not seeking to force projects on Enbridge while declining to aid in their success.  Rather, the Band is resisting the imposition of highly flawed projects on its lands.

And while the Band understands that the Court is concerned with its rejections of Enbridge's project proposals to date, the Band urges the Court to consider the flexibility it has attempted to show on a number of important fronts.  The Band has attempted to offer its own solution to the risks present at the meander, one that—in keeping with the Court's concerns about economic disruption—does not call for the immediate shutdown of the pipeline.  The Band has proposed that it and Enbridge enter a monitoring and shutdown protocol on multiple occasions since 2019, including in the detailed technical evaluations accompanying each of its decisions denying Enbridge's proposed meander projects, *see*, *e.g.*, Trial Ex. 132 at PDF pp. 48–49; *see also* Trial Exs. 126 at PDF p. 13; 128 at PDF pp. 15, 19; 132 at PDF pp. 22, 28; 134 at PDF p. 13; 137 at PDF pp. 34, 40, 55; 139 at PDF pp. 13, 21; 142 at PDF p. 39; 147 at PDF p. 13; 145 at PDF pp. 16, 18, 27, 46, 77; 166 at PDF p. 41, and provided a detailed, comprehensive

protocol of its own in Wright Water Engineers' January 2022 expert litigation report, *see*

WWE's Proposed Line 5 Monitoring and Shutdown Protocol ("WWE Protocol"), Dkt. #484-18.[2]

For its part, Enbridge has refused to adopt the Band's proposed plan, and has abandoned

its own 2019 plan (which would have required a shutdown of Line 5 prior to the development of

any exposure of the pipeline at the meander), Trial Ex. 455.  In their stead, Enbridge adopted its

2021 shutdown plan, which creates the potential for Enbridge to continue operating well past the

point at which a pipeline exposure surpasses Enbridge's own calculated critical span length, Trial

Ex. 70, and to purge the pipeline in the event of a critical integrity threat only "if feasible" to do

so, *id.* at PDF p. 7; *see also* Paton Testimony, Tr. (10/24/22 p.m.) at 106:25 – 107:6.

Whether the parties ultimately agree to a shutdown protocol sufficiently robust to avoid

the threat of a rupture at the meander, or the Court were to impose one as a component of

forward-looking injunctive relief designed to ameliorate an imminent threat of release at the

meander, the critical point for present purposes is this:  A viable shutdown and purge protocol,

successfully implemented, would significantly reduce the threat of an oil spill in the near term.

WWE Protocol at PDF p. 3.  It would also avoid an immediate shut-down of the pipeline and if

average yearly erosion rates hold, would likely enable the pipeline to continue operations for a

sufficient period of time for markets to adapt and Line 5 to be successfully decommissioned on

the Reservation without the significant market disruptions regarding which this Court has raised

---

[2] Of course, given the complexity, sensitivity, and extreme challenges at the meander, no abatement proposal will be perfect or without risk.  And the Band is aware of the Court's concerns with these protocols.  It is open to further cooperative refinement of them under the Court's supervision.  The Band has also taken seriously the Court's concern about the installation of the Emergency Flow Restricting Devices (EFRDs), Tr. (10/26/22 p.m.) at 170:15–23.  The Band's experts have begun exploring possibilities for EFRDs that would be feasible to install this winter, Tr. (10/27/22 a.m.) at 18:13–19, and the Band intends to engage with Enbridge on the issues soon, *id.*

concerns from the public interest standpoint.  And lastly, this protocol could be implemented without expanding the scope of Enbridge's trespass on the Band's lands or requiring the Band to accept riprap construction that violates its environmental laws, or submit to the environmental harms that Enbridge's remediation proposals would impose.

As further indication of the Band's reasonableness here, the Band has acknowledged in the form of its requested relief that the pipeline might continue in operation on its lands for a limited period of time to allow the marketplace to adjust to any shutdown order.  That belies any suggestion that the Band is being uncooperative or dismissive regarding the challenges, including the economic ones, presented by the ongoing operation of the pipeline across the Reservation and the question of when to put that operation to a stop.

Under these circumstances, the Band should not be required by this Court to acquiesce in Enbridge's proposals.  No principle of equity suggests that a nuisance defendant should be entitled to implement its preferred abatement proposals, particularly where they are unreasonable as a matter of law because they would entail violations of law or the rights of adjacent landowners, and alternatives exist that do not bear those infirmities.  *Cf. City of Mackinac Island v. Webster*, Docket No. 289059, 2009 WL 3401156, at *2–*3 (Mich. Ct. App. Oct. 22, 2009) (rejecting defendants' argument "that the only [nuisance abatement] remedy the circuit court might have properly ordered is the one they proffered to the court," which would have violated a municipal ordinance, and upholding alternative abatement measures imposed by lower court to be undertaken on defendant's land).

The law, then, provides no support for the suggestion that the Band's unwillingness thus far to consent to Enbridge's abatement proposals should inform the equitable inquiry regarding the appropriate remedies in this case.  If the law provided for such an outcome, it would invest

10

inordinate power in nuisance-generating entities over nuisance plaintiffs—who would be faced with a choice between living with the nuisance or consenting to trespass on and alterations to their land.  Where, as here, the threat is sufficiently dangerous that the plaintiff cannot reasonably endure it, such a rule would vest de facto condemnation authority in the defendant to impose the trespass.  For that is in truth what Enbridge asks of this Court: not only an injunction but a condemnation of rights in the Band's lands.  No principle of equity counsels in favor of such a result.

III.   **Because Enbridge's Proposals Would Require Encroachment on Band Lands Over Which No Valid Easement Exists, They Are Beyond the Court's Equitable Authority to Order.**

Enbridge's abatement proposals would require this Court to equitably accord to Enbridge the right to enter and alter Band lands in which Enbridge no longer has a valid interest.  *See, e.g.*, Bench Mem., Dkt. #589, at 2 ("This Court Has Ample Authority to Enjoin the Band in Connection with the Meander"); *id.* at 3 (requesting that Court "enjoin the Band" from denying "Enbridge's proposed Meander projects").  As such, Enbridge is asking this Court to exercise its equitable powers to achieve an outcome prohibited by federal law.

As this Court has recognized, Congress has made "tribal consent a statutory requirement to an encumbrance on tribal land.  Under the Nonintercourse Act, a transfer of *any rights* in tribal land to a non-Indian … entity requires the consent of both the Secretary of the Interior and the tribe itself."  Op. and Order ("Op."), Dkt. #360, at 22 (emphasis added) (citing 25 U.S.C. § 177).  The Court has likewise recognized the Band's inherent sovereign power "to exclude non-Indians from Indian lands," *id.* at 21 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 (1982)), which "only Congress" has the authority to infringe, *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 557 (7th Cir. 2022) (emphasis

11

omitted).  The Court has further recognized that the Band's "sovereign power over its lands was acknowledged in the 1854 Treat[y] with the Chippewa, *State of Wisconsin v. Hitchcock*, 201 U.S. 202, 214, (1906), which created a permanent reservation for the Band with permanent rights of occupancy and possession, including the power to exclude and to 'place conditions on entry, on continued presence, or on reservation conduct.'  *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235 (1985)."  Op. at 21–22.  The authority to impair such rights, again, "belongs to Congress alone," *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020); *see also Lac Courte Oreilles Band*, 46 F.4th at 557 (same).  Finally, the Court has recognized, Op. at 22 & n.6, that the 1948 Right of Way Act provides that "*[n]o grant of a right-of-way* over and across any lands belonging to a tribe … shall be made without the consent of the proper tribal officials," 25 U.S.C. § 324 (emphasis added).

In light of these bedrock protections for tribal lands, Enbridge is asking the Court to order abatement measures that exceed the parameters of its equitable authority.  As the Supreme Court has repeatedly admonished, "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) (quoting *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988)).  *See also*, *e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (same); *United States v. Choctaw Nation*, 179 U.S. 494, 533 (1900) (same with respect to Indian treaties);  *F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 782 (7th Cir. 2019) (courts of equity are bound by "statutory … requirements" in fashioning remedies (quoting *Armstrong*, 575 U.S. at 327)).

In asking this Court to enjoin the Band to acquiesce in the proposed trespass (and violation of the Band's inherent sovereignty, the Nonintercourse Act, the Band's treaty, and the

1948 Right of Way Act), Enbridge is asking the Court to accomplish indirectly what it lacks equitable authority to accomplish directly.  To accept Enbridge's argument would put the Band to a Hobson's choice: either stick to its rights, lose on nuisance liability, and live with the unabated circumstances at the meander on the one hand, or acquiesce in violations of its sovereignty and statute- and treaty-guaranteed property rights on the other—harms that this Court has already rightly deemed irreparable, *see* Op. at 40.  Because the Band cannot live with the circumstances at the meander (which both parties' experts agree would, if unabated, pose a risk of environmental catastrophe), it would be *compelled* to acquiesce in the trespass and the abrogation of its sovereign rights in its lands.  *Cf.*, *Smith v. Grams*, 565 F.3d 1037, 1046 (7th Cir. 2009) ("[A] Hobson's choice is actually no choice at all.").  Putting the Band to such an illusory choice would amount to a de facto condemnation of the Band's rights in its lands. Neither Enbridge nor this Court possesses condemnation authority over the Band's lands.  *See*, *e.g.*, *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101, 1112 (10th Cir. 2017) (tribal land is "beyond the reach of condemnation"); *Neb. Pub. Power Dist. v. 100.95 Acres of Land*, 719 F.2d 956, 962 (8th Cir. 1983) ("tribal land [is] not subject to condemnation").  And no public interest in the continued operation of the pipeline overcomes that fact.  Under constitutional separation of powers principles, "[t]he necessity for appropriating private property for public use is not a judicial question.  This power resides in the Legislature[.]"  *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 468 (7th Cir. 2002) (quoting *Rindge Co. v. Los Angeles Co.*, 262 U.S. 700, 709 (1923)).

**CONCLUSION**

For the foregoing reasons, Enbridge cannot avoid liability or an injunctive remedy based on the Band's unwillingness thus far to adopt Enbridge's meander proposals.  Nor does the Court's equitable discretion extend to injunctive relief imposing those proposals on the Band.

Dated: November 1, 2022

Respectfully submitted,

_/s/ Riyaz A. Kanji_
Riyaz A. Kanji

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
attorney@badriver-nsn.gov
(715) 682-7107

David A. Giampetroni
Lucy W. Braun
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
lbraun@kanjikatzen.com
(734) 769-5400

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
bwallace@hooperhathaway.com
(734) 662-4426

Jane G. Steadman
Philip H. Tinker
Claire R. Newman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com
cnewman@kanjikatzen.com
(206) 344-8100

Oday Salim
NATIONAL WILDLIFE FEDERATION
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104
salimo@nwf.org
(586) 255-8857

Douglas M. Poland
David P. Hollander
STAFFORD ROSENBAUM, LLP
222 West Washington Avenue, Suite 900
Madison, WI 53701
dpoland@staffordlaw.com
dhollander@staffordlaw.com
(608) 256-0226

_Counsel for the Bad River Band of the Lake Superior
Tribe of Chippewa Indians and Naomi Tillison, Director
of the Mashkiiziibii Natural Resources Department of
the Bad River Band, in her official capacity_