**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION,<br><br>*Plaintiff*,<br><br>v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,<br><br>*Defendants*. | Case No. 3:19-cv-00602-wmc<br><br>Judge William M. Conley<br>Magistrate Judge Stephen L. Crocker |
| ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,<br><br>*Counter-Plaintiffs*,<br><br>v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity,<br><br>*Counter-Defendants*. | |

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS' RESPONSE TO DEFENDANTS' BENCH MEMORANDUM ADDRESSING THE COURT'S EQUITABLE POWERS TO ENTER AN INJUNCTION FACILITATING REMEDIATION AT THE MEANDER**

## INTRODUCTION

Enbridge contends that "[t]he Court has the authority to enjoin the Band from unreasonably and unlawfully denying Enbridge's proposed Meander projects because its denials exceed the scope of its delegated authority under the CWA." Defs.' Bench Mem. ("Mem."), Dkt. #589, at 3. It further contends that the Court may order equitable relief to compel the Band to abide by the "equal-treatment requirement" of the 1977 Transit Treaty. *Id*. at 8. Neither contention has merit.

Enbridge cites an array of cases referencing the broad scope of federal equity jurisdiction, *see id.* at 2, 4, but none of them overrides or is inconsistent with the bedrock principle that a "court's equitable discretion … though considerable is of course not unlimited," *F.T.C. v. Think Achievement Corp.*, 312 F.3d 259, 262 (7th Cir. 2002). Simply put, "[a] Court of equity cannot … create a remedy in violation of law[.]" *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) (citation omitted). That is precisely what Enbridge asks this Court to do pursuant to both its Clean Water Act and 1977 Transit Treaty arguments. Nor can federal courts create their own jurisdiction where none exists. Enbridge's Clean Water Act arguments suffer from this additional, fundamental infirmity. Enbridge's requests should be denied.

## ARGUMENT

### I. Enbridge Has No Claims Left in This Case and Cannot Amend Its Answer Mid-Trial To Add New Claims.

Before the Court reaches the merits of Enbridge's claims, it should address the threshold question of whether Enbridge has properly placed those claims before the Court. The answer is no. On the eve of trial, Enbridge's only remaining counterclaims were Count IV, "Declaratory and Injunctive Relief (Against the Band)," and Count V, "Declaratory and Injunctive Relief

(Against Director Tillison)." Defs.' Second Am. Answer ("Answer"), Dkt. #146, at 71, 75.[1] *See also* Rough Tr. of Pretrial Conference (10/18/22) at 68:17–18 (Defs.' Counsel: "[W]hat's still preserved in this case for trial is Counts 4 and 5" of the counterclaim). But a request for injunctive relief "is a remedy, not a cause of action[.]" *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019); *Tietjen v. Ninneman*, Case No. 16-CV-1542, 2017 WL 5634675, at *3 (E.D. Wis. Feb. 7, 2017) (same for request for declaratory relief). Requests for equitable relief, then, need "some statutory or common law hook[.]" *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 881 (7th Cir. 2020).

Here, Counts IV and V do not state any causes of action. And to the extent any causes of action can be inferred from the surrounding context of the pleading, they would consist of violations of the 1992 Agreement, the fifty-year BIA easement, Enbridge's perpetual fee-land easements, and the 1948 Right of Way Act. *See* Answer ¶¶ 117, 119–20, 135–36. Yet Enbridge's Memorandum does not mention these legal predicates at all. It instead seeks to swap them out for an entirely new suite of claims under the Clean Water Act ("CWA") and the *Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("1977 Transit Treaty"), effectively seeking to amend its counterclaims in the middle of trial seeking sub silentio to modify its counterclaims in the middle of trial.[2] This Enbridge cannot do. *See, e.g.*,

[1] Enbridge's Count III for equitable easement is solely premised on Counts I and II, on which the Court granted summary judgment to the Band. *See* Answer ¶ 101 ("In light of the Band's obligations under both the express terms of the 1992 Agreement [Count I] and the implied covenant of good faith and fair dealing [Count II], Enbridge Energy is equitably entitled to easements[.]"). Op. and Order, Dkt. #360. Count III, then, falls with Counts I and II.

[2] While Counts IV and V mention the CWA, they make no claim under that statute and do not allege that the Band has violated any of its provisions. They simply assert that no law, rule, or regulation, including the CWA, confers authority on the Band to subject Enbridge to Band permitting requirements. *See*, *e.g.*, Answer ¶ 111. By contrast, Enbridge now concedes the

*ABS Glob., Inc. v. Inguran, LLC*, No. 14-cv-503-wmc, 2019 WL 4276647, at *2 (W.D. Wis. Sept. 10, 2019) (Conley, J.) (refusing to give jury instruction "mid-trial" because it would effectively create a new claim and "be inappropriate under any sense of basic fairness at trial, especially following adoption of the Federal Rules of Civil Trial and abandonment of trial by ambush" (quotation marks omitted)). Were the law otherwise, the opposing party would "not receive[] the fair notice required by the federal pleading rules." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). Requests for equitable remedies are not all-purpose vessels for any claim a party might seek to attach to them at any point in the litigation, and Enbridge should not be allowed to employ Counts IV and V to that effect here.

Enbridge's claims are thus not properly before this Court. And as discussed below, even if they are, they fail on their merits.

## II. Enbridge's Arguments Under the Clean Water Act Fail as a Matter of Both Law and Fact.

### A. Enbridge's Clean Water Act Arguments Fail as a Matter of Law Because the Court Lacks Jurisdiction to Review Tribal Section 401 Certifications.

Enbridge's CWA arguments rest on its underlying assertion that the Band's denial of CWA Section 401 certification for its abatement proposals at the meander "contravene the scope of the Band's CWA authority," Mem. at 5. But unless expressly provided by Congress, federal courts do not possess jurisdiction to substantively review state or tribal Section 401 determinations because those determinations are rendered as a matter of state or tribal law. As the United States Court of Appeals for the District of Columbia Circuit has explained,

> if a party seeks to challenge a state certification issued pursuant to section 401, it must do so through the state courts. The reason for this rule is plain enough. The

Band's CWA permitting authority. *See*, *e.g.*, Molina Testimony, Tr. (10/26/22 a.m.) at 27:1–3 ("Q: Okay. You agree that 401 certification was required for the projects you were— A: I agree.").

> Clean Water Act gives a primary role to states "to block … local water projects" by imposing and enforcing water quality standards that are more stringent than applicable federal standards. Therefore, the decision whether to issue a section 401 certification generally turns on questions of state law.

*City of Tacoma v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006) (ellipsis in original) (quoting *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991)); *see also*, *e.g.*, *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 109 (2d Cir. 1997) ("[N]either a federal agency *nor a federal court* may review … the grant or denial of a certificate[.]" (quotation marks omitted) (emphasis added)); *Roosevelt Campobello Int'l Park Comm'n v. E.P.A.*, 684 F.2d 1041, 1056 (1st Cir. 1982) ("The courts have consistently agreed … that *federal courts* and agencies are without authority to review the validity of requirements imposed under state law or in a state's [Section 401] certification." (emphasis added)).[3] Indeed, because Section 401 certifications turn on issues of state or tribal law, EPA has confirmed that states and tribes may, but are not required to, provide for judicial review of them. *See* Amendments to the Water Quality Standards Regulation That Pertain to Standards on Indian Reservations, 56 Fed. Reg. 64,876, 64,882 (Dec. 12, 1991) (States are not "required to provide judicial reviews of section 401 certifications. Judicial reviews of section 401 certifications are conducted based on the requirements of State laws, not the Clean Water Act.

[3] References to "states" in the CWA and cases interpreting it apply equally to tribes. As the EPA has explained:

> There is no reason to treat a tribe's laws differently than a state's laws with respect to their ability to form the legal basis for a certification decision or any conditions the tribe might find necessary to include in a certification. Once it attains TAS status, a tribe stands on equal footing with a state regarding its ability to carry out its functions under sections 401(a)(1), 401(d) and 401(a)(2).

Clean Water Act Section 401 Water Quality Certification Improvement Rule, 87 Fed. Reg. 35,318, 35,373 (proposed June 9, 2022); *see also*, *e.g.*, *Wisconsin v. EPA*, 266 F.3d 741, 750 (7th Cir. 2001) (treating tribes with TAS status as possessing lesser authority under the CWA than states "would treat tribes as second-class citizens. Nothing in [the CWA] indicates that Congress authorized any such hierarchy.").

Therefore, EPA has not required Tribes to provide such judicial review, as it is a matter of Tribal law.").[4]

Moreover, parties cannot use other causes of action (as Enbridge is attempting) to attack the substance of a state's or tribe's Section 401 decision. *Conservation Law Found. v. Fed. Highway Admin.*, 630 F. Supp. 2d 183, 207 (D.N.H. 2007) ("I need not evaluate CLF's Clean Water Act arguments on their merits, however, because I lack jurisdiction to consider such claims in a NEPA action. NHDOT has obtained § 401 Water Quality Certification from the state. Challenges to that certification ordinarily must be brought in state court."); *see also City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 273 (D.C. Cir. 2002) ("Although the petitioner may disagree with the substantive decisions made by the various agencies involved in an EIS, neither NEPA nor any other statute confers jurisdiction on this Court to hear such challenges as part of this proceeding…. This is not a proper forum for Olmsted Falls to assail the Ohio EPA's decision to grant a waiver.").

Enbridge's case law confirms the Band's position. Enbridge contends that "federal courts have frequently reviewed whether grants or denials of CWA Section 401(a) Certifications under a state's delegated authority are proper." Mem. at 4 n.4. But every case cited by Enbridge for that proposition involved a suit under the Natural Gas Act, in which Congress expressly provided for federal appellate court original jurisdiction to review state CWA Section 401 certification decisions pertaining to Federal Energy Regulatory Commission authorization. *See*

---

[4] This is not surprising. The general rule that federal courts lack jurisdiction to review tribal determinations of tribal law applies throughout the law, not just in the context of the CWA. *See, e.g.*, *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987) ("[T]ribal courts are best qualified to interpret and apply tribal law."); *Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139, 1143 (10th Cir. 2004) ("A dispute over the meaning of tribal law does not arise under the Constitution, laws, or treaties of the United States").

15 U.S.C. § 717r(d)(1) and (2) (providing such jurisdiction with respect to certification involving "a facility subject to" the Natural Gas Act). And each court asserted its jurisdiction expressly under that provision.[5] Line 5 and the meander proposals are not subject to the Natural Gas Act, and there is no similar provision authorizing review of CWA Section 401 certification decisions pertaining to Army Corps CWA Section 404 permits or Rivers and Harbors Act Section 10 permits. Enbridge's cases in footnote 6 of its brief likewise do not salvage its argument—indeed, they support the Band's—as each involves state court review of a state certification decision. *See* Mem. at 7 n.6.

Enbridge's cases involving suits against the EPA, *see* Mem. at 4–5, likewise fail to provide it with any comfort. The Band is not a federal agency, and Enbridge makes no attempt to explain how federal court authority to review federal agency actions translates to the authority asserted here. *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), involved a petition for direct review of an EPA standard in the Court of Appeals, a procedure expressly provided for under the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). And *Idaho Sportsmen's Coalition v. Browner*, 951 F. Supp. 962, 964 (W.D. Wash. 1996), involved a claim against the EPA under the citizen suit provision of the CWA and federal Administrative Procedure Act. Enbridge has asserted no claims under either provision, nor could it. *See*, *e.g.*, 5 U.S.C. § 702 (establishing right of review against United States); *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1160–61 (9th Cir. 2021) (CWA "does not indicate—let alone clearly indicate—that Congress intended in

[5] *See Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 752 (4th Cir. 2019) ("We possess jurisdiction to review the Board's Section 401 Upland Certification pursuant to 15 U.S.C. § 717r(d)(1)."); *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 400 (4th Cir. 2018); *Mountain Valley Pipeline, LLC v. N.C. Dep't of Envtl. Quality*, 990 F.3d 818, 826 (4th Cir. 2021); *Constitution Pipeline Co., LLC v. N.Y. Dep't of Envtl. Conservation*, 868 F.3d 87, 99 (2d Cir. 2017); *Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 175 (3d Cir. 2017).

the CWA to subject tribes to unconsented suits"); *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 945–46 (9th Cir. 2022) (same).

Enbridge suggests that the Seventh Circuit's statement in *Wisconsin v. EPA*, 266 F.3d 741, 749 (2001), that "[t]he tribe cannot impose any water quality standards or take any action that goes beyond the federal statute or the EPA's power" translates into federal court jurisdiction to substantively review tribal Section 401 certifications. *See* Mem. at 5. That is flatly incorrect. As the fuller quote makes clear, the Circuit did not identify federal judicial review as a check on tribal or state Section 401 certifications. Rather, it is the EPA that has regulatory authority in two ways: *First*, the EPA must approve tribal or state water quality standards; and *second*, in the Section 401(a)(2) neighboring jurisdiction provision, the EPA must determine whether a discharge allowed by a federal license or permit "may affect" downstream tribal or state waters before potentially moving forward with a tribal-state dispute resolution mechanism:

> Wisconsin exaggerates the power of the tribe to veto upstream discharge activities. The tribe cannot impose any water quality standards or take any action that goes beyond the federal statute or the EPA's power. To the contrary, the EPA supervises all standards and permits. Far from allowing a tribe to veto a state permit, granting TAS status to tribes simply allows the tribes some say regarding those standards and permits…. [I]t is the EPA, not the tribe or the state, that has the ultimate authority to decide whether or not to issue a permit.

*Wisconsin*, 266 F.3d at 749–50.

Finally, Enbridge's citation to cases from far-afield areas of law authorizing injunctive relief against tribes is irrelevant here. First, none involves the same jurisdictional scheme as the CWA. Second, contrary to Enbridge's assertion, the Band did not "waive[] sovereign immunity to injunctive relief in the 1992 Agreement with Enbridge, Section (1)(b)," Mem. at 3. Even if a waiver of sovereign immunity could supply a court with subject matter jurisdiction, the 1992 Agreement contains only a "limited waiver," restricted to "any dispute regarding *this Agreement*

and with respect to enforcement of *this Agreement*[.]" Agreement Between Band and Enbridge, Dkt. #170-5, § 1(b) (emphasis added). Enbridge's Section 401 arguments do not remotely implicate this language.

In sum, the court lacks jurisdiction to review the Band's Section 401 certification determinations. Accordingly, there is no basis on which it could order injunctive relief against the Band with respect to them.

### B. Enbridge's Arguments Under the Clean Water Act Fail as a Matter of Fact Because Enbridge Has Identified No Act of the Band Contravening the Clean Water Act.

Enbridge spends a section of its brief seeking to impugn the motives of Band officials and employees and thereby to discredit the Band's Section 401 certification determinations. *See* Mem. at 5-8. Its arguments are a house of cards: Nowhere does Enbridge cite, or even mention, a single provision or requirement of the Band's Water Quality Standards, the Band's Water Quality Certification and Water Quality Review Code, or the CWA that it believes the Band has violated, much less explain how the Band has violated it. That alone should doom its arguments. *See*, *e.g.*, *M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017) ("[U]ndeveloped arguments are waived, as are arguments unsupported by legal authority.").

Enbridge instead asserts as follows:

> The Band itself proffered evidence that a CWA 401 Certification may be denied if the project "***will* cause**" or contribute to a violation of the water quality standards (Trial Ex. 3 at 9); however, the Band admitted that it employed a "***may* cause**" standard against Enbridge. *See* Trial Tr. 10/24/22 (Rough), 104:7–105:10 (Naomi Tillison)[.]

Mem. at 7 (emphases in original). This, according to Enbridge, is a "poignant example[] of the Band's abuse of its delegated authority." *Id.*

Enbridge is wrong. First, Enbridge misrepresents the cited testimony, in which Director Tillison explains that the details of the Band certification decisions are in the Band's decision documents. Tillison Testimony, Tr. (10/25/22 a.m.), at 104:7–105:10. Moreover, Enbridge ignores Director Tillison's clear testimony that the Band determined Enbridge's proposals would not comply with the Band's Water Quality Standards and Wetlands and Watercourse Protection ordinance, *id.* at 31:16–32:1. Enbridge's cherry-picking demonstrates why, when courts have jurisdiction to review agency actions, they do so based on the administrative record rather than selectively curated emails and trial testimony.

Every Band decision is contained in a decision document and explains that: (1) a water quality certification is required to provide a reasonable assurance that a proposed activity will not violate the Tribe's water quality standards and other applicable requirements of tribal or federal law; and (2) after review, the Band found that Enbridge's proposals do not satisfy the Antidegradation Policy of the Band's Water Quality Standards nor comply with the Band's Wetlands and Watercourse Protection ordinance. *See*, *e.g.*, Trial Ex. 137, 2021, First Round Bad River Decisional Documents for Enbridge's Bad River Meander Rip Rap Stabilization Project Application, at PDF pp. 13, 18; Trial Ex. 139, 2021, Second Round Bad River Decisional Documents for Enbridge's Bad River Meander Rip Rap Stabilization Project Application, at PDF pp. 8, 12. The standard applied by the Band is consistent with tribal and state Section 401 certification decisions throughout the country. *See PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704–10, 714–15, 718–20 (1994); 40 C.F.R. § 121.7(b) ("If the certifying authority cannot certify that the discharge from a proposed project will comply with water quality requirements, it may deny or waive certification."); *id* § 131.10 (states must designate uses of waterbodies); *id.* § 131.12 (states shall develop antidegradation policy); *see*

*also S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006) ("Changes in the river like these fall within a State's legitimate legislative business, and the Clean Water Act provides for a system that respects the States' concerns."). Enbridge does not substantively engage with those decisions, and the Court should not sanction its attempts to muddy the waters through insinuations.[6]

Enbridge relies on internal Band statements, the majority from one former Band employee, Melis Arik, who served as the Band's Water Resources Specialist. Arik Dep. Tr. at 18:11–13.[7] Enbridge's presentation of these statements is simply misleading. For example, Enbridge cites a string of email statements from Ms. Arik expressing purportedly favorable views of Enbridge's HDD proposal. *See* Mem. at 6 (citing Trial Ex. 964). But regarding those statements, Ms. Arik testified that "[a]t that time that was true," but "at a later period in time [she received] more … information that led [her] to have concerns about impact to the Bad River from the construction of the HDD," including "[f]rac-outs," which are "a concern that Enbridge had very clearly minimized multiple times in their application [but] was actually something that was very well known in the industry to be a common occurrence that needed to be planned for.… And those were the kinds of concerns that caused me to change my view from November 5th to the time that the permits were completed." Arik Dep. Tr. at 181:17– 182:22.

[6] Without any evidence, Enbridge claims that the Band denied certification for Enbridge's projects as part of a litigation strategy. Mem. at 6. This is patently false. What the record evidence does show is that Enbridge started submitting the proposals only after the Band filed its lawsuit, stating, "Anything we provide that the Band denies can be used against their lawsuit." Trial Ex. 150 at PDF p. 7.

[7] Enbridge uploaded deposition transcripts to Box.com in a folder titled "Deposition Designations," file name "Defendants' Annotated & Combined Transcripts.pdf." The transcript of Melis Arik's deposition is at PDF pages 2 to 163.

Similarly, regarding the statements made by Ms. Arik in Trial Ex. 967, *see* Mem. at 6, she testified that by the time the MNRD made its decision, she had concerns about the proposal. Arik Dep. Tr. at 181:17–182:22. As to the statement that "not every line of evidence adds up to 'irreparable damage' …. [I]t is not that straightforward for me," *see* Mem. at 6 (emphasis omitted), Ms. Arik testified that "there were people in our—in our department who were weighing in on things that was not their area of expertise. But they weren't involved in the project. They weren't involved in the permitting." Arik Dep. Tr. at 239:18–240:22. If anything, Ms. Arik's statements evidence an employee doing her job, grappling with the materials in good faith, and declining to take the very approach that Enbridge accuses the Band of pursuing.

As to the statement that Enbridge's brief attributes to an unnamed "NRD official," *see* Mem. at 3 (citing Trial Ex. 844), Enbridge knows full well that it was made by Tribal Historic Preservation Officer Edith Leoso. As Director Tillison testified, Ms. Leoso's "role is specific to Section 106 of the National Historic Preservation Act," not "the water quality technical review that the Band performs as to Enbridge's proposals[.]" Tillison Testimony, Tr. (10/25/22 a.m.) at 139:19–140:6. Enbridge makes no effort to explain the relevance of statements made by a Band employee who has no role in making water-quality-based decisions. The notes of the Band community meeting on February 13, 2019, Mem. at 6 (quoting Trial Ex. 724), are likewise of dubious relevance, as those notes were made nearly a year before Enbridge submitted its first application for Section 401 certification.

A smattering of curated emails and other internal statements stripped of any fair testimonial context hardly evidences a CWA violation, much less warrants the "abuse of … authority" accusation Enbridge levels at the Band. With each decision, the Band provided Enbridge with a written explanation of the decision and supporting documents explaining the

technical and scientific bases for its Section 401 determinations. *E.g.*, Trial Exs. 130, 132, 134, 137, 139, 145, 147. In the event that this Court determines it has jurisdiction to review the merits of the Band's actions, those documents form the core of the administrative record properly subject to review. *See Smith v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 97 F.3d 950, 955 (7th Cir. 1996) ("[T]he court reviews the administrative record as it stood when the agency acted, not extra-record material produced later in court."). Enbridge cites to nothing in them evidencing any abuse of authority or failure to follow the dictates of the CWA or the Band's own law, and their thorough explication of the bases for the Band's decisions belie Enbridge's charges regarding the same.

## III. Enbridge's Arguments Under the 1977 Transit Treaty Fail as a Matter of Both Law and Fact.

### A. Enbridge Has Waived Any Claim Under the 1977 Transit Treaty.

For the first time, Enbridge now requests affirmative relief under the 1977 Transit Treaty, arguing that the Court can order the Band to implement Enbridge's remediation proposals pursuant to the treaty's provisions. *Compare* Mem. at 8–10, *with* Def.'s Pretrial Br., Dkt. #449 (no invocation of treaty), Answer at 71–78 (no mention of treaty in counterclaims Counts IV and V), *id.* at 48 ¶ 29 (invoking treaty as part of its affirmative defense, not a counterclaim); and Defs.' Br. in Support of Mot. for Partial Summ. J. ("SJ Br."), Dkt. #231, at 14–18 (invoking treaty only as defense to Band's ejectment claim). By failing to plead any treaty-based causes of action, Enbridge has waived them. *See* Fed. R. Civ. P. 13(a); *Crown Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 35 F.3d 296, 300 (7th Cir. 1994) ("[C]ompulsory counterclaims … are waived when not filed along with the answer." (citation omitted)).

**B. The 1977 Transit Treaty Supplies No Private Right of Action and This Court Accordingly Lacks Jurisdiction Over Enbridge's Counterclaims.**

For this Court to exercise jurisdiction over Enbridge's new claim under the 1977 Transit Treaty, that treaty would have to supply a private right of action. *See Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir. 1990) ("A federal rule of decision is necessary but not sufficient for federal jurisdiction. There must also be a right of action to enforce that rule. Section 1331 does not furnish it." (citation omitted)); *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 841 (9th Cir. 2004) ("Because there was no federal cause of action for Sparta's claim, there would have been no jurisdiction predicated solely on 28 U.S.C. § 1331."). The 1977 Transit Treaty lacks such a right.

"[I]nternational agreements … generally do not create private rights or provide for a private cause of action in domestic courts." *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (citation omitted). "[A]n international agreement can be considered to create judicially-enforceable private rights only where such rights are contemplated in the agreement itself." *Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir. 2001); *see also McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008) ("To determine whether a treaty creates a cause of action, we look to its text.").

The 1977 Transit Treaty's text lacks any reference to a private party right of action, or to any enforcement of its provisions in domestic courts. To the contrary, Article IX sets forth the exclusive dispute resolution measures contemplated by the parties: "Any dispute between the Parties regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them," art. IX(1); and should such negotiations fail, "[a]ny such dispute which is not settled by negotiation shall be submitted to arbitration at the request of either party," art. IX(2). Enbridge has indeed declared to this Court that the 1977

Transit Treaty's arbitration clause provides the sole mechanism for interpretation and enforcement of the treaty's terms. "The Treaty also prescribes a specific procedure for the handling of disputes …. Any dispute 'over the [Treaty's] interpretation, application, or operation' shall be settled at the national level through negotiation and, if necessary, international arbitration." Defs.' Suppl. Br., Dkt. #357-1, at 1 (motion to file brief granted, Op. and Order, Dkt. #360, at 55).

Because the 1977 Transit Treaty does not confer a private right of action on Enbridge, this Court lacks jurisdiction to entertain Enbridge's treaty-based requests for relief.

**C. Enbridge's Counterclaims Fail on the Merits Because They Are Based on the Mischaracterization of Record Facts.**

Enbridge argues that the Band's permitting of four projects while thus far rejecting its remediation proposals at the meander shows that the Band does not "apply its environmental protection regulations in the 'same manner as for any other pipelines[.]'" Mem. at 8 (quoting 1977 Transit Treaty art. IV); *see also* 1977 Transit Treaty art. IV (regulation of pipelines "shall always, under substantially similar circumstances with respect to all hydrocarbons transmitted in similar pipelines … be applied equally to all persons and in the same manner"). Enbridge never explains why these projects are materially similar to its proposals at the meander, apparently relying on the Court to assume that to be the case. Mem. At 8–9. Such conclusory comparison merits dismissal.

By its terms, Article IV prohibits discrimination against transit (cross-border) as compared to domestic hydrocarbon pipelines. 1977 Transit Treaty art. IV. Three of the referenced projects—the Potato River Road Riprap Project, the Upper Vaughn Creek Riprap Project, and an HDD project associated with a Band drinking water facility—relate to road or bridge stabilization projects or drinking water infrastructure, and accordingly have nothing to do

with hydrocarbon pipelines. *See* Trial Ex. 1087 at PDF pp. 4, 7 (Potato River Road and North Vaughn Creek); Trial Ex. 1461 at PDF pp. 2–3 (Potato River Road and North Vaughn Creek); Tillison Testimony, Tr. (10/25/22 a.m.) at 136:21–137:13 (Diaperville Community Drinking Water HDD Project). On their face they cannot support Enbridge's claim of discrimination against its cross-border line.

The fourth referenced project involves riprap at a pipeline crossing; however, that pipeline transports natural gas, not crude oil and natural gas liquids (which Line 5 transports). *See* Mem. at 8 (invoking riprap project relating to the TC Energy (formerly known as TransCanada or Great Lakes Gas Transmission Company) natural gas pipeline). Enbridge never explains why these pipelines could be considered "similar" for purposes of Article IV's equal treatment provision. More fundamentally, the comparison fails because the TC Energy riprap project was installed in 2005–2006, at least three years before the Band attained Clean Water Act "treatment-as-state" (TAS) status from the EPA, *see* Trial Ex. 5, and five years before the Band's water quality review codes went into effect, *see* Trial Ex. 4. Enbridge cannot sustain an argument that the Band has failed to apply its environmental protection regulations "equally to all persons and in the same manner," 1977 Transit Treaty art. IV, by pointing to a single project approved by the Band years before the Band's current regulatory structure came into being.

Enbridge's equal-treatment arguments accordingly lack all merit.

## IV. Enbridge's Conditional Relief Argument Adds Nothing to the Mix.

Enbridge argues that the Court can condition an injunction "requiring removal of Line 5 after a certain time period or event and condition that relief on a duty imposed on the Band to comply with federal law[.]" Mem. at 10 (emphases omitted). None of Enbridge's cited cases stand for the proposition that limitations on a court's subject matter jurisdiction give way in the

context of injunctive relief. And the law is decidedly to the contrary. "[C]ourts lack authority to create equitable exceptions to jurisdictional requirements[.]" *Nestorovic v. Metro. Water Reclamation Dist.*, 926 F.3d 427, 430 (7th Cir. 2019). But even more to the point, Enbridge has entirely failed to establish (as demonstrated above) that the Band has acted in violation of the CWA or the 1977 Transit Treaty in its project determinations. As the Court knows, the Band would welcome an injunction "requiring removal of Line 5 after a certain time period," *id.*, and a condition that the Band follow the law would not alter that outcome.[8]

**V. Enbridge's Arguments Under the All Writs Act Fail as a Matter of Law.**

As a final gambit, Enbridge invokes the All Writs Act, 28 U.S.C. § 1651 ("AWA"), as "an additional source of authority," by which the Court can "operationalize the CWA and its standards in the form of an order requiring the Band to apply only lawful water quality standards" to Enbridge, and "operationalize the terms of the 1977 Transit Treaty" requiring non-discriminatory treatment of Enbridge, Mem. at 11, 13. The argument lacks all merit.

First, the AWA is not "an additional source of authority," *id*. at 11. "The authority to issue a writ under the All Writs Act is not a font of jurisdiction." *United States v. Denedo*, 556 U.S. 904, 914 (2009). Instead, "[t]he express terms of the Act confine the power of [a federal court] to issuing process in aid of its existing statutory jurisdiction; the Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999) (quotation marks and citation omitted); *see also*, *e.g.*, *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 367 (7th Cir. 1983)

[8] In its brief to filed be on November 4, 2022, responding to Enbridge's 1977 Transit Treaty brief, the Band will address more fully the scope and applicability of that agreement. For now, the Band will make just one further note. Enbridge's argument, see Mem. at 10 n. 7, that the 1977 Transit Treaty can override the Band's rights under the Band's 1854 Treaty, including its right to exclude outsiders who have been in conscious trespass on the Band's Reservation, has already been soundly rejected by this Court, SJ Br. at 42–43, and Enbridge provides no basis for revisiting that conclusion here.

("The intent of the Act is to effectuate established jurisdiction, not to enlarge it."). The AWA therefore cannot be used to "operationalize" Enbridge's otherwise inoperable claims under the CWA and the 1977 Transit Treaty.

Enbridge's case law is not to the contrary. *Virginia Department of Education v. Riley*, 23 F.3d 80 (4th Cir. 1994), involved the "rare" and "sparing[]" use of the AWA in favor of party "a party aggrieved by administrative actions *when the court would have full appellate jurisdiction* following a final agency decision." *Id.* at 83–84 (emphasis added). Similarly, in *Astrazeneca Pharmaceuticals LP v. Burwell*, 197 F. Supp. 3d 53 (D.D.C. 2016), the court acted under the AWA "to preserve the availability of meaningful judicial review," *id.* at 56, in a case arising "under the Administrative Procedure Act," *id*. at 54, where a final agency decision was imminent.

Second, although Enbridge has not specified which of the extraordinary writs it wishes for the Court to issue, what it seeks is clearly in the nature of a writ of mandamus, in that it asks the Court to compel the Band to apply certain standards purportedly set by the CWA and the 1977 Transit Treaty to Enbridge's Section 401 certification applications going forward. *See*, *e.g.*, *Miguel v. McCarl*, 291 U.S. 442, 451 (1934) (describing writ of mandamus as a court order "to compel action … in matters involving judgment and discretion"); *Byrd v. Comm'r*, No. 1:09-CV-102, 2009 WL 3100448, at *1 (E.D. Tenn. Sept. 23, 2009) ("A suit in mandamus seeks to compel government agents to perform an action."). Because this is so, Enbridge's plea for relief must clear the high bar for such writs. *See Miguel*, 291 U.S. at 452 ("The mandatory injunction here prayed for is in effect equivalent to a writ of mandamus, and governed by like considerations."); *see also Melton v. United States*, 359 F.3d 855, 857 (7th Cir. 2004) (regarding a writ of habeas corpus, "the name makes no difference. It is substance that controls.").

Under the AWA, "a party seeking a writ of mandamus bears the burden of showing that his right to relief is clear and indisputable." *United States v. Dorfman*, 690 F.2d 1217, 1224 (7th Cir. 1982); *Jarecki v. United States*, 590 F.2d 670, 674 (7th Cir. 1979) ("clear and free from doubt"). On the merits, Enbridge cannot meet this stringent standard under the CWA or the 1977 Transit Treaty for the reasons set forth above. *Supra* at 4–16. But there is another, equally fatal, bar to its argument: The Band and its officials are not federal entities. The mandamus statute—the restrictions of which Enbridge cannot escape by just failing to mention it—provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Under this plain statutory language, as the Ninth Circuit has explained, mandamus actions against non-federal entities "are frivolous as a matter of law." *Demos v. U.S. Dist. Ct. for E. Dist. of Wash.*, 925 F.2d 1160, 1162 (9th Cir. 1991); *Jackson v. Unknown*, Case No. 2:15-cv-06016-SJO-JC, 2015 WL 5156439, at *2 (C.D. Cal. Sept. 1, 2015) (same).[9]

Finally, Enbridge asserts that the circumstances of this case are so extraordinary as to warrant such a writ because "the situation at the Meander, the game of 'Russian Roulette,' and the lack of adequate alternative remedies—certainly earn the moniker 'exceptional,'" and because there exists "a real possibility that the parties will face similar disputes about the Meander going forward." Mem. at 13. Other than giving Enbridge an opportunity to reiterate its disparaging comments about a Band that has worked tirelessly to protect the water quality in the

[9] *See also*, *e.g.*, *Van Sickle v. Holloway*, 791 F.2d 1431, 1436 n.5 (10th Cir. 1986) ("We have no authority to issue such a writ to direct state courts or their judicial officers in the performance of their duties." (quotation marks omitted)); *Bennett v. City of Kingman*, 543 F. Supp. 3d 794, 802 (D. Ariz. 2021) ("Federal courts have no jurisdiction or authority … to issue mandamus to direct non-federal entities or officials in the performance of their duties." (quotation marks omitted)).

Bad River watershed, these conclusory statements add nothing to the mix. Like its arguments under the CWA and the 1977 Transit Treaty, Enbridge's claims under the AWA are replete with legal error, and no amount of rhetoric can alter that conclusion.

## CONCLUSION

For the foregoing reasons, Enbridge's requested relief lacks any legal grounding and should be rejected.

Dated: November 2, 2022

Respectfully submitted,

/s/ Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
KANJI & KATZEN, P.L.L.C.
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
lbraun@kanjikatzen.com
(734) 769-5400

Jane G. Steadman
Philip H. Tinker
Claire R. Newman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
jsteadman@kanjikatzen.com
ptinker@kanjikatzen.com
cnewman@kanjikatzen.com
(206) 344-8100

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
attorney@badriver-nsn.gov
(715) 682-7107

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE & WALLACE
126 S. Main Street
Ann Arbor, MI 48104
bwallace@hooperhathaway.com
(734) 662-4426

Oday Salim
NATIONAL WILDLIFE FEDERATION
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104
salimo@nwf.org
(586) 255-8857

Douglas M. Poland
David P. Hollander
STAFFORD ROSENBAUM, LLP
222 West Washington Avenue, Suite 900
Madison, WI 53701
dpoland@staffordlaw.com
dhollander@staffordlaw.com
(608) 256-0226

*Counsel for the Bad River Band of the Lake Superior Tribe of Chippewa Indians and Naomi Tillison, Director of the Mashkiiziibii Natural Resources Department of the Bad River Band, in her official capacity*