IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

                Plaintiff and
                Counter Defendant,

   v.

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

                Defendants and
                Counter Claimants,

   v.

NAOMI TILLISON,

                Counter Defendant.

OPINION AND ORDER
(Public Nuisance Claim and
Counterclaims)

19-cv-602-wmc

---

      Concerned about a potential failure of Enbridge Energy's Line 5 crude oil and liquid natural gas pipeline running through the Reservation of the Bad River Band of the Lake Superior Tribe of Chippewa Indians in northern Wisconsin, the Band brought this suit seeking to enjoin its continued operation under federal common law claims of public nuisance and trespass. At summary judgment, this court concluded that Enbridge had trespassed by operating the pipeline on expired rights-of-way on 12 parcels owned in whole or in part by the Band and dismissed Enbridge's breach of contract counterclaims, but denied either side summary judgment on the Band's public nuisance claim. (Dkt. #360.) After reviewing relevant expert reports, deposition designations and other voluminous, additional written submissions by the parties, the court held a trial to the bench on the Band's public nuisance claim and Enbridge's remaining counterclaims on October 24, 25

and 26, 2022.¹ Before issuing a final decision on the Band's public nuisance claim, the court will direct the parties to meet and confer on specific issues and submit a proposal to the court, as set forth below. However, the court will deny Enbridge's request for declaratory and injunctive relief on its counterclaims.

OPINION

I.     The Band's Nuisance Claim

Under federal common law, a public nuisance is a substantial and unreasonable interference with a right common to the general public. Restatement (Second) of Torts § 821B. Where, as in this case, the nuisance is not presently occurring, a plaintiff must generally prove that the substantial and unreasonable interference "is imminent" or "certain to occur." *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) (*Asian Carp II*). The Seventh Circuit has advised that this concept of "imminence" does not have a precise definition. Rather, there is "no meaningful legal difference" between "imminent" and such arguable synonyms as "immediate," "significant," "real," "unreasonable," or "greater than a reasonable [person] would incur." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 781–82 (7th Cir. 2011) ("*Asian Carp I*"). Thus, the ultimate question is whether a grave, irreparable harm is "sufficiently close to occurring" that the court "should order the defendants to take some new action that will be effective to abate the public nuisance." *Id*.

---

¹ At the end of this first phase of trial, the court went on to hear evidence for remedies as to Enbridge's ongoing trespass of the Band's territory, which will be the subject of a separate Opinion and Order.

2

Both parties presented evidence at trial establishing that the greatest known risk of a pipeline rupture is currently located at or near the meander where Line 5 crosses the Bad River:



(Fig 1: Line 5 crossing Bad River meander (Def's Demonstrative Ex. 4).)

Not only is there an actual risk of a significant rupture, but the negative impact in this area on the Bad River watershed and even Lake Superior itself could be catastrophic. Thus, the court finds that a rupture of Line 5 at the meander would be a substantial and unreasonable interference with the Band's and the public's rights. Indeed, the nearest, existing shutoff valves of Line 5 on either side of that meander are approximately 14 miles apart. Even if those shutoff valves were activated in time to prevent *any* release of additional crude oil and liquid natural gas ("NGL"), a failure of the line would likely not prevent the roughly 20,000 gallons of crude oil and NGL constantly contained in that stretch of pipe from being released into the Bad River, absent sufficient time to purge it

3

into a fleet of trucks before the pipe failed.[2]

Still, although there are various reasons why Line 5 seems likely to fail the meander at some point, the Band has yet to prove its right to an immediate entry of injunctive relief, and particularly its right to an injunction immediately stopping the operation of Line 5 altogether. *First*, whether a rupture of Line 5 is "imminent" or "certain to occur" remains open to reasonable debate, as illustrated by much of the evidence at trial. There are actually three, separate ways that the pipeline might fail at the meander:



(Fig 2: Potential pipeline failure at Bad River meander (PEX. 70, at 4).)

The least likely, identified as "channelization" on Figure 2 above, is that one of the

---

[2] Enbridge offered substantial evidence of shut off and purge protocols, as well as possible mediation efforts in the event of a spill, but there remains at least some risk of a much larger spill than 20,000 gallons because the shut down and purge protocols take time to complete. While Enbridge claims to be much better prepared now, one need look no further to appreciate the potential damage than the spill of over one million gallons into the Kalamazoo River in 2010, after the failure of another of Enbridge's pipelines, which was similarly built in the 1950s.

4

current flood channels through the meander's toe could become sufficiently worn that the pipe is exposed, and eventually the area below the pipe is scoured by a perpendicular current, creating a free standing, unsupported span of pipe subject to failure by metal fatigue and vibrations.[3]  The parties presented conflicting evidence as to how far that span would have to be:  plaintiff's experts suggested that the pipe would lose its ability to "flex" without causing permanent damage and a catastrophic failure at approximately 60 feet, while Enbridge's protocol claims no substantial risk until an unsupported span reaches 90 to 100 feet.  The next (and only slightly more likely) risk, identified as "scour" on Figure 2, is a similar, perpendicular scouring event at the bottom of the river bed, in which pipe now buried under the riverbed sufficiently exposed to erosion to create a substantial, unsupported span and perpendicular current.  Finally, as the court found at trial following the close of evidence on the Band's public nuisance claim, the third possibility -- horizontal erosion at the meander's river bank closest to the pipeline (identified as "historical bank erosion" on Figure 2) -- poses the greatest current risk of rupture of Line 5 within the Reservation.

Even at this location, however, there still remains approximately 26 or 27 feet of riverbank between the Bad River shoreline and Line 5 at its nearest point, a distance that, although alarmingly significant given annual average erosion, has remained stable for three straight years as a result of below average flooding and the serendipitous formation of a

---

[3] Under a perpendicular "channel scouring" scenario, the possibility of vibrations stressing the pipe becomes more concerning, but then the metal failure risk caused by the free span is reduced by support of the water below the pipe.

small gathering of fallen trees directly upstream.



(Fig 3: View across meander (WWE Rep. (dkt. #268-1, 27).)  In their reports and at trial, the parties' experts offered differing opinions regarding the probable annual rate of future horizontal erosion, what flood events could affect that rate, and whether Enbridge's current shutdown and purge protocols are sufficient to prevent a major, crude oil spill.  Similarly, the experts offered conflicting evidence and differing opinions regarding the efficacy of remediation projects proposed by Enbridge to slow the rate of erosion at the meander.

Under current conditions, therefore, the court has yet to find that the Band has established that a public nuisance is imminent at the meander.  This is mainly because a worst-case flooding scenario -- consisting of *more* than the so-called 1-in-500-year flood that last occurred in 2016, *or* more likely, a series of major floods -- capable of causing sufficient

6

horizontal erosion for the Bad River to *approach* the pipe at the meander, is still unlikely to then scour suddenly and immediately an additional span of 65 to 100 feet of unsupported pipe necessary to raise legitimate, imminent concerns about its structural integrity. Thus, the risk of a catastrophic failure of the pipeline at the meander remains thankfully at least a year away. Given heightened monitoring, so, too, it remains likely that Enbridge would be able to recognize the risk of an imminent failure in time to shut down the current 14-mile stretch of vulnerable pipeline between shutoff valves *and* to purge its contents, so that more dubious, large-scale containment and recovery efforts would not be necessary.

A *second*, ongoing question is whether *Enbridge's* actions or inaction might cause a failure of Line 5 within the Reservation. *See*, *Asian Carp II*, 758 F.3d at 900. Defendant must be responsible for *causing* an unreasonable interference with a public right to be held liable. By itself, Enbridge's operation of a pipeline carrying crude oil and NGL is not a public nuisance. The Band obviously recognizes this, as its claim has boiled down to an assertion that the public nuisance here is the *threat* of a rupture at the meander, and more specifically that Enbridge has failed to take reasonable steps to address that threat.[4]

However, the evidence presented to the court at trial established that Enbridge *has* made, and continues to make, efforts to prevent a rupture of Line 5 at the meander, and thus, to abate a potential public nuisance, including: (1) implementing a more robust and timely shutdown and purge plan at the meander, with additional, real time video

---

[4] The concept of "reasonableness," and the reasonableness of a defendant's actions in particular, is discussed repeatedly in the Restatement (Second) of Torts' chapters on nuisance liability. *Eg.*, § 838 (defendant may be liable if he "fails to exercise reasonable care to prevent the nuisance"); § 839(c) (defendant may be liable if "he has failed after a reasonable opportunity to take reasonable steps to abate the condition").

monitoring and spacing of additional warning monuments at that location; (2) to install emergency flow restricting device shutoff valves (EFRDs) to reduce the exposed stretch from 14 to 5 miles and the risk of a crude oil spill to as little as 6,000 gallons; (3) speeding up the purging of even that amount before the pipeline fails at the meander; (4) proposing various remediation plans to slow erosion at the meander, including rip rap and tree revetment projects; and (5) purchasing all necessary easements, designing a reroute, acquiring pipe, and pursuing the required permits to relocate Line 5 outside the Band's territorial limits (though not its watershed).[5]

---

[5] The unrebutted testimony at trial was that Enbridge now holds 100% of the necessary easements from landowners to reroute Line 5 around the entire Bad River Reservation, if barely so at its southwest and southeast corners and well within the Bad River watershed. Enbridge has also stockpiled some $80 million in necessary materials to begin installation of this reroute. However, none of the environmental permitting is in place to begin construction, which will likely take a few years to obtain from state and federal officials under a best-case scenario and could be denied entirely under a worst case given environmental and political opposition, including, as is its right, by the Bad River Band itself.



(Fig 5: Proposed reroute (PEX 11).

For its part, the Band presented evidence and argument that Enbridge's current processes are inadequate, and its remediation proposals are unlikely to go forward because they are environmentally unreasonable and will ultimately be ineffective. The Band also objects that Enbridge's proposed abatement projects would result in a continuing trespass on the Band's lands. In particular, Enbridge's rip rap and tree revetment proposals would require a significant portion of work and placement of revetment material on parcel 430-S13, a parcel on which Line 5 already runs, but on which Enbridge no longer has a valid easement and on which the Band possesses a 50.79% interest. Despite the Band's objections, however, these efforts by Enbridge *are* relevant to whether it has caused a

9

substantial, unreasonable and imminent interference with public rights. *See Asian Carp II*, 758 F.3d at 904 (efforts by Corps to address threat of invasion by Asian carp were relevant to analysis of public nuisance, including in particular, the Corps' "diligent efforts to find the solution best suited to accommodating the competing concerns").

*Third*, in balancing the relevant equities, the court finds that the Band's failure to engage meaningfully with Enbridge in addressing the risk of further erosion at the meander and developing acceptable shutoff and purge protocols, including the installation of new EFRDs closer to the meander, is relevant to the nuisance analysis, as well as the appropriateness of immediate injunctive relief. In considering the balance of harms, *Asian Carp I*, for example, the Seventh Circuit, faulted the plaintiffs for having "adopted a rather insouciant attitude" about the potential costs of their proposal, as well as for "scoffing at the defendants' concerns about the costs of relief . . . when they apparently feel no obligation to contribute to the costs of averting this crisis." 667 F.3d at 794. Similarly, in this case, the Band has downplayed the potential for significant economic impacts of its preferred solution (a shutdown of Line 5), while rejecting opportunities to collaborate with Enbridge on potential remediation plans at the meander.

Indeed, some of the remediation plans, including rip rap, have been used to successfully address similar erosion problems on the Bad River, and on other waterways throughout the country, and the proposed, additional EFRDs could significantly reduce the environmental impacts of a spill at the meander. Rather than confer with Enbridge on these proposals, the Band has to date taken the position that the *only* other solution to prevent an imminent rupture from occurring at the meander besides a permanent

shutdown would be to adopt a shutoff and purge of the pipeline as soon as it is within 20 feet of the river, despite the evidence at trial showing that no more than erosion of 6 or 7 feet at the river's shoreline is likely to occur by next spring, and worst case scenario is unlikely to approach, much less result, in immediate scouring of some 60 to 100 feet below the pipe sufficient to threaten its integrity. Nevertheless, the Band's alternate injunction would effectively require an automatic, permanent shutdown of Line 5 without any possibility of remediation at the meander.

    Before adopting such draconian injunctive remedies, therefore, the court must consider what alternative steps, however imperfect (particularly in the longer run), would reduce the risk of an oil spill in the near term, while also preserving operation of Line 5 for those areas of the United States and Canada that currently depend upon it. In doing so, the court readily acknowledges that the Band's National Resource Department ("MNRD") has already considered these alternatives and provided reasons for refusing to permit them. However, on each occasion, the MNRD appears to have failed to weigh the flaws in those alternatives against the risks of a possible pipeline failure at the meander, which could obviously result in a far greater environmental disaster than anything proposed by Enbridge as remediation. In fact, while *none* of Enbridge's proposals provide permanent solutions to a possible failure at the meander (short of a complete reroute), each at least appears to forestall that risk at *relatively* limited costs to the Band's natural resources as compared to a catastrophic pipe failure or a massive reroute still within the Band's watershed.



Fig 4: Enbridge's most recent rip rap remediation proposal at meander (DEX 1264, at 3).

For all of these reasons, the Band has not yet shown that its specific shutdown and purge plan, much less an immediate shutdown of Line 5, is the best or even a reasonable way to prevent a catastrophic rupture of Line 5 in the near term after balancing all the interests of the Band and the public. *See Asian Carp II*, 758 F.3d at 905–06 (concluding that plaintiffs' request for specific solution to stop invasion of Asian carp did not satisfy requirements for obtaining equitable relief because there were "a host of competing concerns" that the Corps had to consider in adopting a particular plan). Even so, the court has concerns about whether EFRDs, rip rap, or some other remediation

plan could be in place before the next, serious flooding event that will surely cause further, substantial erosion at the meander and increasingly threaten the pipe's integrity. The court also remains concerned that Enbridge's current shutoff and purge plan is not sufficiently conservative, given the catastrophic damage a rupture might cause, both to be Bad River watershed and conceivably Lake Superior. Accordingly, before the court enters a final decision on the Band's public nuisance claim, it will direct the parties to meet and confer regarding: (1) the installation of EFRDs on Line 5 on the Reservation; (2) an appropriate shutdown and purge protocol should conditions worsen at the meander; and (3) other reasonable remediation projects that could inhibit further erosion at the meander. If they still cannot agree on a reasonable plan, each should submit their own last, best offer on the shutoff and purge protocols, and the court will consider whether it is appropriate to issue an injunction requiring Enbridge to adopt a plan.

## II. Enbridge's Counterclaims and Request for Injunctive Relief

During the public nuisance phase of trial, the parties also presented evidence relevant to Enbridge's remaining counterclaims IV and V for declaratory and injunctive relief, both of which allege that the Band and Naomi Tillison, the director of MNRD, have unreasonably and unlawfully denied Enbridge access to Line 5 to conduct operations, inspections and maintenance. (Counterclaims IV & V (dkt. #146) 71–78.) Both before and during trial, the court directed Enbridge to point to legal authority that would permit the court to order the declaratory and injunctive relief Enbridge requests -- specifically, an order requiring the Band and Tillison to permit Enbridge access to tribal lands to perform specific maintenance tasks or to facilitate remediation at the meander. Enbridge has now

13

filed a brief (dkt. #589), arguing that the Clean Water Act, the Transit Pipelines Treaty[6] and the All Writs Act, 28 U.S.C. § 1651, provide the court with authority to require the Band and MNRD to comply with all applicable federal law. However, the court is not persuaded by any of Enbridge's arguments.

To begin, Enbridge argues that the court can enjoin the Band because the denials of Enbridge's proposed meander projects exceed the scope of its Clean Water Act authority. Specifically, Enbridge argues that the Band used "false water quality pretexts" in unfairly reviewing and denying Enbridge projects. (Dkt. #589, at 5.) Unlike the cases cited by Enbridge (dkt. #589, at 4), however, Enbridge did *not* bring a claim in this case challenging a particular permit denial as improper under the Clean Water Act. Certainly, the MNRD's consideration of Enbridge's remediation proposals is relevant to the balance of equities and the nuisance analysis as just discussed above, but the evidence at trial did *not* establish that MNRD's denials of Enbridge's proposals exceeded the Band's Clean Water Act authority. Rather, Director Tillison's testimony and underlying documents supporting the Band's denial of Enbridge's various proposals provided detailed reasons why both believed that Enbridge's proposals would threaten water quality in the Bad River watershed.

Next, Enbridge argues that the court should issue an injunction requiring the Band to comply with the Transit Treaty, which prohibits public authorities from "institut[ing] any measures . . . which would have the effect of impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." 1977 Transit

---

[6] *Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Treaty").

Treaty, 1977 WL 181731, art. II, IV. Again, however, Enbridge did not bring a counterclaim alleging that the Band had violated the Transit Treaty, nor could it since Enbridge is not a party to the Transit Treaty, and nothing in the Treaty suggests that a private entity could bring a cause of action to enforce it or even that it may be enforced in federal court. Instead, the signatory countries may bring claims under the Transit Treaty pursuant to a specific arbitration process, as Canada has done with respect to Line 5. Moreover, the evidence at trial did not establish any violation of the Transit Treaty, which specifically states that, "notwithstanding the provisions of Article II," international pipelines "shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline" with respect to matters of "environmental protection." 1977 Transit Treaty art. IV (emphasis added). Thus, the Band has not violated the Transit Treaty by rejecting Enbridge's remediation proposals based on environmental and water quality concerns.

Finally, the All Writs Act, 28 U.S.C. § 1651, does not give this court authority to enjoin the Band as Enbridge requests. The All Writs Act allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but it does not create a cause of action or provide a source of subject matter jurisdiction. *United States v. Denedo*, 556 U.S. 904, 914 (2009). Rather, before invoking its authority under the All Writs Act, the court would need to conclude that Enbridge was entitled to injunctive relief on its counterclaims under some tenable legal theory. Despite repeated opportunities to do so, Enbridge has still failed to identify such a theory, except by asserting the court's vague authority to "operationalize" the Clean Water Act and Transit Treaty.

However, as discussed, Enbridge has failed to establish that it is entitled to relief for any violation of the Clean Water Act, the Transit Treaty or on any other legal claim.

In sum, the court has and will continue to consider the Band's request for injunctive relief to abate a public nuisance under the procedure set forth below, but will not enter injunctive relief against the Band on Enbridge's counterclaims.

ORDER

IT IS ORDERED that:

1. By December 17, 2022, the parties shall meet and confer regarding: (1) the installation of EFRDs on Line 5 on the Reservation; (2) an appropriate shutdown and purge protocol should conditions worsen at the meander; and (3) other reasonable remediation projects that could inhibit further erosion at Line 5.

2. By December 24, 2022, the parties shall submit a joint proposal to the court regarding an appropriate shutoff and purge plan for the meander, *or* if they cannot agree on a joint proposal, each should submit their own last, best offer on a shutoff and purge protocol.

3. Enbridge's request for declaratory and injunctive relief on its counterclaims IV and V is DENIED.

Entered this 28th day of November, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge