**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION<br><br>*Plaintiff*,<br><br>v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.<br><br>*Defendants*.<br><hr>ENBRIDGE ENERGY, L.P.<br><br>*Counter-Plaintiff,*<br><br>v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity<br><br>*Counter-Defendants.* | Case # 3:19-cv-00602<br><br><br><br><br><br><br>Judge William M. Conley<br>Magistrate Judge Stephen Crocker |

**ENBRIDGE'S MOTION FOR PROTECTIVE ORDER
TO SEAL THE PARTIES' SHUTDOWN-AND-PURGE SUBMISSIONS**

Pursuant to Federal Rule of Civil Procedure 26(c)(1) and the parties' stipulated amended protective order (Dkt. 226-1), Defendants Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership (collectively "**Enbridge**") hereby seek a protective order to seal the parties' most recent December 23, 2022 shutdown plan-related filings.

Specifically, Enbridge requests that this Court:

- Keep under seal Enbridge's currently implemented June 2021 "Monitoring and Shutdown" plan (the "**Existing Plan**"), which was filed under seal in connection with

1

- Enbridge's "last, final offer" for a monitoring, shutdown and purge protocol for the Meander (the "**Offer**"). The Existing Plan falls squarely within the scope of "confidential" under the Protective Order, has been filed under seal multiple times pursuant to its confidentiality designation without objection, and should continue to be so treated for the reasons set forth in this Motion.

- Keep under seal both parties' briefs and accompanying submissions (collectively the "**Offers**") regarding their respective "last, best offers" regarding monitoring, shutdown and purge protocols applicable to Enbridge operations at the Meander for two key reasons:

    - *First,* the Court asked the parties to confer privately on risk reduction mechanisms, and merely "submit" a potential "joint proposal" or respective Offers (as opposed to file). Publicly filing the Offers would be tantamount to compelling the parties to negotiate Enbridge's operational procedures in public and disclose settlement-like submissions. Not only are these Offers the product of modifications made to the confidential Existing Plan, which is a sensitive and location-specific emergency response plan, but these proposals were also the subject of good faith, confidential discussions among the parties' engineers and experts in an effort to potentially reach a "joint proposal" requested by the Court.

    - *Second,* there is good cause to protect the sensitive nature of Enbridge's Existing Plan, as part of Enbridge's family of confidential, operational plans, and the Offers which could become part of that family of operational and emergency response plans. These documents are not typically shared outside the company, except with its regulators who also protect the sensitive nature of this "critical energy infrastructure information," in large part because disclosing these plans could make Line 5 more vulnerable to physical attack.

- To be consistent in keeping the same information and documents protected, seal or redact the Court's upcoming order(s) that may address or analyze the substance of Enbridge's Existing Plan or the parties' Offers. This is consistent with the same grounds as described above and herein, including the same operational security concerns.

**BACKGROUND**

On November 28, 2022, this Court issued an interim Opinion and Order after considering evidence at the bench trial, concluding in relevant part that (i) "the Court has yet to find that the Band has established that a public nuisance is imminent at the meander," (ii) "the Court finds that the Band's failure to engage meaningfully with Enbridge in addressing the risk of further erosion at the meander and developing acceptable shutoff and purge protocols . . . is relevant to the

2

nuisance [and injunctive relief] analys[e]s," (iii) "the Band has not yet shown that its specific shutdown and purge plan . . . is the best or even a reasonable way to prevent a catastrophic rupture of Line 5 in the near term after balancing all the interests," and (iv) "the court must consider what alternative steps, however imperfect (particularly in the long run), would reduce the risk of an oil spill in the near time, while also preserving operation of Line 5 . . . ." Dkt. #612 at 6, 11-12. The Court then ordered the parties to promptly "meet and confer" on three risk reduction possibilities, namely (1) valve installation to minimize any released product, (2) "reasonable" erosion prevention projects, and (3) "an appropriate shutdown and purge protocol should conditions worsen at the meander." *Id.* at 16. The Court further ordered the parties to submit a joint proposal to the court regarding an appropriate shutoff and purge plan for the meander, *or* if they cannot agree on a joint proposal, submit their own last, best offer on a shutoff and purge protocol. *Id.*

In compliance with this Order, the parties met multiple times, during which the Band, its "outside subject matter experts" and Enbridge's "internal subject matter experts" conferred on risk reduction possibilities. These conversations were held pursuant to a "strict confidentiality agreement" under which the parties reported to the Court that discussions on each topic were held in good faith, the parties were unable to reach agreement on a "joint proposal" and would submit separate "last, best offers," as instructed by the Court. *See* Dkt. #614 at 2.

On December 23, 2022, the parties each submitted under seal a "last, best offer" on their respective proposal. Enbridge's submission included its brief describing the Enbridge Offer,[1] which included a proposed operational document, a declaration of a company pipeline engineer involved in its creation, and Enbridge's Existing Plan for reference. *See* Dkt. # 615, 616, 616-1,

---

[1] As explained in its accompanying brief (Dkt. #616), Enbridge's "Offer," like other plans Enbridge maintains on its system, is rooted in principled risk and safety assessments by its Pipeline Integrity and Operations personnel. Such assessments were conducted consistent with federal pipeline safety rules, as explained in the Declaration of Andrew Duncan (Dkt. #615) submitted with the Offer.

616-2.  The Enbridge Offer was developed by its pipeline integrity and safety engineers who are well aware of the need to conform any plan to their regulator's safety requirements.  Dkt. #615.

The Band, for its part, submitted a "last, best offer," along with a brief and corresponding explanatory document.  *See* Dkt. # 617, 618.  Enbridge submitted its Offer and accompanying documents under seal because they contain confidential, security-sensitive information and because these submissions are tantamount to disclosing confidential negotiations that were discussed in an effort to design a joint proposal as requested by the Court.

Earlier in this litigation, the parties entered into, and this Court approved, an amended stipulated Protective Order.  *See* Dkt. #226-1; Dkt. #229 (granting proposed protective order).  Among other categories of information, the Protective Order squarely defines the Existing Plan and similar types of "emergency response plans," non-public "asset data" and "company procedures concerning asset operations" as "Protected Information":

- "[E]mergency response plans, including data and information generated in the course of preparing and implementing such plans";
- "[P]roprietary technical, research, and/or development information";
- "[A]sset data (including non-public and/or commercially sensitive information, data and/or information about assets such as pipelines or property rights or interests, including their design and location)"; and
- "[C]ompany procedures or processes concerning asset operations and maintenance."

Dkt. # 226-1 ¶¶ 10, 12.

The stipulated Protective Order requires filing any document "which refers to or contains any Protected Information[,] shall be filed under seal." *Id.* ¶ 37.  If the parties are unable to agree to proposed redactions for documents after it is filed under seal, the party seeking to maintain

4

confidentiality over the Protected Information can file a motion with the Court to demonstrate that the information warrants remaining sealed. *Id.*

Prior to filing its Offer, Enbridge counsel asked the Band to also file its "last, best offer" submission under seal, which it agreed to do. Since submitting their respective Offers, Enbridge and the Band have met and conferred numerous times to discuss sealing or redacting the submissions from public filing. The Band agreed that location-specific data (*i.e.,* identifying pipe infrastructure (valve sites) and sites for purge and/or shutdown activity) should be redacted as critical energy infrastructure information, as required by federal statute. At trial, this Court similarly agreed to seal exhibits that disclosed these location-based, sensitive details. *See, e.g.*, Dkt. #607 (10/25/2022 PM Trial Tr.) at 62:7–25 (sealing Enbridge's annual pipeline integrity assessment report because it identifies particular location-based details of Line 5); Dkt. #608 (10/26/2022 PM Trial Tr.) at 114:13–23 (deeming an exhibit revealing locations of tactical control points as "sealed as long as it is security-related" during examination of Enbridge's oil spill prevention and response protocols). However, the Band did not agree that the Existing Plan as a whole and the substantive components of the parties' "last, best offers" should also be sealed.

As a result of this impasse, Enbridge moves this Court for a protective order to protect from public disclosure any mile post markers, critical infrastructure locations, Enbridge's Existing Plan, and each party's "last, best offer" for a shutoff and purge plan for the Meander

**LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 26(c)(1)(A), the Court may "for good cause" enter an order to protect a party by "forbidding the disclosure or discovery" of certain information or documents. FED. R. CIV. P. 26(c)(1)(A). The Court may also "for good cause" enter an order "requiring that a trade secret or other confidential research, development, or commercial

5

information not be revealed or be revealed only in a specified way." FED. R. CIV. P. 26(c)(1)(G). Specifically, "documents that are shown to contain . . . 'other information' that would cause undue private or public harm if disclosed . . . may be kept under seal." *ABS Global, Inc. v. Inguran, LLC*, 14-cv-503-wmc, 2017 U.S. Dist. LEXIS 51754, at *2 (W.D. Wis. Apr. 5, 2017); *ForMax Inc. v. Alkar-RapidPak-MP Equip., Inc.*, No. 11-C-0298, 2014 WL 792086, at *2–3 (E.D. Wis. Feb. 25, 2014). "[A] party seeking such relief must explain how disclosure would cause harm and why the harm predicted warrants secrecy." *Id.* at *3 (E.D. Wis. Feb. 25, 2014). The interest in secrecy is weighed against competing interests on a case-by-case basis. *Central Nat'l Bank v. U.S. Dep't of Treasury*, 912 F.2d 897, 900 (7th Cir. 1990).

## ARGUMENT

### I. The Existing Plan Should Remain Sealed

Enbridge's Existing Plan was filed as an attachment to Enbridge's submission and is the starting point for these "last, final offers." Good cause exists for keeping Enbridge's Existing Plan sealed for several reasons, namely (1) the information constitutes "critical energy infrastructure information" or "CEII," which is protected by from public disclosure, (2) the Existing Plan is a site-specific, security-sensitive emergency response plan that was shared with the Band as a protected document through the governing protective order to ensure its confidentiality, and (3) the Band has *never* objected to its treatment of confidentiality and as a sealed document throughout this litigation until now.

#### A. The Existing Plan Is A Non-Public, Emergency Response Procedure Governing Critical Energy Infrastructure

First, good cause exists to protect the Existing Plan because it constitutes "critical energy infrastructure information" that could be used to attack or interfere with the Line. Federal statute allows for "critical energy infrastructure information" (CEII) to be protected from public

disclosure. *See* 18 C.F.R. § 388.113(c)(2)(iii). CEII is defined as "specific engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure" related to the transportation of energy that "[c]ould be useful to a person in planning an attack on critical infrastructure" and thus, is "exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552." Such information is withheld from public disclosure to prevent adversaries from using the information to target and damage or destroy pipeline critical infrastructure. *See, e.g., id.* § 388.113(h) ("Unauthorized disclosure of CEII is prohibited.").

Pipelines have been increasingly subject to both physical and cyberattacks, and the federal government, notably through the Transportation Security Administration (TSA), has expressly acknowledged that pipelines are particularly vulnerable to physical attacks:

> According to [the Transportation Security Administration within the Department of Homeland Security], pipelines are vulnerable to physical attacks—including the use of firearms or explosives—largely due to their stationary nature, the volatility of transported products, and the dispersed nature of pipeline networks spanning urban and outlying areas. The nature of the transported commodity and the potential effect of an attack on national security, commerce, and public health make some pipelines and their assets more attractive targets for attack. Oil and gas pipelines have been and continue to be targeted by terrorists and other malicious groups.

U.S. Gov't Accountability Off., GAO-19-48, *Critical Infrastructure Protection Actions Needed to Address Significant Weaknesses in TSA's Pipeline Security Program Mgmt.*, pp. 10-11 (Dec. 2018) (emphasis added), *available at* https://www.gao.gov/assets/700/696123.pdf. The GAO has also concluded that the more than 2.7 million miles of pipelines that provide fuel to the economy operate under the risk of "malicious physical attack." GAO-19-426, *Critical Infrastructure Protection: Key Pipeline Security Documents Need to Reflect Current Operating Environment*, available at https://www.gao.gov/assets/gao-19-426.pdf. TSA has also adopted Pipeline Security Guidelines for pipeline operators due to the importance of pipelines to the nation's economy and of their vulnerability. *See* https://www.tsa.gov/sites/default/files/pipeline_security_guidleines.pdf

Further, Enbridge's regulator, the Pipeline and Hazardous Materials Safety Administration (PHMSA) does not disclose safety-sensitive information received from regulated pipeline operators, as discussed further below.

The Existing Plan is an internal, sensitive emergency response plan. It is a location-specific protocol that is part of the larger family of Enbridge's system-wide plans and procedures governing integrity management and emergency response. *See* Dkt. #620 ¶¶ 3, 7, 8 (Feb. 21, 2023 Declaration of Andrew Duncan, *hereinafter* "Duncan Decl."). As an emergency response procedure, it identifies the Line's vulnerabilities and "[c]ould be useful to a person in planning an attack on critical infrastructure." Further, unlike system-wide plans, the Existing Plan is appliable to a specified area of the Line, increasing the potential usefulness of the Plan to those who seek to attack or disrupt the operation of critical infrastructure. *See id.* ¶ 7.

For example, the Existing Plan contains specific location-based information – identifying valve sites or other facilities and locations that are utilized as part of shutdown and purge procedures for Line 5 at the Meander – that would more easily create a target for physical attack. This Court has previously protected similar, location-based details from public disclosure on this same ground. *See, e.g.*, Dkt. #607 (10/25/2022 PM Trial Tr. at 62:7–25) (sealing Enbridge's annual pipeline integrity assessment report because it identifies particular location-based details of Line 5); Dkt. #608 (10/26/2022 PM Trial Tr. at 114:13–23) (deeming an exhibit revealing locations of tactical control points as "sealed as long as it is security-related" during examination of Enbridge's oil spill prevention and response protocols). The Band agrees that location-based information, such as specific milepost markers and facilities, that are identified both in the Existing Plan and the parties' offer submissions should remain non-public.

Enbridge is diligent in protecting its family of operational plans and procedures particularly because each plan, at a minimum, contains information that is either required to be secret as a matter of law or because it "reflect[s] sensitive information about the locations, ongoings and operations of [Enbridge's] liquid pipelines." *Id.* ¶¶ 4, 5, 10.  These plans, including the Existing Plan, are not typically shared outside of the company except with federal regulators, such as PHMSA.  *Id.* Enbridge has ensured that the Existing Plan is treated as "Protected Information" pursuant to the parties' protective order in this case as discussed *infra*.  And even PHMSA seeks to protect non-public operator protocols when they are shared with the agency.  *Id.* ¶¶ 5-6.

To be sure, if Freedom of Information Act (FOIA) requests are made for Enbridge's plans and procedures, PHMSA often relies upon an exemption to FOIA disclosure to protect Enbridge's operational procedures.  The D.C. Circuit has concluded that a federal agency was prohibited from disclosing pipeline operator "blueprints, maps and emergency plans" where a FOIA request is made for such documents.  *See Pub. Emps. for Env't Resp. v. U.S. Sec., Int'l Boundary & Water Comm'n*, 740 F.3d 195, 206 (D.C. Cir. 2014) (hereinafter "*PEER*") (parties "will ordinarily be able to satisfy Exemption 7(F) for documents relating to critical infrastructure, such as blueprints, maps, and emergency plans.").

In *PEER,* the D.C. Circuit affirmed the district court's decision that the federal government permissibly withheld "emergency action plans" and "inundation maps" for two damns along the U.S.-Mexico border.  *See id.* at 198-99.  In doing so, the court was required to balance the competing interests between protecting information created by the operator of critical infrastructure and the public's desire to "review sensitive information," much like the Court is tasked to do here.  *Id.*  The D.C. Circuit concluded that (1) the emergency action plans, which "contain guidelines that inform emergency personnel how to manage a dam failure at Amistad

9

Dam or Falcon Dam from 'event detection to termination,'" and (2) inundation maps "displaying the downstream areas and populations that would be affected if the dams were to break," constituted "sensitive information [that] could be misused for nefarious ends." *Id.* at 203-06. This appellate court could withhold the documents based on the determination that the record's release "could reasonably be expected to endanger the life or physical safety of any individual." *Id.*

This Court has also previously held in other cases that information that poses safety and security risks if disclosed must be protected and kept confidential. *See Sheppard v. Walker*, No. 12-cv-703-wmc, 2015 WL 1000000, at *1 (W.D. Wis. Mar. 6, 2015) (sealing materials that "could present security and safety concerns"); *ABS Global, Inc.*, 2017 U.S. Dist. LEXIS 51754, at *2; *Lewis v. Henneman*, No. 16-cv-733, 2018 WL 611794, at *2 (W.D. Wis. Jan. 29, 2018).

Just like the emergency action plans in *PEER,* Enbridge's Existing Plan (as well as any proposed plans such as describe *infra*) contains detailed instructions "that inform emergency personnel how to manage [potential pipeline failure] from event detection to termination." *Id.* And the vulnerabilities to operation of Enbridge's Line are not merely speculative. There have been several instances in recent years of criminal damage to property and tampering with Enbridge's assets in the United States and Canada. *See* Duncan Decl. ¶ 11. That same risk patently exists here where there is public knowledge of a pipe's specific location and ongoing construction or activity (such as monument monitoring) in that area related to the Line's operations. Moreover, Enbridge cannot easily secure or protect the Line at the Meander when it requires permission from the Band to access the Reservation and this remote area in particular, making the vulnerabilities to Enbridge's operations in this location all the more appreciable.

10

### B. The Protective Order Plainly Reflects the Parties' Agreement to Keep The Existing Plan Sealed

The Existing Plan is also squarely protected under the terms of the parties' stipulated Amended Protective Order (the "**Protective Order**"). *See* Dkt. #226-1. The Protective Order defines "Confidential Information" to include "company procedures or processes concerning asset operations and maintenance"; "proprietary technical, research, and/or development information"; and "emergency response plans, including data and information generated in the course of preparing and implementing such plans." Dkt. #229.[2] As discussed above, Enbridge has continued to protect the Existing Plan, in part, because it constitutes both an operational "company procedure" and an "emergency response plan," and Enbridge rarely shares its operational plans outside the company (particularly site-specific plans of this nature). *See* Duncan Decl. ¶¶ 7, 10, 11, 15.

The parties entered into this Protective Order with a clear understanding that the Existing Plan is one of the "company procedures" and "emergency responses plans" that required, and warrants, protection from being shared outside of the Band in this litigation. The Existing Plan was developed and then shared with the Band under circumstances in which Enbridge had a legitimate expectation of confidentiality: the parties first discussed the possibility of a "monitoring, shutdown and purge plan" as an enhanced protection pursuant to a confidential mediation in 2019. Dkt. #601 (10/26/22 AM Trial Tr.) at 149:14-150:7. After the Band asserted a public nuisance claim, Enbridge developed this Plan and shared it with the Band—under the original protective

---

[2] It is consistent with the Protective Order entered in this case to maintain confidentiality of protected information throughout the duration of this action. *See* Dkt. #226-1 ¶ 49 ("[T]he obligations of this Amended Protective Order shall survive the termination of the Action and continue in full force and effect . . . [and] may not be waived or terminated absent written agreement by the undersigned parties hereto or by an order of the Court for good cause shown."); *GQ Sand, LLC v. Range Mgmt. Sys., LLC*, 278 F. Supp. 3d 1115, 1123 (W.D. Wis. 2017) (Conley, J.) (holding that a protective order entered by the Court remains in effect post-trial and post-judgment).

11

order that defined "Confidential Information" the same way—to inform it of additional protections implemented in light of the fact that the Band would not entertain any erosion remediation or allow preventative maintenance at the Meander. *See id.* at 131:20-132:7. The parties then agreed to the amended and current Protective Order knowing that "Confidential Information" squarely encompassed and described the Existing Plan. *See* Dkt. #229.

To be sure, the Band has <u>never</u> objected to the Existing Plan remaining sealed based on its treatment as "Confidential Information." Enbridge has filed the Existing Plan under seal in this case numerous times pursuant to the Protective Order based on its designation of the Existing Plan as confidential. *See* Dkt ## 324-2, 397-3, 400-4, 479-3, 480-4. The Band has never objected to Enbridge's confidential treatment of the Existing Plan nor has it opposed Enbridge's attempts to keep the document sealed. Only now, for the first time, does the Band appear to be arguing that the Existing Plan – the underlying document upon which these "last, final offer" submissions are based – is not confidential.[3] For all of these reasons, the Existing Plan should remain sealed.

## II. Each Party's "Last, Best Offer" Should be Sealed

Enbridge also seeks to keep sealed each party's submissions supporting their respective "last, best offer," which are currently under seal. *See* Dkt. ##615 - 618.

### A. The Parties' "Last, Best Offers" Reflect Confidential Proposals Relating to Enbridge's Site-Specific Operational Procedures

Public disclosure of these Offers is tantamount to divulging settlement-like negotiations over Enbridge's operational procedures. The parties' Offers were submitted to this Court to report on whether Enbridge and the Band could jointly reach a compromise on the emergency protocols

---

[3] The parties did not display or discuss the Existing Plan (Trial Exhibit 70) in open court at trial in a manner that would reveal the details of the operational document or particular locations within the document. As stated in the Protective Order, presentation of the document at trial in open court "does not waive any confidentiality over the party's Protected Information." Dkt. #226-1 ¶ 28.

governing Line 5 at the Meander and if not, to inform the Court on their latest respective positions following good faith, confidential discussions.

For context, this Court's order asking the parties to submit these Offers arises from the Band's position at trial to have the Court impose on Enbridge an unreasonably conservative purge-and-shutdown procedure instead of permitting Enbridge to install any erosion prevention projects that would substantially increase the safety of the Line at the Meander:

> The shutoff -- changing the shutoff plan is something that I might consider, but making it a shutoff at 20 feet is not – I mean, the Tribe is creating almost a catch-22. They're not willing to consider any form of remediation, and they're also not willing to adopt a shutoff plan except for their version of the shutoff plan, and that will result in shutting down the pipeline soon as well. And I'm not convinced that there isn't room for compromise between the parties on that point.

Dkt. #602 (Oct. 27, 2022 AM Trial Tr.) at 12:9-16 (Conley, J); *id.* at 13:16-25 (concluding that the Band's proposed shutdown plan had "just been recently proposed by the Tribe as a compromise without ever going through the exchange and the cooperation that's apparently contemplated by the public nuisance standard"). The Court then observed that it was "not convinced that there isn't room for compromise between the parties on [Enbridge's purge and shutdown plan]" and Band counsel suggested the Band was willing to consider other plans other than its own. *Id.* at 12-13.

This Court's subsequent November 28, 2022 Order was a continuation of that idea by instructing the parties to confer on three possible risk reduction measures, including the purge-and-shutdown procedure, given the Court's rejection of an immediate shutdown of the Line for as a remedy for the Band's trespass claim. As previously reported to this Court, the parties entered into a "strict confidentiality agreement" to keep the substance of those conversations confidential. Dkt. #613. During these conversations, the parties comprehensively discussed each of these measures at length, as these concepts cannot be separated from the overall goal of risk reduction at the Meander. Dkt. #614 at 2. The Band's expert witnesses, who developed the trial proposal

13

and their Offer, engaged in detailed conversations directly with Enbridge's pipeline integrity and safety experts. *See id.*

These "last, final offers" are the product of work product and discussions undertaken through the parties' confidential process in an effort to reach a mutually agreeable emergency response plan for the Meander. Good cause exists warranting protection for several reasons. First, as discussed above, the parties' proposals were developed based on information exchanged under "strict" confidentiality provisions and in confidence between personnel and experts from both parties. Dkt. #613. Enbridge also does not share its plans outside of the company, nor does it consult with third parties, such as the Band, to determine what the most safe and practical methods are for operating the Line in any given location. *See* Duncan Decl. ¶¶ 4-7, 10.

Second, the parties' proposals warrant protection based upon their likeness to the Existing Plan as they were developed in the mold of the Existing Plan as critiques or modifications thereto. The Band's proposal is based off of the Existing Plan as its framework and incorporates industry-specific details that its experts learned in discussing with Enbridge's internal experts. *Compare, e.g.,* Dkt. #618 at 7 *with* Dkt. #616 at 7. Enbridge Offer reflects modifications that its Pipeline Integrity engineers incorporated from the Existing Plan in light of the Band's positions, the Court's commentary in its November 28, 2022 order, and regulatory requirements. *See* Duncan Decl. ¶ 13; Dkt. #615 ¶ 22; Dkt. #616 at 8 (describing Enbridge's Offer as one where the "conceptual framework . . . has not changed").

Third, the parties' conferrals were made in a good faith effort to find a potential compromise that might satisfy both Enbridge's safety and risk experts as well as the Band and its experts. *See* Dkt. #615 ¶ 2; Duncan Decl. ¶ 14. It is important to note, however, that a "compromise" does not *in any way* mean that Enbridge negotiated its safety standards or

14

requirements with the Band.[4]  Enbridge has consistently maintained that its Existing Plan is sufficiently conservative and designed effectively, it meets or exceeds pipeline safety standards and regulations, and Enbridge does not intend to implement its confidential Offer shared with the Band and this Court. *See id.* ¶¶ 9, 14.  Enbridge shared its internal analyses and bases for its safety response plan, and in turn, submitted its "last, final offer" to the Band and this Court in an effort to agree to a joint proposal with the Band for operational procedures for the Meander. *See id.* Although the Offer would ensure safety at the Meander consistent with regulatory standards (as does the Existing Plan), the Offer was only created as an attempt to achieve a joint proposal with the Band, per the Court's requirement.  Therefore, disclosure of the Offers would compel the parties to negotiate in public Enbridge's internal safety plans and to divulge a proposal that Enbridge would not have developed or shared with the Band absent this Court's request and would not implement along its pipeline systems.  *See id.* ¶ 14.

Finally, keeping these proposals sealed may be consistent with the Court's expectation as well.  This Court directed in its Order that, "if [the parties] cannot agree on a joint proposal, each should ***submit*** their own last, best offer on a shutoff and purge protocol." Dkt. #612 at 16 (emphasis added).  This language closely tracks the Court's standing practice for pretrial settlement letters that are not filed publicly on the docket:

> "[E]ach party must ***submit*** a confidential settlement letter to the clerk of court at clerkofcourt@wiwd.uscourts.gov. The letter should set forth the terms and conditions upon which that party would settle this case. These letters ***will not become part of the record in this case*** and will not be shared with the presiding judge or opposing counsel."

---

[4] Enbridge Offer does not materially alter how it would implement purge and shutdown of the Line nor does it change the fundamental basis for the conditions that Enbridge believes such action is required to safely protect the Line.

15

Dkt. #40 at 4 (emphasis added). In both situations, the Court directs parties to "*submit*"—not necessarily file—a document setting forth their respective bottom-line positions. Enbridge accomplished this by filing the submissions under seal.

### B. Good Cause Also Exists to Protect Details of Enbridge's Operations and Emergency Response Procedures Due to Security Risks

The parties' Offers cannot be disclosed for the additional, related reason that they are based entirely on Enbridge's Existing Plan, which has remained sealed due to the internal, non-public nature of Enbridge's emergency response plans and the risk of threats to the operation of Line 5 if disclosed. *See supra* at Section I; Duncan Decl. ¶ 15. Like in *PEER,* documents which contain detailed instructions "that inform emergency personnel how to manage [potential pipeline failure] from event detection to termination" could be "misused for nefarious ends" and warrant confidentiality. *See* 740 F.3d at 198. This Court cannot protect the Existing Plan but also choose to disclose the proposals as they are strongly interrelated.

Moreover, disclosure would be inconsistent with the safety and security goal of keeping under seal non-public pipeline safety and operational plans of a type that could be used by bad actors to harm the pipeline. the Offers, particularly Enbridge's Offer, provide a clear roadmap as to when and how Enbridge responds to events with purge or shutdown-related activities at a specific location on Line 5. Disclosure of these Offers—especially if they became part of Enbridge's operations—could create opportunities to disrupt, interfere with, or threaten the mechanisms of the operational response (and thus the safety of Line 5), such as by destroying cameras, removing monuments, interfering with access to the Meander, or interfering with restart of the pipeline following a shutdown.

In particular, the Offers identify restart criteria, purge preparedness actions, and purge scenarios that could increase the Line's vulnerability to physical attack and/or divulge great detail

into Enbridge activities critical to effectuate the plan, including personnel movement, and timing for when the entire Line 5 may be shut down for short or long periods of time. *See* Duncan Decl. ¶¶ 10, 15. For example, the Band's proposal contains restart criterion that, if adopted, would disclose precise date ranges for when the Line could be inactive. Such clear information could obviously threaten the security of the Line in places other than the Meander as well.

### C. The Band Cannot Articulate Any Specific Reason Why the Offers Should Be Public and the Risks of Disclosure Greatly Outweigh the Need to Make Public

Finally, the parties' proposals have created a unique and unusual circumstance through which Enbridge's emergency response plans have become the focus of briefing and discussion. An order compelling disclosure of the Existing Plan, and the closely related proposals, would create a ripple effect across the industry, setting a new precedent for all utility and critical energy infrastructure operators. *See* Duncan Decl. ¶ 16. The risk to Enbridge, and others in the industry, from disclosure of details related to its operating and safety plans (beyond the information about emergency response preparedness that is already made public on an annual basis) is great. Moreover, Enbridge does not seek to protect a large category of documents, but rather a single internal company protocol and the proposed modifications of that plan stemming from the parties' negotiations to reach a compromise on a joint plan within the context of this Court's instructions.

Conversely, there is no compelling reason why the public should be entitled to this information. The Band, to date, has not articulated a specific reason why Enbridge's Existing Plan, which has been confidential for years and throughout this litigation, and these proposals must be made public.[5] Enbridge's security-sensitive protocols are not typically made public by either Enbridge or its regulator, and in fact, there are compelling reasons for not doing so, *see supra.*

---

[5] The Band may argue that the information that Enbridge seeks to keep sealed is material to the disposition of this litigation, and requires Enbridge to satisfy a heightened burden to keep information

In sum, the Band takes no risk by asserting a position that these documents are entitled to disclosure yet there is great potential prejudice to Enbridge. *See Saso Golf, Inc. v. Nike, Inc.*, 2009 WL 3242112, at *2 (N.D. Ill. Oct. 5, 2009) (when "parties have executed a protective order governing disclosure of confidential information, the court must balance the interests of the party seeking disclosure against those of the party seeking protection"). Given the significant security and confidentiality concerns raised in this Motion and the nature of these confidential submissions, Enbridge requests that the Court grant its requested protective order.

### III. Any Court Order Addressing the Parties' Offers Should Also Be Kept Confidential

To keep consistent with the protections Enbridge seeks, Enbridge also respectfully requests that the Court should also withhold any portion of its forthcoming order(s) that might address the parties' "last, final offers" on shutdown plan procedures—specifically, any portions of that order disclosing the specific scenarios and actions of current or future Enbridge operational plans, as well as any specific locations related to those activities. The Seventh Circuit has approved of district courts redacting confidential information from judicial decisions when that information should remain confidential despite the judicial decision being made public. *See Mitze v. Saul*, 968 F.3d 689, 692 (7th Cir. 2020) (holding that when a dispositional order involves protected information, courts have redacted the order or opinion to maintain necessary confidentiality); *U.S. v. Franklin Elec. Co. Inc.*, 130 F. Supp. 2d 1025, 1036 (W.D. Wis. 2000) ("This opinion is to be

---

protected. The mechanics of Enbridge's Existing Plan and the related proposals are not material to the Band's now-tried nuisance claim, which this Court has signaled the Band did not prove. *See Levitin v. Northwest Cmty. Hosp.*, No. 13 C 5553, 2016 WL 4179088, at *1–3 (N.D. Ill. Aug. 8, 2016) ("[T]he district judge has yet to issue a decision on the motions to which the filings at issue pertain. The bearing on the merits of the suit therefore has not been revealed. To engage in guesswork and predict what may or may not influence or underpin the district judge's decision at this juncture would fail to serve the end of judicial efficiency.") (internal citation omitted).

kept sealed and out of the public file until the parties have had an opportunity to be heard on the need for redaction of any portions of the opinion that refer to confidential business information.").

### IV. If the Court Denies this Motion, Enbridge Requests a Stay Pending Appeal

If the Court denies this Motion, Enbridge requests that the Court stay enforcement of that order pending the resolution of an appeal. A stay would be warranted based on the potential security issues surrounding critical energy infrastructure and because once this information becomes public, that publicity cannot be undone later. *See, e.g.*, *Doe v. Vill. of Deerfield*, 819 F.3d 372, 375 (7th Cir. 2016) (stating that, among other factors for collateral-order appeal, the order must be "effectively unreviewable" on an appeal from the final judgment of the underlying action); *In re Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1245–46 (11th Cir. 2020) (assuming immediate appellate jurisdiction under collateral-order doctrine from decision "modif[ying] a protective order to revoke protections that conceal a party's identity"); *Al Odah v. United States*, 559 F.3d 539, 543–44 (D.C. Cir. 2009) (allowing appeal of a collateral order regarding classified information because it could not be unseen once revealed).

### CONCLUSION

For the foregoing reasons, Enbridge requests that the Court grant its Motion.

### ORAL HEARING REQUESTED

Enbridge respectfully requests an oral hearing on this Motion.

### RULE 26(C)(1) CERTIFICATE

I certify that the parties met and conferred in good faith in an effort to resolve the dispute without court action, including via email between January 9 and 13, 2023 and twice by telephone on January 24, 2023. The parties were unable to come to a resolution.

19

DATED: February 22, 2023         Respectfully submitted,

| | |
|---|---|
| David H. Coburn | */s/ Justin B. Nemeroff* |
| STEPTOE & JOHNSON LLP | Michael C. Davis |
| 1330 Connecticut Avenue, NW | David L. Feinberg |
| Washington, DC 20036-1795 | Justin B. Nemeroff |
| (202) 429-3000 | VENABLE LLP |
| dcoburn@steptoe.com | 600 Massachusetts Ave., NW |
| aloughran@steptoe.com | Washington, DC 20001 |
| msavignac@steptoe.com | (202) 344-8278 |
| | MCDavis@venable.com |
| Eric M. McLeod | DLFeinberg@venable.com |
| Joseph S. Diedrich | JBNemeroff@venable.com |
| HUSCH BLACKWELL LLP | |
| 33 East Main Street, Suite 300 | |
| Madison, WI 53701-1379 | |
| (608) 234-6056 | |
| joseph.diedrich@huschblackwell.com | |

*Counsel for Enbridge Energy Company, Inc., and Enbridge Energy, Limited Partnership*

## CERTIFICATE OF SERVICE

I certify that on February 22, 2023, I served the foregoing document on all counsel of record using the Court's ECF system.

                                          /s/      Justin B. Nemeroff