**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, <br><br>                *Plaintiff*, <br><br> v. <br><br> ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P., <br><br>                *Defendants*. | Case No. 3:19-cv-00602-wmc <br><br> Judge William M. Conley <br> Magistrate Judge Stephen L. Crocker |
| ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P., <br><br>                *Counter-Plaintiffs*, <br><br> v. <br><br> BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity, <br><br>                *Counter-Defendants*. | |

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS'**
**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR**
**INJUNCTIVE RELIEF**

**INTRODUCTION**

In recent weeks, riverbank erosion at the Bad River meander has proceeded at an alarming pace.  There presently exist four locations at which less than 15 feet of bank remains between the Bad River and Line 5.  At the E series of monuments, that figure is 11 feet.  A staggering amount of bank has been lost at these locations.  At the M3 series of monuments, for example, 34 feet of bank existed between the pipeline and the river prior to flows increasing in the second week of April.  Now only 12.5 feet remain.  This means that far more bank has been lost at this location in a month than presently stands between the pipeline and the river.  Indeed, in one week alone (between April 29 and May 5), 10.5–11.5 feet of bank was lost there, or nearly the same amount as still exists.  Erosion continues to progress at a number of series, and important factors suggest that further bank loss could be significant, resulting in the exposure and rupture of the pipeline.  These circumstances present an imminent threat to the Bad River watershed and Lake Superior, and hence to the rights of the Band and the public, and they warrant immediate action by this Court.  While the Band is sensitive to the Court's economic concerns about enjoining the pipeline, the far graver threat at present is of a rupture that not only would shut down Line 5 but would devastate the Bad River watershed and Lake Superior in the process.

**I.      An Imminent Risk of Pipeline Rupture Exists.**

**A.      Substantial Bank Loss Has Taken Place with Alarming Rapidity.**

In its Opinion and Order of November 28, 2022 ("November Order"), Dkt. 612, this Court held that "[n]ot only is there an actual risk of a significant rupture [of Line 5 at the meander], but the negative impact in this area on the Bad River watershed and even Lake Superior itself could be catastrophic.  Thus, the court finds that a rupture of Line 5 at the

meander would be a substantial and unreasonable interference with the Band's and the public's rights." *Id.* at 3.

The Court further noted, however, that to qualify as a public nuisance, the threatened interference must be "imminent," *id.* at 2, which the Seventh Circuit has characterized as "sufficiently close to occurring" as to warrant judicial action, *id.* at 2 (quoting *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 781–82 (7th Cir. 2011) ("*Asian Carp I*")). The Court stated that "whether a rupture of Line 5 is 'imminent' … remains open to reasonable debate, as illustrated by much of the evidence at trial," *id.* at 4, and that "the risk of a catastrophic failure of the pipeline at the meander remains thankfully at least a year away," *id.* at 7. In so stating, the Court observed "there still remains approximately 26 or 27 feet of riverbank between the Bad River shoreline and Line 5 at its nearest point, a distance that, although alarmingly significant given annual average erosion, has remained stable for three straight years as a result of below average flooding and the serendipitous formation of a small gathering of fallen trees directly upstream." *Id*. at 5–6. The Court further noted "the evidence at trial showing that no more than erosion of 6 or 7 feet at the river's shoreline is likely to occur by next spring[.]" *Id*. at 11.

These observations have been upended by developments in recent weeks. Rapid erosion has taken place since flows began to increase in the Bad River on April 9, and that erosion remains ongoing. The 26–27-foot minimum distance figure cited by the Court is now obsolete. At the E series, just 11 feet of bank remains. Decl. of Ian B. Paton (Paton Decl.) ¶ 4; Proposed Finding of Fact ("PFF") ¶ 1. At other locations the river and pipeline are nearly as close: 12.5 feet at the M3 series; 13.5 feet at a point between the E and F series; 14.5 feet at the D series; and 16.5 feet at the F series. Paton Decl. ¶¶ 4, 6.e; PFF ¶ 2.

Equally startling is the amount and pace of bank loss at these junctures.  At the M3 series, the distance between the bank and pipeline was measured at 34 feet in February 2023, Paton Decl. ¶ 6.b, PFF ¶ 3, meaning that *21.5 feet* of bank has been lost in the past few weeks.  In one week alone—from April 29 to May 5—the bank decreased by 10.5–11.5 feet, eroding by nearly half from 23–24 feet to 12.5 feet.  Paton Decl. ¶ 6.b; PFF ¶ 4.  Other stark examples include losses of 14.5 feet at the E series, more than 12 feet between the E and F series, and 9 feet at the F series, all in less than a month.  Paton Decl. ¶ 6.c-e; PFF ¶ 5. At the D series, *19.5 feet* has been lost in the last month.  Paton Decl. ¶ 6.a; PFF ¶ 6. Here, Enbridge Camera 4—itself now within 4 feet of the top of the bank—captured images showing 3-4 feet of bank loss at both the D and the E series in a single 24-hour period between May 3 and May 4, this at a time when flows in the river were only 6,000 cfs. Paton Decl. ¶¶ 10, 7 (Figure 3); PFF ¶ 6.

In the Parties' May 1, 2023 Joint Status Report Regarding Meander Conditions (Dkt. 627), four monuments had been lost at the M3 and F series, but just a week later, another four monuments have been lost all along the bank, including two much closer to the pipeline at the D and E series. *Compare* Dkt. 627 at 4 (Figure 2) & 6 (Figure 3) *with* Paton Decl. at 6 (Figure 1) & 9 (Figure 4); PFF ¶ 7.   And all this erosion and monument loss has taken place in conjunction with flow levels that are far from extreme.  Flows have peaked three times: on April 13 at 13,900 cubic feet per second (cfs), or less than a 10-year event; on April 21 at 10,400 cfs; and on May 1 at 10,900 cfs, with the latter two being less than a 5-year event.  Dkt. 627 at 3; Paton Decl. ¶ 12 & Figure 7; PFF ¶ 8.  While these flows are significant, none comes remotely close to the flows of record for this stretch of the Bad River.  Paton Decl. ¶ 14.c (pp. 14-15); PFF ¶ 9.

### B.    Substantial Bank Loss Is Likely to Continue.

A significant likelihood of further bank erosion exists at the meander in the weeks to

come.  Several key points underpin this conclusion.

Ongoing bank erosion is evident from both aerial drone imagery and photographs from site visits conducted by the Band on Friday, May 5, and by the Band and Enbridge on Monday, May 8. Drone imagery from May 6 shows a block of channel bank with a tree collapsing into the Bad River immediately downstream from the narrowest portion of the meander neck.  Paton Decl. ¶ 8 & Figure 5; PFF ¶ 10.  This bank failure occurred while the flow rate of the river was less than 4,000 cfs, or between a 1- to 2-year event.  Paton Decl. ¶ 8; PFF ¶ 10.

Site visit photographs show signs that more bank erosion is to come. Along much of the bank, including in the areas where the river is now closest to the pipeline, there are undercut areas where roots are visible and exposed.  Paton Decl. ¶ 14.a & Figure 8; PFF ¶ 11.  Undercut areas are prone to collapse and bank loss.  Paton Decl. ¶ 14.a; PFF ¶ 12.  Moreover, on top of the bank, cracks have formed that indicate locations where the bank is more susceptible to large slope failures into the river.  Paton Decl. ¶ 9 & Figure 6; PFF ¶ 13.

That there is evidence of additional bank loss to come is not surprising.  The higher water levels in the river have provided some measure of support for the saturated and unstable bank.  Paton Decl. ¶ 14.b (p. 14); PFF ¶ 14. As the waters recede, the lower levels of bank are losing that support, with additional sloughing as a result.  Paton Decl. ¶ 14.b (p. 14); PFF ¶ 15.  This is a familiar and predictable pattern, and it is one that is not dependent on further storm events at the meander.  Paton Decl.; PFF ¶ 16.

In addition, as the bank moves ever closer to Line 5, the rate of erosion will become even more unpredictable. The soil and vegetation adjacent to the pipeline may be different than the conditions near the current edge of the bank.  Paton Decl. ¶ 14.e (p. 15); PFF ¶ 17.  If the soil in the pipeline trench is less compact (having already been disturbed once) or if there is less root

mass to provide stability to the soil in the right of way as a result of periodic clearing of trees and brush, this could accentuate the rate of erosion. Paton Decl. ¶ 14.e (p. 15); PFF ¶ 17.

Additional rainfall events, even if relatively small, could also contribute to further erosion. Paton Decl. ¶ 14.c-d (pp. 14-15); PFF ¶ 18. Since 2014, precipitation events causing heightened flows have occurred in the months of May, June, July, August, September, and October, with July 2016 being the flood of record. Paton Decl. ¶ 14.c (pp. 14-15); Dkt. 268-1 at PDF 65 (Table 3); PFF ¶ 19. Heightened flows from such events do not have to be extraordinary to cause bank loss. In April 2020, 5 feet of erosion was observed in a one-week period associated with a peak flow of less than 8,000 cfs, which corresponds to a 2-year event. Paton Decl. ¶ 14.d (p. 15); Dkt. 268-1 at PDF 70-73; PFF ¶ 20. And there is no more dramatic evidence of this point than the events of the past few weeks, where 21.5 feet and 19.5 feet of bank loss has been observed at the M3 and D series, respectively, in the aftermath of 5–10 year flows. Paton Decl. ¶ 6.a-b; PFF ¶ 20.

### C.     A Significant Risk Exists that the Pipeline Could Be Undermined and Rupture in the Same Event.

In its November Order, the Court suggested that a flood or series of floods that would have been necessary to erode the 26 feet of bank that remained at that point "is still unlikely to then scour suddenly and immediately an additional span of 65 to 100 feet of unsupported pipe necessary to raise legitimate, imminent concerns about its structural integrity." Dkt. 612 at 7. While the Band disagreed that the record supported that conclusion, Dkt. 618 at 4–6, there can be little doubt now that the small amount of remaining bank could be eroded and the pipeline undermined and breached in short order. The record establishes that initial exposure, undermining of support, and pipeline rupture all too often go hand in hand when flooding is involved. Paton Decl. ¶ 14.f; PFF ¶ 21. Indeed, in response to questioning from the Court,

Enbridge expert Hamish Weatherly testified that he had personally "worked on pipelines that have become exposed and unsupported in a single event" and that one could not "rule out" that "a single flood could result in both an initial pipeline exposure and a free span of greater than 90 feet if the bank started at five feet from the pipeline," just as he did not rule out "that there's a potential for exposure right now with the 26 feet to the pipe," the bank remaining at the time of trial.  Dkt. 608 at 17:7–18:4, 18:21–23; *see* PFF ¶ 21.

Examples of such rapid progression abound.  In 2011, the Silvertip pipeline became exposed and undermined and ruptured into the Yellowstone River during an episode of prolonged flooding.  PFF ¶ 22.  In 2015, a 24-inch pipeline on the Arkansas River in North Little Rock, Arkansas, failed after its critical span length was exceeded when high water levels eroded the ground cover and exposed the pipeline to the river's flow.  PFF ¶ 23.  The exposure and rupture happened during the same flood.  *Id.*  In 2011, a natural gas pipeline on the Missouri River in Iowa ruptured when the pipeline was exposed, exceeded its critical span, and failed during a single bout of flooding.  PFF ¶ 24.  In 2012, a 12-inch crude oil pipeline operated by Plains Midstream Canada ruptured after reaching its critical span, likely failing in the same flood that exposed it.  PFF ¶ 25.  And in 1994, four pipelines were exposed and ruptured during a single flood event on the San Jacinto River in Texas when the river cut a new channel through a meander where the pipelines were located.  PFF ¶ 26.  All these ruptures resulted in significant releases of oil.

There is no reason to think things would be any different at the meander.  To the contrary, as WWE has explained:

> As water impacts the pipeline at the juncture where the pipeline intersects with intact soil, some of the water's force will be redirected toward the soil, producing rapid erosion.  As the silty-sandy floodplain deposits are exposed to the erosive impacts of the Bad River, the cross section for water flow will become larger.

> While the precise rate of the progression of the pipeline exposure cannot be accurately predicted, it is foreseeable that a substantial length of pipeline could be exposed in a single high flow event, or over the course of several high flow events occurring within a short period of time.

WWE Report, Dkt. 268-2, at PDF p. 12; Paton Decl. ¶ 14.f; PFF 21.

**D.    A Rupture Is Sufficiently Close to Occurring as To Necessitate Action by This Court.**

The line separating imminent from less-than-imminent eventualities may not always be clear, but it undoubtedly has been crossed here.  It is simply not possible to proclaim with any certainty that further significant erosion and undermining of the pipeline will not take place over the next several months.  While recent events have confirmed what the Band and its experts stated to the Court regarding the episodic nature of erosion at the meander and the potential for large losses of bank in short periods of time, no one would have predicted just how dramatic the bank loss would be this spring.  Enbridge certainly did not.  To the extent its denies that further significant erosion or undermining of the pipeline will take place now, there is no reason to think its predictive powers have improved.

There exist at least three different locations where less bank remains than has been lost in the last month, in some cases by a substantial margin.  Paton Decl. ¶ 6.a-c (D series where 19.5 feet lost and 14.5 feet remain; M3 series where 21.5 feet lost and 12.5 feet remain; and E series where 14.5 feet lost and 11 feet remain); PFF ¶ 27.  The pace and breadth of erosion has been dramatic, with as many as 3–4 feet of bank being lost in a single day and 10.5–11.5 feet in a single week.  Paton Decl. ¶¶ 6.b, 7 (Figure 3); PFF ¶ 27.  The erosion remains ongoing and for numerous reasons outlined above could continue for some time.  And it will not require further high flows for that to happen.  *Supra* p. 5.

Very little margin for error remains.  This is especially so in light of the time required to effectuate a purge and shutdown of the pipeline.  Even once all necessary materials have been acquired and staged at the necessary locations and the decision has been made to go ahead, purging the line of oil will take 45 to 48 hours.  PFF ¶¶ 28–30.  Since purging requires the pipeline to remain operational, that means a corresponding shutdown would likewise take several days to accomplish.  PFF ¶ 31.  The pipeline cannot simply be turned off with the flick of a switch in the face of further bank loss, and this fact must be fully accounted for in determining imminence, especially when multiple locations have seen bank loss of 3–4 feet in a 24-hour period this spring.

The consequences of failing to take sufficiently protective action would be catastrophic. The Seventh Circuit has instructed that that the imminency determination turns on "not only the probability of harm, but also the magnitude of the harm if the probability materializes."  *Asian Carp I*, 667 F.3d at 785 (citation omitted).  Given the rapid pace of erosion and the immense and lasting damage that would result from a Line 5 rupture, the imminence requirement is amply satisfied here.

### E.    The Present Nuisance Results from Enbridge's Actions and Warrants an Injunction.

In its November Order, the Court questioned whether the threat of a rupture is attributable to Enbridge's actions or rather stems from the Band's reluctance to acquiesce in Enbridge's remediation proposals and to engage with Enbridge in other ways.  Dkt. 612 at 10–12.  The Court weighed this factor heavily against the Band "in balancing the relevant equities."  *Id.* at 10. While the proper application of the four-factor injunction test is addressed in the next section, a critical factual issue bears underscoring here.  The Band's acquiescence or not in Enbridge's remediation proposals is presently beside the point.  Enbridge has acknowledged that any

remediation project must take place in low-flow conditions—that is, in late summer or fall.   PFF ¶ 32.  Thus, even if the Band were to determine that a particular project meets its water quality standards, that would not alleviate the present threat.  The threat instead results directly from Enbridge's insistence on continuing to pump oil through the Reservation despite the circumstances at the meander.

Moreover, while the Court faulted the Band in November (and at trial) for not engaging with Enbridge on issues including valves and erosion control, Dkt. 612 at 10, the Parties recently reported that they "are continuing discussion of the issues raised in the Court's order," Dkt. 627 at 8.  Substantial progress has been made on at least one of those issues, as discussions regarding valves (the specifics of which are confidential) have yielded an application by Enbridge to install a check valve on the Reservation and continued engagement, the details of which the parties remain actively engaged on.  Decl. of Naomi Tillison ¶ 3; PFF ¶ 33.

## II.  The Four-Factor Injunction Test Overwhelmingly Favors an Injunction.

Not only have factual developments rendered the Band's position with respect to Enbridge's remediation projects beside the point, but the Court's prior, heavy focus on that issue does not square with the four-factor injunction test.  To be entitled to an injunction, the Band must demonstrate (1) irreparable harm; (2) inadequate remedies at law; (3) that the balance of hardships weighs in its favor; and (4) that the public interest will not be disserved by an injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  All four factors strongly favor the issuance of an injunction on the Band's nuisance claim under current circumstances.

**A.      The Band Faces Irreparable Harm from a Pipeline Rupture and Would Have No Adequate Remedy at Law.**

Environmental harm is presumptively irreparable and not susceptible to relief through monetary damages. *See Asian Carp I*, 667 F.3d at 788 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." (citation omitted)); *see also Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008).  That certainly is the case here, where the Court has recognized that a rupture of the pipeline would be "catastrophic."  November Order, Dkt. 612 at 3; *see also id*. at 4 n.2 ("[O]ne need look no further to appreciate the potential damage than the spill of over one million gallons into the Kalamazoo River in 2010, after the failure of another of Enbridge's pipelines[.]").

**B.      The Court Should Not Balance the Equities.**

In its Order, the Court engaged in "balancing the relevant equities," *id.* at 10, and suggested (without making any final determination) that those equities could weigh against the issuance of injunctive relief on the Band's nuisance claim.  However, the Seventh Circuit has stated that "the denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health or to the environment should be rare."  *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 942 (7th Cir. 2019), and that "[w]here the plaintiff is a sovereign and where the activity may endanger the public health, injunctive relief is proper, without resort to balancing [of harms]."  *U.S. EPA v. Envtl. Waste Control, Inc.*, 917 F.2d 327, 332 (7th Cir. 1990) (citation and quotation marks omitted); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 868 (7th Cir. 1994).  The Band and its members have long relied on fishing, wild rice, medicines, and other plants and animals from the Bad River and Lake Superior. PFF ¶¶ 51-52. Fish harvest occurs year-round, with many tribal members fishing in the spring as migratory fish

enter the Bad River to spawn.  PFF ¶ 52.  A rupture at Line 5 will endanger the Band's

commercial and subsistence fisheries, wild rice harvest, and other cultural activities, as well as

the health of tribal members and other members of the public.  PFF ¶¶ 51-53.  Because a pipeline

rupture would carry with it dire environmental and public health consequences through the

contamination of the fisheries, wild rice sloughs, and innumerable other species of flora and

fauna, along with the devastation of critical surface waters and potentially groundwater aquifers,

an injunction should issue.  Moreover, even if the Court balances the equities and considers the

public interest, those factors now weigh heavily in favor of such relief regardless of what the

situation was last November.

### C.     The Equities Weigh Overwhelmingly in Favor of the Injunction.

The Parties' relative hardships strongly counsel for issuance of an injunction.  At stake for

the Band is its very way of life and the preservation of its homeland and the resources it has

fought so hard to maintain in the face of repeated breaches of the promises contained in solemn

treaties.  As this Court has found, "there is no reasonable dispute that a rupture would cause

significant environmental damage to the Bad River and its surrounding natural resources,

including wild rice beds and fisheries on which the Band depends."  Opinion and Order ("Summ.

J. Op."), Dkt. 360, at 47.  The courts have consistently found threats to treaty-protected natural

resources to be a compelling factor in the equitable balance.  *See*, *e.g.*, *United States v.

Washington*, 853 F.3d 946, 977 (9th Cir. 2017), *aff'd by equally divided court*, 138 S. Ct. 1832

(2018).

On Enbridge's side of the ledger, *no hardship exists that is cognizable in equity*.  This

Court implicitly recognized this in its November Order, which omitted any reference to hardship

for Enbridge in its balance-of-equities discussion, *see* Dkt. 612 at 12 (rendering decision "after

balancing all the interests of the Band and the public"), and appropriately so.  Enbridge's injury

from an injunction would be financial, but since Enbridge has no legal right to operate its

pipeline on the Reservation given that it is in conscious trespass, Summ. J. Op., Dkt. 360, at 28,

that factor does not weigh in the balance.  *See*, *e.g.*, *Ute Indian Tribe of the Uintah & Ouray*

*Reservation v. Utah*, 790 F.3d 1000, 1007 (10th Cir. 2015) (Gorsuch, J.) (upholding injunction

against activity on tribal land that defendant had "no legal entitlement to do" and stating that

"[i]n this light, the defendants' claims to injury should an injunction issue shrink to all but the

vanishing point" (quotation marks omitted)); *S.C. Johnson & Son, Inc. v. Minigrip, LLC*, 16-cv-

244-jdp, 2017 WL 8727853, at *4 (W.D. Wis. Oct. 16, 2017) ("If a party engages in unlawful

conduct 'in spite of warnings,' that party does so 'at its own risk and cannot ... be heard to

complain that it will be severely injured' by an injunction." (ellipsis in original) (quoting *Helene*

*Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333–34 (7th Cir. 1977))).

>    **D.**    **The Band Should Not Be Penalized for Its Reluctance To Adopt Enbridge's**
>           **Erosion Mitigation Proposals.**

Nor should the Band's application of its water quality standards weigh against it in the

Court's equitable analysis.  This Court discussed the issue at some length in its Order and at trial,

and it indicated an inclination to hold the Band's application of its water quality standards to

Enbridge's projects against the Band.  Following through on that inclination would constitute a

serious error of law.

In its Order, the Court suggested a potential equivalence between the Band's application

of its water quality standards to Enbridge's erosion control proposals and the plaintiffs in *Asian*

*Carp I.*  However, those plaintiffs sought to have projects implemented on waters and lands

scores of miles from their own and declined to contribute to their costs.  *See* November Order,

Dkt. 612, at 10.  Here, by contrast, the projects would take place on the Band's lands—lands with

respect to which Enbridge is in trespass.  Indeed, as the Court recognized, the projects would involve an intensification of Enbridge's trespass on those lands.  *Id.* at 9.  And even if Enbridge paid for the projects, their regulation and oversight would require the Band's Mashkiiziibii Natural Resources Department ("MNRD") to expend substantial time, on top of the thousands of hours the MNRD has already spent on Enbridge issues.  Accordingly, the Band is not being "insouciant," *id.* at 10 (quoting *Asian Carp I*, 667 F.3d at 794), in its approach to the Enbridge projects.  It has already borne the burdens associated with Enbridge's trespass for many years, and whether the projects are forced on it directly by court order (which this Court has appropriately recognized it does not have the authority to do, Dkt. 612 at 15), or indirectly because the Court refuses to issue an injunction, the Band would bear those burdens for many years more.

Nor is the Band being insouciant with regard to the economic implications of shutting down the pipeline.  The Band has a keen awareness of the Court's concerns in that regard.  That is why, prior to the recent developments at the meander, the Band had expressed its willingness to acquiesce in the company's continued trespass on the Reservation for a finite (though far from insignificant) period—and this was *after* the Court had ruled Enbridge to be in deliberate and irreparable violation of the Band's sovereignty, treaty, and property rights and in violation of unambiguous federal statutes and regulations flatly prohibiting the very sort of trespass perpetrated by Enbridge on the Band's Reservation.  But circumstances have changed dramatically, and the threat of ongoing operations has become too significant to tolerate.  There exists not a single case in this country holding that a party has an obligation—cognizable in either law or equity—to allow further, ever more intrusive trespasses on its property so that the trespasser can continue trespassing, let alone where the trespass threatens catastrophe.

There accordingly is no appropriate analogy between the Band and plaintiffs in *Asian Carp I*, and the Band strongly disputes that it should shoulder a portion of the blame for any economic impacts of a shutdown (which, as explained in the next section, will not be nearly as significant as Enbridge contends).  To the contrary, any hardship posited here—for the Band, the environment, Enbridge, and the public—has one author: Enbridge.  Enbridge has known it was trespassing since June 2013, PFF ¶ 34, yet it did not pursue a viable reroute.  As early as 2015, Enbridge officials acknowledged internally that the company needed to make plans to reroute the pipeline.  PFF ¶ 35.  In the ensuing years, they continued to discuss the need for a reroute, PFF ¶ 36, yet even after the Band passed a resolution in January 2017 insisting that Enbridge leave its land, PFF ¶ 37, the company did not begin the regulatory approval process.  Enbridge, in fact, did not file the permit applications for the reroute until *February 2020*, PFF ¶ 38, three years after the Band's resolution and nearly seven years after the company began its conscious trespass.  And when it did so, it proposed a reroute that would hew as closely as possible to the Reservation's borders, PFF ¶ 39, which it knew would prompt opposition from the Band, PFF ¶ 40.  At trial, Enbridge's explanation for not having pursued a reroute earlier was that it would have looked "insincere" to take steps toward one while engaged in mediation with the Band from May 2017 to July 2019, PFF ¶ 41—an excuse that surpasses ludicrous given that the Band's desire *for Enbridge to leave its land* is what gave rise to the mediation.

The actual reason Enbridge delayed any genuine effort toward a reroute is obvious: profit.  Enbridge knew that the reroute would cost at least $450 million, PFF ¶ 42, and, in light of the time value of money, Enbridge benefited to the tune of about $25 million each year that it delayed the expense, PFF ¶ 43.  In fact, even *after* Enbridge submitted its permit request and publicly announced its intent to reroute the pipeline, its executives were analyzing the financial

benefits to be gained from further delays.  PFF ¶ 44.  Enbridge pursued this course betting that the Band would never have the determination to seek to vindicate its rights or, if it did, that a court would not dare hold the company accountable if Enbridge screamed loudly enough about regional economic consequences.

In sum, any economic impacts that may follow from a shutdown of Line 5 are not the product of the Band's lawful unwillingness to acquiesce in further trampling of its sovereignty, resources, and property rights.  They are the result of Enbridge's conscious determination to maximize its profits for as long as possible by remaining in trespass on the Bad River Reservation.  "[E]quity follows the law." *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893); *Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892, 906 (7th Cir. 2014) (citing *Hedges* for same principle).  Favoring Enbridge's insistence on maintaining its trespass over the Band's lawful insistence on protecting its lands and waters would do anything but that.

**E.   The Public Interest Will Be Served by an Injunction.**

**1.   The Interests of the Band and the Public are Aligned.**

In its Order, the Court appeared to view the Band's interests and those of the public as opposed.  But they are in fact fully aligned, as amply confirmed by the events of recent weeks.  The rapid progression of erosion at the meander has created the very real prospect that, unless Enbridge decides to shut down the pipeline itself given the imminent threats presented, there will be a shutdown of Line 5 in one of two ways: either because the Court acts on the grave interference with the rights of the Band and the public that the devastation of the Bad River watershed and Lake Superior will pose, or because the pipeline ruptures.  In the first scenario, the public will bear the economic impacts associated with a shutdown that, as explained below (and without any intent to be cavalier), will not remotely approach Enbridge's alarmist rhetoric.

15

In the second scenario, the public will bear those same impacts, *plus* the devastation of a crude oil spill into a direct tributary of Lake Superior.

This latter threat to the public interest has continued to increase dramatically given the rapid progression of the river towards the pipeline at the meander.  And as with the risk to the Band itself, that threat to the broader public is potentially of catastrophic magnitude.  *E.g.*, PFF ¶ 50. A full-bore rupture of Line 5 would send 21,974 barrels—nearly *one million gallons*[1]—of crude oil coursing down the Bad River toward Lake Superior.  PFF ¶ 45.  Such a spill would be on the scale of Enbridge's 2010 Kalamazoo River catastrophe.  PFF ¶ 47.  Even a smaller spill would be disastrous.  Under the spill scenarios evaluated by both Parties' experts ranging from roughly 2,000 to 22,000 barrels, a spill at the meander would rapidly spread downstream, devastating not only the Bad River watershed but also large swaths of the Kakagon-Bad River Slough complex *and* Lake Superior.  PFF ¶ 48.  Both Parties' experts have developed animated modeling confirming that crude oil would contaminate long stretches of Lake Superior's pristine shoreline.  PFF ¶ 49.  Lake Superior is of course a critical freshwater resource relied on by the public for recreation, fisheries, navigation, and myriad other purposes—including drinking water. As the Court rightly acknowledged, "there isn't really any dispute … that the effects [of an oil spill] would be catastrophic[.]"  Dkt. 599 at 32:7–10 (Trial Tr. 10/24 a.m.); *see also* Dkt. 606 at 128:12–16 (Trial Tr. 10/24 p.m.) ("If there's a major oil spill, there's going to be tremendous dispersion in Lake Superior.  [Enbridge's] own expert says so.  And even with evaporation, it's

---

[1] This full-bore rupture volume assumes 13 minutes of additional pumping before valves would be shut in the event of a spill.  PFF ¶ 45.  However, even if Line 5 were shut down at the time of rupture but not purged (a 45-hour process), a devastating amount of oil would still be released. PFF ¶ 46.  Trent Wetmore, Enbridge's project director and former operations director for the Midwest region, agreed at trial that at any given time, there is a volume of approximately 20,000 barrels—or 840,000 gallons—of oil in Line 5 between the two safety valves, which are set 14 miles apart on either side of the Bad River Reservation.  PFF ¶ 46.

going to do substantial damage to the shoreline that it reaches."); PFF ¶ 50.  The threat to the public interest should an injunction not issue, then, is grave.

### 2. Even in the Context of an Emergency Order, the Economic Consequences of Shutting Down the Pipeline Would Not Be Substantial.

The Band is highly sensitive to the concerns the Court has expressed about the economic implications of shutting down the pipeline, and has consistently considered those implications in its decisionmaking.  It is for this reason that the Band suggested at and after trial that, so long as ongoing operation of the pipeline did not pose a dire threat of rupture and release, it would be amenable to a 12–18-month transition period in order to provide the market with ample notice of the need to shift to alternative modes of energy supply.  The situation at the meander has shifted so significantly that this is no longer feasible:  The choice that the Court, the Band, Enbridge, and the market face is that of a shutdown with or without a rupture.  Enbridge will undoubtedly claim that an immediate shutdown will cause substantial economic harm, but a number of important factors ensure that this will not be so.

#### a) Crude Oil

Even an immediate shutdown of Line 5 will not have a significant effect on consumer prices for refined gasoline products, as refined product pipelines serve the market area and can supply any needed product until there is a transition in crude oil supply.  History bears this out. In July 2010, Enbridge's Line 6B (now known as Line 78) ruptured and spilled into the Kalamazoo River system, resulting in a shutdown lasting several months.  PFF ¶ 54.  While Line 6B conveyed up to 240,000 barrels of crude oil daily to the same refineries served by Line 5, *see* PFF ¶ 55, Enbridge expert Neil Earnest testified that the shutdown did not have "sizable price impacts for refined product in the Detroit/Toledo area" because refined product pipelines filled the gap.  He further testified that the lack of a price impact from the Line 6B shutdown is

"consistent with [his] analysis here regarding a Line 5 shutdown." PFF ¶ 56. That analysis projects a price increase in Michigan, Wisconsin, and Ohio of *less than one cent per gallon of gasoline*. PFF ¶ 57. For Ontario, he projects a price increase of 4 to 6 cents per gallon, PFF ¶ 58, an amount that would register as noise among normal weekly fluctuations in price.

Refineries would also be able to absorb the effects of shutdown, and for the most part very quickly. Ten refineries receive between 400,000 and 450,000 barrels per day (bpd) of crude oil from Line 5, PFF ¶ 59, but within a few months, the shortfall resulting from a Line 5 shutdown will be reduced to under 80,000 bpd by using other available means of transportation. Mr. Earnest testified that Line 78 presently operates at about 100,000 bpd below capacity and that if Line 5 were to shut down, the excess capacity would be utilized almost immediately to convey oil to the same refineries already receiving oil from one or both pipelines. PFF ¶¶ 60–61. The two Quebec refineries, which receive about 200,000 bpd of crude oil from Enbridge, PFF ¶ 62, can revert to the pre-2016 status quo of obtaining their deliveries from alternative sources, primarily waterborne tankers—a method of delivery that is already cost-competitive with Line 5, PFF ¶¶ 63–64. Indeed, the refineries already have contingency plans they could set into action immediately, PFF ¶ 65, and Mr. Earnest acknowledged that doing so would be commercially viable, PFF ¶ 66. And several of the refineries served by Line 5 also have rail terminals that can be reactivated quickly and that are capable of unloading modest amounts of crude oil in that fashion. PFF ¶¶ 67–68.

If the Quebec refineries do take these steps, then, under Mr. Earnest's calculations, the shortfall from a Line 5 shutdown would, within a short period of time, be less than 80,000 bpd, PFF ¶ 71, almost all of which would be concentrated in Ontario, PFF ¶ 72. The four Ontario refineries have among the highest profit margins in North America and have weathered far more

significant events, including internal fires that have caused substantial reductions in output for lengthy periods of time, as well as the Line 6B rupture.  PFF ¶¶ 69, 70, 73.  Ontario's new fuel requirements will yield a reduction in refining demand of 15,000 bbd in any event (Quebec demand will likewise be reduced by 10,000 bbd), *see* PFF ¶ 70, and in the medium term Enbridge could more than offset the small remaining shortfall by adding pumping equipment to Line 78A, which would take less than two years and would increase Line 78's capacity by 110,000 bpd,  PFF ¶¶ 74–77.

### b)      Propane

Fortuitously, a shutdown of the pipeline now will avoid the period of substantial propane usage for residential purposes.  The winter heating season is over and will not begin again until October.  PFF ¶ 78.  Multiple options exist for promptly adding propane-delivery capacity in the Line 5 delivery area before then, with the principal solutions centering on rail, which is the most common means by which propane and butane are transported from Canada to the United States. PFF ¶ 79.  Northern Wisconsin and the Upper Peninsula of Michigan could fully offset Line 5-produced propane with rail deliveries within a few months by setting up a handful of mobile transloaders.  PFF ¶¶ 80-82.  As for the area served by the Sarnia fractionator, there exists over one billion gallons (23 million barrels) of storage capacity, *see* PFF ¶ 83, and there are rail terminals throughout the area—including several with direct pipeline connections to the petrochemical and refining complex in Sarnia.  PFF ¶ 84.  Thus, while it is possible that propane-offloading racks will need to be added to some of those rail terminals or that portable transloaders will need to be used to fully offset the loss of propane produced by the Sarnia

fractionator, much of the infrastructure needed to quickly increase propane-by-rail deliveries already exists in the Sarnia area.[2]

Propane consumers will not be affected by the switch from pipeline deliveries to rail deliveries.  This is confirmed by experiences in Wisconsin and Michigan.  Wisconsin relies far more heavily on rail for its propane deliveries than Michigan, and Michigan relies more heavily on Line 5—yet Wisconsin has consistently had lower propane prices for more than a decade.  PFF ¶ 85.  Hence, Enbridge's experts did not opine that switching from pipeline deliveries to rail deliveries would cause an increase in the consumer price of propane.[3]  PFF ¶ 86.

\* \* \*

In sum, the economic effects of a Line 5 shutdown will be modest—nothing like what Enbridge warns of.  The Band is sensitive to even that modest impact, which is why, in discussing a trespass remedy, it was willing to accept an 18-month transition period before a shutdown, which would have given enough time for refineries to fully replace every drop of Line 5 oil and to ensure that every gallon of replacement propane could be delivered without any long-distance trucking.  That is, the Band was willing to acquiesce in further conscious trespass on its sovereign land to help the businesses and employees impacted by a shutdown.  But the

---

[2] Furthermore, it may also be possible for the Sarnia fractionator to be reconfigured so that it can receive and fractionate the type of NGLs produced in the nearby Marcellus Shale.  *See* PFF ¶ 90.

[3] Mr. Earnest does project that a switch to propane deliveries by long-distance *trucking* would cause an increase in the consumer price of propane of more than 8 cents in each of the affected markets of the Line 5 delivery area. PFF ¶ 87.  But even if trucks *were* used to ship propane and butane into the Line 5 delivery area, the price impact would not match some of Enbridge's alarmist rhetoric.  The impact of transportation costs on the price of propane is swamped by other economic factors influencing the price.  One need look no further than the example that two Enbridge experts gave of a "propane supply emergency"—the winter of 2019–2020, when demand for propane in Wisconsin exceeded the normal modes of supply, which led to deliveries by trucks carrying propane from Kansas and Texas.  PFF ¶ 88.  As one of those experts acknowledged at trial, the residential price of propane during this period was not in fact any higher than in other years.  PFF ¶ 89.

threat of calamity for both the Band and the public more generally is now far too great.  The continued operation of the pipeline under the circumstances present at the meander should be enjoined.

Dated: May 9, 2023                                 Respectfully submitted,


                                                   */s/ Riyaz A. Kanji*
Erick Arnold                                       Riyaz A. Kanji
BAD RIVER BAND OF THE LAKE SUPERIOR                David A. Giampetroni
TRIBE OF CHIPPEWA INDIANS OF THE BAD               Lucy W. Braun
RIVER RESERVATION                                  Christopher Miller
72682 Maple Street                                 Joshua C. Handelsman
Odanah, Wisconsin 54861                            Joohwan Kim
attorney@badriver-nsn.gov                          KANJI & KATZEN, P.L.L.C.
(715) 682-7107                                     303 Detroit Street, Suite 400
                                                   Ann Arbor, MI 48104
Bruce Wallace                                      rkanji@kanjikatzen.com
HOOPER HATHAWAY PRICE BEUCHE                        (734) 769-5400
& WALLACE
126 S. Main Street                                 Jane G. Steadman
Ann Arbor, MI 48104                                Philip H. Tinker
bwallace@hooperhathaway.com                        Claire R. Newman
(734) 662-4426                                     KANJI & KATZEN, P.L.L.C.
                                                   811 1st Avenue, Suite 630
Oday Salim                                         Seattle, WA 98104
NATIONAL WILDLIFE FEDERATION                        jsteadman@kanjikatzen.com
213 West Liberty Street, Suite 200                 (206) 344-8100
Ann Arbor, MI 48104
salimo@nwf.org
(586) 255-8857

Douglas M. Poland
David P. Hollander
STAFFORD ROSENBAUM, LLP
222 West Washington Avenue, Suite 900
Madison, WI 53701
dpoland@staffordlaw.com
dhollander@staffordlaw.com
(608) 256-0226


*Counsel for the Bad River Band of the Lake Superior*
*Tribe of Chippewa Indians and Naomi Tillison, Director*
*of the Mashkiiziibii Natural Resources Department of*
*the Bad River Band, in her official capacity*

**CERTIFICATE OF SERVICE**

I certify that on May 9, 2023, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ Riyaz A. Kanji
Riyaz A. Kanji