**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION<br><br>      *Plaintiff,*<br>  v.<br><br>ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, LP<br><br>      *Defendants.* | Case No. 3:19-cv-00602<br><br><br><br>Judge William M. Conley |
| ENBRIDGE ENERGY, LP<br><br>      *Counter-Plaintiff,*<br>  v.<br><br>BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION and NAOMI TILLISON, in her official capacity,<br><br>      *Counter-Defendants.* | |

**MEMORANDUM IN SUPPORT OF ENBRIDGE'S MOTIONS
FOR STAY AND, ALTERNATIVELY,
A FED. R. CIV. P 62.1 RULING TO MODIFY INJUNCTION**

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 5

I.      The Court should stay its injunction requiring Enbridge to shut down Line 5
        by June 16, 2026. ............................................................................................... 5

        A.      Shutting down Line 5 would irreparably injure the public. .................................. 6

        B.      Enbridge would be irreparably harmed too. ....................................................... 11

        C.      Preserving the status quo would not harm the Band. .......................................... 13

        D.      Enbridge is likely to succeed on the merits. ....................................................... 16

                1.      Trespass and nuisance liability ................................................ 16

                2.      Foreign affairs and the 1977 U.S-Canada Transit Treaty ........................ 17

                3.      Other harm to public .................................................................... 21

                4.      The Band's conduct ..................................................................... 22

II.     The Court should issue a Rule 62.1(a)(3) Order to modify the injunction and
        extend the Line 5 shutdown date. ...................................................................... 23

        A.      Legal standard ............................................................................................. 23

        B.      The Court set the original shutdown date to protect the public interest. .............. 24

        C.      In light of changed circumstances, a new shutdown date is necessary
                to protect the public interest. ........................................................................... 24

        D.      The requested modification will not have significant adverse effects. ................ 26

CONCLUSION ............................................................................................................. 26

**GLOSSARY**

| Short Form | Description |
| --- | --- |
| Army Corps | U.S. Army Corps of Engineers |
| Band | Plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation |
| Enbridge | Defendants Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership. Throughout this brief, "Enbridge" includes the predecessor company, Lakehead Pipeline Company. |
| Meander | Line 5 runs underground near a specific meander or bend in the Bad River. |
| NGLs | Natural gas liquids |
| Relocation Project | Enbridge's project to relocate a segment of Line 5 outside of the Reservation—also known as the "reroute" project |
| Reservation | Bad River Reservation |
| Transit Treaty | *Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 |
| WDNR | Wisconsin Department of Natural Resources |

**INTRODUCTION**

Enbridge's Line 5 continues to operate at full capacity due to strong demand from shippers and energy consumers. But in fewer than five months, the Court's injunction will force Line 5—along with all the critical energy products it transports—to stop operating. Am. Final J., ECF No. 689, at 2 ¶ 4. A court-ordered shutdown of a major pipeline that has operated safely for decades is literally unprecedented. The consequences are only magnified in this case because Line 5 crosses an international border.

Despite the Band's predictions, no one has invested the hundreds of millions it would take to build transportation alternatives to replace Line 5's products in the markets. As a result, any shutdown would cause significant shortages of propane and increased energy prices in the Midwest and Canada. The severe economic toll from a shutdown will be in the billions, with thousands forced out of work. The extensive harm from any shutdown vastly exceeds any *de minimis* risks from continued Line 5 operation.

In light of these devastating and irreparable consequences, and because the Band has directly contributed to delays in the permitting process for the Relocation Project, the Court should continue to maintain the safe status quo and stay the June 2026 shutdown date.[1] Alternatively, the Court should advise the Seventh Circuit that it wishes to move the shutdown date.

---

[1] Enridge recognizes that it is unusual for an appellant to seek a stay at this stage of the case under Fed. R. Civ. P. 62 and Fed. R. App. P. 8. Enbridge had hoped that the three-year period allowed by the Court's final judgment would be sufficient to complete the Relocation Project and appellate processes. But now, with the upcoming June 16 shutdown date, a stay pending appeal is necessary. In accordance with the applicable federal rules, Enbridge first seeks a stay of the shutdown date from this Court before proceeding, if necessary, to the Seventh Circuit.

## BACKGROUND

Enbridge has safely transported light crude oil and natural gas liquids (NGLs) over the Bad River Reservation for more than 70 years. That record was built on oversight of pipeline safety by the federal government and collaboration with the Band. Once the Band broke off negotiations with Enbridge by filing this action, Enbridge acquired the land interests to relocate a segment of Line 5 off the Reservation, spent over $85 million on materials, and applied to the relevant state and federal authorities for permits. Order, ECF No. 684, at 21–22; *see* Schwartz Decl. ¶ 3.

Initially, this Court contemplated an injunction that would require Enbridge to complete the Relocation Project within five years or, if it did not, pay twice the easement fees. Order, ECF No. 360, at 43. In the Court's initial view, "[s]uch an injunction would balance the equities between the Band's sovereign interests, broader economic concerns, and foreign relations." *Id.* But the Court later believed that five years "appears to be optimistic" and there was "little realistic prospect of a reroute proceeding even then." Order, ECF No. 684, at 51. In the final order, the Court set three years into the future by which Enbridge must cease operations on the allotted parcels—i.e., until June 16, 2026.  Am. Final J., ECF No. 689 at 2, ¶ 4; Order, ECF No. 684, at 52. The three years was intended to provide time for Enbridge to complete the Relocation Project or "at least give the public and the market players time to adjust" without shortages or extreme price swings. Order, ECF No. 684, at 36, 51. "It will also give Enbridge sufficient time to appeal this court's injunctive order or make new law." *Id*. at 51–52.

The Court's findings and underlying assumptions have been undermined by subsequent events.

First, the United States and Canada agree that this Court's June 2026 shutdown date should be reversed. In its amicus brief to the Seventh Circuit, the United States said that, when crafting the current shutdown order, this Court "did not specifically address whether its order could be

considered a breach of the Transit Pipeline Treaty [with Canada]" or "the public interests in the United States' diplomatic and trade relationship with Canada, including impacts on supplies in Canada." Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 26–29. The Government of Canada urged the Seventh Circuit to ensure there is no shutdown until Enbridge has time to complete the Relocation Project. Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 29. Based on the views of these sovereigns, a federal court recently declared a Michigan order to shut down Line 5 unlawful under the foreign-affairs doctrine. *Enbridge Energy, L.P. v. Whitmer*, --- F. Supp. 3d ----, 2025 WL 3707609, at *17–20 (W.D. Mich. 2025) (any order to shut down Line 5 "intrudes on the United States foreign relation power because it interferes with the United States's relations with Canada").

Second, despite delays caused by the Band, Enbridge has made significant progress with respect to the permits for the Relocation Project. Schwartz Decl. ¶¶ 5–7, 9.[2] This progress confirms that Enbridge had provided a "realistic" timeline to this Court for completing the Relocation Project. *See* Order, ECF No. 684, at 51. In November 2024, after an extensive environmental analysis, the WDNR issued the necessary state wetland and waterway permit, water quality certification, and stormwater authorization. Schwartz Decl. ¶¶ 6–7. The permit and certification included more than 200 conditions (none of which Enbridge contested) designed to ensure that there is no significant adverse impact from pollutants or contaminants into any State-regulated waterways or wetlands, let alone measurable impacts to water quality downstream where waterways enter the Bad River Reservation. *Id.* ¶ 7. Construction has been stayed pending the

---

[2] The Band caused significant delays in the permitting process, for example, by raising multiple site-specific concerns with the Relocation Project and asking for surveys and others measures not required under Wisconsin law, while at the same time maintaining that nothing short of moving Line 5 outside the watershed would be acceptable. Schwartz Decl. ¶ 11.

conclusion of a contested administrative proceeding initiated by the Band and certain environmental organizations.[3] *Id.* ¶ 8. In October 2025, the Army Corps issued an initial proffered permit for the Relocation Project, which will become final once the stay is lifted in the Wisconsin contested case. *Id.* ¶ 9. Once these permits are operational, Enbridge will have all authorizations necessary to initiate construction, and will start construction on the Relocation Project immediately thereafter. *Id.* ¶ 12.

Third, the testimony of the Band's experts that the market would adjust to a Court ordered Line 5 closure has been proven wrong. Besides the Relocation Project, *no* additional means of transportation of Line 5 products have been constructed or are being constructed that would make up for a Line 5 closure. O'Shaughnessy Decl. ¶ 7; Murray Decl. ¶ 5; Baker Decl. ¶ 6; Podavin Decl. ¶ 5; Hutchinson Decl. ¶ 6; Yu Decl. ¶ 7; Donley Decl. ¶ 6; Rennicke Decl. ¶¶ 3–34; Earnest Decl. ¶¶ 4–11, 13; Tetzlaff Decl. ¶ 11; Schwartz Decl. ¶ 26. Current pipeline, rail, truck, and waterborne infrastructure are essentially the same as in 2023 when the parties were last before the Court. Rennicke Decl. ¶¶ 3–34. That infrastructure remains woefully insufficient to replace the supply of both crude oil and NGLs to the markets served by Line 5. *Id.*; Earnest Decl. ¶¶ 4–11, 13. Thus, the key premise of the Court's remedy—that alternative modes of transportation would be built—has not borne out in practice. In fact, Enbridge's Relocation Project is the *only* project in progress to preserve uninterrupted delivery of the product transported by Line 5. *See* Rennicke Decl. ¶ 7; *see, e.g.*, Baker Decl. ¶ 6.

Finally, at the Band's invitation, the parties collaboratively developed a "log jack" revetment project to address erosion at the Meander. Schwartz Decl. ¶¶ 21–22; Duncan Decl.

---

[3] The contested case has been fully briefed and is awaiting a decision. Schwartz Decl. ¶ 8.

¶¶ 11, 13. Enbridge installed 235 log jacks over 562 feet of the Bad River shoreline at the Meander in March 2025. Schwartz Decl. ¶ 22; Duncan Decl. ¶ 11; Storlid Decl. ¶¶ 11–15; Weatherly Decl. ¶¶ 11–12. The log jacks are working as intended and have prevented further erosion at the narrowest points along the Meander. Duncan Decl. ¶¶ 14–15; Storlid Decl. ¶¶ 16–18; Schwartz Decl. ¶ 22. In addition, Enbridge installed additional cameras; continues to comply with the Court's June 2023 monitoring, shutdown, and purge protocol; and also installed, at the Band's request, a mainline check valve east of the Meander in 2024. Schwartz Decl. ¶¶ 18–19; Duncan Decl ¶¶ 5–7; Storlid Decl. ¶¶ 8, 10; Weatherly Decl. ¶¶ 6–10. These projects represent an Enbridge investment exceeding $30 million in pipeline safety on the Reservation. Schwartz Decl. ¶ 24.

In short, this Court had initially intended to give Enbridge five years to complete the Relocation Project (instead of three years), and it now appears reasonable that Enbridge will be able to do so within that five-year time frame. Enbridge has done everything it can to both ensure pipeline safety on the Reservation and expedite the Relocation Project's progress. But the Band's opposition to the Relocation Project has materially delayed Enbridge's ability complete that project by June 16, 2026. Schwartz Decl. ¶ 11. A stay of the shutdown is warranted.

**ARGUMENT**

**I.      The Court should stay its injunction requiring Enbridge to shut down Line 5 by June 16, 2026.**

The Court is familiar with the four-factor test for a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020); *see* Fed. R. Civ. P. 62(b), (c)(1). The "standard calls for equitable balancing, much like that required in deciding whether to grant a preliminary injunction." *Common Cause*, 978 F.3d at 1039 (citation omitted). Here, all four factors support a stay, and a stay is "necessary to mitigate the damage" that the

Court's injunction will "do[] during the interim." *A & F Enters., Inc. v. IHOP Franchising, LLC*, 742 F.3d 763, 766 (7th Cir. 2014).

### A.    Shutting down Line 5 would irreparably injure the public.

Federal courts have repeatedly recognized the "quite disruptive" consequences of shutting down an "operational" pipeline, *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019); *see, e.g.*, *Apache Corp. v. FERC*, 627 F.3d 1220, 1222–23 (D.C. Cir. 2010), or any large infrastructure project, *e.g.*, *Massachusetts v. NRC*, 924 F.2d 311, 336 (D.C. Cir. 1991) (nuclear power plant operating license).[4] Shutting down Line 5 would cause unprecedented irreparable injury.

As the Court recognized, millions in Canada and the Midwest depend on the energy products transported by Line 5, and with no alternative means of transportation available, any shutdown would thus cause disruption and long-term uncertainty on a massive scale. Order, ECF No. 360, at 41–43; Order, ECF No. 612, at 11; Order, ECF No. 684, at 22–27, 39. This is still true today. Contrary to the Band's representations to this Court that new modes of transportation would be created within two years, *no* new modes of transport for Line 5's essential energy products have emerged that would make up for a Line 5 shutdown. O'Shaughnessy Decl. ¶ 7; Murray Decl. ¶ 5; Baker Decl. ¶ 6; Podavin Decl. ¶ 5; Hutchinson Decl. ¶ 6; Donley Decl. ¶ 6; Rennicke Decl. ¶¶ 3– 34; Earnest Decl. ¶¶ 4–11, 13; Tetzlaff Decl. ¶¶ 6–8, 11; Schwartz Decl. ¶ 26. And Line 5 continues to transport at or near its average annual capacity of 540,000 barrels per day due to continued demand. Tetzlaff Decl. ¶ 7.

---

[4] The Supreme Court has emphasized the importance of the public interest in equitable balancing, explaining that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction" or stay. *Winter v. NRDC*, 555 U.S. 7, 24 (2008); *see Nken*, 556 U.S. 418. Courts weigh the public interest by evaluating "the consequences . . . to nonparties" from "granting or denying" requested relief. *Abbott Labs. v. Mead Johnson & Co*., 971 F.2d 6, 11–12 (7th Cir. 1992).

As a result, shutting down Line 5 in June 2026—fewer than five months from now—would irreparably injure the public. As the United States explained only six months ago, "[a]bove all, shutting down Line 5 could disrupt the energy supply chain, increase domestic prices, and enhance the economic and political power and leverage of malign foreign actors worldwide."[5] Thus, the injuries include:

      <u>Refineries</u> reliant on Line 5 would face serious losses. As Enbridge established, Line 5 serves five refineries in the United States and five in Canada. Tetzlaff Decl. ¶¶ 5, 7–8; Bishop Decl. ¶ 5; Report, ECF No. 495, at 53. In Ohio, Toledo Refining Company, owned by PBF Energy, will likely cease operations if Line 5 is shut down more than a few weeks. Donley Decl. ¶¶ 7–8; *see also* Lucey Decl. ¶¶ 7–8, 12–13. Similarly, Plains Midstream has fractionator facilities in Rapid River, Superior, and Sarnia. Podavin Decl. ¶ 4. Shutting down Line 5 is likely to result in the inevitable shutdown of Plains' facilities in Rapid River and Superior, and severe limitations at the Sarnia facility. *Id.* ¶¶ 5, 10. Other refineries would drastically reduce operations. Hutchinson Decl. ¶¶ 4–5; Yu Decl. ¶¶ 5–6; Murray Decl. ¶ 4; O'Shaugnessy Decl. ¶ 5; Baker Decl. ¶¶ 3–4; Lucey Decl. ¶ 8; *see also* Baker Decl. ¶¶ 3–5; Bishop Decl. ¶¶ 7–9. Thousands of workers would lose their jobs. Donley Decl. ¶¶ 9–10; Bishop Decl. ¶¶ 9–10; O'Shaughnessy Decl. ¶ 5; Podavin Decl. ¶ 6; Lucey Decl. ¶¶ 6, 12; Grainger Decl. ¶¶ 26–29.

      This would have a rippling effect on the local economies. Donley Decl. ¶¶ 9–10; Yu Decl. ¶ 8. As the President of the United Steelworkers Local 912 explains, "Toledo Refining is one of the largest private employers in East Toledo," providing middle class jobs and benefits for generations of workers. Donley Decl. ¶¶ 5, 10. It employs 600 employees and 200 contractors, and

---

[5] United States Statement of Interest, No. 1:20-cv-01141-RJJ-RSK, ECF No. 140 at 24 (filed Sept. 12, 2025 in W.D. Mich.).

each job "supports about 12 community jobs in [the] area." *Id.* ¶ 9. "In addition to family-sustaining wages, workers would lose health insurance, pensions, and other benefits." Bishop Decl. ¶ 10. Workers also fund important community projects. Donely Decl. ¶ 8. Any prolonged shutdown of Line 5 would not only result in the loss of these jobs and community projects, but also potentially the "loss of $5.4 billion in annual economic output to Ohio and southeast Michigan." *Id.* ¶¶ 9–10. Over 5 years, "Line 5 shutdown is expected to cost" the Midwest and elsewhere "approximately $27.3 billion . . . due to loss of production at area refineries." Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 7 n.9.

Immediate shortages of propane and transportation fuels would result.[6] Line 5 is unique in that it transports both natural gas liquids and light crude oil. Report, ECF No. 495, at 14. It supplies the natural gas liquids for producing virtually all propane, used to heat households and businesses, in Ontario and most of Michigan. *Id.* at 18–19; Amicus Br. of Mich. Propane Gas Ass'n, *et al.*, No. 23-2309, ECF No. 29, at 6–9; Schwartz Decl. ¶ 26; Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 8 (explaining Ontario's reliance on Line 5 for propane). If Line 5 were shut down, there would be significant shortages in propane, leaving consumers with a "heat-or-eat" dilemma. Grainger Decl. ¶¶ 4–6, 15. Without the Relocation Project, acute propane shortages

---

[6] Courts routinely recognize that the public has numerous powerful interests in pipelines, including an interest as end-consumers of crude oil. *See Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*, 2008 WL 1751358, at *23 (E.D. Wis. 2008) ("Denying Guardian's motion [for injunctive relief] would also operate against the public interest, potentially limiting the natural gas available to citizens of the region in which the pipeline is to run, and/or contributing to already high natural gas prices.") (citation omitted); *Texas E. Transmission Corp. v. Giannaris*, 818 F. Supp. 755, 760–61 (M.D. Pa. 1993) ("[G]ranting injunctive relief will be in the public interest. Enjoining [landowners] from impeding Plaintiff's access to the pipelines will further the federally protected goal that gas lines be adequately tested and maintained."); *Williams Pipe Line v. City of Mounds View*, 651 F. Supp. 551, 570 (D. Minn. 1987) ("The public has at least three important interests at stake here: an interest in safety, an interest in the continued operation of petroleum pipelines, and an interest in the maintenance and enforcement of uniform federal pipeline safety standards.").

would persist in the Midwest and Ontario for years and lead to shortfalls and higher propane prices. *Id.* ¶¶ 4–6, 30–31; Earnest Decl. ¶¶ 4–5, 12; Yu Decl. ¶ 6 (explaining that "Line 5 is the only pipeline currently capable of carrying natural gas liquids from Alberta to Ontario"). Propane supply shortfalls in Michigan and Ontario during cold winters will have severe consequences, with potential life and safety implications if not backfilled. Grainger Decl. ¶¶ 4–6, 15, 25–31; Earnest Decl. ¶¶ 4–5, 12; Yu Decl. ¶¶ 6–8. These shortages will have an outsized effect on low-income households. Grainger Decl. ¶¶ 4–25, 30–31.[7] As the United States recently explained, Michigan "households could be adversely affected if Line 5 ceases to provide them energy."[8]

Line 5 is critical for supplying jet fuel to certain airports. For example, it supplies more than half of the jet fuel supplies for the Detroit Metro Airport and between 90% to 100% of the jet fuel supplies to Toronto's Pearson International Airport. Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 8; Schwartz Decl. ¶ 26; Yu Decl. ¶ 5.[9] Line 5 also supplies a large part of Quebec's crude oil needs and about 38% of crude oil in parts of the Midwest. Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 8; Report, ECF No. 495, at 58. "Canada believes that even with a certain three-year lead-time, the economic impacts of a shutdown would be severe, both for crude oil and NGLs producers in the west, and for downstream refineries and facilities in

---

[7] The Administration has recognized that "high energy costs devastate American consumers" by driving up costs for "transportation, heating, utilities, farming, and manufacturing, while weakening our national security." *Unleashing American Energy*, Exec. Order No. 14154 § 1, 90 Fed. Reg. 8353 (Jan. 20, 2025). Inadequate energy infrastructure "causes and makes worse the high energy prices that devastate Americans, particularly those living on low- and fixed-incomes." Exec. Order No. 14156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025).

[8] United States Statement of Interest, No. 1:20-cv-01141-RJJ-RSK, ECF No. 140 at 24 (filed Sept. 12, 2025 in W.D. Mich.).

[9] Canadian Energy Centre, A Matter of Fact, https://bit.ly/4bSbh0R ("100 per cent of the jet fuel used at Toronto's Pearson Airport and more than half of the jet fuel for the Detroit Metro Airport" is derived from petroleum delivered by Line 5).

central Canada and the U.S. Midwest that produce refined products for industry and consumers." Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 10–11.

Harm to relations with Canada and substantial monetary exposure. As explained in Section I.D, *infra*, permanently shutting down Line 5 will adversely affect United States' trade and diplomatic relations with Canada and could put the United States in breach of its obligations under the Transit Treaty—potentially leading to substantial monetary damages. Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 2–3, 27–29.

Environmental risks associated with alternative means of transportation. Those risks would more than offset the speculative advantage of avoiding an extremely low probability of an oil spill. *See also* Donley Decl. ¶¶ 6–7. Every barrel of oil that shifts to rail, trucks, or barges means a net increase in spill risks, potential fatalities and injuries, and air pollution.[10] Rail, truck, or barge

---

[10] *E.g.*, Army Corps, *Enbridge Line 5 Wisconsin Segment Relocation Project – Final Decision Document*, at 15 (Oct. 29, 2025) ("pipelines are safer [than railroads] and more economical for long-haul transport"); *id.* at 16 ("A trucking alternative would overburden public road capacity, increase greenhouse gas emissions, and negatively impact communities and roadways . . . ."); *id.* (explaining the challenges and risks of shipping oil via barges across the Great Lakes); *see also* Mich. Pub. Serv. Comm'n, *In the Matter of the Application for the Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac*, No. U-20763-1454, at 303 (Dec. 1, 2023), https://bit.ly/49MQN7h ("The Commission also finds that alternative modes of transporting Line 5 products, such as truck, rail, oil tankers and barges, will likely increase environmental impairment and may increase the threat of spills that could significantly damage the Great Lakes, the state's terrestrial environment, and more than 1,000 other aquatic environments in Michigan."); *see id.* at 294–95, 332 (report demonstrated that "the increased rail transportation may negatively impact urban and farm areas and may pose an environmental threat to over 1,000 other aquatic environments in Michigan in the event of a rail accident and spill"); *id.* at 339 (report "demonstrated that a spill of Line 5 product from a rail accident would have a significantly negative effect on Michigan wetlands and endangered species"); *id.* at 337–41 (rejecting alternative modes of transportation to Line 5 because they would result in "significantly more GHG emissions than an equivalent volume by pipeline" and "carry greater likelihood of environmental harm").

transport of Line 5 products increases the risk of spilled product reaching those tribes who rely on rivers or lakes for fishing, wild rice, and other treaty protected rights.[11]

This Court said that three years would "give Enbridge sufficient time to appeal this court's injunctive order or make new law." Order, ECF No. 52, at 684. In fact, both parties promptly filed their merits briefs within months of this Court's judgment. The Seventh Circuit panel heard oral argument in February 2024, with the panel consisting of Judges Easterbrook, Scudder, and St. Eve. While the panel has issued opinions in every other case from that week's sitting, it has not yet issued a merits opinion in this case. It has been almost two years since oral argument was held, thereby confirming that the appeals raise important and serious issues requiring time to properly resolve. With petitions for en banc rehearing or Supreme Court review a realistic possibility given the important issues raised in this case, appellate proceedings will likely be ongoing when the current shutdown date hits. The Court should grant a stay to ensure adequate time for the appellate review process including through the Rule 41 mandate.

**B.      Enbridge would be irreparably harmed too.**

Compelling Enbridge to shut down Line 5 by June 2026—while both its appeal and its Relocation Project permitting process are pending—would deprive Enbridge of all its revenue from that pipeline's interstate and international operations. Aside from lost revenue, Enbridge will suffer losses to goodwill and reputational benefits it earns from delivering energy products to customers. *See* Tetzlaff Decl. ¶ 13.

This harm is irreparable. Enbridge will not be able to recover these economic losses from the Band. Economic harm is considered irreparable when it cannot be remedied after the fact, when any remedy would come too late, or when the quantum of harm would be difficult to calculate—

---

[11] *See* Mich. Pub. Serv. Comm'n, *supra* note 10, at 303, 305, 332–33, 338–39.

all of which are the case here. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *see also Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (noting "it is well established that the loss of goodwill and reputation" can constitute irreparable harm); *Gateway E. Ry. Co v. Term. R.R. St. Louis*, 35 F.3d 1134, 1139–40 (7th Cir. 1994) (affirming finding of irreparable harm due to likely "loss of customers to a competitor" and related "loss of goodwill").

At least one court has recognized that shutting down a pipeline causes irreparable harm to the pipeline operator. *See Williams Pipe Line*, 651 F. Supp. 551. In that case, the district court enjoined local authorities from interfering with the reopening of the pipeline, finding that the pipeline operator had shown irreparable harm from a shutdown:

> [The pipeline operator] is, of course, concerned with its own economic losses, but the record also indicates that idling of the line is likely to cause fuel shortages. State officials have expressed concern about "serious short term supply problems." … Such shortages may result in higher prices and may also necessitate more dangerous means of transporting petroleum products, such as trucking. [The pipeline operator] has shown that any unnecessary delay in restarting the pipeline will cause irreparable harm.

*Id.* at 570 (citation and footnote omitted). Similar reasoning applies here: given the expressed concerns of the United States and Canada about serious supply problems from any shut down, Enbridge has demonstrated irreparable harm.

The Court should follow the persuasive reasoning in *United States v. Osage Wind, LLC*, 4:14-cv-00704-JCG-JFJ, 2025 WL 678039 (N.D. Okla. 2025). There, after finding an energy company in trespass on Osage Nation land, the court ordered damages and ejection of the wind farm. *Id.* at *1. The court granted a stay pending appeal because the energy company would suffer substantial unrecoverable economic losses; because of the sheer "scale" of the injunction order's

12

requirements; and because "the appeal is unlikely to be fully resolved before the deadlines imposed by the Court's opinion." *Id.* at *6, 8.[12]

Here, the economic losses and public harms are enormous and unprecedented. And given facts on the ground now, the complete appellate process is "unlikely to be fully resolved before" June 16, 2026.

### C.    Preserving the status quo would not harm the Band.

Enbridge seeks a stay of *only* the part of the Court's order requiring Enbridge to "cease operation of Line 5" on the allotted parcels by June 16, 2026. Order, ECF No. 684, at 52. This narrow request will not substantially injure the Band while appellate proceedings are ongoing and until the Relocation Process is in service. Line 5 has been safely operating on the Reservation for decades, with no detrimental environmental or financial harm to the Band. Should this Court's trespass ruling be upheld on appeal, the Band will be compensated in trespass damages per this Court's judgment. Am. Final J., ECF No. 689, at 2 ¶ 3.

Apart from the millions invested in the Relocation Project, Enbridge has invested tens of millions over the last three years in the safety of pipeline operations on the Reservation. In March 2025, Enbridge installed the log jack revetment project, consisting of boulders framed in tetrahedral cages of large logs, held together by stainless steel hardware, which looks like this:

---

[12] The court granted the stay even though it also found that the energy company had not shown a likelihood of success on appeal; that the Osage Nation would continue to suffer injury to its sovereignty if a stay was granted; and that the public interest did not support a stay. *Osage Wind*, 2025 WL 678039, at *4–7. Here, by contrast, all four factors support a stay.



Duncan Decl. ¶¶ 3, 11.

The log jack project consists of a protective lattice of large logs that prevents erosion from occurring, traps sediment and woody debris against the riverbank, which builds up over time, thereby further reinforcing, strengthening, and stabilizing the riverbank. *Id.* ¶¶ 11–12; Schwartz Decl. ¶ 21; Weatherly Decl. ¶¶ 11–12. Enbridge successfully installed 235 log jacks over 562 feet of the Bad River shoreline at the Meander. Schwartz Decl. ¶ 22; Storlid Decl. ¶¶ 11–15.

The log jacks are working well and have halted erosion at the narrowest part of the Meander, which was the location of the highest concern in Spring 2023. Schwartz Decl. ¶ 22; Duncan Decl. ¶¶ 14–15; Storlid Decl. ¶¶ 16–18. *No* meaningful erosion has occurred in that area since that time. Duncan Decl. ¶ 14; Schwartz Decl. ¶ 22. The log jacks are diligently monitored by a total of eight cameras. Duncan Decl. ¶¶ 6, 15; Storlid Decl. ¶ 8. The log jacks are well-maintained, have not required any modification or reinforcement, and will continue to effectively

protect the riverbank, and therefore the pipeline, into the foreseeable future.[13] Duncan Decl. ¶¶ 14–15; Storlid Decl. ¶¶ 16–18; *see also* LeBlanc Decl. ¶¶ 10–18; Weatherly Decl. ¶¶ 13–18.

Additionally, Enbridge also installed, at the Band's request, a mainline check valve east of the Meander. Schwartz Decl. ¶ 18. As the Court is aware, the check valve would substantially reduce the volume of any oil released from Line 5 in a highly unlikely event of any discharge. *Id.* ¶ 19. Enbridge's recent investments in ensuring the continued safe operation of Line 5 on the Reservation exceed $30 million. *Id.* ¶ 24. This is on top of the tens of millions that Enbridge has invested in the Relocation Project. Order, ECF No. 684, at 21–22; Schwartz Decl. ¶¶ 3, 5–11.

Enbridge continues to follow the enhanced monitoring, shutdown, and purge protocol that the Court imposed in June 2023. Duncan Decl. ¶¶ 5–7; Storlid Decl. ¶ 10; Weatherly Decl. ¶¶ 6–10. Enbridge *does not* seek a stay of that part of the Court's order. Enbridge continues to comply with the Court's ruling by monitoring the weather on a daily basis, keeping close tabs on the Meander more frequently when forecasts call for flooding or potential flooding, and staging nitrogen and personnel to prepare for potentially purging the line if circumstances ever warrant, which is extremely unlikely given the added protection from the log jacks. Duncan Decl. ¶¶ 8–10, 15; Weatherly Decl. ¶¶ 7–10.

While the Band insists that it wants Line 5 off the Reservation, it has caused significant delays in Enbridge's Relocation Project. Schwartz Decl. ¶ 11. Had it not been for the Band's objections in the permitting process, Enbridge would have likely completed the project by June 16, 2026. *Id.* For its part, Enbridge has been diligent in pursuing the Relocation Project permits.

---

[13] The Band's permit purports to set a deadline on Enbridge to remove the log jacks no later than September 30, 2026. Schwartz Decl. ¶ 23.

Once commenced, construction of the Relocation Project is expected to take about a year.[14] *Id.*
¶ 13.

### D.    Enbridge is likely to succeed on the merits.

A stay is also warranted because Enbridge is likely to prevail in material respects on its
appeal. While a stay applicant "must make a strong showing" of success on the merits on appeal,
that "does not mean proof by preponderance"; it rather means "a demonstration of how the
applicant proposes to prove the key elements of its case." *Wisconsinites for Alternatives to
Smoking & Tobacco, Inc. v. Casey*, 2025 WL 2617091, at *1 (W.D. Wis. 2025) (Conley, J.)
(quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020)). In other words,
the "likelihood of success" standard "requires something less than a 50% chance of success," and
"[i]t is sufficient that a party have a substantial case on the merits." *Lindell v. Frank*, 2003 WL
23198184, at *1 (W.D. Wis. 2003). This is especially true when—as here—"the balance of equities
weighs heavily in favor of granting the stay." *League of Women Voters of Fla., Inc. v. Fla. Sec'y
of State*, 32 F.4th 1363, 1370 (11th Cir. 2022); *accord A & F Enters.*, 742 F.3d at 766 ("[T]he
greater the moving party's likelihood of success on the merits, the less heavily the balance of harms
must weigh in its favor, and vice versa.").

### 1.    Trespass and nuisance liability

On trespass liability, the Band gave its consent to easements over the Allotted Parcels, both
explicitly and impliedly, by operation of its 1992 Agreement with Enbridge. Enbridge Opening
Br., No. 23-2309, ECF No. 15, at 17–29. The United States did not dispute this but asserted that
Enbridge was trespassing because the Bureau of Indian Affairs had not renewed Enbridge's federal

---

[14] Conditions in the permit granted to Enbridge restrict construction during certain months of the
year. Schwartz Decl. ¶ 13. Enbridge's construction thus could take longer than a year depending
on when the work starts. *See id.*

easement. *See* Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 16, 19, 21. But the only basis the BIA has pointed to for not renewing the easement is its belief that the Band has not consented. ECF No. 170-26, at 9, 13. It is thus the Band's unlawful withholding of consent that is preventing the BIA from granting Enbridge's renewal applications. If the Seventh Circuit determines that the Band's consent is required under the 1992 Agreement, there is no suggestion that federal approval will not then be forthcoming.[15]

On nuisance liability, the United States agreed with Enbridge that the Pipeline Safety Act wholly displaces the Band's nuisance claims seeking equitable relief at the Meander. Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 47–59. Thus, according to the United States, this Court erred by entertaining the Band's federal law nuisance claim. *Id*.

### 2.    Foreign affairs and the 1977 U.S-Canada Transit Treaty

**a.    Foreign-Affairs Doctrine**. On the remedy for any trespass, Enbridge has made a substantial case on the merits that the Court's shutdown injunction violates the foreign-affairs doctrine. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401 (2003).

Almost half a century ago, the United States and Canada agreed that no public authority would do anything to impair or impede with the transmission of hydrocarbons across transit pipelines such as Line 5. *See* Agreement Concerning Transit Pipelines, Can-U.S., Art. II, cl. 1, Jan. 28, 1977, 1086 U.N.T.C. 344 (Transit Treaty). As Judge Easterbrook emphasized at the oral argument, "[t]here's no doubt that a federal district judge is a public authority under the treaty."

---

[15] Enbridge followed the federal statutory scheme by submitting timely applications to renew rights-of-way across the Allotted Parcels. The BIA Regional Director denied Enbridge's applications in July 2021, but the denial has been stayed pending a final agency determination. Order, ECF No. 360, at 24 ("Enbridge timely filed administrative appeals from the denials"); 25 C.F.R. § 2.6; 43 C.F.R. § 4.314(a). On July 28, 2025, the Deputy Secretary of Interior assumed jurisdiction over the administrative appeals, and the record was transmitted to the Office of Secretary. Schwartz Decl. ¶ 25. No final agency action has occurred.

Tr. of Oral Argument, No. 23-2309, Feb. 24, 2024, at 55:11. But regardless of how the Transit Treaty is applied as a matter of law, both Canada and the United States have reaffirmed repeatedly their common foreign policy that neither will do anything to impair the flow of hydrocarbons via the transit pipelines.

On appeal in this case, Canada said that "[a]n order by a U.S. court halting the flow of hydrocarbons along Line 5 that is not authorized under the Treaty directly contravenes the express undertakings the United States made to Canada under the Treaty." Amicus Br. of Gov't of Canada, No. 23-2309, ECF No. 20, at 13–14. "[T]here is at least a substantial risk that under the district court's order (or a similar order after modification on appeal) Canada's rights under the Transit Treaty will be violated." *Id*. at 17. Canada said that there should be no shutdown until Enbridge receives the necessary permits for the Relocation Project and has time to construct and bring into operation the re-routed pipeline segment. *Id.* at 29.

The United States expressed concern to the Seventh Circuit that "if Line 5 were shut down before a replacement pipeline is put into operation . . . it is possible that the United States could be subject to arbitration in which it could have exposure for significant damages if the arbitration panel found the United States liable for breaching its treaty obligations." Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 28–29. "There is a public interest in avoiding a dispute with Canada over whether a shutdown order would violate the Transit Pipeline Treaty and in recognizing the importance of the broader diplomatic and trade relationship with Canda." *Id.* at 28–30. According to the United States, this Court initially tried to avoid these public interest concerns by giving Enbridge five years to complete the reroute, followed by increased payments. *Id.* at 25. But the Court later abandoned this approach and directed Enbridge to shut down Line 5 in three years in the final injunction. *Id*. at 26. In crafting the final relief, the Court "fail[ed] to consider the

possibility that an arbitral panel could find that its order is inconsistent with the United States'
international obligations." *Id*. at 27; *accord* Amicus Br. of Gov't of Canada, No. 23-2309, ECF
No. 20, at 13–15. The United States urged the Seventh Circuit to reverse the injunction and remand
for further proceedings to craft the appropriate remedy after fulling considering and weighing of
the important public interests. Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 36–37.

More recently, both Canada and the United States confirmed their positions that Line 5
should not be shutdown. *See Enbridge*, 2025 WL 3707609, at *17–20. In *Enbridge*, the Western
District of Michigan analyzed the same pipeline (Line 5) and the same Treaty. In its Statement of
Interest, the United States emphasized: "'Canada is a key U.S. partner in energy trade, with
investment flowing in both directions across the border, and the continued operation of Line 5
plays a significant role in that partnership.'" *Id*. at *19 (quoting the United States' Statement of
Interest). Observing that both the United States and Canada agreed that the Transit Treaty's
foreign-affairs purpose was to keep international pipelines flowing, the court held that an order
shutting the pipeline down would interfere with that purpose. *Id.* at *18–19. As the court explained,
"[b]oth the United States and Canada continue to reiterate . . . their shared foreign policy position
embodied in the Transit Treaty that neither country will do anything to impede the flow of oil
[through Line 5] between the two countries. And . . . both countries agree that a compelled
shutdown of Line 5 would conflict with those domestic and foreign policy positions." *Id*. at *18;
*see id*. at *19 (an order to shut down Line 5 "intrudes on the United States foreign relation power
because it interferes with the United States's relations with Canada").

The same reasoning applies here. Enbridge Opening Br. No. 23-2309, ECF No. 15, at 32–
40; Amicus Br. of U.S., No. 23-2309, ECF No. 94 at 2–3, 8, 23, 25–32, 36. As in *Garamendi* and
*Enbridge*, the Court's shutdown injunction here violates the foreign-affairs doctrine because it

would "interfere[] with the National Government's [i.e., the President's and Congress's] conduct of foreign relations." 539 U.S. at 401. The Transit Treaty prescribes a specific process for resolving disputes arising under it. *See Enbridge*, 2025 WL 3707609, at \*19–20, discussing Transit Treaty, Art. IX. While this Court noted that the Band will not be involved in any Transit Treaty arbitration (Order, ECF No. 360, at 42), the Federal Government has plenary authority over both Indian tribes and international relations, and it represents the interests of the United States as a whole in the Art. IX dispute resolution proceedings. And while this Court emphasized the Band's 1854 Treaty with the United States, nothing in that treaty forecloses application of generally applicable federal laws regulating interstate and international commerce. U.S. Const. Art. I, § 8, cl. 3 (Congress has plenary authority to regulate commerce with foreign nations and with Indian tribes).[16]

> **b.**     **The 1977 Transit Treaty's Plain Text**. Enbridge also has a substantial case on the merits that the Transit Treaty's plain text bars an injunction ordering the shutdown of a pipeline.

> Under Article II of the Transit Treaty, the United States and Canada reciprocally agreed that "[n]o public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." Both Canada and the United States agree Article II is self-executing as domestic law. Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 30 n.5; Amicus Br. of Gov't of Canada, No. 23-2309, ECF

---

[16] The Band's 1854 Treaty expressly recognizes that the United States may traverse all necessary roads, highways, and railroads through the Reservation, with compensation being made for them. 1854 Treaty, Art. 3. Pipelines did not exist in 1854, but the broad language in Article 3—"all necessary roads, highways, and railroads"—shows an intent to cover rights of way for the different types of infrastructure necessary for interstate commerce purposes.

No. 20, at 12. This self-executing provision prohibits a domestic public authority—including a federal district court and the Band—from permanently shutting down Line 5.

Importantly, the Transit Treaty precludes only the specific *remedy* of a shutdown injunction. The 1854 Treaty with the Chippewa, for its part, says nothing about what *remedies* federal courts must make available. *See* Amicus Br. of U.S., No. 23-2309, ECF No. 94, at 35–36 (agreeing). While the Transit Treaty precludes the shutdown injunction here, it does not preclude an award of monetary damages for any trespass liability. *See City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 213 (2005) ("The distinction between a claim or substantive right and a remedy is fundamental."). The two treaties thus do not conflict. Anyways, the Band specifically agreed that Enbridge may operate Line 5 through 2043 over its tribal lands as provided in the 1992 Agreement.[17] Thus, this case does not concern any surrender of sovereign authority.

### 3.    Other harm to public

The Court ruled that the public interest and other equitable factors could not displace any tribal sovereignty over the twelve Allocated Parcels absent extraordinary circumstances. Order, ECF No. 684, at 51. Even where there is an intentional trespass on Indian land, however, district courts retain equitable authority to decline to issue an injunction. *See United States v. Pend Orielle Cnty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 614 (9th Cir. 1998). As the United States explained to the Seventh Circuit, nothing in the 1854 Treaty with the Chippewa or the Band's sovereign tribal rights prevents this Court "from crafting a remedy based on relevant factors governing equitable

---

[17] *See* Agreement, ECF No. 28-1, at 2 ("Tribe agrees … [to] a right of way for the construction, operation, and maintenance of a pipeline for fifty (50) years within the Existing Right of Way"); *see also* Band's Resolution Granting Consents to Rights of Way, ECF No. 170-22, at 1 ("the Tribal Counsel . . . hereby consents to the Company's offer, consents to the Company's requests and Application, and the requests the Secretary of Interior . . . to approve and grant the Application and the rights of way, including any rights of way which are substantially similar to those described in the Application and as may be amended by the Company with technical amendments . . . .").

relief, including comprehensive consideration of the public interests." Amicus Br. of U.S., No. 23-2309, at 36. "Remand is appropriate to allow the district court to conduct a more complete analysis of the public interests here" including the United States' treaty obligations, "the effects of a shutdown of Line 5, and all other equitable considerations relevant to the crafting of appropriate injunctive relief." *Id.* at 36–37.

Despite recognizing that "both sides' experts [at the trial] acknowledge[d] that the loss of Line 5 . . . will have near-term economic impacts on consumers," the Court concluded that "three years will at least give the public and other affected market players time to adjust to a permanent closure of Line 5." Order, ECF No. 684, at 27, 51. That key premise of the Court's injunction has not since borne out in practice. Facts emerging since June 2023 demonstrate that the public and market players have not adjusted to a possible closure of Line 5.

### 4.    The Band's conduct

Finally, the Band used its interests in the Allotted Parcels to force Enbridge's Line 5 off of *Tribal Parcels*—even though the Band promised in the 1992 Agreement to allow Enbridge to operate on its land until 2043 and Enbridge paid the Band substantial compensation for that promise. In addition, the Band continues to cause significant delays in the permitting process of the Relocation Project. Those delays have prevented Enbridge from complying with the June 2026 shutdown date.

Even under this Court's order, Enbridge is in trespass of less than a half precent of the pipeline's length and yet the Band is using those parcels to shut down the entire 645 miles of pipeline. The Court's injunction was overly broad as a result. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022).

*    *    *

The same reasons and changed circumstances favoring a stay pending appeal also support modifying the Court's June 16 shutdown date. Thus, Enbridge requests a Rule 8(a)(1)(C) modification of the injunction. At a minimum, the Court should enter a stay order through the Seventh Circuit's issuance of the Rule 41 mandate and any certiorari review by either party. *See Rakovich v. Wade*, 834 F.2d 673, 674 (7th Cir. 1987).

## II. The Court should issue a Rule 62.1(a)(3) Order to modify the injunction and extend the Line 5 shutdown date.

Alternatively, Enbridge seeks a Rule 62.1 indicative ruling that advises the Seventh Circuit it wishes to modify the injunction to allow Enbridge to continue operating Line 5 until the Relocation Project is complete. At the very least, the Court should return to its original idea of allowing Enbridge to operate for five years (i.e., until June 16, 2028), with increased payments owed to the Band after that date. Order, ECF No. 360, at 43.

### A. Legal standard

Because the appeals are pending, this Court's authority to modify the injunction is set forth in Rules 62.1 and 60(b)(5), (6). "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (citation omitted). Courts "may modify an injunction to adapt to changed circumstances." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 920 (7th Cir. 1996); *see Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); Fed. R. Civ. P. 60(b)(5), (6). "A district court may modify an injunction 'if persuaded that change had benefits for the parties and the public interest,' or for 'for good cause on the motion of a person adversely affected by it.'" *Weather Shield Mfg., Inc. v. Drost*, No. 17-CV-294-JDP, 2017 WL 7053652, at *2 (W.D. Wis. Nov. 16, 2017) (quoting *CFTC v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015); and *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989, 996 (N.D. Ill.), *aff'd*, 40 F.3d 175 (7th Cir. 1994)). Said otherwise,

"a court can modify an injunction that it has entered previously whenever the principles of equity require it to do so." *Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1187 (7th Cir. 1994) (citation omitted).

Here, good cause exists for the requested modification. Key events and circumstances since the Court's order was issued require a modification of the Court's injunction remedy.

### B.    The Court set the original shutdown date to protect the public interest.

When crafting the existing injunction, the Court balanced competing interests. It decided to delay shutting down Line 5 by a certain period of time. In selecting the appropriate shutdown date, the Court sought to allow enough time to avoid public harm from Line 5's closure. The Court decided that a period of three years—until June 16, 2026—would suffice, hoping that this three-year period would allow Enbridge to "complete a reroute" or "give the public and other affected market players time to adjust to a permanent closure of Line 5"—as well as "give Enbridge sufficient time to appeal this court's injunctive order or make new law." Order, ECF No. 684, at 51–52. In short, the entire point of the Court's three-year shutdown date was to prevent harm to the public interest.

### C.    In light of changed circumstances, a new shutdown date is necessary to protect the public interest.

As the June 2026 shutdown date approaches, the Court's assumptions have not been realized. Leaving in place the June 16, 2026 shutdown date would harm millions of third parties, invite tensions between the United States and Canada, and turn the injunction into an "instrument of wrong." *United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932). "[I]f Line 5 were shut down before a replacement pipeline is put into operation—and that shutdown were to lead to the sort of economic harm Canada describes—it is possible that the United States could be subject to arbitration in which it could have exposure for significant damages if the arbitration panel found

24

the United States liable for breaching its treaty obligations." Amicus Br. of U.S., No. 23-2309, at 29.

The changed circumstances relate specifically to the Court's rationale for selecting the shutdown date. *See* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2961 (3d ed.) ("In order to determine whether the changes in operative facts are a sufficient basis for modification, the focus must be on those circumstances that led to the original relief."). Current facts show that more time is needed before Line 5 is shut down: the Relocation Project is not yet complete, and the market has not invested in any other alternatives. Given these changed circumstances, a shutdown of Line 5 in June 2026 would cause significant harm to the public interest. The requested extension, by contrast, would protect the public interest.

*First*, the Relocation Project is not complete and will not be complete by June 16, 2026. But Enbridge has made significant progress with respect to the permits, as explained above. While the Band purports to want Enbridge off of the Reservation, it has caused significant delays in the permitting process of the Relocation Project. Schwartz Decl. ¶ 11.

*Second*, as explained above, affected market players have not adjusted to the impending closure of Line 5, and their conduct since 2023 indicates that they believe the Relocation Project is likely to be completed and they are supporting it. *See also* Rennicke Decl. ¶ 7; *see, e.g.*, Baker Decl. ¶ 6. Thus, more time is necessary to avoid an energy and economic catastrophe in the areas served by Line 5.

*Third*, the Court also found in June 2023 that three years would "give Enbridge sufficient time to appeal this court's injunctive order or make new law." Order, ECF No. 52, at 684. This finding, too, has not borne out.

All of this means that based on circumstances as they exist *now*, shutting down Line 5 in the near future is incompatible with the public interest.

### D.    The requested modification will not have significant adverse effects.

Enbridge seeks a modification of *only* the part of the Court's judgment requiring Enbridge to cease operating Line 5 on any parcel within the Band's tribal territory on which defendants lack a valid right of way on or before June 16, 2026." Am. Final J., ECF No. 689, at 2 ¶ 4. This narrow request will not have significant adverse effects on the Band or their right to use and enjoyment of tribal lands, especially given the increased safety measures collaboratively implemented at the Meander and due to the installation of the log jacks and check valve. And it will not impair the Band's financial remedies for trespass if this Court's trespass finding is upheld on appeal.

### CONCLUSION

The Court should stay the part of its injunction requiring Enbridge to cease operation of Line 5 on June 16, 2025. The stay should continue through the Seventh Circuit's issuance of the Rule 41 mandate and any certiorari review by either party. Alternatively, the Court should issue a Rule 62.1(a)(3) indicative order advising the Seventh Circuit that it wishes to modify the injunction. Enbridge is willing to provide this Court with quarterly updates on the progress of the Relocation Project and demonstrate that, for its part, it will not unduly delay completion of the Relocation Project.

Dated: January 27, 2026                    Respectfully submitted,

/s/ Joseph S. Diedrich
_____

Joseph S. Diedrich                    Michael C. Davis
Eric M. McLeod                        David L. Feinberg
HUSCH BLACKWELL LLP                   VENABLE LLP
33 East Main Street, Suite 300        600 Massachusetts Ave., NW
Madison, WI 53703                     Washington, DC 20001
(414) 978-5425                        (202) 344-8278
joseph.diedrich@huschblackwell.com    MCDavis@venable.com
eric.mcleod@huschblackwell.com        DLFeinberg@venable.com

*Counsel for Enbridge Energy Company, Inc.,*
*and Enbridge Energy, Limited Partnership*

**CERTIFICATE OF SERVICE**

I certify that on January 27, 2026, I served the foregoing document on all counsel of record using the Court's ECF system.

/s/ Joseph S. Diedrich