## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

                   *Plaintiff*,

v.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

                   *Defendants*.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

                   *Counter-Plaintiffs*,

v.

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION and NAOMI TILLISON,
in her official capacity,

                   *Counter-Defendants*.

Case No. 3:19-cv-00602-wmc

Judge William M. Conley

**BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS'
MEMORANDUM OF LAW IN OPPOSITION TO ENBRIDGE'S MOTION TO STAY OR
MODIFY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................4

I.     Enbridge Asks This Court To Act Far in Excess of the Limits It Has Recognized on Its Own Authority While an Appeal Is Pending.........................................................4

       A.    Federal Rule of Civil Procedure 62(d) Governs Enbridge's Motion for a Stay and Forecloses Enbridge's Requested Relief........................................................4

       B.    This Court Lacks the Authority To Grant a Stay Pending Certiorari.......................7

II.    Even If This Court Addresses Enbridge's Motion on the Merits, Enbridge Has Fallen Far Short of Making the Necessary Showing for a Stay.......................................9

       A.    Enbridge's Recycled Arguments Do Not Establish a Likelihood of Success on the Merits. ...........................................................................................10

             1.    Enbridge Says Nothing To Undermine this Court's Conclusion that It Cannot Allow for a Prolonged or Indefinite Trespass on the Band's Lands..............................................................................................10

             2.    The United States Has Said Nothing To Increase Enbridge's Chances of Success on Trespass Liability. ............................................................13

             3.    Neither the Transit Treaty nor the Foreign Affairs Doctrine Provides Any Basis To Stay the Injunction. ...........................................................15

       B.    Enbridge Will Not Suffer Cognizable Irreparable Injury from the Denial of a Stay....................................................................................................18

       C.    Issuance of a Stay Will Cause Substantial Injury to the Band. ..............................20

             1.    The Band Will Suffer Significant Harm from a Stay of the Shutdown Order. .............................................................................................20

             2.    The Band's Valid, Constitutionally Protected Objections to the Reroute Do Not Weigh in Favor of a Stay. ...........................................................26

       D.    The Public Interest Weighs Against a Stay of the Injunction. ...............................29

             1.    Protecting Tribal Sovereignty and Treaty Rights Serves the Public Interest...........................................................................................29

2.      The Market Will Readily Adjust to the Shutdown....................................32

        a.      Refineries Can Replace Nearly All Their Line 5 Deliveries
                Without Large-Scale Infrastructure Investment and with
                Negligible Impact on Gasoline Prices.............................................34

        b.      Large-Scale Infrastructure Investments Are Likewise Not
                Necessary To Replace Line 5-Derived Propane. ..........................40

        c.      Enbridge's Narrative About the Market Has No Basis in
                Evidence......................................................................................44

3.      The United States' Relationship with Canada Does Not Weigh in Favor
        of Staying the Injunction...........................................................................48

III.    Relief Under Federal Rule of Civil Procedure 62.1 Would Only Ensure Delay and Chaos
        in this Case................................................................................................50

CONCLUSION.....................................................................................................52

## INTRODUCTION

Enbridge's Motion to Stay should be denied on jurisdictional grounds alone. As this Court held in *United States v. Spectrum Brands, Inc.*, 15-cv-371, 2018 WL 502736 (W.D. Wis. Jan. 19, 2018) (Conley, J.), a case nowhere cited by Enbridge, a court proceeding on a stay motion once an appeal has been taken must act with keen awareness of the limitations on its authority. In particular, the court cannot take any action that would materially interfere with the appellate process. That is precisely what Enbridge asks this Court to do. The Seventh Circuit is currently considering the propriety of this Court's trespass injunction. Enbridge would have this Court wrest that decision away from the Circuit and suspend the injunction itself, substantially altering the issues before the Circuit for resolution. *Spectrum Brands* and a host of additional case law warn against Enbridge's suggested disregard for jurisdictional boundaries.

Enbridge's stay motion is jurisdictionally infirm for a second reason. Enbridge asks this Court to suspend its injunction through the Supreme Court certiorari process. But a district court can at most stay a decision through appeal. Once an appeal is resolved, it is for the Court of Appeals to determine whether to stay its ruling further. And a proper understanding of this limitation on the district court's authority highlights the pointlessness of Enbridge's Motion. The Seventh Circuit currently has the validity of the shutdown date squarely before it. If it determines that law or equity requires it to stay or modify the injunction, it can choose to do so, without this Court having to guess whether the Circuit will opt for such a course of action.

Accordingly, this Court need not reach the merits of Enbridge's motion. Should it nevertheless choose to do so, it will find that the motion fails on each of the four criteria for a stay pending appeal.

First, the Motion falls far short of establishing the likelihood of success on appeal. Enbridge simply rehashes its arguments on trespass liability, the Transit Treaty, and the foreign affairs doctrine. And it ignores entirely this Court's considered reasoning as to why it cannot bless a prolonged or indefinite trespass on the Band's lands. Repetition and avoidance do not suffice to justify the extraordinary remedy of a stay.

Second, the Motion fails to establish that Enbridge will suffer irreparable harm absent a stay. Coming into compliance with the law does not qualify as irreparable harm, even if accompanied by the loss of revenues or goodwill.

Third, Enbridge's claim that its continuing trespass on the Band's Reservation is causing the Band no harm defies both law and reality. This Court has already held that the trespass interferes substantially with the Band's rights both as property owner and as sovereign. And while Enbridge attempts to paint a benign picture of its presence on the Reservation, the declarations of Band Chairwoman Elizabeth Arbuckle and Mashkiiziibii Natural Resources Department Director Naomi Tillison tell a very different story. They document that since this Court's decision in 2023, the Band has needed to expend substantial time and resources to guard against a catastrophic pipeline rupture on the Reservation. The installation of log jacks in the Bad River to slow erosion at the meander, and of a check valve to reduce the amount of oil that will spill in the event of a pipeline rupture, predictably caused significant damage to Reservation resources and required the expenditure of thousands of hours of Band time in devising the projects and working with Enbridge to ensure their proper implementation. If the pipeline is to remain in operation on the Reservation, further projects will be required, draining additional resources and causing further damage.

In addition, as Chairwoman Arbuckle recites, the conflict engendered by Enbridge's presence on the Reservation has "led to the slow, painful tearing apart of the fabric of a community …. The three years of additional trespass that the Court has already allowed for Enbridge have been three long years for our community." Decl. of Chairwoman Elizabeth Arbuckle ("Arbuckle Decl.") ¶ 27. The time has come for these harms to end.

Fourth, and finally, the public interest militates against suspension of the injunction. There is a strong public interest in the vindication of tribal treaty and self-governance rights, especially where those rights have been honored in the breach for years. Enbridge counters, as it did in 2023, that economic catastrophe will result from the shutdown of the pipeline. The Band and its experts, Enbridge claims, predicted that significant infrastructure spending would occur in the face of a shutdown order. That has not occurred, so according to Enbridge the trespass must continue.

The narrative does not hold up. The Band and its experts have consistently demonstrated that the vast majority of the crude oil and natural gas liquids conveyed by Line 5 can be replaced, at very little additional cost and in a matter of months, through the use of existing infrastructure. Enbridge attempts to obscure this reality by making wildly exaggerated claims about the harms that will accompany a shutdown on schedule. But those claims do not withstand even the slightest scrutiny and are frequently defeated by the analysis of Enbridge's own experts.

And even if Enbridge were right that more significant infrastructure investments are necessary, it would ironically be making a powerful case for this Court to adhere to the shutdown deadline. Extension of the date will only mean that the market will not be incentivized to adjust to a world without trespass, ensuring that the trespass will continue indefinitely. Only if they take

a deadline seriously will Enbridge and its refinery customers pursue the avenues readily available to them to replace Line 5 product.

Accordingly, while this Court cannot and should not reach the four-factor stay test because of jurisdictional concerns, doing so should still lead to the rejection of Enbridge's Motion.

## ARGUMENT

I.   **Enbridge Asks This Court To Act Far in Excess of the Limits It Has Recognized on Its Own Authority While an Appeal Is Pending.**

A.   **Federal Rule of Civil Procedure 62(d) Governs Enbridge's Motion for a Stay and Forecloses Enbridge's Requested Relief.**

In support of its Motion for a Stay, Enbridge cites several rules that do not apply, while never citing Federal Rule of Civil Procedure 62(d), which does.[1] Enbridge's Motion cites Rule 62(b) as a basis for relief. Mot. (Dkt. 707) at 1; Enbridge Br. (Dkt. 708) at 5. But that rule applies only to stays of monetary judgments, not injunctive relief. Nearly thirty years ago, Judge Easterbrook explained that where "'an order to do, rather than an order to pay,'" is at issue, "the rationale as well as the text of Rule 62[(b)[2]] is inapplicable." *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 502 (7th Cir. 1998) (quoting *Donovan v. Fall River Foundry Co.*, 696 F.2d 524, 526 (7th Cir. 1982)); *see also ABS Glob., Inc. v. Inguran, LLC*, 14-cv-503, 17-cv-446, 2022 WL 2390186, at *9 (W.D. Wis. July 1, 2022) (Conley, J.) (stating that Rule 62(b) governs a "stay [of] a monetary judgment") (quotation marks omitted).

---

[1] *See also* Canada Amicus Br. (Dkt. 736) at 10 (concurring in Enbridge's statement of legal standards); *cf.* U.S. Statement of Interest (Dkt. 738) (citing no procedural basis for stay).
[2] Discussing then-Rule 62(d), now Rule 62(b) following the 2018 reorganization of the Rules.

4

Federal Rule of Civil Procedure 62(c)(1), *see* Enbridge Br. (Dkt. 708) at 5, is also irrelevant, as it provides only that a "final judgment in an action for an injunction" is not automatically stayed.

It is instead Rule 62(d) that governs. The rule is titled plainly: "Injunction Pending an Appeal." Its provisions govern the power of the district court to "suspend, modify, restore, or grant an injunction" "[w]hile an appeal is pending from a[] … final judgment that grants … an injunction[.]" Fed. R. Civ. P. 62(d). And as this Court held in *United States v. Spectrum Brands, Inc.*, 15-cv-371, 2018 WL 502736 (W.D. Wis. Jan. 19, 2018) (Conley, J.), Rule 62(d) motions implicate important jurisdictional considerations—considerations which receive no attention in Enbridge's briefing, but which foreclose the relief it seeks here.

 "[T]here is a general rule that the filing of a notice of appeal divests the district court of jurisdiction over the matters appealed." *Ced's Inc. v. U.S. EPA*, 745 F.2d 1092, 1095 (7th Cir. 1984). Consequently, in considering a motion for a stay pending appeal in *Spectrum Brands*, this Court was "very cognizant of the limitations on its authority," 2018 WL 502736, at *2, and recognized that district courts do not have free rein to alter their injunctions once an appeal has been taken. "[I]t would seem, at minimum, that any injunctive action taken … pursuant to Rule 62[(d)[3] 'must be designed to aid the appeal and, accordingly, may not materially alter the status of the case on appeal.'" *Id.* at *1 (brackets in original) (citation omitted) (quoting Allan Ides, *The Authority of a Federal District Court To Proceed After a Notice of Appeal Has Been Filed*, 143 F.R.D. 307, 322 (1992)); *see also S & S Sales Corp v. Marvin Lumber & Cedar Co.*, 457 F. Supp. 2d 903, 906 (E.D. Wis. 2006) (same, and quoted by this Court in *Spectrum Brands*, 2018 WL 502736, at *1); *Nat. Res. Defense Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir.

---

[3] Discussing then-Rule 62(c), now Rule 62(d) following the 2018 reorganization of the Rules.

2001) (same); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007 (6th Cir. 2003) ("The distinction … is between actions that merely aid the appellate process and actions that alter the case on appeal." (quoting Ides, 143 F.R.D. at 323))*.*

The paradigmatic case for Rule 62(d) relief, in which a stay of an injunction truly can "aid the appeal," is where a stay is needed to allow the Circuit Court the chance to weigh in before an injunction takes effect. *See, e.g.*, *United States v. Osage Wind, LLC*, Court No. 4:14-cv-00704, 2025 WL 678039, at *8 (N.D. Okla. Mar. 3, 2025) (staying injunction specifically to ensure that "the appellate court has an opportunity to consider the case" before injunction goes into effect); *Holloway v. City of Virginia Beach*, No. 2:18-CV-69, 2021 WL 3037410, at *2 (E.D. Va. July 19, 2021) (stating that with a 62(d) motion "[t]he moving party effectively asks the court to delay the implementation of its decision until the court of appeals has had an opportunity to consider the validity of that ruling"); *NextEra Energy Cap. Holdings, Inc. v. Walker*, No. 1:19-CV-626-LY, 2020 WL 13866485, at *1 (W.D. Tex. Mar. 13, 2020) (substantially same); *see also Nken v. Holder*, 556 U.S. 418, 421 (2009) ("A stay… hold[s] a ruling in abeyance to allow an appellate court the time necessary to review it."). Here, by contrast, the appeal was briefed and the Seventh Circuit heard oral argument more than two years ago. The Circuit Court is fully aware of the upcoming shutdown date; indeed, last month Enbridge filed a letter with the Circuit reminding it of the date and informing it of each of the purportedly changed circumstances addressed in its Motion for a Stay. *See* Enbridge Rule 28(j) Letter, *Bad River Band v. Enbridge Energy Co.*, Nos. 23-2309, 23-2467 (7th Cir. Jan. 13, 2026). The Circuit is fully capable of ensuring that the June 16 shutdown date does not take effect if that is what it decides the law or equity requires.

Enbridge's motion would have this Court blow through the limits it has identified on its own authority once a matter is pending in front of the Circuit. There can be no question that its requested relief would "materially alter the status of the case on appeal," *Spectrum Brands*, 2018 WL 502736, at *1 (citation omitted). Rather than determining the propriety of the June 16 shutdown date, the Circuit would instead be forced to consider the propriety of this Court's action suspending that date. Enbridge is in effect using this Court as a means of collaterally attacking the Seventh Circuit for not having (yet) relieved it of the obligations of a shutdown order that the Circuit has under active advisement. But this Court has properly recognized that it does not sit in judgment of the Circuit. Granting a stay in this case would not "aid the appeal," *id.*, but do just the opposite—it would interfere with an appellate process that is well underway. As such, it would far exceed the "limitations on [this Court's] authority," *id.* at *2, and on this basis alone Enbridge's motion should be denied.

### B.    This Court Lacks the Authority To Grant a Stay Pending Certiorari.

Enbridge's stay motion is foreclosed for a second, independent reason. Enbridge tells this Court that it "should stay the part of its injunction requiring Enbridge to cease operation of Line 5 on June 16, 202[6]. *The stay should continue through the Seventh Circuit's issuance of the Rule 41 mandate and any certiorari review by either party*." Enbridge Br. (Dkt. 708) at 26 (emphasis added). Enbridge cites no rule or precedent empowering the Court to issue a stay extending beyond a decision of the Circuit, and none exists. The law is instead clear that this Court cannot do what Enbridge asks.

In moving for a stay through certiorari, Enbridge effectively asks this Court to proclaim that it will "refrain from any action on the Court of Appeal's [yet-to-be issued] Mandate [if the Circuit affirms the injunction] while waiting to see if the Supreme Court grants [a] yet-to-be-

filed petition and overturns the Seventh Circuit's decision," *Snowden v. Henning*, Case No. 19-cv-01322, 2024 WL 128735, at *2 (S.D. Ill. Jan. 11, 2024). The motion would require the Court "to determine whether four Justices would vote to grant certiorari, to balance the so-called stay equities, and to give some consideration as to predicting the final outcome of the case in th[e Supreme] Court," *Deaver v. United States*, 483 U.S. 1301, 1302 (1987) (quotation marks and citation omitted). Enbridge would thus obligate this Court to weigh the likelihood that its injunction will be left intact by the Supreme Court if affirmed by the Court of Appeals, and to do so without knowing the bases of the Circuit's ruling. A district court plainly "is not in a proper position to perform these analyses …. It is not an appropriate function for this Court to pass on the likelihood that the ruling of a higher court will be accepted for review by the Supreme Court." *Mister v. Ill. Cent. Gulf R.R. Co.*, 680 F. Supp. 297, 299 (S.D. Ill. 1988) (quoting *Studiengesellschaft Kohle, mbH v. Novamont Corp.*, 578 F. Supp. 78, 80 (S.D.N.Y. 1983)) (both cited approvingly by *A.F. Moore*, 974 F.3d at 841).

And indeed, Enbridge's stay request is foreclosed not only precedent but by statute:

> [i]n any case in which the final judgment or decree of any court is subject to review by the Supreme Court on writ of certiorari, the execution and enforcement of such judgment or decree may be stayed for a reasonable time to enable the party aggrieved to obtain a writ of certiorari from the Supreme Court. The stay may be granted *by a judge of the court rendering the judgment or decree or by a justice of the Supreme Court*[.]

28 U.S.C. § 2101(f). "[B]y permitting only a judge of the court that rendered the reviewable judgment or a justice to stay a judgment pending certiorari, § 2101(f) precludes a district judge from doing so." *Snowden*, 2024 WL 128735, at *2 (citation omitted); *see also A.F. Moore*, 974 F.3d at 839 ("Virtually every court to have considered this question has reached the same conclusion." (quoting *Whitehead v. Frawner*, Civ. No. 17-275, 2019 WL 4016334, at *1 (D.N.M. Aug. 26, 2019))).

Enbridge's stay motion is accordingly an exercise in procedural futility. At the very most, this Court could grant a stay of its injunction up until the Seventh Circuit decision, but not beyond. And it cannot do even that, as such a stay would "materially alter the status of the case on appeal," *Spectrum Brands*, 2018 WL 502736, at *1 (citation omitted), and hence would exceed the limits this Court has recognized on its own authority. *Id.*

Enbridge is in effect suggesting that the Seventh Circuit is asleep at the wheel and will not take action, one way or another, prior to the June 16 shutdown date, such that this Court should insert itself back into the mix. But "[t]he purpose of the rule [divesting a district court of jurisdiction once an appeal has been noticed] is to keep the district court and the court of appeals out of each other's hair." *Matter of Jones*, 768 F.2d 923, 930–31 (7th Cir. 1985) (Posner, J., concurring). No basis exists for Enbridge's suggestion that the Circuit requires this Court's supervision and, as this Court has properly recognized, no authority exists for it to so act in any event.

## II.    Even If This Court Addresses Enbridge's Motion on the Merits, Enbridge Has Fallen Far Short of Making the Necessary Showing for a Stay.

Under the traditional standard for staying an injunction pending appeal, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 426 (citation omitted); *Ohio v. EPA*, 603 U.S. 279, 291 (2024) (same); *see also Doe v. Gundersen Lutheran Health Sys., Inc.*, 23-cv-694, 2024 WL 1270798, at *1 (W.D. Wis. Mar. 26, 2024) (Conley, J.) (same). The moving party bears the burden of showing that these factors justify a stay. *Nken*, 556 U.S. at 433–34. Enbridge has not met its burden under any of these prongs.

9

**A.    Enbridge's Recycled Arguments Do Not Establish a Likelihood of Success on the Merits.**

If Enbridge's merits arguments look familiar, that is because they are. Enbridge rehashes its arguments on trespass liability, the Transit Treaty, and the foreign affairs doctrine (all of which it has raised with the Circuit), while failing to call into question this Court's holding that it cannot allow for a prolonged or indefinite trespass on the Band's lands. Despite what Enbridge "appears to think, this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure," *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988). Enbridge presents nothing new that would warrant this Court's reconsideration of its prior, sound conclusions.

**1.    Enbridge Says Nothing To Undermine this Court's Conclusion that It Cannot Allow for a Prolonged or Indefinite Trespass on the Band's Lands.**

In issuing its trespass injunction, this Court

> conclude[d] that the Band is ultimately entitled to permanent injunctive relief on its trespass claim under a fair reading of the current law applicable to its sovereign rights. Plus, Enbridge has presented no legal authority supporting its position that the court could permit it to trespass indefinitely on the Band's land. Nor has Enbridge cited any legal authority suggesting that the court could effectively force a renewal of expired easements despite the Band's sovereignty, by permitting Enbridge to pay a fee or profits while continuing to operate its pipeline.

Op. and Order (Dkt. 684) at 50–51.

Enbridge proceeds as if this Court had never arrived at these conclusions—or did not really mean what it said—such that if the company and its allies can create enough sound and fury about the potential consequences of a pipeline shutdown the Court will relent, suspend its injunction, and force an indefinite easement on the Band. But just as Enbridge failed to present any legal authority establishing such a power to the Court in 2023, it adduces none now.

"Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) (quoting *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)), and hence they cannot "create a remedy in violation of law," *Pangilinan*, 486 U.S. at 883 (citation omitted). This rule of course applies in tribal cases as in any other. *United States v. Choctaw Nation*, 179 U.S. 494, 533 (1900) ("We are not at liberty to dispense with any of the conditions or requirements of the treaty … upon any notion of equity or general convenience[.]" (quoting *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 72 (1821) (Story, J.))). And the Seventh Circuit adheres firmly to the principle. *See, e.g.*, *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 782 (7th Cir. 2019) (stating that courts of equity are bound by "statutory … requirements" in fashioning remedies (quoting *Armstrong*, 575 U.S. at 327)); *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892 (7th Cir. 2014) (same); *Matter of Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) (stating that a court's "equitable powers do not allow it to override the plain command of" a statute).

In granting summary judgment to the Band and then issuing its injunction, this Court recognized that four unambiguous provisions of federal law govern the trespass issues in this case and establish the bounds of any permissible remedy. The 1854 Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854), confirms the Band's "permanent rights of occupancy and possession, including the power to exclude and to place conditions on entry, on continued presence, or on reservation conduct." Op. and Order (Dkt. 360) at 21–22 (quotation marks omitted). Moreover, "[u]nder the Nonintercourse Act, a transfer of *any rights* in tribal land to a non-Indian … entity requires the consent of both the Secretary of the Interior and the tribe itself. *See* 25 U.S.C. § 177; *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960)." *Id.* at 22 (emphasis added). "With respect to right-of-way easements across tribal lands in

particular, the Secretary of the Interior … cannot authorize a right-of-way easement across land owned or co-owned by a tribe 'without the consent of the proper tribal officials.' 25 U.S.C. § 324; *see also* 25 C.F.R. § 169.4." *Id.* And the expired easements required Enbridge to vacate the parcels "within six months of termination[.]" *Id.* at 6; Dkt. 170-15 at PDF p. 3.

Taken together, these provisions leave no doubt that the Court correctly rejected Enbridge's suggestion that it be allowed to continue its trespass on the Band's lands unless and until it completes a reroute around the Reservation. Enbridge long ago lost any right to operate its pipeline on the trespass parcels. Congress has mandated that it can only regain that right if the Secretary issues a new easement, which the Secretary (in adherence to Congress's requirement of tribal consent) has not done. And Congress has proscribed the conveyance of an interest in the Band's lands by any other means "in law or equity." 25 U.S.C. § 177. This Court accordingly could not "countenance an indefinite delay or even justify what would amount to a five-year forced easement with little realistic prospect of a reroute proceeding even then." Dkt. 684 at 51.

The Band believes that the Court was generous to Enbridge (and exceeded the bounds of its equitable authority) in allowing the company to trespass on its lands for an additional three years on top of the decade-long trespass that had already occurred by the time the Court issued its Order. And yet Enbridge is now back asking for more, citing the same considerations that this Court has already concluded could not justify an even longer trespass. As discussed below, the justifications offered by Enbridge in support of its request do not withstand scrutiny. More fundamentally, Enbridge's request only underscores the need for firm adherence to the legal principles properly recognized by this Court as foreclosing what would otherwise be a never-ending litany of rationalizations by Enbridge and other companies for remaining in perpetual trespass on Indian land.

## 2.  The United States Has Said Nothing To Increase Enbridge's Chances of Success on Trespass Liability.

This Court correctly concluded that, as a matter of federal common law, Enbridge has been in conscious trespass on the Band's lands since 2013. *See* Dkt. 360 at 11–23, 31–32. It rejected as "strained and unpersuasive" Enbridge's theory that the Band consented to renew easements that expired in 2013 by virtue of a 1992 agreement between the Band and Enbridge relating to different parcels of land. *Id.* at 14. Enbridge now tells this Court that the United States' amicus brief in the Seventh Circuit "did not dispute" Enbridge's theory of Band consent via the 1992 agreement, Enbridge Br. (Dkt. 708) at 16, seemingly suggesting that the United States agrees with the theory such that Enbridge has a greater chance of prevailing on appeal. In so suggesting, Enbridge is testing its obligations to this Court.

In its Seventh Circuit briefing, the United States declared unequivocally that "Enbridge is in trespass on the Band's lands, has been for many years, and agreed when it initially acquired the easements that expired in 2013 to remove all equipment and installations within six months of the easements' termination." Brief of the United States as Amicus Curiae Supporting Partial Reversal ("U.S. Amicus Br.") at 37, *Bad River Band v. Enbridge Energy Co.*, Nos. 23-2309, 23-2467 (7th Cir. Apr. 10, 2024) (filed in this case as Dkt. 738-1). The government further stated, again in no uncertain terms, that while "Enbridge … owes a duty to the Band and to the United States to end its trespass and resolve the issues the trespass has created," *id.* at 38, instead "Enbridge is consciously trespassing on tribal land," *id.* at 6. Rather than agreeing with Enbridge's theory of Band consent via the 1992 agreement, the United States argued that it was "unnecessary" to even address the theory because the expiration of the easements in 2013 and Enbridge's failure to obtain a new federally issued right-of-way renders the theory irrelevant. *Id.* at 17–22; *see also id.* at 22 ("The 1992 agreement cannot provide Enbridge with the legal right to

occupy the Band's lands and thus cannot defeat the Band's trespass claim."). The United States does not retreat from these positions in the Statement of Interest it has now filed with this Court, which instead focuses on the appropriate remedy for the "trespass in this case," U.S. Statement of Interest (Dkt. 738) at 8.

Nor is it correct for Enbridge to claim that "the Band's unlawful withholding of consent" is the only thing "preventing the BIA from granting" Enbridge a right-of-way, Enbridge Br. (Dkt. 708) at 17. The United States strongly disagrees with this assertion, having explained to the Circuit that BIA review is "not just a rubber stamp," that Enbridge had never even attempted to argue how the "alleged consent" in the 1992 agreement could possibly satisfy federal requirements for Indian rights-of-way, and that Enbridge had previously *conceded* that it lacked Band consent for renewal. U.S. Amicus Br. (Dkt. 738) at 21–22. This Court and the United States agree, moreover, that there is nothing "unlawful" about the Band's decision not to consent to a new easement. "[T]he Band's decision effectively to refuse additional, 30-year easements to Enbridge … was the exercise of a sovereign power to which Enbridge was always subject[.]" Dkt. 360 at 23; U.S. Amicus Br. (Dkt. 738) at 34 ("[T]he Band's land rights, both as a property owner and a sovereign, include the right to exclude others.").

Indeed, as internal documents confirm, Enbridge has long understood that the company is plainly in trespass on the Band's lands, and further has understood that in light of the company's ongoing trespass, "a federal/tribal judge could order the pipeline shut down immediately (and to be removed within 6 months) if Bad River seeks a court remedy," Trial Ex. 369, ENB00023908–09; Dkt. 170-35 at PDF p. 21 ("We are currently operating in trespass as they spelled out in their lawsuit."); *id.* at PDF pp. 10, 14, 18 (describing Enbridge as "currently in trespass"); *id.* at PDF

p. 16 ("Our easements … are expired and the Band has the ability to hold Enbridge in trespass and likely require removal of the pipeline.").

In sum, this Court properly found in 2022 that Enbridge is in conscious trespass on the Band's lands, and nothing has changed since then to call that conclusion into question.

### 3. Neither the Transit Treaty nor the Foreign Affairs Doctrine Provides Any Basis To Stay the Injunction.

Enbridge, the United States, and Canada argue that the injunction should be stayed because its enforcement may contravene the Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, 28 U.S.T. 7449, 1977 WL 181731 (Jan. 28, 1977) ("Transit Treaty"). They further argue that a shutdown would run afoul of the foreign affairs doctrine, based on litigation filings from the United States and Canada stating that a shutdown is inconsistent with the foreign policy objectives embedded in the Transit Treaty. Enbridge Br. (Dkt. 708) at 17–21; U.S. Statement of Interest (Dkt. 738) at 8–9, 11–12; Canada Amicus Br. (Dkt. 736) at 2–6, 10–15.

These arguments ignore what this Court has already held: the Transit Treaty does not abrogate the 1854 Treaty with the Chippewa, which predates the Transit Treaty by well over a century and guarantees the Band's right to exclude others from its Reservation. And if the Transit Treaty does not abrogate the Band's treaty rights, litigation filings based on the common law foreign affairs doctrine certainly do not either.

The 1854 Treaty reserved for the Band a "permanent home" from which it "'shall not be required to remove,'" *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 559–60 (7th Cir. 2022) (quoting 10 Stat. 1109, art. 11 (Sept. 30, 1854)), and thereby guaranteed the Band's "power to exclude" others from its lands, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982). This treaty power is "a hallmark of Indian sovereignty,"

15

*id.* at 141, that "Congress alone may diminish," *Lac Courte Oreilles*, 46 F.4th at 571; *see also id.* at 557, 558 (stating that the authority to "lessen," "diminish," "modify or even abrogate" tribal sovereign rights belongs "*only* [to] Congress"). Congress "must clearly express its intent to do so," which requires "clear evidence that Congress actually considered the conflict between its intended action … and Indian treaty rights … and chose to resolve that conflict by abrogating the [Indian] treaty." *Herrera v. Wyoming*, 587 U.S. 329, 344–45 (2019) (citations omitted).[4]

This Court properly concluded that the Transit Treaty does not remotely meet this standard. "There is no such abrogation language in the 1977 Transit Treaty, as the Transit Treaty does not mention Indian treaties or treaty rights at all, let alone the 1854 Treaty[.]" Dkt. 360 at 43. This is fatal to Enbridge's argument, as courts may not accomplish indirectly through equity what the law prevents them from accomplishing directly. *See Matter of Greenig*, 152 F.3d 631, 635 (7th Cir. 1998) (stating that a court "cannot use its equitable power to circumvent the law" (citation omitted)); *see also Choctaw Nation*, 179 U.S. at 533 (stating that courts "are not at liberty to dispense with any of the conditions or requirements of [a] treaty … upon any notion of equity or general convenience").

Enbridge offers no change in facts or law that would undermine this Court's holding. It can only grasp at straws. Literally as an aside, it states: "Anyways, the Band specifically agreed that Enbridge may operate Line 5 through 2043 over its tribal lands as provided in the 1992 Agreement." Enbridge Br. (Dkt. 708) at 21. This Court, of course, long ago dispensed with this

---

[4] Enbridge's argument that "nothing in [the Band's] treaty forecloses application of generally applicable federal laws regulating interstate and international commerce," Enbridge Br. (Dkt. 708) at 20, betrays a fundamental misunderstanding of the law. That is not the test for overriding rights specified in tribal treaties—rather, the Supreme Court, the Seventh Circuit, and this Court have consistently held that what is required is a "clear" expression of congressional "intent" to abrogate the rights, *Herrera*, 587 U.S. at 344 (citations omitted).

argument based on a thorough analysis of the relevant agreements. Dkt. 360 at 9–18. The half-hearted recycling of contentions this Court has already rebuffed hardly provides a basis for the extraordinary remedy of a stay.

Enbridge's foreign affairs doctrine argument, in turn, is based entirely on the Transit Treaty and fails for the same reason: given that the Transit Treaty contains no indication of congressional abrogation, litigation filings from the United States and Canada about foreign policy goals grounded in that Treaty do not abrogate the Band's treaty rights either. Only Congress can accomplish that end.

Nor does the decision in *Enbridge Energy, Ltd. Partnership v. Whitmer*, Case No. 1:20-cv-1141, 2025 WL 3707609 (W.D. Mich. Dec. 17, 2025)), help Enbridge. The company claims that the decision "undermined" this Court's "findings and underlying assumptions" in granting the injunction. Enbridge Br. (Dkt. 708) at 2–3. But that case did not involve the Band, or any tribe, as a party and hence had no occasion to consider the issue of tribal treaty abrogation. Canada itself recognizes that "the Bad River Band's rights to govern its Reservation … give rise to issues not present in the Michigan case." Canada Amicus Br. (Dkt. 736) at 15 n.39.[5]

* * *

There is nothing new in Enbridge's merits arguments. Enbridge has raised these same arguments with the Circuit, which can reverse this Court's conclusions if, in its view, the law or equity require. But Enbridge has provided no basis for this Court to second-guess itself and hence has failed to satisfy the likelihood of success prong of the stay test.

---

[5] Even if the Transit Treaty does apply, it provides no basis for staying the injunction. Enbridge, the United States, and Canada recycle their old arguments about the treaty terms without ever countering the infirmities in those arguments previously identified by the Band. *See* Band Reply Br. in Supp. of Mot. for Partial Summ. J. and for Summ. J. on Defs.' Countercls. (Dkt. 256) at 76–78; Band's Resp. Br. in Opp'n to Defs.' Mot. for Partial Summ. J. (Dkt. 282) at 15–16.

**B.    Enbridge Will Not Suffer Cognizable Irreparable Injury from the Denial of a Stay.**

Enbridge argues that it will be irreparably harmed by the denial of a stay because requiring it to shut down Line 5 will cause it to lose revenue and goodwill. *See* Enbridge Br. (Dkt. 708) at 11–13. But Enbridge has consciously trespassed on the Band's land for thirteen years, *see supra* pp.13–15, and the injunction will simply require it, at long last, to stop. A defendant cannot be said to have suffered a cognizable injury by bringing its actions into compliance with the law. As then-Judge Gorsuch explained in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000 (10th Cir. 2015), where an injunction would simply foreclose defendants from doing "something they have no legal entitlement to do in the first place …. the defendants' claims to injury should an injunction issue shrink to all but the vanishing point." *Id.* at 1007 (quotation marks omitted); *see also, e.g.*, *S.C. Johnson & Son, Inc. v. Minigrip, LLC*, 16-cv-244-jdp, 2017 WL 8727853, at *4 (W.D. Wis. Oct. 16, 2017) (stating that if a party knowingly "engages in unlawful conduct … [it] does so at its own risk and cannot … be heard to complain that it will be severely injured by an injunction") (quotation marks omitted) (second ellipsis in original); *Light v. Zhangyali*, No. 15 CV 5918, 2016 WL 4429758, at *4 (N.D. Ill. Aug. 22, 2016) ("There is no harm to the defendant to being enjoined from violating the law[.]").

Indeed, the Seventh Circuit has held that "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful," *Sierra Club v. Frankling Cnty. Power of Ill., LLC*, 546 F.3d 918, 935 (7th Cir. 2008) (brackets in original) (citation omitted), and while this Court did choose to weigh the equities, it long ago concluded that "the balance of hardship between the parties weighs heavily in the Band's favor since Enbridge's conduct was willful," Dkt. 360 at 40. Enbridge advances nothing

to alter this conclusion, and its references to customer goodwill show the extent to which it is grasping at straws. Enbridge's customers have had almost three years to know and adjust to the fact that Enbridge is under a court order to bring itself into compliance with the law. To the extent that Enbridge has engendered "goodwill" with them by trespassing on the Band's lands, Enbridge Br. (Dkt. 708) at 11, the loss of those warm feelings is hardly cognizable under the law and cannot override the Band's interests, well recognized by this Court, in having its legal rights vindicated.

Enbridge contends that "[a]t least one court has recognized that shutting down a pipeline causes irreparable harm to the pipeline operator." *Id.* at 12 (citing *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 570 (D. Minn. 1987)). But that case concerned a preliminary injunction to shut down a lawfully operating pipeline, 651 F. Supp. at 570 (finding the company "likely to prevail" on the merits), not a motion to stay an injunction against a long-time willful trespasser with no lawful right to profit from its trespass in the first place.

Enbridge also relies on *Osage Wind*, Enbridge Br. (Dkt. 708) at 12–13, but that case cuts strongly against it. In *Osage Wind*, the stay was necessary to give the appellate court the chance to hear the case before the injunction took effect. The district court ordered the windfarm to be removed within just one year, 2024 WL 5158188, at *1 (N.D. Okla. Dec. 18, 2024) (ordering "ejectment of the wind towers by December 1, 2025"), and the company promptly moved for a stay pending appeal, *see* Defendants' Motion to Stay Judgment Pending Appeal and Brief in Support (N.D. Okla. Jan. 10, 2025), 2025 WL 1581229 ("*Osage Wind* Stay Mot."). The district court granted the motion specifically because "[i]f the stay is not granted, [the company] would be required to complete the costly and potentially irreversible process of deconstructing the wind farm *before the appellate court has an opportunity to consider the case*." 2025 WL 678039, at *8

(emphasis added). Here, by contrast, the Seventh Circuit has already heard the case and has had it under advisement for two years. If it believes Enbridge is entitled to relief, it is well-positioned to issue a stay or to modify the injunction itself, and the judicially efficient and appropriate course of action is for this Court to leave it to the Circuit to decide whether it wants to do so. *See supra* pp. 4–7.

> **C.**    **Issuance of a Stay Will Cause Substantial Injury to the Band.**

> **1.**    **The Band Will Suffer Significant Harm from a Stay of the Shutdown Order.**

Enbridge claims the Band will incur no harm if the shutdown date is suspended. *See* Enbridge Br. (Dkt. 708) at 13, 26. But this Court has already held, consistent with well-settled law, that Enbridge's ongoing interference with the Band's property rights is causing the Band irreparable harm:

> [A]n injunction is necessary to prevent irreparable harm, and … remedies available at law, such as monetary damages, would be inadequate compensation. Indeed, "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989).

Dkt. 360 at 40 (second brackets in original). The Court has further recognized that the harm is all the greater here given the interference with the Band's ability to exercise sovereign control over its lands:

> [T]he harm of a continuing trespass would dispossess the Band of its sovereign right to control its own land. *See Merrion*, 455 U.S. at 141 ("power to exclude non-Indians from Indian lands" is "a hallmark of Indian sovereignty"). For the same reason, interference with the Band's sovereignty cannot be adequately remedied with monetary damages.

*Id.*

Rather than acknowledging the harm being visited on the Band by its ongoing trespass— and this Court's recognition of the same—Enbridge argues that no harm exists because the

nuisance at the meander has temporarily abated. Enbridge Br. (Dkt. 708) at 13–15. But the nuisance Enbridge has created is distinct from the trespass it has perpetrated, and the three-year deadline was intended to remedy the latter. *Compare* Dkt. 684 at 50 (describing shutdown deadline as "Injunctive relief for trespass"), *with id.* at 34 (describing modifications to emergency purge and shutdown protocol as "injunctive relief … to abate th[e] nuisance"). The mitigation of risks at the meander no more renders Enbridge's trespass harmless than would be the case were a trespasser on Enbridge property to cease setting off dangerous pyrotechnics at night. If anything, the nuisance-mitigation efforts cited by Enbridge evidence the extraordinary lengths the Band has needed to go to protect its members—and the public—from the consequences of Enbridge's ongoing trespass.

The check valve. A check valve has been installed to reduce the volume of petroleum product that would be released on the Reservation in the event of a pipeline rupture. Enbridge Br. (Dkt. 708) at 15, 26. As Enbridge concedes, the valve was installed at the request of the Band. Enbridge Br. (Dkt. 708) at 15; *see also* Decl. of Tom Schwartz (Dkt. 723) ¶¶ 18–19 ("The Band considered the check valve project to be necessary for the Tribe's welfare and to protect the Reservation.").

What Enbridge does not note are the Band's strenuous efforts to make the check valve a reality in the face of Enbridge's concerted resistance. At trial, Enbridge raised the absence of a valve on the Reservation as evidencing the purported insincerity of the Band's concerns for environmental integrity. Trial Test. of Naomi Tillison (Dkt. 600) at 119:22–121:18. But once trial was over, Enbridge refused the Band's request to install a check valve prior to the 2023 flood season. Decl. of Naomi Tillison ("Tillison Decl.") ¶ 6. Enbridge submitted an application to install the valve only months later, after repeated requests from the Band. *Id.* ¶¶ 7–8. And even

after the Band granted the necessary permits, Enbridge failed to install the project for over a year. *Id.* ¶¶ 12–18. Only with the support of retained engineering and pipeline operations consultants facilitating the design, sourcing, installation, and location of the check valve was the project finally installed in September 2024. *Id.* ¶¶ 18–19. The success of the project (as a result of which the maximum amount of crude oil and NGLs that can now be released from Line 5 into the Bad River and Lake Superior has been cut by roughly two-thirds, *id.* ¶ 24) is a testament to the thousands of hours of time invested by the Band's Mashkiiziibii Natural Resources Department (MNRD), *id.* ¶¶ 19–20, and the thousands more by its engineering consultants, Decl. of Christopher Olson and Noah Greenberg on Behalf of Wright Water Engineers, Inc. ("WWE Decl.") ¶ 6–9.

The valve project has had significant impacts in addition to the drain on governmental resources. The project "impaired the ability of tribal members to hunt and gather on a significant swath of their Reservation homeland," Arbuckle Decl. ¶ 19; *see also* Tillison Decl. ¶ 23, and caused serious environmental impairments to wetlands and streams that are still being remedied, WWE Decl. ¶ 9; Tillison Decl. ¶¶ 21–23 & Figs. 1–7 (photos), while others will never be cured, Tillison Decl. ¶ 21. Enbridge of course acknowledges none of this. But these were real harms visited on the Band, occasioned by the need to reduce the risk of environmental catastrophe while Enbridge remains in trespass. Arbuckle Decl. ¶¶ 11–14; Tillison Decl. ¶ 24; *see also* WWE Decl. ¶¶ 7–9. Further operation of the pipeline on the Reservation will undoubtedly entail further projects, and the time for the Band to bear those burdens has long since come to an end.

The log jacks. Even with the check valve in place, a rupture at the meander can release up to 325,500 gallons of oil. Tillison Decl. ¶ 24. With the pipeline less than eleven feet from the Bad River, and with a court-decreed shutdown protocol that, in the Band's opinion, still leaves too

much to chance, WWE Decl. ¶ 5; Arbuckle Decl. ¶ 11, the Band has to live with that risk every single day. As the Court knows, there was considerable discussion at trial and at the subsequent emergency hearing about projects that might slow the erosion at the meander, and the Court made very clear its view that the Band should allow such a project to go forward regardless of localized environmental impacts.

After extensive research and analysis, the Band's expert consultants, Wright Water Engineers (WWE), developed the concept of installing log jacks in the river as a means of slowing erosion while avoiding the substantial environmental harm threatened by Enbridge's previously proposed projects. WWE Decl. ¶¶ 13–21; Arbuckle Decl. ¶¶ 11–12. Band leadership presented the log jack concept to Enbridge and urged it to cooperate with WWE and MNRD "to ensure the project's effectiveness, to evaluate and minimize water quality impacts, and to facilitate review under the relevant environmental laws." Arbuckle Decl., Ex. 1 (July 5, 2024 Letter from Chairman Blanchard to Enbridge at 3).

Given the continued operation of the pipeline, the Band had little choice but to suffer significant burdens and environmental harms to make the project happen. Arbuckle Decl. ¶ 14 ("Approving this project was a painful decision. While the log jacks offer important protection against Enbridge's pipeline, they also amount to an accommodation of a company that has knowingly been trespassing on our land for more than a decade."); *see also* WWE Decl. ¶ 14. Roughly forty acres of mature forest in the Bad River watershed were clear cut to supply the timber for the existing log jacks. Tillison Decl. ¶ 29. An additional eight acres of forest and other habitat were chopped to the ground to make way for project staging and helicopter landing areas, access routes, and workspaces, *id.* ¶ 32 & Figs. 10–11, and a new road was cut across Band fee land for the sole purpose of facilitating the project, *id.* ¶ 37. The project predictably resulted in

the pollution of numerous Reservation watercourses, the introduction of invasive species, loss of habitat, and other significant environmental harms. *Id.* ¶ 44.

The entire project lasted eighteen months, with twenty weeks of on-reservation work and over three weeks of work in the Bad River itself. *Id.* ¶¶ 42–43. A major reservation road along the flight path had to be closed for a full week while a heavy-lift helicopter lifted, transported, and unloaded the multi-ton log jacks over the course of nearly 500 flights from the staging area to the meander nearly a mile away. *Id.* ¶ 41. Existing Reservation roads were severely damaged by the trucks transporting more than 1,000 loads of log jacks and heavy equipment for the project. *Id.* ¶ 36. And there now sits in the Bad River a human-made assemblage of nearly 2,000 logs and over two hundred boulders bound together with countless chains and bolts, extending more than 300 feet along the banks and obstructing the natural migration of the river. Arbuckle Decl. ¶¶ 12–16 (describing in detail the burdens imposed by the project, including the significance to the Band of obstructing the natural course of the river); Tillison Decl. ¶ 41 (details of project); WWE Decl. ¶¶ 42–46 & Figs. 1–2 (photos of project); *id.* ¶¶ 41–53 & Figs. 3–5 (describing and depicting altered migration of Bad River).

As with the check valve project, the Band and WWE each spent thousands of hours developing and refining the log jack project in conjunction with Enbridge, Tillison Decl. ¶ 46; WWE Decl. ¶¶ 15–20, 24–25, all of which is time taken away from other natural resource priorities of the Band, Tillison Decl. ¶ 47.

The log jack installation went in last March, WWE Decl. ¶ 34, and appears to be working as designed, *id.*; Decl. of Andrew ("Andy") Duncan ¶ 14. But it has yet to be tested by heavier flows, WWE Decl. ¶¶ 34–40, and consistent with the project's anticipated removal following a June 2026 shutdown, it is designed to withstand only a ten-year flow event, *id.* ¶¶ 34, 38, 40.

Flows exceeding that level will have less than a twenty-percent chance of occurring before June 16, 2026, but a considerably higher chance with each additional year, *id.* ¶ 30. If the pipeline were to remain in operation, more log jacks will need to be added, *see, e.g.*, Decl. of Scott Storlid ¶¶ 17–18; WWE Decl. ¶ 61, meaning substantial additional impacts on Reservation resources and on the Band, Tillison Decl. ¶ 45. This was decidedly not the Band's expectation when it agreed to the project. Arbuckle Decl. ¶ 12 ("We were promised by Enbridge that the log jacks would never be a permanent or even a long term fixture on our land."). The Band understood there to be a commitment to remove the log jacks by September of this year. Arbuckle Decl. ¶ 14 ("The permits require—in explicit conditions that Enbridge agreed to—that the log jacks would be removed by the end of September 2026."); *see also* WWE Decl. ¶ 28 (stating that during design and engineering, "the possibility that the log jacks would remain in place beyond 2026 was never proposed by Enbridge"). Enbridge's papers make clear that it is instead treating that commitment with the same lack of seriousness that it did the original easement expiration date.

And there is more. To ensure the physical integrity of the project, it was necessary to extend the log jacks and their anchoring onto the Band-owned parcel immediately upstream of the meander. WWE Decl. ¶ 27. The Band then granted Enbridge the necessary property rights via a new easement and right of way, the terms of which are tied to the June 2026 shutdown and September 2026 log jack removal date. Arbuckle Decl. ¶¶ 14–18. If the injunction is stayed, that will mean not only the continuation of a forced easement across the trespass parcels, but also a forced easement at the Band's meander parcel, all in service of keeping the pipeline in operation.

And there is even more. During the design of the project, the engineers for both Enbridge and the Band anticipated that the hard bank surface introduced by the log jacks could deflect river forces towards the opposite bank. WWE Decl. ¶ 33. Given enough time, this could cause

changes to the river that would direct the force of the river towards the pipeline at a nearby steep

location that Enbridge calls Slope 6, which has long been of concern because of the possibility

that a landslide could lead to pipeline rupture. *Id.* ¶¶ 54–56. Almost immediately upon

installation of the log jacks, Enbridge and the Band began to document erosion developing at that

location on the opposite bank. *Id.* ¶¶ 47–48. The parties have spent considerable efforts

surveying and mapping that erosion, *id.*, which is progressing more rapidly than anticipated, *id.*

¶¶ 32–33. A stay would mean that the log jacks will continue to ricochet the river's forces

towards the opposite bank, with unknown risks for the pipeline at Slope 6 and elsewhere. *Id.*

¶¶ 51–56. The longer the log jacks remain in place, the greater those risks become. *Id.* ¶¶ 53–56.

While Enbridge claims that the Band is suffering no harm from its continued presence on

the Reservation, the declarations from Chairwoman Arbuckle and MNRD Director Tillison tell a

very different story. Perpetuating Enbridge's trespass will prolong and exacerbate very real

burdens, risks, and harms that the Band has endured for years. Taking its cues from this Court,

the Band has gone to extraordinary lengths to protect the Bad River and Lake Superior from the

pipeline during its continued operation—all while continuing to suffer ongoing dispossession

and interference with its sovereignty from the ongoing trespass. No warrant exists for imposing

the new round of additional burdens on the Band and its members that will be occasioned by any

further delay in putting an end to Enbridge's trespass.

### 2. The Band's Valid, Constitutionally Protected Objections to the Reroute Do Not Weigh in Favor of a Stay.

Enbridge suggests that "[h]ad it not been for the Band's objections in the permitting

process, Enbridge would have likely completed the project by June 16, 2026." Enbridge Br. (Dkt.

708) at 15. The Band's opposition (the story goes) is inequitable because the Band has

simultaneously "caused significant delays in Enbridge's Relocation Project" while "insist[ing]

that it wants Line 5 off the Reservation," *id.* Ultimately, in Enbridge's eyes, it is the Band that is responsible for the company's noncompliance with the Court's injunction, as Band-caused delays "have prevented Enbridge from complying with the June 2026 shutdown date." *Id.* at 22.

There are several glaring problems with this narrative. First, this Court has been clear that the Band is doing nothing wrong in exercising its protected First Amendment rights to oppose a reroute that poses significant threats to Reservation resources. At trial, the Court reproved Enbridge's attorneys for suggesting that such opposition should factor into its analysis:

> I've made so clear that is not relevant to my considerations, and we're not going to go further down the road. The Band has a right to oppose whatever they oppose under the First Amendment, and I'm not going to factor that into my decision making.… I've said it a number of times during this trial.

Trial Tr. (Closing Arguments) (Dkt. 611) at 26:1–7.

Second, and relatedly, the Court anticipated the Band's continued opposition efforts. When it enjoined Enbridge to leave the Reservation within three years, it was fully aware of the Band's steadfast opposition to a reroute within the watershed and the possibility that such opposition could delay or even frustrate entirely Enbridge's reroute plan. In its final order, the Court recapped the extent of the resistance by the Band and others to the reroute:

> [T]he Band, affected landowners along the reroute, various governmental bodies, and numerous environmental groups oppose it. The Band and others point out that the rerouted pipeline would remain within the Bad River watershed, damage numerous wetlands and cross several bodies of water protected by the Clean Water Act. Thus, in response to Enbridge's permit applications, the Band, several other tribes, the Great Lakes Indian Fish & Wildlife Commission, National Park Service and the Environmental Protection Agency have raised formal concerns with the reroute's impact on wetlands and waterbodies, aquatic resources, water quality, tribal resources and climate change.

Dkt. 684 at 22 (citation omitted). In issuing its injunction, moreover, the Court recognized the possibility that opposition could delay or defeat the reroute, explaining its "hope[]" that three years would give enough time "even for Enbridge to complete a proposed reroute of Line 5,

which Enbridge represents would likely take 5 years," while mindful of the reality that "[f]rankly, absent extraordinary efforts by Enbridge and intervention by federal officials, even this appears to be optimistic given the organized opposition to it, including by the Band." *Id.* at 51. This statement echoed the Court's earlier findings:

> [N]one of the environmental permitting is in place to begin construction, which will likely take a few years to obtain from state and federal officials under a best-case scenario and could be denied entirely under a worst case given environmental and political opposition, including, as is its right, by the Bad River Band itself.

Op. and Order (Dkt. 612) at 8 n.5.

Finally, as the Court also anticipated, the Band has been joined in its opposition to the reroute by other groups, including the Sierra Club, 350 Wisconsin, and the League of Women Voters of Wisconsin (all represented by Midwest Environmental Advocates) and Clean Wisconsin. Those groups participated vigorously in the proceedings before the Wisconsin Department of Natural Resources (WDNR) in an effort to convince it not to issue permits for the reroute, and then brought sixteen objections to WDNR's approvals of the project in a petition for an administrative hearing that WDNR granted.[6] In the multi-week hearings that took place this past fall, those groups presented substantial evidence in opposition to the reroute, including putting on multiple expert and lay witnesses. The groups would oppose the reroute even if the Band had not, and the timetable (and uncertainty) of the reroute (including the certain prospect of further litigation in state court) would be no different. And they have grounded their opposition in legitimate concerns about the reroute, just as has the Band.

---

[6] *See* Petition for Contested Case Hearing (WDNR Dec. 12, 2024), https://midwestadvocates.org/wp-content/uploads/2024-12-12-Line-5-Petition-CCH-Final.pdf.

In sum, the Band's opposition to the reroute has been neither wrongful nor unexpected, nor has it altered the timetable for resolution of the challenges to the reroute. While Enbridge routinely seeks to sully the Band in its effort to tip the equitable scales, this particular instance of finger-pointing deserves no more heed than any of the others.

### D.   The Public Interest Weighs Against a Stay of the Injunction.

Enbridge argues strenuously that the public interest weighs in favor of a stay. In doing so, it ignores entirely the public interest in vindicating the Band's treaty rights and right of self-government. It relies instead on a severe underestimation of the ability of the markets to respond to a shutdown of Line 5, and a gross mischaracterization of the position taken by the Band's experts in that regard. Those experts testified that the vast majority of Line 5 deliveries can be replicated through the use of existing infrastructure, which remains true today as it was then.

### 1.   Protecting Tribal Sovereignty and Treaty Rights Serves the Public Interest.

As Enbridge nowhere acknowledges, there exists a strong public interest in protecting the Band's treaty rights, sovereignty, and power of self-government against their ongoing violation by Enbridge. *See, e.g.*, *Stifel v. Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 13-cv-372, 2014 WL 12489707, at *25 (W.D. Wis. May 16, 2014) (Conley, J.) ("Certainly, the public interest favors encouraging tribal sovereignty and self-government[.]"); *United States v. Michigan*, 534 F. Supp. 668, 669 (W.D. Mich. 1982) (granting injunction and referring to "the protection of … treaty rights to the fullest extent possible" as an "overwhelming public interest"); *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1516 (W.D. Wash. 1988) ("[T]he enforcement of rights that are reserved by treaty to the Tribes is an important public interest, and it is vital that the courts honor those rights.").

This is never truer than where Congress has expressly considered the balance of considerations and weighed in clearly on the side of tribal sovereignty. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (requiring deference to "the judgment of Congress, deliberately expressed in legislation" (citation omitted)); *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d at 901 ("When Congress passes a statute, it weighs the competing public interests that would be served."). The Non-Intercourse Act expressly forbids the conveyances of Indian land absent tribal consent. *See* 25 U.S.C. § 177. While Congress has since modified federal law to allow lands owned by *individual* Indians to be condemned for public benefit, 25 U.S.C. § 357, it has kept *tribal* lands (including allotted lands in which a tribe has regained an interest) "beyond the reach of condemnation," regardless of economic benefit, *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101, 1104, 1111–1112 (10th Cir. 2017). This reflects Congress's judgment that concerns about economic efficiency and output must yield to a tribe's sovereign land rights—a judgment that is due substantial, if not dispositive, weight.[7]

By contrast, the public interest self-evidently is not "enhanced by permitting defendants to continue to violate federal law[.]" *Boles v. Earl*, 601 F. Supp. 737, 748 (W.D. Wis. 1985). To the contrary, it is promoted "by preventing conduct Congress declared illegal[.]" *CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*, No. 99 C 7249, 2000 WL 715601, at *7 (N.D. Ill. June 2, 2000); *see also, e.g.*, *Denbra IP Holdings, LLC v. Thornton*, 521 F. Supp. 3d 677, 690 (E.D. Tex. 2021) ("The public interest is always served by requiring compliance with Congressional statutes[.]"

---

[7] Enbridge cites one case for the notion that "district courts retain equitable authority to decline to issue an injunction." Enbridge Br. (Dkt. 708) at 21 (citing *United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 614 (9th Cir. 1998)). But that case arose under the Federal Power Act, which expressly allows FERC to authorize the use of tribal lands for hydroelectric power projects *without tribal consent*. *See Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 787 & n.30 (1984).

(citation omitted)); *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 640 (N.D. Ill. 2016) ("[T]he public interest is advanced by enforcing faithful compliance with the laws of the United States and …. upholding property interests[.]"). Almost three years ago, this Court firmly declared that Enbridge could not be allowed to violate federal law by staying in trespass on the Band's lands for another half decade. Enbridge appears to view that holding as a discretionary whim, rather than a reflection of the strong public interest in putting an end to illegal occupancy of tribal lands.

But the Court was hardly an outlier in holding that the law needs to be followed. Indeed, vindication of the public interest in ensuring compliance with tribal property rights typically leads to an *immediate* injunction against further trespass by conveyors of energy. For example, when Tesoro continued operating a crude-oil pipeline through the Fort Berthold Indian Reservation after its easements on allotted parcels expired, the United States ordered it to stop, and the company complied. *See* Defendants' Answer and Counterclaim at 27, *Tesoro High Plains Pipeline Co. v. United States*, No. 1:21-cv-90, (D.N.D. Nov. 8, 2023) (suing for removal of now-idle pipeline and stating that the company complied with a 2020 shutdown order). Elsewhere, after a federal court found that BNSF Railway consciously trespassed for almost a decade by sending more oil (by rail) across the Swinomish Reservation than permitted by BNSF's easement, the company ceased the trespass before the court even addressed injunctive relief. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, Cause No. C15-0543RSL, 2022 WL 3597439, at *6 (W.D. Wash. Aug. 23, 2022). BNSF was then required to disgorge $395 million for its past trespass, because the one mile of trespass across the reservation had been essential to nearly all the profit generated by BNSF's 1,500-mile rail route delivering crude oil from field to

refinery. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 2024 WL 3027911 (W.D. Wash. June 17, 2024).

### 2. The Market Will Readily Adjust to the Shutdown.

Enbridge argues that economic considerations justify a stay of the shutdown, insisting that new information reveals that the market has not sufficiently prepared for one. Enbridge Br. (Dkt. 708) at 4, 6–10. As Enbridge tells it, the Band and its experts wrongly predicted that the market would make massive investments in new rail infrastructure by now, and the Court premised its shutdown deadline on such a prediction. *See* Enbridge Br. (Dkt. 708) at 1 ("Despite the Band's predictions, no one has invested the hundreds of millions … to build transportation alternatives to replace Line 5's products in the markets."); *id.* at 4 ("[T]he testimony of the Band's experts that the market would adjust to a Court ordered Line 5 closure has been proven wrong."); *id.* at 6 ("Contrary to the Band's representations to this Court that new modes of transportation would be created within two years, *no* new modes of transport for Line 5's essential energy products have emerged that would make up for a Line 5 shutdown."); *id.* at 22 (arguing that purported evidence that "market players have not adjusted to a possible closure of Line 5" undermines a "key premise of the Court's injunction").[8]

This is a complete strawman of an argument. The Band's actual position has always been that there *already exists* infrastructure to offset nearly all the crude oil delivered by Line 5 to refineries, *see infra* pp. 34–40,[9] and that minimal if any investment in rail infrastructure will be

---

[8] *See also* Decl. of William Rennicke and David Hunt ("Rennicke Decl.") (Dkt. 729) (reviewing satellite images showing that major rail infrastructure has not been built in certain locations where one of the Band's expert witnesses opined it could be built).

[9] *See also, e.g.*, Trial Tr. (Closing Arguments) (Dkt. 605) at 16:16–22 ("Mr. Earnest and our experts are all in basic agreement that even though Line 5 transports approximately 440,000 barrels of crude oil a day, that the net shortfall that one would end up with in fairly short order after a shutdown, with proper notice to the market, would be far more in the vein of 70- to

needed to offset the propane and butane produced from Line 5 NGLs, *see infra* p. 40–44.[10] To be sure, one of the Band's experts, Graham Brisben, did identify numerous possible locations to build new crude-by-rail infrastructure.[11] But, as discussed below, he identified these locations as options (only one of which would even conceivably have to be built) if the refineries wished to offset *every last drop* of Line 5 crude oil—a step that the Band has always maintained, and the evidence shows, is unnecessary for protecting the refineries' business operations and consumers. *See infra* pp. 34–40. And despite Enbridge's best wishes, the *Court* surely did not premise its three-year deadline on an expectation that the market would build a large new crude-by-rail facility.[12]

---

[10] 80,000 barrels a day, that there are some simple market adjustments that lead to that number."); Rebuttal Report of Sarah Emerson ("Emerson Rebuttal Report") (Dkt. 435) at PDF pp. 17–24 (discussing options to replace crude oil using existing infrastructure); Rebuttal Report of Graham Brisben ("Brisben Report") (Dkt. 440) at PDF p. 65 (summarizing existing crude-oil delivery infrastructure discussed in report).

[10] *See also, e.g.*, Test. of Graham Brisben ("Brisben Test.") (Dkt. 611) at 86:20–87:14 (explaining that replacing all propane produced by the Superior and Rapid River fractionators would only require increasing rail volumes by eight rail cars per day and that there already exists "rail-receipt capability at most of the major storage caverns" in Sarnia); *id.* at 88:17–21 ("THE COURT: So of the natural gas that's needed of roughly 80,000 barrels, your testimony is how much of that could almost immediately be obtained and sent by rail? THE WITNESS: I think all of it could be immediately obtained and sent by rail."); Brisben Report (Dkt. 440) at PDF p. 67 (summarizing existing delivery infrastructure for propane, butane, and mixed NGLs discussed in report); Trial Tr. (Closing Arguments) (Dkt. 605) at 28:18–29:3 ("[Enbridge's expert] Mr. Earnest testified that for the building of permanent infrastructure—and this is if we are talking about the building of a single unit train facility [to replace NGL deliveries], and I think the testimony is that wouldn't necessarily—*that wouldn't be necessary. There are other ways to do it*—but if one's talking about [new] permanent infrastructure, he put a three-year time line on that. *That's the outside time line for propane infrastructure because using some of these other solutions would take less time. They're already in place, unloading facilities like the caverns we heard about yesterday*." (emphasis added)).

[11] *E.g.*, Brisben Report (Dkt. 440) at PDF pp. 38–40 (identifying possible crude-by-rail locations in Sarnia).

[12] Trial Tr. (Closing Arguments) (Dkt. 605) at 18:18–19:6 ("THE COURT: There is a question as to when there would be sufficient motivation to build out those facilities and whether it would be before or after a stop deadline, particularly given all the uncertainties as to whether or not that is ultimately going to be required. Even if this court says it is, there's still the question of appeals.

As for Enbridge's purportedly new evidence, it blatantly overstates the impacts of a Line 5 shutdown to an extraordinary degree. *See infra* pp. 44–48. Now as much as ever, the actual evidence shows that the market will—by deploying *existing* infrastructure—readily offset nearly all the product delivered by Line 5, with virtually no impact on consumers.

> **a.    Refineries Can Replace Nearly All Their Line 5 Deliveries Without Large-Scale Infrastructure Investment and with Negligible Impact on Gasoline Prices.**

Ten refineries receive between 400,000 and 450,000 barrels per day (bpd) of crude oil from Line 5 (which amounts to about a third of their total feedstock).[13] The trial evidence established that existing alternative modes of transportation can promptly offset all but about 80,000 bpd of that oil based on three adjustments, none of which requires significant investment or more than a few months to deploy. First, as Mr. Earnest testified, Line 78 presently operates at about 100,000 bpd below capacity, and if Line 5 were to shut down, the excess capacity would be utilized almost immediately to convey oil to the same refineries already receiving oil from one or both pipelines.[14] Second, the two Quebec refineries, which receive about 200,000 bpd of

---

There are the questions of other legal bodies stepping in and changing the deadline. Even under the rosiest of scenarios, and I appreciate your acknowledging that I can't assume the rosiest of scenarios, there's going to be a disruption whenever that deadline occurs, whether—and maybe this cuts both ways for you—whether I impose i[t] immediately or I impose it three years from now. I don't have the same confidence of an easy transition.").

[13] Expert Report of Sarah Emerson ("Emerson Report") (Dkt. 265-1) at PDF pp. 15, 17.

[14] Trial Test. of Neil Earnest ("Earnest Test.") (Dkt. 610) at 99:11–20. This Court previously expressed concern that a "bottleneck" will prevent Line 78 from being filled. Dkt. 684 at 24, 26. But Enbridge's own policy ensures that this would not happen. Enbridge has a binding, government-approved "apportionment" policy, *see* Trial Ex. 294 at 9–10, that governs when the upstream pipelines that feed both Line 78 and other Enbridge pipelines (which transport oil south to the Gulf) are full. The policy determines how much oil each downstream pipeline receives. And according to Mr. Earnest (including in his most recent declaration), filling Line 78 will take priority under the policy if Line 5 is shut down, such that Line 78 will operate at capacity. *See* Earnest Test. (Dkt. 610) at 96:6–21, 99:11–20; Decl. of Neil Earnest ("Earnest Decl.") (Dkt. 728) Ex. 2 (Dkt. 728-2) at PDF p. 6 (apportionment analysis showing full use of Line 78 (570,000 bpd)). To be sure, one Enbridge lay witness suggested at trial that a bottleneck could prevent

crude oil from Enbridge,[15] can go back to doing exactly what they did prior to 2016 and what one of them still does in significant part—which is to obtain their deliveries from alternative sources, primarily waterborne tankers on the St. Lawrence Seaway.[16] Indeed, the refineries themselves have touted their ability to promptly re-employ these delivery systems if Line 5 shuts down.[17] Third, several of the refineries served by Line 5 also have rail terminals that can be reactivated quickly and are capable of unloading modest amounts of crude oil.[18] Once the refineries make full use of existing infrastructure, then, even under Mr. Earnest's calculations, the shortfall from a Line 5 shutdown would be less than 80,000 bpd—just seven percent of the ten refineries' total feedstock.[19] As this Court observed during closing argument, "I do think that

Line 78 from being filled, but then he expressly deferred to Mr. Earnest on the issue. *See* Trial Test. of Marlon Samuel (Dkt. 610) at 85:21–25 ("Q. Do you have any reason to doubt Mr. Earnest's calculations as to the amount of oil available to Line 78 and downstream pipelines in the event of a Line 5 shutdown? A. No, I trust Mr. Earnest. He's our expert.").

[15] Emerson Report (Dkt. 265-1) at PDF pp. 20, 38; Earnest Decl. (Dkt. 728) Ex. 2 (Dkt. 728-2) at PDF p. 5.

[16] Emerson Report (Dkt. 265-1) at PDF p. 38. It is important to debunk two strawmen that Enbridge and its allies consistently set forth in this regard. This option will not involve oil tankers on the Great Lakes, period. And it will not require a reversal of Line 9. In its 2023 opinion, the Court thought that the second of these points might be the case, Dkt. 684 at 23–24, but it is not. A reversal of Line 9 would only be necessary to transport waterborne oil to the Ontario refineries, which is simply one of many options that would be possible for offsetting the small amount of oil deliveries that could *not* be promptly offset using existing infrastructure.

[17] Emerson Report (Dkt. 265-1) at PDF pp. 38–39 (quoting Valero spokeswoman saying regarding Line 5 contingency plans that "[w]e have access to a deepwater port, allowing us to be supplied by ships," and quoting a Suncor spokeswoman saying that they likewise "have contingency plans in place.").

[18] *See* Emerson Rebuttal Report (Dkt. 435) at PDF pp. 19–20 & fig. 2 (identifying 159,500 bpd in unused offloading capacity in rail terminals at refineries served by Line 5); Expert Report of Neil Earnest ("Earnest Report") (Dkt. 495) at pp. 54, 113–14 (identifying crude-by-rail unloading facilities at certain refineries); Earnest Test. (Dkt. 610) at 99:21–100:3 (same); Decl. of Graham Brisben (filed contemporaneously with this memorandum of law) ("Brisben Decl."), Ex. 1, *Likely Market Responses to a Shutdown of Line 5* ("PLG Report") at 52–54 (same).

[19] *See* Earnest Test. (Dkt. 610) at 103:3–8 (agreeing that "[i]f the Quebec refineries were, in fact, to go back to waterborne sources of crude oil, then the shortfall in the Line 5 delivery area would be reduced to 79,000 barrels a day"); Emerson Report (Dkt. 265-1) at PDF p. 17 (the ten refineries have a combined throughput of more than 1.1 million bpd). To be sure, Mr. Earnest has

[the Band] did an effective job of laying out why, at least with respect to crude oil, there are alternatives to get the product to an appropriate refinery."[20]

New information since the trial only further confirms that the refineries can offset nearly all the Line 5 crude-oil deliveries without significant infrastructure investments or lead time. Since the trial, PLG Consulting—an energy-industry consulting firm led by Graham Brisben, who testified for the Band at trial—has conducted the most thorough analysis to date of the likely market response to a Line 5 shutdown. It has concluded that existing infrastructure would offset all but just *53,000* bpd of Line 5 crude oil—or less than five percent of the ten refineries' total

---

disputed that the market would make full use of existing infrastructure; his most recent declaration predicts that refineries would experience a reduction in crude runs of 155,700 bpd, not 79,000, if Line 5 shut down. *See* Earnest Decl. (Dkt. 728) Ex. 2 (Dkt. 728-2) at PDF p. 6. Mr. Earnest's view is that although it is commercially *viable* for the Quebec refineries to revert to non-Enbridge sources of oil, *see* Earnest Test. (Dkt. 610) at 101:18–24, they would instead continue to take a significant amount of Enbridge oil under Enbridge's apportionment policy, leaving less of the remaining Enbridge oil for other refineries with fewer available alternatives, *see* Earnest Report (Dkt. 495) at PDF pp. 63–66. But that opinion is incorrect for multiple reasons, with perhaps the most important being that even if Enbridge's apportionment policy *did* prevent the market from efficiently allocating Enbridge crude oil to Ontario instead of Quebec, the Canadian government would have the authority to fix the situation. *See* Trial Ex. 294 at 9 (Enbridge's government-approved apportionment policy, granting Canada Energy Regulator power to override the policy by allocating supply to "priority destinations.").

[20] Trial Tr. (Closing Arguments) (Dkt. 605) at 19:20–22; *see also id.* at 40:17–18 ("[T]here is reason to think that the markets could adjust with respect to crude oil"). To be sure, the Court also wrote that the Band's account of market adjustments is "rosy" and even "wildly optimistic," Dkt. 684 at 23–24, but, respectfully, the Court's stated concerns were off-base. Contrary to Dkt. 684 at 23–25, Line 78 will be filled to capacity regardless of how full the feeder lines are, *see supra* n.14; the shift to waterborne deliveries by Quebec refineries does not require a re-reversal of Line 9, *see supra* n.16; and there would be no need for new crude-by-rail or truck infrastructure in Superior (Mr. Brisben addressed the feasibility of this in his rebuttal report because Enbridge's expert had brought it up in presenting what Mr. Brisben described as a "straw man," not because Mr. Brisben claimed it would or should occur, *see* Brisben Report (Dkt. 440) at PDF p. 9).

feedstock.[21] The bar graph on the left shows the means by which the market would offset the loss of Line 5 crude oil using infrastructure that can be fully activated within three months:



Figure 1: PLG Report at 13

PLG's subsequent study is fully consistent with Mr. Brisben's trial testimony and with the representations the Band has made to this Court.

With respect to consumer impacts, it remains clear that any reduction in crude-oil deliveries to these refineries will have only the most negligible impact on the price of refined products such as gasoline. Enbridge's lead expert, Neil Earnest, testified that, given the vast network of refined gasoline pipelines serving the Line 5 delivery area, even an immediate Line 5 shutdown will, at most, cause a half-cent-per-gallon increase in gasoline prices in Michigan and

---

[21] PLG Report at 45–57, 73; Emerson Report (Dkt. 265-1) at PDF p. 17 (the ten refineries have a combined throughput of more than 1.1 million bpd).

Wisconsin and a nickel increase in Ontario[22]—changes that would be undetectable in the noise of daily price fluctuations. Mr. Earnest has never strayed from this opinion, and history bears it out. When Enbridge's Line 6B (now known as Line 78)—which served the same refineries as Line 5—ruptured and shut down for several months in 2010, there was no noticeable impact on prices.[23] As Mr. Earnest testified, "There was not, you know, sizable price impacts for refined product in the Detroit/Toledo area. And that's consistent with my analysis here regarding a Line 5 shutdown."[24]

Unable to put a dent in any of this evidence about refinery or consumer impacts, Enbridge presses its strawman, repeatedly insisting that the Band and its experts predicted the market would manage to adjust only by constructing new large crude-by-rail infrastructure by now. *See* Enbridge Br. (Dkt. 708) at 4, 6.[25] But the locations identified in Mr. Brisben's rebuttal report were presented simply as options for the refineries to replace every drop of oil, which, for all the reasons just discussed, the Band certainly never claimed is necessary for a smooth transition in which the refineries can replace nearly all their oil and consumers are essentially unaffected. Nor did the Band guarantee that the refineries would respond to a shutdown date by

---

[22] *See* Earnest Report (Dkt. 495) at PDF pp. 72–74, 79. If anything, the impact in Ontario will be less than five cents per gallon now, given investments in new transportation infrastructure for refined products. *See* Earnest Decl. (Dkt. 728) ¶ 11 (discussing opening of new refined products terminal in Ontario in 2024).

[23] Earnest Test. (Dkt. 610) at 116:3–15; *see also* PLG Report at 33.

[24] Earnest Test. (Dkt. 610) at 116:9–12. Line 5 itself has been shut down with no impact on consumer prices. In 2020, when a near-rupture caused the pipeline to shut down entirely for nineteen days, and then to run at half capacity for seventy-eight days, the price of gasoline in Michigan and Toronto actually declined during that period—both in absolute terms and relative to the national average. *See* Laina G. Stebbins, *Study: Partial Line 5 Shutdown Has Not Impacted Gas Prices, Despite Enbridge Warnings*, Mich. Advance (Aug. 10, 2020), https://michiganadvance.com/2020/08/10/study-partial-line-5-shutdown-has-not-impacted-gas-prices-despite-enbridge-warnings/.

[25] *See also* Rennicke Decl. (Dkt. 729) ¶¶ 17–26.

constructing such a facility; indeed, the Band argued that the incentive for them to do so would be strongest if the Court ordered an earlier shutdown.[26] And while the refineries likely *would* construct such infrastructure in the event of a Line 5 shutdown even of relatively short duration,[27] the modest impact of a Line 5 shutdown on refinery feedstock given existing options for replacing Line 5 crude oil makes it unsurprising that they have not done so pending a Seventh Circuit decision.

Moreover, Enbridge has deliberately chosen *not* to fully inoculate its customers against the effects of a Line 5 shutdown. In addition to the 100,000 bpd of unused capacity that is already available on Line 78, Enbridge could have further increased Line 78's capacity by 110,000 bpd simply by adding pumping capacity (without laying new pipe)[28]—which would have allowed the refineries to replace *all* Line 5 oil in the event of a Line 5 shutdown. Enbridge does not deny this in its most recent submission to this Court. Instead, Trent Tetzlaff, an Enbridge Vice President, states that "Enbridge has no current plans at this time to expand Line 78,"[29] and Enbridge has not even commenced the process of seeking a permit from the Michigan Public Service Commission for the expansion. Mr. Tetzlaff acknowledges that Enbridge is expanding the pipelines downstream of Superior, Wisconsin—which feed Line 78 and the Enbridge pipelines that transport oil south to the Gulf—by more than 150,000 bpd, but then he declares that this expanded capacity "will not provide service to the same market as Line 5" (i.e.,

---

[26] Trial Tr. (Closing Arguments) (Dkt. 605) at 22:9–10 ("[T]he incentive for the market to act [to build a crude-by-rail unloading facility] will be all the greater if that shutdown timing is closer in time.").

[27] *See* PLG Report at 57–67; Brisben Test. (Dkt. 603) at 70:23–71:12 (explaining that crude-by-rail terminals can pay for themselves within two to three years).

[28] Brisben Report (Dkt. 440) at PDF pp. 61–62; PLG Report at 74–75; Trial Ex. 421 (Defs.' Objs. and Resps. to Pls.' Fourth Set of Interrogs.) at 5 (describing actions needed to expand Line 78).

[29] Declaration of Trent Tetzlaff ("Tetzlaff Decl.") (Dkt. 724) ¶ 11.

will not be used to fill existing or expanded capacity on Line 78).[30] But that is by choice, and it illustrates what is at issue here. Enbridge cares not one whit about the public interest. It cares about maximizing its profitability. And that is fine—it is a corporation, after all. But Enbridge cannot then cloak itself in the mantle of the public interest to justify extending its thirteen-year trespass on the Band's lands for any longer, and it actions belie its arguments for doing so. Faced with a Court-imposed shutdown date for Line 5, Enbridge has chosen to increase its deliveries to the Gulf instead of expanding Line 78's capacity and ensuring that its existing customers can obtain the same amount of oil upon a Line 5 shutdown. Now, it seeks to benefit from that choice by arguing that even a modest reduction in refinery feedstock—including one it could have averted entirely by adding pumping capacity to Line 78—is sufficient reason not to shut down Line 5. Equity cannot reward such conduct. *See Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232–233 (1959) (explaining that "the maxim that no man may take advantage of his own wrong" is "[d]eeply rooted in our jurisprudence" and "has been applied in many diverse classes of cases by both law and equity courts").

> **b.    Large-Scale Infrastructure Investments Are Likewise Not Necessary To Replace Line 5-Derived Propane.**

Enbridge is also wrong to say that the Band's experts opined that large-scale infrastructure investment would be needed to allow the propane market to smoothly transition away from Line 5. As the Band maintained at trial and remains true today, the markets served by Line 5 already obtain propane from rail delivery and other pipelines,[31] and the market can

---

[30] *Id.* ¶¶ 9, 12.

[31] *See, e.g.*, Brisben Report (Dkt. 440) at PDF pp. 26–27 (describing rail-served propane storage facilities in the Sarnia, Ontario area); *id.* at PDF pp. 50–51 (describing Ambassador Pipeline in Michigan); *id.* at PDF pp. 57–59 (describing recent investment in propane-by-rail facility in Kincheloe, Michigan, and Duluth, Minnesota (outside of Superior, Wisconsin), as well as rail-

respond to a Line 5 shutdown by transporting more propane by those alternatives with minimal

new investment.[32] As the State of Michigan's elected policymakers—who have a great deal to

lose should their analysis prove wrong—concluded after conducting multiple thorough studies,

the "markets will ably adjust to a court-ordered shutdown of Line 5[.]" Brief of Amici Curiae

State of Michigan and Attorney General Dana Nessel in Support of Bad River Band at 6–9, *Bad*

*River Band v. Enbridge Energy Co.*, Nos. 23-2309, 23-2467 (7th Cir. Oct. 18, 2023).

In the areas currently served by the Superior and Rapid River fractionators (northern

Wisconsin and Michigan's Upper Peninsula), both the market and the State of Michigan have

already invested in expanding alternatives to Line 5, including propane-by-rail infrastructure.[33]

Enbridge and its declarants seek to minimize the impact of those investments. Mr. Earnest

argues, without further explanation, that Michigan's $8 million in public expenditures will "only

modestly enhance Michigan propane supply security."[34] But, as Mr. Earnest acknowledged at

trial, a single $5 million rail terminal can offload more than the entire supply of propane

consumed in the Upper Peninsula.[35] And even if recent investments in rail are not sufficient to

fully offset the propane produced at the Rapid River and Superior fractionators (which together

---

served propane storage facilities in the Sarnia, Ontario area); Earnest Report (Dkt. 495) at PDF p. 34 (map showing propane-by-rail terminals in Wisconsin and Michigan).

[32] *See generally* PLG Report at 78–103; *see also* Brisben Test. (Dkt. 611) at 86:20–87:14, 88:17–21 (explaining that replacing all propane produced by the Superior and Rapid River fractionators would only require increasing rail volumes by eight rail cars per day and that in Sarnia there already exists "rail-receipt capability at most of the major storage caverns," such that all of the propane and butane currently derived from Line 5 NGLs could be replaced by increased rail deliveries and utilization of the Ambassador Pipeline).

[33] *See* PLG Report at 82–83; Earnest Decl. (Dkt. 728) ¶¶ 6–9.

[34] Earnest Decl. (Dkt. 728) ¶ 7.

[35] *See* Earnest Test. (Dkt. 610) at 122:23–123:1 (acknowledging that a $5 million rail facility can enable receipt of enough propane to supply 35,000 homes); Trial Ex. 265 (Dep't of Env't, Great Lakes, & Energy, *Upper Peninsula Energy Task Force Committee Recommendations: Part I – Propane Supply* (2020)) at PDF p. 6 (stating that 23,000 households in the Upper Peninsula use propane).

employ sixteen individuals[36]), Mr. Earnest further acknowledged at trial that it would take less than six months to set up portable transloaders to offload additional propane by rail car.[37] Only four to six mobile transloaders (which even if purchased outright rather than leased cost less than $1 million each[38]) would likely be needed to enable delivery of a volume equal to the entire amount produced by the two fractionators,[39] thus avoiding any need for long-distance trucking of propane to northern Wisconsin and the Upper Peninsula.

The area served by the third fractionator in Sarnia (primarily Ontario and Michigan's Lower Peninsula) will likewise adjust without significant disruption. Enbridge's declarants concede that the Sarnia fractionator will continue to produce propane (albeit less than with deliveries of NGLs from Line 5),[40] and rail deliveries of purity propane can be used to fill the gap.[41] The greater Sarnia area has over twenty-three million barrels of storage capacity for propane, and all of it is already connected to rail delivery infrastructure (as rail is the most common means by which propane is transported between Canada and the United States).[42] To be

---

[36] Expert Report of Corbett Grainger (Dkt. 493) at PDF pp. 14–15 & n.24.

[37] Earnest Test. (Dkt. 610) at 110:8–12.

[38] Trial Test. of William Rennicke (Dkt. 604) at 95:11–24.

[39] *See* Trial Test. of Jill Steiner (Dkt. 603) at 95:6–19 (testifying that it takes approximately four hours for a portable transloader to unload a rail car); *id.* at 99:10–14 (testifying that the Rapid River area would need to receive three to four rail cars per day to make up for propane lost from the Rapid River fractionator); *id.* at 98:3–7 (testifying that there would need to be 2,100 bpd of propane delivered to the Rapid River area and 3,700 bpd delivered to the Superior area to make up for the loss of fractionator output).

[40] Decl. of Bonnie Yu (Dkt. 711) ¶ 6 ("[A] shutdown will reduce the natural gas liquids supply moved by pipeline into the Sarnia fractionation facility[.]").

[41] *See generally* PLG Report at 90–99; *see also* Brisben Test. (Dkt. 611) at 86:14–87:14, 88:17–21 (explaining that that there already exists "rail-receipt capability at most of the major storage caverns" in Sarnia, such that all of the propane and butane currently derived from Line 5 NGLs could immediately be replaced by rail deliveries). Ethane, which is delivered directly by pipeline to Sarnia, can also substitute for propane in various industrial and petrochemical uses. *See* Expert Rebuttal Report of Jill Steiner ("Steiner Report") (Dkt. 439) at PDF p. 49.

[42] *See* Brisben Report (Dkt. 440) at PDF pp. 21–22, 26, 51–52, 58; *see also* PLG Report at 89–91; Earnest Test. (Dkt. 610) at 107:22–108:1.

sure, Enbridge's expert witness William Rennicke insists that the market will not make use of this existing propane-by-rail infrastructure because the reroute could happen and railcar lessors are unwilling to lease the requisite number of rail cars for any less than three-year terms.[43] But the market is not nearly so sclerotic. As PLG Consulting explains in its recent analysis, propane-by-rail activity in the area currently served by the Sarnia fractionator would "not involve unknown shippers having to cold-call for railcars."[44] Rather, there are thousands of unused pressurized railcars on the market, and numerous existing market participants possess fleets of many thousands of railcars that can be deployed to the Sarnia area within a few months.[45] No indication exists that with the certainty of an approaching deadline, the market will not spring into action. Indeed, the owner of the Sarnia (and Rapid River and Superior) fractionator attests in its investor reports that it "sells propane in various North American markets, often where the only option for delivery is via railcar or truck."[46]

The switch from pipeline deliveries to rail deliveries will have a minimal impact on propane consumers. This is confirmed by experiences in Wisconsin and Michigan. Wisconsin relies far more heavily on rail for its propane deliveries than Michigan, and Michigan relies more heavily on Line 5—yet Wisconsin has consistently had lower propane prices for more than a decade.[47] Hence, Enbridge's experts never opined that switching from pipeline deliveries to rail deliveries would cause an increase in the consumer price of propane, but instead argued that such

---

[43] Rennicke Decl. (Dkt. 729) ¶¶ 4(a), 32–33.
[44] PLG Report at 99.
[45] *Id.* at 98–99; *see also* Brisben Report (Dkt. 440) at PDF p. 37.
[46] Keyera, 2025 Second Quarter Report 26 (Aug. 7, 2025), https://www.keyera.com/assets/Attachments/Q2-2025-Report-Final.pdf.
[47] *See* Steiner Report (Dkt. 439) at PDF p. 42 (comparing prices in Wisconsin and Michigan); Earnest Report (Dkt. 495) at PDF p. 34 (showing propane-by-rail terminals in Wisconsin and Michigan).

a transition would not occur and that it would therefore be necessary to rely on costly long-distance trucking to deliver propane.[48] Yet even Mr. Earnest's prediction—more than an eight-cent increase per gallon of propane from using long-distance trucking in each of the affected markets[49]—would pale in comparison to the impact of other factors affecting consumer propane prices.[50] The price of a gallon of propane has ranged from $1.56 to $2.75 in Michigan and from $1.15 to $2.62 in Wisconsin during the past decade due to a multitude of market factors, and in both states the price per gallon was about thirty-three cents lower this past November than at the time of trial in November 2022.[51]

### c.    Enbridge's Narrative About the Market Has No Basis in Evidence.

Enbridge and its allies warn of dramatic economic impacts if Line 5 shuts down, but their narrative has no tether to reality. Over and over, they rely on evidence-free assertions and exaggerate the impacts of a Line 5 shutdown by orders of magnitude. But the wildness of their claims cannot obscure the lack of factual basis. Here are just a few examples:

1. <u>Impact in Toledo</u>. Citing declarations from union leaders and refinery executives, Enbridge states that "Toledo Refining Company, owned by PBF Energy, will likely cease operations if Line 5 is shut down more than a few weeks," and that such a shutdown will cause "the loss of $5.4 billion in annual economic output." Enbridge Br. (Dkt. 708) at 7–8 (quotation

---

[48] Earnest Report (Dkt. 495) at PDF pp. 43–44, 46–47, 104–06.

[49] *Id.* at 44.

[50] PLG Report at 102–03.

[51] U.S. Energy Info. Admin., *Weekly Michigan Propane Residential Price* (last accessed Feb. 12, 2026), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=W_EPLLPA_PRS_SMI_DPG&f=W; U.S. Energy Info. Admin., *Weekly Wisconsin Propane Residential Price* (last accessed Feb. 12, 2026), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=W_EPLLPA_PRS_SWI_DPG&f=W.

marks omitted).[52] But the cited declarations provide no evidence to support these assertions, and they are refuted by the analysis of Enbridge's own expert. Mr. Earnest predicts just a *4.5%* (17,100 bpd) decline in oil delivered to the two Toledo refineries even under his assumption that the market will not make full use of existing infrastructure, and he has admitted there would be *no* reduction for these refineries if existing infrastructure is fully utilized.[53] This bears underscoring: while Enbridge and its declarants make apocalyptic representations to the Court about refinery shutdowns in Toledo, Enbridge's own expert is far more measured, and his testimony hardly provides cause for perpetuating Enbridge's trespass on tribal lands.

2. Impact on refined product prices. Several of Enbridge's declarants insist without evidence that a Line 5 shutdown would cause dramatic increases in the price of refined petroleum products, such as one who says "[t]here will be significant upward pressure on refined product prices for the region including Michigan."[54] But again, Enbridge's own expert, who has actually analyzed the issue, predicts an increase of half a cent per gallon in the price of refined products in Michigan. *See supra* pp. 37–38.

3. Impact on airports. Enbridge also asserts—based on an amicus brief and evidence-free declarations—that Line 5 is "critical for suppling jet fuel to certain airports" and that it supplies "between 90% to 100%" of the jet fuels used at Toronto's main airport, suggesting there will be a

---

[52] Citing Decl. of Justin Donley (Dkt. 716) ¶¶ 7–8, 9–10 and Decl. of Matthew Lucey ("Lucey Decl.") (Dkt. 717) ¶¶ 7–9, 12–13; *see also* Lucey Decl. (Dkt. 717) ¶ 8 (lamenting purported sixty-percent decline in Enbridge deliveries to Toledo refineries); Decl. of Brandon Bishop (Dkt. 712) ¶ 10 (estimating that 687 individuals work at the Toledo refineries who could be affected by a Line 5 shutdown); Decl. of Geoff Murray (Dkt. 714) ¶ 4 ("[I]f Line 5 is shut down for any length of time, the consequences to [the Cenovus Toledo Refinery] and affected refiners in the region would be significant.").

[53] Earnest Decl. (Dkt. 728) Ex. 2 (Dkt. 728-2) at PDF p. 6 (projecting 4.5% decline in crude runs to Toledo refineries); Earnest Test. (Dkt. 610) at 105:16–21 (admitting that full use of existing infrastructure in the Line 5 area would result in "no shortfall in the Detroit/Toledo region").

[54] Decl. of Paula O'Shaughnessy (Dkt. 720) ¶ 5(b).

jet-fuel shortage or price spike in the region if Line 5 shuts down. Enbridge Br. (Dkt. 708) at 9; *see also* Canada Amicus Br. (Dkt. 736) at 17. Yet again, this alarmism is refuted by Enbridge's own expert. Mr. Earnest's prediction of the impact on refined product prices—a half-cent per gallon in Michigan and Wisconsin and a nickel in Canada—pertains not just to gasoline but also specifically to "jet fuel."[55] That is a negligible price increase, not a threat to the region's airports, and certainly no warrant for further extending an illegal, thirteen-year trespass.

    4. <u>Dr. Grainger's Declaration</u>. Dr. Corbett Grainger reiterates his predictions of thousands of lost jobs and billions in "economic impact" from a Line 5 shutdown.[56] Even setting aside the problems with the assumptions underlying his model, it measures an utterly unrealistic scenario with no connection to reality. Instead of estimating the effect that a Line 5 shutdown would actually have on GDP and employment, Dr. Grainger's model estimates the gross impact on regional business revenue that would occur—and the ripple effect on jobs that would result—if fractionators and refineries were to shut down and large volumes of refined products were to *disappear* from the market *without there being replacement refined products, jobs, or economic activity*.[57] Such modeling might be useful in North Korea, but not in the dynamic energy market of North America. There is no other way to put it—this is junk analysis of a situation that no reasonable observer thinks will come to pass.

    The most baffling part of Enbridge's submission may be Dr. Grainger's opinion that recent funding cuts to SNAP, the Affordable Care Act, and other government programs will render any increase in fuel prices more stressful for low-income households, which are

---

[55] Earnest Report (Dkt. 495) at PDF p. 79.
[56] Decl. of Dr. Corbett Grainger ("Grainger Decl.") (Dkt. 713) ¶ 4.
[57] Trial Test. of Corbett Grainger (Dkt. 604) at 108:14–110:8, 111:3–23, 116:1–120:10.

disproportionately "rural" and "indigenous."[58] While cuts to anti-poverty programs have indeed affected Band members and others throughout the country, they surely do not provide an equitable basis to force the Band to endure a longer trespass on its sovereign land.

5. The Consumer Energy Alliance Report. Enbridge and Canada also cite a report[59] from Consumer Energy Alliance to support claims of major job loss, price spikes, and energy insecurity. Canada Amicus Br. (Dkt. 736) at 7 n.19, 9 n.27, 20 n.50; Enbridge Br. (Dkt. 708) at 8 (citing Canada's Seventh Circuit brief for statistic from same report). But that industry-financed report, which was published in 2022 before trial, is filled with false assumptions and conjecture that would never pass muster in a courtroom and hence has never been subjected to the adversarial process. As just one example: the report asserts, without any discernible methodology, that a Line 5 shutdown would cause consumer gasoline prices in the Midwest to rise between 9.47% and 11.66% (approximately thirty cents a gallon) and thus cost consumers $23.7 billion over a five-year period.[60] That is, it predicts a price increase *sixty times* as big as the prediction by the Enbridge expert who actually took the stand, *see supra* pp. 37–38.

6. The Army Corps' Draft Decision Document. Canada even argues that a United States Army Corps of Engineers draft decision document from May 2024—which contains three pages about alternatives to Line 5—amounts to "changed circumstances" justifying a stay. Canada Amicus Br. (Dkt. 736) at 17–18. But the Army Corps' discussion of Line 5 alternatives in that document contains no new information of any kind, and it states that its analysis is based on

---

[58] Grainger Decl. (Dkt. 713) ¶¶ 4(b), 17–24.
[59] Consumer Energy All., *Enbridge Line 5: Shutdown Impacts on Transportation Fuel* 3–4 (2022), https://consumerenergyalliance.org/cms/wp-content/uploads/2022/02/CEA-Line-5-Shutdown-Impacts-on-Transportation-Fuel.pdf.
[60] *Id.* at 3–4.

"information provided by the applicant [Enbridge]."[61] The Army Corps' analysis engages with irrelevant hypotheticals such as how many trucks would be needed if all of Line 5's oil and NGLs were to be shipped by truck from western Canada to the refineries.[62] Canada's assertion that this box-checking exercise in an environmental review relying solely on information provided by Enbridge amounts to "changed circumstances"—after a trial involving evidentiary standards, expert testimony, and cross-examination—shows the extent to which Canada is grasping at straws to justify a continuation of Enbridge's trespass.

*    *    *

In sum, the market is already capable of handling a Line 5 shutdown without significant economic disruption and without substantial investments in new infrastructure, and Enbridge's many declarants fail to show otherwise. To be clear, the Band does not claim that shutting down Line 5 will have absolutely no economic effects. As with any other transition in our dynamic economy, there will likely be both positive and negative impacts. But Enbridge has failed to establish, based on actual facts, that any detrimental impacts will be more than modest. And such impacts cannot, as a matter of law or equity, justify forcing the Band to endure the negation of its sovereign rights any longer than the thirteen years of willful and dangerous trespass that it has already experienced.

### 3.    The United States' Relationship with Canada Does Not Weigh in Favor of Staying the Injunction.

Enbridge also argues that a Line 5 shutdown will adversely affect diplomatic relations between the United States and Canada and potentially expose the United States to monetary

---

[61] U.S. Army Corps of Eng'rs, *Draft Decision Document* 34–36 (May 20, 2024), https://www.mvp.usace.army.mil/Portals/57/docs/regulatory/Enbridge/EnbridgeLine5/DCDD/L5 R%20Draft%20CDD%2020240520_508_final.pdf.

[62] Answer: "a total of 3,000 loaded tanker trucks and an additional 3,000 empty tanker trucks would be required[.]" *Id.* at 36.

damages in international arbitration. Enbridge Br. (Dkt. 708) at 10; *see also* Canada Amicus Br. (Dkt. 736) at 1–6, 10–15; U.S. Statement of Interest (Dkt. 738) at 3, 11–12.

Again, the Court already considered these factors and gave them substantial weight when deciding to give Enbridge three more years on the Reservation. *See, e.g.*, Dkt. 360 at 41–42 (considering "significant public policy implications on the trade relationship between the United States and Canada," and that a shutdown of the pipeline could be "subject to international arbitration" under the Transit Treaty); Dkt. 684 at 39 (citing "international relations between the United States and Canada" as a factor weighing against an injunction). There is no credible reason why those considerations should be given *more* weight now than the Court gave them three years ago.

If anything, the recent shift in federal policy reflects a judgment by the current Administration that the United States' relationship with Canada matters very little to the public interest. While the United States cites its "broader diplomatic and trade relationship with Canada" as a factor weighing in favor of a stay, U.S. Statement of Interest (Dkt. 738) at 11, it is impossible to square such rhetoric with the events of the past year, which have seen a dramatic fraying in that relationship. On the economic front, American tariffs have obliterated trade between the two countries, with economic impacts that dwarf anything that could result from a Line 5 shutdown even according to the most pessimistic predictions. *See, e.g.*, Danielle Kaeding, *Trump's Trade War Took a Toll on Shipments in the Twin Ports Last Year*, Wisconsin Public Radio (Jan. 30, 2026) (explaining that the amount of cargo moved through the Port of Duluth-Superior is "the lowest tonnage shipped through the port since 1938, according to season end figures released Friday by the Duluth Seaway Port Authority. Canadian trade dropped 41 percent across all cargoes, and overseas trade fell 30 percent to its lowest level since the St. Lawrence

Seaway opened in 1959. The amount of grain moving through the port also dropped to roughly 560,000 tons, the lowest level seen since 1890").[63] And events in recent weeks indicate that the United States is only threatening further damage to the trade relationship. *See, e.g.*, Mike Crawley, *Trump Threatens To Block Opening of New Bridge Between Windsor and Detroit*, CBC News (Feb. 9, 2026);[64] Michelle L. Price & Rob Gillies, *Trump Threatens Canada with a 100% Tarriff Over Its China Trade Deal and Escalates Feud with Carney*, AP News (Jan. 24, 2026).[65]

Of course, none of this should matter to begin with. This Court already gave substantial weight to relations with Canada when it set the June 16, 2026 shutdown deadline, and it would be folly to try to re-balance foreign policy considerations based on the submission of amicus briefs or the most recent diplomatic dustup. Such balancing can never obviate the Band's concrete rights as guaranteed by treaty and federal statute, *see supra* pp. 10–12, 15–17, 29–32, and certainly it can no more justify extending Enbridge's trespass now than it could several years ago.

## III. Relief Under Federal Rule of Civil Procedure 62.1 Would Only Ensure Delay and Chaos in this Case.

Enbridge moves in the alternative for relief under Federal Rule of Civil Procedure 62.1, pursuant to which it would have this Court indicate to the Circuit that it wishes to modify its injunction. For all the reasons discussed above, there exists no legal or factual warrant for modifying the injunction. And granting Enbridge's request would wreak judicial havoc. What Enbridge nowhere acknowledges is that the practice of the Seventh Circuit when confronted with

---

[63] https://www.wpr.org/news/trumps-trade-war-took-a-toll-on-shipments-in-the-twin-ports-last-year.

[64] https://www.cbc.ca/news/canada/trump-gordie-howe-bridge-9.7081924.

[65] https://apnews.com/article/trump-canada-carney-china-tariffs-5079e910df071b45d2b16949efb8f11a.

a Rule 62.1 indicative ruling is to dismiss the appeal and send the entire case back to the district court for resolution, requiring a new appeal by any party dissatisfied with the district court's ultimate judgment. *See, e.g.*, *Koerner v. Experian Info. Sols., Inc.*, No. 24-1549, 2025 WL 2817554, at *1 (7th Cir. July 24, 2025).[66]

If this Court were to grant Enbridge's motion for an indicative ruling, the matter would hence be remanded without guidance from the Seventh Circuit on the issues at play. Enbridge would undoubtedly benefit from the resulting delay, but if the goal is to get to a definitive judicial resolution of this matter, Enbridge's suggestion would accomplish exactly the opposite. This Court has delivered a clear judgment and a thorough opinion setting forth its reasoning for the three-year deadline. The arguments for and against that deadline are now fully briefed and argued before the Circuit, whose decision will "more finally resolve [this] issue as opposed to proceeding with a district court decision subject to appeal," *Adams v. Kijakazi*, Civil No. 7:19-88, 2022 WL 987337, at *3 (E.D. Ky. Mar. 31, 2022) (brackets in original) (quoting *Ret. Bd. of Policemen's Annuity and Benefit Fund v. Bank of N.Y. Mellon*, 297 F.R.D. 218, 221 (S.D.N.Y. 2013) ("[T]here is little indication the drafters of that rule intended it to be used … to ask a district court to issue an indicative ruling reconsidering the same question being reviewed by the court of appeals.")).

---

[66] The dismissals are issued as a matter of course through formulaic orders that do not address the merits. *See, e.g.*, *Rogers v. Mitchell*, No. 24-2307, 2024 WL 5357531, at *1 (7th Cir. Aug. 29, 2024); *Holsten v. O'Malley*, No. 24-1205, 2024 WL 3694693, at *1 (7th Cir. May 3, 2024); *Steuernagel v. O'Malley*, No. 23-2801, 2024 WL 1108647, at *1 (7th Cir. Mar. 1, 2024); *Smith v. Stevens*, No. 23-3236, 2024 WL 2264398, at *1 (7th Cir. Feb. 2, 2024); *Wilson v. Kijakazi*, No. 21-2800, 2021 WL 7909363, at *1 (7th Cir. Dec. 3, 2021) (St. Eve, J.).

## CONCLUSION

For the foregoing reasons, the Band respectfully requests that the Court deny Enbridge's

Motions For Stay and, Alternatively, Fed. R. Civ. P. 62.1 Ruling To Modify Injunction.

Dated: February 13, 2026

Erick Arnold
BAD RIVER BAND OF THE LAKE SUPERIOR
TRIBE OF CHIPPEWA INDIANS OF THE BAD
RIVER RESERVATION
72682 Maple Street
Odanah, Wisconsin 54861
attorney@badriver-nsn.gov
(715) 682-7107

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
bwallace@hooperhathaway.com
(734) 662-4426

David P. Hollander
STAFFORD ROSENBAUM, LLP
222 West Washington Avenue, Suite 900
Madison, WI 53701
dhollander@staffordlaw.com
(608) 256-0226

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
Lucy W. Braun
Christopher Miller
Joshua C. Handelsman
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
rkanji@kanjikatzen.com
(734) 769-5400

*Counsel for the Bad River Band of the Lake Superior
Tribe of Chippewa Indians and Naomi Tillison, Director
of the Mashkiiziibii Natural Resources Department of
the Bad River Band, in her official capacity*

53

**CERTIFICATE OF SERVICE**

I certify that on February 13, 2026, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji